# EXHIBIT A

Page 1

1

2              UNITED STATES DISTRICT COURT

3              EASTERN DISTRICT OF NEW YORK

4

5    AMELIA YEHOSHUA,                )

                                     )

6                   Plaintiff,       ) No. 21-cv-4055

                                     ) (FB)(SJB)

7              vs.                   )

                                     )

8    MANHATTAN AND BRONX SURFACE     )

     TRANSIT OPERATING AUTHORITY,    )

9    THE NEW YORK CITY TRANSIT       )

     AUTHORITY, and WESLII           )

10   KHAHAIFA,                       )

                                     )

11                  Defendants.      )

     ----------------------------)

12

13

14

15

16              DEPOSITION OF AMELIA YEHOSHUA

17                  New York, New York

18              Wednesday, August 9, 2023

19

20

21

22

23   Reported by:

24   KRISTIN KOCH, RPR, RMR, CRR

25   JOB NO. NY5992143

Page 2

```
 1
 2
 3
 4                  August 9, 2023
 5                  9:42 a.m.
 6
 7
 8          Deposition of AMELIA YEHOSHUA, held at
 9   the offices of Seyfarth Shaw LLP, 620 Eighth
10   Avenue, New York, New York, before Kristin
11   Koch, a Registered Professional Reporter,
12   Registered Merit Reporter, Certified Realtime
13   Reporter and Notary Public of the State of
14   New York.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S :
 3
 4
 5      NESENOFF & MILTENBERG LLP
 6      Attorneys for Plaintiff
 7         363 Seventh Avenue
 8         New York, New York 10001
 9      BY:  GABRIELLE M. VINCI, ESQ.
10
11
12      SEYFARTH SHAW LLP
13      Attorneys for Defendants
14         620 Eighth Avenue
15         New York, New York 10018
16      BY:  GENA B. USENHEIMER, ESQ.
17            DANIEL I. SMALL, ESQ.
18
19
20
21   ALSO PRESENT:
22
23   WESLII KHAHAIFA
24
25
```

Page 4

```
 1               A. Yehoshua
 2   A M E L I A   Y E H O S H U A ,
 3      called as a witness, having been duly
 4      affirmed by a Notary Public, was examined and
 5      testified as follows:
 6   EXAMINATION BY
 7   MS. USENHEIMER:
 8      Q.   Good morning.
 9      A.   Good morning.
10      Q.   My name is Gena Usenheimer.  We have
11   met before.  I am here today as the attorney for
12   the Manhattan and Bronx Surface Transit Operating
13   Authority, the New York City Transit Authority and
14   Weslii Khahaifa in the case that you filed against
15   them in federal court.  Okay.  Do you understand
16   that?
17      A.   Yes.
18      Q.   All right.  I am going to ask you today
19   questions about your case.  I may refer to the
20   Transit Authority as the Transit Authority or the
21   TA or NYCTA.  Will you understand what I am
22   referring to?
23      A.   Yes.
24      Q.   Okay.  And I may also refer to MABSTOA
25   as MABSTOA or OA and collectively perhaps refer to
```

Page 5

```
 1               A. Yehoshua
 2   them as Transit Authority.  Will you understand
 3   that?
 4      A.   If I don't, I'll let you know.
 5      Q.   Perfect.  That was my next question.
 6   Great.  And if you want to specifically articulate
 7   that you mean to assert some claim against OA and
 8   not TA, you will let me know, yes?
 9      A.   If I know.
10      Q.   If you know.  Fine.  All right.  Okay.
11   And so you understand that you were just sworn in
12   and you are under oath and you have an obligation
13   to tell the truth and the whole truth today;
14   right?
15      A.   Yes.
16      Q.   And do you agree to provide truthful
17   and complete answers to the questions that I ask
18   you?
19      A.   Yes.
20      Q.   I'm sure you know some of what I am
21   going to tell you now from your own experience
22   taking depositions, but just, you know, so it's
23   clear on the record, it's very important if you
24   don't understand something I am asking you, don't
25   answer, tell me, and I will rephrase.  Okay?
```

2 (Pages 2 - 5)

Page 6

A. Yehoshua

1
2    A.    Yes.
3    Q.    Okay.  And then another point is we
4  want you to be sure to verbalize your answers,
5  right, so no nods and shakes of your head, because
6  the court reporter can't record that.  Okay?
7    A.    Yes.
8    Q.    Something else that's very important is
9  that I might talk quickly, so if I am going too
10  quickly, just let me know and I will slow down.
11  All right?
12    A.    Yes.
13    Q.    Something else that's difficult
14  typically in a deposition is the court reporter
15  can only record one answer at a time or one person
16  speaking at a time, so I will do my best to let
17  you finish answering the questions before I ask
18  the next question, and I ask that you do your best
19  to let me finish asking the question before you
20  start talking.  Okay?
21    A.    Okay.
22    Q.    All right.  So if I ask you a question
23  and you answer it, I am going to assume that you
24  understood my question and the answer that you
25  gave me was the answer you intended to give and

Page 7

A. Yehoshua

1
2  was your best and most truthful answer.  Do you
3  understand that?
4    A.    I understand.
5    Q.    All right.  If you need a break for any
6  reason, let me know.  If there is a pending
7  question, I will ask that you answer it and then
8  you are free to take a break at any time.  Okay?
9    A.    Okay.
10    Q.    All right.  Do you have any questions?
11    A.    Not at the moment.
12    Q.    Okay.  Great.  All right.  So are you
13  taking any medication today that would affect your
14  ability to understand my questions?
15    A.    No.
16    Q.    Are you taking any medication that
17  would interfere with your ability to testify
18  truthfully?
19    A.    No.
20    Q.    Are you taking any medication that
21  would affect your ability to respond to my
22  questions to the best of your knowledge?
23    A.    No.
24    Q.    Are you under the influence of drugs or
25  alcohol today?

Page 8

A. Yehoshua

1
2    A.    No.
3    Q.    All right.  Is there any reason that
4  you can think of why you cannot give truthful
5  testimony today?
6    A.    No.
7    Q.    All right.  As we just noted, you are
8  under oath today, and do you understand what that
9  means?
10    A.    Yes.
11    Q.    All right.  And you understand that
12  means you are obligated to tell the truth?
13    A.    Yes.
14    Q.    And you understand the difference
15  between the truth and a lie; correct?
16    A.    Yes.
17    Q.    All right.  And do you always tell the
18  truth?
19    A.    Always?
20    Q.    Always, yeah.
21    A.    What I believe to be the truth, I would
22  say.
23    Q.    So you -- you always -- I'm not sure
24  what your question is.
25         Your testimony is that what you believe

Page 9

A. Yehoshua

1
2  to be the truth is what you always tell when you
3  are asked to tell the truth; is that right?
4    A.    Correct.
5    Q.    Okay.  Are there times that you can
6  recall not telling the truth, what you believe to
7  be the truth?
8    A.    No.
9    Q.    Have you ever signed a form under
10  penalty of perjury that you can recall and not
11  provided truthful answers?
12    A.    Well, if my counsel advised me to do
13  something, I do what my counsel advises me to do.
14    Q.    So is that a yes, that that has
15  happened in the past, that you have signed a form
16  under penalty of perjury and provided false
17  answers?
18    A.    No.
19    Q.    Okay.  So I am just going to ask you
20  again.  Have you ever signed a form under penalty
21  of perjury and provided false answers?
22    A.    And the answer is I would have asked my
23  attorney if there was a questionable question on a
24  form and I would fill out the form according to
25  the advice of counsel.

3 (Pages 6 - 9)

Page 10

A. Yehoshua

1
2    Q.   Okay.  And I am -- I don't want to ask
3  you to disclose any communications that you had
4  with your counsel, but what I am asking you is can
5  you recall any time in which you have signed a
6  form or a document under penalty of perjury and
7  provided a false answer, whether or not upon
8  advice of counsel?
9    A.   I have to answer that the same way I
10  did before.
11    Q.   Which is what?
12    A.   If my counsel said to fill it out a
13  certain way, I filled it out the way my counsel
14  advised me.
15    Q.   And you are an attorney as well;
16  correct?
17    A.   I am an attorney, yes.
18    Q.   All right.  And I am just taking
19  notes when I pause, so just bear with me.  All
20  right.
21        Did you do anything to prepare for your
22  deposition today?
23    A.   Met with my attorney.
24    Q.   All right.  And how many times did you
25  meet with her?

Page 11

A. Yehoshua

1
2    A.   Well, we didn't meet in person.  We met
3  virtually.  I don't know if that's what you mean
4  by met.
5    Q.   Yeah, that's fine.  Spoke with,
6  communicated with.
7    A.   Three times.
8    Q.   Okay.  And for how long did you meet
9  with your attorney on each of those occasions?
10    A.   I don't recall.
11    Q.   All right.  And was anyone else present
12  in those conversations?
13    A.   No.
14    Q.   And did you review any documents in
15  anticipation of your deposition today?
16    A.   Yes.
17    Q.   And what documents did you review?
18    A.   Whatever documents she showed me.
19    Q.   Your attorney?
20    A.   My attorney.
21    Q.   All right.  And did you bring any
22  documents with you today to the deposition?
23    A.   No.
24    Q.   Did you take any notes or prepare any
25  notes in advance of deposition?

Page 12

A. Yehoshua

1
2    A.   I don't remember.
3    Q.   All right.  And can you recall doing
4  anything else to prepare?
5    A.   No.
6    Q.   All right.  And did you meet with any
7  current or former Transit Authority employee to
8  prepare for your deposition?
9    A.   No.
10    Q.   And did you speak with any of them?
11    A.   No.
12    Q.   Or otherwise communicate?
13    A.   No.
14        MS. USENHEIMER:  Okay.  All right.
15        Okay.  I'd like to mark our first exhibit,
16        which will be Defendants' Exhibit 1.
17        (Defendants' Exhibit 1, e-mail dated
18        June 12, 2020, and attached letter dated June
19        12, 2020, Bates stamped P000410 through
20        P000414, marked for identification.)
21    Q.   Ms. Yehoshua, is it correct that you
22  received a Disciplinary Action Notice on Friday,
23  June 12, 2020?
24    A.   Yes.
25    Q.   All right.  And I'd like you to look at

Page 13

A. Yehoshua

1
2  the document that I have marked as Defendants'
3  Exhibit 1.  Is this a true and correct copy,
4  starting on page Plaintiff's 411, 412, 413 and
5  414, of that Disciplinary Action Notice?
6    A.   It looks like it.
7    Q.   Do you have any reason to believe that
8  this is not a true and correct copy of what you
9  produced in discovery in this litigation?
10    A.   Well, I think there was more
11  attached --
12    Q.   Oh, you are right.  I have not included
13  the exhibits here.  So is this a true and correct
14  copy other than the exhibits which may have been
15  attached?
16    A.   Other than the attachments --
17    Q.   Yes, other than the attachments.
18    A.   This is the e-mail, the letter, but
19  then there were other attachments.
20    Q.   Okay.  And you answered my next
21  question, which was did you receive this by
22  e-mail.  All right.
23        And so this covering e-mail on page
24  410, is that a true and correct copy of the
25  covering e-mail that you received?

4 (Pages 10 - 13)

Page 14

A. Yehoshua

1
2     A.   The e-mail?  I don't remember the word
3  "final" on it, so I would have to look at my
4  e-mails, because this one -- I don't remember this
5  word "final" on it.
6     Q.   Where do you see the word "final"?
7     A.   Where it says "attachments."
8     Q.   Yeah.  So this document is a
9  document you produced.  It's Plaintiff's 410, you
10  see at the bottom right-hand corner.
11     A.   Okay.
12     Q.   Do you have any reason to believe that
13  this is not a true and correct copy of a document
14  that you produced in this litigation?
15     A.   No.  I just didn't remember the word.
16     Q.   All right.  Okay.  So this -- you
17  received this on Friday, June 12th, at 1:24 in the
18  afternoon; is that right?
19     A.   According to the document, that's the
20  time.  I don't remember it off the top of my head,
21  but that's what it says.
22     Q.   And do you have any claims in this case
23  about the date or time on which you received this
24  document?
25     A.   No.

Page 15

A. Yehoshua

1
2     Q.   All right.  Who sent you a copy of this
3  Disciplinary Action Notice?
4     A.   Khahaifa.
5     Q.   And when you say "Khahaifa," who is
6  that?
7     A.   The woman that's in this room.
8     Q.   And was she your supervisor while you
9  worked at Transit?
10     A.   Not the entire time.  I had three
11  supervisors while I was there.
12     Q.   At what dates was she your supervisor?
13     A.   Officially or unofficially?
14     Q.   Why don't you tell me officially and
15  then you can tell me unofficially.
16     A.   Unofficially I would say she started
17  after Danielle Ruttman retired.
18     Q.   Do you remember when that was?
19     A.   And that was never put in writing, so I
20  don't remember, but I do remember the official
21  date, because that was in writing from the
22  time-keeping department, I think, some department
23  in Transit.
24     Q.   And when was that?
25     A.   That was -- the year was 2018.

Page 16

A. Yehoshua

1
2     Q.   Okay.  And you have no recollection of
3  when Daniel Ruttman retired?
4     A.   Probably sometime in 2016.
5     Q.   Could it have been earlier than that,
6  could it have been 2014?
7     A.   No, not 2014, definitely not.
8     Q.   What about 2015?
9     A.   2015?  I got an e-mail from her in 2015
10  in December, so I don't think it was 2015.
11     Q.   You got an e-mail from Danielle
12  Ruttman?
13     A.   Yeah.  It was a general e-mail to the
14  whole office about floating holidays.  That's what
15  I remember.
16     Q.   So you recall sometime in 2016 that
17  Weslii Khahaifa became your unofficial supervisor;
18  is that right?
19     A.   That's correct.
20     Q.   Okay.  And then at some point later in
21  time, you testified you think in or around 2018,
22  she was officially your supervisor; correct?
23     A.   Well, according to a document I
24  received by e-mail from time-keeping.
25     Q.   Do you have any reason to believe that

Page 17

A. Yehoshua

1
2  that e-mail from time-keeping was inaccurate in
3  any way?
4     A.   No.
5     Q.   Okay.  And did there come a time when
6  Weslii was no longer your supervisor, officially
7  or unofficially?
8     A.   Yes.
9     Q.   When was that?
10     A.   Unofficially, it was December 2020.
11  Officially, it was January 2020.
12     Q.   Okay.  Can you tell me what you mean by
13  "unofficially, it was December 2020"?
14     A.   Unofficially, Larry Heisler came to my
15  office and we spoke and he told me he was going to
16  be transferring me to the Brooklyn unit.
17     Q.   In --
18     A.   December of 2019.
19     Q.   Okay.  I'm sorry.  I thought you said
20  December 2020.  All right.
21     A.   No.
22     Q.   2019.
23     A.   Yes.
24     Q.   He told you he would be transferring
25  you to the Brooklyn unit.  Okay.  And what, if

5 (Pages 14 - 17)

Page 18

A. Yehoshua

1                    A. Yehoshua
2  anything, else did he say in that conversation?
3      A.   Oh, we talked for a long time.
4      Q.   And what, if anything, else did he say
5  in that conversation?
6      A.   I told him about the hostility and the
7  discrimination I was facing under Khahaifa's unit.
8  I told him that I wanted to transfer.  I told him
9  I interviewed for the Kings County trial unit and
10 I showed him photographs of my medical condition
11 when Khahaifa insisted that I continue working,
12 and I said, "look at these text messages she is
13 sending me, look at these e-mails she is sending
14 me, this is harassment, this is intolerable," and
15 I told him that I wanted to be reassigned as soon
16 as possible, and he looked at my text messages, he
17 looked at my photos, he said he understood the
18 history and he said, "I will do it," and that's
19 when it was said to me.
20     Q.   All right.  So what is the reason that
21 Larry came to your office on this day in December
22 2019, do you recall?
23     A.   I just won a big case.
24     Q.   What case was that?
25     A.   The Adika case.

Page 19

1                    A. Yehoshua
2      Q.   Okay.  And so for what purpose did he
3  come to your office?
4      A.   Well, we talked about the case.  He was
5  very happy.  I was very happy.  It was a very long
6  trial.  It was four weeks long.  I got very sick
7  at the end of it.  I had conjunctivitis in both of
8  my eyes.  I had a doctor's note.
9      Q.   And did you discuss your conjunctivitis
10 with Larry?
11     A.   I showed him the doctor's note.  I
12 showed him my photo of my eye.
13     Q.   And for what purpose did you do that?
14     A.   What purpose?  I -- Larry and I
15 discussed numerous things and I was telling him
16 how hard that trial was.  I put probably 80 hours
17 into it, and this could be verified by looking at
18 my time records, when I punched in, when I punched
19 out.  I would leave the office at 12 midnight
20 sometimes after preparing for the next day of
21 trial.  That was what I did.  Every single time I
22 had a trial, I would work from 9 to midnight every
23 day of the week except for Fridays, but then I
24 would come in on Sunday to continue working on
25 trials.

Page 20

1                    A. Yehoshua
2      Q.   Okay.  So I am trying to ask you very
3  specific questions --
4      A.   Okay.
5      Q.   -- about this conversation that you
6  had.  So you have testified, and you can tell me
7  if I have misunderstood, that on some date in
8  December 2019 -- do you remember what that date
9  was?
10     A.   No.
11     Q.   Okay.  That Larry came to your office
12 because you won a big case, the Adika case, and
13 you were both happy about it and so you were
14 discussing the win; is that right?
15     A.   I don't remember verbatim what words we
16 said to each other, but I think that was the
17 general subject.
18     Q.   Okay.  And then you testified that you
19 showed him your doctor's note and pictures of
20 your -- and a photo of your eye.
21          So can you tell me why you showed him
22 your doctor's note and a picture of your eye?
23     A.   I thought I explained that already.
24     Q.   I am asking you to tell me again,
25 because I didn't understand your first

Page 21

1                    A. Yehoshua
2  explanation.
3      A.   Well, he was telling -- we were
4  discussing the case and I said this case really
5  took a lot -- a toll on me physically.  I was very
6  sick at the end.  I went to deliberations with two
7  swollen eyes.  And I came back after I took some
8  time -- I think it was -- the verdict was December
9  23rd, I believe.  I don't remember dates after
10 that, but I know maybe three days or four
11 days of sick time because of my eyes.
12     Q.   Okay.  And you were just explaining
13 this to him?
14     A.   Yes.
15     Q.   And what, if anything, did he say?
16     A.   Oh, and I said to him that I was -- I
17 was not happy, that I put all this time into the
18 trial, I came -- and then I had this condition and
19 I was harassed like from Khahaifa to continue to
20 do a deposition, to do discovery responses, and I
21 just couldn't catch a break and I couldn't
22 tolerate this anymore and I wanted to be
23 transferred.
24     Q.   And did you provide any other details
25 in connection with any comments that Weslii made

6 (Pages 18 - 21)

Page 22

A. Yehoshua

1    to you about doing depositions or discovery
2    responses?
3
4    A.    Sure.
5    Q.    What did you tell him?
6    A.    Well, I didn't tell him.  I showed him.
7    Q.    What did you show him?
8    A.    Probably the text messages of
9    harassment, the e-mails of harassment.
10    Q.    And are those documents, text messages
11    and e-mails of harassment, all documents that you
12    produced in connection with your litigation?
13    A.    I'm sure I did.
14    Q.    And you testified that you told Larry
15    I couldn't tolerate it anymore.
16          What, if anything, did he say to you in
17    response to that comment?
18    A.    He nodded and he -- I don't remember --
19    I don't remember, but I -- I remember feeling good
20    about him hearing me, it was nice to know that he
21    heard me, and he did say he would do something to
22    transfer me out of the unit.  I was very happy.
23    Q.    Okay.  And when you said 'I couldn't
24    tolerate it anymore,' what was it that you were
25    referring to, what was the "it" in that sentence?

Page 23

A. Yehoshua

1
2    A.    Discrimination and harassment.
3    Q.    And the person who was discriminating
4    and harassing you was Weslii, that's your
5    testimony?
6    A.    Yes.
7    Q.    All right.  And you testified that it
8    was nice to know he heard you.  Can you provide a
9    little bit more explanation as to what you mean by
10    that?
11    A.    Well, when he nodded in recognition, I
12    know that he heard me.
13    Q.    Were there times previously that you
14    had this conversation with him where he did not
15    nod or, quote unquote, heard you or he didn't hear
16    you?
17    A.    Well, I feel that at that time I was
18    receiving confirmation from him that I would be
19    transferred, which was what I wanted for a long
20    time.
21          MS. USENHEIMER:  Can you read my
22    question back, please.
23          (Record read.)
24    A.    Didn't I answer that?
25    Q.    You did not.

Page 24

A. Yehoshua

1
2    A.    I said that I had had conversations
3    with him in the past asking for transfer and I
4    felt that he wasn't hearing me because I wasn't
5    being transferred.  This time I knew it was going
6    to happen.
7    Q.    Okay.  So please tell me each and every
8    time you had a conversation in the past asking for
9    a transfer with Larry.
10    A.    I don't have dates.
11    Q.    Can you recall any such conversations
12    other than this one that you believe happened on a
13    date in December 2019?
14    A.    We had numerous conversations.  I just
15    don't remember the dates.
16    Q.    Can you recall any date on which you
17    had this conversation?
18    A.    No.  Dates, no.  I could recall
19    conversations, yes.  Dates, no.
20    Q.    Okay.  What's the first conversation
21    you can recall?  And when I say "first," I mean
22    the earliest-in-time conversation that you can
23    recall with Larry asking for a transfer.
24    A.    I don't have a date.  I remember the
25    conversation was, "Larry, look what she is doing

Page 25

A. Yehoshua

1
2    to me, look what she is sending me," and I would
3    show him text messages from her.
4    Q.    And you produced all those text
5    messages in your litigation today?
6    A.    Showed him.  Yes, I believe so.
7    Q.    And what, if anything, else did you say
8    to Larry in this first conversation?
9    A.    I said I wanted to be transferred out.
10    Q.    Do you recall saying anything else?
11    A.    That she was discriminating against me
12    from the very first time that the train was late.
13    I'll wait -- I'll talk about that later.
14    Q.    Okay.  So you testified that you told
15    Larry you wanted to be transferred out and that
16    'she was discriminating against me from the first
17    time the train was late'; is that correct?
18    A.    Yes.
19    Q.    What, if anything, else did you tell to
20    Larry about discrimination?
21    A.    Oh, I said she was very hostile towards
22    me.
23    Q.    Did you provide any additional details?
24    A.    Well, whenever she would say something
25    nasty, I would tell him.  And when she would write

7 (Pages 22 - 25)

A. Yehoshua

1
2 something nasty, I would show him.  And it was
3 very often.
4    Q.   In this conversation, did you provide
5 any additional details to Larry about the
6 discrimination or the harassment that you just
7 testified you told him about?
8    A.   What was the question?
9    Q.   In this conversation --
10    A.   Which conversation?
11    Q.   We have been discussing a conversation
12 that you said you remember the conversation, but
13 you don't remember the date.  I asked you to
14 describe the first-in-time conversation when you
15 asked Larry for a transfer out of the New York
16 County unit.  You said: I don't remember the
17 date, but I remember the conversation.  And you
18 said: I said to Larry, look what she is sending
19 me, and you showed him text messages.  I asked
20 you:  What, if anything, else did you say to
21 Larry?  You said:  I said I wanted to be
22 transferred out.  I asked you if you said anything
23 else and you said that she was discriminating
24 against me from the first time the train was late.
25 I said:  What, if anything, else did you say to

A. Yehoshua

1
2 Larry?  And you said that she was being hostile
3 towards you.
4         And I said:  Did you provide any
5 additional details of the discrimination or the
6 hostility in this conversation?
7    A.   I don't remember.
8    Q.   Do you remember what, if anything,
9 Larry said in response to your points that you
10 made?
11    A.   I don't remember what he said.
12    Q.   But is your recollection that on this
13 conversation he did not agree to transfer you out?
14    A.   He didn't say he would not transfer me.
15    Q.   So he just like didn't give you a
16 response one way or the other?
17    A.   I don't remember his words.
18    Q.   Well, you used this as an example of a
19 time when he didn't hear you.  So can you recall
20 your general sense of his impression of your
21 request to be transferred out of the unit?
22    A.   What I remember is I didn't receive the
23 confirmation that I was looking for.
24    Q.   Which was that you would be
25 transferred?

A. Yehoshua

1
2    A.   Correct.
3    Q.   All right.  And you -- okay.
4         And when was the next conversation you
5 can recall having with Larry in which you asked
6 for a transfer?
7    A.   Similar to that one.
8    Q.   How much later in time was it from the
9 first conversation?
10    A.   Probably a couple months later.
11    Q.   Do you remember what year this first --
12 the first conversation was in?
13    A.   2016.
14    Q.   All right.  And do you remember what
15 year the second conversation was in?
16    A.   Probably the same year.
17    Q.   Okay.  And you said it was similar.
18 What, if anything, can you remember about that
19 conversation?
20    A.   Oh, I remember showing him the
21 harassing e-mails.  I just remember showing him my
22 phone.
23    Q.   And what, if anything, else can you
24 remember?
25    A.   Same thing that happened the first

A. Yehoshua

1
2 time.
3    Q.   Please tell me what that is.
4    A.   I told him that she was extremely
5 hostile, "look at these e-mails."
6    Q.   Did you tell him anything else?
7    A.   I don't remember.
8    Q.   Do you remember what he said?
9    A.   No.
10    Q.   Did you receive the confirmation you
11 were looking for that you would be transferred out
12 in this conversation?
13    A.   No.
14    Q.   Did you take any notes of this
15 conversation?
16    A.   No.
17    Q.   Did you take any notes of the first
18 conversation?
19    A.   No.
20    Q.   Okay.  All right.  And then you
21 testified that there were numerous conversations.
22 What was the next conversation you can recall
23 having?
24    A.   Most likely it was the next year, 2017.
25    Q.   Okay.  And what, if anything, can you

A. Yehoshua

1
2 remember?
3     A.    Probably the same thing.  I was getting
4 same treatment.  Never ever improved.  It
5 worsened.
6     Q.    What, if anything, can you remember
7 saying to him in this conversation?
8     A.    I discussed my treatment, the unfair
9 treatment that I was receiving.
10     Q.    And what, if anything, else do you
11 recall telling him?
12     A.    I don't recall.
13     Q.    What, if anything, did he say to you?
14     A.    I don't recall.
15     Q.    Did you take any notes of this
16 conversation?
17     A.    No.
18     Q.    Did you show him any documents in this
19 conversation, text messages or e-mails?
20     A.    Maybe.
21     Q.    And to the extent that you did show him
22 any text messages or e-mails, have those all been
23 produced in the litigation?
24     A.    If they were available.
25     Q.    Why would they not be available?

A. Yehoshua

1
2     A.    Well, because I don't have access to my
3 e-mails.  It would have been work e-mails.
4     Q.    So text messages?
5     A.    Well, if it was a text message on my
6 phone, I would have showed him.  If it was an
7 e-mail, I wouldn't have access to that, so I
8 wouldn't know.
9     Q.    Right.  And have you -- if there was a
10 text message on your phone, did you produce it in
11 your litigation today?
12     A.    If I was asked to, I would have, yes.
13 I don't know.
14     Q.    So I am going to represent to you that
15 you were asked to.
16     A.    Okay.
17     Q.    So is it your testimony that you
18 produced all text messages in your possession that
19 support your claims of unfair treatment,
20 discrimination or harassment or retaliation?
21     A.    I hope so.
22     Q.    I hope so too.  We will follow up in
23 writing just in case you haven't.  How's that?
24 Okay.
25        When was the next conversation you

A. Yehoshua

1
2 had -- what was the next conversation you had?
3     A.    So I don't know the dates.  I just know
4 it was numerous tines, like I said, so I would --
5 I don't know.
6     Q.    You have testified it was numerous
7 times, however, it seems that you can recall three
8 particular instances when you made the request.
9 Can you recall any other instances?
10     A.    Probably a second time in 2017,
11 probably two more times in 2018, and 2019 were
12 maybe four times that I complained.
13     Q.    And do you have any notes or documents
14 evidencing the dates or the substance of these
15 discussions?
16     A.    No.
17     Q.    And so how is it that you are
18 remembering these dates if you have no notes?
19     A.    Because I know it was a couple of times
20 a year I went to him and I showed him, but it just
21 kept getting worse and worse, and so there was one
22 time, maybe it was 2018 or 2019, I don't remember,
23 but I did tell him that it was so unfair that I
24 was trying more cases than everybody in my unit.
25     Q.    And what was unfair about that?

A. Yehoshua

1
2     A.    There were three lawyers in my unit and
3 I was the only one trying cases all year.
4     Q.    Do you have any personal knowledge as
5 to the reason why the other attorneys in your unit
6 weren't trying cases?
7     A.    She wasn't being hostile to them.  She
8 was going out to lunch with them.
9     Q.    Do you have any personal knowledge as
10 to why they weren't trying cases?
11     A.    Personal knowledge, no.
12     Q.    So your testimony is that it was
13 hostile to you because Weslii asked you to try
14 cases in 2018 or 2019?
15     A.    No.
16        MS. VINCI:  Objection.
17 Mischaracterizes testimony.
18     Q.    What is your testimony?
19     A.    That's not what I said.
20     Q.    So clarify, please.
21     A.    I said that I believed that I was
22 receiving more files than anyone else in my unit
23 and it was unfair.
24     Q.    Okay.  And what was the basis of that
25 belief?

9 (Pages 30 - 33)

Page 34

A. Yehoshua

1
2    A.   I was being discriminated against
3 because I was Jewish.
4    Q.   What are the facts that support your
5 claim that you were receiving more files than
6 anyone else in your unit?
7    A.   Because I was constantly on trial.  I
8 was doing depositions.  I was doing hearings.  I
9 was receiving files in my office on Fridays after
10 I had left for the Sabbath, and I would arrive on
11 Monday with a ton of work that I had no
12 preparation for.  It was my understanding that
13 this was unfair.
14    Q.   Is it your testimony that -- okay.  Let
15 me strike that.
16        You testified that you were constantly
17 on trial doing depositions and hearings.
18        Do you have any personal knowledge as
19 to the workload of the other attorneys in your
20 unit?
21    A.   I personally asked them if they were on
22 trial and they said no.
23    Q.   When did you ask them that?
24    A.   Different times of the year.
25    Q.   You asked -- it's your testimony that

Page 35

A. Yehoshua

1
2 you asked -- in what year did you ask them this
3 conversation -- did you ask them this question?
4    A.   Well, I asked whenever I saw them.  I
5 don't know the dates.
6    Q.   Whenever you saw them in 2018, you
7 would ask your colleagues if they were on trial?
8    A.   If I was on trial and I saw a colleague
9 on the elevator, I would say, "I'm going to court.
10 I'm on trial.  Are you on trial?"
11    Q.   And what did your colleagues say?
12    A.   "No."
13    Q.   All right.  And did you have any
14 personal knowledge of the work of your
15 colleagues -- the other trial attorneys in the
16 New York unit, do you have any personal knowledge
17 of what their workload was in 2018?
18    A.   I asked Larry because I wanted to know.
19    Q.   Do you have any personal knowledge of
20 what their workload was in 2018?
21    A.   No.
22    Q.   And what about in 2019?
23    A.   No.
24    Q.   And what about 2020?
25    A.   I was not in the unit anymore as of

Page 36

A. Yehoshua

1
2 January 2020.
3    Q.   What about 2017?
4    A.   No.
5    Q.   And 2016?
6    A.   When Danielle Ruttman was there, I did
7 have personal knowledge.
8    Q.   Okay.  After Danielle Ruttman left?
9    A.   No.
10    Q.   Okay.  All right.  So I just want to
11 back up.  So you testified that you spoke -- you
12 requested a transfer out of the unit from Larry
13 and you testified at least twice, a second time in
14 2017, you testified two more times in 2018, and in
15 2019 maybe four times that you
16 complained.  And in each of these conversations --
17 so let's talk about the second time in 2017.  Can
18 you recall the sum and substance of that
19 discussion?
20    A.   Similar to the previous ones.
21    Q.   What does that mean?
22    A.   It means I would receive hostile
23 messages and show them to Larry.
24    Q.   And what, if anything, else did you
25 tell him?

Page 37

A. Yehoshua

1
2    A.   I don't remember the details of our
3 conversations.
4    Q.   Okay.  And what, if anything, did he
5 say to you?
6    A.   I don't remember.
7    Q.   Okay.  And then the first time in 2018
8 that you can recall having this discussion with
9 Larry, what, if anything, did you say to him?
10    A.   I don't remember the words that I used.
11    Q.   The sum and substance.
12    A.   It was similar to what I had said
13 before.
14    Q.   Which is what?
15    A.   If I received something hostile, I
16 would show him.
17    Q.   You testified there was a specific
18 conversation that you had in 2018 with Larry in
19 which you asked to be transferred out of the
20 New York unit.  So I am asking what was the sum
21 and substance of that conversation?
22    A.   I told you it was the same as the
23 previous times.
24    Q.   And I would like you to testify as to
25 what that means.

10 (Pages 34 - 37)

Page 38

A. Yehoshua

1
2    A.    I don't remember the words that I used.
3    Q.    And so what was --
4    A.    The sum and substance was similar to
5  what I had said in the past.
6    Q.    Which -- can you put that into words
7  for me?
8    A.    Something along the lines of "look at
9  this message I got."
10    Q.    And what, if anything, did he say in
11  response?
12    A.    I don't remember.
13    Q.    And what about the second conversation
14  you had in 2018, what can you recall from that
15  conversation?
16    A.    I showed him a message.
17    Q.    And said?
18    A.    "Look at how hostile she is."
19    Q.    And what, if anything, did he say?
20    A.    I don't remember.
21    Q.    Okay.  And then what about the first
22  conversation that you had in 2019?
23    A.    2019 -- well, I recall the last
24  conversation we had, which I told you in detail
25  what we spoke about.

Page 39

A. Yehoshua

1
2    Q.    The December 2019 conversation when he
3  came to your office following the Adika trial;
4  correct?
5    A.    Correct.
6    Q.    Okay.  So what about the first
7  conversation in 2019?
8    A.    There was no details as detailed as the
9  last one.  Last one -- the one in December was the
10  most significant, because I showed him more texts,
11  more photos, and the first conversation in 2019,
12  similar to the ones before.
13    Q.    Which means what?
14    A.    Which means I would show him what she
15  said.
16    Q.    And what, if anything, else did you
17  say?
18    A.    That's it.
19    Q.    And what, if anything, did he say?
20    A.    I don't remember.
21    Q.    And then the second conversation that
22  you remember having, the second conversation in
23  2019, what was the sum and substance of that
24  conversation?
25    A.    The sum and substance was the same as

Page 40

A. Yehoshua

1
2  the previous one.
3    Q.    Okay.  I am going to ask you again.
4  Can you, please, tell me what that means to you?
5    A.    I was unhappy with the messages I was
6  receiving and I would show them to Larry because
7  they were continually worse and worse.
8    Q.    And these messages were text messages
9  or e-mails?
10    A.    I don't remember.
11    Q.    I'm saying, they were text messages
12  comma e-mails, or what were -- were they something
13  else, were they voicemails?  What was the nature
14  of these messages that you are testifying about?
15    A.    I don't remember.
16    Q.    Okay.
17    A.    Both or one the other.  I don't
18  know.
19    Q.    Was there any other form of message
20  that you received?
21    A.    Once I received a phone call from John
22  Jerman related to --
23    Q.    Okay.  I am talking about Weslii.  Did
24  you receive a phone call from Weslii?
25    A.    Phone call?

Page 41

A. Yehoshua

1
2    Q.    That you were complaining to Larry in
3  any of these conversations.
4    A.    No.  It was done mostly by e-mails.
5    Q.    Okay.  And then, please, tell me about
6  the third conversation in 2019.
7    A.    Similar to the previous one, and I will
8  say it again, if there was something disturbing I
9  found in an e-mail or text, I would show Larry.
10    Q.    And what, if anything, else did you
11  say?
12    A.    That's it.  Oh, I probably did mention
13  that I wanted to be transferred out of the unit.
14    Q.    Did you say that, did you make a
15  request to be transferred out of the unit in every
16  conversation?
17    A.    I don't remember if it was every
18  conversation.
19    Q.    That you have been testifying about
20  today.
21    A.    I hope I did.  I don't remember.
22    Q.    And what, if anything, did he say?
23    A.    I don't remember.
24    Q.    Okay.  And then you testified that
25  there was a fourth conversation -- okay.  The

11 (Pages 38 - 41)

Page 42

A. Yehoshua

1
2 fourth conversation in 2019 you testified about.
3 That was in December 2019; correct?
4     A.   Correct.
5     Q.   All right.  And then you testified
6 that -- I'd just like to confirm, all these
7 conversations that you testified about with Larry
8 about requesting a transfer, you -- do you have a
9 specific recollection of having specifically
10 requested a transfer in those conversations?
11     A.   Some, not all.
12     Q.   About how many do you specifically
13 remember requesting a transfer?
14     A.   I don't remember.
15     Q.   And you don't have any notes of any of
16 these conversations or any other documents that
17 memorialize the substance or the date or the time
18 of these conversations; is that right?
19     A.   I just received a message from Khahaifa
20 saying that she understood that I would be
21 transferred out of the unit in January 2020.
22     Q.   No other notes, notes to file, e-mails
23 or anything else that memorializes the substance
24 of any of these conversations, the dates or times;
25 is that right?

Page 43

A. Yehoshua

1
2     A.   I don't remember.  It's possible I did
3 send Larry an e-mail.  I don't have access to my
4 e-mails so I don't remember.
5     Q.   Okay.  And that was my next question,
6 that you have produced all documents supporting
7 your claim that you had these conversations with
8 Larry that are in your possession; right?
9     A.   In my possession.
10     Q.   All right.  Then you testified that you
11 received a phone call from John Jerman.  Please
12 tell me what this phone call was.
13     A.   He said that Khahaifa yelled at him in
14 the copy room because he got an adjournment for me
15 while I was on trial.
16     Q.   Okay.  Were you present in the copy
17 room --
18     A.   No.
19     Q.   -- when Weslii allegedly yelled?
20     A.   No.
21     Q.   No?
22     A.   I said no.
23     Q.   Okay.  And how is this evidence of
24 discrimination or hostility against you from
25 Weslii?

Page 44

A. Yehoshua

1
2     A.   Well, he wrote her an e-mail
3 apologizing for helping me get the adjournment
4 while I was on trial and that was completely
5 hostile.
6     Q.   What was hostile?
7     A.   That I was on trial and he was
8 assisting me in asking for an adjournment on a
9 different case and he was being yelled at and
10 mistreated because he helped me.
11     Q.   Did you advise Weslii that somebody
12 else was going to be getting an adjournment for
13 you on a case before you asked John to do it?
14     A.   Well, it -- I don't remember, but I
15 know it was late in the day.  It wasn't possible
16 for me to walk over from one building to another
17 building when I had a witness on the stand, and he
18 offered to help the night before.
19     Q.   And isn't it true that Weslii has made
20 clear that she would like to be advised before
21 another -- one attorney in her unit covers for
22 another attorney or requests an adjournment on
23 their case?
24     A.   I don't know.
25     Q.   Okay.  I just need to go through some

Page 45

A. Yehoshua

1
2 of your notes here and make sure that we have
3 discussed all of your testimony.
4          You testified that you -- when we were
5 talking about -- you testified that you were
6 trying more cases than your colleagues in the New
7 York County unit and you mentioned that you asked
8 Larry because you wanted to know.  What did you
9 ask Larry?
10     A.   I asked Larry -- well, I said, "Larry,
11 this is impossible" -- no, strike that.  I said,
12 "this is unfair.  I am constantly on trial.  No
13 one else in my unit is on trial.  I would like to
14 know how many cases are assigned to each attorney
15 in my unit, because there is no transparency."
16     Q.   And what, if anything, did he say?
17     A.   "I'll look into it."
18     Q.   And did he get back to you?
19     A.   I don't remember.
20     Q.   Okay.  So this all started because you
21 testified that Weslii was no longer --
22 unofficially was not your supervisor as of
23 December 2019, and when was she -- when was she
24 officially no longer your supervisor?
25     A.   Well, in January 2020 she sent me the

12 (Pages 42 - 45)

Page 46

1          A. Yehoshua
2  e-mail saying "I understand you are being
3  transferred to Kings" -- "to" -- I don't know -- I
4  don't know the words to the e-mail, but she sent
5  me an e-mail confirming my transfer.
6      Q.   Okay.  And so my original question was
7  who sent you a copy of the DAN, which is Exhibit 1
8  that we are looking at, and you testified Weslii;
9  is that correct?
10     A.   Correct.
11     Q.   And do you have any personal knowledge
12 of why Weslii sent you a copy of this Disciplinary
13 Action Notice?
14     A.   Personal knowledge?
15     Q.   Yes.
16     A.   No.
17     Q.   And who signed this Disciplinary Action
18 Notice?
19     A.   She did.
20     Q.   Who is "she"?
21     A.   Khahaifa.
22     Q.   And do you have any personal knowledge
23 about the reason why she signed it?
24     A.   No personal knowledge.
25     Q.   Do you know who drafted this?

Page 47

1          A. Yehoshua
2      A.   No, but she signed it.  I don't know
3  who wrote it.
4      Q.   Okay.  And it's your understanding that
5  this Disciplinary Action Notice was generated
6  based on the findings of an OIG investigation; is
7  that right?
8      A.   I don't know the answer to that
9  question.  I know it came with attachments.
10     Q.   What part of the question can you not
11 answer?
12     A.   You can ask me again.
13     Q.   Okay.  Is it your understanding that
14 this Disciplinary Action Notice was generated
15 based on the findings of an OIG investigation?
16     A.   Where does it say that?
17     Q.   I am asking you what your understanding
18 is.
19     A.   I had no understanding why this was
20 drafted in the way that it was by her, but it came
21 attached with the OIG report.
22     Q.   Okay.  And I believe you testified that
23 you don't have any personal knowledge of who
24 drafted this Disciplinary Action Notice; is that
25 right?

Page 48

1          A. Yehoshua
2      A.   I don't have personal knowledge of who
3  drafted this.
4          MS. USENHEIMER:  Okay.  So I would like
5      to mark as Exhibit 2 a copy of the OIG report
6      without exhibits.  That will be Defendants'
7      Exhibit 2.
8          (Defendants' Exhibit 2, Office of the
9      Inspector General letter dated January 23,
10     2020, Bates stamped P000415 through P000423,
11     marked for identification.)
12     Q.   So Ms. Yehoshua, this is -- have you
13 seen a copy of this document before?  It's Bates
14 stamped on the lower right-hand side P looks like
15 415 to 42 -- it looks like 8.  It's hard to tell
16 because the page number is there.
17         MS. VINCI:  Just for the record, I
18     believe it's P 422, page 8 of the document
19     itself.
20         MS. USENHEIMER:  Let's say this.  It's
21     a nine-page document starting on P 415.
22         MS. VINCI:  That's the Bates stamp.
23         Just for the record, the witness just
24     asked me what the number at the bottom of the
25     page is.

Page 49

1          A. Yehoshua
2      A.   It doesn't look like a 5, but I will
3  take your word for it.
4      Q.   Have you seen a copy of this document
5  before?
6      A.   Yes.
7      Q.   And I am representing to you that this
8  does not include the exhibits that were originally
9  included with this, but is this a true and correct
10 copy of the OIG investigation report that was
11 prepared on -- dated January 23rd, 2020?
12     A.   Seems like the same thing that was
13 attached to the letter.
14     Q.   To the letter that's the Disciplinary
15 Action Notice we have been discussing?
16     A.   From June 12, 2020.
17     Q.   And this report concluded that you
18 violated certain All-Agency Code of Ethics, MTA
19 All-Agency Code of Ethics provisions; is that
20 right?
21         MS. VINCI:  Objection.  Document speaks
22     for itself.  She can answer.
23     A.   I disagree with your characterization
24 of what it concludes.
25     Q.   What do you believe it concluded?

A. Yehoshua

1
2    A.  It just says recommendations at the
3  end.  It doesn't say conclusion.
4    Q.  Okay.  Let's look at page -- the second
5  to last page, subheading IV, it says Findings, and
6  there are five bullet points.
7        So in the first number under Findings
8  this provides that:  The Transit Attorney
9  solicited and hired the Outside Counsel, a
10  Prohibited Source, to represent her in a personal
11  litigation for which representation he was not
12  paid, in violation of MTA All-Agency Code of
13  Ethics, New York State Public Officers Law.  Is
14  that correct?
15    A.  I --
16        MS. VINCI:  Are you asking her if
17    that's what it says or if the finding is
18    true?
19    Q.  I am asking her if that is what your
20  understanding of what this finding says.  I am
21  asking you what the report concluded.  I am not
22  asking you if you believe that to be true.
23    A.  Well, the record -- you are reading
24  what it says.
25    Q.  Okay.  So you told me that you did not

A. Yehoshua

1
2  agree that the OIG report concluded that you
3  violated certain All-Agency Code of Ethics
4  provisions.  So what -- if that is what it says,
5  then what is the source of your disagreement?
6    A.  It doesn't say violation on number 1 or
7  2 or 3.
8    Q.  On number 1 does it not say in
9  violation of MTA All-Agency Code of Ethics,
10  certain sections, and New York State Public
11  Officers Law, certain sections?
12    A.  Well, you are reading from the
13  document.
14    Q.  So do you see the words "in violation"?
15    A.  That's what it says.  That's what it
16  says.  You are reading from the document.  That's
17  what it says.
18    Q.  Okay.  Fine.  And did this -- okay.
19  Strike that.
20        All right.  And so these findings that
21  are on subsection IV here, is it your
22  understanding that the OIG conducted an
23  investigation in order to come to those findings?
24    A.  I don't have any personal knowledge of
25  their investigation.

A. Yehoshua

1
2    Q.  Did you participate in an
3  investigation?
4    A.  I know what I said.
5    Q.  I'm sorry?  Can you answer the
6  question?
7        THE WITNESS:  Can you read it back.
8        (Record read.)
9    A.  By "participate," what do you mean?
10    Q.  Did you speak to someone at the OIG's
11  office who asked you questions about the
12  circumstance that is summarized in the OIG report?
13    A.  Yes.
14        MS. USENHEIMER:  I have just provided a
15    copy of a document which we will mark as
16    Defendants' Exhibit 3 to the court reporter
17    and your attorney.
18        (Defendants' Exhibit 3, Investigations
19    Interview Memo, Bates stamped NYCTA 003467
20    through NYCTA 003469, marked for
21    identification.)
22    Q.  Ms. Yehoshua, have you seen a copy of
23  this document before?  It's a three-page document
24  starting on NYCTA 3467.
25    A.  I've seen this.

A. Yehoshua

1
2    Q.  Okay.  As far as you know, is this a
3  true and correct summary of the discussion that
4  you had with a member of the OIG's office?
5    A.  I don't know how they came to write
6  this.  I have no personal knowledge of their
7  preparation of this document.
8        MS. USENHEIMER:  Can you read my
9    question back.
10        (Record read.)
11    A.  I believe there was much more said
12  during that interview that was not in this report.
13    Q.  Do you have a specific recollection of
14  anything that was said that is not in this report?
15    A.  Well, the fact that it was contingency,
16  it was not a gift.  There is -- that's omitted
17  here.
18    Q.  Who said that?
19    A.  I did.  I told them.
20    Q.  What, if anything, else is not in here
21  that you told them?
22    A.  I did not believe that there was
23  anything wrong.  I felt that many attorneys use
24  outside counsel for personal cases.  Nothing
25  unusual.  I did ask them to look into the

Page 54

A. Yehoshua

1           A. Yehoshua
2  contractor's background, because he had sued
3  people before.
4      Q.  Who was the contractor?
5      A.  His name was Flom.
6      Q.  Okay.  Anything else that's not
7  memorialized in here that you can remember?
8      A.  Oh, yeah.  They told me not to worry
9  about anything, everything was fine, there is
10  gonna be no action taken against me.  I remember
11  that.  When I was leaving the office, they said.
12  "Don't worry, everything is fine, nothing is gonna
13  happen."  I don't remember what else, but I felt
14  comfortable.
15      Q.  Okay.  And did you -- did you, in, fact,
16  speak with someone from the OIG's office on
17  January 30th, 2019?
18      A.  Well, if it says it on the document.  I
19  don't have an independent recollection of the
20  date.
21      Q.  Do you have any reason to believe that
22  date is wrong?
23      A.  No.
24      Q.  Okay.  And in the third paragraph here
25  in the second sentence it states:  Yehoshua is a

Page 55

1           A. Yehoshua
2  trial attorney and has no contact with a case
3  while it is assigned to the EMP, where the
4  majority of pretrial discovery would be managed.
5          Do you recall telling them that?
6      A.  No.
7      Q.  Is that a true statement, as far as you
8  are concerned, about how work was assigned
9  between -- I think that means E and P and the
10  trial unit?
11      A.  I don't remember saying I had no
12  contact.  That doesn't make sense.
13          MS. USENHEIMER:  Can you repeat my
14  question.
15          (Record read.)
16      A.  I don't think it's a true statement.
17      Q.  Okay.  What's not true about it?
18      A.  Having no contact with the E and P
19  unit.
20      Q.  What was the nature of -- so what is
21  the extent of the contact that you would have with
22  a case while it's assigned to E and P?
23      A.  I wouldn't have any contact during the
24  assignment to E and P, but after the case came
25  back -- came to me afterwards, I would sometimes

Page 56

A. Yehoshua

1           A. Yehoshua
2  communicate with the E and P attorney that handled
3  it for discovery purposes with regards to, I don't
4  know, discovery, photos that could be used at
5  trial, a number of reasons.
6      Q.  Okay.  Okay.  And then on the next
7  page, on the bottom it's page 2, in the very last
8  paragraph it states:  Yehoshua began working at
9  New York City Transit in 2013.  She told us in
10  2014 she saw Smith at New York City Transit and
11  approached him about representing her in her
12  lawsuit against the contractor.
13          Is that a true statement?
14      A.  It's possible.  But I had known him for
15  twenty years.
16      Q.  Any reason to believe that is an
17  inaccurate statement?
18      A.  No.
19      Q.  Okay.  And then the next page at the
20  top, the last -- the first paragraph, the sentence
21  starts:  "Yehoshua stated that Smith refused to
22  take a retainer."  Do you see that sentence?
23      A.  Yes.
24      Q.  Is that an accurate description of the
25  factual circumstance?

Page 57

1           A. Yehoshua
2      A.  Well, it's very common in this industry
3  to work on contingency, so --
4      Q.  So is that a yes?
5      A.  I wouldn't say refused.  I would say we
6  made other arrangements.
7      Q.  Okay.  So he did not take a retainer or
8  any payment from you; is that correct?
9      A.  Correct.
10      Q.  The next sentence:  Yehoshua stated she
11  did not request permission to have Smith represent
12  her and did not tell anyone that Smith was
13  representing her in a private litigation until
14  after trial.  Is that true?
15      A.  That's true.
16      Q.  All right.  And then under MTA Code of
17  Ethics, that first sentence:  Yehoshua told us
18  that she had ethics training and has annually
19  certified she is familiar with the All Agency Code
20  of Ethics.  Is that true, did you tell them that?
21      A.  Likely true.
22      Q.  What part is likely true?
23      A.  I don't remember using the term "All
24  Agency Code of Ethics."  I think that's the name
25  of the manual, but I don't remember saying those

15 (Pages 54 - 57)

A. Yehoshua

1
2 words.  I was familiar, though, because I had to
3 do this training once a year.
4      Q.   And the next sentence:  Yehoshua stated
5 that she believed that because Smith was not a New
6 York City Transit employee, there was no problem.
7 Did you say that to them?
8      A.   Again, I don't remember the words I
9 used, but this statement about Smith, that is
10 true, he is not a New York City Transit employee.
11     Q.   Okay.  And then did they tell you that
12 Smith was considered a prohibited source because
13 he is a vendor?
14     A.   I don't remember what they told me.
15     Q.   But you do remember that they told you
16 everything was gonna be fine and you wouldn't be
17 in trouble; is that right?
18     A.   The trouble word didn't come out.  All
19 I remember them saying is, "don't worry about
20 anything, everything will be okay," and "it's good
21 that you came today and explained to us what
22 happened, we understand," and he told me that the
23 woman, Maura Daly, also had a similar situation
24 happen in her life.  She was renovating -- same --
25 same story.  That's why I was told not to worry,

A. Yehoshua

1
2 it happens.
3      Q.   Okay.  And the person who conducted
4 your conversation, that was Lawrence McGugins?
5      A.   He walked me out of the office.
6      Q.   Did he also conduct the interview?
7      A.   He was there.
8      Q.   Who conducted the interview?
9      A.   I think it was mostly Maura Daly.
10     Q.   Was there anyone else present?
11     A.   No.
12     Q.   All right.  And so to the extent that
13 you believe that there was information that was
14 excluded from this memo or the memo wasn't a
15 perfect reflection of what you said, do you have
16 any reason -- do you have any understanding of why
17 that might be or why certain statements were
18 excluded from the memo?
19     A.   No.
20     Q.   And do you believe that the OIG had any
21 discriminatory motive towards you in preparing
22 this memo or their report?
23     A.   No.
24     Q.   Harassing motive?
25     A.   No.

A. Yehoshua

1
2      Q.   What about retaliatory?
3      A.   No.
4      Q.   Okay.  You testified many attorneys use
5 outside counsel for personal cases, that's not
6 unusual.  Can you tell me who those attorneys are?
7      A.   No.
8      Q.   Why not?
9      A.   I don't remember.
10     Q.   So when you say "many," what does that
11 mean?
12     A.   I just heard other people had cases of
13 their own.
14     Q.   Do you ever remember learning the
15 specifics or the specific names of those attorneys
16 or do you just recall generally hearing --
17     A.   Generally.
18     Q.   All right.  Have you told me everything
19 that you believe is not included in this memo that
20 you believe you told Maura and Lawrence when you
21 spoke with them?
22     A.   I think so.
23     Q.   Okay.  And do you have any personal
24 knowledge of who else the OIG's office may have
25 spoken to in connection with this investigation?

A. Yehoshua

1
2      A.   Yes.
3      Q.   Who did they speak with?
4      A.   Khahaifa.
5      Q.   Anybody else?
6      A.   Personal knowledge, no.
7      Q.   And how did you come to have personal
8 knowledge of whether Weslii spoke with OIG?
9      A.   Because Lawrence, the senior
10 investigator, told me, "everything is fine, all we
11 have to do is speak to your supervisor, Khahaifa,
12 and everything will be okay, you'll be fine, don't
13 worry about anything."  That's how I know she was
14 involved.
15     Q.   Do you know for sure if that
16 conversation happened?
17     A.   I was told it would take place.
18     Q.   Do you know for sure if that
19 conversation happened?
20     A.   No.
21     Q.   Do you have any personal knowledge as
22 to what Weslii may have told the OIG's office if
23 or when they spoke?
24     A.   I can say that from this document --
25     Q.   What is that?

16 (Pages 58 - 61)

A. Yehoshua

1
2     A.    From the one you showed me, January
3  30th, 2019 --
4     Q.    Which is marked what?
5     A.    -- which is marked Defendants'
6  Exhibit 3 --
7     Q.    Okay.
8     A.    -- to what happened in this document,
9  January 23rd, 2020, marked as Exhibit 2, is
10 drastically different, so therefore it is clear
11 that she had a lot to say after this investigation
12 was concluded with me.
13    Q.    And were you present for any
14 discussions that Weslii may have had with the
15 OIG's office?
16    A.    No.
17    Q.    So do you have any personal knowledge
18 of what she said?
19    A.    No.
20    Q.    All right.  Let's go back to the
21 report, which is Defendants' Exhibit 2.  I'd like
22 you to go to the last page of this report under
23 Recommendations.
24        So the first recommendation is that:
25 New York City Transit should impose discipline as

A. Yehoshua

1
2  it deems appropriate.
3        So what does that mean to you, do you
4  have any understanding of what that recommendation
5  means?
6     A.    No.
7     Q.    Do you have any personal knowledge of
8  who at Transit was responsible for making the
9  decision to accept the OIG's recommendation to
10 impose discipline?
11    A.    Well, the word "discipline" doesn't
12 mean termination.
13        MS. USENHEIMER:  Can you read my
14    question back, please.
15        (Record read.)
16    A.    I don't understand the question.
17    Q.    So the OIG recommended that the Transit
18 Authority should impose discipline as it deems
19 appropriate.  You have agreed that that is what
20 this document says; right?
21    A.    No.  You are reading it, but --
22    Q.    Please read out loud for the record
23 bullet point number 1 under Recommendations.
24    A.    'New York City Transit should impose
25 discipline on the Transit Attorney as it deems

A. Yehoshua

1
2  appropriate.'
3     Q.    Okay.  Now, we looked at Defendants'
4  Exhibit 1, which is a copy of the disciplinary
5  action memo or Disciplinary Action Notice, which I
6  will call a DAN.  So this document is, in fact,
7  imposing discipline on you; is that correct?
8     A.    It's -- just to be literal, it doesn't
9  impose discipline.  It recommends dismissal.  So
10 this is not the same thing.
11    Q.    Is it your understanding that -- why is
12 it not the same thing?
13    A.    It's saying discipline.  This is not
14 saying discipline.  There is no -- it says
15 recommended penalty is dismissal.
16    Q.    Do you understand that dismissal is not
17 a form of discipline?
18    A.    It's a -- disproportionate.  It's
19 not -- doesn't make sense.
20    Q.    Do you agree that discipline is a
21 form -- I'm sorry.
22        Do you agree that dismissal is a form
23 of discipline?
24    A.    Could be.
25    Q.    And do you have any understanding for

A. Yehoshua

1
2  who at Transit made the decision to impose
3  discipline on you based on the findings of the OIG
4  report?
5     A.    Well, if you read the report, it says
6  'please provide your response to David Farber,' so
7  based on this document, it appears that David
8  Farber was the one that decided it.
9     Q.    And do you have any personal knowledge
10 of whether Weslii played any role in David
11 Farber's decision to recommend the OIG's -- I'm
12 sorry -- to accept the OIG's recommendation and
13 impose some form of discipline on you?
14    A.    She signed the document.
15        MS. USENHEIMER:  Can you read my
16    question back, please.
17        (Record read.)
18    A.    My personal knowledge would be what's
19 written here.  I don't know anything else from
20 what it says here.
21    Q.    And when you say "here," what are you
22 referencing?
23    A.    I'm referencing your Exhibit 1.
24    Q.    The Disciplinary Action Notice; is that
25 correct?

17 (Pages 62 - 65)

Page 66

A. Yehoshua

1
2    A.    The one that's signed by Khahaifa, yes.
3    Q.    Okay.  And do you have any personal
4 knowledge about who at the Transit Authority
5 determined what discipline would be appropriate?
6    A.    I don't have personal knowledge.
7    Q.    Do you have any personal knowledge of
8 the factors that were used by Transit Authority
9 personnel in determining what discipline was
10 appropriate?
11    A.    I don't have personal knowledge.
12    Q.    Do you have any personal knowledge of
13 who made the decision to recommend your dismissal?
14    A.    Again, it's signed by Khahaifa.  She is
15 the one that recommended it.  And that's what I
16 have personal knowledge of, what's in writing.
17    Q.    No other personal knowledge then; is
18 that correct?
19    A.    Correct.
20    Q.    Okay.  And other than the fact that
21 Weslii signed this DAN, do you have any personal
22 knowledge of whether Weslii played any role in
23 recommending the penalty of dismissal?
24    A.    No.
25    Q.    Do you have any personal knowledge of

Page 67

A. Yehoshua

1
2 any other law department attorney who was the
3 subject of an OIG investigation in which the OIG
4 recommended that the Transit Authority take
5 appropriate discipline?
6    A.    Mike Daniels.
7    Q.    Who is Mike Daniels?
8    A.    He was an investigator.
9    Q.    So is he an attorney or investigator?
10    A.    Investigator.
11    Q.    And, please, tell me all the facts that
12 relate to Mike Daniels' OIG investigation.
13    A.    Well, that was general knowledge.
14 Everyone knew.
15    Q.    And what was he investigated for?
16    A.    Ask the OIG's office.  I don't know.
17    Q.    I'm sorry?
18    A.    I said the OIG has a record of that.  I
19 don't -- I just know what people said, that he was
20 being investigated.
21    Q.    And what was the outcome of that
22 investigation?
23    A.    I don't know, but he still worked there
24 even after the investigation was concluded.
25    Q.    But you don't have any knowledge of

Page 68

A. Yehoshua

1
2 what the nature of the investigation was or if the
3 OIG recommended discipline; is that correct?
4    A.    Generally, it was said that he had
5 recommended family members to work there and that
6 was against the nepotism policy, but I don't --
7 that's third hand.  That's what people were
8 saying.
9        MS. USENHEIMER:  Okay.  All right.
10    Then I'd like to mark Defendants' Exhibit 4.
11        (Defendants' Exhibit 4, letter dated
12    February 3, 2021, Bates stamped P000194,
13    marked for identification.)
14    Q.    Okay.  Ms. Yehoshua, have you seen this
15 document before?
16    A.    Yes.
17    Q.    All right.  And just for the record,
18 it's a one-page document Bates stamp number
19 Plaintiff's -- P 194.  Okay.
20        What is this document?
21    A.    The document speaks for itself.
22    Q.    What do you understand the document to
23 be?
24    A.    Well, it says Notice of Penalty
25 imposing a 20-day suspension without pay.

Page 69

A. Yehoshua

1
2    Q.    And it's your understanding that this
3 is in connection with the OIG's investigation and
4 the resulting DAN that we have been reviewing this
5 morning?
6    A.    I don't know what the result of this
7 was.  It doesn't clarify how they came to this
8 decision.  All it addresses is a response received
9 from my prior attorney, Karl Sleight, dated July
10 6, 2020.
11    Q.    And what was the substance of that
12 response from Karl Sleight dated July 6, 2020, was
13 it in response to the Disciplinary Action Notice
14 marked as Defendants' Exhibit 1?
15    A.    Yes.
16    Q.    Do you have any personal knowledge who
17 made the determination -- who made the
18 determination to implement a suspension?
19    A.    Again, this is signed by David Farber.
20 My personal knowledge -- my understanding is that
21 he did, because he signed it.
22    Q.    And do you have any personal knowledge
23 as to whether Weslii was involved in that
24 decision?
25    A.    Well, she is the one that signed the

18 (Pages 66 - 69)

Page 70

A. Yehoshua

1    A. Yehoshua
2 previous document. I don't know what
3 conversations they had.
4    Q. You weren't party to any conversation
5 that they had about this?
6    A. No.
7    Q. Do you have any personal knowledge of
8 who drafted that letter?
9    A. No.
10   Q. Okay. Please tell me each and every
11 fact that supports your claim that the
12 Disciplinary Action Notice, which is Exhibit 1,
13 was discriminatory against you?
14   A. I filed an EEOC claim and a New York
15 State Department of Human Rights claim in December
16 of 2020. While those two were pending, I received
17 this.
18   Q. What's "this"?
19   A. This document marked as Defendants'
20 Exhibit 4.
21   Q. Which reduced your -- which reduced the
22 penalty of dismissal to your suspension?
23   A. It doesn't say a reduction. It just
24 says it was imposing a twenty-day suspension.
25   Q. And so how was that discriminatory?

Page 71

A. Yehoshua

1    A. Yehoshua
2    A. There was no investigation into my EEOC
3 claim. I was advised that once you file it, there
4 would be an investigation. There was never an
5 investigation conducted from December 2020 to the
6 date of this document marked as Exhibit 4.
7    Q. How do you know that there was no
8 investigation at the EEOC into your EEOC claim?
9    A. Well, I was the one that prepared the
10 response to the -- I prepared the documents.
11   Q. What documents?
12   A. The ones from -- for the -- that I just
13 identified, the claims for the EEOC and the New
14 York State Department of Human Rights.
15   Q. Okay. So how do you know that there
16 was no investigation at the EEOC in connection to
17 the claim that you just testified you filed?
18   A. Because I did not receive anything in
19 writing.
20   Q. And do you understand that the EEOC --
21 strike that.
22      How do you know that there was no
23 investigation into your New York State Division of
24 Human Rights claim?
25   A. I did not receive anything in writing.

Page 72

A. Yehoshua

1    A. Yehoshua
2    Q. Okay. So my question was with respect
3 to Defendants' Exhibit 1, which is the
4 Disciplinary Action Notice dated June 12, 2020,
5 please tell me each and every fact that supports
6 your claim that this was discriminatory.
7    A. Okay. So should I start from before
8 2020?
9    Q. If that's the answer.
10   A. Or should I start from this date? I
11 don't understand your question.
12      MS. VINCI: Answer the question as best
13   as you are able to.
14      THE WITNESS: Okay. Let me hear the
15   question again.
16      (Record read.)
17   A. Okay. Well, I feel that this
18 disciplinary action was filed in retaliation to my
19 request to be transferred out of the New York
20 unit.
21   Q. What are the facts that support that
22 belief?
23   A. Okay. Starting -- I am going to start
24 with 2016.
25   Q. Okay.

Page 73

A. Yehoshua

1    A. Yehoshua
2    A. In 2016 on a Friday I was going to work
3 and my train was delayed and I brought in a train
4 incident report to be excused for the 45 minutes
5 so that I could arrive home on time for the
6 Sabbath. She denied my request and that's when
7 the discrimination started. I went to Larry and I
8 told him about the issues that I just told you.
9 He said he would take care of it. I told her I
10 was going to Larry. She said go to Larry. She
11 never signed my time sheet. He went to talk to
12 her and she sent Larry an e-mail, copying me on
13 the e-mail, stating that she was offended that
14 Larry accused her of interfering with my Sabbath
15 observance.
16   Q. And how is it that that incident makes
17 this Disciplinary Action Notice, which is
18 Defendants' Exhibit 1, discriminatory or
19 retaliatory?
20   A. Okay. That's what started the
21 discrimination throughout the years.
22   Q. Okay. So how did what you just
23 described make this Disciplinary Action Notice,
24 which is Defendants' Exhibit 1, discriminatory or
25 retaliatory?

19 (Pages 70 - 73)

Page 74

A. Yehoshua

1
2    A.    Well, this was -- I think, this is my
3  belief, this was a result of her hostility,
4  retaliation for my -- my requests to be
5  transferred.
6    Q.    And that's your belief.  What are the
7  facts that support your belief?
8    A.    Do you want to know the facts of why I
9  believed I was being discriminated?  Because I
10  don't -- I cannot tell you what led to this.  I'm
11  not the writer of this.
12    Q.    I understand.  But you are -- is it
13  your claim in this case that this Disciplinary
14  Action Notice was unlawful, discriminatory,
15  retaliatory in any way?
16    A.    I had a lawyer that responded to this.
17    Q.    That's not my question.
18    A.    So he would have -- he laid out the
19  reasons why this didn't make sense.
20    Q.    Do you have any claims in your
21  litigation today about this Disciplinary Action
22  Notice?
23    A.    Of course.  We are denying every
24  section of it.
25    Q.    Do you have any claims in your case

Page 75

A. Yehoshua

1
2  today about this Disciplinary Action Notice?
3    A.    Yes.
4    Q.    Okay.  What are those claims?
5    A.    That this was in retaliation.
6    Q.    Okay.  And I am asking you to tell me
7  every fact that supports your claim that this was
8  in retaliation.  So what are those facts?
9    A.    All of the events that led up to this.
10  I was transferred in January.  She was no longer
11  my supervisor.  Then in June she -- she signs this
12  document asking for my dismissal.
13    Q.    Any other facts?
14    A.    All the years before that.  I don't
15  know what exactly it was that led to her six
16  months after she was removed as my supervisor to
17  prepare this document and sign it.
18    Q.    Okay.  You testified that you didn't
19  know who prepared this document; is that correct?
20    A.    I told you that she signed it.
21    Q.    And you testified that you didn't know
22  who prepared the document; is that correct?
23    A.    I didn't watch her type it.  I don't
24  know who prepared it.
25    Q.    And you also testified that you don't

Page 76

A. Yehoshua

1  know the reason why she signed it; is that
2  correct?
3
4    A.    I think it was because of her
5  retaliation against me.
6    Q.    All right.  Can you tell me -- have you
7  told me all the facts that support your belief
8  that this is retaliatory?
9    A.    Well, there were -- I told you, there
10  were years and years of hostility against me and
11  when I was removed from the unit, that led to this
12  document.  This was directly related to all the
13  years that I was previously under her unit.
14    Q.    Okay.
15    A.    I have many examples of this
16  discrimination.  I'll wait until you ask me those.
17        MS. USENHEIMER:  Okay.  Thank you.
18  Okay.  All right.  I'd like to move to
19  Exhibit 5.
20        THE WITNESS:  Can I take a five-minute
21  break?
22        MS. USENHEIMER:  Yes, we can take a
23  five-minute break.  Let's just go off the
24  record.
25        (Recess was taken from 11:05 to 11:15.)

Page 77

A. Yehoshua

1
2        (Defendants' Exhibit 5, e-mail dated
3  June 19, 2020, Bates stamped P000160 and
4  P000161, marked for identification.)
5  BY MS. USENHEIMER:
6    Q.    So just before we look at Exhibit 5, I
7  just want to confirm, Ms. Yehoshua, is there any
8  testimony that you gave before we took a break
9  that you would like to change?
10    A.    No.
11    Q.    Okay.  All right.  So now we are
12  looking at Exhibit 5, which is a document marked
13  at the bottom P 160 and the second page is 161.
14        So have you seen a copy of this
15  document before?
16    A.    It's two pages?  Okay.  Yes, I've seen
17  this.
18    Q.    Okay.  And is it a true and correct
19  copy of a document that you produced?
20    A.    Yes.
21    Q.    Okay.  And do you -- and this document,
22  the top e-mail is an e-mail from Weslii to you
23  with various people copied indicating that your
24  request for an extension of time to respond is
25  denied.

20 (Pages 74 - 77)

Page 78

A. Yehoshua

1          A. Yehoshua
2        And so my question for you is do you
3    have any personal knowledge of Weslii's
4    involvement in the decision to deny your request
5    for an extension of time to respond?
6        A.    No.
7        Q.    And do you have any personal knowledge
8    of who was responsible for making a decision in
9    connection with your request for an extension of
10   time?
11       A.    No.
12       Q.    Okay.  Now, as we wrap up this
13   discussion about this DAN, I'd like to confirm or
14   ask you have you told me each and every fact that
15   supports your claim that Exhibit 1, which is the
16   Disciplinary Action Notice, was an example of
17   discriminatory, harassing or retaliatory conduct?
18       MS. VINCI:  Object to form, but you can
19   answer.
20       A.    Well, I said I had many, many examples
21   of discrimination, but I don't know what led to
22   this.  All I can say is what happened previously,
23   that I filed an EEOC claim two months before this.
24       Q.    Okay.
25       A.    Before the February letter.

Page 79

A. Yehoshua

1          A. Yehoshua
2        Q.    And have you told me each and every
3    fact that supports your claim that Defendants'
4    Exhibit 4, which is a letter imposing a suspension
5    on you, is an example of discriminatory conduct?
6        A.    No.  There are --
7        MS. VINCI:  Exhibit 4.
8        A.    Oh, okay.  I'm sorry.  Can you read
9    back the question.
10       (Record read.)
11       A.    I hope I did.
12       Q.    Can you think of anything sitting here
13   today, any facts that support that claim that you
14   have not told me?
15       A.    I can think of claims, but I will wait
16   until you ask me those questions.
17       Q.    Can you repeat my question.
18       A.    I don't know about this one.  I hope I
19   told you everything.  I don't know what your
20   question is asking.  It's very confusing.
21       Q.    Do you have claims in this case
22   about -- Defendants' Exhibit 4 is a letter which
23   imposed discipline on you and it imposed a
24   twenty-day suspension.  Do you have claims in your
25   case about this letter?

Page 80

A. Yehoshua

1          A. Yehoshua
2        A.    My claims are, as you know from my
3    lawyers, they are all written clearly on --
4        Q.    Ms. Yehoshua, this deposition today,
5    I'm sure your lawyer told you, is my opportunity
6    to ask you questions about your claims.  So I am
7    going to need you to actually answer my question.
8        So I am asking you today:  This
9    exhibit, which is Exhibit 4, do you have claims in
10   your litigation that you filed in federal court,
11   do you have any claims about this document in your
12   case?  It's a yes or no.
13       A.    No.
14       Q.    Okay.  All right.  Then I'd like to
15   look at Defendants' Exhibit 5.  Do you have any
16   claims in your case that you filed in federal
17   court about this document, Defendants' Exhibit 5?
18       A.    No.
19       MS. USENHEIMER:  Okay.  Thank you.
20   Okay.  Now I'd like to mark a copy of your
21   Amended Complaint as Exhibit 6.
22       (Defendants' Exhibit 6, Amended
23   Complaint and Jury Demand, marked for
24   identification.)
25       Q.    All right.  Ms. Yehoshua, I have given

Page 81

A. Yehoshua

1          A. Yehoshua
2    you a document which is fourteen pages long.  Have
3    you seen this document before?
4        A.    Yes.
5        Q.    Okay.  And is this a copy of your
6    Amended Complaint in this action?
7        A.    Yes.
8        Q.    All right.  Did you review this
9    Complaint before your attorney filed it?
10       A.    Did I review this?
11       Q.    Correct.
12       A.    Before he filed it?  I believe I did.
13       Q.    Okay.  And did you make sure when you
14   reviewed it, did you let your attorney know if
15   anything in it was not true or was inaccurate in
16   any way?
17       A.    I believe it to be true.
18       Q.    And when you filed your Amended
19   Complaint, all the facts that were contained in
20   here and all the allegations were true and correct
21   in your understanding?
22       A.    Yes.
23       Q.    All right.  And are they -- do they
24   remain true and correct now?
25       A.    Do they what?

21 (Pages 78 - 81)

A. Yehoshua

2    Q.    Are they true and correct today?

3    A.    Are they true and correct today?  Yes.

4    Q.    And is this -- your Amended Complaint

5  that we are looking at, is it an accurate

6  reflection of your claims in this case?

7    A.    Yes.

8    Q.    Do you have any claims in your

9  litigation today that are not included in this

10  Amended Complaint?

11    A.    I don't know.  There could be

12  additional claims after discovery is complete.

13    Q.    What does that mean?

14    A.    That means that if there is testimony

15  that comes out from the defendants that involve an

16  additional form of relief that I would be seeking,

17  then I would want to put that in.

18    Q.    As of today, are there any claims in

19  your litigation that are not included in the

20  Amended Complaint?

21    A.    As of today, it seems accurate.

22    Q.    Okay.  Can you, please, look to

23  paragraph 9 of your Complaint.  Is that paragraph

24  true and correct?

25    A.    Yes.

A. Yehoshua

2    Q.    Can you, please, turn to paragraph 30.

3  Is that true and correct?

4    A.    Oh, well, paragraph 30 adds the word

5  "Orthodox" and paragraph 9 says "Jewish."  I guess

6  paragraph 9 should have said "Orthodox Jewish."

7    Q.    Do you consider yourself to be an

8  Orthodox Jew?

9    A.    Yes.

10    Q.    I'd like you to turn to paragraph 21.

11  All right.  This paragraph states:  "Plaintiff is

12  an experienced litigator who has tried numerous

13  cases to verdict."  Is that true?

14    A.    Yes.

15    Q.    All right.  And what do you mean when

16  you say here that you are an experienced

17  litigator?

18    A.    I have been in the same field for 25

19  years now as of 2023.  I did try numerous cases.

20  I sent the defendants my chart of verdicts.

21    Q.    In this case the defendants, is that

22  what you mean?

23    A.    Yes.

24    Q.    Okay.  And so in your experience as a

25  litigator, I'd like to ask you do you agree that

A. Yehoshua

2  it is an important characteristic of an attorney

3  for the attorney to be honest?

4    A.    I don't think -- I think all people

5  should be honest.  I don't see how that --

6    Q.    So all people including attorneys?

7    A.    It depends on what legal advice the

8  person has.  If the person receives legal advice

9  telling them to say something different, then I

10  would go with the attorney tells the person.  Even

11  an attorney has an attorney.

12    Q.    Okay.  And do you agree that it is an

13  important characteristic in an attorney to be

14  truthful?

15    A.    I'll repeat the same answer.

16    Q.    Okay.  And do you agree that it is an

17  important characteristic for an attorney to be

18  honest or truthful before a court?

19    A.    If an attorney is advised by their

20  superior, their supervisor or another attorney to

21  handle a case in a certain way, then that attorney

22  should go with the advice of their attorney.

23    Q.    Okay.  And do you agree that it is an

24  important characteristic in an attorney to adhere

25  to ethical obligations?

A. Yehoshua

2    A.    Yes.

3    Q.    And what about arriving at court on

4  time?

5    A.    Yes.

6    Q.    Okay.  And complying with court orders?

7    A.    Yes.

8    Q.    All right.  And what about having an

9  understanding of the law that applies to your

10  case?

11    A.    Well, the attorney should have an

12  adequate amount of time to understand the law in a

13  given case.

14    Q.    Okay.  And then would you agree that

15  that is an important characteristic for an

16  attorney, to have an understanding of the law that

17  applies to their case?

18    A.    Yes.

19    Q.    And would you agree that it's an

20  important characteristic in an attorney to be

21  respectful of judges?

22    A.    Yes.

23    Q.    And what about accepting a judge's

24  ruling, is that an important characteristic?

25    A.    An attorney has a right to appeal a

1          A. Yehoshua
2  judge's ruling, so, of course, you -- of course,
3  an attorney should be respectful, but if an
4  attorney disagrees, an attorney should have the
5  right to ask for a record of the judge's decision,
6  so that question needs some reform.
7      Q.   Okay.  But you agree that it's an
8  important characteristic for an attorney to be
9  professional in a courtroom?
10     A.   Of course.  Be professional, of course.
11     Q.   And what about following a judge's
12 instructions?
13     A.   Yes.
14     Q.   So if an attorney referred to a judge's
15 direction or instruction in open court as
16 ridiculous, would you describe that as
17 professional or respectful or something else?
18     MS. VINCI:  Object to form.
19     You can answer.
20     A.   I don't understand the question.
21     Q.   Okay.  So do you agree that -- would
22 you -- do you believe that it is professional for
23 an attorney in open court to refer to a judge's
24 instruction as ridiculous?
25     A.   It depends on the circumstances.  I

1          A. Yehoshua
2  don't know how it was said, in what context it was
3  said.  I don't understand how that would be said,
4  in what scenario.
5      Q.   Okay.  And --
6      MS. USENHEIMER:  Can you repeat the
7  question, please.
8      A.   Is it on the record, is it off the
9  record.
10     THE WITNESS:  Sorry.  Go ahead.
11     (Record read.)
12     Q.   I can clarify.
13     A.   Okay.
14     Q.   To the judge, telling a judge that the
15 instruction is ridiculous.
16     A.   I don't think that's appropriate.
17     Q.   All right.  Ms. Yehoshua, have you ever
18 been convicted of a crime?
19     A.   No.
20     Q.   Have you ever been arrested?
21     A.   No.
22     Q.   Have you ever filed for bankruptcy?
23     A.   No.
24     Q.   Have you ever been a joint filer for
25 bankruptcy?

1          A. Yehoshua
2      A.   No.
3      Q.   All right.  Other than this lawsuit
4  and -- okay.  Let me strike that.
5      You have two litigations against the
6  Transit Authority currently pending; is that
7  correct?
8      A.   Correct.
9      Q.   Okay.  And one is in federal court,
10 which is the case we are here to discuss, and one
11 is a proceeding in state court in which you are
12 asserting various claims, including defamation; is
13 that correct?
14     A.   Correct.
15     Q.   All right.  So other than those two
16 litigations, have you ever been a party to a
17 litigation otherwise?
18     A.   The one that I was describing to you
19 earlier with the contractor.
20     Q.   Yes.  Other than that one.
21     A.   My son fell and I was his guardian, but
22 I was not the plaintiff.  I was just his guardian
23 in the case.
24     Q.   And is that -- did he fall off a
25 scooter?

1          A. Yehoshua
2      A.   Yes, he did.
3      Q.   And so do you recall when that case was
4  filed?
5      A.   No.
6      Q.   Could it have been 2020?
7      A.   I don't recall.
8      Q.   All right.  And do you remember in what
9  court you filed it?
10     A.   Supreme state court.
11     Q.   Kings County, New York County?
12     A.   Kings.
13     Q.   And did you have a lawyer in that case?
14     A.   I did.  I do.
15     Q.   Is it pending?
16     A.   I believe it's still pending.
17     Q.   And who is your lawyer?
18     A.   Ezra Glaser.
19     Q.   Okay.  And you said you believe it's
20 still pending.  All right.
21     And can you describe a high-level
22 description of the nature of claims that are
23 asserted in that case?
24     A.   My son fell off a scooter on the street
25 between Avenue S and Avenue T and he had injuries.

23 (Pages 86 - 89)

A. Yehoshua

1 I took him to the hospital. He fractured his -- I
2 don't know if it was his right arm or his left
3 arm.
4    Q.    Okay. He is healed now?
5    A.    Now he is -- yeah, he had physical
6 therapy and he had his cast removed. He is fine,
7 yes.
8    Q.    Good.
9    A.    That was probably more than three years
10 ago.
11    Q.    Were you deposed in connection with
12 that case?
13    A.    No.
14    Q.    And did you as your son's guardian
15 assert any claims for emotional distress in that
16 litigation?
17    A.    I don't remember.
18    Q.    All right. And I did want to ask you
19 about the contractor litigation that we previously
20 discussed. Did you -- were you deposed in that
21 case?
22    A.    I don't remember.
23    Q.    And did you assert any claims for
24 emotional distress in that case?

A. Yehoshua

1    A.    I don't believe so.
2    Q.    Okay. Any other litigations?
3    A.    Not that I remember.
4    Q.    All right. Do you remember
5 participating in a litigation as a plaintiff
6 against British Airways, Iberia Airways and
7 International Airlines Group?
8    A.    I was not the plaintiff. That was a
9 case -- my youngest son.
10    Q.    Is that David Yehoshua?
11    A.    David, yes.
12    Q.    Is there a reason that the caption in
13 that case would read David Yehoshua comma Amelia
14 Yehoshua under plaintiffs if you were not a
15 plaintiff?
16    A.    Well, he -- he sustained an injury on a
17 plane. I did not sustain any injuries. I don't
18 know why the caption read that way. I was just
19 his guardian.
20    Q.    Okay. And did you assert any claims in
21 that litigation?
22    A.    I was his guardian. I was not injured.
23    Q.    Did you assert any claims on your own
24 behalf in that litigation?

A. Yehoshua

1    A.    I don't remember.
2    Q.    Were you deposed?
3    A.    No.
4    Q.    Did you assert any claims for emotional
5 distress in that case?
6    A.    I don't believe so.
7    Q.    What was the outcome of that case?
8    A.    That settled.
9    Q.    Do you remember in what year it was
10 settled?
11    A.    No.
12    Q.    All right. And other than any filings
13 you may have made in connection with your
14 litigation here today, have you ever filed an
15 administrative charge or a claim for arbitration
16 or any other, you know, proceeding, commenced a
17 proceeding as a plaintiff that we haven't already
18 discussed?
19    A.    I think I -- I think I filed a claim
20 against my first attorney in the contractor
21 dispute case.
22    Q.    Mark Lefkowitz?
23    A.    Yes.
24    Q.    What was the outcome of that?

A. Yehoshua

1    A.    That was in Kings Civil Court and --
2    Q.    Civil like under $25,000 civil court?
3    A.    I believe so. It was like an $8,000
4 claim. I think that was the amount. But the
5 judge did not award any money.
6    Q.    Were you deposed?
7    A.    No.
8    Q.    And did you assert any claims for
9 emotional distress in that litigation?
10    A.    No.
11    Q.    Did you file a complaint against Mark
12 Lefkowitz with a grievance committee?
13    A.    Well, I thought I did, but then -- I
14 don't know. I don't remember.
15    Q.    Okay. All right. So other than -- you
16 couldn't recall. I asked you if you had been
17 deposed in one or two of the litigations that we
18 just described and you couldn't recall.
19    Can you recall being deposed prior to
20 today either as a party in a case or as a witness?
21    A.    Other than the cases that we talked
22 about already?
23    Q.    Yes, but you -- I don't believe that
24 you identified any case in which you were deposed.

24 (Pages 90 - 93)

Page 94

A. Yehoshua
1
2 I believe you said you couldn't remember. But
3 please correct me. Is there -- do you recall
4 being deposed at any time?
5     A.   If my son sued the City in the scooter
6 accident, then I may have been deposed for the
7 hearing, not the deposition. I know a deposition
8 did not go forward.
9     Q.   Oh, like a 50-h hearing?
10    A.   Yes.
11    Q.   Okay. Any other times that you gave
12 testimony in deposition?
13    A.   Not that I recall.
14    Q.   So and including as a witness; is that
15 right?
16    A.   As a witness?
17    Q.   Yes.
18    A.   I don't recall.
19    Q.   Have you given testimony in trial or
20 any other formal proceeding like arbitration
21 before that you can remember?
22    A.   Yes. In the -- in the Mark Lefkowitz
23 arbitration. I don't believe it was on the
24 record, though. It was just before an arbitrator.
25    Q.   Was this the Kings Civil Court

Page 95

A. Yehoshua
1
2 proceeding?
3    A.   Yes.
4    Q.   And was that a mediator, do you think?
5    A.   No, I think it was a judge.
6        MS. USENHEIMER: It was a judge. Okay.
7 Thank you very much.
8        All right. So now I'd like to mark a
9 copy of what we are going to mark as
10 Defendants' Exhibit 7.
11        (Defendants' Exhibit 7, Application
12 Details for Amelia Dweck, Bates stamped NYCTA
13 004171 through NYCTA 004200, marked for
14 identification.)
15        MS. USENHEIMER: Actually, I just need
16 a two-minute break. So can we just go off
17 the record for a minute.
18        (Recess was taken from 11:39 to 11:44.)
19 BY MS. USENHEIMER:
20    Q.   Ms. Yehoshua, did there come a time
21 that you applied to work for New York City Corp
22 Counsel?
23    A.   Yes.
24    Q.   Okay. And when was that?
25    A.   The application was online and I

Page 96

A. Yehoshua
1
2 believe it was sometime in December of 2021.
3    Q.   Okay. Why did you apply for that job?
4    A.   Why? Because I was not happy traveling
5 50 miles per day at my previous job.
6    Q.   Okay. When you say your previous job,
7 did you hold that job when you applied, or was
8 that already a previous job and you were
9 unemployed at the time you applied for New York
10 City?
11    A.   No, I was working at the job.
12    Q.   That was the Miranda Slone --
13    A.   Yes.
14    Q.   Okay. And where was that located?
15    A.   Mineola, Long Island.
16    Q.   So did you take the Long Island Rail
17 Road or did you drive?
18    A.   In the beginning I took the Long Island
19 Rail Road, I think the first month of working
20 there, and then the second month I started
21 driving.
22    Q.   And what was like the remote work
23 arrangement at that point?
24    A.   There was none.
25    Q.   So it was in office five days?

Page 97

A. Yehoshua
1
2    A.   It was six days a week in the office,
3 required.
4    Q.   Six days a week?
5    A.   Well, I -- it was five days a week. I
6 worked six days a week, because I couldn't work 9
7 to 5 on Fridays, so I had to come in on Sundays to
8 make up the time that I lost by leaving early on
9 Fridays.
10    Q.   But, I mean, there are months of the
11 year when sundown is way later than 5:00, so you
12 could work 9 to 5 in the summer when sunset is
13 later; right?
14    A.   This job started at the -- probably in
15 the end of summer, probably in July, maybe, and it
16 was five days a week in the beginning, but then
17 when sun started going down earlier, then it
18 started to change. I had to leave earlier and
19 earlier.
20    Q.   Like around -- did you leave at like
21 2 --
22    A.   No.
23    Q.   -- in the winter months? Like what
24 time would you leave?
25    A.   Between 2 and 3, depending on traffic.

25 (Pages 94 - 97)

Page 98

A. Yehoshua

1
2    Q.    Oh, because that was when you were
3  driving.  All right.
4    A.    Sometimes it took two hours to get
5  home.
6    Q.    And where do you live or where did you
7  live during the period of time that you worked at
8  Miranda Slone?
9    A.    Brooklyn.
10   Q.    And do you still live in the same
11 address?
12   A.    Yes.
13   Q.    We will get to that later.  What
14 neighborhood of Brooklyn?
15   A.    I don't know if it's called Madison or
16 Flatbush, Sheepshead Bay, Marine Park.  I don't
17 know the neighborhood.
18   Q.    Okay.  That's fine.
19   A.    I -- people call it different names.
20   Q.    No problem.  Why did you make the
21 decision to stop taking the railroad and to drive?
22   A.    Oh, the railroad was very difficult.  I
23 had to walk -- it took me longer to walk to the
24 train station and to transfer at Atlantic Avenue
25 for the Long Island Rail Road, it was very long

Page 99

A. Yehoshua

1
2  and difficult for me to walk and to wait for the
3  train and it was a very hard commute.
4    Q.    All right.  Okay.  So we have marked
5  this document as Defendants' Exhibit 7.
6    A.    Okay.
7    Q.    Which it is marked NYCTA 4171 through
8  4194, and then the last page is 4200.
9       So Ms. Yehoshua, I am going to
10 represent to you that these documents were
11 received from the Corporation Counsel via
12 subpoena.
13      MS. VINCI:  Just for the record, mine
14 goes straight from 4171 to 4200.  There isn't
15 a break.
16      MS. USENHEIMER:  Okay.  That's no
17 problem.  That was just a -- all right.
18 Perfect.  That's fine.  Let's just correct
19 the record.  Okay.  So it goes straight
20 through from 4171 to 4200.
21   Q.    All right.  So I'd like to review these
22 documents with you.  They have been previously
23 produced in litigation.  So the first page here,
24 at the top it prints a job ID number and a job
25 title.  Is it your understanding that that's the

Page 100

A. Yehoshua

1
2  job that you applied for, Assistant Corp Counsel,
3  Tort Division?
4    A.    The job title is correct.
5    Q.    Okay.  And the name under General
6  Information is Amelia Dweck.  Is that you?
7    A.    That's -- that's my name as an
8  attorney.  I never changed my name as an attorney.
9    Q.    So you are admitted to practice under
10 Dweck?
11   A.    Yes.
12   Q.    And is that your maiden name?
13   A.    Yes.
14   Q.    Okay.  And at the very bottom of this
15 page you see there is a date and time stamp.  Do
16 you have any understanding of what that -- the
17 date or time stamp might mean?
18   A.    No.
19   Q.    Okay.  All right.  Then I'd like to
20 look at the document at the bottom that's marked
21 4173.  Do you see that?
22   A.    Yes.
23   Q.    Okay.  Is this a copy of your resume?
24   A.    It appears to be.
25   Q.    All right.  Do you have any reason to

Page 101

A. Yehoshua

1
2  believe this is not a copy of the resume that you
3  submitted when you applied to the New York City
4  Corp Counsel?
5    A.    No.
6    Q.    All right.  Great.  Okay.  Then I'd
7  like to look at page 4176.  So at the top of this
8  this form is called the City of New York
9  Comprehensive Personnel Document and it's
10 abbreviated CPD-B on this form.  Do you see that,
11 you agree that's what it's titled?
12   A.    Yes.
13   Q.    Okay.  And then right under that there
14 is, again, Submitted Date Time and it's a date and
15 time stamp.  Again, do you have any understanding
16 of what that date and time stamp is?
17   A.    I don't see a date on mine.
18   Q.    Do you see where it says "Submitted
19 Date Time" and colon?
20   A.    Oh, Submitted Date Time.  I don't have
21 any understanding what that means.
22   Q.    Is it possible it's the date on which
23 you completed the application?
24   A.    I don't know.
25   Q.    Okay.  All right.  So does this --

26 (Pages 98 - 101)

A. Yehoshua

1    okay. So I'd like to look at under -- there is a
2    heading CPD-B Information, the third heading, the
3    third bullet point, it starts with: "All false
4    statements made herein." Can you see that? Would
5    you like a pen?
6        A.   No. It's the third one, not the fourth
7    one.
8        Q.   I'm sorry. I thought I said the third.
9    "All false statements made herein," do you see
10   that?
11       A.   Yes.
12       Q.   Can you just read that to yourself and
13   let me know when you finish.
14           (Document review.)
15       A.   I finished.
16       Q.   Okay. Did you read that when you were
17   completing your application?
18       A.   I don't remember.
19       Q.   All right. Do you have any -- do you
20   have any understanding of what that means?
21       A.   Same understanding anybody would have.
22       Q.   Which is what?
23       A.   What it says.
24       Q.   Okay. And then the fourth bullet

A. Yehoshua

1    point, the bullet point right under it, which is
2    "all applicants are required," can you read that
3    to yourself and let me know when you have
4    completed.
5            (Document review.)
6        A.   I read it.
7        Q.   Okay. And did you review that
8    instruction at the time you completed this
9    application?
10       A.   I don't remember.
11       Q.   Okay. And do you have any
12   understanding of what that instruction means?
13       A.   What it says.
14       Q.   Okay. And so did you comply with those
15   instructions when completing this application?
16       A.   To the best of my ability.
17       Q.   All right. So yes, the next page, you
18   are ahead of me, which is marked at the bottom
19   4177, if you look at six questions up from the
20   bottom, the question is: "Were you ever
21   disciplined (i.e., suspended, demoted,
22   reprimanded, fined, fired, terminated, discharged)
23   in any position by either a public or private
24   employer?" And what did you -- what answer did

A. Yehoshua

1    you provide there?
2        A.   "No."
3        Q.   Okay. And was that a truthful
4    response?
5        A.   That was with the advice of counsel.
6        Q.   Okay. And what counsel gave you that
7    advice?
8        A.   An attorney that I was working with at
9    the time.
10       Q.   And who is that?
11       A.   A different attorney than I have today.
12       Q.   And who is that? Do you not know the
13   answer to the question or --
14       A.   I don't want this attorney to have any
15   issues in this case.
16           MS. USENHEIMER: Okay. Well, let's go
17   off the record.
18           (Recess was taken from 11:54 to 12:00.)
19   BY MS. USENHEIMER:
20       Q.   Okay. So I am going to ask you again,
21   who was the attorney who gave you advice to answer
22   this question with a "no"?
23       A.   Corey Stark.
24       Q.   All right. And it's your understanding

A. Yehoshua

1    that that advice was -- the answer that you
2    provided, "no," is incorrect; is that right?
3        A.   That's correct.
4        Q.   And do you have any understanding of
5    why Corey advised you like that?
6        A.   I'll wait for my counsel.
7            THE COURT REPORTER: I'm sorry? I
8    didn't hear you.
9        A.   I said I'll wait for my attorney to let
10   me know if I can answer that question. I don't
11   know if I can answer.
12           MS. VINCI: Can you repeat the
13   question.
14           MS. USENHEIMER: If she has an
15   understanding of why Corey gave her an
16   instruction to answer the question
17   inaccurately.
18           MS. VINCI: To the extent that it would
19   involve attorney/client privilege, we would
20   object to that question. She can answer as
21   best as she can.
22           MS. USENHEIMER: Well, I think we need
23   to mark it for a ruling. I will be honest, I
24   did not research the extent or scope of

27 (Pages 102 - 105)

A. Yehoshua

1           A. Yehoshua
2   attorney/client privilege before this
3   deposition, but considering that it is a
4   crime to lie on this form, I think it falls
5   outside attorney/client privilege, but you
6   can answer to the best of your ability now
7   and we will revisit it.
8       THE WITNESS: So without waiving
9   attorney/client privilege, I'll answer it?
10      MS. VINCI: If you can.
11    A.   He said that the MTA was repeatedly
12 saying that they would wipe the slate clean once
13 this case settles. Every time they have a
14 conference, they keep asking to clean your record,
15 clean your record, so this won't stand anymore.
16    Q.   What won't stand anymore?
17    A.   The suspension.
18    Q.   What about the termination?
19    A.   That goes for everything, clean,
20 meaning nothing. That's what he said that you
21 were telling him.
22    Q.   "You" meaning me, Gena?
23    A.   "You" meaning defendants.
24    Q.   Defendants. Okay. And did he also --
25 is that what he told you or did he also give you a

A. Yehoshua

1           A. Yehoshua
2 specific instruction to indicate "no" in response
3 to that question?
4    A.   That's what he told me.
5    Q.   So it was your decision to mark "no" in
6 response to that question?
7    A.   It was on -- based on the conversation
8 I had with him.
9    Q.   Okay. Let's move to the -- thank
10 you -- the next question, 4178. I'm sorry. The
11 next page, 4178.
12      Okay. So in the middle of the page you
13 will see here there is a discussion about this
14 Miranda Sloan (sic) Sklarin Vervenio (sic) law
15 firm. Do you see you indicated that you worked
16 there?
17    A.   Yes.
18    Q.   Okay. And you said the start date was
19 June 7, 2021. Is that correct?
20    A.   Seems correct, based on the form.
21    Q.   And then the salary is indicated under
22 last salary, I think that says 150,000; correct?
23    A.   Yes, correct.
24    Q.   Okay. And the time that you applied --
25 that you filled out this form, were you still

A. Yehoshua

1           A. Yehoshua
2 working at this Miranda Slone -- it's a law firm?
3    A.   It's a law firm.
4    Q.   So were you still working at Miranda
5 Slone?
6    A.   I don't know when I filled out the
7 form. I don't know if it was in the evening, on a
8 weekend.
9    Q.   I mean, were you employed?
10    A.   I was an employee.
11    Q.   Yeah.
12    A.   Oh, I didn't understand the question.
13    Q.   Sorry. Good point, but yes, that's
14 what I mean, you were an employee.
15      And then it indicates here "Reason for
16 Leaving" and you wrote: "Job commute is too far,"
17 correct, that's what it says?
18    A.   Correct.
19    Q.   Okay. And have you told me all the
20 facts that relate to the difficult job commute or
21 is there anything else to add?
22    A.   That's the primary reason.
23    Q.   What were the other reasons?
24    A.   I was starting out as a new attorney
25 there. I wasn't experienced. I didn't have any

A. Yehoshua

1           A. Yehoshua
2 accrued vacation time. I didn't have anything. I
3 had no benefits. I had nothing. But that was the
4 primary reason.
5    Q.   And so when you say you were a new
6 attorney without experience, that specifically
7 related to benefits and accrued time off and
8 vacation time or something else?
9    A.   No, I'm saying that I was new to the
10 firm, so I was not given any vacation time because
11 I was brand new, so I had to accrue the time.
12    Q.   Okay. But the primary reason was the
13 commute; is that right?
14    A.   Yes.
15    Q.   Okay. And then under that it starts
16 your submission about your employment at the
17 Transit Authority. The start date provides
18 4-22-2013.
19    A.   Okay.
20    Q.   Do you see that, where it -- it's on
21 4178.
22    A.   4-22-2013 to 4-5 -- 4-5-2021. Okay.
23    Q.   Do you know -- yeah, so I wanted to ask
24 you about the end date of 4-5-2021. Do you know
25 why you selected that date?

28 (Pages 106 - 109)

Page 110

A. Yehoshua

1
2    A.   No, I don't remember why.
3    Q.   Okay.  And then a couple lines below
4  where it asks -- same page -- last salary
5  indicates 141,000.  Is that an accurate --
6    A.   Yes.
7    Q.   -- reflection of your last salary, to
8  the best of your recollection?
9    A.   Yes.
10   Q.   Okay.  And then yes, the top of the
11 next page you wrote reason for leaving, "wanted
12 more money."
13   A.   Yes.
14   Q.   So that's an inaccurate reason for
15 leaving; is that right?
16   A.   It says "Reason for Leaving."  Leaving.
17 So it doesn't say -- it assumes that you are
18 leaving.  So it made sense.  I was leaving for
19 more money.
20   Q.   But isn't it true that you left because
21 you were -- at least as of this date, what you
22 indicate is your end date, which is 4-5-2021, you
23 were suspended?
24   A.   At that time I -- yes.
25   Q.   And at the time you indicated that you

Page 111

A. Yehoshua

1
2  completed -- hold on, give me one second,
3  please -- that the online application was
4  completed sometime in December of 2021.
5          By December of 2021, you had already
6  been terminated from Transit; is that correct?
7    A.   I don't remember.
8    Q.   Okay.  So do you have any other
9  information to add as to why you indicated that
10 you left Transit because you wanted more money?
11   A.   No.
12   Q.   All right.  Are you aware of any other
13 untrue statements that you submitted to Corp
14 Counsel in connection with your application?
15   A.   No.
16   Q.   All right.  I'd like to look at 4187,
17 please.  All right.  Do you see the two questions,
18 the first one is "was a license held by you ever
19 suspended," do you see that question?
20   A.   Yes.
21   Q.   All right.  Is the answer that you
22 provided to that question true and correct?
23   A.   True.
24   Q.   And the next question, "have you ever
25 been censured or disciplined," is that true or

Page 112

A. Yehoshua

1
2  correct?
3    A.   True.
4    Q.   Okay.  Then I'd like you to turn to
5  4194.  Okay.  And you -- at the bottom of this
6  page it indicates "Signature of Applicant."
7  That's your name; is that correct?
8    A.   Yes.
9    Q.   All right.  And then the date, does
10 that refresh --
11   A.   It's not a signature.  It's just typed.
12   Q.   But that's your name?
13   A.   That's my name.
14   Q.   Okay.  And the date, do you have any
15 understanding of what that date is?  Could that
16 have been the date on which you submitted the
17 application?
18   A.   It's possible.  I don't know for sure.
19   Q.   Okay.  And did you understand that when
20 you completed this, you were signing it and
21 representing to the City that all the information
22 was true and correct?
23   A.   What I -- what I was -- I believed that
24 with the advice of counsel that everything that I
25 had signed was accurate.

Page 113

A. Yehoshua

1
2    Q.   Okay.  And that's the advice of counsel
3  that you previously described in your testimony;
4  is that correct?
5    A.   Yes.
6    Q.   And I'm not even sure that that
7  answered my question.  You understood that when
8  you submitted this form to the City, that you
9  were -- I'm sorry.
10         MS. USENHEIMER:  Can you read back my
11 question.
12         (Record read.)
13         THE WITNESS:  I answered it.
14         MS. USENHEIMER:  Can you read back her
15 answer.
16         (Record read.)
17   Q.   But my question is that did you
18 understand that you were representing to the City
19 that all the information that was contained within
20 this was true and correct?
21   A.   And I'll say it again.  I filled it out
22 to the best of my knowledge and with the
23 assistance of counsel.  So I believed it to be
24 accurate with the advice of counsel.
25   Q.   Did you understand that you were

29 (Pages 110 - 113)

Page 114

A. Yehoshua

1
2  submitting this form under penalty of perjury?
3  It's really a yes or no response.
4      A.  Where does it say that?
5      Q.  Okay.  Please turn to 4194.  In the
6  middle of the page under the capitalized words it
7  says:  "By signing below, I affirm, under the
8  penalties of perjury, that," there is a number of
9  bullet points, including:  "I have personally
10  completed this application, and everything I have
11  written within is, to the best of my knowledge and
12  belief, true and complete."
13      A.  I guess I didn't read this.
14      Q.  Okay.  You didn't read this when you
15  submitted the form, is that your testimony?
16      A.  That's my testimony.
17      Q.  Okay.  And then did there come a
18  time that you received -- strike that.
19          What was the outcome of your
20  application here?
21      A.  I received a start date.
22      Q.  And what was your start date?
23      A.  I think it was April 25th.
24      Q.  April 25th?
25      A.  2022.

Page 115

A. Yehoshua

1
2      Q.  April 25th, 2022, was your start date
3  at the City?
4      A.  Correct.
5      Q.  And the location was where?
6      A.  Brooklyn.
7      Q.  And do you remember more specifically
8  where your office was?
9      A.  The address was something Cadman Plaza.
10      Q.  Okay.  Fine.  All right.  And then --
11  all right.  But your employment with the New York
12  City Corp Counsel came to an end; correct?
13      A.  Correct.
14      Q.  And why was your employment terminated?
15      A.  I don't know.
16      Q.  No one ever told you why?
17      A.  No.
18      Q.  Do you believe it to be because there
19  were false statements included in the application?
20      A.  I don't know.
21      Q.  Do you have any claims against
22  defendants in your action today that we are
23  discussing that relate to your termination from
24  the City?
25      A.  No.

Page 116

A. Yehoshua

1
2      MS. USENHEIMER:  Okay.  Thank you.  All
3  right.  Let's now mark Defendants' Exhibit 8,
4  which is a copy of your resume.  This is
5  Bates stamped at the bottom P 351, which is a
6  document that you produced in discovery.
7          (Defendants' Exhibit 8, Amelia Dweck
8  resume, Bates stamped P000351, marked for
9  identification.)
10      Q.  All right.  So do you recognize this
11  document?
12      A.  Yes.
13      Q.  Okay.  Is it a true and correct copy of
14  your current resume?
15      A.  No, not currently.
16      Q.  Okay.  So is there a more-up-to-date
17  resume that you have?
18      A.  I don't have an up-to-date resume, but
19  what I'm saying is it's not current, because it
20  says "present," so it wouldn't be current.
21      Q.  I see.  But this is the most -- is this
22  the last resume that you have prepared, or is
23  there a document that exists later in time to
24  this?
25      A.  Okay.  No.

Page 117

A. Yehoshua

1
2      Q.  No other copies of your resume exist?
3      A.  Okay.  No.
4      Q.  She did say:  "Okay.  No."  I saw that.
5  I heard that.
6      A.  I meant no.
7      Q.  All right.  Do you remember when this
8  was prepared then?
9      A.  No.
10      Q.  All right.  Fine.  Okay.  So at the top
11  it indicates your Bar status and education.  Can
12  you just quickly review that and let me know if
13  anything needs to be corrected there, if that's
14  all correct information?
15      A.  It's correct.
16      Q.  All right.  And then it does not -- it
17  says you are admitted in New York.  Is that the
18  only state in which you are admitted?
19      A.  Correct.
20      Q.  And have you ever been admitted to
21  another state?
22      A.  No.
23      Q.  The education information, the
24  information that you provided about Touro, true
25  and correct?

30 (Pages 114 - 117)

1              A. Yehoshua
2    A.   Correct.
3    Q.   All right.  And what about the Hunter
4 College education line?
5    A.   Correct.
6    Q.   Okay.  Great.  Other than the job at
7 McGivney Kluger Clark and the New York City Law
8 Department we just talked about, did you hold any
9 other jobs after working at Miranda Slone?
10    A.   I was a poll worker for the New York
11 City Board of Elections.
12    Q.   And did that pay?
13    A.   Yes.
14    Q.   For how long did you hold that
15 position?
16    A.   Oh, that was whenever there was an
17 election, so it was probably twice a year.
18    Q.   And can you ballpark estimate how much
19 money you earned in 2021 from this job?
20    A.   Less than -- less than a thousand
21 dollars.
22    Q.   And what about in 2022?
23    A.   Same thing, poll worker.
24    Q.   And have you done it yet in 2023?
25    A.   No.

1              A. Yehoshua
2    Q.   And in 2022 was it also less than a
3 thousand dollars, give or take?
4    A.   Yes.
5    Q.   Okay.  And then no other positions then
6 other than the Corp Counsel position and this
7 McGivney Kluger job; is that right?
8    A.   Correct.
9         MS. USENHEIMER:  Okay.  Great.  So
10    let's actually mark as 9 Plaintiff's document
11    marked 602, which is your offer letter that
12    you recently produced.
13         (Defendants' Exhibit 9, letter dated
14    March 24, 2023, Bates stamped P000602 and
15    P000603, marked for identification.)
16    Q.   So is this a true and correct copy of
17 the offer letter that you received to work at this
18 law firm of McGivney Kluger?
19    A.   Yes.
20    Q.   Okay.  And when did you start working
21 here?
22    A.   May 15th, 2023.
23    Q.   And was there a particular reason for
24 the length of time between the offer letter and
25 your start date?

1              A. Yehoshua
2    A.   I had plans to go away for Passover.
3 Passover was in April.  So I knew I wouldn't have
4 any vacation time if I started a new job.
5    Q.   Where did you go?
6    A.   Nowhere.  Passover I don't work the
7 first two days and the last two days.
8    Q.   Oh, I thought you just said you had
9 plans to go away.
10    A.   Go away meaning go, no work, you know.
11 I went to visit family, went to New Jersey to
12 visit a friend.  I didn't go --
13    Q.   So May 15th was your start date?
14    A.   Right.
15    Q.   Okay.  And are you still employed at
16 this job?
17    A.   Yes.
18    Q.   And there has been no change in
19 employment since May 15, 2023?
20    A.   No.
21    Q.   Okay.  And number 2 in this letter
22 indicates your annual base compensation is set at
23 $170,000.  Is that your current salary?
24    A.   Correct.
25    Q.   Okay.  And it looks like you are

1              A. Yehoshua
2 eligible for a bonus.  Is that also correct?
3    A.   Oh, it's pretty much impossible.  I did
4 read that, but it's impossible.  I will not get
5 this.  It's very hard to bill 45 hours a week.
6    Q.   I agree.  It is -- I mean, that's your
7 regular billing requirement, is an average minimum
8 of 45 hours a week.  I agree that that is a very
9 high average billing requirement.  But the bonus
10 is under 2(a).
11    A.   Right.
12    Q.   That looks like it's an average of 50
13 billable hours.  Is that what you are saying you
14 won't be able to --
15    A.   I am saying it's difficult and I have
16 not reached that, so I don't know how it's
17 possible.  I guess you would have to have a lot of
18 experience with billing.
19    Q.   Well, what about in weeks when you
20 are -- what are your job responsibilities?
21    A.   I'm a trial attorney.
22    Q.   So what about on weeks when you are on
23 trial?  You testified that you worked 80 hours a
24 week at Transit, so that would exceed 50 billable
25 hours a week here; is that right?

31 (Pages 118 - 121)

Page 122

A. Yehoshua

1
2    A.    I hope so.  I haven't had a trial yet.
3    Q.    Oh, you have not had a trial since May?
4    A.    I've had -- I've appeared for trial,
5 I've settled cases.  I have not made any opening
6 statements to juries yet.
7    Q.    Okay.  And what is the nature of --
8 like what kind of cases does this law firm handle?
9 What I mean by that, is it torts work, is it some
10 other specialty?
11    A.    The firm itself handles all varieties
12 of cases, but I am in a special unit.  It's the
13 auto unit, so I only do auto cases.
14    Q.    Okay.  And the people who -- your
15 clients are insurance companies or drivers?
16    A.    Insurance companies.
17    Q.    Got it.  Okay.  Okay.  And this job, is
18 it located at 80 Broad Street?
19    A.    Yes.
20    Q.    And is there remote work flexibility?
21    A.    Not if you are -- have a trial
22 conference or -- there is a potential for remote
23 work, but it's -- it doesn't take into
24 consideration if you have a court appearance.  So
25 if you have a court appearance, you have to go to

Page 123

A. Yehoshua

1
2 court five days a week, it depends on -- like if
3 you pick a jury, you have to stay there, so --
4    Q.    Sure.  Okay.  And what courts do you
5 appear or practice in in this job?
6    A.    Brooklyn and the Bronx.
7    Q.    All right.  And you testified you still
8 hold this job; right?
9    A.    Yes.
10    Q.    And since you left the Miranda Slone
11 job, did you -- in addition to jobs that you held,
12 did you hold any like 1099 contractor positions,
13 did you freelance or have any other source of
14 income other than what we have discussed?
15    A.    I may have referred some cases to
16 attorneys for referral fees.
17    Q.    Okay.  And can you ballpark, you know,
18 how much money you made from referral fees since
19 2021?
20    A.    No.
21    Q.    Was it less than a thousand dollars?
22    A.    I don't know.
23    Q.    Less than 10,000?
24    A.    I don't know.  I don't want to guess.
25 I'm not guessing.

Page 124

A. Yehoshua

1
2    Q.    Okay.  We can follow up.  It's fine.
3 Okay.  All right.
4         When you started working at the Miranda
5 Slone firm, was that during the period you were on
6 suspension at the Transit Authority?
7    A.    June 2021, yes.
8    Q.    Okay.  And but did you formally resign
9 your job at the Transit Authority when you took a
10 new job, or how did you handle that?
11    A.    Well, on the advice of counsel, which I
12 don't want to say --
13         MS. VINCI:  Just answer the question.
14    A.    Okay.  I did not resign.
15    Q.    Did you seek permission for outside
16 employment?
17    A.    I sought reinstatement.
18    Q.    Did you seek permission from the
19 Transit Authority for outside employment?
20    A.    I sought legal advice and I was advised
21 to mitigate and to find other employment and I
22 took that advice.
23    Q.    All right.  Let's please move to the
24 bottom --
25    A.    The bottom?

Page 125

A. Yehoshua

1
2    Q.    Yes, the bottom of the resume.  Thank
3 you.
4    A.    Which resume?
5    Q.    What you are -- oh, I'm sorry.  The
6 resume is Exhibit 8.  Okay.  So it indicates here
7 you are fluent in Spanish.  Is that true?
8    A.    Correct.
9    Q.    All right.  Any other languages?
10    A.    I -- I'm not fluent, but I speak a
11 little bit of Hebrew.
12    Q.    And then right above it you have an
13 entry here for a law firm, I might say it wrong,
14 is it Cheven or Cheven Keely?
15    A.    Cheven.
16    Q.    Is this a true and correct description
17 of the dates that you held that job?
18    A.    Yes.
19    Q.    And is the job responsibilities you set
20 out here true and correct?
21    A.    Yes.
22    Q.    Okay.  Did you have any allegations of
23 discrimination, harassment or retaliation at that
24 firm?
25    A.    No.

32 (Pages 122 - 125)

Page 126

A. Yehoshua

1
2    Q.    Okay.  All right.  Let's more to Morris
3    Duffy.  Is that a true and correct description of
4    the dates that you held that job?
5    A.    Yes.
6    Q.    And are your job responsibilities true
7    and correct?
8    A.    Yes.
9    Q.    All right.  And what was your rate of
10   pay, your last rate of pay at Morris Duffy, if you
11   can recall?
12   A.    I don't recall.
13   Q.    Okay.  And why did you leave this job?
14   A.    Oh, why did I leave Morris Duffy?
15   Q.    Yes.
16   A.    Because I got an offer from the New
17   York City Transit Authority.
18   Q.    And why did you look to leave Morris
19   Duffy?
20   A.    I wasn't looking to leave.  I -- Morris
21   Duffy was outside counsel to the New York City
22   Transit Authority and I was doing a deposition one
23   day at the New York City Transit Authority and
24   someone there said that there is an opening for an
25   attorney.

Page 127

A. Yehoshua

1
2    Q.    And who was that?
3    A.    He is no longer there.  His name was
4    Pilar.  I don't remember his last name.
5    Q.    I know who you are talking about.
6    A.    Oh.  Okay.
7    Q.    Do you have any claims against Morris
8    Duffy for -- or did you have any allegations of
9    discrimination, harassment or retaliation when you
10   worked at Morris Duffy?
11   A.    I didn't pursue any claims.
12   Q.    What does that mean?
13   A.    I think -- I think there was an overall
14   consensus that women with children were not
15   treated fairly, we were required to do a lot of
16   billing, and there were about three women at
17   Morris Duffy that had babies within a year and
18   so -- but I never pursued any -- I just thought it
19   was unfair, because I had three kids there while I
20   was working there.
21   Q.    Okay.
22   A.    But nothing about discrimination.  Is
23   that what your question was?
24   Q.    That's my question, yes.
25        All right.  Let's move to Transit then.

Page 128

A. Yehoshua

1
2    Is the description that you have here about your
3    job at Transit, are the dates correct?
4    A.    Yes.
5    Q.    Okay.  And the job description, is that
6    a true and correct description?
7        THE COURT REPORTER:  That was yours.
8    That's the power.
9    A.    Yes.
10   Q.    Okay.  You took a while to think about
11   it.  Was there something that you were unsure of?
12   A.    No.  I thought you were waiting.  I
13   heard her say your computer.
14   Q.    Oh, sorry.  No.  We were waiting for
15   you.
16   A.    Oh.
17   Q.    And then -- during -- okay.  I would
18   like to show you a copy of what we are going to
19   mark as Defendants' Exhibit 10.
20       (Defendants' Exhibit 10, NY Job Details
21   Summary, Bates stamped NYCTA_004756 and
22   NYCTA_004757, marked for identification.)
23   Q.    Ms. Yehoshua, have you ever seen a
24   document with a similar title here, like Job
25   Details Summary?

Page 129

A. Yehoshua

1
2    A.    No.
3    Q.    Okay.  That makes sense.  I would just
4    like for you to review some of the information on
5    this form about your time at the Transit Authority
6    to the best of your ability to do so.
7        So at the top it indicates your name
8    and your pass number.  Was that your pass number?
9    A.    Looks right.  It's been three years
10   since I've seen it.
11   Q.    Okay.  Fair enough.  You were hired by
12   MABSTOA then; yes?
13   A.    Yes.
14   Q.    All right.  So at the very bottom --
15   this is a two-page document starting at NYCTA
16   4756, but the second page doesn't have any
17   substantive information.  So at the very bottom it
18   indicates 4-22-2013 that you received an
19   appointment to OA, which is MABSTOA, with a
20   starting salary of $110,000.  Does that date and
21   salary look correct to you?
22   A.    Yes.
23   Q.    Okay.  And then the top, the very top,
24   the last entry indicates there was termination
25   entered October 15, 2021.  Does that date sound

33 (Pages 126 - 129)

Page 130

1            A. Yehoshua
2 right to you?
3      A.   I don't remember the date.
4      Q.   Okay.  But you were -- okay.  And your
5 final pay at Transit here is listed at 141,716.
6 Does that seem right to you?
7      A.   Sounds right.
8      Q.   Okay.  Great.  You can put that away
9 then.
10          All right.  So besides the claims that
11 you have in this case, have you ever had any
12 allegations against any prior employer of
13 discrimination or harassment based on religion?
14     A.   No.
15     Q.   What about have you ever had any claims
16 of retaliation against any prior employer?
17     A.   No.
18     Q.   I'm sorry.  Let's just go back to your
19 resume really fast.  I just have one or two more
20 questions.  It's Exhibit 8.
21          Do you hold any degrees or
22 certifications that are not on this resume?
23     A.   No.
24     Q.   And then that e-mail address, that's
25 your e-mail address, that's correct?

Page 131

1            A. Yehoshua
2      A.   Yes.
3      Q.   Okay.  And your address that's up there
4 at the top, that's correct?
5      A.   Yes.
6      Q.   And how long have you lived there?
7 Ballpark is fine.
8      A.   Since the '90s.
9      Q.   And who do you live there with?
10     A.   My husband and my three children.
11     Q.   And what's your husband's name?
12     A.   Yehezkel Yehoshua.
13     Q.   And does he work for the Transit
14 Authority?
15     A.   Yes.
16     Q.   And what's his job?
17     A.   Computer tech.
18     Q.   And what's his salary?
19     A.   I don't know.
20     Q.   You don't know?
21     A.   No.
22     Q.   Was it as much as yours at the Transit
23 Authority?
24     A.   No.
25     Q.   Was it less?

Page 132

1            A. Yehoshua
2      A.   Yes.
3      Q.   And for how long has he worked at the
4 Transit Authority?
5      A.   I think he started in 2015 or '16.  I
6 don't remember.
7      Q.   After you?
8      A.   Yes.
9      Q.   Okay.  All right.  Have you ever been
10 reprimanded or disciplined by a professional
11 organization like the Bar Association or grievance
12 committee?
13     A.   I don't recall.  I don't believe so.  I
14 don't know.
15     Q.   "I don't recall" is a perfectly
16 acceptable answer.  All right.
17          Have you ever learned that another
18 attorney filed a complaint against you with a
19 professional organization like the Bar or
20 grievance committee?
21     A.   No.
22     Q.   And have you ever learned that a judge
23 filed a complaint against you with the Bar or
24 grievance committee?
25     A.   No.

Page 133

1            A. Yehoshua
2      Q.   And can you recall a time when a judge
3 has threatened to sanction you?
4      A.   Are you referring to Judge Freed?
5      Q.   Any judge.
6      A.   The only judge that I had issues with
7 was Judge Freed.
8      Q.   And did Judge --
9      A.   She --
10     Q.   I'm sorry.
11     A.   No, that's it.
12     Q.   Continue.
13     A.   Everyone that was a defendant's
14 attorney that appeared before her had issues with
15 her.
16     Q.   And so did she threaten to sanction
17 you?
18     A.   The threats and the sanction, I don't
19 remember.  I just know that she said harsh words
20 to me.
21     Q.   Any other judge that you can recall
22 threatening to sanction you?
23     A.   I wanted to go on the record with Judge
24 Sokoloff and I -- but there was -- I don't
25 remember the conversation we had, but I was never

34 (Pages 130 - 133)

Page 134

1          A. Yehoshua
2 sanctioned by any judge, if that's your question.
3     Q.   It wasn't, but I'm happy to have the
4 information.
5          Okay.  Has a judge -- can you recall a
6 time when a judge has threatened to have you
7 removed from their courtroom?
8     A.   Never.
9     Q.   Have you been sued for malpractice?
10    A.   Nope.
11    Q.   All right.  I would like to talk about
12 Larry Heisler.  His name is Lawrence Heisler, but
13 I'm going to refer to him as Larry.  Will you
14 understand who I am talking about?
15    A.   Yes.
16    Q.   All right.  So who is Larry Heisler?
17    A.   Who is he?
18    Q.   Yes.
19    A.   Now?  He is the retired -- he was the
20 head of the torts department.  Now he is retired.
21    Q.   And how did you come to know him?
22    A.   I met him when I started working at the
23 Transit Authority.
24    Q.   Okay.  And did there come -- you said
25 that he retired.  Do you recall when he retired?

Page 135

1          A. Yehoshua
2     A.   No.
3     Q.   Could it have been April '21?
4     A.   I don't know.
5     Q.   Okay.  Did he retire before or after
6 you received a twenty-day suspension in connection
7 with the OIG investigation report that we
8 discussed?
9     A.   I don't know.
10    Q.   You don't remember?  Okay, fine.
11         And what is Larry's religion?
12    A.   He is Jewish.
13    Q.   Do you describe him as an Orthodox Jew?
14    A.   Do I describe him as that?
15    Q.   Yes.  Would you describe him as an
16 Orthodox Jew?
17    A.   I don't know his level of Orthodox.  I
18 think -- would he describe himself?  I don't know.
19 He is Jewish.  He is religious.
20    Q.   Is he Shomer Shabbos?
21    A.   Yes, I believe he is.
22    Q.   Does he take off for Yontif and other
23 holidays?
24    A.   I believe he did.
25    Q.   Does he keep kosher?

Page 136

1          A. Yehoshua
2     A.   I don't know.
3     Q.   You have never had a discussion with
4 him about whether or not he keeps kosher?
5     A.   I know he eats matzah on Passover,
6 because we had matzah together.
7     Q.   That's the extent of your understanding
8 of his following of kosher laws?
9     A.   I guess it would follow that he does
10 keep kosher.  We never discussed it.
11    Q.   Do you have an opinion about his level
12 of observance?
13    A.   No, I don't have an opinion.
14    Q.   All right.  Do you believe that he
15 takes his religion seriously?
16    A.   I don't know how serious he takes it.
17    Q.   How would you describe his commitment
18 to the Jewish community, if at all?
19    A.   I wouldn't describe it.
20    Q.   Because you don't have an opinion?
21    A.   I don't know his level of commitment.
22    Q.   And what was the nature of your
23 relationship when you worked with him?
24    A.   He was everyone's boss.  When I
25 started, he was the appeals attorney.  Then he was

Page 137

1          A. Yehoshua
2 promoted to the department head.
3     Q.   Do you recall when he was promoted,
4 ballpark?
5     A.   I started in 2013, so it had to be
6 after that.
7     Q.   And he was promoted because Wallace
8 Gossett left; is that correct?
9     A.   Retired.  I think Wallace Gossett
10 retired.
11    Q.   He was no longer at Transit, because it
12 was Wallace who was in charge of torts; correct?
13    A.   He replaced Wallace.
14    Q.   And did you have a relationship with
15 him other than when he was an appeals colleague
16 and then when he was promoted, boss and employee?
17    A.   What do you mean?
18    Q.   Were you friendly, did you talk, did
19 you communicate outside of work, did you have a
20 cordial relationship, was it acrimonious, did you
21 get along?
22    A.   That's a big question.
23    Q.   You asked me what I meant.  That's what
24 I meant.
25    A.   I mean -- are you asking what type of

35 (Pages 134 - 137)

Page 138

1              A. Yehoshua
2  relationship we had?
3      Q.   I asked you what was the nature of your
4  relationship when you worked with him at Transit?
5      A.   We were friends and I asked him for
6  advice on trials.  He was very knowledgeable.
7      Q.   And would you say that you had a good
8  working relationship with him or a bad working
9  relationship with him?
10     A.   A good working relationship.
11     Q.   And did you communicate about issues in
12 your personal life outside of work-related
13 matters?
14     A.   Very rarely.  I know he met my husband.
15     Q.   And did you -- strike that.
16          How do you think other employees in the
17 torts department would describe your relationship
18 with Larry?
19     A.   I don't know.
20     Q.   Do you think that they would -- others
21 in the torts department would say that he favored
22 you during the period of time he worked at
23 Transit?
24     A.   No.
25     Q.   You don't think they would say that, or

Page 139

1  you don't think that he favored you?
2      A.   I don't know what they said.
3      Q.   Do you think that he favored you while
4  you worked together?
5      A.   No.
6      Q.   Do you believe that all the other
7  attorneys in torts had the same relationship with
8  Larry as you did?
9      A.   I don't know about others attorneys'
10 relationships with Larry.
11     Q.   Do you believe the other attorneys in
12 torts had the same access to Larry that you did?
13     A.   I don't know.
14     Q.   Would you be surprised to learn that
15 other torts attorneys believed that he favored
16 you?
17     A.   I would be surprised to hear that.
18     Q.   Do you have any understanding of why
19 people might think that?
20     A.   I don't know why anyone would say that.
21     Q.   In your experience at Transit, did you
22 ever observe Larry favoring any attorneys or
23 having a special relationship with any attorneys?
24     A.   He was professional.  People sought his

Page 140

1              A. Yehoshua
2  advice.  He was friendly to everyone.  I never saw
3  him favor anyone.
4      Q.   Okay.  And since he retired, has your
5  friendship continued or -- period -- has your
6  friendship continued, question mark?
7      A.   No.
8      Q.   So have you spoken to him since he
9  retired?
10     A.   I don't know when he retired.  I told
11 you I spoke to him the day I got this.
12     Q.   You didn't tell me -- I don't know what
13 "this" is.
14     A.   Okay.  So the last time I spoke to him
15 was when I got this June 12, 2020, letter.
16     Q.   Are you sure?  That's your testimony?
17     A.   No, I'm not sure.  That was a long time
18 ago, but since then I can't recall -- I remember
19 calling him after that and then that was it.  We
20 didn't communicate.
21     Q.   He didn't call you back?
22     A.   He -- he said he wanted to talk to my
23 husband.
24     Q.   So you called him at some point after
25 June 12, 2020, and Larry indicated he wanted to

Page 141

1              A. Yehoshua
2  talk to your husband?
3      A.   Yes.
4      Q.   Why did he want to talk to your
5  husband?
6          MS. VINCI:  Objection.
7          You can answer.
8      Q.   Did he say why he wanted to talk to
9  your husband?
10     A.   He said -- he just said, "I'd rather
11 talk to your husband about this."  That's it.
12     Q.   And the "this" is the Disciplinary
13 Action Notice which we have marked as Exhibit 1?
14     A.   Yes.
15     Q.   Okay.  And do you have an opinion or an
16 understanding as to why he would rather talk to
17 your husband?
18          MS. VINCI:  Object to form.
19          You can answer.
20     A.   He was in a very difficult position.  I
21 don't know.
22     Q.   "He" meaning Larry?
23     A.   Yes.
24     Q.   All right.  And did he, in fact, speak
25 to your husband?

36 (Pages 138 - 141)

Page 142

A. Yehoshua

1
2    A.    Yes.
3    Q.    And were you present for that
4  discussion?
5    A.    No.
6    Q.    Did you ever come to learn what was
7  discussed?
8    A.    My husband told me.
9    Q.    And what topics were discussed?
10   A.    Generally, this --
11   Q.    To the best of your recollection.
12   A.    The next course of action was
13 discussed.
14   Q.    With respect to the Disciplinary Action
15 Notice that we have marked as Exhibit 1?
16   A.    Correct.
17   Q.    And what was the next course of action
18 that was discussed?
19   A.    He recommended to my husband that I
20 should seek legal counsel.
21   Q.    Anything else that you can recall?
22   A.    I think he named some lawyers to get in
23 touch with.
24   Q.    Anything else you can recall from that
25 conversation or their meeting?

Page 143

A. Yehoshua

1
2    A.    I know he felt it was wrong.
3    Q.    Larry?
4    A.    Larry felt that what happened here was
5  wrong.
6    Q.    The "here" again is the Disciplinary
7  Action Notice?
8    A.    I am pointing to Defendants' Exhibit 1.
9    Q.    Was wrong, that's your testimony?
10   A.    It was -- yes.
11   Q.    Did he elaborate or provide any details
12 as to why?
13   A.    That was the feedback I got from my
14 husband.
15   Q.    Well, I am just asking if you --
16   A.    No, I'm saying I didn't speak to Larry
17 directly. That feedback. My husband is not a
18 lawyer. He didn't tell me what words were used.
19   Q.    Do you understand that anything else
20 was discussed in this conversation?
21   A.    I don't remember.
22   Q.    Okay. Okay. And so have you been in
23 communication with him at any time since -- sorry.
24 Let me rephrase that.
25       Have you or your husband been in

Page 144

A. Yehoshua

1
2  communication with Larry at any time since this
3  meeting that your husband had with him?
4    A.    I think I reached out to him once or
5  twice maybe by e-mail to say "what's going on" and
6  he didn't provide -- he -- I don't remember
7  getting a responsive communication. I think it
8  was -- I don't remember the response, but I didn't
9  hear what was going on. I didn't get an answer to
10 my question.
11   Q.    Okay. Do you believe that Larry found
12 you to be trustworthy?
13   A.    I hope so.
14   Q.    Do you believe Larry thought you were
15 honest?
16   A.    What Larry thought you should ask
17 Larry.
18   Q.    Well, I am asking you what you --
19   A.    I was honest -- I was always honest
20 with Larry. I can speak for myself.
21   Q.    Well, my question is do you believe
22 that Larry thought you were honest?
23   A.    I believe -- I believe that Larry
24 believed me when I told him things, yes.
25   Q.    And do you believe Larry to be

Page 145

A. Yehoshua

1
2  trustworthy?
3    A.    Yes.
4    Q.    And honest?
5    A.    Yes.
6    Q.    And would you agree that he is someone
7  who does the right thing, tries to do the right
8  thing?
9    A.    He tries.
10   Q.    Can you recall a particular instance in
11 which he tried but failed?
12   A.    I can't recall. I just would have
13 liked to be transferred earlier.
14   Q.    Any other instances?
15   A.    No.
16   Q.    And what's your opinion of him as a
17 manager?
18   A.    My opinion is that he was excellent.
19   Q.    He was excellent as a manager?
20   A.    My opinion is that he was the most
21 knowledgeable attorney on the whole entire floor
22 because he had been there since the 1970s. He
23 knew cases better than anyone. My opinion is that
24 he was the most knowledgeable in -- with respect
25 to New York City Transit Authority cases.

37 (Pages 142 - 145)

Page 146

A. Yehoshua

1
2    Q.   But I am asking about his opinion --
3 your opinion of him as a manager.
4    A.   Like I said before, I would have liked
5 him to transfer me out of that unit earlier.
6    Q.   But other than that?  I understand you
7 would have liked him to transfer you earlier.
8 Other than that, your general opinion of him as a
9 manager, what was that?
10    A.   Generally, he was responsive, but
11 nobody is perfect.
12    Q.   Did you think he was a good manager?
13    A.   I thought he was a good manager.
14    Q.   All right.  So you testified that Larry
15 is trustworthy.  So are you aware of any reason
16 that Larry would have to lie about you?
17    A.   I cannot think of any reason.
18    Q.   All right.  And so since 2020 or since
19 the date you received the Disciplinary Action
20 Notice that we have marked as Exhibit 1, other
21 than what you have just briefly described to us
22 about communication he had with your husband, have
23 you or your husband communicated with Larry about
24 your litigation in any way?
25    A.   No.

Page 147

A. Yehoshua

1
2    Q.   What about the claims or allegations
3 you have asserted in your case?
4    A.   No.
5    Q.   Has there come a time that Larry
6 discussed his opinion about your claims in this
7 case with you?
8    A.   No.
9    Q.   Okay.  Great.
10    THE WITNESS:  Can I just run to the
11 restroom now?  I'll be right back.
12    MS. USENHEIMER:  Sure.  We could take a
13 five-minute break.
14    (Recess was taken from 12:47 to 12:59.)
15    (Defendants' Exhibit 11, copies of text
16 messages, Bates stamped P000400 through
17 P000409, marked for identification.)
18 BY MS. USENHEIMER:
19    Q.   This is Exhibit 11.  So this is a
20 document Bates stamped P 400 through 408 -- 409.
21 Do you have all those pages?
22    A.   Yes.
23    Q.   Okay.  Great.  Okay.  So you produced
24 these in your discovery.  So are these the only
25 text messages that you have exchanged with Larry

Page 148

A. Yehoshua

1
2 since you received the Disciplinary Action Notice
3 marked as Exhibit 1 in this case?
4    A.   Yes.
5    Q.   Have any texts been modified or
6 withheld?
7    A.   No.
8    Q.   Okay.  So let's look at the first page
9 here.  So the very first communication under the
10 name Larry Heisler says "Mazal tov."  Who -- did
11 you write mazal tov or did Larry write mazal tov?
12    A.   I don't know.
13    Q.   Okay.  And do you have any
14 understanding of what the mazal tov was for?
15    A.   No.
16    Q.   Okay.  And then this text in blue that
17 starts:  "Thank you.  He will meet you this
18 Tuesday, June 16th at 3pm," did you write that or
19 did he write that?
20    MS. VINCI:  I'll just note by counsel
21    that the exhibit is in black and white.
22    MS. USENHEIMER:  Oh, I am sorry.
23    A.   Yeah, I don't have anything in blue.
24    Q.   The text that says:  "Thank you.  He
25 will meet you this Tuesday, June 16th at 3pm in

Page 149

A. Yehoshua

1
2 front of kings supreme court," and continues on to
3 the next page, who is the author of that text
4 message?
5    A.   Oh, so most likely that was me, because
6 I put my husband's cell phone number there.
7    Q.   And do you have any understanding of
8 the -- other than June 16, do you have any
9 understanding what year this text was sent?
10    A.   I believe it was the same -- 2020.
11    Q.   And the "he" in your text message here,
12 "he will meet you," "his phone number is," "he has
13 your number too," that's your husband; correct?
14    A.   Yes.
15    Q.   And what was the purpose of this
16 communication?
17    A.   The purpose?
18    Q.   Uh-huh.
19    A.   Larry wanted to talk to my husband.
20    Q.   Is this what you previously testified
21 to, that Larry wanted to speak to your husband?
22    A.   Yes.
23    Q.   Okay.  Then let's move on to the next
24 page, which is marked P 402.  So the top is just
25 the bottom of your prior text message, right,

38 (Pages 146 - 149)

A. Yehoshua

1            A. Yehoshua
2    "thank you so much Larry."  And then there is a
3    response:  "3:00 on Tuesday.  In front of Supreme
4    Kings."  Do you see that response?
5        A.   Yes.
6        Q.   And was that about Larry meeting your
7    husband as well?
8        A.   I don't know where the -- was it a
9    Tuesday?  I don't know.  Oh, it was a Tuesday, so
10   most likely it would have been the same -- if it
11   was following that, then it makes sense that it
12   was the same Tuesday.
13       Q.   You produced these documents.  We
14   didn't.
15       A.   Yeah, I'm saying -- I'm saying if it
16   was all the same text, the same day, then that
17   makes sense.
18       Q.   Are you aware of another time that
19   Larry met your husband?
20       A.   No.
21       Q.   Okay.  And then --
22       A.   Oh, here is the date, June 16, 2020.
23       Q.   And you believe that's the date of all
24   these communications?
25       A.   Yes.

1            A. Yehoshua
2        Q.   And then on P 404 where it says "Jun
3    16, 2020" --
4        A.   Right.
5        Q.   Was this a text message that you sent
6    to Larry?
7        A.   Yes.
8        Q.   And then -- and have you told me
9    everything that you know about the communications
10   that Larry and your husband had when they met on
11   this day?
12       A.   Well, I told you everything I remember.
13       Q.   Sitting here today, is there anything
14   else that you can recall that you haven't already
15   told me?
16       A.   I'm sure there was more discussion with
17   my husband.  I don't recall the details.
18       Q.   The next page is marked P 406.  The
19   very top you can see it's a little bit cut off, it
20   says -- it looks to me like it says "you hear
21   otherwise."  What was that?
22       A.   I don't know.
23       Q.   Was that a text message between you and
24   Larry?
25       A.   Well, it appears to be.  "To Larry

1            A. Yehoshua
2    Heisler.  I don't know what it was referring to.
3        Q.   Okay.  And is there a reason that it
4    wasn't produced?
5        A.   Maybe it was cut off.  I don't know.
6        Q.   Okay.  And then the next date here is
7    April 7, 2021, that we see.  So do you recall any
8    communications with Larry between June 2020 and
9    April 2021 via text?
10       A.   Via text?  I e-mailed him.  According
11   to the text, I e-mailed him.  So you are asking
12   about prior communications.  There probably were.
13   I was communicating with him by e-mail and this
14   text, but other than these, there was probably no
15   other text.  There were e-mails.
16       Q.   All right.  Except for this text that
17   you don't know what it's about where all we can
18   see is "you hear otherwise"; right?
19       A.   I'm sure it was just cut off.
20  RQ       MS. USENHEIMER:  Okay.  We will relay
21       our request for a non-cut-off version.
22       Q.   All right.  So on April 7, 2021, you
23   sent Larry this text that starts:  "Larry, I
24   emailed you and left you a voicemail"; right?
25       A.   Yes.

1            A. Yehoshua
2        Q.   Who is Lisa?
3        A.   Lisa Urbont.
4        Q.   Okay.  And she was a -- she is retired,
5    but she used to work at Transit; is that right?
6        A.   She was my supervisor.
7        Q.   In the Kings County trial unit?
8        A.   As of January 2020.
9        Q.   You asked Larry in this text:  "Should
10   I assume that you do not want to speak to me?
11   Please let me know."  Why did you ask him that?
12       A.   Because he wasn't answering.
13       Q.   So you left him -- you e-mailed him and
14   left him a voicemail and he didn't respond?
15       A.   Correct.
16       Q.   Was it one e-mail or more than one
17   e-mail?
18       A.   According to this, it was one.
19       Q.   And one voicemail as well?
20       A.   Yes.
21       Q.   And what were you communicating with
22   him about or seeking to communicate with him
23   about?
24       A.   I was seeking to find out what's
25   happening.

Page 154

A. Yehoshua

1
2     Q.    And what does that mean?
3     A.    My status, am I gonna come back to
4  work. I didn't --
5     Q.    Because you were -- what was the status
6  of your employment at that time?
7     A.    Yes.
8     Q.    What was the status of your employment
9  at that time?
10    A.    Oh, in April?  I was -- April 2021 --
11    Q.    If you can't recall, you can just say
12  "I can't recall."
13    A.    I don't remember my status.
14    Q.    Okay.  And then on P 408 it looks like
15  Larry responds and his text starts:  "It's
16  probably not a good idea to speak."
17    A.    Right.
18    Q.    Did you communicate with him after
19  that?
20    A.    No.
21    Q.    So then at the end of --
22    A.    You should just finish that sentence
23  that you said.  "It's probably not a good idea to
24  speak to me.  As it is, I am completely out of the
25  loop and had no idea this was coming."

Page 155

A. Yehoshua

1
2     Q.    Do you know what he is talking about?
3     A.    Yes.  This whole thing.
4     Q.    What is "this whole thing"?
5     A.    He was never included in the first
6  disciplinary action.  He was never copied on it.
7  It was -- he was never included on anything that
8  happened with regards to my employment after this
9  date.
10    Q.    Well, after what date?
11    A.    Well, it's clear on June 12, 2020, that
12  he is not copied.
13    Q.    Okay.  So and he says here "I am
14  completely out of the loop and had no idea this
15  was coming," it's your understanding that that was
16  in reference to the Disciplinary Action Notice
17  marked as Defendants' Exhibit 1?
18    A.    And everything that followed.
19    Q.    Okay.  And when you say "everything
20  that followed" --
21    A.    The second disciplinary action as well.
22  He was not in the loop.
23    Q.    And then under that where it has the
24  date and time stamp, it says "attach recent
25  photo."  Do you see that?

Page 156

A. Yehoshua

1
2     A.    Yes.
3     Q.    And is that meant to suggest that there
4  was a document or a photo attached?
5     A.    No.  Whenever a photo is taken, even if
6  it's dessert, the next text message you send to
7  someone they will assume you want to attach the
8  recent photo.  So that has nothing to do with the
9  message.  It's probably a photo I took of lunch or
10 something, because -- just it always pops up right
11 before I send a message, whatever -- it has
12 nothing to do with the message though.
13    Q.    So have you now told me each and every
14 time you have spoken or communicated with Larry
15 about your claims in this case since 2020?
16    A.    I know that Larry was aware of the
17 lawsuit because he went to Corey Stark's office
18 and said, "I'm following the lawsuit in NYSCEF"
19 and he told Corey other things.  "When are you
20 gonna" -- oh, "when are you going to have me
21 deposed, I want to be deposed" and "they are
22 keeping me out of the loop."  He said that again
23 to Corey.  I don't even know when -- and then
24 Corey said, "But your deposition was adjourned,
25 and he said, "Well, no one told me the new

Page 157

A. Yehoshua

1
2  adjourned date.  I'm here to find out when my date
3  is.  I want to testify."  And that's it.  That's
4  all I -- I know that he was involved in that
5  respect.
6     Q.    Okay.  And so my question was have you
7  told me each and every time you have communicated
8  with Larry about your claims in this case since
9  2020?
10    A.    I hope I did.  The last e-mail I got --
11 I mean, the last text seemed like he didn't want
12 to be texted anymore, so I didn't bother ever
13 again.  I never texted him again.
14    Q.    And have you told me each and every
15 time of which you are aware that your husband has
16 communicated with Larry about your claims in this
17 case since 2020?
18    A.    My husband met with him just this one
19 time, June 16th, 2020.  That's it.
20    Q.    And in your case today, in your
21 litigation, are you claiming that Larry engaged in
22 any form of unlawful conduct with respect to you?
23    A.    No.
24    Q.    So no discrimination?
25    A.    No.

40 (Pages 154 - 157)

Page 158

A. Yehoshua

1
2   Q.   No harassment?
3   A.   No.
4   Q.   And no retaliation?
5   A.   No.
6        MS. USENHEIMER:  Okay.  So I think this
7   is a good time for lunch.  It's 1:10.  We can
8   go off the record.
9        (Lunch recess was taken at 1:10 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 159

A. Yehoshua

1
2       A F T E R N O O N   S E S S I O N
3       (Time noted:  1:48 p.m.)
4   A M E L I A   Y E H O S H U A,
5       resumed as a witness, was examined and
6       testified as follows:
7   CONTINUED EXAMINATION BY
8   MS. USENHEIMER:
9   Q.   So before we continue this afternoon,
10  is there any testimony that you gave earlier today
11  that you want to correct or change?
12  A.   No.
13  Q.   Okay.  All right.  I just want to
14  revisit some of your testimony about Larry.  So
15  you testified that Larry is an excellent manager.
16  So I'd like to --
17  A.   I didn't say excellent.
18  Q.   I believe you did, in fact.
19  A.   No.  I remember saying good.
20  Q.   Okay.  I wrote down that you said he is
21  an excellent manager.
22  A.   We can have it read back.
23  Q.   We could, actually.  Let's do that.
24       (Record read at page 145, line 16,
25       through page 146, line 13.)

Page 160

A. Yehoshua

1
2   Q.   Okay.  So your testimony was that he
3   was a good manager; is that correct?
4   A.   Correct.
5   Q.   So is there any reason that you know of
6   that he would not take complaints from any
7   employee seriously about -- complaints about
8   discrimination from any employee seriously?
9   A.   I wouldn't say that.
10  Q.   The question is is there any reason he
11  would not take complaints from a Transit employee
12  about discrimination seriously?
13  A.   I think he took things seriously.
14  Q.   And what about complaints about
15  retaliation?
16  A.   I don't know.
17  Q.   You don't know if there is any reason
18  he wouldn't take --
19  A.   Retaliation happened after I was
20  transferred out of the unit to Brooklyn.  Well,
21  the retaliation was all along since 2016.
22  Q.   The question is --
23  A.   Okay.
24  Q.   Is there any reason he would not take
25  complaints about retaliation from Transit

Page 161

A. Yehoshua

1
2   employees seriously?
3   A.   I -- I did not complain to him about
4   retaliation.
5   Q.   That's not the question.
6   A.   Okay.  So I don't know how to answer
7   that question.
8   Q.   Are you aware of any reason why he
9   would not take complaints about retaliation
10  seriously?
11  A.   I am not aware that he did not take
12  complaints of retaliation seriously.
13  Q.   Okay.  All right.  Let's go back to the
14  Complaint, which is marked as Transit Exhibit 6,
15  please, the Amended Complaint.
16       Can you, please, tell me each and every
17  person who you are claiming in your litigation
18  here today discriminated against you?
19  A.   I would say Khahaifa and Farber.
20  Q.   Anybody else?
21  A.   You mean according to my Complaint?
22  Q.   According to your claims in the case
23  today, whether or not you put it in the Complaint
24  or otherwise.
25  A.   Oh, whether or not.  Well, now that you

41 (Pages 158 - 161)

A. Yehoshua

1        A. Yehoshua
2  brought it to my attention, I would say the people
3  that were copied on the June 19, 2020, letter did
4  not do anything with respect to the discrimination
5  that I faced.
6      Q.   What exhibit is the June 19, 2020,
7  letter?
8      A.   Exhibit 5.
9      Q.   Okay.  All right.  So can you tell me
10 all the facts that support your claim that those
11 people discriminated against you?
12     A.   Well, Farber --
13     Q.   The people who were copied.
14     A.   Okay.  I'll start with Farber.
15     Q.   Okay.
16     A.   He is the first-named party on the
17 e-mail of June 19, 2020, Exhibit 5.  He is the
18 author of the notice of penalty.  He is the
19 participated in the discrimination by his support
20 of her claims and never investigating or
21 discussing anything with me.
22     Q.   Okay.  So when you say he is the author
23 of the notice of penalty, do you mean Exhibit 4?
24     A.   Well, that was one of them.  He offered
25 two notices of penalties, right?  This was one,

A. Yehoshua

1        A. Yehoshua
2  Exhibit 4, and the second one you have not brought
3  up yet.
4      Q.   Okay.  Was that in connection with the
5  Disciplinary Action Notice that led to your
6  termination?
7      A.   The second one, yeah.
8      Q.   Okay.  And then you testified that he
9  participated in discrimination in support of her
10 claims.  Who is "her"?
11     A.   Khahaifa.
12     Q.   Okay.  And in what way did he
13 participate in discrimination in support of her
14 claims?
15     A.   By not interviewing both sides, by not
16 questioning me about her allegations.
17     Q.   Weslii's allegations?
18     A.   Yes.
19     Q.   Any other way that he discriminated
20 against you?
21     A.   Well, at this time I can't think of any
22 other ways.
23     Q.   Did he ever make any -- on what basis
24 do you believe he discriminated against you?
25     A.   Like I just said.  I just told you.

A. Yehoshua

1        A. Yehoshua
2      Q.   On the basis of your religion, on the
3  basis of your gender, on your race?
4      A.   I think he participated in whatever she
5  was doing.  She was discriminating against me.
6  She was retaliating against me.  He participated
7  in that by not questioning me.
8      Q.   And my question is are you -- let me
9  rephrase.  Your case today involves claims of
10 discrimination based on you being an Orthodox Jew.
11     Do you believe that David discriminated
12 against you on the basis that you are an Orthodox
13 Jew?
14     A.   No.
15     Q.   Do you believe that he discriminated
16 against you on your -- any other protected
17 characteristic?
18     A.   I don't know.
19     Q.   Okay.  What -- why can't you answer,
20 what don't you know?
21     A.   I don't know what transpired with those
22 two.  I don't know how much she told him.  I don't
23 know if he agreed with her.  I don't know if she
24 told him about my religion.  I don't know what
25 happened between the two of them.  I just know

A. Yehoshua

1        A. Yehoshua
2  that he never questioned me.
3      Q.   Okay.  And then -- all right.
4      Do you have any claims against or are
5  you claiming in your litigation today that David
6  Farber retaliated against you in any way?
7      A.   Yes.
8      Q.   Okay.  And can you tell me all the
9  facts that support a claim of retaliation?
10     A.   Yes.  I filed an EEOC claim and a New
11 York State Department of Human Rights claim in
12 December of 2020, and he issued a notice of
13 penalty suspending me on February 3rd, 2021,
14 signed by him.  That is retaliation.
15     Q.   Other than the dates that you just
16 identified, what facts do you have to support that
17 the February 31st (sic), 2021, letter is
18 retaliatory?
19     A.   Because it was in direct response to my
20 filing.
21     Q.   Did somebody tell you it was in direct
22 response?
23     A.   The timing of it is suspicious.
24     Q.   Do you have any other facts or evidence
25 other than the timing of it?

42 (Pages 162 - 165)

Page 166

A. Yehoshua

1
2    A.   I wasn't there, so I don't know what
3  conversations were held, so I would say no.  I
4  don't have any other facts besides what's clear
5  from the dates of the letters.
6    Q.   All right.  And then you said -- there
7  are additional people you indicated.  Exhibit 5,
8  right?  Okay.  So who are the other people who are
9  copied on this Exhibit 5?  The next person is
10 Theresa Murphy?
11   A.   Yes.
12   Q.   Okay.  So can you tell me all the facts
13 that support your claim that Theresa Murphy
14 discriminated against you?
15   A.   I would say she was copied on this
16 letter and she did not do anything to obtain the
17 veracity of it.
18   Q.   Of what, the DAN?
19   A.   Of what was alleged by --
20   Q.   What was alleged where?
21   A.   By Khahaifa with regards to me.  She
22 never called me into her office to discuss it.
23   Q.   Which is -- what you are claiming that
24 Weslii alleged is memorialized in the Disciplinary
25 Action Notice that we have discussed or something

Page 167

A. Yehoshua

1
2  else?
3    A.   In the Disciplinary Action Notice.  I
4  don't know what number it is.
5    Q.   And do you believe that Theresa was
6  motivated to discriminate against you based on
7  your status as an Orthodox Jew?
8    A.   I think the inaction speaks for itself.
9    Q.   Okay.  What facts support your claim
10 that she was discriminating against you based on
11 your status as an Orthodox Jew?
12   A.   I don't have the internal memos, so I
13 don't have any facts for you.
14   Q.   So no facts to support that claim?
15   A.   Not at this time.
16   Q.   And what about -- have you ever heard
17 Theresa make any comments or jokes or slurs about
18 Jewish people or Orthodox Jews?
19   A.   No.
20   Q.   Okay.  And what about -- are you
21 claiming that she retaliated against you in any
22 way?
23   A.   I think she joined in the efforts of
24 Farber.  She works in his office.  She did nothing
25 when he issued this letter.

Page 168

A. Yehoshua

1
2    Q.   So is your entire claim of retaliation
3  based on the fact that she did not do anything in
4  connection with the Disciplinary Action Notice
5  that we have marked as Exhibit 1?
6    A.   Yes.
7    Q.   Okay.  All right.  The next person is
8  Helen Smart.  How did Helen Smart discriminate
9  against you?
10   A.   Well, I would start by saying the same
11 thing I said about Theresa, but I would go further
12 with Helen Smart, if you'd like.
13   Q.   I would like.  I'm asking you all the
14 facts that support your claim.
15   A.   So the first fact I would say is the
16 inaction based on the letter that she received on
17 June 19, 2020.  And another fact, and I don't
18 remember the date, but earlier, maybe it was 2018,
19 when I had a Workers' Comp claim, Helen Smart was
20 involved in discrimination.  When I injured my
21 hand and I filed a Workers' Comp claim, it was
22 approved and then later it was denied, and I --
23 and I know that she was in charge of that, because
24 I sought legal advice and I had an attorney to
25 represent me against them for not -- for denying

Page 169

A. Yehoshua

1
2  my claim, and I wrote to her saying that I would
3  be pursuing legal action if my Workers' Comp claim
4  was not approved, and then she responded that it
5  would be approved and then Khahaifa responded that
6  it would be approved.  So that's when I realized
7  they were participating in discrimination
8  together.
9    Q.   Other than what you just testified to,
10 what facts do you have to support that Helen Smart
11 was discriminating against you?
12   A.   That is the only situation I remember.
13 I don't remember the other situations I was in.
14   Q.   And what is your understanding of Helen
15 Smart's involvement in the process to approve
16 Workers' Comp claims?
17   A.   She was the one I was told to contact
18 if I had any issues.
19   Q.   Do you have any personal knowledge of
20 her job responsibilities in connection with
21 approving or denying Workers' Comp claims?
22   A.   I was told that she was the one to talk
23 to and I think that was -- I don't remember who
24 told me, I don't want to guess, but I was told she
25 would be the one, and then I realized it's -- she

43 (Pages 166 - 169)

Page 170

A. Yehoshua

1          A. Yehoshua
2    had to seek approval from the manager in order to
3    approve it and I realized she was told to decline
4    it, because as soon as I said I'm filing a
5    lawsuit, both of them said it would be approved.
6    And you know who I am referring to, because I just
7    told you.  "Both of them" meaning Khahaifa and
8    Helen Smart.
9          Q.   All right.  So I just want to make sure
10   I understand.
11         A.   Yes.
12         Q.   You were told that Helen is the one to
13   talk to about the denial of your claim --
14         A.   Right.
15         Q.   -- but you have no personal knowledge
16   about the role that she plays or the authority she
17   has in approving or denying claims for Workers'
18   Comp; is that right?
19         A.   I had personal knowledge that she was
20   in charge of those claims.  I was told.
21         Q.   In what way was she -- okay.  So you
22   were told or you have personal knowledge of her
23   involvement in Workers' Comp claims?
24         A.   I have personal knowledge.
25         Q.   Okay.  And what is that personal

Page 171

A. Yehoshua

1          A. Yehoshua
2    knowledge?
3          A.   That she would be the person to discuss
4    Workers' Comp claims with.
5          Q.   Did you understand that that meant that
6    she was responsible for approving or denying
7    claims?
8          A.   Yes.
9          Q.   Okay.  And so you believe that -- you
10   testified that at some point a claim you filed in
11   2018 was approved and then denied and then it was
12   approved again after you threatened legal action;
13   is that right?
14         A.   I didn't threaten.  I did have an
15   attorney.  I said I would be pursuing legal
16   action, I planned to carry out.
17         Q.   And then the claim was approved is your
18   testimony?
19         A.   Yes.
20         Q.   Okay.  So what facts other than the
21   fact -- okay.  So you testified that you had a
22   claim for Workers' Comp, it was approved, it was
23   denied and then it was approved.
24              What facts beyond that do you have that
25   Helen Smart discriminated against you?

Page 172

A. Yehoshua

1          A. Yehoshua
2          A.   Well, it seemed that she was getting
3    the advice from my manager at the time to deny my
4    claim.
5          Q.   And how is that indicative of
6    discriminatory animus on Helen's part?
7          A.   Because my manager at the time was
8    discriminating against me and -- by many examples.
9    That's just one.
10         Q.   Any other ways, any other facts that
11   support Helen Smart's discriminatory animus?
12         A.   There may be other ways that I was not
13   aware of.
14         Q.   Okay.  What facts do you have to
15   support your claim -- well, I guess, is it your
16   claim that Helen Smart was discriminating against
17   you based on your status as an Orthodox Jew?
18         A.   Yes.
19         Q.   What facts support that?
20         A.   I think I explained them.
21         Q.   You did not.  That's why I am asking.
22         A.   Okay.  So then that's the only thing I
23   can explain.  It was very suspicious that was
24   approved and then I was denied and then I was
25   approved, and then when I was approved the second

Page 173

A. Yehoshua

1          A. Yehoshua
2    time, she -- they both told me "don't pursue the
3    lawsuit" together at the same time within seconds.
4    Got an e-mail from Helen Smart, and then I walked
5    out of my office and then Khahaifa said, "You are
6    approved."
7          Q.   Okay.  And you -- what fact links that
8    to your status as an Orthodox Jew?
9          A.   The fact of discrimination based on
10   Khahaifa's retaliation towards me and all the acts
11   that she committed against me throughout the
12   years, which I haven't been asked about yet.
13         Q.   Don't worry.  We are going to talk
14   about it.
15              Have you ever heard Helen Smart make a
16   joke or a comment or a slur about Jews or Orthodox
17   Jews?
18         A.   No.
19         Q.   Are you claiming that Helen Smart
20   engaged in retaliation against you?
21         A.   It's possible.
22         Q.   What are the facts that support your
23   claim that it's possible she retaliated against
24   you?
25         A.   The same reason I think that Theresa

44 (Pages 170 - 173)

Page 174

A. Yehoshua
1
2 Murphy retaliated. The inactions.
3    Q.   Okay. Any other facts to share about
4 Helen Smart?
5    A.   No.
6    Q.   Or her discriminatory or retaliatory
7 actions, yes or no?
8    A.   No.
9    Q.   All right. Then you have -- also CC'd
10 here is Craig Costa. Do you know who Craig Costa
11 is?
12    A.   Well, his name was on the return
13 envelope.
14    Q.   What does that mean? What return
15 envelope are you talking about?
16    A.   I'm talking about the envelope that I
17 received the first disciplinary action -- no, the
18 second disciplinary action. The second one is not
19 here yet. Okay.
20    Q.   Okay. Do you know who Craig is?
21    A.   I did not know at the time who he was.
22 I learned later who he was.
23    Q.   Who is he?
24    A.   I believe he was a labor and relations
25 attorney.

Page 175

A. Yehoshua
1
2    Q.   And what facts support your claim that
3 he discriminated against you?
4    A.   He did not conduct any interviews with
5 me. He did not do anything with respect to this
6 letter, disciplinary action that he received. I
7 don't know what his participation was.
8    Q.   Okay. And what facts do you have that
9 indicate that that -- what you just described is
10 discriminatory?
11    A.   Same ones I would say for -- for
12 Theresa Murphy and --
13    Q.   Just the lack of action --
14    A.   Yes.
15    Q.   -- is, therefore, discriminatory?
16        Do you believe that he is
17 discriminating against you based on your status as
18 an Orthodox Jew?
19    A.   I don't know.
20    Q.   On what basis do you believe he was
21 discriminating against you, on what protected
22 characteristic?
23    A.   I just said I don't know.
24    Q.   All right. And do you believe that
25 Craig Costa retaliated against you in any way?

Page 176

A. Yehoshua
1
2    A.   Possible.
3    Q.   What are the facts that support
4 possible claim of retaliation?
5    A.   He did not question this document.
6    Q.   And what is "this"?
7    A.   He did not -- this is document 6 -- 5,
8 sorry, Defendants' Exhibit 5.
9    Q.   Any other facts that support evidence
10 of retaliation or facts that support retaliation?
11    A.   I can't remember right now.
12    Q.   All right. Well, if you can recall at
13 any time before the deposition ends, you will let
14 me know, yeah? Yes?
15    A.   Yes. I'm trying to remember.
16    Q.   All right. Is there anybody else that
17 you are claiming in your litigation today
18 discriminated against you or retaliated against
19 you?
20    A.   Other than the people I mentioned, no.
21    Q.   Okay. All right. Let's look at your
22 Complaint now. Let's look at -- okay. I'd like
23 to look at paragraph 31. Can you read it to
24 yourself, please, and let me know when you are
25 done.

Page 177

A. Yehoshua
1
2        (Document review.)
3    A.   I'm done.
4    Q.   Okay. So starting with the second
5 sentence, "as an example," okay, so you allege
6 here: "Although MABSTOA and Transit do not have
7 set hours for attorneys," and then you go on. So
8 I'd like to understand all the facts that support
9 your claim that MABSTOA and Transit did not have
10 set hours for attorneys.
11    A.   Well, I think -- to be clear, the hours
12 are designed to cover at least eight hours a day,
13 so the attorney must swipe in and swipe out.
14    Q.   And work a full eight hours, that's
15 your testimony?
16    A.   I believe so, but I know that a lot of
17 attorneys have 9:30 to 5:30, 9 to 5, 10 to 6.
18    Q.   All right. But as long as they get in
19 their full work day, their start time is possible
20 to change, is that your testimony?
21    A.   Yes.
22    Q.   Okay. So then you indicate: "Although
23 MABSTOA and Transit do not have set hours for
24 attorneys, Khahaifa once marked Plaintiff late for
25 work after her train had been delayed."

45 (Pages 174 - 177)

Page 178

1            A. Yehoshua
2        So can you explain to me all the facts
3   that support your claim that Weslii marked you
4   late?
5        A.    Okay.  She didn't mark me late.
6   Remember -- okay.  So she -- I was -- I'll say
7   this two sentences.  I already referred to this
8   earlier when I told you about the train incident.
9        Q.    Yes, but we are going to talk about it
10  again.
11       A.    So how much in detail do you want me
12  to --
13       Q.    Tell me the whole thing, from start to
14  finish.
15       A.    Again?  The same thing I said before?
16       Q.    I would like you to do that here.  We
17  are not going to do that every time, but in the
18  train incident, let's talk about it, yes.
19       A.    On Fridays I would come in early and
20  leave early.
21       Q.    Okay.  Let me stop you.  My question
22  was tell me the facts that support Weslii once
23  marked you late.
24       MS. VINCI:  Okay.  She just said 'do
25   you want to know the train incident again,'

Page 179

1            A. Yehoshua
2   and you said, 'yes, tell me the full story
3   again,' and that's what she is answering.
4        Q.    Okay, fine, you can tell me that, but
5   I -- fine.  We can go through that, but I am still
6   going to want you to answer this question about
7   how she once marked you late, but fine, we can
8   start from the beginning.  Friday, you came in
9   late --
10       A.    I didn't come in --
11       Q.    You came in early and you left early.
12       A.    Okay.  I didn't come in -- all right.
13  I always worked a minimum of eight hours, but on
14  Fridays I started my day earlier so I could leave
15  eight hours later.  Okay.  On one particular
16  Friday in 2016 the train was delayed.
17       Q.    Your subway train that you took to
18  work?
19       A.    Yes.  And before Khahaifa was my
20  manager I had Danielle Ruttman as my manager, and
21  Danielle Ruttman said, "If you are ever late on a
22  Friday, bring in an incident report and I'll
23  excuse the lateness."  So one time in eight years
24  on a Friday the train was delayed, and that was in
25  2016.  So I did what Danielle told me and I got a

Page 180

1            A. Yehoshua
2   train incident report so that I could leave on
3   time for the Sabbath.  I presented it to Khahaifa
4   and I explained that pursuant to Danielle's
5   guidelines, if I was late due to a train incident,
6   I would be permitted to leave my scheduled time
7   and on that day I was told that it didn't matter
8   what Ruttman said, and I think a couple days later
9   or a week later I brought it to her attention
10  again with the train incident report and she said
11  it didn't matter whether it was a Friday or any
12  other day, she was going to discuss it with
13  timekeepers and that I would be docked for the
14  time.  So I went to -- I told her, "I am going to
15  talk to Larry about this," and I went to talk to
16  Larry  and I told him this was discrimination,
17  because if it had happened any other Friday, I
18  would have worked the extra 45 minutes without an
19  issue.
20       Q.    Do you mean any other day but Friday?
21       A.    Yes.  What did I say?  I meant to say
22  any other day but Friday.  He said, "if she
23  doesn't sign your time sheet, I will sign it."
24  Thereafter I believe he went to speak to her about
25  discrimination, about how she disregarded my

Page 181

1            A. Yehoshua
2   Sabbath observance, and he left the office and she
3   wrote this e-mail that I discussed earlier that
4   you may have there.
5        Q.    Okay.  And how is it that she marked
6   you late?
7        A.    I don't think she marked me late.  I
8   think it was just the lateness was not excused.
9        Q.    Okay.
10       A.    The attorney that prepared this wasn't
11  clear.
12       Q.    Okay.  So let's review.  All right.  So
13  you testified -- let's go back to the beginning.
14       All right.  So you testified that
15  Danielle Ruttman told you if the train was ever
16  late on a Friday, you could just bring in an
17  incident report.  It was your understanding that
18  Danielle would then excuse the lateness; is that
19  right?
20       A.    Correct.
21       Q.    Okay.  Do you have any understanding of
22  whether or not Danielle relayed that instruction
23  to Weslii?
24       A.    It was an instruction for the whole
25  entire floor.  Everyone knew this.

46 (Pages 178 - 181)

Page 182

A. Yehoshua

1
2    Q.   Everyone knew that this applied only on
3  Fridays?
4    A.   No.
5    Q.   What did everyone know?
6    A.   Everyone knew that a train incident
7  report would excuse a lateness.  Everyone knew.
8    Q.   Now, when you say "excuse a lateness,"
9  is it your understanding that a train incident
10  report would excuse a lateness such that you
11  didn't have to work late, it would just make it
12  like you worked those 45 minutes that you arrived
13  late, or was it your -- that's the question.  When
14  you say "excuse a lateness," what do you mean by
15  that?
16    A.   So back in 2016 we didn't have a
17  scanner where you put your hand.  I think we had
18  time sheets.
19    Q.   Right.
20    A.   So those -- that's what I mean by
21  excused lateness.  The manager was supposed to
22  sign the time sheet.  And Danielle would say, "I
23  will initial your time sheet if you bring me an
24  incident report, I will initial the hours.  So if
25  you were supposed to work 9 to 5 on a Friday and

Page 183

A. Yehoshua

1
2  you came later because of the train, I'll excuse
3  it, I'll initial my -- the time sheet."  That's
4  how it worked before the scanners came.
5    Q.   So isn't it true that an incident
6  report would allow you to work late to make up the
7  time?
8    A.   No.
9    Q.   So it's your understanding that if the
10  train was delayed, that the general instruction
11  for the whole entire torts floor was that you
12  would be paid for that time like you worked that
13  time?
14    A.   It would be excused, because it wasn't
15  your fault.
16    Q.   You didn't think that maybe you
17  misunderstood the instruction given that you
18  understood this to mean that employees would be
19  paid for time they didn't work?
20    A.   I don't understand that question at
21  all.
22    Q.   So your understanding is that if you
23  arrive late to work because of a train delay, it
24  wasn't your fault, so the late arrival would be
25  excused and you would be paid for the time, but

Page 184

A. Yehoshua

1
2  that's time you didn't work, right, because you
3  were on the train?
4    A.   Well, it's discretionary.  The manager
5  would have to -- I think that it would have to be
6  a reasonable amount of time, yes, that's correct.
7    Q.   And you never thought that maybe you
8  misunderstood it, the instruction, because
9  Danielle Ruttman told the entire floor, "if you
10  are late due to a train delay, we will pay you
11  like you were working during that time even though
12  you weren't working during that time"?
13    A.   The words were not "we will not pay
14  you."  She didn't use those words that you are
15  using.
16    Q.   What words did she use?
17    A.   That lateness will be excused with a
18  reasonable excuse from a train delay report.
19    Q.   Do you know that other -- of any other
20  employee who arrived late to work because of a
21  train delay who was not required -- who was paid
22  for the time and was not required to make it up?
23    A.   Investigators told me, "Yes, this is
24  what we do, we get the train delay report."
25    Q.   And the investigators told you that

Page 185

A. Yehoshua

1
2  they were -- that the train delay report would
3  make it so you were paid for time that you did not
4  work?
5    A.   It didn't have anything to do with time
6  that you did not work.  It had to do with an
7  excused lateness.  That's all it had to do with.
8  You would have been working if the trains were on
9  time, but it wasn't something that you were paid
10  for work that wasn't done.  It had nothing to do
11  with work.  It had to do with excused lateness.
12  That's all it was.
13    Q.   Well, you are testifying that there
14  were 45 minutes that you arrived late and you
15  wanted Weslii to sign your time sheet so that you
16  would be paid for those 45 minutes; is that right?
17    A.   I want the excused lateness.
18    Q.   What did you understand the excused
19  lateness would mean in this particular situation?
20    A.   That I would be paid for the reason I
21  had provided.
22    Q.   For time you did not work; is that
23  correct?
24    A.   I couldn't.
25    Q.   So yes, that's correct?

47 (Pages 182 - 185)

Page 186

A. Yehoshua

1
2    A.   Time I could not work.  It was
3  impossible, physically impossible.
4    Q.   Okay.  And it's your testimony that the
5  whole floor understood that if you arrived late
6  due to a train lateness, that you would be paid
7  for time that you did not work because you were on
8  a train?
9    A.   I can't speak about the whole entire
10  floor.  I know that it was a general rule and I
11  don't know every single person.  I didn't speak to
12  every single person on the whole entire floor.  I
13  spoke to most investigators and they said it was a
14  reasonable excuse, and I even spoke to my
15  timekeeper and she said that's fine.
16    Q.   Your timekeeper said it's fine to be
17  paid for time that you didn't work?
18    A.   No, she didn't say those words.  I just
19  told you.  Nothing like that.
20    Q.   This is the first time you talked about
21  your timekeeper.
22    A.   No, I mean --
23    Q.   So what did your timekeeper say?
24    A.   I am saying it was an excused lateness.
25    Q.   Right, but I am -- you have testified

Page 187

A. Yehoshua

1
2  that an excused lateness means that you are paid
3  for time that you did not work.  So we can call it
4  whatever you want, but it is being paid for time
5  that you did not work; correct?
6    A.   I would say could not work.
7    Q.   Fine.  Did not and could not work.
8  Okay.  And so do you have any understanding of
9  what instruction Weslii received from anybody in
10  time keeping about excusing lateness due to a
11  train delay?
12    A.   My understanding is that she did not
13  speak to the people with regards to my Sabbath
14  observance.
15       MS. USENHEIMER:  Can you --
16    A.   And if you read that e-mail --
17       MS. VINCI:  Amelia, you need to just
18  listen to her question.
19       THE WITNESS:  Okay.
20       MS. VINCI:  Let her finish her full
21  question, listen to it, and then respond as
22  best as you can.
23       MS. USENHEIMER:  Can you just repeat my
24  last question, please.
25       (Record read.)

Page 188

A. Yehoshua

1
2    A.   I have no personal knowledge.  All I
3  have is what the e-mail says she did, but I don't
4  know if she did.
5    Q.   And what personal knowledge do you have
6  about any instruction Weslii received from anyone
7  in torts management about excusing a lateness due
8  to a train delay?
9    A.   I don't.  I just have what she wrote.
10  I don't know if she spoke to those people.
11    Q.   Okay.  And then you said your
12  understanding is that she, Weslii, did not speak
13  to people about your Sabbath observance.  What
14  does that mean?
15    A.   That means that in the e-mail that was
16  sent, it details her speaking to timekeepers about
17  excusing a lateness, but it doesn't state that she
18  told those timekeepers that I was a Sabbath
19  observer.
20    Q.   And why do you believe that that's
21  relevant?
22    A.   Because it would have been very
23  difficult for a Sabbath observer to make up the
24  time and that's why the incident report would have
25  excused the time.

Page 189

A. Yehoshua

1
2    Q.   Well, it would be difficult for a
3  Sabbath observer to make up the time on the
4  Sabbath; right?
5    A.   Right.
6    Q.   But there were plenty of other days
7  when a Sabbath observer can make up the time;
8  isn't that right?
9    A.   Sure, of course.  I wouldn't even have
10  asked if it was any other day.
11    Q.   But if you arrived late to work on a
12  Friday, is your testimony that you would not have
13  been permitted to make up the time on any other
14  day?
15    A.   Correct.
16    Q.   And it's your testimony that because
17  you could not make up the time on Friday, the
18  lateness should be excused, which means that you
19  would be paid for time that you could not and did
20  not work?
21    A.   Only if you had evidence of a train
22  incident report, which I did.
23    Q.   And you testified that you never
24  arrived late due to a train delay under Danielle
25  Ruttman, it only happened this one time with

48 (Pages 186 - 189)

A. Yehoshua

1       A. Yehoshua
2  Weslii; right?
3       A.   No, I never said that.  I said --
4       Q.   You said one time in eight years.
5       A.   I said one time in eight years that I
6  had to request a late excuse, but I -- if I had
7  ever arrived late in any of the other eight years,
8  I would have easily made up the time, because it
9  wasn't a Friday.  Do you understand?  If I got in
10 at 9:30, I would have no problem working until
11 5:30, 6:00, 6:30.  It didn't matter.  I'm
12 saying --
13      Q.   So this is the only time that you
14 arrived late to work on a Friday and made a
15 request to have time excused due to a late train;
16 is that correct?
17      A.   Yes.
18      Q.   And what are the facts that support
19 your claim that this is evidence of religious
20 discrimination?
21      A.   I said to her that I can't make it --
22 "I can't do it today, I can make it up another
23 day," and she said, "No, it has to be today."  I
24 said, "I can't make up the time today."
25      Q.   Any other facts?

1       A. Yehoshua
2       A.   And that was discriminatory, because I
3  said I have to go home to observe the Sabbath.
4       Q.   Are there any other facts that support
5  your claim that was discriminatory?
6       A.   She dismissed me and my reason and the
7  Sabbath reason.  She dismissed it.  It was
8  irrelevant.
9       Q.   Any other facts that support your claim
10 that that was discriminatory?
11      A.   No.
12      Q.   Do you believe that this was
13 retaliatory?
14      A.   No.
15      Q.   Okay.  And you said that you talked to
16 Larry about this issue with the time keeping.  So
17 when -- what did you talk to him -- what did you
18 say to him when you talked to him?
19      A.   I just said that.  I just explained I
20 went -- I told her, "I am going to speak to
21 Larry."  She said, "Go and speak to Larry."  And I
22 also said, "I might speak to Gail too."  She said,
23 "Go and speak to them."
24      Q.   Did you speak to Gail or just to Larry?
25      A.   Gail was not in her office, so I went

1       A. Yehoshua
2  to speak to Larry.
3       Q.   And what did you say to Larry?
4       A.   I told Larry about what happened, what
5  I just said to you.
6       Q.   And did you say it was discrimination?
7       A.   Yes.
8       Q.   And what did he say?
9       A.   He said, "If she doesn't sign your time
10 sheet, I will."
11      Q.   Anything else?
12      A.   "I will take" -- he said, "I will take
13 care of it."
14      Q.   Anything else that you can recall from
15 that conversation with Larry?
16      A.   I don't recall.
17      Q.   And did this happen once or more than
18 once?
19      A.   With the train delay report?
20      Q.   Yes.
21      A.   Just that one time.
22      MS. USENHEIMER:  Okay.  All right.  So
23 yeah, let's mark this e-mail that you keep
24 referring to as 12.
25      (Defendants' Exhibit 12, e-mail dated

1       A. Yehoshua
2  February 4, 2016, Bates stamped P000312 and
3  P000313, marked for identification.)
4       Q.   All right.  Do you recognize this
5  document?
6       A.   Yes.
7       Q.   Okay.  Is this a copy of the e-mail
8  that you keep referring to?
9       A.   Well, I'm copied on it, so I did get
10 it.
11      Q.   And is this a copy of the e-mail that
12 you keep referring to?
13      A.   I referred to it.
14      Q.   In your deposition transcript -- in
15 your deposition testimony?
16      A.   Well, just a minute ago I referred to
17 this, yes.
18      Q.   Okay.  In the second paragraph, two or
19 three sentences in it starts with:  "I simply told
20 her."  Do you see that sentence?
21      A.   Yes.
22      Q.   Okay.  Can you read that sentence to
23 yourself and let me know when you have finished.
24      (Document review.)
25      A.   Yes.

49 (Pages 190 - 193)

Page 194

A. Yehoshua

2    Q.    Is that a true and correct statement of
3    what she said to you?
4    A.    I don't remember.  I think -- I
5    remember thinking that's unusual that she never
6    encountered this, but I remembered thinking also
7    that she had never been a manager before, so
8    that's probably why she never encountered it.
9    Q.    Okay.  And then her next sentence she
10   says: "Subsequently, I spoke with another borough
11   Chief, a former timekeeper and a current
12   timekeeper."
13       Do you have any knowledge about whether
14   or not Weslii spoke with those people?
15   A.    No.
16   Q.    Do you have any knowledge about what
17   they told her?
18   A.    It seems like -- I don't know if it was
19   one person or two people.  I don't know.
20   Q.    Do you have any knowledge of what they
21   told her?
22   A.    No.  Well, are you telling me to read
23   the next sentence?
24       MS. VINCI:  Just wait for a question.
25       THE WITNESS:  Okay.

Page 195

A. Yehoshua

2    A.    No, I have no knowledge of what
3    conversation took place.  I don't even know if she
4    spoke to them.
5    Q.    And then a couple sentences down it
6    says: "On Tuesday, 2/2/16, I spoke with Clara who
7    confirmed what the others had told me regarding
8    procedure."
9        Do you have any knowledge about what
10   Clara told Weslii?
11   A.    No.
12   Q.    Do you have any knowledge about whether
13   she talked to Weslii on that date?
14   A.    No.
15   Q.    Two sentences later she says: "You" --
16   meaning Larry -- "were not in your office, so I
17   spoke to Gail Goode."
18       Do you have any knowledge if she spoke
19   to Gail Goode?
20   A.    No.
21   Q.    Do you have any knowledge of what Gail
22   Goode told her?
23   A.    No.
24   Q.    So I would like to understand a little
25   bit more about if your understanding -- this is

Page 196

A. Yehoshua

2    what I am understanding you are saying, that you
3    are testifying that if you arrive late to work
4    because of a train delay and you have an incident
5    report, it's an excused lateness.  So but then --
6    so that should be the rule every day of the week;
7    right?
8    A.    Should be, but --
9    Q.    So then that this happened on a Friday
10   and you are saying you can't work late to make up
11   the time on a Friday, why is that part of your
12   facts that support this allegation?  If it just
13   should be excused, why is that a meaningful fact
14   that this happened on a Friday?
15   A.    Because there is no way I could make up
16   the time on a Friday.  I could make it up any
17   other day, but I had to do it that day she told
18   me.  That day.  Do you understand?  When you --
19   it's --
20   Q.    And it's your understanding that -- but
21   I just want to understand, you have testified that
22   your understanding of the rule, at least the rule
23   under Danielle Ruttman, was that you did not have
24   to make up the time; right?
25   A.    Okay.  You have an incident report.

Page 197

A. Yehoshua

2    That should excuse the lateness.  The manager
3    would review it, along with your time sheet, and
4    initial it and excuse it.  Danielle Ruttman did it
5    very often with many employees.
6    Q.    With you?
7    A.    Not with me.  I never asked.  It never
8    happened to me when Danielle Ruttman was my
9    manager and I never had issues working late.  I
10   always worked later than I had to.
11   Q.    What employees did Danielle excuse
12   lateness with the time with an incident report?
13   A.    The investigators.
14   Q.    And you know this because you testified
15   that they told you; right?
16   A.    I remember, yes.
17   Q.    But you don't have any personal
18   knowledge of how Danielle Ruttman handled their
19   time sheets?
20   A.    I was in her office once when someone
21   came into her office and gave it to her, she
22   initialed it, gave it back to them.  And she said,
23   "You see?  That's how it works."  And I said, "Oh,
24   I didn't know that before."  I was new.  I started
25   in 2013.

50 (Pages 194 - 197)

Page 198

A. Yehoshua

1
2    Q.    So when -- I need a little more
3  information.
4    A.    Okay.
5    Q.    So you said you were in her office and
6  someone handed her a time sheet.  Can you tell --
7  were you able to tell what was on that time sheet,
8  if there was a late arrival?
9    A.    It was together with the incident
10  report.  It was two things.  They gave her their
11  time sheet with the incident report.  She put them
12  together, saw the time, and initialed the time
13  sheet, returned the time sheet to the employee.
14    Q.    And do you have any personal knowledge
15  of whether or not that employee made up the time?
16    A.    The employee did not have to make up
17  that time because it was excused.
18    Q.    The question is do you have any
19  personal knowledge of whether or not that employee
20  worked extra time, worked to make up the time?
21    A.    The employee did not.
22    Q.    And how do you know that?
23    A.    Because it was excused.
24    Q.    Other than you witnessing Danielle
25  Ruttman sign the time sheet, how do you know that

Page 199

A. Yehoshua

1
2  it was excused?
3    A.    Because Danielle told me.
4    Q.    And your understanding of that
5  conversation was that the employee did not need to
6  work to make up the time?
7    A.    She could not, I think, in that case.
8  She just didn't have to.
9    Q.    And how many times did you personally
10  observe that happening?
11    A.    At least once.
12    Q.    When was the next time you observed
13  that happening?
14    A.    With Danielle Ruttman?
15    Q.    Any time in torts.
16    A.    All right.  So I observed it once with
17  my own eyes and then I heard about it twice from
18  other people that they gave her their incident
19  report.
20    Q.    And that was also investigators?
21    A.    One was a trial assistant, one was an
22  investigator, one was an attorney.  They are
23  retired and one of them passed away.
24    Q.    Okay.  So that's three, one time you
25  witnessed and two things that you heard about from

Page 200

A. Yehoshua

1
2  others.  Any other times that you can recall?
3    A.    No.
4    Q.    Okay.  All right.  Let's move on.  Then
5  paragraph 32, can you read that to yourself and
6  let me know when you are done.
7    A.    32?
8    Q.    Of the Complaint.  I'm sorry.  Back to
9  the Complaint.
10        (Document review.)
11    A.    I read it.
12    Q.    Okay.  Have you told me all the facts
13  that support this allegation already today?
14    A.    I just want to -- I think -- I think
15  the date here should be February, not January, in
16  February 2016 Plaintiff made a complaint, but it
17  could have been January.  I'm not sure.  I'm not
18  sure of the month.  It could have been January
19  actually, now that I look at it, because her
20  e-mail was after I complained about her.  So yes,
21  this is accurate.
22    Q.    And have you told me all the facts that
23  support this allegation?
24    A.    This is all related to this incident
25  with the train, Defendants' Exhibit 12.

Page 201

A. Yehoshua

1
2    Q.    And have you told me all the facts that
3  relate to the allegations set forth in paragraph
4  32?
5    A.    I --
6    Q.    I should rephrase that.
7    A.    Okay.
8    Q.    You allege in paragraph 32 that in
9  January 2016 Plaintiff made a complaint of
10  religious discrimination to Lawrence Heisler.
11        Have you told me all the facts that
12  support your claim that you made a complaint of
13  religious discrimination to Larry Heisler?
14    A.    I believe so.
15    Q.    And then you allege Larry determined
16  that Weslii indeed discriminated against Plaintiff
17  because of her religion.
18        Please tell me all the facts that
19  support this claim.
20    A.    Are you talking about paragraph 33?
21    Q.    No.  I'm talking about the claim in
22  paragraph 32, that is, he determined that Weslii
23  had indeed discriminated against Plaintiff because
24  of her religion.
25    A.    Yes.  Well, it's obvious.  He -- she

51 (Pages 198 - 201)

Page 202

A. Yehoshua

1         A. Yehoshua
2    says it in paragraph 1. "To now be accused of
3    interfering with her religious observance of the
4    Sabbath is insulting." So that's clear.
5         Q.  And are you -- what document are you
6    pointing to?
7         A.  Exhibit 12.
8         MS. USENHEIMER:  All right.  So I'd
9    like to mark as Exhibit 13 additional
10   communications about this issue.
11        (Defendants' Exhibit 13, e-mail dated
12        February 3, 2021, Bates stamped NYCTA 000034
13        through NYCTA 000036, marked for
14        identification.)
15        Q.  Okay.  Have you ever seen -- I assume
16   you haven't seen this e-mail before, because you
17   are not copied on it.  Have you ever seen it
18   before?
19        A.  No.  I'm not copied on it.  You're
20   right, I'm not copied on it.
21        Q.  Okay.  So this document is marked NYCTA
22   34 to 36.  So let's look at the bottom on page
23   NYCTA 35 where it starts Weslii's e-mail dated
24   February 4th to Larry and copied you.
25        So this e-mail that follows that is

Page 203

A. Yehoshua

1         A. Yehoshua
2    essentially the same thing as Defendants'
3    Exhibit 12, is that right, does that sound right
4    to you?
5         A.  No.  This is Exhibit 13.
6         Q.  And where is Exhibit -- do you have
7    Exhibit 12 in front of you?
8         A.  It's the bottom of page 2 of
9    Exhibit 13.
10        Q.  Okay.  Great.  So then after that on
11   the top of that page 35 Larry sent an e-mail to
12   Weslii, so why don't you read that to yourself and
13   let me know when you are done.
14        (Document review.)
15        A.  I read it.
16        Q.  Okay.  So he indicates:  "Amelia came
17   to me and told me that she had a similar situation
18   some years before."  Do you know what Larry is
19   talking about?
20        A.  No.
21        Q.  And then he says two sentences later:
22   "I certainly didn't mean to imply you did anything
23   wrong, and if I did, please accept my apologies."
24   You see that; right?
25        A.  Now I see it.

Page 204

A. Yehoshua

1         A. Yehoshua
2         Q.  So does that impact your belief that
3    Larry determined that Weslii discriminated against
4    you?
5         A.  No.  I still believe she discriminated
6    against me.
7         Q.  The question was that Larry determined
8    that she discriminated against you.
9         A.  The question is whether Larry believed
10   that she discriminated against me or not, is that
11   your question?
12        Q.  No, that's not my question.
13        MS. USENHEIMER:  Would you read the
14   question.
15        (Record read at page 204, line 2,
16   through page 204, line 8.)
17        A.  I don't think this e-mail says
18   anything.
19        Q.  You don't think it says anything?
20        A.  It doesn't -- I mean, it's clear that
21   he accused her.
22        Q.  What makes it clear?
23        A.  Well, she says it first and then he
24   apologized for it.
25        Q.  Where does she say it?

Page 205

A. Yehoshua

1         A. Yehoshua
2         A.  She says it in the last sentence of the
3    first paragraph, "to now be accused of interfering
4    with her religious observance of the Sabbath."
5         Q.  And then in the next -- in the
6    e-mail -- what is he apologizing -- you said he
7    apologizes for it.  What is he apologizing for?
8         A.  If he implied anything wrong.
9         Q.  So he is saying 'I didn't mean to imply
10   you did anything wrong, and if I did, please
11   accept my apologies.'
12        So I am asking you if that sentence
13   changes your opinion about whether or not Larry
14   determined that Weslii discriminated against you?
15        A.  No, it does not change my opinion.
16   I --
17        Q.  Okay.  That's the answer.
18        Then the next e-mail, there is an
19   e-mail on top of it, again, from Larry to Weslii
20   dated February 4th at 3:07 p.m. and he says:  "No
21   one accused you of religious discrimination.  I
22   explained to you that the reason" --
23        A.  Hold on.  Sorry.  Let me read what she
24   said first, because I never saw this before, and
25   then I'll read what he said.  Okay?

52 (Pages 202 - 205)

Page 206

1           A. Yehoshua
2      Q.   Okay.  It's been produced in discovery
3  so you should have seen it before.
4          MS. VINCI:  She can take her time to
5  review the document --
6          MS. USENHEIMER:  She can take her time.
7          MS. VINCI:  -- before she answers
8  further questions.
9          (Document review.)
10     A.   Okay.  I read it now.
11     Q.   Okay.  So you see in Larry's e-mail to
12  Weslii on February 4th the first sentence is:  "No
13  one accused you of religious discrimination"?
14     A.   It still does not change my opinion.
15     Q.   It doesn't change your opinion that --
16  you still believe, despite the fact that Larry
17  said "No one accused you of religious
18  discrimination," that he determined that Weslii
19  had discriminated against you?
20     A.   Yes.
21     Q.   And what is the basis of that belief?
22     A.   Because he says in the next sentence:
23  "I explained to you that the reason I excused
24  Amelia was because she couldn't work longer that
25  Friday.  I would not have excused her for lateness

Page 207

1           A. Yehoshua
2  on another day.  You're reading something into
3  nothing."  In other words, he -- he was trying to
4  explain to her that it was a Friday.  So that does
5  not change my opinion.
6      Q.   Okay.  Let's look back to the Amended
7  Complaint, please.  Please read paragraph 33 to
8  yourself and let me know when you are finished.
9          (Document review.)
10     A.   I'm finished.
11     Q.   All right.  What personal knowledge do
12  you have about any discipline that Weslii has had
13  at Transit?
14     A.   I don't have any personal knowledge.
15     Q.   And so what are the facts that support
16  this claim?
17     A.   She remained my manager.  If she had
18  been disciplined, she would not have been my
19  manager any longer.
20     Q.   And what is the basis of your belief
21  that discipline would necessarily mean that she
22  would not be your manager?
23     A.   Well, she was admonished and that was
24  it.
25     Q.   And what is the basis of your belief

Page 208

1           A. Yehoshua
2  that discipline would mean she would not be your
3  manager?
4      A.   I would have hoped that there would be
5  some discipline and that would include removing
6  her as my manager, but she was not removed as my
7  manager.
8      Q.   Isn't it true that there is various
9  forms that discipline can take and it might not
10  necessarily include removing her as your manager?
11     A.   I don't know.
12     Q.   Okay.  Paragraph 34, please read it to
13  yourself and let me know when you are done.
14         (Document review.)
15     A.   I read it.
16     Q.   Okay.  Please tell me each and every
17  fact that supports your allegations in paragraph
18  34.
19     A.   I'll refer back to Defendants'
20  Exhibit 12 where she criticized Larry accusing her
21  of interfering with my religious observance of the
22  Sabbath.
23     Q.   Any other facts or just that exhibit?
24     A.   This exhibit.
25     Q.   Okay.  Let's move, please, to paragraph

Page 209

1           A. Yehoshua
2  35 of the Amended Complaint.  Oh, I have a
3  question about this timekeeping incident.
4          Other than talking to Larry, did you
5  tell anyone else at Transit that you believe
6  Weslii discriminated against you based on your
7  religion in connection with this timekeeping
8  incident?
9      A.   I don't remember.
10     Q.   All right.  Have you told me all the
11  facts that support your claim that this incident
12  in connection with timekeeping was discriminatory
13  or hostile in any way?
14     A.   I believe so.
15     Q.   And just in case, just so I don't
16  forget to ask, have you ever heard Weslii make any
17  jokes about Jews or slurs?
18     A.   She laughed when I was eating matzah
19  during Passover.
20     Q.   Have you ever heard her make any jokes
21  or slurs about Jews?
22     A.   Not to me personally.
23     Q.   Did you ever come to learn that she
24  made jokes or slurs about Jews?
25     A.   One investigator told me.

53 (Pages 206 - 209)

Page 210

A. Yehoshua

1
2    Q.    What did this one investigator tell
3 you?
4    A.    That she complained that Larry liked me
5 because I was Jewish.
6    Q.    Who is the investigator?
7    A.    And the investigator is afraid to be
8 fired, so he asked me not to tell his name on the
9 record, so --
10        MS. USENHEIMER:  Well, can your
11    attorney, please, direct you have to answer
12    the question.
13        MS. VINCI:  You have to answer the
14    question.
15    A.    He is very scared of -- all right.  So
16 I'll withdraw the answer then.  I don't want him
17 to be fired.
18    Q.    You can't really do that.  You have
19 already testified that one investigator told you
20 she, I am assuming Weslii, complained Larry liked
21 you because you were Jewish.  Who is the
22 investigator?  Do you want to go off the record
23 and talk to your lawyer?
24    A.    Okay, I will.
25        MS. USENHEIMER:  Okay.  Let's go off

Page 211

A. Yehoshua

1
2 the record.
3        (Recess was taken from 2:50 to 2:52.)
4        MS. USENHEIMER:  Can you, please, read
5    back the last question.
6        (Record read.)
7    A.    Can I rephrase my answer now?
8    Q.    Sure.
9    A.    An investigator told me that Larry
10 liked me because we are the same religion and we
11 are friendly to each other and his name was and is
12 Adrian Thompson.
13    Q.    And did Adrian Thompson -- I don't
14 understand.  Did he make any reference to Weslii
15 in this conversation when he told you that Larry
16 likes you because you are the same religion and
17 are friendly?
18    A.    No.
19        MS. USENHEIMER:  Okay.  So we are going
20    to mark this and we are going to follow up in
21    writing, because I think it's very clear that
22    your client is changing her testimony and is
23    not being truthful.
24    A.    All right.  So do you want to read it
25 back?  Did I say that Weslii told me?  Because if

Page 212

A. Yehoshua

1
2 I said that, then it's true.  Weslii told him -- I
3 don't know.  I want to read it back so it's not
4 unclear.  So let's make it clear.
5        (Record read at page 210, line 2,
6    through page 210, line 5.)
7    Q.    So is that true?
8    A.    Yes.
9    Q.    So Adrian Thompson told you that Weslii
10 complained Larry liked you because you were
11 Jewish, that is correct and truthful testimony?
12    A.    Yes, and other things.
13    Q.    What other things did he say?
14    A.    Because we were friendly.
15    Q.    And Weslii complained that Larry liked
16 you because you were friendly?
17    A.    Because we were of the same religion
18 and because we were friendly to each other.
19    Q.    And when did Adrian tell you this?
20    A.    So this was a long time ago.  It had to
21 be around this time, maybe 2017.
22    Q.    Do you have any notes of this
23 conversation?
24    A.    He told me in person.
25    Q.    Did you ever tell anybody else what he

Page 213

A. Yehoshua

1
2 told you?
3    A.    No.
4    Q.    And when is it that you recall Weslii
5 laughed at you when you were eating matzah?
6    A.    Oh, on Passover.
7    Q.    Of what year?
8    A.    I don't remember the year.
9    Q.    Was it before this timekeeping incident
10 or after?
11    A.    After.
12    Q.    Was it 2017?
13    A.    I don't remember the year.
14    Q.    And please tell me all the facts and
15 circumstances that surround your claim that she
16 laughed when you were eating matzah?
17    A.    I invited Larry Heisler to my office.
18 It was Passover.  I had matzah.  He had -- I told
19 him, "Look, Larry, I brought matzah.  You could
20 have some.  I know we can't eat anything else."  I
21 think that was the only time I knew about his food
22 restrictions.  He joined me.  She came, knocked on
23 the door, came in, looked at both of us eating
24 matzah together, laughed at us, said something
25 that doesn't seem to come back to me now, I don't

54 (Pages 210 - 213)

Page 214

1                A. Yehoshua
2  know if it was about a case, I don't remember, and
3  then left.
4      Q.    And what facts do you have that support
5  that she laughed because you were eating matzah?
6      A.    That's what happened.
7      Q.    Any other facts besides what you have
8  just said?
9      A.    No.
10     Q.    And isn't it true that Weslii grew up
11 in her family eating matzah?
12     A.    How am I supposed to know?  I don't
13 know how she grew up.
14     Q.    So you have no knowledge; correct?
15     A.    I have no knowledge.
16     Q.    Okay.  Any other facts that you were
17 aware of -- I'm sorry.  Let me rephrase that.
18         Any other times when you have
19 personally observed Weslii making jokes or slurs
20 about Jews?
21     A.    No.
22     Q.    Okay.  What about jokes or slurs about
23 Orthodox Jews?
24     A.    No.
25     Q.    Okay.  And any other times when you

Page 215

1                A. Yehoshua
2  came to learn that she made jokes or slurs or
3  comments about Jews?
4      A.    No.
5      Q.    Okay.  Same question about Orthodox
6  Jews?
7      A.    What do you mean?
8      Q.    Is there any time that you came to
9  learn that Weslii made a joke or a slur about
10 Orthodox Jews?
11     A.    No.
12     Q.    While we are at it, did anyone at
13 Transit in your presence make a comment, joke or
14 slur about Jews?
15     A.    Not in my presence.
16     Q.    Did you ever come to learn that anyone
17 at Transit made a joke, a comment or a slur about
18 Jews?
19     A.    No.
20     Q.    Did you ever -- did anyone at Transit
21 in your presence ever make a joke or a slur about
22 Orthodox Jews?
23     A.    No.
24     Q.    Okay.  Did you ever come to learn that
25 anyone in Transit made a joke or a slur about

Page 216

1                A. Yehoshua
2  Orthodox Jews?
3      A.    No.
4      Q.    Okay.  Let's go back to the Complaint.
5          MS. VINCI:  Counsel, whenever there is
6  a natural point for a restroom break.
7          MS. USENHEIMER:  Go ahead.  We could
8  take a break right now, sure.
9          (Recess was taken from 2:58 to 3:06.)
10 BY MS. USENHEIMER:
11     Q.    So let's pick back up the Amended
12 Complaint.  Do you have that?  So let's look at
13 paragraph 35.  So after the first paragraph the
14 sentence starts with:  "Numerous acts of disparate
15 treatment."  Do you see that?
16     A.    Yes.
17     Q.    Just read the sentence to yourself and
18 let me know when you are complete.
19         (Document review.)
20     A.    Okay.  I read it.
21     Q.    Okay.  Can you tell me each and every
22 fact that supports your claim that Khahaifa
23 overwhelmed you with new additional work
24 assignments on Fridays so as to interfere with
25 your observance of the Sabbath?

Page 217

1                A. Yehoshua
2      A.    Starting with the first one.  Okay.  So
3  on Fridays I would leave early -- I mean, not
4  early.  I should say I started the day early and I
5  left the day eight hours later.  So if I started
6  at 6, I left at 3.  So I never left early.  I
7  worked my full eight hours on Fridays.  But when I
8  would leave, if it would be 3:00, after I would
9  leave she would assign -- she would send me
10 e-mails after 3, she would leave folders, Redwelds
11 on my chair.  One time I had a deposition to do on
12 Monday that was left late Friday on my chair and I
13 didn't know about it until I got in on Monday
14 morning.  So the e-mails I didn't know about until
15 Monday, but I saw the time and it was always on a
16 Friday, just like this.  June 12th was a Friday.
17     Q.    Any other facts that support that
18 claim?
19     A.    No.
20     Q.    Okay.  So you testified after you would
21 leave she would assign --
22     A.    When I say "this," sorry, I said "just
23 like this," I meant -- I should be very specific
24 when I say "this," so for the record, when I said
25 "this," I mean Defendants' Exhibit 1, Friday, June

55 (Pages 214 - 217)

Page 218

A. Yehoshua

1
2  12th, 2020.  That's what I'm referring to.
3      Q.   What time of day was that sent?
4      A.   Afternoon.
5      Q.   What time?
6      A.   1:24:16 p.m.
7      Q.   So did an e-mail at 1:24:16 p.m.
8  interfere with your observance of the Sabbath?
9      A.   I'm sure it did, because I was --
10 Sabbath would have begun that evening, that day,
11 right?
12     Q.   So in June, what time-ish does the
13 Sabbath begin in June?
14     A.   It interfered with me because that -- I
15 would -- that was the Friday.  That was a Friday,
16 so --
17     Q.   I asked you earlier today if you had
18 any claims in this case about the date or time at
19 which that e-mail was sent and you said no.  So
20 are you changing your testimony now?
21     A.   I'm saying this is one example of when
22 she would do things, she would e-mail me on
23 Fridays, late afternoon Fridays.  She would leave
24 assignments for me on Fridays.  She would do
25 things that hurt me on Fridays knowing that I

Page 219

A. Yehoshua

1
2  wouldn't see it until Monday.  Luckily I saw this
3  on that Friday.
4      Q.   Okay.  And do you have any personal --
5  when you say "this," you are talking about
6  Exhibit 1?
7      A.   I am talking about Defendants'
8  Exhibit 1.
9      Q.   Do you have any personal knowledge of
10 whether Weslii was given any instruction about the
11 time or date on which to send the DAN?
12     A.   No.
13     Q.   Okay.  So is it your testimony that
14 Weslii should not have communicated with you or
15 give you any assignments on a Friday, any time on
16 a Friday?
17     A.   No, that's not my testimony.
18     Q.   Okay.  So what's your testimony?
19     A.   My testimony is that I should have been
20 given the assignments prior to my leaving for the
21 day.
22     Q.   Okay.  So just like this e-mail you
23 received, the e-mail at Exhibit 1, prior to
24 leaving for the day; right?
25     A.   No.  This e-mail was given to me when

Page 220

A. Yehoshua

1
2  no one was working in the office anymore.  People
3  were working at home.  This was during the
4  pandemic.
5      Q.   Okay.  But do you typically leave the
6  office on the Sabbath by 1 -- what did you say,
7  1:14 in the afternoon?
8      A.   I didn't say 1:14.  What time was it
9  sent?
10     Q.   1:24 in the afternoon.  Are you
11 typically gone from work by 1:24 in the afternoon?
12     A.   It would have been an hour and a half
13 before I left.
14     Q.   So you said that she would send you
15 e-mails after you left on Friday.
16     A.   Yes.
17     Q.   How was that discriminatory?
18     A.   Because she knew that I was not there
19 to read it.  How could I --
20     Q.   Did she in any of those e-mails demand
21 an immediate response that would be required
22 during the Sabbath?
23     A.   I don't remember.
24     Q.   Okay.  And you indicate you testified
25 that she would leave folders on your chair --

Page 221

A. Yehoshua

1
2      A.   Yes.
3      Q.   -- after you left on a Friday.  How was
4  that discriminatory?
5      A.   Well, I didn't know they were there
6  until Monday morning.
7      Q.   Okay.  And other than this one time
8  when you testified that you had a deposition to do
9  on Monday that was left on Friday, did any of
10 those assignments require work over the Sabbath or
11 on Monday?
12     A.   It required some preparation before
13 Monday, yes.
14     Q.   Which assignments required preparation
15 before Monday that were left on your chair on a
16 Friday?
17     A.   Well, I remember one Monday morning, it
18 was a deposition, and I don't remember the name of
19 the deposition, but it did require some
20 preparation.
21     Q.   Other than that one deposition, can you
22 recall any other instances?
23     A.   There were instances where I just came
24 to work and I found files on my chair.
25     Q.   And I am asking you how is that

56 (Pages 218 - 221)

Page 222

A. Yehoshua

1
2 discriminatory?
3    A.   Because I did not look at them.  They
4 were left there after I left for the day.
5    Q.   Any other reason -- any other facts
6 that support that they were discriminatory?
7    A.   Yes.  It should have been given to me
8 while I was there before I left.  She knew the
9 time I was leaving, but she waited.  For e-mails,
10 she waited.
11    Q.   Any other facts?
12    A.   I think those were discriminatory.  I
13 didn't have time to prepare.  And you can look at
14 the e-mails I received on Fridays.  I don't have
15 access to them anymore.
16    Q.   Any other facts?
17    A.   No.
18    Q.   Okay.  So this one deposition that
19 required you to be prepared for Monday, when did
20 this happen?
21    A.   I don't remember.
22    Q.   And what was the case?
23    A.   I don't remember.
24    Q.   What time of day was the deposition?
25    A.   In the morning.

Page 223

A. Yehoshua

1
2    Q.   And were you taking the deposition or
3 defending the deposition?
4    A.   Taking it.
5    Q.   And do you have any personal knowledge
6 as to why Weslii decided to assign that to you?
7    A.   No.
8    Q.   Okay.  And then you said she would do
9 things to hurt you on a Friday.  What things did
10 she do to hurt you on a Friday?
11    A.   Those were the examples I was referring
12 to.
13    Q.   All right.  Do you have any other facts
14 to support this claim that Khahaifa overloaded
15 Plaintiff with new additional work assignments on
16 Fridays so as to interfere with your observance of
17 the Sabbath?
18    A.   No.
19    Q.   And how did all these things that you
20 just described interfere with your observance of
21 the Sabbath?
22    A.   I didn't know about them until Monday.
23    Q.   So they didn't interfere with your
24 observance?
25    A.   So they did interfere because I was

Page 224

A. Yehoshua

1
2 unable to prepare for the assignments until
3 Monday.
4    Q.   I believe that you testified that you
5 can only recall one time, which was this one
6 deposition that required you to have prepared
7 before Monday.
8    A.   That was what I recall.
9    Q.   Right.  I am only asking you about what
10 you recall.  And I asked you how did it interfere
11 with your observance of the Sabbath?  Do you have
12 any other facts to add as to how it interfered
13 with your observance of the Sabbath?
14    A.   Yes.  I was not able to prepare for the
15 cases that I was left.  And I don't remember the
16 cases now.  This was going back -- two thousand --
17 I don't even remember the years.  I just remember
18 coming in on Mondays, very often seeing files on
19 my chair.  And I would be nervous on Fridays
20 before I left because I was thinking about what I
21 would be receiving when I came into the office on
22 Monday.
23    Q.   And do you have any personal knowledge
24 of Weslii's method of deciding how to divide up
25 workload in the unit?

Page 225

A. Yehoshua

1
2    A.   She was never transparent, so I had no
3 idea what her method was.
4    Q.   And do you have any personal knowledge
5 of the way -- the timing in which Weslii made
6 assignments or assigned cases?
7    A.   No.  It was by e-mail.  Never in
8 person.
9    Q.   Okay.  Then you -- the next part of
10 this allegation in paragraph 35 is that Weslii
11 stripped you of your trial assistant.  Can you,
12 please, tell me -- hold on.  Yes.  Can you,
13 please, tell me each and every fact that
14 supports -- I'm sorry.
15        Is your claim that Weslii overloaded
16 you with new additional work assignments on
17 Fridays, are you alleging that that's retaliatory
18 in nature or just discriminatory?
19    A.   Both.
20    Q.   And how is it -- can you tell me all
21 the facts that support your claim that it was
22 retaliatory?
23    A.   This happened after the letter from
24 February 2016.
25    Q.   Any other facts?

57 (Pages 222 - 225)

Page 226

1            A. Yehoshua
2     A.   No. I can't think of any right now.
3     Q.   Okay. And over what period of time
4  would she overload you with new work assignments
5  on Fridays?
6     A.   From 2016 until 2019.
7     Q.   All right. And then you allege that
8  she stripped you of your trial assistant.
9          Can you, please, tell me each and every
10 fact that supports this claim?
11    A.   My trial assistant was Adrian Thompson.
12 We had a very good working relationship from 2013
13 until she became my manager.
14    Q.   "She" being Weslii?
15    A.   Yes. She continually overloaded me
16 with assignments, things just continued to get
17 worse, and then one day she said to my trial
18 assistant, "You are not gonna be her trial
19 assistant anymore." There was no conversation, no
20 understanding by either one of us why this was
21 happening. We got along fine. It never happened.
22 We asked around to other units and asked if other
23 people lost their trial assistants and we were
24 told no, that doesn't happen unless there was a
25 dispute between the attorney and the legal

Page 227

1            A. Yehoshua
2  assistant. We never had disputes. We got along
3  and we were successful at trials. We were both
4  upset. And one day Larry Heisler was on the
5  elevator and Mr. Thompson -- no, Mr. Heisler asked
6  Mr. Thompson, "Why did you leave Amelia? Why
7  aren't you working with Amelia anymore?" And
8  Mr. Thompson told Larry Heisler, "I did not want
9  to be removed. I like working for Amelia." And
10 then Adrian Thompson came to my office and told me
11 he was upset that he was removed as my legal
12 assistant. He liked it and he even told Larry
13 Heisler.
14    Q.   Are those all the facts that support
15 that claim?
16    A.   Well, there were more facts. There was
17 no rhyme or reason why he was removed and he
18 didn't understand it and he was not told to work
19 with another attorney, so -- I was told to work
20 with another legal assistant. That was very
21 confrontational. Didn't want to do -- told me
22 right away, "I'm not gonna do anything that Adrian
23 did for you, I'm not gonna do this, I'm not gonna
24 do that." So I told Khahaifa I wanted Adrian back
25 and she refused. So I think Larry reassigned him,

Page 228

1            A. Yehoshua
2  because Thompson told Larry that he wanted to
3  continue working with me, but it took a few weeks.
4     Q.   Have you now told me all the facts that
5  support that claim?
6     A.   There may be other facts that I'm
7  forgetting, but that's all I remember today.
8     Q.   When did this happen?
9     A.   I don't remember the year. It was
10 definitely after she became my manager.
11    Q.   Did it happen once or more than once?
12    A.   Once.
13    Q.   You testified that Adrian was removed
14 as your trial assistant and there was no
15 conversation or understanding why this happened.
16         Does that mean Weslii -- is it your
17 testimony that Weslii didn't discuss with you why
18 this happened?
19    A.   Or him.
20    Q.   How do you know what she discussed with
21 him?
22    A.   Because I asked him. I said, "Why did
23 this happen? We get along great." He said, "I
24 don't know. I agree. It shouldn't have
25 happened."

Page 229

1            A. Yehoshua
2     Q.   Isn't it true that Weslii told you that
3  she was changing your trial assistant so that you
4  would have the opportunity to work with different
5  trial assistants and wouldn't rely so heavily on
6  Adrian?
7     A.   No, she never told me that.
8     Q.   Did you ever come to learn that that
9  was the reason?
10    A.   No.
11    Q.   Do you believe that's the reason?
12    A.   No.
13    Q.   And why not?
14    A.   I believe it was discrimination.
15    Q.   What is the basis --
16    A.   And retaliation.
17    Q.   What is the basis of your belief that
18 it was discrimination?
19    A.   Just the same belief as her overloading
20 me with work assignments. That would have been
21 making my job much harder if I didn't have Adrian
22 as my trial assistant.
23    Q.   And what are the facts this is
24 connected to discriminatory animus?
25    A.   She went out of her way to make things

58 (Pages 226 - 229)

Page 230

A. Yehoshua

1
2  more difficult.  It was more and more intense.
3  Got worse and worse.
4      Q.   And what are the facts that this is
5  connected to discriminatory animus?
6      A.   It followed the same pattern.  Every
7  chance she had to make things harder at work, she
8  did.  This was making the job harder.  I was
9  accustomed to working with one person.  He had no
10  issues.  I had no issues.  When he stopped working
11  with me, things weren't getting done.
12     Q.   Okay.
13     A.   So --
14     Q.   I'm sorry.
15     A.   I was just going to say that this is
16  discrimination, this is retaliation, this is her
17  way of getting back at me because of what happened
18  with the train incident report, that I went to
19  talk to Larry, then Larry accused her of
20  interfering with my observance of the Sabbath.
21  This is the same result.  This is retaliation.
22     Q.   And what is the basis of your belief
23  that Weslii was making the job harder for you as a
24  result of your status as an Orthodox Jew?
25     A.   I was working with Adrian.  Adrian

Page 231

A. Yehoshua

1
2  understood the work pattern, he understood the
3  Fridays, he understood how work was going to be
4  distributed, what was going to be done, he
5  understood.  Now when she stripped me of having
6  Adrian as my trial assistant, that was interfering
7  with the normal pattern of work that I was
8  conducting with my assistant.
9         MS. USENHEIMER:  Can you, please, read
10     my question back.
11         (Record read.)
12         THE WITNESS:  Do you want to read the
13     answer back too?
14         (Record read.)
15     Q.   You have no other answer, that's your
16  answer?
17     A.   Well, we got along so that we
18  understood when the holidays were taking place, he
19  knew that we would work together when the holidays
20  were over, he knew how things were supposed to go,
21  he knew -- I mean, it didn't make sense why I
22  would have to start all over with someone new.  It
23  didn't make sense.  And the new person didn't want
24  to appreciate anything about my Jewish observance,
25  didn't care about it, didn't discuss it, didn't

Page 232

A. Yehoshua

1
2  want to do anything that Adrian did.
3      Q.   Okay.  So do you have any other facts
4  that support your claim that this happened because
5  of your status as an Orthodox Jew?
6      A.   These are the facts I have given you.
7      Q.   Okay.  You said "the new person."  Was
8  the new person Lilly Ramos?
9      A.   Yes.
10     Q.   Okay.  And you said she didn't want to
11  do anything about your observance.  What does that
12  mean?
13     A.   Her words were, "Don't expect me to do
14  what Adrian did for you."
15     Q.   And what was she referring to?
16     A.   Basically whatever he did, whatever
17  assistance he provided for me.
18     Q.   Is that the only thing she said to you
19  that led you to believe this?
20     A.   There were many things she said that
21  made it appear that it would be a very difficult
22  working relationship.  She didn't appreciate the
23  Fridays.  She didn't appreciate anything that I
24  had been doing.
25     Q.   What didn't she appreciate about the

Page 233

A. Yehoshua

1
2  Fridays, what does that mean?
3      A.   She didn't understand that I would be
4  leaving at 3 p.m. on Fridays and my work
5  assignments had to be done before then or on
6  Monday.
7      Q.   Did you tell her that?
8      A.   It was very difficult to communicate my
9  usual assignments with Adrian, because she told me
10  from the very beginning, "I'm not going to do what
11  Adrian did for you."
12     Q.   All right.  Have you told me all the
13  facts that support your claim that Weslii
14  reassigned Adrian because of your status as an
15  Orthodox Jew?
16     A.   Well, I think Gail Goode was involved
17  too.  I believe I remember speaking to her about
18  Adrian's removal.
19     Q.   What was the nature of the discussion
20  you had with Gail Goode?
21     A.   I said, "Gail, I would like to have
22  Adrian as my trial assistant again."
23     Q.   And what did Gail say?
24     A.   She said that -- I think she said that
25  would happen.

59 (Pages 230 - 233)

1              A. Yehoshua
2     Q.   Have you now told me all the facts that
3  support your claim that Weslii took Adrian away
4  from you because of your religion or your status
5  as an Orthodox Jew?
6     A.   I believe I did.
7     Q.   Have you told me all the facts that
8  support your claim that this was retaliatory?
9     A.   I believe I did.  This happened after
10 2016.
11    Q.   But you don't remember when, right,
12 just after 2016?
13    A.   Correct.
14    Q.   And isn't it true that Adrian was
15 reassigned to you by Gail Goode?
16    A.   I don't know if that's true.
17    Q.   Do you have any knowledge of who
18 reassigned him to you?
19    A.   I thought it was Larry, because Adrian
20 told me he saw Larry in the elevator and he told
21 Larry that he didn't understand why Weslii did
22 that to him and that he wanted to return to work
23 for me.  So I don't know if it was Larry or Gail.
24 I don't have that personal knowledge.
25    Q.   And isn't it true that Adrian was

1              A. Yehoshua
2  reassigned to you within two weeks of the change?
3     A.   No.  No, it's not true.
4     Q.   How long was it?
5     A.   It could have been a month.
6     Q.   Did you have a trial in that time
7  period?
8     A.   Well, what time period are we talking
9  about?
10    Q.   The month when Adrian was reassigned.
11    A.   I don't remember.  I know it was a long
12 time.
13    Q.   And did you tell anyone -- did you tell
14 anybody at Transit that you thought that this was
15 discriminatory based on your religion?
16    A.   No.
17    Q.   Did you tell anybody that you thought
18 it was retaliatory?
19    A.   I felt it.  I don't remember if I told
20 anybody.
21    Q.   Would you be surprised to learn that
22 Adrian believed your style in court was
23 cringe-worthy?
24    A.   I've never -- never heard this before.
25    Q.   So yes, you would be surprised?

1              A. Yehoshua
2     A.   I would.
3     Q.   Would you be surprised to learn that
4  Adrian thought that your style in court often led
5  to friction with judges?
6     A.   I never heard this before.
7     Q.   Would you be surprised to learn Adrian
8  believed you did not have the basic skillset for
9  the job you were assigned?
10    A.   I never heard this before.
11    Q.   And would you be surprised to learn
12 that Adrian described working with you as a
13 struggle?
14    A.   I would be surprised.
15    Q.   Okay.  All right.  Let's move on to
16 your next claim here, that you say that Weslii
17 insisted that Plaintiff use her paid-time-off
18 allotment on Jewish holidays even when Plaintiff
19 was working.
20         Can you, please, tell me all the facts
21 that support this claim?
22    A.   Are you reading the last sentence of
23 paragraph 35?
24    Q.   It's the second sentence.  It's very
25 long.  So it's:  "Insisting that Plaintiff use her

1              A. Yehoshua
2  paid-time-off allotment on Jewish holidays even
3  when Plaintiff was working."  Do you see that?
4     A.   Yes.  Okay.  So this is referring to
5  the e-mail that I received during the pandemic
6  when I was observing the holiday of Shavuot,
7  S-H-A-V-U-O-T.
8         MS. USENHEIMER:  I actually have a copy
9     of the letter, so why don't we just mark it
10    now so you are not referring to it without it
11    being marked.
12         (Defendants' Exhibit 14, e-mail dated
13    June 10, 2020, Bates stamped P000277, marked
14    for identification.)
15    Q.   Do you see that this is a one-page
16 exhibit with Bates stamp P 277 which indicates
17 that you produced it?
18    A.   Yes.
19    Q.   Is this the e-mail that you are
20 referencing?
21    A.   Yes.
22    Q.   Okay.  So, please, tell me all the
23 facts that support your claim.
24    A.   She wanted to make me take a day off on
25 5-29.  This is six months after she was removed as

Page 238

A. Yehoshua

1            A. Yehoshua
2 my manager and she was still in charge of my time
3 sheets. She wanted to know why I didn't take off
4 work on a Jewish holiday. She was questioning my
5 religiosity.
6      Q. And how do you know that?
7      A. I had to explain it, why I did not take
8 the day off.
9      Q. And then did she make you use PTO for
10 this time?
11      A. After I explained it -- I don't see the
12 second page of this. I don't think --
13      Q. That was the entire document that was
14 produced.
15      A. Okay. I'm sure she approved it after I
16 explained.
17      Q. And can you tell me all the facts that
18 support that this e-mail communication was
19 discriminatory?
20      A. Yes. Because this is -- I'm not
21 supposed -- I know that questioning an employee of
22 their religion observance is not appropriate.
23 This is a civil job that I had and she had no
24 right to question my observance.
25      Q. Can you point to me where she

Page 239

1            A. Yehoshua
2 questioned your observance on this e-mail?
3      A. Yes. She said 'did you take off on
4 5/29' and she knew that 5-29 was a Jewish holiday.
5      Q. Do you typically take off Jewish
6 holidays?
7      A. This was during the pandemic. I was
8 working from home. So that's a question that
9 doesn't make sense during this time period. I
10 mean --
11      Q. Well, I don't -- let's talk about that.
12      A. Okay.
13      Q. So is your concern with working on
14 Jewish holidays physically going to the office or
15 is it working?
16      A. That's a question of my religiosity,
17 what you are asking me.
18      Q. You said that -- I said do you
19 typically take off Jewish holidays, and you said
20 this was during the pandemic so that doesn't make
21 sense here.
22      A. Right. I was working from home and I
23 explained all the reasons why -- I was reading
24 assignments. I explained it all. I don't think I
25 should have been questioned on it. If I had to go

Page 240

1            A. Yehoshua
2 to work, I wouldn't be able to. I wouldn't be
3 able to take the train.
4      Q. Okay. And what are the facts that
5 support that this was retaliatory?
6      A. She was not my supervisor anymore. I
7 had already been transferred to a different unit.
8 She was trying to interfere with my religious
9 observance. She wanted me to use my time paid --
10 my paid time off on this Jewish holiday.
11      Q. And are those the facts that support
12 your claim that this was retaliatory?
13      A. Yes.
14      Q. And Lisa Urbont was your supervisor?
15      A. Yes.
16      Q. And she is copied on this e-mail?
17      A. No. Yes. Yes, she is.
18      Q. Did she have any questions for you
19 about this or did she have any comment about this
20 communication?
21      A. She did not say anything about this
22 e-mail.
23      Q. Okay. Let's move on to the last clause
24 of that sentence, which is that Weslii assigned
25 you a disproportionate number of cases.

Page 241

1            A. Yehoshua
2      Can you, please, describe each and
3 every fact that supports that allegation.
4      A. Well, I was clearly going to trial more
5 often than my colleagues.
6      Q. And is that what you previously
7 testified to today?
8      A. Yes.
9      Q. Any another facts that support it other
10 than what you previously testified to?
11      A. Well, I identified this fact to Larry
12 and I said I'm being assigned a disproportionate
13 number of cases and the other attorneys are not.
14 I am sure that they have less cases than I do.
15      Q. Any other facts that support this
16 claim?
17      A. Larry said he would look into it and,
18 as I said before, there was no transparency, there
19 was no list of cases, no one knew how many cases
20 each attorney was assigned, but based on the
21 activity of trials, it was clear to everyone, not
22 only to me, but it was clear to other people that
23 I was on trial and I had more cases than the other
24 lawyers in my unit.
25      Q. And when you asked -- and Larry told

61 (Pages 238 - 241)

A. Yehoshua

you he would look into it. You testified earlier today that he never got back to you. Is that still your testimony?

A. I think he did look into it and I don't remember what he said. I believe that he did look into it. He said he would and I believed that he would -- he did.

Q. And what are the facts that support your claim that this was discriminatory against you based on the fact that you are an Orthodox Jew?

A. Well, this was retaliatory.

Q. Okay. And what are the facts that support your claim that it was retaliatory?

A. Ever since that train report, things were continually getting more and more difficult, and that year I tried more cases than any other lawyer in my unit.

Q. In what year?

A. 2019.

Q. And do you have any other facts why this is discriminatory against you?

A. Well, it follows the same pattern from 2016. It was hostile. It was the same unfair



A. Yehoshua

treatment that I had been complaining about. I was unfairly given more cases than any of the other lawyers in my unit, and that is discriminatory.

Q. No other facts then; is that right?

A. What I identified as facts is what I stand by.

Q. Okay. All right. And then paragraph -- and did you tell anybody at Transit that you thought this e-mail about using PTO, that we have marked as Exhibit 14, was discriminatory or retaliatory in any way?

A. I couldn't tell anyone because I wasn't in the office. No one was working in the office. This was during the pandemic and everyone was working from home.

Q. So you didn't tell anybody?

A. I don't remember if I did. I could have.

Q. Did you tell Larry that you thought you were working more than anyone else because of discriminatory animus against you due to your religion?

A. Yes.



A. Yehoshua

Q. Did you tell anybody else?

A. I don't remember.

Q. And what did Larry say to you?

A. He'll look into it.

Q. And did you tell Larry you thought it was retaliatory?

A. I don't remember.

Q. Okay. Then paragraph 36 of your Amended Complaint you say: Thereafter Plaintiff made numerous additional complaints of religious discrimination to Larry Heisler.

I am going to ask you to tell me about each and every one of these complaints, but before you do, earlier today you testified about a number of conversations that you had with Larry requesting a transfer. So are those -- was that testimony -- did that reflect all of these complaints that you made, or are there additional complaints of religious discrimination that you made to Larry?

A. No, there weren't additional. Those were the ones I was referring to.

Q. Those are the ones you are referring to. Okay. And in response to the complaints that



A. Yehoshua

we previously discussed, what steps did Larry take to address your complaints?

A. Well, you saw what he did in 2016, and what he did afterwards was between him and her.

Q. And did he -- at any point in time did he tell you or relay to you whether or not he formed an opinion about whether you were being discriminated against?

A. No.

Q. And at any point in time did he tell you whether he formed an opinion about whether or not you were being retaliated against?

A. No.

Q. Do you know what, if anything, Larry did in response to any of your complaints of discrimination or harassment or retaliation?

A. I believe he looked into them.

MS. USENHEIMER: All right. And then -- let me see. All right. I think we need to mark your interrogatory responses as Exhibit 15.

(Defendants' Exhibit 15, Plaintiff's Verified Amended Response to Defendants' First Set of Interrogatories, marked for

1          A. Yehoshua
2     identification.)
3     Q.   Have you seen this document before?
4     A.   I signed the verification.  I did see
5   this document before.
6     Q.   Okay.  And what do you understand the
7   verification to mean?
8     A.   I verified its contents.
9     Q.   That the contents are true and correct?
10    A.   Yes.
11    Q.   Okay.  And did any attorney tell you to
12  lie when you made this verification?
13    A.   No.
14    Q.   Okay.  So I'd like you to turn to the
15  response for Interrogatory No. 13.  All right.  So
16  here you are asked to identify every complaint of
17  additional -- every additional complaint of
18  religious discrimination, and you have identified
19  a number of complaints here that we didn't
20  previously talk about.  So I just think let's run
21  through them.
22          So you indicate in February 2016 you
23  complained to Larry.  So is that, do you think,
24  the complaint about timekeeping or something else?
25    A.   Oh, that was this one.

1          A. Yehoshua
2     Q.   What's "this"?
3     A.   Exhibit -- the train e-mail,
4   Exhibit 12.
5     Q.   All right.  So are there any other
6   complaints that you are aware of that you made to
7   Larry in February 2016?
8     A.   No.
9     Q.   Okay.  And you put here "March 2019."
10  Is that -- does that refresh your recollection as
11  to one of the dates in 2019 that you complained to
12  Larry?
13    A.   Most likely, yes.
14    Q.   Okay.  And was this March 2019, was
15  this -- we talked at length this morning about
16  your conversations in 2019 with Larry in which you
17  requested a transfer --
18    A.   Uh-huh.
19    Q.   -- or showed him messages that you were
20  receiving from Weslii.  So is March -- is this
21  complaint from March 2019 one of those complaints,
22  or is this a different complaint that you are
23  aware of?
24    A.   Most likely it's one of those
25  complaints that I discussed earlier.

1          A. Yehoshua
2     Q.   All right.  Same question for 2019.
3   You indicate here June 2019 you complained to
4   Larry Heisler.  So did we already discuss the
5   substance of that complaint, or is this a
6   different complaint?
7     A.   I think we already discussed it.
8     Q.   Okay.  And then December 2019 you
9   indicate that you complained to Larry Heisler and
10  I believe we discussed that as well; is that
11  right?
12    A.   Yes.
13    Q.   Okay.  Then you indicate in January
14  2020 you complained to Larry Heisler.  We didn't
15  talk about that.  So can you, please, tell me what
16  happened in January 2020?
17    A.   Oh, that was when I was transferred.
18    Q.   So did you complain of discrimination
19  in January 2020?
20    A.   He addressed my complaint in January
21  2020.  He said, "now you will be transferred."
22    Q.   Okay.  So no new complaint in January
23  2020; is that right?
24    A.   Correct.
25    Q.   Okay.  What about the next one,

1          A. Yehoshua
2   February 2020?
3     A.   Oh, February 2020 I remember asking
4   Larry why I'm still getting assignments for Weslii
5   when I'm already in a new unit.  I was already
6   working for Lisa.
7     Q.   And what did he say?
8     A.   Oh, I think he said something like -- I
9   don't want to guess.  I don't want to guess.
10    Q.   You don't remember what he said?
11    A.   No.
12    Q.   Isn't it true that your transfer to the
13  new unit under Lisa was contingent on you
14  completing your pending assignments?
15    A.   No, that's not true.
16    Q.   Okay.  And isn't it true that any
17  assignments that Weslii gave you following your
18  transfer were just to resolve the cases that were
19  already yours?
20    A.   No.
21    Q.   What evidence do you have that she
22  assigned you new cases after you transferred in
23  January 2020?
24    A.   Evidence do I have?  I didn't bring any
25  evidence with me.

63 (Pages 246 - 249)

Page 250

A. Yehoshua

1
2    Q.    Okay.  What facts do you have?
3    A.    I was reassigned to a new unit and I
4  already had a trial assigned to me and from what I
5  understood from other people in the office, once
6  you are reassigned to a new unit, you are done
7  with your old unit, you work on the new cases for
8  the new unit.  No one ever heard of anyone --
9  there is no written policy that says you have to
10  continue working on old work.
11    Q.    Whether or not there was a written
12  policy, were you instructed that you would finish
13  out your cases that you have?
14    A.    I wasn't instructed.  I was -- I think
15  it was an unclear e-mail that I received and I was
16  addressing the e-mail and I don't have those
17  e-mails with me, but I remember saying how could I
18  do that when I have this, and so on.  There was a
19  lot of unclarity with what work I needed to do.
20    Q.    I asked you what facts you have that
21  support your claim that Weslii assigned you new
22  cases that were never previously assigned to you
23  after January 2020.  Do you have any facts or
24  evidence to support that claim?
25    A.    I don't have access to my e-mails.  I

Page 251

A. Yehoshua

1
2  don't have that -- those facts right now.
3    Q.    Okay.  All right.  And you don't
4  remember the outcome of the discussion that you
5  had with Larry; right?
6    A.    No.
7    Q.    Okay.  And all these discussions that
8  we have just been talking about with Larry, you
9  have no notes or any other documents that
10  memorializes the substance of those discussions;
11  right?
12    A.    I don't know if I had e-mailed him.
13  It's possible I did.  I don't remember.
14    Q.    Anything else that you might have?
15    A.    I don't have access to my e-mail, so I
16  don't remember.
17    Q.    Okay.  And then the interrogatory
18  response goes on to say you complained to Larry in
19  March of 2020.  What was that complaint?
20    A.    Same complaint.
21    Q.    As in February 2020?
22    A.    Correct.
23    Q.    Can you remember anything that you
24  haven't already testified to about the substance
25  of that discussion?

Page 252

A. Yehoshua

1
2    A.    No.
3    Q.    What was the outcome of that
4  discussion?
5    A.    Don't remember.
6    Q.    And what about this Complaint that you
7  indicate in April 2020?
8    A.    It was similar.  I was asking why I
9  have to continue to do this additional work.
10    Q.    And what, if anything --
11    A.    I had two different boroughs I was
12  working for.  I didn't understand it.
13    Q.    And what, if anything, did Larry say in
14  response?
15    A.    I don't remember.
16    Q.    Okay.  And do you remember any outcome
17  from that discussion?
18    A.    No.
19    Q.    And this next time you say May 2020 you
20  complained to Larry.
21    A.    Yes.
22    Q.    Okay.  And what was the substance of
23  that discussion?
24    A.    I continued to complain about the two
25  boroughs that I was working for.  No one in the

Page 253

A. Yehoshua

1
2  whole entire office had to work for two different
3  managers at the same time.
4    Q.    And do you remember what, if anything,
5  he said in response?
6    A.    I -- I feel like he might have said
7  finish it.  Maybe.  I'm not -- I don't want to
8  guess, so -- I don't recall his words.
9    Q.    What does that mean, "finish it"?
10    A.    I don't know.  I just -- I think he
11  just wanted it to end.  He didn't understand
12  either why she was still giving me assignments
13  five months after.
14    Q.    Isn't Larry Weslii's boss?
15    A.    This was during the pandemic and people
16  weren't in the office, so I don't know how much
17  they saw or said anything to each other.  I don't
18  know what discussions they had.  Maybe he was
19  reaching out to her and asking her what's going
20  on.  I don't know.  I wasn't copied on any
21  e-mails.
22    Q.    Okay.  And then what about June 2020?
23    A.    Same.  Oh, no, June 2020 was this day.
24  It was when I told him that I -- oh, sorry.  I
25  don't remember what exhibit it is.

64 (Pages 250 - 253)

Page 254

A. Yehoshua

1
2    Q.   Is it in connection with the DAN?
3    A.   Yes.  Exhibit 1.
4    Q.   Exhibit 1.  And what was the
5  conversation that you had?
6    A.   When I first got this, I called her and
7  she did not answer the phone.  She texted me
8  "write me if you want to discuss anything."
9    Q.   Is the "her" Weslii?
10   A.   Yep.
11   Q.   Okay.
12   A.   I realized she didn't want to discuss
13  this with me even though she just sent it to me.
14  Then I called Larry.
15   Q.   What did you say to Larry?
16   A.   I told him I received this, I was very
17  upset about it and she wouldn't talk to me about
18  it.  He said, "Send it to me."  Because he didn't
19  have any knowledge about this.  He was not copied
20  on it.
21   Q.   What, if anything, else did he say?
22   A.   "I'll call you back."  That was it.
23   Q.   Did he call you back?
24   A.   Yes, he did.
25   Q.   What did he say?

Page 255

A. Yehoshua

1
2    A.   He said something along the lines of "I
3  want to speak to your husband."
4    Q.   And is that what led to the text
5  message exchange that we previously discussed?
6    A.   Correct.  So when you ask about June
7  2020, that's...
8    Q.   Okay.  So you identified a number of
9  complaints in here that you spoke to Larry Heisler
10  about following January -- including January 2020
11  and through May 2020 about being continued to have
12  assignments for New York County.
13       So can you tell me all the facts that
14  support your claim that continuing to have
15  assignments for New York County was
16  discriminatory?
17   A.   I was no longer in the New York unit,
18  so I didn't agree that I should continue to work
19  for her.  She already discriminated against me all
20  those years, she made -- there were so many
21  examples of her unfair treatment and this is what
22  I'm talking about.
23   Q.   Okay.  Is that -- are those the only
24  facts that support your claim that it was
25  discriminatory?

Page 256

A. Yehoshua

1
2    A.   With regards to which one?
3    Q.   The complaints that -- the complaints
4  that you relayed -- oh, I'm sorry.  The fact that
5  you were still receiving assignments from New York
6  County after -- including and following January
7  2020.
8    A.   I believe so.
9    Q.   And what are the facts that support
10  your claim that continuing to receive assignments
11  were retaliatory?
12   A.   That I was no longer in the unit and
13  this was retaliatory because I left -- I demanded
14  the transfer and so I left and this was
15  retaliatory because I chose to transfer out of the
16  unit.  So that's why I was getting assigned these
17  cases.
18   Q.   Okay.  And I just want to confirm again
19  that you don't -- that you are not aware of any
20  notes or documents that memorialize the date or
21  substance of any of these complaints to Larry that
22  we just discussed; right?
23   A.   I don't have access to my e-mails.
24  There may have been e-mails.  I don't remember.
25   Q.   And then you state in response to this

Page 257

A. Yehoshua

1
2  interrogatory:  Plaintiff also made approximately
3  two oral complaints per year to Larry between
4  February 2016 and March 2019.
5       So you have not identified those yet
6  today as complaints.  So can you tell me all the
7  facts that support those complaints?
8    A.   Those were approximate.
9    Q.   Okay.  So do you believe that those
10  happened?
11   A.   I already testified about those.
12   Q.   Oh, that's what you testified about
13  this morning about requesting a transfer?  Let me
14  go back to those.  Let me see what you testified
15  to.  Yes, you said -- right, you said two times in
16  2017, two times in 2018.  Okay.  Are those what we
17  have already testified to?  Okay.  All right.
18       THE COURT REPORTER:  I don't have an
19  answer.
20       MS. USENHEIMER:  Sorry.
21   A.   Correct.
22       MS. USENHEIMER:  Thank you.
23   Q.   Okay.  And so sitting here today, can
24  you recall any other complaints to Larry or
25  anybody else at the Transit Authority of

65 (Pages 254 - 257)

Page 258

A. Yehoshua

1           A. Yehoshua
2  discrimination, harassment or retaliation which
3  are not listed in response to the
4  Interrogatory No. 13 or which we have not
5  discussed already today?
6      A.   No.
7      Q.   And during this period of time from
8  January 2016 to December 2019, did you tell
9  anybody besides Larry that you believed you were
10 being discriminated against?
11     A.   I believe I told Adrian Thompson.
12     Q.   What did you tell Adrian Thompson?
13     A.   That I was being discriminated against.
14     Q.   When did you tell him that?
15     A.   I don't remember the date.
16     Q.   How many times did you tell him?
17     A.   I don't remember.
18     Q.   What, if anything, did he say to you?
19     A.   He knew that there was something wrong
20 with what was happening to me in the unit.
21     Q.   Is that what he said to you?
22     A.   Yes.  Something around -- along those
23 lines.  I don't remember verbatim.
24     Q.   Can you remember anything else about
25 this conversation that you had with Adrian?

Page 259

A. Yehoshua

1           A. Yehoshua
2      A.   No, I don't remember anything else.
3      Q.   And it was a conversation, right, it
4  was a verbal discussion?
5      A.   Yes.
6      Q.   Okay.  Then can you, please, review
7  paragraph 37 of the Amended Complaint to yourself
8  and let me know when you are finished.
9           (Document review.)
10     Q.   Okay.  Have you finished reading the
11 sentence?
12     A.   Yes.
13     Q.   Can you, please, tell me all the facts
14 that support your allegations in paragraph 37?
15     A.   The facts are that Adrian Thompson was
16 reassigned to me, to work with me.
17     Q.   And you also claim that Larry Heisler
18 forced Weslii to distribute some of your cases to
19 co-workers.  What are the facts that support that
20 claim?
21     A.   I don't know if "forced" is the right
22 word for this, but I believe that when I
23 complained about the unfair distribution of my
24 cases, he told her to evenly distribute the cases,
25 so then she came into my office and removed some

Page 260

A. Yehoshua

1           A. Yehoshua
2  of my files.
3      Q.   And were you -- do you have any
4  personal knowledge of any discussion that Larry
5  had with Weslii about assignment of cases in the
6  New York unit?
7      A.   Personal knowledge?
8      Q.   Yes.
9      A.   No.
10     Q.   Okay.  Let's go to paragraph 39.  You
11 allege -- well, I guess read it to yourself and
12 then let me know when you are finished.
13          (Document review.)
14     A.   Okay.  I read it.
15     Q.   Okay.  So you claim here essentially
16 that Plaintiff requested and obtained a transfer
17 to the Kings Trial Unit.
18          So are there any facts that support
19 this allegation in your Complaint beyond what we
20 have already discussed?
21     A.   Beyond what we have already discussed?
22 No.
23     Q.   Yes, you discussed your conversation
24 with Larry in December 2019 requesting a transfer.
25 Are there any --

Page 261

A. Yehoshua

1           A. Yehoshua
2      A.   I said -- not only was it December
3  2019.
4      Q.   Yes, you did.
5      A.   On the record I said, but it was more
6  than just that one time.
7      Q.   But you obtained the transfer.
8      A.   That's when I obtained it, yes.
9      Q.   Okay.  So any other facts besides what
10 you have testified to today?
11     A.   No.
12     Q.   Okay.  Then let's look to paragraph 40.
13 You allege Khahaifa -- after the transfer Khahaifa
14 would not let Plaintiff get out from under her
15 thumb.  Can you tell me all the facts that support
16 that claim?
17     A.   That's what I was explaining, that even
18 though I was out of the unit, she still wanted to
19 approve my time sheets, she wanted to give me work
20 assignments.  She was no longer my manager, but
21 she still wanted to control my every move.  That's
22 what that sentence explains.
23     Q.   Okay.  And we discussed already -- you
24 have told me already all the facts that support
25 your claim that that was discriminatory; is that

66 (Pages 258 - 261)

Page 262

1          A. Yehoshua
2 right?
3     A.   Correct.
4     Q.   Okay.  And then you allege she, meaning
5 Weslii, persisted in treating Plaintiff as though
6 she was still her supervisor even though Weslii
7 had no jurisdiction in Kings County.
8     A.   Correct.
9     Q.   And have you told me all the facts that
10 support that claim?
11     A.   Yes.
12     Q.   And you told me all the facts that
13 support that that claim is discriminatory?
14     A.   Yes.
15     Q.   And you told me all the facts that
16 support that claim is retaliatory?
17     A.   Yes.
18     Q.   Okay.  And same question about "would
19 not let Plaintiff get out from under her thumb,"
20 you told me all the facts that support your claim
21 that that's retaliatory?
22     A.   Yes.
23     Q.   All right.  Okay.  Please read
24 paragraph 41 to yourself and let me know when you
25 are done.

Page 263

1          A. Yehoshua
2          (Document review.)
3     A.   Okay.
4     Q.   So this paragraph is pretty long and I
5 want to take it in chunks.  So the first few
6 sentences -- well, you allege:  Based on an
7 accusation that Plaintiff had received free legal
8 services from an outside attorney who performed
9 work for Transit, the Office of the Inspector
10 General received a referral for investigation, and
11 you allege the allegation was flawed as no gift
12 was involved since Plaintiff engaged the outside
13 attorney on a contingency basis.  And then because
14 the subtlety of the contingency relationship was
15 misunderstood, the Inspector General did recommend
16 some discipline, but he did not recommend
17 termination.
18          Okay.  Now, have you told me all the
19 facts that support the allegations that I just
20 read out loud?
21     A.   Well, what I said and what my prior
22 attorney, Karl Sleight, wrote in his letters would
23 be responsive to this paragraph.
24     Q.   Okay.  And then you go on to allege:
25 Even though Weslii was no longer Plaintiff's

Page 264

1          A. Yehoshua
2 supervisor, on June 12, 2020, I am paraphrasing,
3 Weslii pounced on this opportunity to retaliate
4 against her for complaining about Khahaifa's acts
5 of discrimination, sending Plaintiff a Notice of
6 Penalty Determination for her dismissal.
7          So is that Exhibit 1 that we have
8 already discussed?
9     A.   Yes.
10     Q.   Okay.  Are there any other facts then
11 that support your claim here that Weslii pounced
12 on this opportunity to retaliate against you that
13 you haven't already testified to?
14     A.   Well, again, I refer to the letter
15 addressing this that was written by Karl Sleight
16 in response to these allegations.  He directly
17 responded to this -- what did you call it, DAM?
18 Disciplinary -- DAN, this DAN.
19     Q.   Well, I'd like you to respond to my
20 question here about facts that relate to this
21 claim of retaliation.
22     A.   Okay.
23     Q.   So are there any facts that you haven't
24 testified to today that support your claim that
25 Weslii pounced on this opportunity to retaliate

Page 265

1          A. Yehoshua
2 against you?
3     A.   Well, I think I testified clearly about
4 she was no longer my manager and she took this
5 opportunity to write this letter, sign the letter,
6 recommend something that was not recommended.  I
7 believe I had testified already about this.
8     Q.   Okay.  I just wanted to make sure you
9 have told me all the facts.
10     A.   Yes.
11     Q.   Okay.  We are going to take a bathroom
12 break in just one second, but I want to ask:  So
13 we have discussed today a series of complaints
14 that you testified that you relayed to Larry about
15 Weslii.  Would you agree that that's an accurate
16 description of your testimony?
17     A.   I said a lot of things.  I did talk
18 about Larry, yes.
19     Q.   Okay.  And, in particular, complaints
20 that you made to Larry; right?
21     A.   Yes.
22     Q.   Do you have any personal knowledge of
23 whether Larry relayed any of this information to
24 Weslii or told Weslii about any of your
25 complaints?

67 (Pages 262 - 265)

Page 266

A. Yehoshua

1
2   A.   No, I have no personal knowledge.
3        MS. USENHEIMER:  Okay.  So I think it's
4   a good time to take a bathroom break.
5        (Recess was taken from 4:04 to 4:16.)
6   BY MS. USENHEIMER:
7   Q.   Okay.  So we are going to pick back up
8   with your Amended Complaint.  So, please, turn to
9   paragraph 42, which is on page 7.  Can you read
10  the allegation to yourself and let me know when
11  you finish.
12       (Document review.)
13  A.   Okay.
14  Q.   Can you, please, tell me all the facts
15  that support your allegation that Weslii
16  manufactured a story about certain New York County
17  judges making unverified complaints against
18  Plaintiff or about Plaintiff?
19  A.   Yes.  It's pretty much what it says.
20  There was no supporting evidence.  There were no
21  affidavits.  There was nothing to it.  I believe
22  that she made these stories up about the judges.
23  Q.   Okay.  And your belief is based on the
24  fact that you are not aware of any supporting
25  evidence, or is there additional facts that

Page 267

A. Yehoshua

1
2   support your belief?
3   A.   Well, I mean, three out of the five
4   judges I have never even been before, so those
5   were completely manufactured.
6   Q.   Anything else?
7   A.   And if they knew about this, why wasn't
8   that included in the first notice?
9   Q.   Any other facts that support your claim
10  that Weslii manufactured the stories?
11  A.   No.
12       MS. USENHEIMER:  All right.  So we are
13  going to mark as Exhibit 16 the second
14  Disciplinary Action Notice dated March 29th,
15  2021.
16       (Defendants' Exhibit 16, letter dated
17  March 29, 2021, Bates stamped NYCTA 000217
18  through NYCTA 000220, marked for
19  identification.)
20  Q.   Okay.  Have you -- this is a document,
21  it's four pages long.  It runs Bates stamp NYCTA
22  217 to 220.
23       Ms. Yehoshua, have you seen this
24  document before?
25  A.   Yes.

Page 268

A. Yehoshua

1
2   Q.   Okay.  And so is this a true and
3   correct copy of the Disciplinary Action Notice
4   that you received on March 29, 2021?
5   A.   Yes.
6   Q.   Okay.  I'd like to go to page 2, which
7   is Specification I.  So just if you can read the
8   first paragraph and then let me know when you have
9   completed reviewing it.
10       (Document review.)
11  A.   You want me just to read that first
12  paragraph?
13  Q.   Yes.
14  A.   Okay.  I've read it.
15  Q.   Okay.  So the first sentence states:
16  "On or about November 7, 2019, Judge Lisa Ann
17  Sokoloff reported that she was calling directly
18  from the bench to express her dissatisfaction with
19  your unethical and unprofessional behavior."
20       So do you have any personal knowledge
21  of what Judge Sokoloff did on November 7, 2019, or
22  what she may have reported to the Transit
23  Authority?
24  A.   I know she didn't call from the bench.
25  Q.   How do you know that?

Page 269

A. Yehoshua

1
2   A.   Because I was there.
3   Q.   You were in the courtroom?
4   A.   I was in the courtroom.  She wasn't
5   calling from the bench.
6   Q.   At some point did you leave the
7   courthouse?
8   A.   No.  She left.  At some point she left.
9   She went to the back room and then I was waiting
10  in the courtroom.
11  Q.   Okay.  But do you have any knowledge of
12  any conversation that she may have had with anyone
13  at Transit on that day?
14  A.   Well, I got an e-mail from Khahaifa
15  saying that she called her.
16       MS. USENHEIMER:  Okay.  I have a copy
17  of that e-mail.
18       THE WITNESS:  Okay.
19       MS. USENHEIMER:  So let's look at that.
20       We are going to mark this as
21  Exhibit 17.
22       (Defendants' Exhibit 17, e-mail dated
23  November 7, 2019, Bates stamped NYCTA 003293,
24  marked for identification.)
25  Q.   So is this the e-mail that you were

68 (Pages 266 - 269)

A. Yehoshua

1  just referencing?

2  A.  Yes.

3  Q.  All right.  This is a one-page document

4  Bates stamped NYCTA 3293.

5     Okay.  So I guess my question is

6  this -- this DAN provides that Judge Sokoloff

7  reported she was calling directly from the bench

8  to discuss your behavior in court that day.

9     So do you have -- you testified that

10  you don't believe she was calling from the bench,

11  but do you have any other personal knowledge of

12  what Judge Sokoloff may have reported to any

13  Transit member of management on the phone that day

14  about your performance?

15  A.  Okay.  This -- I'm going to say two

16  sentences about this.  The Wood case was not my

17  case.  It was another attorney's case named

18  Alexandra Vandoros.  I was on trial a week before

19  this and then I was given this case to appear in

20  court.

21     MS. USENHEIMER:  Can you reread my

22  question, please.

23     (Record read.)

24  A.  Now, when you say Transit management,

A. Yehoshua

1  who are you referring to?

2  Q.  Any member of management at Transit.

3  A.  I know for a fact she didn't call Larry

4  or Gail, because the e-mail came from Khahaifa.

5  Q.  Do you have any knowledge of what Judge

6  Sokoloff reported to Khahaifa on the phone that

7  day?

8  A.  I was not on that phone call.

9  Q.  Do you have any -- okay.  Looking at

10  Transit Exhibit 17, do you have any reason to

11  believe that the e-mail description that Weslii

12  sent to you on November 7, 2019, at 3:26 p.m. was

13  inaccurate?

14  A.  Yes.

15  Q.  Why?

16  A.  I was not a part of the phone call and

17  I don't believe that Judge Sokoloff said these

18  things.

19  Q.  What is the basis of your belief that

20  she didn't say those things?

21  A.  I was before Judge Sokoloff in person

22  myself.

23  Q.  And you responded to Weslii indicating:

24  "I'm still in court.  I wish it was on the record."

A. Yehoshua

1  She was acting inappropriate."

2  A.  Right.

3  Q.  "I'll fill you in when I get back.

4  Give me the benefit of the doubt."

5     So this suggests that you knew --

6  "don't assume she's correct.  She was wrong.  I'll

7  explain when I finish."  I mean, it seems like you

8  knew what Judge Sokoloff was talking about from

9  your response here.

10  A.  I did know, but I don't -- I didn't lie

11  to the judge at all.  I -- I was given this case

12  from another lawyer.  I was -- asked another

13  attorney before I answered the call about this

14  discovery exchange, because I didn't participate

15  in it, and I was told that if it's public record,

16  you should just tell the judge it's public record.

17  Now, very often judges disagree with lawyers,

18  that's normal, and I didn't think it was

19  appropriate that she would be demanding that I

20  turn over public records, so I asked her to,

21  please, put it on the record because I was told to

22  say this, and she did not want to put it on the

23  record, and that was what happened.

24  Q.  And did she say to you that she didn't

A. Yehoshua

1  want to put it on the record because it would be

2  very bad for you if she did?

3  A.  No.  She didn't explain why.  She just

4  said, "I'm not gonna put it on the record."

5  Q.  And then did you, in fact, talk to

6  Weslii on this day, November 7, 2019, about what

7  happened with Judge Sokoloff?

8  A.  Yes.

9  Q.  And what did you tell her?

10  A.  I said the judge was acting

11  inappropriate.  I think I -- I believe I said

12  this, "don't assume she's correct."

13  Q.  And what, if anything, did Weslii say

14  to you?

15  A.  I don't remember what she said.  I

16  just -- I know that she was blaming me and telling

17  me -- I don't remember the words.

18  Q.  Well, let's assume for a minute that it

19  was true that Judge Sokoloff was very upset and

20  indicated that you were disingenuous and lying to

21  her in the courtroom.  I mean, wouldn't you agree

22  that if that was true, that would be -- that that

23  is concerning conduct?

24     MS. VINCI:  Object to form.

Page 274

A. Yehoshua

1          A. Yehoshua
2          You can answer.
3      A.   I don't believe that is true.
4      Q.   That was not the question.  Do you need
5  me to repeat the question?
6      A.   You are asking me to assume it's true
7  and I am telling you that I can't assume it's
8  true.
9      Q.   Okay.  Let's say a judge called my boss
10  and told my boss that I was disingenuous and I
11  lied to the judge twice and that the behavior was
12  unbecoming of an attorney or officer of the court.
13  Would you agree that in that circumstance my boss
14  should be concerned about my behavior?
15          MS. VINCI:  Object to form.
16          You can answer.
17      A.   I do not agree that the boss should
18  take one side of the story.  That would be wrong
19  for any boss to say the judge is right.
20      Q.   Okay.  Okay.  You testified that the
21  Wood case was not your case, that it was
22  Alexandra's case.  Isn't it true that the Wood
23  case was your case and then it was reassigned to
24  Alexandra following this November 9th, 2017,
25  conference with Judge Sokoloff?

Page 275

A. Yehoshua

1          A. Yehoshua
2      A.   No, that's not true.
3      Q.   And isn't it true the dispute before
4  Judge Sokoloff had to do with a witness that was
5  identified in the DD5 and was not about discovery
6  of a public document?
7      A.   That was not my case.  I was on trial a
8  week before that.  I was on trial a week before
9  this happened.  I was on trial, and I don't
10  remember the name of the case, but I just finished
11  a trial the week before.  So this case wasn't
12  mine.  It was someone else's.  I don't remember
13  the details of the DD5 or the witnesses or
14  discovery.  I remember just one thing, asking Matt
15  Finkel what to do, and he told me, "just say this,
16  if it's a public record, it's accessible, it's
17  publically accessible, just say that."
18      Q.   Who is Matt Finkel?
19      A.   He is an attorney that only does that.
20  He does discovery.
21      Q.   And was he your colleague, was your
22  more junior than you or more senior than you?
23      A.   He was not a trial attorney.  He was in
24  the E and P unit, but he was very often before
25  Judge Sokoloff, and that's why I asked him.

Page 276

A. Yehoshua

1          A. Yehoshua
2      Q.   Okay.  And then the specification
3  goes -- okay.  Well, you testified you are not
4  aware of any communication, the substance of any
5  conversation between Judge Sokoloff and Weslii on
6  November 9, 2019; right?
7      A.   I know it wasn't on the bench, that I
8  know, because I was there.  I didn't leave the
9  courtroom.
10      Q.   Okay.  And you just testified that you
11  don't remember the specifics of the court -- I
12  think you said you don't remember the specifics of
13  what happened with the discussion about witnesses
14  being exchanged; is that right?
15      A.   I remember saying that it's public
16  record, if it -- I remember saying something about
17  if it's public record, it's available to the
18  plaintiffs, they can access it the same way we
19  access it.
20      Q.   And do you agree that Judge Sokoloff
21  got upset with you that day?
22      A.   She gets upset with a lot of lawyers
23  and I didn't think of it as anything unusual.  She
24  was upset with a lawyer right before I appeared
25  before her.

Page 277

A. Yehoshua

1          A. Yehoshua
2      Q.   So she was upset with you that day?
3      A.   I don't remember if she was that upset.
4  I know that she probably thought we should
5  exchange the information.
6      Q.   Did you ever come to learn that she
7  called Sherri Ehrlich to complain about your
8  conduct that day?
9      A.   No.
10      Q.   Did you ever come to learn that she
11  called Larry Heisler to complain about your
12  conduct that day?
13      A.   No.  In fact, I know she did not call
14  Larry Heisler.
15      Q.   How do you know that?
16      A.   Because I went to talk to Larry Heisler
17  and he said that Weslii called him, not Judge
18  Sokoloff.  Judge Sokoloff did not call him.
19      Q.   Okay.  And you are basing that on what
20  Larry told you in this conversation?
21      A.   I -- I spoke to him, yes.
22      Q.   Okay.  And then can you, please, read
23  the second paragraph of this specification.
24      A.   Second paragraph?
25      Q.   Yes.  It starts with "the judge further

70 (Pages 274 - 277)

Page 278

1           A. Yehoshua
2 reported."
3    A.   Okay.
4       (Document review.)
5    A.   I remember -- I read this.
6    Q.   Okay.  So the first sentence discusses
7 the judge further reported additional information
8 about a prior incident where she witnessed you
9 having lunch in the jury room, speaking with
10 plaintiffs on a case against the Authority.
11       Do you remember having a conversation
12 with Judge Sokoloff about this?
13    A.   I don't believe this is true.
14    Q.   What don't you believe is true, that
15 she reported it or that you were having lunch --
16 you were in a jury room speaking with plaintiffs?
17    A.   The whole thing is not true.  First of
18 all, I don't know if it was prior to November 7th
19 or after November 7th.  It was not something that
20 she discussed with anyone and she didn't witness
21 me having lunch in the jury room.  There was no
22 jury room that I would ever sit in.  And just for
23 the record, Karl Sleight addressed this one
24 specification where I told him that it was not a
25 jury room.  I was on trial on another case and I

Page 279

1           A. Yehoshua
2 was -- walked into a lawyer's room and I sat in
3 the lawyer's room under the direction of a court
4 officer and there were no people, and while I was
5 in there two people came in and I didn't know who
6 they were, we did not talk to each other, they may
7 have asked me about the weather, and that was it.
8 She may have walked by and saw me in the lawyer's
9 room.  She did not admonish me.  She just told the
10 people that were there to go back into the
11 courtroom.  There was no other discussion.
12    Q.   Okay.  And did you tell Judge Sokoloff
13 that the conversation was harmless because you
14 were not discussing the substance of their case?
15    A.   I didn't have to speak to her.
16    Q.   Okay.  So --
17    A.   I don't remember speaking to her.
18    Q.   So you deny any time in which Judge
19 Sokoloff spoke to you about a time when you were
20 having a conversation with plaintiffs who were
21 represented by counsel and their counsel wasn't
22 present; is that correct?
23    A.   I wasn't speaking to -- I didn't know
24 who these people were.  I didn't know if they had
25 counsel.  I was in a lawyer's room.  I'll repeat

Page 280

1           A. Yehoshua
2 what I said before.  I'm denying that this was --
3 that this happened.  There was no jury room that I
4 was sitting in.  I was in a lawyer's room under
5 the direction of a court officer.  And I didn't
6 know who these people were.  They came in after I
7 was already sitting there and they asked me about
8 the weather.
9       MS. USENHEIMER:  Can you repeat my
10    question, please.
11       (Record read at page 279, line 18,
12    through page 279, line 22.)
13    A.   Correct.
14    Q.   Okay.  And you don't have any personal
15 knowledge about what Judge Sokoloff may have told
16 any member of Transit Authority management with
17 respect to whether or not you could continue to
18 appear before her; is that right?
19    A.   I never heard this before.  No one ever
20 said that I could not appear before her.  So the
21 answer is correct.
22    Q.   So you have no knowledge?
23    A.   Correct, I have no knowledge of that.
24    Q.   And do you -- isn't it true that Judge
25 Sokoloff directed that you be -- that another

Page 281

1           A. Yehoshua
2 attorney appear on the case?
3    A.   I was never told that.
4    Q.   Well, did you appear on the case the
5 next time there was a conference on that case?
6    A.   I -- I did not.
7    Q.   Do you ever remember appearing on this
8 case after this conference with Judge Sokoloff?
9    A.   I don't know if it was a scheduling
10 issue.  I think I was on a trial the next time
11 that the case was on.  I don't remember.  But I
12 did not appear on this case and I don't know the
13 circumstances around it.
14    Q.   Okay.  Can you, please, read to
15 yourself the details under Specification II and
16 let me know once you have read it.
17       (Document review.)
18    A.   I read it.
19    Q.   Okay.  I'm sorry.  Before we move on
20 from Specification I, I just want to make sure
21 that you have told me all the facts that you are
22 aware of sitting here today that support your
23 claim that the specification is false.
24    A.   I believe I did.
25    Q.   Okay.  All right.  So Specification II.

71 (Pages 278 - 281)

Page 282

A. Yehoshua

1                   A. Yehoshua
2    Specification II addresses a conversation between
3    Judge Frank --
4        A.   And who?
5        Q.   And members of -- and someone at the
6    Transit Authority on or about December 3rd, 2019,
7    about your conduct during the Chinn case.
8             Do you have any personal knowledge
9    about what Judge Frank may have reported on or
10   about December 3rd, 2019?
11       A.   The trial was July of 2019.  I don't
12   have any personal knowledge of what conversations
13   he had months after the trial, no.
14       Q.   All right.  And do you have any
15   personal knowledge of what Judge Frank may have
16   said about your ability to appear before him in
17   court going forward?
18       A.   No.
19       Q.   Okay.  And have you told me all the
20   facts that support your claim that this
21   specification is false?
22       A.   Have I told you all the facts?  You
23   didn't ask me about the facts.
24       Q.   What facts do you have that support
25   your claim that this specification is false?

Page 283

1                   A. Yehoshua
2    You're right.  Thank you.
3        A.   All right.  I will answer that
4    question.  I do not believe this is true.
5        Q.   And what are the facts that support
6    your belief?
7        A.   Judge Frank was -- it seems like --
8    four months after the trial I don't think he would
9    say these things.  He was fair to both sides
10   during the trial.  Both attorneys were zealous
11   advocates for the trial.  It doesn't make sense
12   that he would have said this.  He has young
13   children.  I have young children.  We discussed
14   our young children.  This is not believable to me.
15   Those are the only facts I have.
16       Q.   Okay.  All right.  Let's move on to
17   Specification III.  Please read it to yourself and
18   let me know when you are done.
19             (Document review.)
20       A.   I'm done reading it.
21       Q.   Okay.  So this specification discusses
22   information that Judge Freed relayed to members --
23   relayed to somebody at the Transit Authority on or
24   about December 4th, 2019, largely about your
25   conduct during the Garcia trial.

Page 284

1                   A. Yehoshua
2             Do you have any personal knowledge of
3    the substance of that discussion?
4        A.   No.
5        Q.   Okay.  So according to the
6    specification, the second sentence, Judge Freed
7    reported that during the trial you were repeatedly
8    late, unprepared, dishonest, unethical,
9    disrespectful and unprofessional.
10            Were you repeatedly late?
11       A.   No.
12       Q.   Were you unprepared?
13       A.   No.
14       Q.   Were you dishonest?
15       A.   No.
16       Q.   Were you unethical?
17       A.   No.
18       Q.   Were you disrespectful?
19       A.   No.
20       Q.   Were you unprofessional?
21       A.   No.
22       Q.   Okay.  And then according to the
23   specification, the judge recounted on one occasion
24   she observed you blowing your hair in the jury
25   box.  Is that true?

Page 285

1                   A. Yehoshua
2        A.   No.
3        Q.   Then this provides in the second
4    paragraph Judge Freed removed herself from hearing
5    Authority cases as a result of your conduct.  Do
6    you believe that is true?
7        A.   No.
8        Q.   Okay.  Can you tell me the facts that
9    support your claim that that is not true?
10       A.   She continued to hear Authority cases
11   and my prior attorney, Karl Sleight, provided 23
12   cases that she heard from the Authority.
13       Q.   Okay.  Let's talk about those 23 cases.
14            MS. USENHEIMER:  Exhibit 18.
15            (Defendants' Exhibit 18, WebCivil
16   Supreme - Case Search Results, Bates stamped
17   NYCTA 000249 through NYCTA 000252, marked for
18   identification.)
19       Q.   Okay.  Is this a copy of the list of
20   cases that Karl Sleight provided?
21       A.   I think Karl Sleight highlighted the
22   Transit Authority cases.  I don't see any of those
23   cases highlighted here, but I guess if you look
24   for the defendant word, you will see the
25   defendant's name and count.

72 (Pages 282 - 285)

Page 286

A. Yehoshua

1
2    Q.   Okay.  So let's -- I guess we should go
3 through it then based on defendant.  So on the
4 first page, line 405, is a Manhattan and Bronx --
5 a MABSTOA case, and it indicates that the case was
6 disposed under Case Status.  Do you see that?
7    A.   Yes.
8    Q.   All right.  So does that suggest that
9 she continued to take new cases after your
10 conduct?
11    A.   You said it was November.
12    Q.   I said it was November?
13    A.   Well, you said it was -- oh, it doesn't
14 say it here, but I believe the case was tried late
15 2017.  I don't believe it was in March.  That
16 might have been before.  You will have to find the
17 date of the Garcia trial.
18    Q.   Well, let's continue going
19 through this.  Let's keep going.  So actually,
20 let's just talk about that one case.
21          That MABSTOA case, so the index number
22 is a 2017 index number, so does that suggest to
23 you that that case was first filed in 2017?
24    A.   I don't know when that case was filed.
25    Q.   Okay.  So what is your understanding of

Page 287

A. Yehoshua

1
2 the year and index number in New York County?
3    A.   That's not the index number, right?
4 3/23 is when the case was supposed to be tried.
5    Q.   There is --
6    A.   The next number is a different -- it's
7 150251, but this is pro se litigant, right?  It
8 says pro se.
9    Q.   No, I don't know what you are looking
10 at.  This MABSTOA is line 405.  There is a
11 plaintiff's firm.  Did you -- so are you looking
12 at line 405 on this first page?
13    A.   Yes, I am.
14    Q.   Okay.  So do you see under -- the
15 second column says Index Number?
16    A.   Yes.
17    Q.   Do you see an index number?
18    A.   I see it.
19    Q.   Okay.  And what is the year?
20    A.   2017.
21    Q.   Okay.  And what does the year usually
22 mean in an index number in New York Supreme
23 County?
24    A.   Most likely it's when the index number
25 was purchased.

Page 288

A. Yehoshua

1
2    Q.   Okay.  So does that typically align
3 with when the case was filed?
4    A.   Most likely.
5    Q.   Okay.  The next time I see an MTA case
6 is line 421.  Do you see that?
7    A.   421?  Yes.
8    Q.   Actually, the MTA cases go from 421 to
9 431; is that right?
10    A.   They are not in chronological order,
11 because there are some 2018 cases.
12          MS. VINCI:  She is referring to how
13    it's listed over here.  Listen to her
14    question and answer her question.
15          THE WITNESS:  Okay.
16    Q.   Okay.  So it goes from line 421 to 431?
17    A.   Yes.
18    Q.   Okay.  And starting on 421, the index
19 number reflects there a case -- what year is
20 reflected in the index number on line 421?
21    A.   The index number ends in 2017.
22    Q.   Okay.  And what about the case on line
23 422?
24    A.   The index number is also 2017.
25    Q.   And what about the case on line 423?

Page 289

A. Yehoshua

1
2    A.   The index number is 2016, but you are
3 not looking at the appearance dates.
4    Q.   And is the appearance date -- why do
5 you think the appearance dates are relevant?
6    A.   Because this is after 2017.  This case
7 from 2017 was handled by the judge in 2021.  That
8 was when the appearance was.  Do you see?
9    Q.   Which line are you talking about?
10    A.   I'm talking about the first line that
11 you said, 421.
12    Q.   So Justice Freed was no longer willing
13 to oversee new Transit Authority cases after the
14 Garcia trial, in particular your motion, I guess,
15 to set aside the verdict in which you accused her
16 of colluding with the plaintiff, so but these
17 cases were assigned to her well before that
18 happened, so I'd like to continue reviewing the
19 assignment numbers.
20          MS. VINCI:  I just object to that as it
21    mischaracterizes the prior exhibit.  It does
22    not say Judge Freed removed herself from
23    hearing all new Authority cases.  This says
24    all Authority cases.
25          MS. USENHEIMER:  I am making a

73 (Pages 286 - 289)

Page 290

A. Yehoshua

1       representation to you that she removed
2       herself from hearing new Authority cases.  So
3       I'd like to continue reviewing these index
4       numbers.
5           Q.   Why are you shaking your head?
6           A.   I have not seen anything in writing
7   that says she was removing herself, and here,
8   these are index numbers provided to you from --
9   the reason why he probably got these was because
10  that was when the Garcia case was, 2017.
11          Q.   Okay.  So all the index numbers from
12  421 to 431 are either 2017 or 2016; is that right?
13              I'm not sure if I heard an answer.
14          A.   You are asking me just to look at 420
15  to 431?
16          Q.   From 421 to 431, whether you see any
17  index number other than an index number with the
18  year of 2017 or 2016.
19          A.   Yes.
20          Q.   Yes, you do see other different dates?
21          A.   I see other index numbers ending in
22  2016, 2017.
23          Q.   Do you see any for 2018?
24          A.   Not yet.

Page 291

A. Yehoshua

1           Q.   I am just --
2           A.   No, not in these ten case.
3           Q.   What about anything after 2017 in these
4   ten cases?
5           A.   No.
6           Q.   Okay.  Then on the next page, it looks
7   to me like line 447 to 451 reflect MTA cases.
8   Looking at those index numbers, do you see an
9   index number that's after 2017?
10          A.   No.
11          Q.   Okay.  And then the next page it looks
12  to me like New York City Transit, 478 to 481.  Do
13  you see any index numbers after 2018 there?
14          A.   No.
15          Q.   And also -- okay.  I'd like to just go
16  back to the first page -- no, the second page.
17  Okay.  Never mind.  All right.
18              Any other -- so this is the chart that
19  you are saying Karl -- what's his last name,
20  Sleight, Sleight?
21          A.   His last name is Sleight, but I think
22  that you are -- can I give my opinion?
23              MS. VINCI:  Just answer the question
24      that you are asked.

Page 292

A. Yehoshua

1           THE WITNESS:  Okay.
2           Q.   I don't even remember the question.
3               Is this the submission that Karl
4   Sleight provided to refute your claim that Judge
5   Freed stopped taking Transit Authority cases or
6   removed herself from hearing Transit Authority
7   cases?
8           A.   This shows that she was still hearing
9   cases after 2017.  She was hearing Transit cases
10  2018, 2019, 2020.  This does not show what you are
11  saying.  It does not confirm the truth of the
12  statement, and I believe that Judge Freed had many
13  complaints filed against her from the Authority
14  attorneys, including Larry Heisler, Gail Goode and
15  myself, so maybe it's not what you are saying.
16  Maybe they asked her not to hear any more cases.
17  I don't believe that she would have been able to
18  do that herself.
19          Q.   So have you told me all the facts that
20  support your claim that the Specification III --
21          A.   Yes.
22          Q.   -- is false?  Can you answer now that I
23  have asked?
24          A.   I did answer.  I answered yes.

Page 293

A. Yehoshua

1           Q.   Okay.  It was in the middle of my
2   question, so if you can do your best to, please,
3   let me finish my questions before you answer, that
4   would be very helpful.
5               And you indicated that Judge Freed
6   had -- there were a lot of complaints against
7   Judge Freed by Transit Authority members.
8               Are you aware of Justice Freed
9   complaining about any other attorney that worked
10  at the Transit Authority?
11          A.   Yes.
12          Q.   What attorneys?
13          A.   Alexandra Vandoros.
14          Q.   And what was the nature of that
15  complaint?
16          A.   She didn't want her in the courtroom.
17          Q.   And how do you know that?
18          A.   Because I was in the courtroom.
19          Q.   And what did she say?
20          A.   Well, Alexandra walked into the
21  courtroom and she told her officer, "What is she
22  doing here?"
23          Q.   And when was this?
24          A.   When I was on trial.

74 (Pages 290 - 293)

1           A. Yehoshua
2    Q.   Which trial?
3    A.   Garcia.
4    Q.   And you said that Justice Freed looked
5  to her officer and said "what is she doing here"
6  about Alexandra?
7    A.   Correct.
8    Q.   And that is how you understand that she
9  didn't want Alexandra in her chambers or her
10  courtroom?
11    A.   That was the question she asked.
12    Q.   Did she say anything else?
13    A.   I didn't hear the rest of the
14  conversation she had with the officer, but I
15  believe she told her -- she told him to go ask
16  what she was doing there.
17    Q.   Are you aware of any other Transit
18  Authorities that Justice Freed complained about?
19    A.   Transit Authorities or Transit
20  Authority attorneys?
21    Q.   Attorneys who work for the Transit
22  Authority or MABSTOA?
23       THE WITNESS:  Can you just repeat the
24  question.  I didn't understand.
25       (Record read.)

1           A. Yehoshua
2    Q.   I can rephrase it.
3       Are you aware of any other Transit
4  Authority or MABSTOA attorneys that Justice Freed
5  complained about?
6    A.   Not at this time, I can't remember.
7    Q.   Okay.  Please read Specification V to
8  yourself.
9       (Document review.)
10    A.   Okay.
11    Q.   The first paragraph discusses a
12  conversation that Judge Adams had with Authority
13  management on January 23rd, 2020.
14       Do you have any personal knowledge
15  about any conversation that Judge Adams had with
16  Transit Authority management on that day?
17    A.   No.
18    Q.   Then the second sentence in that
19  paragraph indicates Judge Silvera also advised
20  Authority management you were not to appear in his
21  courtroom.
22       Do you have any personal knowledge of
23  what Judge Silvera said on that day?
24    A.   No.
25    Q.   Did Judge Adams used to work at Morris

1           A. Yehoshua
2  Duffy?
3    A.   Yes.
4    Q.   Did Alexandra Vandoros use to work at
5  Morris Duffy?
6    A.   No.
7    Q.   Did any other attorney at the Transit
8  Authority used to work at Morris Duffy?
9    A.   Anna Ervolina.
10    Q.   Nobody else?
11    A.   Not that I can recall.
12    Q.   Are you aware of any time that Judge
13  Adams worked at Ahmuty, Demers & McManus?
14    A.   No.
15    Q.   Are you aware of any time that
16  Alexandra Vandoros worked at that law firm?
17    A.   No.
18    Q.   Did Judge Adams recuse herself from
19  appearing before Alexandra Vandoros?
20    A.   I don't know.
21    Q.   Okay.  So the first sentence about
22  Judge Adams here, you believe that this is false;
23  is that right?
24    A.   I was transferred to the Brooklyn unit
25  in January, so there was -- I would not have

1           A. Yehoshua
2  appeared before Judge Adams.  She is in New York.
3  There is no -- I don't understand why she would
4  have recused herself if I wasn't going before her.
5    Q.   Okay.  And the statement by Judge
6  Silvera, do you believe that that's false?
7    A.   It is false.  I have never been before
8  him.  I don't know who he is.
9    Q.   You don't know who he is?
10    A.   No.
11    Q.   Okay.  Any other facts to support your
12  claim that anything in that first paragraph is
13  false?
14    A.   Judge Adams and I were working at
15  Morris Duffy for ten years together.  I think it
16  was understandable that she would have to recuse
17  herself if she did, but I don't believe that she
18  did, because I did not go before her.  So all I am
19  saying is that if she did, there would have been
20  an ethical obligation that she would have to do.
21  I don't know if it's true, but just saying that I
22  worked with her.  That's it.
23    Q.   Any other facts?
24    A.   No.
25    Q.   Okay.  This next paragraph says that on

75 (Pages 294 - 297)

Page 298

A. Yehoshua

1
2  or about January 30th, 2020, Judge Kaplan advised
3  Authority management you were not welcome in the
4  courthouse based on your past conduct and
5  unethical behavior with judges.
6        Do you have any personal knowledge
7  about any discussion that Judge Kaplan had on
8  January 30, 2020, with Authority management about
9  you?
10   A.   No.
11   Q.   Okay.  And you deny that you engaged in
12  any unethical behavior; is that correct?
13   A.   Correct.
14   Q.   All right.  Have you told me now all
15  the facts that you are aware of sitting here today
16  about why the information in this specification is
17  false?  I'm sorry.  In this DAN.
18   A.   I wasn't in the New York unit in
19  January of 2020.  I was already transferred to the
20  Brooklyn unit.  This -- I didn't go before Judge
21  Silvera at all ever.  So I hope that I have
22  answered your question.
23   Q.   Well, I'm asking you, are you aware of
24  any other facts that support your claim that this
25  Disciplinary Action Notice --

Page 299

A. Yehoshua

1
2   A.   No.
3        MS. VINCI:  Let her finish her question
4  so we have a clear record.
5        THE WITNESS:  I thought she finished.
6  Okay.
7        MS. USENHEIMER:  Can you read it out
8  loud.
9        (Record read as follows:  "Well, I'm
10  asking you, are you aware of any other facts
11  that support your claim that this
12  Disciplinary Action Notice -- ")
13   Q.   -- contains information that is false?
14        THE WITNESS:  One more time.
15        (Record read.)
16   A.   No.
17   Q.   Okay.  Do you have any personal
18  knowledge of who authored or wrote this
19  Disciplinary Action Notice?
20   A.   I have an opinion, but it seems to have
21  been signed by David Farber.
22   Q.   So did you understand that David Farber
23  authored it?
24   A.   No.
25   Q.   You do not understand that?

Page 300

A. Yehoshua

1
2   A.   I don't believe it.
3   Q.   Who do you believe authored it?
4   A.   Khahaifa.
5   Q.   And what information do you have to
6  support that?
7   A.   Because of previous discovery that was
8  exchanged with my attorney.
9   Q.   And what is that discovery?
10   A.   Discovery that has almost identical
11  words that are here in another report to Farber
12  from Khahaifa.
13   Q.   And that is the only basis of your
14  belief that Weslii authored this?
15   A.   She had -- she was retaliating against
16  me and this says to me that it was by her.
17   Q.   Any other facts to support your claim
18  that she wrote this?
19   A.   No.
20   Q.   Do you have any facts to support your
21  belief that Weslii was involved in any way in the
22  preparation of this Disciplinary Action Notice?
23   A.   Yes.
24   Q.   And what are those facts?
25   A.   As I indicated a question ago, that she

Page 301

A. Yehoshua

1
2  had written pretty much the same thing about three
3  times before this, once in response to the New
4  York State Department of Human Rights claim and
5  two other -- and one other time.
6   Q.   Okay.  And what are the facts that
7  support your claim that this memo was
8  discriminatory towards you?
9   A.   This was prepared after I filed the
10  EEOC claim and the New York State Department of
11  Human Rights claim and after I was transferred to
12  another unit.  That's the grounds for my belief.
13   Q.   No other claims to support your
14  allegation that this memo is discriminatory?
15   A.   Most of it is untrue and based on what
16  I had previously testified about all day.
17   Q.   I'm sorry, what?
18   A.   What I testified today.
19   Q.   I need you to clarify that for me.
20  It's based on what you testified about today?
21   A.   Yes.
22   Q.   What does that mean?
23   A.   Meaning that from all the years of her
24  discriminating against me, my departure from her
25  unit and the other memos that she had written in

76 (Pages 298 - 301)

Page 302

1          A. Yehoshua
2   response to my claim for the New York State
3   Department of Human Rights have the same language.
4       Q.   Okay.  Any other facts?
5       A.   No.
6       Q.   Okay.  And what about facts to support
7   your claim that this memo is retaliatory?
8       A.   It's retaliatory because it's asking
9   for my dismissal.
10      Q.   Any other way in which it's
11  retaliatory?
12      A.   And it's -- the date of it is during my
13  first suspension three months after my filing of
14  the EEOC claim and the New York State Department
15  of Human Rights claim.
16      Q.   Do you have any personal knowledge of
17  who at the Transit Authority determined that
18  termination was the appropriate disciplinary
19  measure in connection with this DAN?
20      A.   Personal knowledge?
21      Q.   Yes.
22      A.   No.
23          MS. USENHEIMER:  Okay.  Let's mark
24  Exhibit -- this is Exhibit 19.
25          (Defendants' Exhibit 19, Memorandum

Page 303

1          A. Yehoshua
2   dated February 28, 2021, with attachments,
3   Bates stamped NYCTA 003283 through NYCTA
4   003308, marked for identification.)
5       Q.   Okay.  Is this a copy of the memo or
6   the writing that you just testified about that
7   Weslii prepared?
8       A.   Yes.
9       Q.   And this is the reason why you believe
10  that Weslii prepared the Disciplinary Action
11  Notice that we marked as Exhibit 16?
12      A.   Yes.
13          (Defendants' Exhibit 20, e-mail dated
14          February 3, 2021, Bates stamped NYCTA 000030
15          through NYCTA 000033, marked for
16          identification.)
17      Q.   Okay.  I am giving you what's been
18  marked as Defendants' Exhibit 20.  It's a
19  three-page -- it's marked NYCTA 30 through 33.
20      A.   It's four pages, right?
21      Q.   Yes.  30 through 33 is the Bates stamp
22  number.
23          You have identified -- have you ever
24  seen these e-mails before?
25      A.   I'm not copied on any of them.

Page 304

1          A. Yehoshua
2       Q.   Have you ever seen these e-mails
3   before?
4       A.   I don't recall if these were ever shown
5   to me.
6       Q.   Okay.  So why don't you take a minute
7   or two and read through the three pages and let me
8   know when you are done.
9          (Document review.)
10      A.   Okay.
11      Q.   Do you believe that any of these
12  e-mails are evidence of discrimination against
13  you?
14      A.   Yes.
15      Q.   Okay.  Please tell me each and every
16  way in which they are discriminatory.
17      A.   This is done during the same time frame
18  as what I was saying before.  She had been hostile
19  to me and this just confirms it.
20      Q.   Okay.  And have you told me or can you
21  tell me now each and every fact that supports your
22  claim that any hostility from Weslii was based on
23  your religion?
24      A.   I think it all stems from the 2016
25  letter when she was accused of interfering with my

Page 305

1          A. Yehoshua
2   religious rights.
3       Q.   Any other facts?
4       A.   Well, they are all -- there are so many
5   examples of times that she was hostile to me due
6   to my religion.  You didn't ask me about those
7   yet, so...
8       Q.   I would like you to tell me each and
9   every time that you believe Weslii was hostile to
10  you based on your religion.
11      A.   I'll start with one where she invited
12  all of the people from the unit to go out for
13  drinks on Friday nights for a whole -- I don't
14  know how many months, and I was not invited, I was
15  not included.  That was --
16      Q.   When was that?
17      A.   I don't know what year.
18      Q.   You don't know?
19      A.   I don't remember the year.  I remember
20  hearing about it every Monday morning.
21      Q.   Well, you couldn't join if it was on a
22  Friday night; right?
23      A.   Right.
24      Q.   So did you expect to be invited in any
25  event?

77 (Pages 302 - 305)

Page 306

1                    A. Yehoshua
2     A.   I expected these outings to take place
3 on a Thursday night when I could join.
4     Q.   Would you have joined?
5     A.   Thursday night I was able to.  Friday
6 night I was not able to.
7     Q.   Any other facts that support any
8 other --
9     A.   I was not even invited though, so --
10 sorry.  I interrupted you.
11     Q.   Yes.  You were telling me all the times
12 in which Weslii was hostile to you based on your
13 religion.
14     A.   Okay.  She would assign me cases to try
15 on Jewish holidays.  One in particular was
16 Passover.  And this is in writing, there is an
17 e-mail, and I had to write -- I always wrote to
18 her every year, "these are the Jewish holidays for
19 this year," and I gave her the dates in January
20 for the whole year, all the Jewish holidays, and
21 she would assign me cases on those Jewish holidays
22 or assign me depositions and I would write back,
23 "see above e-mail, I told you I could not try
24 these cases, this is the Passover holiday."
25     Q.   And would she reassign them?

Page 307

1                    A. Yehoshua
2     A.   She would reassign them.
3     Q.   Okay.  Can you tell me every other time
4 when she was hostile to you based on your religion?
5     A.   I gave you the examples from this
6 morning about the Fridays when I left.  Remember
7 those?
8     Q.   Yes.  Anything that you haven't already
9 testified to.
10     A.   She was hostile to me during the time
11 when -- so in -- between 2011 -- sorry -- between
12 November 2017 to November 2018 I was approved for
13 FMLA.  My mother had dementia.  She was very, very
14 ill, and I was approved for it and I was asking
15 for accommodation.  I didn't want to go to trial
16 on one occasion and she said I had to do my job.
17 So I didn't take the day off and I didn't go with
18 my mother and I didn't use an FMLA day because I
19 was told that only managers were able to use FMLA
20 sick days, non-managers had to use FMLA vacation
21 days.  So she just was hostile when I referred to
22 days that were difficult for me because of my
23 mom's illness.  Another example.
24     Q.   Is that in any way connected to your
25 religion?

Page 308

1                    A. Yehoshua
2     A.   That's connected to her hostility,
3 retaliation.
4     Q.   And how is it retaliation?
5     A.   This goes in line with all the times
6 following the February 2016 e-mail where Larry
7 accused her of interfering with my Sabbath.
8     Q.   Any other times she was hostile to you
9 based on your religion?
10     A.   She was hostile in general and I'm
11 talking about every single time I left -- when I
12 left the office, for example, one time I had a
13 deposition for a whole eight hours, the name of
14 the case was Marianne Clayson, and she was very
15 upset when I returned to the office because she
16 didn't know that I had the case in the plaintiff's
17 attorney's office and she screamed at me, and I
18 remember that day because I was working for eight
19 hours in the plaintiff's attorney's office
20 doing -- taking the deposition of this plaintiff,
21 and I could not believe the hostility that I had
22 to endure when I returned to the office, because
23 she demanded that I come back to the office when I
24 did -- when I went to court, and she demanded that
25 I go to the office before I went to court.  So I

Page 309

1                    A. Yehoshua
2 had to go to the office to swipe in, then I left
3 for the deposition, and when I finished the
4 deposition I had to come back to swipe out.  She
5 was extremely hostile when I returned to the
6 office after the Clayson deposition.  She was
7 continuously hostile throughout my whole career
8 and it just intensified with text messages "where
9 are you," or if I would go to the bathroom, "where
10 are you going, are you leaving?"  One time I was
11 going to the library and she laughed at me, "yeah
12 right, you're going to the library."  She was
13 continuously hostile.
14     Q.   And what facts do you have -- your
15 answer to the last question did not identify any
16 way in which she was hostile to you based on your
17 religion.
18          So do you have any facts to support
19 your claim that she was hostile to you based on
20 your religion?
21     A.   I would say that these -- this
22 hostility stemmed from the February 2016 e-mail
23 where Larry accused her of interfering with my
24 religious rights.
25     Q.   Any other facts to support your claim

78 (Pages 306 - 309)

Page 310

A. Yehoshua

1
2 that the hostility was based on your religion or
3 retaliation?
4      A.   Other than the facts that I said this
5 morning?
6      Q.   Right, other than the facts that you
7 have testified to today.
8      A.   Let's see.  I can't recall any more.
9      Q.   Okay.  So I think we were looking at
10 Exhibit 20 and I asked you if you believed that
11 these were discriminatory, and you said 'she had
12 been hostile to me and this confirms it.'
13           Are there any other facts that support
14 your claim that this Exhibit 20 was discriminatory
15 against you based on your religion?
16      A.   Well, I think -- she doesn't talk about
17 religion in the e-mail, but this is directly
18 related to the hostility, retaliation, but it
19 doesn't say it.
20      Q.   And what are your facts that support
21 your claim that this was directly related to your
22 hostility and retaliation?
23      A.   What I have been saying all along.
24      Q.   So everything you have testified to
25 today?

Page 311

A. Yehoshua

1
2      A.   Yes.
3      Q.   Anything else?
4      A.   No.
5      Q.   Okay.  And that -- what are the facts
6 that support your claim that these e-mails in
7 Exhibit 20 are retaliatory?
8      A.   Well, this was -- this was -- okay.
9 This is December 4th, 2019, that's the date of
10 this e-mail.  I was in court selecting a jury on
11 this day when she was writing these e-mails.  I
12 had a 23-day trial beginning on December 2nd or
13 3rd and she was doing e-mails trying to get Larry
14 to -- Larry and Gail to do something about this
15 issue when she failed to acknowledge that I was on
16 trial, and I had won that case that I was on
17 trial, for the whole month.  So I think this is
18 retaliatory.  I wasn't there to defend myself.  I
19 wasn't there to explain myself.  I was in court
20 every single day that month.
21      Q.   Those are the reasons you believe it's
22 retaliatory?
23      A.   Yes.
24      Q.   You have spoken a number of times today
25 about all the hostility.  Have you told me all of

Page 312

A. Yehoshua

1
2 the incidents in which Weslii was hostile to you,
3 or are there more incidents?
4      A.   I'm sure there are more that I can't
5 remember right now.
6      Q.   Okay.  So you have no more -- sitting
7 here today, you can't recall any other incidents
8 of hostility; is that right?
9      A.   I can think of many.  I mean, I
10 remember one time when she was with my co-workers
11 standing by the restroom and I was walking out to
12 lunch and in front of all my co-workers she said,
13 "do you plan to come back?"  And that was hostile.
14 Of course I was coming back.  I wasn't leaving for
15 the day.  It was 12:00.  In front of all my
16 co-workers that had a good laugh about that
17 question too.  That was hostile.  And it was
18 hostile when I wanted to go to lunch and she
19 questioned me about going, "where are you going?"
20 And I had to show her my books.  I was going to
21 the library.  She laughed about that.  She was
22 continuously hostile.
23           She made -- I'll never forget this one
24 time she was texting me continuously, "where are
25 you?  Where are you?  Where are you?"  I was

Page 313

A. Yehoshua

1
2 sitting in a courtroom with my phone off.  I was
3 waiting for the calendar call.  I could not talk
4 to her.  And then she just continued writing,
5 "where are you?  Where are you?  Where are you?"
6 And it was -- and then I came out of the courtroom
7 and I called her, I said, "I'm in court, I'm
8 handling a motion," and I started crying because I
9 couldn't take it, and she heard me crying and I
10 hung up and then she called me back and she said,
11 "I'm sorry, I'm sorry if I made you cry."
12      Q.   Any other incidents of hostility that
13 you can remember?
14           MS. VINCI:  Is something funny about
15 the witness drinking water, counsel?
16           MS. USENHEIMER:  Well, it looks like
17 she is taking a lot of water instead of
18 responding to my question.
19           MS. VINCI:  She can drink as much water
20 as she wants.
21           MS. USENHEIMER:  She can.  I didn't say
22 anything.
23           MS. VINCI:  You just laughed.
24           MS. USENHEIMER:  I did laugh.  It's
25 been a long day.  I thought it was funny.

79 (Pages 310 - 313)

Page 314

1          A. Yehoshua
2      Can you read the question out loud for
3  the witness.
4      (Record read.)
5      A.   As I said before, there were many
6  instances.  She was continuously asking me where I
7  was going, what I was doing, when I was coming
8  back from lunch, texting me "where are you,"
9  texting me when I was on trial, "what's going on
10 with the trial, what's going on, I want to know,"
11 and one day she even told me, "I want to know
12 where you are at all moments of the day.  Even if
13 you go to the bathroom, I want to know where you
14 are."
15     Q.   Are there any other instances of
16 hostility that you can recall?
17     A.   No.
18     Q.   So this incident with the Marianne
19 Clayson deposition, when did that take place?
20     A.   I don't remember the day.
21     Q.   And with this comment by the restroom
22 where she said, "do you plan to come back," when
23 was that?
24     A.   I don't remember the day.
25     Q.   And how was that indicative of

Page 315

1          A. Yehoshua
2  discriminatory animus against you based on your
3  religion?
4      A.   It wasn't a Friday.  I don't know why
5  she would think I wouldn't come back.
6      Q.   How is that indicative of
7  discrimination against you based on your religion?
8      A.   That's the hostility.
9      Q.   And how is that hostility indicative of
10 discriminatory animus against you based on your
11 religion?
12     A.   I don't know if it is.
13     Q.   And how was this comment evidence of
14 retaliation against you?
15     A.   She was doing this to retaliate against
16 my complaint about her to Larry, and she was
17 laughing -- as you just laughed at me, she did the
18 same thing in front of her co-workers, my
19 co-workers.
20     Q.   When did she -- you previously
21 testified that your co-workers laughed.  So who
22 laughed at this comment?
23     A.   She made the comment, they laughed.
24     Q.   And the evidence that you have about
25 retaliation is that it followed the complaint that

Page 316

1          A. Yehoshua
2  you made to Larry in 2016; is that right?
3      A.   I believe that all of the hostile
4  events that occurred that I have testified about
5  today followed the events from February 2016.
6      Q.   And you testified you wanted to go to
7  lunch and Weslii asked you where you were going,
8  you said you were going to the library and she
9  laughed about that.  When did that happen?
10     A.   I don't remember the day.
11     Q.   And how was this comment indicative of
12 discrimination against you based on your religion?
13     A.   It's hostile.
14     Q.   How is it indicative of discrimination
15 against you based on your religion?
16     A.   I don't know.
17     Q.   Do you have any facts that would
18 suggest or support your claim that this is
19 discriminatory based on your religion?
20     A.   I know that it was humiliating.
21     Q.   Do you have any facts --
22     A.   And I don't have any facts that it was
23 discrimination.  I believe it was hostile.
24     Q.   And what about retaliatory, do you have
25 any facts to support your claim that this was

Page 317

1          A. Yehoshua
2  retaliatory?
3      A.   Just what I said.
4      Q.   And what is that, that it followed in
5  time the 2016 complaint?
6      A.   Yes.
7      Q.   Then you testified she is continuously
8  hostile, she texts you "where are you" when you
9  are at calendar call, there is incidents when you
10 were in the courtroom and you were handling a
11 motion.
12     This incident when you were handling a
13 motion and your phone was off, when was that?
14     A.   I don't remember.
15     Q.   And how is this evidence -- what facts
16 do you have to support that this incident was due
17 to discrimination against you based on your
18 religion?
19     A.   Oh, this was -- this was after I had
20 been transferred out of the New York unit.  This
21 was in January now, I remember the date, January
22 2020 when I was in court.  This was retaliatory
23 because I had been transferred out of the New York
24 unit.
25     Q.   And was it discriminatory in any way

80 (Pages 314 - 317)

Page 318

A. Yehoshua

1             A. Yehoshua
2  based on your religion?
3      A.  I don't know.
4      Q.  All right.  And then you said that she
5  would ask you, you know, what's going on with
6  trial when you were on trial.  How often did that
7  happen?
8      A.  Every single time I was on trial.
9      Q.  And how is this evidence -- what facts
10 do you have to support your claim that this was
11 discriminatory?
12     A.  I don't know.
13     Q.  And what about retaliatory?
14     A.  I think she was hoping I would not
15 succeed at trial so that she could have -- she
16 could continue to say these things, say things
17 negative -- in a negative light, so she would
18 never be encouraging when I was on trial.
19     Q.  And what facts do you have to support
20 that that is discriminatory against you based on
21 your religion?
22     A.  I don't know.
23     Q.  And what facts do you have to support
24 that that's retaliatory?
25     A.  I just said.  What I just said.

Page 319

A. Yehoshua

1             A. Yehoshua
2      Q.  No other facts to support that?
3      A.  No.
4      Q.  Okay.  And then you testified that she
5  said -- that Weslii said to you, "I want to know
6  where you are all moments of the day, even if you
7  go to the bathroom."
8      A.  Yes.
9      Q.  When did she say that?
10     A.  I don't remember the day.
11     Q.  And how is this -- can you tell me all
12 the facts that support your claim that this is
13 evidence of discrimination against you based on
14 your religion?
15     A.  Oh, I just thought of another incident.
16 But with regards to the question that you just
17 asked -- can you read it back.
18         (Record read.)
19     A.  Oh, I don't know.
20     Q.  And can you tell me all the facts that
21 support your claim that this was retaliatory
22 against you?
23     A.  I think like I answered before, it
24 follows all the other -- the pattern of her
25 behavior towards me, hostility towards me.

Page 320

A. Yehoshua

1             A. Yehoshua
2      Q.  Okay.  And what was this other incident
3  that you just remembered?
4      A.  The incident involving John Jerman in
5  my office.
6      Q.  You testified about that earlier today;
7  is that right?
8      A.  I hope so.
9      Q.  Is there something that you -- is there
10 some incident about John Jerman in your office
11 that you haven't already discussed?
12     A.  No.  If I discussed it, then I'm sure
13 I...
14     Q.  Are there any other incidents of
15 hostility by Weslii that you can recall sitting
16 here today?
17     A.  Yes.
18     Q.  What are they?
19     A.  She would talk badly about me to other
20 people, to other experts, to people that were
21 going to be testifying on trial with me.  She was
22 constantly -- I was constantly hearing from other
23 people that she was speaking badly about me.  For
24 example, Norman Marcus.
25     Q.  Do you have any other -- can you

Page 321

A. Yehoshua

1             A. Yehoshua
2  think -- sitting here today, can you think of any
3  other incidents of hostility against you from
4  Weslii?
5      A.  No.
6      Q.  Okay.  All right.  Now, you said she
7  would talk badly about you to other people.  When
8  did she do this?
9      A.  The date had to be 2019.
10     Q.  How often did she do this?
11     A.  I learned about this from the people
12 that told me.
13     Q.  What people?
14     A.  So I would start with Norman Marcus.
15     Q.  Okay.  What did he tell you?
16     A.  He told me that she criticized me and
17 she was disparaging me to him.
18     Q.  When did he tell you this?
19     A.  When we were getting together for the
20 trial that he was going to testify in with me.
21     Q.  And when was that?
22     A.  He testified in a case called Lowther,
23 Quintin Lowther, L-O-W-T-H-E-R.
24     Q.  Do you know when that trial was?
25     A.  July of 2019.

81 (Pages 318 - 321)

Page 322

A. Yehoshua

1
2    Q.   Okay.  And what specifically did he
3    tell you that Weslii said?
4    A.   Specifically I don't remember.  I
5    remember he said she was disparaging me, she was
6    talking negatively about me, and I couldn't
7    believe that she would do that.  I was telling him
8    that we have to focus on this trial and disregard
9    what she said, we are going to win this trial.
10   And so I tried to ignore it, but she was
11   continuously talking badly about me to people.
12   This is how I heard about it.  In the end we won
13   the case.  Norman Marcus was very helpful in that
14   case.
15   Q.   So what facts do you have to support
16   your claim that she was consistently talking badly
17   about you to people?
18   A.   Well, comments like that, like from
19   Norman Marcus.
20   Q.   Well, that's one comment.
21   A.   That's one.  Comments from Adrian
22   Thompson, another person.
23   Q.   And what did Adrian Thompson tell you?
24   A.   I don't remember the words that he
25   used.

Page 323

A. Yehoshua

1
2    Q.   The sum and substance.
3    A.   You can ask him.
4    Q.   I am asking you.  It's your deposition.
5    A.   I don't remember.  I know that he
6    was -- she was disparaging me.
7    Q.   Is this the conversation that you
8    previously relayed from Adrian Thompson?
9    A.   Well, he was my legal assistant.  We
10   had many conversations.  So I don't remember the
11   previous one that I --
12   Q.   Okay.  When did he relay this to you?
13   A.   I don't know.
14   Q.   Who else told you that she was talking
15   about you or saying bad things about you?
16   A.   I don't remember now.
17   Q.   And what facts do you have to
18   support your claim that when Weslii said something
19   bad about you to Norman Marcus, it was due to your
20   religion?
21   A.   I don't know.
22   Q.   And what about retaliatory?
23   A.   Again, same answer as before.  I
24   believe this stems from the February 2016 accusal
25   from Larry.

Page 324

A. Yehoshua

1
2    Q.   And what facts do you have to support
3    your claim that whatever bad things Weslii may
4    have said to Adrian Thompson, disparaging comments
5    she made about you, was due to your religion?
6    A.   Well, obviously he was the one telling
7    me that they were going out for drinks on Friday
8    nights.  He -- I told him, "because of my
9    religion, I can't -- I'm not invited and I'm not
10   even -- I'm not even able to join you," and so I
11   felt that was negative.
12   Q.   Didn't you also testify that Adrian
13   Thompson relayed to you that she made -- that
14   Weslii made comments about you that were
15   disparaging?
16   A.   Yes.
17   Q.   So what are the facts that support your
18   claim that the comments that Weslii made about you
19   that were disparaging to Adrian Thompson were
20   because of your religion?
21   A.   I think I said those already.
22   THE COURT REPORTER:  I'm sorry?
23   A.   I think I said that already.
24   Q.   It's because -- I don't know what your
25   answer is.

Page 325

A. Yehoshua

1
2    A.   I testified --
3    Q.   It's because Weslii went out for drinks
4    on Friday night and you weren't invited?
5    A.   No.  That was a different instance.
6    There was one instance where he told me that
7    because I'm friendly with Larry -- remember I
8    testified about that before?
9    Q.   Yes, but I am -- okay.  So -- all
10   right.  I'm sorry.  I'm having a hard time
11   following what's happening.  So I asked you who
12   else you heard from that Weslii was speaking badly
13   about you and you said Norman Marcus, you said
14   Adrian Thompson, and you said you couldn't
15   remember anyone else, right?  Okay.
16   So Adrian Thompson, I asked you what he
17   told you.  You said you didn't remember the words,
18   just that Weslii was disparaging you.
19   And so I am asking you what are the
20   facts that support that she was disparaging you
21   based on your religion?  Is it just -- so it's the
22   comment that you previously testified to that
23   Weslii said Larry liked you because of your
24   religion, is that your testimony?
25   A.   Somewhere along those lines, but I

82 (Pages 322 - 325)

Page 326

1          A. Yehoshua
2 don't remember the exact words.
3     Q.   Well, can you -- I don't want to
4 testify for you.  Can you, please, clarify for me.
5     A.   I already testified about that.
6     Q.   Okay.  So you have no facts to add
7 beyond what you have already testified to?
8     A.   No.
9     Q.   Okay.  And what about retaliation, any
10 facts to support your claim that Weslii saying
11 something disparaging to Adrian Thompson about you
12 was retaliatory?
13     A.   I believe it stems from the February
14 2016 letter.
15     Q.   All right.  Now, is there anybody -- I
16 asked you if there is anybody else you can
17 remember who told you that Weslii was speaking
18 badly about you, and you said you didn't remember.
19 Can you remember anybody else now?
20     A.   No.
21     Q.   Okay.  All right.  So now have you now
22 told me all the incidents of hostility that you
23 can recall from Weslii?
24     A.   From what I could recall.
25     Q.   And have you told me all the reasons

Page 327

1          A. Yehoshua
2 why you believe that any of these incidents that
3 we just discussed of hostility were related to
4 your religion?
5     A.   I believe I discussed those.
6     Q.   Okay.  And have you told me all the
7 facts that support your claim that any of these
8 incidents of hostility that we discussed were
9 retaliatory against you?
10     A.   I believe I discussed those.
11     Q.   All right.  I'd like to go back to the
12 Complaint and look at paragraph 42.  I just want
13 to confirm, are there any -- have we now testified
14 about -- have you now testified about all the
15 facts that support this allegation in paragraph
16 42, or are there additional facts?
17     A.   I don't know of any additional facts.
18     Q.   Okay.  And have we now testified about
19 all the alleged manufactured stories about New
20 York County judges, or are there any others?
21     A.   I don't know of any others.
22     Q.   Okay.  Can you, please, read paragraph
23 44 to yourself.
24          (Document review.)
25     A.   Okay, I read it.

Page 328

1          A. Yehoshua
2     Q.   Okay.  Can you, please, tell me all the
3 facts that support your claim that the indefinite
4 suspension constituted disparate treatment?
5     A.   I think it's clear in the paragraph.
6     Q.   Can you tell me all the facts that
7 support your claim?  And if there is no facts
8 beyond what's in the paragraph, you can say that.
9     A.   There are no other facts.
10     Q.   Okay.  And can you, please, identify
11 for me each individual who you believe to be a
12 comparator as alleged in this paragraph?
13     A.   No.
14     Q.   Why not?
15     A.   I don't know their names.
16     Q.   Can you describe them in any other way
17 besides their names?
18     A.   These -- this was something I had heard
19 from investigators at the Transit Authority, that
20 this is how they are disciplined:  They are
21 informed in writing, they get reasons for it, how
22 long it's expected to last.
23     Q.   Do you have any personal knowledge of
24 how anybody else's suspensions have been addressed
25 or the information received by anybody else who

Page 329

1          A. Yehoshua
2 was suspended in the Law Department?
3     A.   That's my personal knowledge.
4     Q.   Just what the investigators told you?
5     A.   Yes.
6     Q.   Which investigators?
7     A.   Tony Braxton.
8     Q.   Anyone else?
9     A.   No.
10     Q.   And is Tony Braxton a lawyer?
11     A.   No.
12     Q.   And did Tony Braxton tell you how
13 investigator discipline is handled, or was he
14 telling you how attorney discipline was handled?
15     A.   He just -- it was general.
16          MS. USENHEIMER:  Okay.  Let's mark
17 Defendant's Exhibit 21 for the record.
18          (Defendants' Exhibit 21, letter dated
19 October 14, 2021, Bates stamped NYCTA 000258,
20 marked for identification.)
21     Q.   Have you seen a copy of this document
22 before?
23     A.   Yes.
24     Q.   Is this a copy of the letter that
25 informed you that your employment was being

83 (Pages 326 - 329)

Page 330

A. Yehoshua

1          A. Yehoshua
2  terminated?
3      A.   It says:  "The Appeal of the penalty of
4  Dismissal from service is denied."
5      Q.   What did you understand that to mean?
6      A.   I didn't understand it.
7      Q.   You did not understand it?  Do you have
8  any understanding of who prepared this letter?
9      A.   No.
10     Q.   Do you have any understanding of who
11  made the determination to deny your appeal of the
12  penalty of dismissal?
13     A.   No.
14     Q.   Do you have any understanding of the
15  factors that went into the determination to deny
16  the appeal of your penalty of dismissal?
17     A.   No.
18     Q.   I'd like to go back to Exhibit 15,
19  which are your interrogatory responses.
20          Okay.  Please look at your response to
21  Interrogatory No. 3 and let me know when you have
22  read it.
23          (Document review.)
24     A.   Okay.  I've read it.
25     Q.   I'm not sure you are looking -- I'm

Page 331

A. Yehoshua

1  looking at response to number 3.  I don't know
2  what you are looking at.
3          MS. VINCI:  These are the objections.
4  She means the responses.  This number 3.
5          (Document review.)
6      A.   Okay.  I've read it.
7      Q.   Okay.  So you identify -- this
8  interrogatory asks you to identify individuals,
9  other than your attorneys, with whom you have
10  discussed or communicated regarding your claims in
11  this case, and you identify Yehezkel Yehoshua.  Is
12  that your husband?
13     A.   Yes.
14     Q.   All right.  Larry Heisler; right?
15     A.   Yes.
16     Q.   And have we already discussed --
17     A.   Yes.
18          MS. VINCI:  Let her finish her question
19  so the transcript is clear.
20          THE WITNESS:  Okay.
21     Q.   Have we already discussed all the facts
22  that relate to any communications or discussions
23  you had with Larry Heisler about your claims in
24  this case?

Page 332

A. Yehoshua

1          A. Yehoshua
2      A.   I believe so.
3      Q.   And Lisa Urbont, right, you identify
4  Lisa Urbont?
5      A.   Yes.
6      Q.   Can you tell me all the discussions
7  that you had with Lisa about your claims in this
8  case?
9      A.   Well, okay.  Lisa was my new supervisor
10  as of January 2020 and she was, like Larry, out of
11  the loop, didn't know anything that was happening,
12  and when I received my first DAN letter, I
13  discussed it with her and she didn't know where it
14  came from, she said, "Nobody told me."  She
15  contacted Farber to ask him about it.  He did not
16  respond to her.  She just -- she just continually
17  told me, "don't worry, everything is going to be
18  okay, everything is going to be okay, I need you,
19  you are the greatest lawyer we have, I want you to
20  try this case and this case," she just kept giving
21  me assignments, and she was pretty much a part of
22  everything that followed from the first letter.  I
23  just called her up and I said, "What's going on?"
24  She said, "I don't know, no one is telling me
25  anything."  So I sent her the copy of the

Page 333

A. Yehoshua

1          A. Yehoshua
2  second -- the second DAM I guess it's called --
3      Q.   DAN, Disciplinary Action Notice.
4      A.   She read it and she called me and she
5  said, "I don't believe it, it's not true," and I
6  said, "I don't believe it either, I don't believe
7  it's true."  And she just said, "I really need
8  you, I need your help," you know, "I need you to
9  cover this case" and so on and so forth, and while
10  I was on my first suspension she told me, "When
11  you come back to the office, can you do this
12  deposition?"  I said yes.  I was planning to
13  return to do the deposition and then I received
14  the second notice, so I never finished, I never
15  did any of the cases that she assigned me.  And
16  that's what I mean when I say "Lisa."
17     Q.   All right.  So you have told us --
18     A.   Everything.
19     Q.   Everything.  Okay.  All right.
20          Okay.  Turn to the next page, please.
21  Interrogatory No. 5 asks you to identify all
22  individuals who you contend made an admission
23  against interest binding on Defendants, and you
24  identify Weslii, Larry and Lisa.
25          So starting with Weslii, please tell me

84 (Pages 330 - 333)

Page 334

A. Yehoshua

1
2  each and every admission against interest that
3  Weslii made.
4      A.   I don't remember what -- I don't
5  remember her admissions.
6      Q.   Okay.  And what about Larry?
7      A.   Well, I think by -- I think he was
8  reaching out to my husband.  That may have been an
9  admission against interest.
10     Q.   Anything else or just that?
11     A.   That's it.
12     Q.   And what about Lisa?
13     A.   And Lisa had been talking to me about
14 how she didn't believe that this happened.  She
15 didn't believe the judges would have complained.
16     Q.   Okay.  That's it about Lisa?  Any other
17 statements that are admissions against interest?
18     A.   At this time I don't remember anything
19 other than that.
20     Q.   Okay.  You testified earlier when I was
21 asking you questions about making truthful
22 statements under -- I'm sorry -- truthful
23 statements in court that you thought -- your
24 response suggested that if a supervisor told you
25 to handle a case in a certain way and it involved

Page 335

A. Yehoshua

1
2  not telling the truth in court, that that would be
3  okay.  I just want to understand what your
4  testimony was.  I'm not sure that's exactly what
5  you said.  I'd like you to clarify.
6      A.   I didn't say that that would be okay.
7  I said -- and the reason I said that is because I
8  was referring to the case of when Matt Finkel, not
9  my supervisor, Matt Finkel told me that you can
10 say this, it's okay, you can say that if it's
11 available for the public, it's a public record,
12 you can get that.  That's what I meant.
13     Q.   Okay.  And have you ever had a
14 supervisor or anybody, a superior at Transit tell
15 you to make a lie or misrepresentation in court?
16     A.   No.
17     Q.   Have you told me now all the claims
18 that you are asserting in your case here today
19 against the Transit Authority?
20     A.   I've answered your questions.  I
21 believe I have told you everything.
22     Q.   Do you have any other claims that we
23 haven't discussed yet in this case against the
24 Transit Authority?
25     A.   Not that I can recall.

Page 336

A. Yehoshua

1
2      Q.   Are there any facts that support your
3  claims against the Transit Authority in your
4  litigation today that we haven't discussed?
5      A.   Not that I recall.
6      Q.   And same questions for MABSTOA, have
7  you told me all the claims in your litigation
8  today against MABSTOA?
9      A.   I believe so.
10     Q.   Have you told me all the facts that
11 support your claims against MABSTOA?
12     A.   I believe so.
13     Q.   Have you told me all the claims that
14 you have against Weslii in your case today?
15     A.   What I recall I did say.
16     Q.   And have you told me all the facts that
17 support those claims?
18     A.   What I remember.
19     Q.   And have you told me all the claims
20 that you have against David Farber in your case
21 today?
22     A.   What I remember.
23     Q.   And have you told me all the facts that
24 you can remember that support your claims against
25 David Farber?

Page 337

A. Yehoshua

1
2      A.   What I remember.
3      Q.   And you also identified Theresa Murphy,
4  Helen Smart and Craig Costa as individuals who you
5  are alleging engaged in wrongdoing in your case.
6          So have you told me all the claims that
7  you have against Theresa Murphy?
8      A.   I believe so.
9      Q.   Have you told me all the facts that
10 support those claims?
11     A.   I believe so.
12     Q.   And have you told me all the claims
13 that you have today -- I'm sorry.  Have you told
14 me all the facts you have in your litigation
15 against Helen Smart?
16     A.   I believe so.
17     Q.   Okay.  And all the facts that support
18 those claims you shared?
19     A.   I think so.
20     Q.   All right.  And have you told me all
21 the claims you have against Craig Costa?
22     A.   I think so.
23     Q.   And have you told me all the facts that
24 support those claims?
25     A.   I believe so.

85 (Pages 334 - 337)

Page 338

1          A. Yehoshua
2      Q.   Are there any other claims that you are
3  asserting in your litigation today that we haven't
4  discussed?
5      A.   I don't recall if there is any others.
6          MS. USENHEIMER:  Let's mark this as
7  Exhibit 22, please.
8          (Defendants' Exhibit 22, EEO
9  Pre-Complaint Form, with attachments, Bates
10  stamped NYCTA 003248 through NYCTA 003268,
11  marked for identification.)
12     Q.   All right.  Ms. Yehoshua, let's please
13  turn to -- okay -- like really the last two pages,
14  last three pages of this exhibit.  It's 3266, 3267
15  and 3268.  Are you there?
16     A.   Yes.
17     Q.   Okay.  So the bottom of 3266 looks like
18  an e-mail that you sent to Joel Andrews; is that
19  correct?
20     A.   I did.
21     Q.   All right.  And so I'd like you to look
22  at the substance of the e-mail that falls on 3268,
23  okay, and then the first full paragraph on this
24  page starts:  "In June 2020."  Do you see that?
25     A.   Can you give me a second to read it.

Page 339

1          A. Yehoshua
2      Q.   I just want to make sure you see the
3  paragraph before you read it.
4      A.   I see the paragraph.
5      Q.   Okay.  Perfect.  Now, please, read it
6  to yourself.  Make sure we are on the same page.
7          (Document review.)
8      A.   Okay.  I read it.
9      Q.   Okay.  So the second sentence here
10  states:  "It took David Farber, General Counsel, 8
11  months to decide her charges."
12          Those are -- which are the charges that
13  you are referencing there, can you tell?
14     A.   The first June 2020 DAM -- DAN.
15     Q.   And do you have any claims against
16  David for taking eight months to decide the
17  charges?
18     A.   I thought it was retaliatory.
19     Q.   And what are the facts that suggest --
20  support your claim that it's retaliatory?
21     A.   Because I was claiming religion
22  discrimination.  I had an attorney writing letters
23  to reinstate my job.  Karl Sleight was constantly
24  in touch with the Authority.  And after I filed my
25  EEOC claim and my New York State Division of Human

Page 340

1          A. Yehoshua
2  Rights claim, a decision came two months later to
3  suspend me.  That was clearly retaliatory.
4      Q.   Any other facts to support your claim
5  that it's retaliatory?
6      A.   Oh, I was going to say everything that
7  led up to that point from my transfer out of the
8  New York unit to Brooklyn in January of 2020 was
9  retaliatory.  It was --
10     Q.   Okay.
11     Q.   Okay.
12     Q.   Just to confirm, are there any other
13  facts that you haven't testified -- no.  Are there
14  any other facts that support your claim that that
15  was retaliatory?
16     A.   No.
17     Q.   Okay.  Do you believe it was
18  discriminatory on David Farber's behalf?
19     A.   Yes.
20     Q.   Can you tell me all the facts that
21  support your claim that it was discriminatory?
22     A.   Because he didn't even ask me one
23  question.  He didn't ask to speak with me.  He
24  didn't call me.  He didn't request an independent
25  conversation.  He didn't question me about the

Page 341

1          A. Yehoshua
2  charges.  They were alleged and he accepted them
3  without investigating them.
4      Q.   Any other facts?
5      A.   He didn't talk to Larry Heisler about
6  them.  I believe that was very important.
7      Q.   Any other facts that support your claim
8  that --
9      A.   He didn't talk to Lisa either.  Lisa
10  tried to reach out to him and he would not talk to
11  her.
12     Q.   Any other facts that you have to
13  support your claim that this was discriminatory?
14     A.   Well, I think I've testified about all
15  the other reasons why I thought it was.
16     Q.   That's what I want to know.  I just
17  want to know if you have testified to that.  Okay.
18          Then a couple sentences later it reads:
19  "However, Farber decided to suspend me without pay
20  until he makes a decision."  Do you see that?
21     A.   Yes.
22     Q.   Okay.  Do you believe that that was
23  discriminatory against you in any way?
24     A.   Of course.
25     Q.   And can you tell me all the facts that

86 (Pages 338 - 341)

Page 342

1              A. Yehoshua
2 that was discriminatory against you?
3     A.   Because, again, all the reasons why I
4 just gave you.  Why would he suspend me without
5 talking to me first?  He didn't talk to me.  He
6 didn't talk to Larry.  He didn't talk to Lisa.  He
7 didn't have an independent investigation before he
8 suspended me.  There was no confirmation of her
9 allegations.  There was no veracity to it.  There
10 was no invest-- it was -- in my mind, this was
11 not conducted properly and that's what I mean.
12    Q.   Okay.  And can you tell me all the --
13 do you believe that this is retaliatory in any
14 way?
15    A.   Yes.
16    Q.   Can you tell me all the facts that
17 support your claim that it was retaliatory?
18    A.   Three reasons -- three mains reasons:
19 One, because I transferred out of the New York
20 unit; two, because I filed a EEOC claim; and
21 three, because I filed a New York State Department
22 of Human Rights claim.  That's why this is
23 retaliatory.
24    Q.   Can you explain to me why you think
25 David Farber would be motivated by retaliatory

Page 343

1              A. Yehoshua
2 animus against you because you moved units within
3 torts?
4     A.   Why -- I believe that he did not do a
5 proper investigation into the facts of what
6 occurred here and that's -- that was done
7 improperly.
8     Q.   Is that why you believe that this is
9 retaliatory, because he didn't conduct what you
10 consider to be a proper investigation into the
11 facts?
12    A.   I can't speak for him.
13    Q.   No, I'm asking you.  I am just trying
14 to understand all your claims that -- so you wrote
15 here:  "Farber decided to suspend me without pay
16 until he makes a decision."  I asked you why you
17 thought it was discriminatory.  I am paraphrasing.
18 You said basically because he didn't talk to you,
19 he didn't talk to anybody, he just relied on the
20 charges.  I asked you why you thought it was
21 retaliatory.  You said because you filed the EEOC
22 charge, state division charge, and because you
23 moved units.
24              And my question was why do you think
25 Farber would be motivated by retaliatory animus

Page 344

1              A. Yehoshua
2 because you changed units within torts?
3     A.   I don't know.
4     Q.   Any other facts that support your claim
5 that this was retaliatory?
6     A.   I don't know.  I never spoke to him.
7     Q.   Okay.  Are you seeking -- I'm sorry.
8        MS. USENHEIMER:  Okay.  And for
9 Defendants' 23, Plaintiff's Amended Initial
10 Disclosures.
11         (Defendants' Exhibit 23, Plaintiff's
12 Amended Initial Disclosures, marked for
13 identification.)
14    Q.   All right.  Ms. Yehoshua, do you
15 recognize this document?
16         (Document review.)
17    A.   I'm sure it was sent to me.  I don't
18 remember it though.
19    Q.   Okay.  So you don't remember reviewing
20 it before your attorneys prepared it and served
21 it?
22    A.   I'm sure it was sent to me.  I just
23 didn't -- I don't remember it.
24    Q.   Okay.  I'd like you to turn to page 8
25 under Damages.  There is a heading two up from the

Page 345

1              A. Yehoshua
2 bottom that says "Compensatory Damages."  And
3 this -- in the interests of full disclosure, these
4 are -- this is purporting to be the damages that
5 you are claiming in the case.
6        So are you, in fact, claiming
7 compensatory damages in your litigation today?
8     A.   Yes.
9     Q.   Okay.  Can you tell me all -- okay.
10    Are you seeking compensatory damages as
11 described here in this -- these two sentences, for
12 non-economic losses, for shame, humiliation,
13 emotional suffering?
14    A.   Yes.
15    Q.   Are you seeking compensatory damages on
16 any other basis?
17    A.   All the bases that are listed here.
18    Q.   Any other basis?
19    A.   I can't recall.
20    Q.   Okay.  So can you tell me all the facts
21 that support feelings of shame that arise out of
22 the facts which you have discussed today?
23    A.   Okay.  Now, I am going to begin with
24 February 2016.
25    Q.   Okay.

87 (Pages 342 - 345)

Page 346

A. Yehoshua

2    A.    After that incident, I was continuously
3 suffering from humiliation under her.  She was a
4 bully and she demanded that I tell her where I am
5 all the time.  She was not helpful at all during
6 my trials.  She criticized me.  She humiliated me
7 in front of other people.  I suffered emotional
8 distress.  I went home every night and told my
9 husband and it was -- it was degrading, the way
10 that I was treated at work by her.  And I
11 continually told her don't -- give me the benefit
12 of the doubt.  She accused me of doing all these
13 things.  She wrote me those e-mails.  You read it.
14 I told her, "Give me the benefit of the doubt."
15 She always assumed the worst every single time she
16 spoke to me.  She was humiliating me in front of
17 people.  She accused me of not taking the time.  I
18 explained to you all the examples.  When she
19 called me and I cried on the phone because she was
20 harassing me when I was in court.  She didn't
21 remember where I was.  I told you all those
22 examples.  It was humiliating.  It was
23 embarrassing that I would be treated like a child.
24 Every other lawyer in every other unit was able to
25 go to court.  But she said, "I want you to come

Page 347

A. Yehoshua

2 here first, swipe in, and then go to court, and
3 when you are finished with court, come back and
4 swipe in," and she was -- that was extremely
5 different and unfair to me, because I was treated
6 like a child and humiliated, when she would treat
7 other people this way, and unfortunately at some
8 point I was the only trial attorney in the unit,
9 so she was continuously badgering me about time,
10 where was I.  Finally there was another attorney
11 that was brought into the unit, but then she
12 didn't allow that attorney to assist me in any
13 way.  And I just told my husband that it was a
14 very difficult -- it just continued to get worse
15 and worse and worse and I couldn't believe that I
16 was being treated like a child and she was -- she
17 was degrading me and leaving me files on Fridays
18 and going out with people without me and I would
19 hear about all of the fun that they had on Friday
20 night knowing that I wasn't invited, that I wasn't
21 able to join and I couldn't join in that
22 camaraderie that was -- that everyone participated
23 in except for me, and she never complimented
24 anything that anyone did -- I mean -- let me say
25 that again.  Me, I'm specifically talking about

Page 348

A. Yehoshua

2 me.  Other people she would write e-mails about.
3 I never got one e-mail written about any of the
4 trials that I won.  I won five trials in 2019 and
5 not one was acknowledged by her.
6        It was a very, very difficult
7 environment and a hostile environment and I never
8 felt appreciated.  She never ever -- and I know
9 that that's -- I know that other county bureau
10 chiefs did appreciate their attorneys, but she
11 enjoyed humiliating me and doing it in front of
12 others, and she questioned me and she micromanaged
13 my calendar and she called me repeatedly when she
14 didn't remember where I was, and when I went to
15 depositions and she didn't have it on her
16 calendar, she assumed the worst.  She never
17 thought of asking my assistant, Adrian, who could
18 have easily said, "She is at a deposition."  When
19 I had a scene inspection one day, she assumed --
20        THE COURT REPORTER:  I'm sorry?
21    A.    A scene inspection, accident scene
22 inspection, she assumed I was just out.  She
23 continuously made the work environment difficult
24 and shameful and I did not like going to work and
25 I couldn't sleep when I was at work and I did my

Page 349

A. Yehoshua

2 best to win cases, not for her satisfaction,
3 because I knew she would never be satisfied, but
4 for Larry's satisfaction, because Larry did
5 acknowledge my successful verdicts, Larry did say
6 that I was a valuable source.  She did not.
7        She would have -- she even had a
8 holiday party on a day that I was on trial at the
9 end of December and I was not able to participate
10 in that party.
11        So I would say that the time that I had
12 been working under her was -- was a horrible time
13 for me, and it just continued to get worse until
14 she -- until I had to tell Larry that I needed to
15 be transferred out of that unit, because she was
16 intolerable, and that was after my fifth or sixth
17 defense verdict that I told Larry, "Now can you
18 transfer me?"  And he said yes, he confirmed it.
19        So it didn't end there.  I continued to
20 suffer humiliation afterwards because I -- I was
21 suspended and I didn't know how to explain that to
22 my family and it was very difficult to tell my
23 children that.  So I worked since I was 12 and
24 then I didn't work because of her, because of her
25 lies in her DAN reports.  So as I was saying, it

88 (Pages 346 - 349)

1          A. Yehoshua
2   just continued to get worse.  Until today I still
3   have difficulty understanding how no one -- until
4   this day no one even asked me one question.  They
5   just believed the lies that she put in her
6   reports.  Nothing was substantiated.  Nothing was
7   verified.  And so this is just a short version of
8   why I was humiliated by her.
9       Q.   And can you tell me all the emotional
10  suffering that you experienced, if different from
11  what you have just testified to?
12      A.   I think I already explained about how
13  difficult it was to work in this hostile
14  environment when I was faced with religious
15  discrimination from February 2016 until June 2020.
16  Afterwards it just -- you know, I explained I had
17  a difficult time finding a job and that I was
18  not -- it was not fair that I had to look for
19  another job. Emotional suffering.  I couldn't
20  sleep.  I needed to get help emotionally.  I
21  wasn't able to take care of my kids for a while
22  because I was so depressed.  I couldn't stop
23  crying for a few months after this happened.  I
24  was accustomed to working and to doing well, and I
25  remember during the pandemic before June, before I

1          A. Yehoshua
2   got this notice I remember my kids telling me,
3   "Mommy, is anything gonna happen to you during the
4   pandemic?"  And I said, "No, not at all.  I'm a
5   great trial lawyer.  I won every single case last
6   year.  Nothing is gonna happen."  And then in June
7   this happened and I suffered very much because of
8   the lies that she presented in her signed notice,
9   and it just continued -- I was suffering
10  throughout the period of time afterwards, after
11  June 2020 due to the uncertainty.  I even wrote,
12  as you read, to Farber telling him how difficult
13  those eight months were waiting for him to decide
14  my employment future, and then it took him another
15  eight months to decide on the second one she
16  wrote -- I believe that she wrote the second DAN
17  notice.
18         So I'll just sum it up by saying I had
19  a lot of anxiety, a lot of depression, lack of
20  sleep, and my confidence was very low, and for a
21  long time I didn't believe that I could be a good
22  lawyer, even though I had all these successful
23  verdicts in my past.  It was very difficult to
24  move on.
25      Q.   And did you get help emotionally?  You

1          A. Yehoshua
2   testified you needed to.  Did you see a doctor?
3       A.   I did.  I did want to and I did seek
4   help and I had no job, so I didn't have the extra
5   money to pay, and the doctors that I was
6   contacting from my insurance said that they will
7   not see me without payment up front and I had to
8   be out of pocket because they would not take my
9   insurance. I called about six different doctors
10  and all six want -- did not take insurance.  Even
11  though they were in the insurance plan, they would
12  not take insurance any longer.  They said that it
13  is very unlikely that I will be able to seek
14  mental health assistance without paying out of
15  pocket.  But now that I just got a job, I plan to
16  begin seeing a professional.
17      Q.   Okay.  And you testified that you had a
18  lot of anxiety and a lot of depression.
19         Did anybody diagnose you with that or
20  are you just describing the way you felt that way?
21      A.   I'm describing the way I felt.
22      Q.   Can you describe all the symptoms that
23  you had of anxiety?
24      A.   I didn't know what my future had in
25  store for me.  I didn't know how I was going to

1          A. Yehoshua
2   pay the mortgage, how I was going to pay the
3   tuition, how I was going to pay my children's
4   clothing, how I was going to pay for food.  I
5   didn't know what was gonna happen in my future.
6   She took away my livelihood, my job, my
7   profession, my career.  She took away everything.
8   So that's why I'm depressed.
9       Q.   Well, I was going to ask you what the
10  symptoms of your depression were.
11      A.   I was crying.  I was not sleeping.  I
12  was anxious.  I had -- I was worrying about my
13  future.  I was worrying about my children.
14      Q.   For what period of time were you unable
15  to sleep?
16      A.   I still can't sleep.
17      Q.   So is it your testimony that you have
18  not been able to sleep because of the
19  circumstances that you describe in your litigation
20  from 2016 until today?
21      A.   It wasn't the litigation.  It was what
22  she did --
23      Q.   The factual circumstances underlying --
24      A.   The factual circumstances.  Not the
25  case.

89 (Pages 350 - 353)

Page 354

1          A. Yehoshua
2      Q.   I understand that.
3      A.   It's what she did and she did it.
4      Q.   And so you have been unable to sleep
5  since 2016?
6      A.   I sleep, of course I sleep sometimes,
7  right?  But I don't -- you know, it's not the same
8  as it used to be.
9      Q.   How is it different?
10     A.   It was difficult during my work days in
11 the Transit Authority, but then it became more
12 difficult when I had this uncertainty of my
13 future, so...
14     Q.   Were you able to sleep without a
15 problem before 2016?
16     A.   Before 2016?  I had -- I had very
17 little trouble sleeping.  I had -- I didn't have
18 any issues at work.
19     Q.   Did you seek any treatment for
20 inability to sleep?
21     A.   When?
22     Q.   Any time since the onset of this
23 symptom.
24     A.   No.
25     Q.   And over what period of time -- you

Page 355

1          A. Yehoshua
2  testified that you cried.  Over what period of
3  time did you cry?
4      A.   From that day, June 12, 2020,
5  sporadically over the next few weeks, more
6  intensely for those first two months from June,
7  July, August of 2020, and then more so at -- in
8  February, March, April.
9      Q.   February, March, April of when?
10     A.   Of 2021.
11     Q.   And when you said you cried, how --
12 every day, once a week, once a month?
13     A.   I don't know.  Very often.
14     Q.   And when you say -- can you
15 characterize often?
16     A.   I told you, it was more so in the
17 beginning and it lessened, and then it increased
18 when things happened, like when I got the second
19 notice.
20     Q.   So I asked you about the frequency.  So
21 when you say it was more often in June, July and
22 August 2020 --
23     A.   2020, right.
24     Q.   What does "more often" mean?  Does that
25 mean --

Page 356

1          A. Yehoshua
2      A.   It was every day.
3      Q.   Every day.  Okay.  And then in early
4  2021 again?
5      A.   No.  I think in July of 2021 or --
6  whenever --
7      Q.   You said --
8          THE COURT REPORTER:  I'm sorry.  We
9  have to do one at a time.
10     Q.   You testified February, March and April
11 of 2021 you cried more.  So I am asking how
12 frequently did you cry in those months?
13     A.   I don't remember.
14     Q.   So when you were testifying about your
15 shame and your humiliation just moments ago, I
16 just want to make sure that out of -- you know,
17 you identified -- you identified a couple of
18 incidents -- you identified a series of incidents
19 that you found to be shameful or humiliating, and
20 I just would like to confirm that -- I'd like you
21 to tell me all the facts that support any of these
22 incidents that you found shameful and humiliating
23 were due to your -- were discriminatory against
24 you due to your religion, and if it's what you
25 have already testified to, that's totally fine.  I

Page 357

1          A. Yehoshua
2  just want to make sure we close the loop and get
3  your full story.
4      A.   I think I have testified about that.
5      Q.   Okay.  And same about the facts that
6  support your claim that all of these incidents
7  that led to your shame and humiliation were
8  retaliatory?
9      A.   Yes.
10         (Continued on next page to include
11 jurat.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

90 (Pages 354 - 357)

Page 358

```
 1          A. Yehoshua
 2     Q.   You have testified to all that?
 3     A.   I believe I did, yes.
 4          MS. USENHEIMER:  Okay.  All right.  We
 5   can go off the record.
 6          (Recess was taken from 6:16 to 6:22.)
 7          MS. USENHEIMER:  Okay.  So that's it
 8   for our questions today.  We are done.  Thank
 9   you very much both for your time.
10          So unless you have any questions, we
11   can go off the record.
12          MS. VINCI:  I don't have any questions.
13   I would just reserve the witness' right to
14   review and sign.
15          MS. USENHEIMER:  Yes, of course.
16          (Time noted:  6:22 p.m.)
17
18
19          ---------------------
20          AMELIA YEHOSHUA
21
22   Subscribed and sworn to before me
23   this      day of            2023.
24
     ---------------------------------------
25          Notary Public
```

Page 359

```
 1
 2      C E R T I F I C A T E
 3
 4  STATE OF NEW YORK   )
 5                      ) ss.:
 6  COUNTY OF NASSAU    )
 7
 8       I, KRISTIN KOCH, a Notary Public
 9  within and for the State of New York, do
10  hereby certify:
11       That AMELIA YEHOSHUA, the witness
12  whose deposition is hereinbefore set forth,
13  was duly affirmed by me and that such
14  deposition is a true record of the
15  testimony given by such witness.
16       I further certify that I am not
17  related to any of the parties to this
18  action by blood or marriage; and that I am
19  in no way interested in the outcome of this
20  matter.
21       IN WITNESS WHEREOF, I have hereunto
22  set my hand this 16th day of August, 2023.
23
24  ---------------------------
25       KRISTIN KOCH, RPR, RMR, CRR
```

Page 360

```
 1
 2   ------------------I N D E X------------------
 3
     WITNESS        EXAMINATION BY      PAGE
 4
 5   AMELIA YEHOSHUA      MS. USENHEIMER       4
 6
     -----------------EXHIBITS-----------------
 7
 8   DEFENDANTS'              PAGE LINE
 9
     Exhibit 1
10   E-mail dated June 12, 2020, and
     attached letter dated June 12,
11   2020, Bates stamped P000410 through
     P000414........................... 12  17
12
     Exhibit 2
13   Office of the Inspector General
     letter dated January 23, 2020,
14   Bates stamped P000415 through
     P000423........................... 48   8
15
     Exhibit 3
16   Investigations Interview Memo,
     Bates stamped NYCTA 003467 through
17   NYCTA 003469...................... 52  18
18   Exhibit 4
     Letter dated February 3, 2021,
19   Bates stamped P000194............. 68  11
20   Exhibit 5
     E-mail dated June 19, 2020, Bates
21   stamped P000160 and P000161......... 77   2
22   Exhibit 6
     Amended Complaint and Jury Demand.... 80  22
23
     Exhibit 7
24   Application Details for Amelia
     Dweck, Bates stamped NYCTA 004171
25   through NYCTA 004200................ 95  11
```

Page 361

```
 1
 2   -----------------EXHIBITS-----------------
 3
     DEFENDANTS'              PAGE LINE
 4
 5   Exhibit 8
     Amelia Dweck resume, Bates stamped
 6   P000351........................... 116  7
 7   Exhibit 9
     Letter dated March 24, 2023, Bates
 8   stamped P000602 and P000603......... 119  13
 9   Exhibit 10
     NY Job Details Summary, Bates
10   stamped NYCTA_004756 and
     NYCTA_004757...................... 128  20
11
     Exhibit 11
12   Copies of text messages, Bates
     stamped P000400 through P000409...... 147  15
13
     Exhibit 12
14   E-mail dated February 4, 2016,
     Bates stamped P000312 and P000313.... 192  25
15
     Exhibit 13
16   E-mail dated February 3, 2021,
     Bates stamped NYCTA 000034 through
17   NYCTA 000036...................... 202  11
18   Exhibit 14
     E-mail dated June 10, 2020, Bates
19   stamped P000277................... 237  12
20   Exhibit 15
     Plaintiff's Verified Amended
21   Response to Defendants' First Set
     of Interrogatories.................. 245  23
22
     Exhibit 16
23   Letter dated March 29, 2021, Bates
     stamped NYCTA 000217 through NYCTA
24   000220............................ 267  16
25
```

91 (Pages 358 - 361)

Page 362

```
 1
 2  -------------------EXHIBITS------------------
 3
    DEFENDANTS'                    PAGE LINE
 4
 5  Exhibit 17
    E-mail dated November 7, 2019,
 6  Bates stamped NYCTA 003293.......... 269  22
 7  Exhibit 18
    WebCivil Supreme - Case Search
 8  Results, Bates stamped NYCTA 000249
    through NYCTA 000252................. 285  15
 9
    Exhibit 19
10  Memorandum dated February 28, 2021,
    with attachments, Bates stamped
11  NYCTA 003283 through NYCTA 003308.... 302  25
12  Exhibit 20
    E-mail dated February 3, 2021,
13  Bates stamped NYCTA 000030 through
    NYCTA 000033........................ 303  13
14
    Exhibit 21
15  Letter dated October 14, 2021,
    Bates stamped NYCTA 000258.......... 329  18
16
    Exhibit 22
17  EEO Pre-Complaint Form, with
    attachments, Bates stamped NYCTA
18  003248 through NYCTA 003268......... 338  8
19  Exhibit 23
    Plaintiff's Amended Initial
20  Disclosures......................... 344  11
21
    -------------------REQUESTS------------------
22
23  Page 152   Non-cut-off version of text message
24
25
```

Page 363

```
 1
 2      ERRATA SHEET FOR THE TRANSCRIPT OF:
 3  Case Name:  Yehoshua v. MABSTOA
     Dep. Date:  August 9, 2023
 4  Deponent:   Amelia Yehoshua
 5          CORRECTIONS:
 6  Pg. Ln.  Now Reads     Should Read    Reason
 7  ___ ___ _____ _____ _____
 8  ___ ___ _____ _____ _____
 9  ___ ___ _____ _____ _____
10  ___ ___ _____ _____ _____
11  ___ ___ _____ _____ _____
12  ___ ___ _____ _____ _____
13  ___ ___ _____ _____ _____
14  ___ ___ _____ _____ _____
15  ___ ___ _____ _____ _____
16  ___ ___ _____ _____ _____
17  ___ ___ _____ _____ _____
18
19          _____
20          Signature of Deponent
21  SUBSCRIBED AND SWORN BEFORE ME
22  THIS____DAY OF_____, 2023.
23
24  _____
25  (Notary Public)  MY COMMISSION EXPIRES:_____
```

[& - 19]

**&**

**&** 3:5 296:13

**0**

**000030** 303:14 362:13
**000033** 303:15 362:13
**000034** 202:12 361:16
**000036** 202:13 361:17
**000217** 267:17 361:23
**000220** 267:18 361:24
**000249** 285:17 362:8
**000252** 285:17 362:8
**000258** 329:19 362:15
**003248** 338:10 362:18
**003268** 338:10 362:18
**003283** 303:3 362:11
**003293** 269:23 362:6
**003308** 303:4 362:11
**003467** 52:19 360:16
**003469** 52:20 360:17

**004171** 95:13 360:24
**004200** 95:13 360:25
**004756** 128:21 361:10
**004757** 128:22 361:10

**1**

**1** 12:16,17 13:3 46:7 51:6,8 63:23 64:4 65:23 69:14 70:12 72:3 73:18,24 78:15 141:13 142:15 143:8 146:20 148:3 155:17 168:5 202:2 217:25 219:6,8 219:23 220:6 254:3,4 264:7 360:9
**10** 128:19,20 177:17 237:13 361:9,18
**10,000** 123:23
**10001** 3:8
**10018** 3:15
**1099** 123:12
**11** 147:15,19 360:19,25 361:11,17 362:20

**110,000** 129:20
**116** 361:6
**119** 361:8
**11:05** 76:25
**11:15** 76:25
**11:39** 95:18
**11:44** 95:18
**11:54** 104:19
**12** 12:18,19,23 19:19 49:16 72:4 140:15,25 155:11 192:24 192:25 200:25 202:7 203:3,7 208:20 247:4 264:2 349:23 355:4 360:10 360:10,11 361:13,19
**128** 361:10
**12:00** 104:19 312:15
**12:47** 147:14
**12:59** 147:14
**12th** 14:17 217:16 218:2
**13** 159:25 202:9,11 203:5 203:9 246:15 258:4 361:8,15 362:13
**14** 237:12 243:12 329:19 361:18 362:15

**141,000** 110:5
**141,716** 130:5
**145** 159:24
**146** 159:25
**147** 361:12
**15** 120:19 129:25 245:22 245:23 330:18 361:12,20 362:8
**150,000** 107:22
**150251** 287:7
**152** 362:23
**15th** 119:22 120:13
**16** 132:5 149:8 150:22 151:3 159:24 267:13 267:16 303:11 361:22,24
**160** 77:13
**161** 77:13
**16th** 148:18,25 157:19 359:22
**17** 269:21,22 271:11 360:11 362:5
**170,000** 120:23
**18** 280:11 285:14,15 360:17 362:7 362:15
**19** 77:3 162:3,6 162:17 168:17 302:24,25

360:20 362:9
**192** 361:14
**194** 68:19
**1970s** 145:22
**1:10** 158:7,9
**1:14** 220:7,8
**1:24** 14:17
220:10,11
**1:24:16** 218:6,7
**1:48** 159:3

**2**

**2** 48:5,7,8 51:7
56:7 62:9,21
97:21,25
120:21 121:10
203:8 204:15
212:5 268:6
360:12,21
**2/2/16** 195:6
**20** 68:25
303:13,18
310:10,14
311:7 361:10
362:12
**2011** 307:11
**2013** 56:9
137:5 197:25
226:12
**2014** 16:6,7
56:10
**2015** 16:8,9,9
16:10 132:5
**2016** 16:4,16
28:13 36:5
72:24 73:2

160:21 179:16
179:25 182:16
193:2 200:16
201:9 225:24
226:6 234:10
234:12 242:25
245:4 246:22
247:7 257:4
258:8 289:2
290:13,19,23
304:24 308:6
309:22 316:2,5
317:5 323:24
326:14 345:24
350:15 353:20
354:5,15,16
361:14
**2017** 29:24
32:10 36:3,14
36:17 212:21
213:12 257:16
274:24 286:15
286:22,23
287:20 288:21
288:24 289:6,7
290:11,13,19
290:23 291:4
291:10 292:10
307:12
**2018** 15:25
16:21 32:11,22
33:14 35:6,17
35:20 36:14
37:7,18 38:14
168:18 171:11

257:16 288:11
290:24 291:14
292:11 307:12
**2019** 17:18,22
18:22 20:8
24:13 32:11,22
33:14 35:22
36:15 38:22,23
39:2,7,11,23
41:6 42:2,3
45:23 54:17
62:3 226:6
242:21 247:9
247:11,14,16
247:21 248:2,3
248:8 257:4
258:8 260:24
261:3 268:16
268:21 269:23
271:13 273:7
276:6 282:6,10
282:11 283:24
292:11 311:9
321:9,25 348:4
362:5
**202** 361:17
**2020** 12:18,19
12:23 17:10,11
17:13,20 35:24
36:2 42:21
45:25 48:10
49:11,16 62:9
69:10,12 70:16
71:5 72:4,8
77:3 89:6

140:15,25
146:18 149:10
150:22 151:3
152:8 153:8
155:11 156:15
157:9,17,19
162:3,6,17
165:12 168:17
218:2 237:13
248:14,16,19
248:21,23
249:2,3,23
250:23 251:19
251:21 252:7
252:19 253:22
253:23 255:7
255:10,11
256:7 264:2
292:11 295:13
298:2,8,19
317:22 332:10
338:24 339:14
340:8 350:15
351:11 355:4,7
355:22,23
360:10,11,13
360:20 361:18
**2021** 68:12
96:2 107:19
111:4,5 118:19
123:19 124:7
129:25 152:7,9
152:22 154:10
165:13,17
202:12 267:15

**[2021 - 410]**

267:17 268:4
289:7 303:2,14
329:19 355:10
356:4,5,11
360:18 361:16
361:23 362:10
362:12,15
**2022**  114:25
115:2 118:22
119:2
**2023**  1:18 2:4
83:19 118:24
119:14,22
120:19 358:23
359:22 361:7
363:3,22
**204**  204:15,16
**21**  1:6 83:10
135:3 329:17
329:18 362:14
**210**  212:5,6
**217**  267:22
**22**  280:12
338:7,8 360:22
362:6,16
**220**  267:22
**23**  48:9 285:11
285:13 311:12
344:9,11
360:13 361:21
362:19
**237**  361:19
**23rd**  21:9
49:11 62:9
295:13

**24**  119:14
361:7
**245**  361:21
**25**  83:18
361:14 362:11
**25,000**  93:3
**25th**  114:23,24
115:2
**267**  361:24
**269**  362:6
**277**  237:16
**279**  280:11,12
**28**  303:2
362:10
**285**  362:8
**29**  267:17
268:4 361:23
**29th**  267:14
**2:50**  211:3
**2:52**  211:3
**2:58**  216:9
**2nd**  311:12

**3**

**3**  51:7 52:16,18
62:6 68:12
97:25 202:12
217:6,10 233:4
303:14 330:21
331:2,5 360:15
360:18 361:16
362:12
**3/23**  287:4
**30**  83:2,4 298:8
303:19,21

**302**  362:11
**303**  362:13
**30413**  359:24
**30th**  54:17 62:3
298:2
**31**  176:23
**31st**  165:17
**32**  200:5,7
201:4,8,22
**3266**  338:14,17
**3267**  338:14
**3268**  338:15,22
**329**  362:15
**3293**  270:5
**33**  201:20
207:7 303:19
303:21
**338**  362:18
**34**  202:22
208:12,18
**344**  362:20
**3467**  52:24
**35**  202:23
203:11 209:2
216:13 225:10
236:23
**351**  116:5
**36**  202:22
244:9
**363**  3:7
**37**  259:7,14
**39**  260:10
**3:00**  150:3
217:8

**3:06**  216:9
**3:07**  205:20
**3:26**  271:13
**3pm**  148:18,25
**3rd**  165:13
282:6,10
311:13

**4**

**4**  68:10,11
70:20 71:6
79:4,7,22 80:9
162:23 163:2
193:2 360:5,18
361:14
**4-22-2013**
109:18,22
129:18
**4-5**  109:22
**4-5-2021**
109:22,24
110:22
**40**  261:12
**400**  147:20
**402**  149:24
**404**  151:2
**405**  286:4
287:10,12
**4055**  1:6
**406**  151:18
**408**  147:20
154:14
**409**  147:20
**41**  262:24
**410**  13:24 14:9

**[411 - accepting]**

| | | | |
|---|---|---|---|
| **411** 13:4 | **478** 291:13 | **620** 2:9 3:14 | 363:3 |
| **412** 13:4 | **48** 360:14 | **68** 360:19 | **90s** 131:8 |
| **413** 13:4 | **481** 291:13 | **6:00** 190:11 | **95** 360:25 |
| **414** 13:5 | **4:04** 266:5 | **6:16** 358:6 | **9:30** 177:17 |
| **415** 48:15,21 | **4:16** 266:5 | **6:22** 358:6,16 | 190:10 |
| **4171** 99:7,14,20 | **4th** 202:24 | **6:30** 190:11 | **9:42** 2:5 |
| **4173** 100:21 | 205:20 206:12 | | **9th** 274:24 |
| **4176** 101:7 | 283:24 311:9 | **7** | |
| **4177** 103:20 | **5** | **7** 95:10,11 99:5 | **a** |
| **4178** 107:10,11 | **5** 49:2 76:19 | 107:19 152:7 | **a.m.** 2:5 |
| 109:21 | 77:2,6,12 | 152:22 266:9 | **abbreviated** |
| **4187** 111:16 | 80:15,17 97:7 | 268:16,21 | 101:10 |
| **4194** 99:8 | 97:12 162:8,17 | 269:23 271:13 | **ability** 7:14,17 |
| 112:5 114:5 | 166:7,9 176:7 | 273:7 360:23 | 7:21 103:17 |
| **42** 48:15 266:9 | 176:8 177:17 | 361:6 362:5 | 106:6 129:6 |
| 327:12,16 | 182:25 212:6 | **77** 360:21 | 282:16 |
| **420** 290:15 | 333:21 360:20 | **7th** 278:18,19 | **able** 72:13 |
| **4200** 99:8,14,20 | **5-29** 237:25 | **8** | 121:14 198:7 |
| **421** 288:6,7,8 | 239:4 | **8** 48:15,18 | 224:14 240:2,3 |
| 288:16,18,20 | **5/29** 239:4 | 116:3,7 125:6 | 292:18 306:5,6 |
| 289:11 290:13 | **50** 94:9 96:5 | 130:20 204:16 | 307:19 324:10 |
| 290:17 | 121:12,24 | 339:10 344:24 | 346:24 347:21 |
| **422** 48:18 | **52** 360:17 | 360:14 361:5 | 349:9 350:21 |
| 288:23 | **5:00** 97:11 | 362:18 | 352:13 353:18 |
| **423** 288:25 | **5:30** 177:17 | **8,000** 93:4 | 354:14 |
| **431** 288:9,16 | 190:11 | **80** 19:16 | **above** 125:12 |
| 290:13,16,17 | **6** | 121:23 122:18 | 306:23 |
| **44** 327:23 | **6** 69:10,12 | 360:22 | **accept** 63:9 |
| **447** 291:8 | 80:21,22 | **9** | 65:12 203:23 |
| **45** 73:4 121:5,8 | 161:14 176:7 | **9** 1:18 2:4 | 205:11 |
| 180:18 182:12 | 177:17 217:6 | 19:22 82:23 | **acceptable** |
| 185:14,16 | 360:22 | 83:5,6 97:6,12 | 132:16 |
| **451** 291:8 | **602** 119:11 | 119:10,13 | **accepted** 341:2 |
| **4756** 129:16 | | 177:17 182:25 | **accepting** |
| | | 276:6 361:7 | 85:23 |

**access** 31:2,7
43:3 139:13
222:15 250:25
251:15 256:23
276:18,19
**accessible**
275:16,17
**accident** 94:6
348:21
**accommodati...**
307:15
**accrue** 109:11
**accrued** 109:2
109:7
**accurate** 56:24
82:5,21 110:5
112:25 113:24
200:21 265:15
**accusal** 323:24
**accusation**
263:7
**accused** 73:14
202:2 204:21
205:3,21
206:13,17
230:19 289:15
304:25 308:7
309:23 346:12
346:17
**accusing**
208:20
**accustomed**
230:9 350:24
**acknowledge**
311:15 349:5

**acknowledged**
348:5
**acrimonious**
137:20
**acting** 272:2
273:11
**action** 12:22
13:5 15:3
46:13,17 47:5
47:14,24 49:15
54:10 64:5,5
65:24 69:13
70:12 72:4,18
73:17,23 74:14
74:21 75:2
78:16 81:6
115:22 141:13
142:12,14,17
143:7 146:19
148:2 155:6,16
155:21 163:5
166:25 167:3
168:4 169:3
171:12,16
174:17,18
175:6,13
267:14 268:3
298:25 299:12
299:19 300:22
303:10 333:3
359:18
**actions** 174:7
**activity** 241:21
**acts** 173:10
216:14 264:4

**actually** 80:7
95:15 119:10
159:23 200:19
237:8 286:19
288:8
**adams** 295:12
295:15,25
296:13,18,22
297:2,14
**add** 108:21
111:9 224:12
326:6
**addition**
123:11
**additional**
25:23 26:5
27:5 82:12,16
166:7 202:9
216:23 223:15
225:16 244:11
244:19,22
246:17,17
252:9 266:25
278:7 327:16
327:17
**address** 98:11
115:9 130:24
130:25 131:3
245:3
**addressed**
248:20 278:23
328:24
**addresses** 69:8
282:2

**addressing**
250:16 264:15
**adds** 83:4
**adequate** 85:12
**adhere** 84:24
**adika** 18:25
20:12 39:3
**adjourned**
156:24 157:2
**adjournment**
43:14 44:3,8
44:12,22
**administrative**
92:16
**admission**
333:22 334:2,9
**admissions**
334:5,17
**admitted** 100:9
117:17,18,20
**admonish**
279:9
**admonished**
207:23
**adrian** 211:12
211:13 212:9
212:19 226:11
227:10,22,24
228:13 229:6
229:21 230:25
230:25 231:6
232:2,14 233:9
233:11,14,22
234:3,14,19,25
235:10,22

236:4,7,12
258:11,12,25
259:15 322:21
322:23 323:8
324:4,12,19
325:14,16
326:11 348:17
**adrian's** 233:18
**advance** 11:25
**advice** 9:25
  10:8 84:7,8,22
  104:6,8,22
  105:2 112:24
  113:2,24
  124:11,20,22
  138:6 140:2
  168:24 172:3
**advise** 44:11
**advised** 9:12
  10:14 44:20
  71:3 84:19
  105:6 124:20
  295:19 298:2
**advises** 9:13
**advocates**
  283:11
**affect** 7:13,21
**affidavits**
  266:21
**affirm** 114:7
**affirmed** 4:4
  359:13
**afraid** 210:7
**afternoon**
  14:18 159:9

218:4,23 220:7
220:10,11
**agency** 49:18
  49:19 50:12
  51:3,9 57:19
  57:24
**ago** 90:11
  140:18 193:16
  212:20 300:25
  356:15
**agree** 5:16
  27:13 51:2
  64:20,22 83:25
  84:12,16,23
  85:14,19 86:7
  86:21 101:11
  121:6,8 145:6
  228:24 255:18
  265:15 273:22
  274:13,17
  276:20
**agreed** 63:19
  164:23
**ahead** 87:10
  103:19 216:7
**ahmuty** 296:13
**airlines** 91:8
**airways** 91:7,7
**alcohol** 7:25
**alexandra**
  270:19 274:24
  293:14,21
  294:6,9 296:4
  296:16,19

**alexandra's**
  274:22
**align** 288:2
**allegation**
  196:12 200:13
  200:23 225:10
  241:3 260:19
  263:11 266:10
  266:15 301:14
  327:15
**allegations**
  81:20 125:22
  127:8 130:12
  147:2 163:16
  163:17 201:3
  208:17 259:14
  263:19 264:16
  342:9
**allege** 177:5
  201:8,15 226:7
  260:11 261:13
  262:4 263:6,11
  263:24
**alleged** 166:19
  166:20,24
  327:19 328:12
  341:2
**allegedly** 43:19
**alleging** 225:17
  337:5
**allotment**
  236:18 237:2
**allow** 183:6
  347:12

**amelia** 1:5,16
  2:8 91:14
  95:12 100:6
  116:7 187:17
  203:16 206:24
  227:6,7,9
  358:20 359:11
  360:5,24 361:5
  363:4
**amended** 80:21
  80:22 81:6,18
  82:4,10,20
  161:15 207:6
  209:2 216:11
  244:10 245:24
  259:7 266:8
  344:9,12
  360:22 361:20
  362:19
**amount** 85:12
  93:5 184:6
**andrews**
  338:18
**animus** 172:6
  172:11 229:24
  230:5 243:23
  315:2,10 343:2
  343:25
**ann** 268:16
**anna** 296:9
**annual** 120:22
**annually** 57:18
**answer** 5:25
  6:15,23,24,25
  7:2,7 9:22 10:7

[answer - april]                                                          Page 7

10:9 23:24
47:8,11 49:22
52:5 72:9,12
78:19 80:7
84:15 86:19
103:25 104:14
104:22 105:2
105:11,12,17
105:21 106:6,9
111:21 113:15
124:13 132:16
141:7,19 144:9
161:6 164:19
179:6 205:17
210:11,13,16
211:7 231:13
231:15,16
254:7 257:19
274:2,16
280:21 283:3
288:14 290:14
291:24 292:23
292:25 293:4
309:15 323:23
324:25
**answered**
13:20 113:7,13
272:14 292:25
298:22 319:23
335:20
**answering**  6:17
153:12 179:3
**answers**  5:17
6:4 9:11,17,21
206:7

**anticipation**
11:15
**anxiety**  351:19
352:18,23
**anxious**  353:12
**anybody**  61:5
102:22 161:20
176:16 187:9
212:25 235:14
235:17,20
243:10,18
244:2 257:25
258:9 326:15
326:16,19
328:24,25
335:14 343:19
352:19
**anymore**  21:22
22:15,24 35:25
106:15,16
157:12 220:2
222:15 226:19
227:7 240:6
**apologies**
203:23 205:11
**apologized**
204:24
**apologizes**
205:7
**apologizing**
44:3 205:6,7
**appeal**  85:25
330:3,11,16
**appeals**  136:25
137:15

**appear**  123:5
232:21 270:20
280:18,20
281:2,4,12
282:16 295:20
**appearance**
122:24,25
289:3,4,5,8
**appeared**  122:4
133:14 276:24
297:2
**appearing**
281:7 296:19
**appears**  65:7
100:24 151:25
**applicant**  112:6
**applicants**
103:3
**application**
95:11,25
101:23 102:18
103:10,16
111:3,14
112:17 114:10
114:20 115:19
360:24
**applied**  95:21
96:7,9 100:2
101:3 107:24
182:2
**applies**  85:9,17
**apply**  96:3
**appointment**
129:19

**appreciate**
231:24 232:22
232:23,25
348:10
**appreciated**
348:8
**approached**
56:11
**appropriate**
63:2,19 64:2
66:5,10 67:5
87:16 238:22
272:20 302:18
**approval**  170:2
**approve**  169:15
170:3 261:19
**approved**
168:22 169:4,5
169:6 170:5
171:11,12,17
171:22,23
172:24,25,25
173:6 238:15
307:12,14
**approving**
169:21 170:17
171:6
**approximate**
257:8
**approximately**
257:2
**april**  114:23,24
115:2 120:3
135:3 152:7,9
152:22 154:10

**[april - attach]** Page 8

154:10 252:7
355:8,9 356:10

**arbitration**
92:16 94:20,23

**arbitrator**
94:24

**arm** 90:3,4

**arrangement**
96:23

**arrangements**
57:6

**arrested** 87:20

**arrival** 183:24
198:8

**arrive** 34:10
73:5 183:23
196:3

**arrived** 182:12
184:20 185:14
186:5 189:11
189:24 190:7
190:14

**arriving** 85:3

**articulate** 5:6

**aside** 289:15

**asked** 9:3,22
26:13,15,19,22
28:5 31:12,15
33:13 34:21,25
35:2,4,18
37:19 44:13
45:7,10 48:24
52:11 93:17
137:23 138:3,5
153:9 173:12

189:10 197:7
210:8 218:17
224:10 226:22
226:22 227:5
228:22 241:25
246:16 250:20
272:13,21
275:25 279:7
280:7 291:25
292:17,24
294:11 310:10
316:7 319:17
325:11,16
326:16 343:16
343:20 350:4
355:20

**asking** 5:24
6:19 10:4
20:24 24:3,8
24:23 37:20
44:8 47:17
50:16,19,21,22
75:6,12 79:20
80:8 106:14
137:25 143:15
144:18 146:2
152:11 168:13
172:21 205:12
221:25 224:9
239:17 249:3
252:8 253:19
274:6 275:14
290:15 298:23
299:10 302:8
307:14 314:6

323:4 325:19
334:21 343:13
348:17 356:11

**asks** 110:4
331:9 333:21

**assert** 5:7 90:16
90:24 91:21,24
92:5 93:9

**asserted** 89:23
147:3

**asserting** 88:12
335:18 338:3

**assign** 217:9,21
223:6 306:14
306:21,22

**assigned** 45:14
55:3,8,22
225:6 236:9
240:24 241:12
241:20 249:22
250:4,21,22
256:16 289:17
333:15

**assignment**
55:24 260:5
289:19

**assignments**
216:24 218:24
219:15,20
221:10,14
223:15 224:2
225:6,16 226:4
226:16 229:20
233:5,9 239:24
249:4,14,17

253:12 255:12
255:15 256:5
256:10 261:20
332:21

**assist** 347:12

**assistance**
113:23 232:17
352:14

**assistant** 100:2
199:21 225:11
226:8,11,18,19
227:2,12,20
228:14 229:3
229:22 231:6,8
233:22 323:9
348:17

**assistants**
226:23 229:5

**assisting** 44:8

**association**
132:11

**assume** 6:23
153:10 156:7
202:15 272:7
273:13,19
274:6,7

**assumed**
346:15 348:16
348:19,22

**assumes** 110:17

**assuming**
210:20

**atlantic** 98:24

**attach** 155:24
156:7

[attached - back]                                                Page 9

**attached**   12:18
   13:11,15 47:21
   49:13 156:4
   360:10
**attachments**
   13:16,17,19
   14:7 47:9
   303:2 338:9
   362:10,17
**attention**   162:2
   180:9
**attorney**   4:11
   9:23 10:15,17
   10:23 11:9,19
   11:20 44:21,22
   45:14 50:8
   52:17 55:2
   56:2 63:25
   67:2,9 69:9
   81:9,14 84:2,3
   84:10,11,11,13
   84:17,19,20,21
   84:22,24 85:11
   85:16,20,25
   86:3,4,4,8,14
   86:23 92:21
   100:8,8 104:9
   104:12,15,22
   105:10,20
   106:2,5,9
   108:24 109:6
   121:21 126:25
   132:18 133:14
   136:25 145:21
   168:24 171:15

   174:25 177:13
   181:10 199:22
   210:11 226:25
   227:19 241:20
   246:11 263:8
   263:13,22
   272:14 274:12
   275:19,23
   281:2 285:11
   293:10 296:7
   300:8 329:14
   339:22 347:8
   347:10,12
**attorney's**
   270:18 308:17
   308:19
**attorneys**   3:6
   3:13 33:5
   34:19 35:15
   53:23 60:4,6
   60:15 84:6
   123:16 139:8
   139:10,12,16
   139:23,24
   177:7,10,17,24
   241:13 283:10
   292:15 293:13
   294:20,21
   295:4 331:10
   344:20 348:10
**august**   1:18 2:4
   355:7,22
   359:22 363:3
**author**   149:3
   162:18,22

**authored**
   299:18,23
   300:3,14
**authorities**
   294:18,19
**authority**   1:8,9
   4:13,13,20,20
   5:2 12:7 63:18
   66:4,8 67:4
   88:6 109:17
   124:6,9,19
   126:17,22,23
   129:5 131:14
   131:23 132:4
   134:23 145:25
   170:16 257:25
   268:23 278:10
   280:16 282:6
   283:23 285:5
   285:10,12,22
   289:13,23,24
   290:3 292:6,7
   292:14 293:8
   293:11 294:20
   294:22 295:4
   295:12,16,20
   296:8 298:3,8
   302:17 328:19
   335:19,24
   336:3 339:24
   354:11
**auto**   122:13,13
**available**   30:24
   30:25 276:17
   335:11

**avenue**   2:10 3:7
   3:14 89:25,25
   98:24
**average**   121:7
   121:9,12
**award**   93:6
**aware**   111:12
   146:15 150:18
   156:16 157:15
   161:8,11
   172:13 214:17
   247:6,23
   256:19 266:24
   276:4 281:22
   293:9 294:17
   295:3 296:12
   296:15 298:15
   298:23 299:10

**b**

**b**   3:16 101:10
   102:3
**babies**   127:17
**back**   21:7
   23:22 36:11
   45:18 52:7
   53:9 55:25
   62:20 63:14
   65:16 79:9
   113:10,14
   130:18 140:21
   147:11 154:3
   159:22 161:13
   181:13 182:16
   197:22 200:8
   207:6 208:19

**[back - believe]**                                                   Page 10

211:5,25 212:3
213:25 216:4
216:11 224:16
227:24 230:17
231:10,13
242:3 254:22
254:23 257:14
266:7 269:9
272:4 279:10
291:17 306:22
308:23 309:4
312:13,14
313:10 314:8
314:22 315:5
319:17 327:11
330:18 333:11
347:3
**background**
54:2
**bad** 138:8
273:3 323:15
323:19 324:3
**badgering**
347:9
**badly** 320:19
320:23 321:7
322:11,16
325:12 326:18
**ballpark**
118:18 123:17
131:7 137:4
**bankruptcy**
87:22,25
**bar** 117:11
132:11,19,23

**base** 120:22
**based** 47:6,15
65:3,7 107:7
107:20 130:13
164:10 167:6
167:10 168:3
168:16 172:17
173:9 175:17
209:6 235:15
241:20 242:11
263:6 266:23
286:3 298:4
301:15,20
304:22 305:10
306:12 307:4
308:9 309:16
309:19 310:2
310:15 315:2,7
315:10 316:12
316:15,19
317:17 318:2
318:20 319:13
325:21
**bases** 345:17
**basic** 236:8
**basically**
232:16 343:18
**basing** 277:19
**basis** 33:24
163:23 164:2,3
164:12 175:20
206:21 207:20
207:25 229:15
229:17 230:22
263:13 271:20

300:13 345:16
345:18
**bates** 12:19
48:10,13,22
52:19 68:12,18
77:3 95:12
116:5,8 119:14
128:21 147:16
147:20 193:2
202:12 237:13
237:16 267:17
267:21 269:23
270:5 285:16
303:3,14,21
329:19 338:9
360:11,14,16
360:19,20,24
361:5,7,9,12,14
361:16,18,23
362:6,8,10,13
362:15,17
**bathroom**
265:11 266:4
309:9 314:13
319:7
**bay** 98:16
**bear** 10:19
**began** 56:8
**beginning**
96:18 97:16
179:8 181:13
233:10 311:12
355:17
**begun** 218:10

**behalf** 91:25
340:18
**behavior**
268:19 270:9
274:11,14
298:5,12
319:25
**belief** 33:25
72:22 74:3,6,7
76:7 114:12
204:2 206:21
207:20,25
229:17,19
230:22 266:23
267:2 271:20
283:6 300:14
300:21 301:12
**believable**
283:14
**believe** 8:21,25
9:6 13:7 14:12
16:25 21:9
24:12 25:6
47:22 48:18
49:25 50:22
53:11,22 54:21
56:16 59:13,20
60:19,20 81:12
81:17 86:22
89:16,19 91:2
92:7 93:4,24
94:2,23 96:2
101:2 115:18
132:13 135:21
135:24 136:14

**[believe - brought]**                                          Page 11

| | | | |
|---|---|---|---|
| 139:7,12 | 327:2,5,10 | **better** 145:23 | 103:21 112:5 |
| 144:11,14,21 | 328:11 332:2 | **beyond** 171:24 | 116:5 124:24 |
| 144:23,23,25 | 333:5,6,6 | 260:19,21 | 124:25 125:2 |
| 149:10 150:23 | 334:14,15 | 326:7 328:8 | 129:14,17 |
| 159:18 163:24 | 335:21 336:9 | **big** 18:23 20:12 | 149:25 202:22 |
| 164:11,15 | 336:12 337:8 | 137:22 | 203:8 338:17 |
| 167:5 171:9 | 337:11,16,25 | **bill** 121:5 | 345:2 |
| 174:24 175:16 | 340:17 341:6 | **billable** 121:13 | **box** 284:25 |
| 175:20,24 | 341:22 342:13 | 121:24 | **brand** 109:11 |
| 177:16 180:24 | 343:4,8 347:15 | **billing** 121:7,9 | **braxton** 329:7 |
| 188:20 191:12 | 351:16,21 | 121:18 127:16 | 329:10,12 |
| 201:14 204:5 | 358:3 | **binding** 333:23 | **break** 7:5,8 |
| 206:16 209:5 | **believed** 33:21 | **bit** 23:9 125:11 | 21:21 76:21,23 |
| 209:14 224:4 | 58:5 74:9 | 151:19 195:25 | 77:8 95:16 |
| 229:11,14 | 112:23 113:23 | **black** 148:21 | 99:15 147:13 |
| 232:19 233:17 | 139:16 144:24 | **blaming** 273:17 | 216:6,8 265:12 |
| 234:6,9 242:6 | 204:9 235:22 | **blood** 359:18 | 266:4 |
| 245:18 248:10 | 236:8 242:7 | **blowing** 284:24 | **briefly** 146:21 |
| 256:8 257:9 | 258:9 310:10 | **blue** 148:16,23 | **bring** 11:21 |
| 258:11 259:22 | 350:5 | **board** 118:11 | 179:22 181:16 |
| 265:7 266:21 | **bench** 268:18 | **bonus** 121:2,9 | 182:23 249:24 |
| 270:11 271:12 | 268:24 269:5 | **books** 312:20 | **british** 91:7 |
| 271:18 273:12 | 270:8,11 276:7 | **borough** | **broad** 122:18 |
| 274:3 278:13 | **benefit** 272:5 | 194:10 | **bronx** 1:8 4:12 |
| 278:14 281:24 | 346:11,14 | **boroughs** | 123:6 286:4 |
| 283:4 285:6 | **benefits** 109:3 | 252:11,25 | **brooklyn** 17:16 |
| 286:14,15 | 109:7 | **boss** 136:24 | 17:25 98:9,14 |
| 292:13,18 | **best** 6:16,18 7:2 | 137:16 253:14 | 115:6 123:6 |
| 294:15 296:22 | 7:22 72:12 | 274:9,10,13,17 | 160:20 296:24 |
| 297:6,17 300:2 | 103:17 105:22 | 274:19 | 298:20 340:8 |
| 300:3 303:9 | 106:6 110:8 | **bother** 157:12 | **brought** 73:3 |
| 304:11 305:9 | 113:22 114:11 | **bottom** 14:10 | 162:2 163:2 |
| 308:21 311:21 | 129:6 142:11 | 48:24 56:7 | 180:9 213:19 |
| 316:3,23 322:7 | 187:22 293:3 | 77:13 100:14 | 347:11 |
| 323:24 326:13 | 349:2 | 100:20 103:19 | |

[building - certainly]                                                    Page 12

**building**  44:16
44:17
**bullet**  50:6
63:23 102:4,25
103:2 114:9
**bully**  346:4
**bureau**  348:9

**c**

**c**  3:2 359:2,2
**cadman**  115:9
**calendar**  313:3
317:9 348:13
348:16
**call**  40:21,24,25
43:11,12 64:6
98:19 140:21
187:3 254:22
254:23 264:17
268:24 271:4,9
271:17 272:14
277:13,18
313:3 317:9
340:24
**called**  4:3 98:15
101:8 140:24
166:22 254:6
254:14 269:15
274:9 277:7,11
277:17 313:7
313:10 321:22
332:23 333:2,4
346:19 348:13
352:9
**calling**  140:19
268:17 269:5

270:8,11
**camaraderie**
347:22
**capitalized**
114:6
**caption**  91:13
91:19
**care**  73:9
192:13 231:25
350:21
**career**  309:7
353:7
**carry**  171:16
**case**  4:14,19
14:22 18:23,24
18:25 19:4
20:12,12 21:4
21:4 31:23
44:9,13,23
55:2,22,24
74:13,25 79:21
79:25 80:12,16
82:6 83:21
84:21 85:10,13
85:17 88:10,23
89:3,13,23
90:13,22,25
91:10,14 92:6
92:8,22 93:21
93:25 104:16
106:13 130:11
147:3,7 148:3
156:15 157:8
157:17,20
161:22 164:9

199:7 209:15
214:2 218:18
222:22 270:17
270:18,18,20
272:12 274:21
274:21,22,23
274:23 275:7
275:10,11
278:10,25
279:14 281:2,4
281:5,8,11,12
282:7 285:16
286:5,5,6,14,20
286:21,23,24
287:4 288:3,5
288:19,22,25
289:6 290:11
291:3 308:14
308:16 311:16
321:22 322:13
322:14 331:12
331:25 332:8
332:20,20
333:9 334:25
335:8,18,23
336:14,20
337:5 345:5
351:5 353:25
362:7 363:3
**cases**  32:24
33:3,6,10,14
45:6,14 53:24
60:5,12 83:13
83:19 93:22
122:5,8,12,13

123:15 145:23
145:25 224:15
224:16 225:6
240:25 241:13
241:14,19,19
241:23 242:18
243:3 249:18
249:22 250:7
250:13,22
256:17 259:18
259:24,24
260:5 285:5,10
285:12,13,20
285:22,23
286:9 288:8,11
289:13,17,23
289:24 290:3
291:5,8 292:6
292:8,10,10,17
306:14,21,24
333:15 349:2
**cast**  90:7
**catch**  21:21
**cc'd**  174:9
**cell**  149:6
**censured**
111:25
**certain**  10:13
49:18 51:3,10
51:11 59:17
84:21 266:16
334:25
**certainly**
203:22

[certifications - claiming]                                      Page 13

| certifications | 170:20 238:2 | 95:21 96:10 | 233:13 234:3,8 |
|---|---|---|---|
| 130:22 | 343:22,22 | 101:3,8 112:21 | 236:16,21 |
| certified 2:12 | charges 339:11 | 113:8,18 115:3 | 237:23 240:12 |
| 57:19 | 339:12,17 | 115:12,24 | 241:16 242:10 |
| certify 359:10 | 341:2 343:20 | 118:7,11 | 242:15 250:21 |
| 359:16 | chart 83:20 | 126:17,21,23 | 250:24 255:14 |
| chair 217:11,12 | 291:19 | 145:25 291:13 | 255:24 256:10 |
| 220:25 221:15 | cheven 125:14 | civil 93:2,3,3 | 259:17,20 |
| 221:24 224:19 | 125:14,15 | 94:25 238:23 | 260:15 261:16 |
| chambers | chief 194:11 | claim 5:7 34:5 | 261:25 262:10 |
| 294:9 | chiefs 348:10 | 43:7 70:11,14 | 262:13,16,20 |
| chance 230:7 | child 346:23 | 70:15 71:3,8 | 264:11,21,24 |
| change 77:9 | 347:6,16 | 71:17,24 72:6 | 267:9 281:23 |
| 97:18 120:18 | children | 74:13 75:7 | 282:20,25 |
| 159:11 177:20 | 127:14 131:10 | 78:15,23 79:3 | 285:9 292:5,21 |
| 205:15 206:14 | 283:13,13,14 | 79:13 92:16,20 | 297:12 298:24 |
| 206:15 207:5 | 349:23 353:13 | 93:5 162:10 | 299:11 300:17 |
| 235:2 | children's | 165:9,10,11 | 301:4,7,10,11 |
| changed 100:8 | 353:3 | 166:13 167:9 | 302:2,7,14,15 |
| 344:2 | chinn 282:7 | 167:14 168:2 | 304:22 309:19 |
| changes 205:13 | chose 256:15 | 168:14,19,21 | 309:25 310:14 |
| changing | chronological | 169:2,3 170:13 | 310:21 311:6 |
| 211:22 218:20 | 288:10 | 171:10,17,22 | 316:18,25 |
| 229:3 | chunks 263:5 | 172:4,15,16 | 318:10 319:12 |
| characteristic | circumstance | 173:23 175:2 | 319:21 322:16 |
| 84:2,13,17,24 | 52:12 56:25 | 176:4 177:9 | 323:18 324:3 |
| 85:15,20,24 | 274:13 | 178:3 190:19 | 324:18 326:10 |
| 86:8 164:17 | circumstances | 191:5,9 201:12 | 327:7 328:3,7 |
| 175:22 | 86:25 213:15 | 201:19,21 | 339:20,25 |
| characterizati... | 281:13 353:19 | 207:16 209:11 | 340:2,4,14,21 |
| 49:23 | 353:23,24 | 213:15 216:22 | 341:7,13 |
| characterize | city 1:9 4:13 | 217:18 223:14 | 342:17,20,22 |
| 355:15 | 56:9,10 58:6 | 225:15,21 | 344:4 357:6 |
| charge 92:16 | 58:10 62:25 | 226:10 227:15 | claiming |
| 137:12 168:23 | 63:24 94:5 | 228:5 232:4 | 157:21 161:17 |

[claiming - communicating]                                    Page 14

165:5 166:23
167:21 173:19
176:17 339:21
345:5,6
**claims** 14:22
31:19 71:13
74:20,25 75:4
79:15,21,24
80:2,6,9,11,16
82:6,8,12,18
88:12 89:22
90:16,24 91:21
91:24 92:5
93:9 115:21
127:7,11
130:10,15
147:2,6 156:15
157:8,16
161:22 162:20
163:10,14
164:9 165:4
169:16,21
170:17,20,23
171:4,7 218:18
301:13 331:11
331:24 332:7
335:17,22
336:3,7,11,13
336:17,19,24
337:6,10,12,18
337:21,24
338:2 339:15
343:14
**clara** 195:6,10

**clarify** 33:20
69:7 87:12
301:19 326:4
335:5
**clark** 118:7
**clause** 240:23
**clayson** 308:14
309:6 314:19
**clean** 106:12,14
106:15,19
**clear** 5:23
44:20 62:10
155:11 166:4
177:11 181:11
202:4 204:20
204:22 211:21
212:4 241:21
241:22 299:4
328:5 331:20
**clearly** 80:3
241:4 265:3
340:3
**client** 105:20
106:2,5,9
211:22
**clients** 122:15
**close** 357:2
**clothing** 353:4
**code** 49:18,19
50:12 51:3,9
57:16,19,24
**colleague** 35:8
137:15 275:21
**colleagues** 35:7
35:11,15 45:6

241:5
**collectively**
4:25
**college** 118:4
**colluding**
289:16
**colon** 101:19
**column** 287:15
**come** 17:5 19:3
19:24 51:23
58:18 61:7
95:20 97:7
114:17 134:21
134:24 142:6
147:5 154:3
178:19 179:10
179:12 209:23
213:25 215:16
215:24 229:8
277:6,10
308:23 309:4
312:13 314:22
315:5 333:11
346:25 347:3
**comes** 82:15
**comfortable**
54:14
**coming** 154:25
155:15 224:18
312:14 314:7
**comma** 40:12
91:14
**commenced**
92:17

**comment** 22:17
173:16 215:13
215:17 240:19
314:21 315:13
315:22,23
316:11 322:20
325:22
**comments**
21:25 167:17
215:3 322:18
322:21 324:4
324:14,18
**commission**
363:25
**commitment**
136:17,21
**committed**
173:11
**committee**
93:13 132:12
132:20,24
**common** 57:2
**communicate**
12:12 56:2
137:19 138:11
140:20 153:22
154:18 233:8
**communicated**
11:6 146:23
156:14 157:7
157:16 219:14
331:11
**communicating**
152:13 153:21

communication
  143:23 144:2,7
  146:22 148:9
  149:16 238:18
  240:20 276:4
communicati...
  10:3 150:24
  151:9 152:8,12
  202:10 331:23
community
  136:18
commute  99:3
  108:16,20
  109:13
comp  168:19
  168:21 169:3
  169:16,21
  170:18,23
  171:4,22
companies
  122:15,16
comparator
  328:12
compensation
  120:22
compensatory
  345:2,7,10,15
complain  161:3
  248:18 252:24
  277:7,11
complained
  32:12 36:16
  200:20 210:4
  210:20 212:10
  212:15 246:23

247:11 248:3,9
248:14 251:18
252:20 259:23
294:18 295:5
334:15
complaining
  41:2 243:2
  264:4 293:10
complaint
  80:21,23 81:6
  81:9,19 82:4
  82:10,20,23
  93:12 132:18
  132:23 161:14
  161:15,21,23
  176:22 200:8,9
  200:16 201:9
  201:12 207:7
  209:2 216:4,12
  244:10 246:16
  246:17,24
  247:21,22
  248:5,6,20,22
  251:19,20
  252:6 259:7
  260:19 266:8
  293:16 315:16
  315:25 317:5
  327:12 338:9
  360:22 362:17
complaints
  160:6,7,11,14
  160:25 161:9
  161:12 244:11
  244:14,19,20

244:25 245:3
245:16 246:19
247:6,21,25
255:9 256:3,3
256:21 257:3,6
257:7,24
265:13,19,25
266:17 292:14
293:7
complete  5:17
  82:12 114:12
  216:18
completed
  101:23 103:5,9
  111:2,4 112:20
  114:10 268:9
completely
  44:4 154:24
  155:14 267:5
completing
  102:18 103:16
  249:14
complimented
  347:23
comply  103:15
complying  85:6
comprehensive
  101:9
computer
  128:13 131:17
concern  239:13
concerned  55:8
  274:14
concerning
  273:24

concluded
  49:17,25 50:21
  51:2 62:12
  67:24
concludes
  49:24
conclusion  50:3
condition  18:10
  21:18
conduct  59:6
  78:17 79:5
  157:22 175:4
  273:24 277:8
  277:12 282:7
  283:25 285:5
  286:10 298:4
  343:9
conducted
  51:22 59:3,8
  71:5 342:11
conducting
  231:8
conference
  106:14 122:22
  274:25 281:5,8
confidence
  351:20
confirm  42:6
  77:7 78:13
  256:18 292:12
  327:13 340:12
  356:20
confirmation
  23:18 27:23
  29:10 342:8

**[confirmed - conversations]**                                      Page 16

| | | | |
|---|---|---|---|
| **confirmed** | **consistently** | 228:3 250:10 | 26:11,12,14,17 |
| 195:7 349:18 | 322:16 | 252:9 255:18 | 27:6,13 28:4,9 |
| **confirming** | **constantly**  34:7 | 280:17 286:18 | 28:12,15,19 |
| 46:5 | 34:16 45:12 | 289:18 290:4 | 29:12,15,18,22 |
| **confirms** | 320:22,22 | 318:16 | 30:7,16,19 |
| 304:19 310:12 | 339:23 | **continued** | 31:25 32:2 |
| **confrontational** | **constituted** | 140:5,6 159:7 | 35:3 37:18,21 |
| 227:21 | 328:4 | 226:16 252:24 | 38:13,15,22,24 |
| **confusing** | **contact**  55:2,12 | 255:11 285:10 | 39:2,7,11,21,22 |
| 79:20 | 55:18,21,23 | 286:9 313:4 | 39:24 41:6,16 |
| **conjunctivitis** | 169:17 | 347:14 349:13 | 41:18,25 42:2 |
| 19:7,9 | **contacted** | 349:19 350:2 | 59:4 61:16,19 |
| **connected** | 332:15 | 351:9 357:10 | 70:4 107:7 |
| 229:24 230:5 | **contacting** | **continues** | 133:25 142:25 |
| 307:24 308:2 | 352:6 | 149:2 | 143:20 192:15 |
| **connection** | **contained** | **continuing** | 195:3 199:5 |
| 21:25 22:12 | 81:19 113:19 | 255:14 256:10 | 211:15 212:23 |
| 60:25 69:3 | **contains** | **continuously** | 226:19 228:15 |
| 71:16 78:9 | 299:13 | 309:7,13 | 254:5 258:25 |
| 90:12 92:14 | **contend**  333:22 | 312:22,24 | 259:3 260:23 |
| 111:14 135:6 | **contents**  246:8 | 314:6 317:7 | 269:12 276:5 |
| 163:4 168:4 | 246:9 | 322:11 346:2 | 277:20 278:11 |
| 169:20 209:7 | **context**  87:2 | 347:9 348:23 | 279:13,20 |
| 209:12 254:2 | **contingency** | **contractor**  54:4 | 282:2 294:14 |
| 302:19 | 53:15 57:3 | 56:12 88:19 | 295:12,15 |
| **consensus** | 263:13,14 | 90:20 92:21 | 323:7 340:25 |
| 127:14 | **contingent** | 123:12 | **conversations** |
| **consider**  83:7 | 249:13 | **contractor's** | 11:12 24:2,11 |
| 343:10 | **continually** | 54:2 | 24:14,19 29:21 |
| **consideration** | 40:7 226:15 | **control**  261:21 | 36:16 37:3 |
| 122:24 | 242:17 332:16 | **conversation** | 41:3 42:7,10 |
| **considered** | 346:11 | 18:2,5 20:5 | 42:16,18,24 |
| 58:12 | **continue**  18:11 | 23:14 24:8,17 | 43:7 70:3 |
| **considering** | 19:24 21:19 | 24:20,22,25 | 166:3 244:16 |
| 106:3 | 133:12 159:9 | 25:8 26:4,9,10 | 247:16 282:12 |

[conversations - court]                                                    Page 17

323:10
**convicted**
87:18
**copied**  77:23
155:6,12 162:3
162:13 166:9
166:15 193:9
202:17,19,20
202:24 240:16
253:20 254:19
303:25
**copies**  117:2
147:15 361:12
**copy**  13:3,8,14
13:24 14:13
15:2 43:14,16
46:7,12 48:5
48:13 49:4,10
52:15,22 64:4
77:14,19 80:20
81:5 95:9
100:23 101:2
116:4,13
119:16 128:18
193:7,11 237:8
268:3 269:16
285:19 303:5
329:21,24
332:25
**copying**  73:12
**cordial**  137:20
**corey**  104:24
105:6,16
156:17,19,23
156:24

**corner**  14:10
**corp**  95:21
100:2 101:4
111:13 115:12
119:6
**corporation**
99:11
**correct**  8:15
9:4 10:16
12:21 13:3,8
13:13,24 14:13
16:19,22 25:17
28:2 39:4,5
42:3,4 46:9,10
49:9 50:14
53:3 57:8,9
64:7 65:25
66:18,19 68:3
75:19,22 76:3
77:18 81:11,20
81:24 82:2,3
82:24 83:3
88:7,8,13,14
94:3 99:18
100:4 105:4
107:19,20,22
107:23 108:17
108:18 111:6
111:22 112:2,7
112:22 113:4
113:20 115:4
115:12,13
116:13 117:14
117:15,19,25
118:2,5 119:8

119:16 120:24
121:2 125:8,16
125:20 126:3,7
128:3,6 129:21
130:25 131:4
137:8,12
142:16 149:13
153:15 159:11
160:3,4 181:20
184:6 185:23
185:25 187:5
189:15 190:16
194:2 212:11
214:14 234:13
246:9 248:24
251:22 255:6
257:21 262:3,8
268:3 272:7
273:13 279:22
280:13,21,23
294:7 298:12
298:13 338:19
**corrected**
117:13
**corrections**
363:5
**costa**  174:10,10
175:25 337:4
337:21
**counsel**  9:12,13
9:25 10:4,8,12
10:13 50:9
53:24 60:5
95:22 99:11
100:2 101:4

104:6,7 105:7
111:14 112:24
113:2,23,24
115:12 119:6
124:11 126:21
142:20 148:20
216:5 279:21
279:21,25
313:15 339:10
**count**  285:25
**county**  18:9
26:16 45:7
89:11,11 153:7
255:12,15
256:6 262:7
266:16 287:2
287:23 327:20
348:9 359:6
**couple**  28:10
32:19 110:3
180:8 195:5
341:18 356:17
**course**  74:23
86:2,2,10,10
142:12,17
189:9 312:14
341:24 354:6
358:15
**court**  1:2 4:15
6:6,14 35:9
52:16 80:10,17
84:18 85:3,6
86:15,23 88:9
88:11 89:9,10
93:2,3 94:25

[court - dates]                                              Page 18

105:8 122:24
122:25 123:2
128:7 149:2
235:22 236:4
257:18 270:9
270:21 271:25
274:12 276:11
279:3 280:5
282:17 308:24
308:25 311:10
311:19 313:7
317:22 324:22
334:23 335:2
335:15 346:20
346:25 347:2,3
348:20 356:8
**courthouse**
269:7 298:4
**courtroom** 86:9
134:7 269:3,4
269:10 273:22
276:9 279:11
293:17,19,22
294:10 295:21
313:2,6 317:10
**courts** 123:4
**cover** 177:12
333:9
**covering** 13:23
13:25
**covers** 44:21
**cpd** 101:10
102:3
**craig** 174:10,10
174:20 175:25

337:4,21
**cried** 346:19
355:2,11
356:11
**crime** 87:18
106:4
**cringe** 235:23
**criticized**
208:20 321:16
346:6
**crr** 1:24 359:25
**cry** 313:11
355:3 356:12
**crying** 313:8,9
350:23 353:11
**current** 12:7
116:14,19,20
120:23 194:11
**currently** 88:6
116:15
**cut** 151:19
152:5,19,21
362:23
**cv** 1:6

--- d ---

**d** 360:2
**daly** 58:23 59:9
**dam** 264:17
333:2 339:14
**damages**
344:25 345:2,4
345:7,10,15
**dan** 46:7 64:6
66:21 69:4
78:13 166:18

219:11 254:2
264:18,18
270:7 298:17
302:19 332:12
333:3 339:14
349:25 351:16
**daniel** 3:17
16:3
**danielle** 15:17
16:11 36:6,8
179:20,21,25
181:15,18,22
182:22 184:9
189:24 196:23
197:4,8,11,18
198:24 199:3
199:14
**danielle's** 180:4
**daniels** 67:6,7
67:12
**date** 14:23
15:21 20:7,8
24:13,16,24
26:13,17 42:17
54:20,22 71:6
72:10 100:15
100:17 101:14
101:14,16,17
101:19,20,22
107:18 109:17
109:24,25
110:21,22
112:9,14,15,16
114:21,22
115:2 116:16

116:18 119:25
120:13 129:20
129:25 130:3
146:19 150:22
150:23 152:6
155:9,10,24
157:2,2 168:18
195:13 200:15
218:18 219:11
256:20 258:15
286:17 289:4
302:12 311:9
317:21 321:9
363:3
**dated** 12:17,18
48:9 49:11
68:11 69:9,12
72:4 77:2
119:13 192:25
202:11,23
205:20 237:12
267:14,16
269:22 303:2
303:13 329:18
360:10,10,13
360:18,20
361:7,14,16,18
361:23 362:5
362:10,12,15
**dates** 15:12
21:9 24:10,15
24:18,19 32:3
32:14,18 35:5
42:24 125:17
126:4 128:3

**[dates - deliberations]**

165:15 166:5
247:11 289:3,5
290:21 306:19
**david** 65:6,7,10
69:19 91:11,12
91:14 164:11
165:5 299:21
299:22 336:20
336:25 339:10
339:16 340:18
342:25
**day** 18:21
19:20,23 44:15
68:25 70:24
79:24 96:5
126:23 135:6
140:11 150:16
151:11 177:12
177:19 179:14
180:7,12,20,22
189:10,14
190:23 196:6
196:17,17,18
207:2 217:4,5
218:3,10
219:21,24
222:4,24
226:17 227:4
237:24 238:8
253:23 269:13
270:9,14 271:8
273:7 276:21
277:2,8,12
295:16,23
301:16 307:17

307:18 308:18
311:11,12,20
312:15 313:25
314:11,12,20
314:24 316:10
319:6,10
348:19 349:8
350:4 355:4,12
356:2,3 358:23
359:22 363:22
**days** 21:10,11
96:25 97:2,4,5
97:6,16 120:7
120:7 123:2
180:8 189:6
307:20,21,22
354:10
**dd5** 275:5,13
**december**
16:10 17:10,13
17:18,20 18:21
20:8 21:8
24:13 39:2,9
42:3 45:23
70:15 71:5
96:2 111:4,5
165:12 248:8
258:8 260:24
261:2 282:6,10
283:24 311:9
311:12 349:9
**decide** 339:11
339:16 351:13
351:15

**decided** 65:8
223:6 341:19
343:15
**deciding**
224:24
**decision** 63:9
65:2,11 66:13
69:8,24 78:4,8
86:5 98:21
107:5 340:2
341:20 343:16
**decline** 170:3
**deems** 63:2,18
63:25
**defamation**
88:12
**defend** 311:18
**defendant**
285:24 286:3
**defendant's**
133:13 285:25
329:17
**defendants**
1:11 3:13
12:16,17 13:2
48:6,8 52:16
52:18 62:5,21
64:3 68:10,11
69:14 70:19
72:3 73:18,24
77:2 79:3,22
80:15,17,22
82:15 83:20,21
95:10,11 99:5
106:23,24

115:22 116:3,7
119:13 128:19
128:20 143:8
147:15 155:17
176:8 192:25
200:25 202:11
203:2 208:19
217:25 219:7
237:12 245:23
245:24 267:16
269:22 285:15
302:25 303:13
303:18 329:18
333:23 338:8
344:9,11 360:8
361:3,21 362:3
**defending**
223:3
**defense** 349:17
**definitely** 16:7
228:10
**degrading**
346:9 347:17
**degrees** 130:21
**delay** 183:23
184:10,18,21
184:24 185:2
187:11 188:8
189:24 192:19
196:4
**delayed** 73:3
177:25 179:16
179:24 183:10
**deliberations**
21:6

**[demand - difficult]**                                                      Page 20

| | | | |
|---|---|---|---|
| **demand**  80:23 | **departure** | **depressed** | 95:12 128:20 |
| 220:20 360:22 | 301:24 | 350:22 353:8 | 128:25 143:11 |
| **demanded** | **depending** | **depression** | 151:17 188:16 |
| 256:13 308:23 | 97:25 | 351:19 352:18 | 275:13 281:15 |
| 308:24 346:4 | **depends**  84:7 | 353:10 | 360:24 361:9 |
| **demanding** | 86:25 123:2 | **describe**  26:14 | **determination** |
| 272:20 | **deponent**  363:4 | 86:16 89:21 | 69:17,18 264:6 |
| **dementia** | 363:20 | 135:13,14,15 | 330:11,15 |
| 307:13 | **deposed**  90:12 | 135:18 136:17 | **determined** |
| **demers**  296:13 | 90:21 92:3 | 136:19 138:17 | 66:5 201:15,22 |
| **demoted** | 93:7,18,20,25 | 241:2 328:16 | 204:3,7 205:14 |
| 103:22 | 94:4,6 156:21 | 352:22 353:19 | 206:18 302:17 |
| **denial**  170:13 | 156:21 | **described** | **determining** |
| **denied**  73:6 | **deposition**  1:16 | 73:23 93:19 | 66:9 |
| 77:25 168:22 | 2:8 6:14 10:22 | 113:3 146:21 | **diagnose** |
| 171:11,23 | 11:15,22,25 | 175:9 223:20 | 352:19 |
| 172:24 330:4 | 12:8 21:20 | 236:12 345:11 | **difference**  8:14 |
| **deny**  78:4 | 80:4 94:7,7,12 | **describing** | **different**  34:24 |
| 172:3 279:18 | 106:3 126:22 | 88:18 352:20 | 44:9 62:10 |
| 298:11 330:11 | 156:24 176:13 | 352:21 | 84:9 98:19 |
| 330:15 | 193:14,15 | **description** | 104:12 229:4 |
| **denying**  74:23 | 217:11 221:8 | 56:24 89:22 | 240:7 247:22 |
| 168:25 169:21 | 221:18,19,21 | 125:16 126:3 | 248:6 252:11 |
| 170:17 171:6 | 222:18,24 | 128:2,5,6 | 253:2 287:6 |
| 280:2 | 223:2,3 224:6 | 265:16 271:12 | 290:21 325:5 |
| **dep**  363:3 | 308:13,20 | **designed** | 347:5 350:10 |
| **department** | 309:3,4,6 | 177:12 | 352:9 354:9 |
| 15:22,22 67:2 | 314:19 323:4 | **despite**  206:16 | **difficult**  6:13 |
| 70:15 71:14 | 333:12,13 | **dessert**  156:6 | 98:22 99:2 |
| 118:8 134:20 | 348:18 359:12 | **detail**  38:24 | 108:20 121:15 |
| 137:2 138:17 | 359:14 | 178:11 | 141:20 188:23 |
| 138:21 165:11 | **depositions** | **detailed**  39:8 | 189:2 230:2 |
| 301:4,10 302:3 | 5:22 22:2 34:8 | **details**  21:24 | 232:21 233:8 |
| 302:14 329:2 | 34:17 306:22 | 25:23 26:5 | 242:17 307:22 |
| 342:21 | 348:15 | 27:5 37:2 39:8 | 347:14 348:6 |

348:23 349:22
350:13,17
351:12,23
354:10,12
**difficulty** 350:3
**direct** 165:19
165:21 210:11
**directed** 280:25
**direction** 86:15
279:3 280:5
**directly** 76:12
143:17 264:16
268:17 270:8
310:17,21
**disagree** 49:23
272:18
**disagreement**
51:5
**disagrees** 86:4
**discharged**
103:23
**disciplinary**
12:22 13:5
15:3 46:12,17
47:5,14,24
49:14 64:4,5
65:24 69:13
70:12 72:4,18
73:17,23 74:13
74:21 75:2
78:16 141:12
142:14 143:6
146:19 148:2
155:6,16,21
163:5 166:24

167:3 168:4
174:17,18
175:6 264:18
267:14 268:3
298:25 299:12
299:19 300:22
302:18 303:10
333:3
**discipline**
62:25 63:10,11
63:18,25 64:7
64:9,13,14,17
64:20,23 65:3
65:13 66:5,9
67:5 68:3
79:23 207:12
207:21 208:2,5
208:9 263:16
329:13,14
**disciplined**
103:22 111:25
132:10 207:18
328:20
**disclose** 10:3
**disclosure**
345:3
**disclosures**
344:10,12
362:20
**discovery** 13:9
21:20 22:2
55:4 56:3,4
82:12 116:6
147:24 206:2
272:15 275:5

275:14,20
300:7,9,10
**discretionary**
184:4
**discriminate**
167:6 168:8
**discriminated**
34:2 74:9
161:18 162:11
163:19,24
164:11,15
166:14 171:25
175:3 176:18
201:16,23
204:3,5,8,10
205:14 206:19
209:6 245:9
255:19 258:10
258:13
**discriminating**
23:3 25:11,16
26:23 164:5
167:10 169:11
172:8,16
175:17,21
301:24
**discrimination**
18:7 23:2
25:20 26:6
27:5 31:20
43:24 73:7,21
76:16 78:21
125:23 127:9
127:22 130:13
157:24 160:8

160:12 162:4
162:19 163:9
163:13 164:10
168:20 169:7
173:9 180:16
180:25 190:20
192:6 201:10
201:13 205:21
206:13,18
229:14,18
230:16 244:12
244:20 245:17
246:18 248:18
258:2 264:5
304:12 315:7
316:12,14,23
317:17 319:13
339:22 350:15
**discriminatory**
59:21 70:13,25
72:6 73:18,24
74:14 78:17
79:5 172:6,11
174:6 175:10
175:15 191:2,5
191:10 209:12
220:17 221:4
222:2,6,12
225:18 229:24
230:5 235:15
238:19 242:10
242:23 243:5
243:12,23
255:16,25
261:25 262:13

**[discriminatory - document]** Page 22

301:8,14
304:16 310:11
310:14 315:2
315:10 316:19
317:25 318:11
318:20 340:18
340:21 341:13
341:23 342:2
343:17 356:23
**discuss** 19:9
88:10 166:22
171:3 180:12
228:17 231:25
248:4 254:8,12
270:9
**discussed** 19:15
30:8 45:3
90:21 92:19
123:14 135:8
136:10 142:7,9
142:13,18
143:20 147:6
166:25 181:3
228:20 245:2
247:25 248:7
248:10 255:5
256:22 258:5
260:20,21,23
261:23 264:8
265:13 278:20
283:13 320:11
320:12 327:3,5
327:8,10
331:11,17,22
332:13 335:23

336:4 338:4
345:22
**discusses** 278:6
283:21 295:11
**discussing**
20:14 21:4
26:11 49:15
115:23 162:21
279:14
**discussion**
36:19 37:8
53:3 78:13
107:13 136:3
142:4 151:16
233:19 251:4
251:25 252:4
252:17,23
259:4 260:4
276:13 279:11
284:3 298:7
**discussions**
32:15 62:14
251:7,10
253:18 331:23
332:6
**dishonest** 284:8
284:14
**disingenuous**
273:21 274:10
**dismissal** 64:9
64:15,16,22
66:13,23 70:22
75:12 264:6
302:9 330:4,12
330:16

**dismissed**
191:6,7
**disparaging**
321:17 322:5
323:6 324:4,15
324:19 325:18
325:20 326:11
**disparate**
216:14 328:4
**disposed** 286:6
**disproportion...**
64:18 240:25
241:12
**dispute** 92:22
226:25 275:3
**disputes** 227:2
**disregard**
322:8
**disregarded**
180:25
**disrespectful**
284:9,18
**dissatisfaction**
268:18
**distress** 90:16
90:25 92:6
93:10 346:8
**distribute**
259:18,24
**distributed**
231:4
**distribution**
259:23
**district** 1:2,3

**disturbing** 41:8
**divide** 224:24
**division** 71:23
100:3 339:25
343:22
**docked** 180:13
**doctor** 352:2
**doctor's** 19:8
19:11 20:19,22
**doctors** 352:5,9
**document** 10:6
13:2 14:8,9,13
14:19,24 16:23
48:13,18,21
49:4,21 51:13
51:16 52:15,23
52:23 53:7
54:18 61:24
62:8 63:20
64:6 65:7,14
68:15,18,20,21
68:22 70:2,19
71:6 75:12,17
75:19,22 76:12
77:12,15,19,21
80:11,17 81:2
81:3 99:5
100:20 101:9
102:15 103:6
116:6,11,23
119:10 128:24
129:15 147:20
156:4 176:5,7
177:2 193:5,24
200:10 202:5

202:21 203:14
206:5,9 207:9
208:14 216:19
238:13 246:3,5
259:9 260:13
263:2 266:12
267:20,24
268:10 270:4
275:6 278:4
281:17 283:19
295:9 304:9
327:24 329:21
330:23 331:6
339:7 344:15
344:16
**documents**
11:14,17,18,22
22:10,11 30:18
32:13 42:16
43:6 71:10,11
99:10,22
150:13 251:9
256:20
**doing**   12:3 22:2
24:25 34:8,8
34:17 126:22
164:5 232:24
293:23 294:5
294:16 308:20
311:13 314:7
315:15 346:12
348:11 350:24
**dollars**   118:21
119:3 123:21

**door**   213:23
**doubt**   272:5
346:12,14
**drafted**   46:25
47:20,24 48:3
70:8
**drastically**
62:10
**drink**   313:19
**drinking**
313:15
**drinks**   305:13
324:7 325:3
**drive**   96:17
98:21
**drivers**   122:15
**driving**   96:21
98:3
**drugs**   7:24
**due**   180:5
184:10 186:6
187:10 188:7
189:24 190:15
243:23 305:5
317:16 323:19
324:5 351:11
356:23,24
**duffy**   126:3,10
126:14,19,21
127:8,10,17
296:2,5,8
297:15
**duly**   4:3 359:13
**dweck**   95:12
100:6,10 116:7

360:24 361:5

**e**

**e**   3:2,2 4:2,2
12:17 13:18,22
13:23,25 14:2
14:4 16:9,11
16:13,24 17:2
18:13 22:9,11
28:21 29:5
30:19,22 31:3
31:3,7 40:9,12
41:4,9 42:22
43:3,4 44:2
46:2,4,5 55:9
55:18,22,24
56:2 73:12,13
77:2,22,22
130:24,25
144:5 152:10
152:11,13,15
153:13,16,17
157:10 159:2,2
159:4,4 162:17
173:4 181:3
187:16 188:3
188:15 192:23
192:25 193:7
193:11 200:20
202:11,16,23
202:25 203:11
204:17 205:6
205:18,19
206:11 217:10
217:14 218:7
218:19,22

219:22,23,25
220:15,20
222:9,14 225:7
237:5,12,19
238:18 239:2
240:16,22
243:11 247:3
250:15,16,17
250:25 251:12
251:15 253:21
256:23,24
269:14,17,22
269:25 271:5
271:12 275:24
303:13,24
304:2,12
306:17,23
308:6 309:22
310:17 311:6
311:10,11,13
321:23 338:18
338:22 346:13
348:2,3 359:2
359:2 360:2,10
360:20 361:14
361:16,18
362:5,12
**earlier**   16:5
88:19 97:17,18
97:19 145:13
146:5,7 159:10
168:18 178:8
179:14 181:3
218:17 242:2
244:15 247:25

320:6 334:20
**earliest** 24:22
**early** 97:8
178:19,20
179:11,11
217:3,4,4,6
356:3
**earned** 118:19
**easily** 190:8
348:18
**eastern** 1:3
**eat** 213:20
**eating** 209:18
213:5,16,23
214:5,11
**eats** 136:5
**economic**
345:12
**education**
117:11,23
118:4
**eeo** 338:8
362:17
**eeoc** 70:14 71:2
71:8,8,13,16,20
78:23 165:10
301:10 302:14
339:25 342:20
343:21
**efforts** 167:23
**ehrlich** 277:7
**eight** 177:12,14
179:13,15,23
190:4,5,7
217:5,7 308:13

308:18 339:16
351:13,15
**eighth** 2:9 3:14
**either** 93:21
103:24 226:20
253:12 290:13
333:6 341:9
**elaborate**
143:11
**election** 118:17
**elections**
118:11
**elevator** 35:9
227:5 234:20
**eligible** 121:2
**else's** 275:12
328:24
**emailed** 152:24
**embarrassing**
346:23
**emotional**
90:16,25 92:5
93:10 345:13
346:7 350:9,19
**emotionally**
350:20 351:25
**emp** 55:3
**employed**
108:9 120:15
**employee** 12:7
58:6,10 108:10
108:14 137:16
160:7,8,11
184:20 198:13
198:15,16,19

198:21 199:5
238:21
**employees**
138:16 161:2
183:18 197:5
197:11
**employer**
103:25 130:12
130:16
**employment**
109:16 115:11
115:14 120:19
124:16,19,21
154:6,8 155:8
329:25 351:14
**encountered**
194:6,8
**encouraging**
318:18
**ends** 176:13
288:21
**endure** 308:22
**engaged** 157:21
173:20 263:12
298:11 337:5
**enjoyed** 348:11
**entered** 129:25
**entire** 15:10
145:21 168:2
181:25 183:11
184:9 186:9,12
238:13 253:2
**entry** 125:13
129:24

**envelope**
174:13,15,16
**environment**
348:7,7,23
350:14
**errata** 363:2
**ervolina** 296:9
**esq** 3:9,16,17
**essentially**
203:2 260:15
**estimate**
118:18
**ethical** 84:25
297:20
**ethics** 49:18,19
50:13 51:3,9
57:17,18,20,24
**evening** 108:7
218:10
**evenly** 259:24
**event** 305:25
**events** 75:9
316:4,5
**everybody**
32:24
**everyone's**
136:24
**evidence** 43:23
165:24 176:9
189:21 190:19
249:21,24,25
250:24 266:20
266:25 304:12
315:13,24
317:15 318:9

[evidence - explained]                                                    Page 25

319:13
**evidencing**
32:14
**exact** 326:2
**exactly** 75:15
335:4
**examination**
4:6 159:7
360:3
**examined** 4:4
159:5
**example** 27:18
78:16 79:5
177:5 218:21
307:23 308:12
320:24
**examples** 76:15
78:20 172:8
223:11 255:21
305:5 307:5
346:18,22
**exceed** 121:24
**excellent**
145:18,19
159:15,17,21
**except** 19:23
152:16 347:23
**exchange** 255:5
272:15 277:5
**exchanged**
147:25 276:14
300:8
**excluded** 59:14
59:18

**excuse** 179:23
181:18 182:7,8
182:10,14
183:2 184:18
186:14 190:6
197:2,4,11
**excused** 73:4
181:8 182:21
183:14,25
184:17 185:7
185:11,17,18
186:24 187:2
188:25 189:18
190:15 196:5
196:13 198:17
198:23 199:2
206:23,25
**excusing**
187:10 188:7
188:17
**exhibit** 12:15
12:16,17 13:3
46:7 48:5,7,8
52:16,18 62:6
62:9,21 64:4
65:23 68:10,11
69:14 70:12,20
71:6 72:3
73:18,24 76:19
77:2,6,12
78:15 79:4,7
79:22 80:9,9
80:15,17,21,22
95:10,11 99:5
116:3,7 119:13

125:6 128:19
128:20 130:20
141:13 142:15
143:8 146:20
147:15,19
148:3,21
155:17 161:14
162:6,8,17,23
163:2 166:7,9
168:5 176:8
192:25 200:25
202:7,9,11
203:3,5,6,7,9
208:20,23,24
217:25 219:6,8
219:23 237:12
237:16 243:12
245:22,23
247:3,4 253:25
254:3,4 264:7
267:13,16
269:21,22
271:11 285:14
285:15 289:21
302:24,24,25
303:11,13,18
310:10,14
311:7 329:17
329:18 330:18
338:7,8,14
344:11 360:9
360:12,15,18
360:20,22,23
361:5,7,9,11,13
361:15,18,20

361:22 362:5,7
362:9,12,14,16
362:19
**exhibits** 13:13
13:14 48:6
49:8 360:6
361:2 362:2
**exist** 117:2
**exists** 116:23
**expect** 232:13
305:24
**expected** 306:2
328:22
**experience** 5:21
83:24 109:6
121:18 139:22
**experienced**
83:12,16
108:25 350:10
**experts** 320:20
**expires** 363:25
**explain** 172:23
178:2 207:4
238:7 272:8
273:4 311:19
342:24 349:21
**explained**
20:23 58:21
172:20 180:4
191:19 205:22
206:23 238:11
238:16 239:23
239:24 346:18
350:12,16

[explaining - false]    Page 26

| | | | |
|---|---|---|---|
| **explaining** | 208:17 216:22 | 225:21,25 | 316:21,22,25 |
| 21:12 261:17 | 225:13 226:10 | 227:14,16 | 317:15 318:9 |
| **explains** 261:22 | 241:3,11 | 228:4,6 229:23 | 318:19,23 |
| **explanation** | 242:11 256:4 | 230:4 232:3,6 | 319:2,12,20 |
| 21:2 23:9 | 266:24 271:4 | 233:13 234:2,7 | 322:15 323:17 |
| **express** 268:18 | 273:6 277:13 | 236:20 237:23 | 324:2,17 |
| **extension** 77:24 | 304:21 345:6 | 238:17 240:4 | 325:20 326:6 |
| 78:5,9 | **factors** 66:8 | 240:11 241:9 | 326:10 327:7 |
| **extent** 30:21 | 330:15 | 241:15 242:9 | 327:15,16,17 |
| 55:21 59:12 | **facts** 34:4 | 242:14,22 | 328:3,6,7,9 |
| 105:19,25 | 67:11 72:21 | 243:6,7 250:2 | 331:22 336:2 |
| 136:7 | 74:7,8 75:8,13 | 250:20,23 | 336:10,16,23 |
| **extra** 180:18 | 76:7 79:13 | 251:2 255:13 | 337:9,14,17,23 |
| 198:20 352:4 | 81:19 108:20 | 255:24 256:9 | 339:19 340:4 |
| **extremely** 29:4 | 162:10 165:9 | 257:7 259:13 | 340:13,14,20 |
| 309:5 347:4 | 165:16,24 | 259:15,19 | 341:4,7,12,25 |
| **eye** 19:12 20:20 | 166:4,12 167:9 | 260:18 261:9 | 342:16 343:5 |
| 20:22 | 167:13,14 | 261:15,24 | 343:11 344:4 |
| **eyes** 19:8 21:7 | 168:14 169:10 | 262:9,12,15,20 | 345:20,22 |
| 21:11 199:17 | 171:20,24 | 263:19 264:10 | 356:21 357:5 |
| **ezra** 89:18 | 172:10,14,19 | 264:20,23 | **factual** 56:25 |
| **f** | 173:22 174:3 | 265:9 266:14 | 353:23,24 |
| | 175:2,8 176:3 | 266:25 267:9 | **failed** 145:11 |
| **f** 159:2 359:2 | 176:9,10 177:8 | 281:21 282:20 | 311:15 |
| **faced** 162:5 | 178:2,22 | 282:22,23,24 | **fair** 129:11 |
| 350:14 | 190:18,25 | 283:5,15 285:8 | 283:9 350:18 |
| **facing** 18:7 | 191:4,9 196:12 | 292:20 297:11 | **fairly** 127:15 |
| **fact** 53:15 | 200:12,22 | 297:23 298:15 | **fall** 88:24 |
| 54:15 64:6 | 201:2,11,18 | 298:24 299:10 | **falls** 106:4 |
| 66:20 70:11 | 207:15 208:23 | 300:17,20,24 | 338:22 |
| 72:5 75:7 | 209:11 213:14 | 301:6 302:4,6 | **false** 9:16,21 |
| 78:14 79:3 | 214:4,7,16 | 305:3 306:7 | 10:7 102:4,10 |
| 141:24 159:18 | 217:17 222:5 | 309:14,18,25 | 115:19 281:23 |
| 168:3,15,17 | 222:11,16 | 310:4,6,13,20 | 282:21,25 |
| 171:21 173:7,9 | 223:13 224:12 | 311:5 316:17 | 292:23 296:22 |
| 196:13 206:16 | | | |

**[false - first]**                                               Page 27

297:6,7,13
298:17 299:13
**familiar**  57:19
58:2
**family**  68:5
120:11 214:11
349:22
**far**  53:2 55:7
108:16
**farber**  65:6,8
69:19 161:19
162:12,14
165:6 167:24
299:21,22
300:11 332:15
336:20,25
339:10 341:19
342:25 343:15
343:25 351:12
**farber's**  65:11
340:18
**fast**  130:19
**fault**  183:15,24
**favor**  140:3
**favored**  138:21
139:2,4,16
**favoring**
139:23
**fb**  1:6
**february**  68:12
78:25 165:13
165:17 193:2
200:15,16
202:12,24
205:20 206:12

225:24 246:22
247:7 249:2,3
251:21 257:4
303:2,14 308:6
309:22 316:5
323:24 326:13
345:24 350:15
355:8,9 356:10
360:18 361:14
361:16 362:10
362:12
**federal**  4:15
80:10,16 88:9
**feedback**
143:13,17
**feel**  23:17 72:17
253:6
**feeling**  22:19
**feelings**  345:21
**fees**  123:16,18
**fell**  88:21 89:24
**felt**  24:4 53:23
54:13 143:2,4
235:19 324:11
348:8 352:20
352:21
**field**  83:18
**fifth**  349:16
**file**  42:22 71:3
93:12
**filed**  4:14 70:14
71:17 72:18
78:23 80:10,16
81:9,12,18
87:22 89:4,9

92:15,20
132:18,23
165:10 168:21
171:10 286:23
286:24 288:3
292:14 301:9
339:24 342:20
342:21 343:21
**filer**  87:24
**files**  33:22 34:5
34:9 221:24
224:18 260:2
347:17
**filing**  165:20
170:4 302:13
**filings**  92:13
**fill**  9:24 10:12
272:4
**filled**  10:13
107:25 108:6
113:21
**final**  14:3,5,6
130:5
**finally**  347:10
**find**  124:21
153:24 157:2
286:16
**finding**  50:17
50:20 350:17
**findings**  47:6
47:15 50:5,7
51:20,23 65:3
**fine**  5:10 11:5
51:18 54:9,12
58:16 61:10,12

90:7 98:18
99:18 115:10
117:10 124:2
131:7 135:10
179:4,5,7
186:15,16
187:7 226:21
356:25
**fined**  103:23
**finish**  6:17,19
102:14 154:22
178:14 187:20
250:12 253:7,9
266:11 272:8
293:4 299:3
331:19
**finished**  102:16
193:23 207:8
207:10 259:8
259:10 260:12
275:10 299:5
309:3 333:14
347:3
**finkel**  275:15
275:18 335:8,9
**fired**  103:23
210:8,17
**firm**  107:15
108:2,3 109:10
119:18 122:8
122:11 124:5
125:13,24
287:11 296:16
**first**  12:15
20:25 24:20,21

**[first - friday]**                                    Page 28

| | | | |
|---|---|---|---|
| 25:8,12,16 | **flatbush** 98:16 | **food** 213:21 | **four** 19:6 21:10 |
| 26:14,24 28:9 | **flawed** 263:11 | 353:4 | 32:12 36:15 |
| 28:11,12,25 | **flexibility** | **forced** 259:18 | 267:21 283:8 |
| 29:17 37:7 | 122:20 | 259:21 | 303:20 |
| 38:21 39:6,11 | **floating** 16:14 | **forget** 209:16 | **fourteen** 81:2 |
| 50:7 56:20 | **flom** 54:5 | 312:23 | **fourth** 41:25 |
| 57:17 62:24 | **floor** 145:21 | **forgetting** | 42:2 102:7,25 |
| 92:21 96:19 | 181:25 183:11 | 228:7 | **fractured** 90:2 |
| 99:23 111:18 | 184:9 186:5,10 | **form** 9:9,15,20 | **frame** 304:17 |
| 120:7 148:8,9 | 186:12 | 9:24,24 10:6 | **frank** 282:3,9 |
| 155:5 162:16 | **fluent** 125:7,10 | 40:19 64:17,21 | 282:15 283:7 |
| 168:15 174:17 | **fmla** 307:13,18 | 64:22 65:13 | **free** 7:8 263:7 |
| 186:20 204:23 | 307:19,20 | 78:18 82:16 | **freed** 133:4,7 |
| 205:3,24 | **focus** 322:8 | 86:18 101:8,10 | 283:22 284:6 |
| 206:12 216:13 | **folders** 217:10 | 106:4 107:20 | 285:4 289:12 |
| 217:2 245:25 | 220:25 | 107:25 108:7 | 289:22 292:6 |
| 254:6 263:5 | **follow** 31:22 | 113:8 114:2,15 | 292:13 293:6,8 |
| 267:8 268:8,11 | 124:2 136:9 | 129:5 141:18 | 293:9 294:4,18 |
| 268:15 278:6 | 211:20 | 157:22 273:25 | 295:4 |
| 278:17 286:4 | **followed** | 274:15 338:9 | **freelance** |
| 286:23 287:12 | 155:18,20 | 362:17 | 123:13 |
| 289:10 291:17 | 230:6 315:25 | **formal** 94:20 | **frequency** |
| 295:11 296:21 | 316:5 317:4 | **formally** 124:8 | 355:20 |
| 297:12 302:13 | 332:22 | **formed** 245:8 | **frequently** |
| 332:12,22 | **following** 39:3 | 245:12 | 356:12 |
| 333:10 338:23 | 86:11 136:8 | **former** 12:7 | **friction** 236:5 |
| 339:14 342:5 | 150:11 156:18 | 194:11 | **friday** 12:22 |
| 347:2 355:6 | 249:17 255:10 | **forms** 208:9 | 14:17 73:2 |
| 361:21 | 256:6 274:24 | **forth** 201:3 | 179:8,16,22,24 |
| **five** 50:6 76:20 | 308:6 325:11 | 333:9 359:12 | 180:11,17,20 |
| 76:23 96:25 | **follows** 4:5 | **forward** 94:8 | 180:22 181:16 |
| 97:5,16 123:2 | 159:6 202:25 | 282:17 | 182:25 189:12 |
| 147:13 253:13 | 242:24 299:9 | **found** 41:9 | 189:17 190:9 |
| 267:3 348:4 | 319:24 | 144:11 221:24 | 190:14 196:9 |
| | | 356:19,22 | 196:11,14,16 |

206:25 207:4
217:12,16,16
217:25 218:15
218:15 219:3
219:15,16
220:15 221:3,9
221:16 223:9
223:10 305:13
305:22 306:5
315:4 324:7
325:4 347:19
**fridays**  19:23
34:9 97:7,9
178:19 179:14
182:3 216:24
217:3,7 218:23
218:23,24,25
222:14 223:16
224:19 225:17
226:5 231:3
232:23 233:2,4
307:6 347:17
**friend**  120:12
**friendly**  137:18
140:2 211:11
211:17 212:14
212:16,18
325:7
**friends**  138:5
**friendship**
140:5,6
**front**  149:2
150:3 203:7
312:12,15
315:18 346:7

346:16 348:11
352:7
**full**  177:14,19
179:2 187:20
217:7 338:23
345:3 357:3
**fun**  347:19
**funny**  313:14
313:25
**further**  168:11
206:8 277:25
278:7 359:16
**future**  351:14
352:24 353:5
353:13 354:13

### g

**gabrielle**  3:9
**gail**  191:22,24
191:25 195:17
195:19,21
233:16,20,21
233:23 234:15
234:23 271:5
292:15 311:14
**garcia**  283:25
286:17 289:14
290:11 294:3
**gena**  3:16 4:10
106:22
**gender**  164:3
**general**  16:13
20:17 27:20
48:9 67:13
100:5 146:8
183:10 186:10

263:10,15
308:10 329:15
339:10 360:13
**generally**  60:16
60:17 68:4
142:10 146:10
**generated**  47:5
47:14
**getting**  30:3
32:21 44:12
144:7 172:2
230:11,17
242:17 249:4
256:16 321:19
**gift**  53:16
263:11
**give**  6:25 8:4
27:15 106:25
111:2 119:3
219:15 261:19
272:5 291:23
338:25 346:11
346:14
**given**  80:25
85:13 94:19
109:10 183:17
219:10,20,25
222:7 232:6
243:3 270:20
272:12 359:15
**giving**  253:12
303:17 332:20
**glaser**  89:18
**go**  44:25 62:20
62:22 73:10

76:23 84:10,22
87:10 94:8
95:16 104:17
120:2,5,9,10,10
120:12 122:25
130:18 133:23
158:8 161:13
168:11 177:7
179:5 181:13
191:3,21,23
210:22,25
216:4,7 231:20
239:25 257:14
260:10 263:24
268:6 279:10
286:2 288:8
291:16 294:15
297:18 298:20
305:12 307:15
307:17 308:25
309:2,9 312:18
314:13 316:6
319:7 327:11
330:18 346:25
347:2 358:5,11
**goes**  99:14,19
106:19 251:18
276:3 288:16
308:5
**going**  4:18 5:21
6:9,23 9:19
17:15 24:5
31:14 33:8
35:9 40:3
44:12 72:23

**[going - harassing]**

73:2,10 80:7
95:9 97:17
99:9 104:21
128:18 134:13
144:5,9 156:20
173:13 178:9
178:17 179:6
180:12,14
191:20 211:19
211:20 224:16
230:15 231:3,4
233:10 239:14
241:4 244:13
253:19 265:11
266:7 267:13
269:20 270:16
282:17 286:18
286:19 297:4
309:10,11,12
312:19,19,20
314:7,9,10
316:7,8 318:5
320:21 321:20
322:9 324:7
332:17,18,23
340:6 345:23
347:18 348:24
352:25 353:2,3
353:4,9
**gonna**  54:10,12
58:16 154:3
156:20 226:18
227:22,23,23
273:5 351:3,6
353:5

**good**  4:8,9
22:19 58:20
90:9 108:13
138:7,10
146:12,13
154:16,23
158:7 159:19
160:3 226:12
266:4 312:16
351:21
**goode**  195:17
195:19,22
233:16,20
234:15 292:15
**gossett**  137:8,9
**great**  5:6 7:12
101:6 118:6
119:9 130:8
147:9,23
203:10 228:23
351:5
**greatest**  332:19
**grew**  214:10,13
**grievance**
93:13 132:11
132:20,24
**grounds**  301:12
**group**  91:8
**guardian**  88:21
88:22 90:15
91:20,23
**guess**  83:5
114:13 121:17
123:24 136:9
169:24 172:15

249:9,9 253:8
260:11 270:6
285:23 286:2
289:14 333:2
**guessing**
123:25
**guidelines**
180:5

**h**

**h**  4:2,2 94:9
159:4,4 237:7
321:23
**hair**  284:24
**half**  220:12
**hand**  14:10
48:14 68:7
168:21 182:17
359:22
**handed**  198:6
**handle**  84:21
122:8 124:10
334:25
**handled**  56:2
197:18 289:7
329:13,14
**handles**  122:11
**handling**  313:8
317:10,12
**happen**  24:6
54:13 58:24
192:17 222:20
226:24 228:8
228:11,23
233:25 316:9
318:7 351:3,6

353:5
**happened**  9:15
24:12 28:25
58:22 61:16,19
62:8 78:22
143:4 155:8
160:19 164:25
180:17 189:25
192:4 196:9,14
197:8 214:6
225:23 226:21
228:15,18,25
230:17 232:4
234:9 248:16
257:10 272:24
273:8 275:9
276:13 280:3
289:18 334:14
350:23 351:7
355:18
**happening**
153:25 199:10
199:13 226:21
258:20 325:11
332:11
**happens**  59:2
**happy**  19:5,5
20:13 21:17
22:22 96:4
134:3
**harassed**  21:19
**harassing**  23:4
28:21 59:24
78:17 346:20

**[harassment - hostile]**                                          Page 31

**harassment**
  18:14 22:9,9
  22:11 23:2
  26:6 31:20
  125:23 127:9
  130:13 158:2
  245:17 258:2
**hard**  19:16
  48:15 99:3
  121:5 325:10
**harder**  229:21
  230:7,8,23
**harmless**
  279:13
**harsh**  133:19
**he'll**  244:5
**head**  6:5 14:20
  134:20 137:2
  290:6
**heading**  102:3
  102:3 344:25
**healed**  90:5
**health**  352:14
**hear**  23:15
  27:19 72:14
  105:9 139:18
  144:9 151:20
  152:18 285:10
  292:17 294:13
  347:19
**heard**  22:21
  23:8,12,15
  60:12 117:5
  128:13 167:16
  173:15 199:17

199:25 209:16
209:20 235:24
236:6,10 250:8
280:19 285:12
290:14 313:9
322:12 325:12
328:18
**hearing**  22:20
  24:4 60:16
  94:7,9 285:4
  289:23 290:3
  292:7,9,10
  305:20 320:22
**hearings**  34:8
  34:17
**heavily**  229:5
**hebrew**  125:11
**heisler**  17:14
  134:12,12,16
  148:10 152:2
  201:10,13
  213:17 227:4,5
  227:8,13
  244:12 248:4,9
  248:14 255:9
  259:17 277:11
  277:14,16
  292:15 331:15
  331:24 341:5
**held**  2:8 111:18
  123:11 125:17
  126:4 166:3
**helen**  168:8,8
  168:12,19
  169:10,14

170:8,12
171:25 172:11
172:16 173:4
173:15,19
174:4 337:4,15
**helen's**  172:6
**help**  44:18
  333:8 350:20
  351:25 352:4
**helped**  44:10
**helpful**  293:5
  322:13 346:5
**helping**  44:3
**hereinbefore**
  359:12
**hereunto**
  359:21
**high**  89:21
  121:9
**highlighted**
  285:21,23
**hired**  50:9
  129:11
**history**  18:18
**hold**  96:7 111:2
  118:8,14 123:8
  123:12 130:21
  205:23 225:12
**holiday**  237:6
  238:4 239:4
  240:10 306:24
  349:8
**holidays**  16:14
  135:23 231:18
  231:19 236:18

237:2 239:6,14
239:19 306:15
306:18,20,21
**home**  73:5 98:5
  191:3 220:3
  239:8,22
  243:17 346:8
**honest**  84:3,5
  84:18 105:24
  144:15,19,19
  144:22 145:4
**hope**  31:21,22
  41:21 79:11,18
  122:2 144:13
  157:10 298:21
  320:8
**hoped**  208:4
**hoping**  318:14
**horrible**  349:12
**hospital**  90:2
**hostile**  25:21
  27:2 29:5 33:7
  33:13 36:22
  37:15 38:18
  44:5,6 209:13
  242:25 304:18
  305:5,9 306:12
  307:4,10,21
  308:8,10 309:5
  309:7,13,16,19
  310:12 312:2
  312:13,17,18
  312:22 316:3
  316:13,23
  317:8 348:7

Case 1:21-cv-04055-FB-RML    Document 62-19    Filed 03/11/25    Page 125 of 175
PageID #: 1904

350:13
**hostility**  18:6
  27:6 43:24
  74:3 76:10
  304:22 308:2
  308:21 309:22
  310:2,18,22
  311:25 312:8
  313:12 314:16
  315:8,9 319:25
  320:15 321:3
  326:22 327:3,8
**hour**  220:12
**hours**  19:16
  98:4 121:5,8
  121:13,23,25
  177:7,10,11,12
  177:14,23
  179:13,15
  182:24 217:5,7
  308:13,19
**how's**  31:23
**huh**  149:18
  247:18
**human**  70:15
  71:14,24
  165:11 301:4
  301:11 302:3
  302:15 339:25
  342:22
**humiliated**
  346:6 347:6
  350:8
**humiliating**
  316:20 346:16

346:22 348:11
356:19,22
**humiliation**
  345:12 346:3
  349:20 356:15
  357:7
**hung**  313:10
**hunter**  118:3
**hurt**  218:25
  223:9,10
**husband**
  131:10 138:14
  140:23 141:2,5
  141:9,11,17,25
  142:8,19
  143:14,17,25
  144:3 146:22
  146:23 149:13
  149:19,21
  150:7,19
  151:10,17
  157:15,18
  255:3 331:13
  334:8 346:9
  347:13
**husband's**
  131:11 149:6

**i**

**i.e.**  103:22
**iberia**  91:7
**idea**  154:16,23
  154:25 155:14
  225:3
**identical**
  300:10

**identification**
  12:20 48:11
  52:21 68:13
  77:4 80:24
  95:14 116:9
  119:15 128:22
  147:17 193:3
  202:14 237:14
  246:2 267:19
  269:24 285:18
  303:4,16
  329:20 338:11
  344:13
**identified**
  71:13 93:25
  165:16 241:11
  243:7 246:18
  255:8 257:5
  275:5 303:23
  337:3 356:17
  356:17,18
**identify**  246:16
  309:15 328:10
  331:8,9,12
  332:3 333:21
  333:24
**ignore**  322:10
**ii**  281:15,25
  282:2
**iii**  283:17
  292:21
**illness**  307:23
**immediate**
  220:21

**impact**  204:2
**implement**
  69:18
**implied**  205:8
**imply**  203:22
  205:9
**important**  5:23
  6:8 84:2,13,17
  84:24 85:15,20
  85:24 86:8
  341:6
**impose**  62:25
  63:10,18,24
  64:9 65:2,13
**imposed**  79:23
  79:23
**imposing**  64:7
  68:25 70:24
  79:4
**impossible**
  45:11 121:3,4
  186:3,3
**impression**
  27:20
**improperly**
  343:7
**improved**  30:4
**inability**
  354:20
**inaccurate**  17:2
  56:17 81:15
  110:14 271:14
**inaccurately**
  105:18

**[inaction - instruction]**                                    Page 33

**inaction**  167:8
  168:16
**inactions**  174:2
**inappropriate**
  272:2 273:12
**incident**  73:4
  73:16 178:8,18
  178:25 179:22
  180:2,5,10
  181:17 182:6,9
  182:24 183:5
  188:24 189:22
  196:4,25
  197:12 198:9
  198:11 199:18
  200:24 209:3,8
  209:11 213:9
  230:18 278:8
  314:18 317:12
  317:16 319:15
  320:2,4,10
  346:2
**incidents**  312:2
  312:3,7 313:12
  317:9 320:14
  321:3 326:22
  327:2,8 356:18
  356:18,22
  357:6
**include**  49:8
  208:5,10
  357:10
**included**  13:12
  49:9 60:19
  82:9,19 115:19

155:5,7 267:8
  305:15
**including**  84:6
  88:12 94:14
  114:9 255:10
  256:6 292:15
**income**  123:14
**incorrect**  105:3
**increased**
  355:17
**indefinite**
  328:3
**independent**
  54:19 340:24
  342:7
**index**  286:21
  286:22 287:2,3
  287:15,17,22
  287:24 288:18
  288:20,21,24
  289:2 290:4,9
  290:12,18,18
  290:22 291:9
  291:10,14
**indicate**  107:2
  110:22 175:9
  177:22 220:24
  246:22 248:3,9
  248:13 252:7
**indicated**
  107:15,21
  110:25 111:9
  140:25 166:7
  273:21 293:6
  300:25

**indicates**
  108:15 110:5
  112:6 117:11
  120:22 125:6
  129:7,18,24
  203:16 237:16
  286:5 295:19
**indicating**
  77:23 271:24
**indicative**
  172:5 314:25
  315:6,9 316:11
  316:14
**individual**
  328:11
**individuals**
  331:9 333:22
  337:4
**industry**  57:2
**influence**  7:24
**information**
  59:13 100:6
  102:3 111:9
  112:21 113:19
  117:14,23,24
  129:4,17 134:4
  198:3 265:23
  277:5 278:7
  283:22 298:16
  299:13 300:5
  328:25
**informed**
  328:21 329:25
**initial**  182:23
  182:24 183:3

197:4 344:9,12
  362:19
**initialed**  197:22
  198:12
**injured**  91:23
  168:20
**injuries**  89:25
  91:18
**injury**  91:17
**insisted**  18:11
  236:17
**insisting**
  236:25
**inspection**
  348:19,21,22
**inspector**  48:9
  263:9,15
  360:13
**instance**  145:10
  325:5,6
**instances**  32:8
  32:9 145:14
  221:22,23
  314:6,15
**instructed**
  250:12,14
**instruction**
  86:15,24 87:15
  103:9,13
  105:17 107:2
  181:22,24
  183:10,17
  184:8 187:9
  188:6 219:10

[instructions - jew]                                    Page 34

**instructions**
  86:12 103:16
**insulting**  202:4
**insurance**
  122:15,16
  352:6,9,10,11
  352:12
**intended**  6:25
**intense**  230:2
**intensely**  355:6
**intensified**
  309:8
**interest**  333:23
  334:2,9,17
**interested**
  359:19
**interests**  345:3
**interfere**  7:17
  216:24 218:8
  223:16,20,23
  223:25 224:10
  240:8
**interfered**
  218:14 224:12
**interfering**
  73:14 202:3
  205:3 208:21
  230:20 231:6
  304:25 308:7
  309:23
**internal**  167:12
**international**
  91:8
**interrogatories**
  245:25 361:21

**interrogatory**
  245:21 246:15
  251:17 257:2
  258:4 330:19
  330:21 331:9
  333:21
**interrupted**
  306:10
**interview**  52:19
  53:12 59:6,8
  360:16
**interviewed**
  18:9
**interviewing**
  163:15
**interviews**
  175:4
**intolerable**
  18:14 349:16
**invest**  342:10
**investigated**
  67:15,20
**investigating**
  162:20 341:3
**investigation**
  47:6,15 49:10
  51:23,25 52:3
  60:25 62:11
  67:3,12,22,24
  68:2 69:3 71:2
  71:4,5,8,16,23
  135:7 263:10
  342:7 343:5,10
**investigations**
  52:18 360:16

**investigator**
  61:10 67:8,9
  67:10 199:22
  209:25 210:2,6
  210:7,19,22
  211:9 329:13
**investigators**
  184:23,25
  186:13 197:13
  199:20 328:19
  329:4,6
**invited**  213:17
  305:11,14,24
  306:9 324:9
  325:4 347:20
**involve**  82:15
  105:20
**involved**  61:14
  69:23 157:4
  168:20 233:16
  263:12 300:21
  334:25
**involvement**
  78:4 169:15
  170:23
**involves**  164:9
**involving**  320:4
**irrelevant**
  191:8
**ish**  218:12
**island**  96:15,16
  96:18 98:25
**issue**  180:19
  191:16 202:10
  281:10 311:15

**issued**  165:12
  167:25
**issues**  73:8
  104:16 133:6
  133:14 138:11
  169:18 197:9
  230:10,10
  354:18
**iv**  50:5 51:21

**j**

**january**  17:11
  36:2 42:21
  45:25 48:9
  49:11 54:17
  62:2,9 75:10
  153:8 200:15
  200:17,18
  201:9 248:13
  248:16,19,20
  248:22 249:23
  250:23 255:10
  255:10 256:6
  258:8 295:13
  296:25 298:2,8
  298:19 306:19
  317:21,21
  332:10 340:8
  360:13
**jerman**  40:22
  43:11 320:4,10
**jersey**  120:11
**jew**  83:8
  135:13,16
  164:10,13
  167:7,11

[jew - justice]                                                        Page 35

| | | | |
|---|---|---|---|
| 172:17 173:8 | 229:21 230:8 | 272:9,12,17 | 75:11 77:3 |
| 175:18 230:24 | 230:23 236:9 | 273:8,11,20 | 107:19 124:7 |
| 232:5 233:15 | 238:23 307:16 | 274:9,11,19,25 | 140:15,25 |
| 234:5 242:12 | 339:23 350:17 | 275:4,25 276:5 | 148:18,25 |
| **jewish** 34:3 | 350:19 352:4 | 276:20 277:17 | 149:8 150:22 |
| 83:5,6 135:12 | 352:15 353:6 | 277:18,25 | 152:8 155:11 |
| 135:19 136:18 | 361:9 | 278:7,12 | 157:19 162:3,6 |
| 167:18 210:5 | **jobs** 118:9 | 279:12,18 | 162:17 168:17 |
| 210:21 212:11 | 123:11 | 280:15,24 | 217:16,25 |
| 231:24 236:18 | **joel** 338:18 | 281:8 282:3,9 | 218:12,13 |
| 237:2 238:4 | **john** 40:21 | 282:15 283:7 | 237:13 248:3 |
| 239:4,5,14,19 | 43:11 44:13 | 283:22 284:6 | 253:22,23 |
| 240:10 306:15 | 320:4,10 | 284:23 285:4 | 255:6 264:2 |
| 306:18,20,21 | **join** 305:21 | 289:7,22 292:5 | 338:24 339:14 |
| **jews** 167:18 | 306:3 324:10 | 292:13 293:6,8 | 350:15,25 |
| 173:16,17 | 347:21,21 | 295:12,15,19 | 351:6,11 355:4 |
| 209:17,21,24 | **joined** 167:23 | 295:23,25 | 355:6,21 |
| 214:20,23 | 213:22 306:4 | 296:12,18,22 | 360:10,10,20 |
| 215:3,6,10,14 | **joint** 87:24 | 297:2,5,14 | 361:18 |
| 215:18,22 | **joke** 173:16 | 298:2,7,20 | **junior** 275:22 |
| 216:2 | 215:9,13,17,21 | **judge's** 85:23 | **jurat** 357:11 |
| **job** 1:25 96:3,5 | 215:25 | 86:2,5,11,14,23 | **juries** 122:6 |
| 96:6,7,8,11 | **jokes** 167:17 | **judges** 85:21 | **jurisdiction** |
| 97:14 99:24,24 | 209:17,20,24 | 236:5 266:17 | 262:7 |
| 100:2,4 108:16 | 214:19,22 | 266:22 267:4 | **jury** 80:23 |
| 108:20 118:6 | 215:2 | 272:18 298:5 | 123:3 278:9,16 |
| 118:19 119:7 | **judge** 87:14,14 | 327:20 334:15 | 278:21,22,25 |
| 120:4,16 | 93:6 95:5,6 | **july** 69:9,12 | 280:3 284:24 |
| 121:20 122:17 | 132:22 133:2,4 | 97:15 282:11 | 311:10 360:22 |
| 123:5,8,11 | 133:5,6,7,8,21 | 321:25 355:7 | **justice** 289:12 |
| 124:9,10 | 133:23 134:2,5 | 355:21 356:5 | 293:9 294:4,18 |
| 125:17,19 | 134:6 268:16 | **jun** 151:2 | 295:4 |
| 126:4,6,13 | 268:21 270:7 | **june** 12:18,18 | |
| 128:3,5,20,24 | 270:13 271:6 | 12:23 14:17 | |
| 131:16 169:20 | 271:18,22 | 49:16 72:4 | |

**[kaplan - know]** Page 36

| k | 300:12 | 52:4 53:2,5 | 153:11 155:2 |
|---|---|---|---|
| **kaplan** 298:2,7 | **khahaifa's** 18:7 | 56:4 61:13,15 | 156:16,23 |
| **karl** 69:9,12 | 173:10 264:4 | 61:18 65:19 | 157:4 160:5,16 |
| 263:22 264:15 | **kids** 127:19 | 67:16,19,23 | 160:17 161:6 |
| 278:23 285:11 | 350:21 351:2 | 69:6 70:2 71:7 | 164:18,20,21 |
| 285:20,21 | **kind** 122:8 | 71:15,22 74:8 | 164:22,23,23 |
| 291:20 292:4 | **kings** 18:9 46:3 | 75:15,19,21,24 | 164:24,25 |
| 339:23 | 89:11,12 93:2 | 76:2 78:21 | 166:2 167:4 |
| **keely** 125:14 | 94:25 149:2 | 79:18,19 80:2 | 168:23 170:6 |
| **keep** 106:14 | 150:4 153:7 | 81:14 82:11 | 174:10,20,21 |
| 135:25 136:10 | 260:17 262:7 | 87:2 90:3 | 175:7,19,23 |
| 192:23 193:8 | **kluger** 118:7 | 91:19 92:17 | 176:14,24 |
| 193:12 286:19 | 119:7,18 | 93:15 94:7 | 177:16 178:25 |
| **keeping** 15:22 | **knew** 24:5 | 98:15,17 | 182:5 184:19 |
| 16:24 17:2 | 67:14 120:3 | 101:24 102:14 | 186:10,11 |
| 156:22 187:10 | 145:23 181:25 | 103:4 104:13 | 188:4,10 |
| 191:16 | 182:2,6,7 | 105:11,12 | 193:23 194:18 |
| **keeps** 136:4 | 213:21 220:18 | 108:6,7 109:23 | 194:19 195:3 |
| **kept** 32:21 | 222:8 231:19 | 109:24 112:18 | 197:14,24 |
| 332:20 | 231:20,21 | 115:15,20 | 198:22,25 |
| **khahaifa** 1:10 | 239:4 241:19 | 117:12 120:10 | 200:6 203:13 |
| 3:23 4:14 15:4 | 258:19 267:7 | 121:16 123:17 | 203:18 207:8 |
| 15:5 16:17 | 272:6,9 349:3 | 123:22,24 | 208:11,13 |
| 18:11 21:19 | **knocked** | 127:5 131:19 | 212:3 213:20 |
| 42:19 43:13 | 213:22 | 131:20 132:14 | 214:2,12,13 |
| 46:21 61:4,11 | **know** 5:4,8,9 | 133:19 134:21 | 216:18 217:13 |
| 66:2,14 161:19 | 5:10,20,22 | 135:4,9,17,18 | 217:14 221:5 |
| 163:11 166:21 | 6:10 7:6 11:3 | 136:2,5,16,21 | 223:22 228:20 |
| 169:5 170:7 | 21:10 22:20 | 138:14,19 | 228:24 234:16 |
| 173:5 177:24 | 23:8,12 31:8 | 139:3,10,14,21 | 234:23 235:11 |
| 179:19 180:3 | 31:13 32:3,3,5 | 140:10,12 | 238:3,6,21 |
| 216:22 223:14 | 32:19 35:5,18 | 141:21 143:2 | 245:15 251:12 |
| 227:24 261:13 | 40:18 44:15,24 | 148:12 150:8,9 | 253:10,16,18 |
| 261:13 269:14 | 45:8,14 46:3,4 | 151:9,22 152:2 | 253:20 259:8 |
| 271:5,7 300:4 | 46:25 47:2,8,9 | 152:5,17 | 259:21 260:12 |

**[know - larry]**                                                          Page 37

| | | | |
|---|---|---|---|
| 262:24 266:10 | **knowledge** | 295:22 298:6 | 43:3,8 45:8,9 |
| 268:8,24,25 | 7:22 33:4,9,11 | 299:18 302:16 | 45:10,10 73:7 |
| 271:4 272:11 | 34:18 35:14,16 | 302:20 328:23 | 73:10,10,12,14 |
| 273:17 276:7,8 | 35:19 36:7 | 329:3 | 134:12,13,16 |
| 277:4,13,15 | 46:11,14,22,24 | **knowledgeable** | 138:18 139:9 |
| 278:18 279:5 | 47:23 48:2 | 138:6 145:21 | 139:11,13,23 |
| 279:23,24 | 51:24 53:6 | 145:24 | 140:25 141:22 |
| 280:6 281:9,12 | 60:24 61:6,8 | **known** 56:14 | 143:3,4,16 |
| 281:16 283:18 | 61:21 62:17 | **koch** 1:24 2:11 | 144:2,11,14,16 |
| 286:24 287:9 | 63:7 65:9,18 | 359:8,25 | 144:17,20,22 |
| 293:18 296:20 | 66:4,6,7,11,12 | **kosher** 135:25 | 144:23,25 |
| 297:8,9,21 | 66:16,17,22,25 | 136:4,8,10 | 146:14,16,23 |
| 304:8 305:14 | 67:13,25 69:16 | **kristin** 1:24 | 147:5,25 |
| 305:17,18 | 69:20,22 70:7 | 2:10 359:8,25 | 148:10,11 |
| 308:16 314:10 | 78:3,7 113:22 | **l** | 149:19,21 |
| 314:11,13 | 114:11 169:19 | | 150:2,6,19 |
| 315:4,12 | 170:15,19,22 | **l** 4:2 159:4 | 151:6,10,24,25 |
| 316:16,20 | 170:24 171:2 | 321:23 | 152:8,23,23 |
| 318:3,5,12,22 | 188:2,5 194:13 | **labor** 174:24 | 153:9 154:15 |
| 319:5,19 | 194:16,20 | **lack** 175:13 | 156:14,16 |
| 321:24 323:5 | 195:2,9,12,18 | 351:19 | 157:8,16,21 |
| 323:13,21 | 195:21 197:18 | **laid** 74:18 | 159:14,15 |
| 324:24 327:17 | 198:14,19 | **language** 302:3 | 180:15,16 |
| 327:21 328:15 | 207:11,14 | **languages** | 191:16,21,21 |
| 330:21 331:2 | 214:14,15 | 125:9 | 191:24 192:2,3 |
| 332:11,13,24 | 219:9 223:5 | **largely** 283:24 | 192:4,15 |
| 333:8 341:16 | 224:23 225:4 | **larry** 17:14 | 195:16 201:13 |
| 341:17 344:3,6 | 234:17,24 | 18:21 19:10,14 | 201:15 202:24 |
| 348:8,9 349:21 | 254:19 260:4,7 | 20:11 22:14 | 203:11,18 |
| 350:16 352:24 | 265:22 266:2 | 24:9,23,25 | 204:3,7,9 |
| 352:25 353:5 | 268:20 269:11 | 25:8,15,20 | 205:13,19 |
| 354:7 355:13 | 270:12 271:6 | 26:5,15,18,21 | 206:16 208:20 |
| 356:16 | 280:15,22,23 | 27:2,9 28:5 | 209:4 210:4,20 |
| **knowing** | 282:8,12,15 | 35:18 36:12,23 | 211:9,15 |
| 218:25 347:20 | 284:2 295:14 | 37:9,18 40:6 | 212:10,15 |
| | | 41:2,9 42:7 | |

**[larry - left]**                                    Page 38

213:17,19
227:4,8,12,25
228:2 230:19
230:19 234:19
234:20,21,23
241:11,17,25
243:21 244:4,6
244:12,16,21
245:2,15
246:23 247:7
247:12,16
248:4,9,14
249:4 251:5,8
251:18 252:13
252:20 253:14
254:14,15
255:9 256:21
257:3,24 258:9
259:17 260:4
260:24 265:14
265:18,20,23
271:4 277:11
277:14,16,20
292:15 308:6
309:23 311:13
311:14 315:16
316:2 323:25
325:7,23
331:15,24
332:10 333:24
334:6 341:5
342:6 349:4,5
349:14,17
**larry's** 135:11
206:11 349:4

**late** 25:12,17
26:24 44:15
177:24 178:4,5
178:23 179:7,9
179:21 180:5
181:6,7,16
182:11,13
183:6,23,24
184:10,20
185:14 186:5
189:11,24
190:6,7,14,15
196:3,10 197:9
198:8 217:12
218:23 284:8
284:10 286:14
**lateness** 179:23
181:8,18 182:7
182:8,10,14,21
184:17 185:7
185:11,17,19
186:6,24 187:2
187:10 188:7
188:17 189:18
196:5 197:2,12
206:25
**laugh** 312:16
313:24
**laughed** 209:18
213:5,16,24
214:5 309:11
312:21 313:23
315:17,21,22
315:23 316:9

**laughing**
315:17
**law** 50:13
51:11 67:2
85:9,12,16
107:14 108:2,3
118:7 119:18
122:8 125:13
296:16 329:2
**lawrence** 59:4
60:20 61:9
134:12 201:10
**laws** 136:8
**lawsuit** 56:12
88:3 156:17,18
170:5 173:3
**lawyer** 74:16
80:5 89:13,17
143:18 210:23
242:19 272:13
276:24 329:10
332:19 346:24
351:5,22
**lawyer's** 279:2
279:3,8,25
280:4
**lawyers** 33:2
80:3 142:22
241:24 243:4
272:18 276:22
**learn** 139:15
142:6 209:23
215:2,9,16,24
229:8 235:21
236:3,7,11

277:6,10
**learned** 132:17
132:22 174:22
321:11
**learning** 60:14
**leave** 19:19
97:18,20,24
126:13,14,18
126:20 178:20
179:14 180:2,6
217:3,8,9,10,21
218:23 220:5
220:25 227:6
269:6 276:8
**leaving** 54:11
97:8 108:16
110:11,15,16
110:16,18,18
219:20,24
222:9 233:4
309:10 312:14
347:17
**led** 74:10 75:9
75:15 76:11
78:21 163:5
232:19 236:4
255:4 340:7
357:7
**lefkowitz** 92:23
93:13 94:22
**left** 34:10 36:8
90:3 110:20
111:10 123:10
137:8 152:24
153:13,14

**[left - long]**                                                    Page 39

179:11 181:2
214:3 217:5,6
217:6,12
220:13,15
221:3,9,15
222:4,4,8
224:15,20
256:13,14
269:8,8 307:6
308:11,12
309:2
**legal**  84:7,8
124:20 142:20
168:24 169:3
171:12,15
226:25 227:11
227:20 263:7
323:9
**length**  119:24
247:15
**lessened**  355:17
**letter**  12:18
13:18 48:9
49:13,14 68:11
70:8 78:25
79:4,22,25
119:11,13,17
119:24 120:21
140:15 162:3,7
165:17 166:16
167:25 168:16
175:6 225:23
237:9 264:14
265:5,5 267:16
304:25 326:14

329:18,24
330:8 332:12
332:22 360:10
360:13,18
361:7,23
362:15
**letters**  166:5
263:22 339:22
**level**  89:21
135:17 136:11
136:21
**library**  309:11
309:12 312:21
316:8
**license**  111:18
**lie**  8:15 106:4
146:16 246:12
272:11 335:15
**lied**  274:11
**lies**  349:25
350:5 351:8
**life**  58:24
138:12
**light**  318:17
**liked**  145:13
146:4,7 210:4
210:20 211:10
212:10,15
227:12 325:23
**likely**  29:24
57:21,22 149:5
150:10 247:13
247:24 287:24
288:4

**likes**  211:16
**lilly**  232:8
**line**  118:4
159:24,25
204:15,16
212:5,6 280:11
280:12 286:4
287:10,12
288:6,16,20,22
288:25 289:9
289:10 291:8
308:5 360:8
361:3 362:3
**lines**  38:8 110:3
255:2 258:23
325:25
**links**  173:7
**lisa**  153:2,3
240:14 249:6
249:13 268:16
332:3,4,7,9
333:16,24
334:12,13,16
341:9,9 342:6
**list**  241:19
285:19
**listed**  130:5
258:3 288:13
345:17
**listen**  187:18
187:21 288:13
**literal**  64:8
**litigant**  287:7
**litigation**  13:9
14:14 22:12

25:5 30:23
31:11 50:11
57:13 74:21
80:10 82:9,19
88:17 90:17,20
91:6,22,25
92:15 93:10
99:23 146:24
157:21 161:17
165:5 176:17
336:4,7 337:14
338:3 345:7
353:19,21
**litigations**  88:5
88:16 91:3
93:18
**litigator**  83:12
83:17,25
**little**  23:9
125:11 151:19
195:24 198:2
354:17
**live**  98:6,7,10
131:9
**lived**  131:6
**livelihood**
353:6
**llp**  2:9 3:5,12
**ln**  363:6
**located**  96:14
122:18
**location**  115:5
**long**  11:8 18:3
19:5,6 23:19
81:2 96:15,16

96:18 98:25,25
118:14 131:6
132:3 140:17
177:18 212:20
235:4,11
236:25 263:4
267:21 313:25
328:22 351:21
**longer** 17:6
45:21,24 75:10
98:23 127:3
137:11 206:24
207:19 255:17
256:12 261:20
263:25 265:4
289:12 352:12
**look** 12:25 14:3
18:12,13 24:25
25:2 26:18
29:5 38:8,18
45:17 49:2
50:4 53:25
77:6 80:15
82:22 100:20
101:7 102:2
103:20 111:16
126:18 129:21
148:8 176:21
176:22,23
200:19 202:22
207:6 213:19
216:12 222:3
222:13 241:17
242:2,5,6
244:5 261:12

269:19 285:23
290:15 327:12
330:20 338:21
350:18
**looked** 18:16
18:17 64:3
213:23 245:18
294:4
**looking** 19:17
27:23 29:11
46:8 77:12
82:5 126:20
271:10 287:9
287:11 289:3
291:9 310:9
330:25 331:2,3
**looks** 13:6
48:14,15
120:25 121:12
129:9 151:20
154:14 291:7
291:12 313:16
338:17
**loop** 154:25
155:14,22
156:22 332:11
357:2
**losses** 345:12
**lost** 97:8
226:23
**lot** 21:5 62:11
121:17 127:15
177:16 250:19
265:17 276:22
293:7 313:17

351:19,19
352:18,18
**loud** 63:22
263:20 299:8
314:2
**low** 351:20
**lower** 48:14
**lowther** 321:22
321:23
**luckily** 219:2
**lunch** 33:8
156:9 158:7,9
278:9,15,21
312:12,18
314:8 316:7
**lying** 273:21

**m**

**m** 3:9 4:2 159:4
**mabstoa** 4:24
4:25 129:12,19
177:6,9,23
286:5,21
287:10 294:22
295:4 336:6,8
336:11 363:3
**made** 21:25
27:10 32:8
44:19 57:6
65:2 66:13
69:17,17 92:14
102:5,10
110:18 122:5
123:18 190:8
190:14 198:15
200:16 201:9

201:12 209:24
215:2,9,17,25
225:5 232:21
244:11,19,21
246:12 247:6
255:20 257:2
265:20 266:22
312:23 313:11
315:23 316:2
324:5,13,14,18
330:11 333:22
334:3 348:23
**madison** 98:15
**maiden** 100:12
**mail** 12:17
13:18,22,23,25
14:2 16:9,11
16:13,24 17:2
31:7 41:9 43:3
44:2 46:2,4,5
73:12,13 77:2
77:22,22
130:24,25
144:5 152:13
153:16,17
157:10 162:17
173:4 181:3
187:16 188:3
188:15 192:23
192:25 193:7
193:11 200:20
202:11,16,23
202:25 203:11
204:17 205:6
205:18,19

**[mail - marked]**                                            Page 41

| | | | |
|---|---|---|---|
| 206:11 218:7 | 256:24 303:24 | **making**   63:8 | **manufactured** |
| 218:19,22 | 304:2,12 311:6 | 78:8 214:19 | 266:16 267:5 |
| 219:22,23,25 | 311:11,13 | 229:21 230:8 | 267:10 327:19 |
| 225:7 237:5,12 | 346:13 348:2 | 230:23 266:17 | **march**   119:14 |
| 237:19 238:18 | **mains**   342:18 | 289:25 334:21 | 247:9,14,20,21 |
| 239:2 240:16 | **majority**   55:4 | **malpractice** | 251:19 257:4 |
| 240:22 243:11 | **make**   41:14 | 134:9 | 267:14,17 |
| 247:3 250:15 | 45:2 55:12 | **managed**   55:4 | 268:4 286:15 |
| 250:16 251:15 | 64:19 73:23 | **management** | 355:8,9 356:10 |
| 269:14,17,22 | 74:19 81:13 | 188:7 270:14 | 361:7,23 |
| 269:25 271:5 | 97:8 98:20 | 270:25 271:3 | **marcus**   320:24 |
| 271:12 303:13 | 163:23 167:17 | 280:16 295:13 | 321:14 322:13 |
| 306:17,23 | 170:9 173:15 | 295:16,20 | 322:19 323:19 |
| 308:6 309:22 | 182:11 183:6 | 298:3,8 | 325:13 |
| 310:17 311:10 | 184:22 185:3 | **manager** | **marianne** |
| 338:18,22 | 188:23 189:3,7 | 145:17,19 | 308:14 314:18 |
| 348:3 360:10 | 189:13,17 | 146:3,9,12,13 | **marine**   98:16 |
| 360:20 361:14 | 190:21,22,24 | 159:15,21 | **mark**   12:15 |
| 361:16,18 | 196:10,15,16 | 160:3 170:2 | 48:5 52:15 |
| 362:5,12 | 196:24 198:16 | 172:3,7 179:20 | 68:10 80:20 |
| **mailed**   152:10 | 198:20 199:6 | 179:20 182:21 | 92:23 93:12 |
| 152:11 153:13 | 209:16,20 | 184:4 194:7 | 94:22 95:8,9 |
| 251:12 | 211:14 212:4 | 197:2,9 207:17 | 105:24 107:5 |
| **mails**   14:4 | 215:13,21 | 207:19,22 | 116:3 119:10 |
| 18:13 22:9,11 | 229:25 230:7 | 208:3,6,7,10 | 128:19 140:6 |
| 28:21 29:5 | 231:21,23 | 226:13 228:10 | 178:5 192:23 |
| 30:19,22 31:3 | 237:24 238:9 | 238:2 261:20 | 202:9 211:20 |
| 31:3 40:9,12 | 239:9,20 265:8 | 265:4 | 237:9 245:21 |
| 41:4 42:22 | 281:20 283:11 | **managers** | 267:13 269:20 |
| 43:4 152:15 | 335:15 339:2,6 | 253:3 307:19 | 302:23 329:16 |
| 217:10,14 | 356:16 357:2 | 307:20 | 338:6 |
| 220:15,20 | **makes**   73:16 | **manhattan**   1:8 | **marked**   12:20 |
| 222:9,14 | 129:3 150:11 | 4:12 286:4 | 13:2 48:11 |
| 250:17,25 | 150:17 204:22 | **manual**   57:25 | 52:20 62:4,5,9 |
| 253:21 256:23 | 341:20 343:16 | | 68:13 69:14 |

[marked - message]                                                    Page 42

| | | | |
|---|---|---|---|
| 70:19 71:6 | **maura** 58:23 | 312:9 330:5 | **meeting** 142:25 |
| 77:4,12 80:23 | 59:9 60:20 | 333:16 342:11 | 144:3 150:6 |
| 95:13 99:4,7 | **mazal** 148:10 | 347:24 355:24 | **member** 53:4 |
| 100:20 103:19 | 148:11,11,14 | 355:25 | 270:14 271:3 |
| 116:8 119:11 | **mcgivney** | **meaning** | 280:16 |
| 119:15 128:22 | 118:7 119:7,18 | 106:20,22,23 | **members** 68:5 |
| 141:13 142:15 | **mcgugins** 59:4 | 120:10 141:22 | 282:5 283:22 |
| 146:20 147:17 | **mcmanus** | 170:7 195:16 | 293:8 |
| 148:3 149:24 | 296:13 | 262:4 301:23 | **memo** 52:19 |
| 151:18 155:17 | **mean** 5:7 11:3 | **meaningful** | 59:14,14,18,22 |
| 161:14 168:5 | 17:12 23:9 | 196:13 | 60:19 64:5 |
| 177:24 178:3 | 24:21 36:21 | **means** 8:9,12 | 301:7,14 302:7 |
| 178:23 179:7 | 52:9 60:11 | 36:22 37:25 | 303:5 360:16 |
| 181:5,7 193:3 | 63:3,12 82:13 | 39:13,14 40:4 | **memorandum** |
| 202:13,21 | 83:15,22 97:10 | 55:9 63:5 | 302:25 362:10 |
| 237:11,13 | 100:17 108:9 | 82:14 101:21 | **memorialize** |
| 243:12 245:25 | 108:14 121:6 | 102:21 103:13 | 42:17 256:20 |
| 267:18 269:24 | 122:9 127:12 | 187:2 188:15 | **memorialized** |
| 285:17 303:4 | 137:17,25 | 189:18 331:5 | 54:7 166:24 |
| 303:11,15,18 | 154:2 157:11 | **meant** 117:6 | **memorializes** |
| 303:19 329:20 | 161:21 162:23 | 137:23,24 | 42:23 251:10 |
| 338:11 344:12 | 174:14 180:20 | 156:3 171:5 | **memos** 167:12 |
| **marriage** | 182:14,20 | 180:21 217:23 | 301:25 |
| 359:18 | 183:18 185:19 | 335:12 | **mental** 352:14 |
| **matt** 275:14,18 | 186:22 188:14 | **measure** | **mention** 41:12 |
| 335:8,9 | 203:22 204:20 | 302:19 | **mentioned** 45:7 |
| **matter** 180:7 | 205:9 207:21 | **mediator** 95:4 | 176:20 |
| 180:11 190:11 | 208:2 215:7 | **medical** 18:10 | **merit** 2:12 |
| 359:20 | 217:3,25 | **medication** | **message** 31:5 |
| **matters** 138:13 | 228:16 231:21 | 7:13,16,20 | 31:10 38:9,16 |
| **matzah** 136:5,6 | 232:12 233:2 | **meet** 10:25 | 40:19 42:19 |
| 209:18 213:5 | 239:10 246:7 | 11:2,8 12:6 | 149:4,11,25 |
| 213:16,18,19 | 253:9 267:3 | 148:17,25 | 151:5,23 156:6 |
| 213:24 214:5 | 272:8 273:22 | 149:12 | 156:9,11,12 |
| 214:11 | 287:22 301:22 | | 255:5 362:23 |

**[messages - name]**                                    Page 43

| | | | |
|---|---|---|---|
| **messages** 18:12 | **minutes** 73:4 | **money** 93:6 | **motion** 289:14 |
| 18:16 22:8,10 | 180:18 182:12 | 110:12,19 | 313:8 317:11 |
| 25:3,5 26:19 | 185:14,16 | 111:10 118:19 | 317:13 |
| 30:19,22 31:4 | **miranda** 96:12 | 123:18 352:5 | **motivated** |
| 31:18 36:23 | 98:8 107:14 | **month** 96:19,20 | 167:6 342:25 |
| 40:5,8,8,11,14 | 108:2,4 118:9 | 200:18 235:5 | 343:25 |
| 147:16,25 | 123:10 124:4 | 235:10 311:17 | **motive** 59:21 |
| 247:19 309:8 | **mischaracteri...** | 311:20 355:12 | 59:24 |
| 361:12 | 33:17 289:21 | **months** 28:10 | **move** 76:18 |
| **met** 4:11 10:23 | **misrepresent...** | 75:16 78:23 | 107:9 124:23 |
| 11:2,4 134:22 | 335:15 | 97:10,23 | 127:25 149:23 |
| 138:14 150:19 | **mistreated** | 237:25 253:13 | 200:4 208:25 |
| 151:10 157:18 | 44:10 | 282:13 283:8 | 236:15 240:23 |
| **method** 224:24 | **misunderstood** | 302:13 305:14 | 261:21 281:19 |
| 225:3 | 20:7 183:17 | 339:11,16 | 283:16 351:24 |
| **micromanaged** | 184:8 263:15 | 340:2 350:23 | **moved** 343:2 |
| 348:12 | **mitigate** 124:21 | 351:13,15 | 343:23 |
| **middle** 107:12 | **modified** 148:5 | 355:6 356:12 | **mta** 49:18 |
| 114:6 293:2 | **mom's** 307:23 | **morning** 4:8,9 | 50:12 51:9 |
| **midnight** 19:19 | **moment** 7:11 | 69:5 217:14 | 57:16 106:11 |
| 19:22 | **moments** | 221:6,17 | 288:5,8 291:8 |
| **mike** 67:6,7,12 | 314:12 319:6 | 222:25 247:15 | **murphy** 166:10 |
| **miles** 96:5 | 356:15 | 257:13 305:20 | 166:13 174:2 |
| **miltenberg** 3:5 | **mommy** 351:3 | 307:6 310:5 | 175:12 337:3,7 |
| **mind** 291:18 | **monday** 34:11 | **morris** 126:2 | **n** |
| 342:10 | 217:12,13,15 | 126:10,14,18 | **n** 3:2 159:2,2,2 |
| **mine** 99:13 | 219:2 221:6,9 | 126:20 127:7 | 360:2 |
| 101:17 275:12 | 221:11,13,15 | 127:10,17 | **name** 4:10 54:5 |
| **mineola** 96:15 | 221:17 222:19 | 295:25 296:5,8 | 57:24 100:5,7 |
| **minimum** | 223:22 224:3,7 | 297:15 | 100:8,12 112:7 |
| 121:7 179:13 | 224:22 233:6 | **mortgage** | 112:12,13 |
| **minute** 76:20 | 305:20 | 353:2 | 127:3,4 129:7 |
| 76:23 95:16,17 | **mondays** | **mother** 307:13 | 131:11 134:12 |
| 147:13 193:16 | 224:18 | 307:18 | 148:10 174:12 |
| 273:19 304:6 | | | 210:8 211:11 |

**[name - notes]**                                                    Page 44

| | | | |
|---|---|---|---|
| 221:18 275:10 | 324:11 | 3:8,15,15 4:13 | 340:8 342:19 |
| 285:25 291:20 | **negatively** | 26:15 35:16 | 342:21 359:4,9 |
| 291:22 308:13 | 322:6 | 37:20 45:6 | **nice** 22:20 23:8 |
| 363:3 | **neighborhood** | 50:13 51:10 | **night** 44:18 |
| **named** 142:22 | 98:14,17 | 56:9,10 58:5 | 305:22 306:3,5 |
| 162:16 270:18 | **nepotism** 68:6 | 58:10 62:25 | 306:6 325:4 |
| **names** 60:15 | **nervous** 224:19 | 63:24 70:14 | 346:8 347:20 |
| 98:19 328:15 | **nesenoff** 3:5 | 71:13,23 72:19 | **nights** 305:13 |
| 328:17 | **never** 15:19 | 89:11 95:21 | 324:8 |
| **nassau** 359:6 | 30:4 71:4 | 96:9 101:3,8 | **nine** 48:21 |
| **nasty** 25:25 | 73:11 100:8 | 108:24 109:5,9 | **nod** 23:15 |
| 26:2 | 127:18 133:25 | 109:11 115:11 | **nodded** 22:18 |
| **natural** 216:6 | 134:8 136:3,10 | 117:17 118:7 | 23:11 |
| **nature** 40:13 | 140:2 155:5,6 | 118:10 120:4 | **nods** 6:5 |
| 55:20 68:2 | 155:7 157:13 | 120:11 124:10 | **non** 152:21 |
| 89:22 122:7 | 162:20 165:2 | 126:16,21,23 | 307:20 345:12 |
| 136:22 138:3 | 166:22 184:7 | 145:25 156:25 | 362:23 |
| 225:18 233:19 | 189:23 190:3 | 165:10 197:24 | **nope** 134:10 |
| 293:15 | 194:5,7,8 | 216:23 223:15 | **normal** 231:7 |
| **necessarily** | 197:7,7,9 | 225:16 226:4 | 272:19 |
| 207:21 208:10 | 205:24 217:6 | 231:22,23 | **norman** 320:24 |
| **need** 7:5 44:25 | 225:2,7 226:21 | 232:7,8 248:22 | 321:14 322:13 |
| 80:7 95:15 | 227:2 229:7 | 249:5,13,22 | 322:19 323:19 |
| 105:23 187:17 | 235:24,24 | 250:3,6,7,8,21 | 325:13 |
| 198:2 199:5 | 236:6,10 242:3 | 255:12,15,17 | **notary** 2:13 4:4 |
| 245:21 274:4 | 250:22 267:4 | 256:5 260:6 | 358:25 359:8 |
| 301:19 332:18 | 280:19 281:3 | 266:16 286:9 | 363:25 |
| 333:7,8,8 | 291:18 297:7 | 287:2,22 | **note** 19:8,11 |
| **needed** 250:19 | 312:23 318:18 | 289:13,23 | 20:19,22 |
| 349:14 350:20 | 333:14,14 | 290:3 291:13 | 148:20 |
| 352:2 | 344:6 347:23 | 297:2 298:18 | **noted** 8:7 159:3 |
| **needs** 86:6 | 348:3,7,8,16 | 301:3,10 302:2 | 358:16 |
| 117:13 | 349:3 | 302:14 317:20 | **notes** 10:19 |
| **negative** | **new** 1:3,9,17,17 | 317:23 327:19 | 11:24,25 29:14 |
| 318:17,17 | 2:10,10,14 3:8 | 332:9 339:25 | 29:17 30:15 |

**[notes - occurred]**                                        Page 45

32:13,18 42:15
42:22,22 45:2
212:22 251:9
256:20
**notice** 12:22
13:5 15:3
46:13,18 47:5
47:14,24 49:15
64:5 65:24
68:24 69:13
70:12 72:4
73:17,23 74:14
74:22 75:2
78:16 141:13
142:15 143:7
146:20 148:2
155:16 162:18
162:23 163:5
165:12 166:25
167:3 168:4
264:5 267:8,14
268:3 298:25
299:12,19
300:22 303:11
333:3,14 351:2
351:8,17
355:19
**notices** 162:25
**november**
268:16,21
269:23 271:13
273:7 274:24
276:6 278:18
278:19 286:11
286:12 307:12

307:12 362:5
**number** 48:16
48:24 50:7
51:6,8 56:5
63:23 68:18
99:24 114:8
120:21 129:8,8
149:6,12,13
167:4 240:25
241:13 244:15
246:19 255:8
286:21,22
287:2,3,6,15,17
287:22,24
288:19,20,21
288:24 289:2
290:18,18
291:10 303:22
311:24 331:2,5
**numbers**
289:19 290:5,9
290:12,22
291:9,14
**numerous**
19:15 24:14
29:21 32:4,6
83:12,19
216:14 244:11
**ny** 128:20
361:9
**ny5992143**
1:25
**nycta** 4:21
52:19,20,24
95:12,13 99:7

128:21,22
129:15 202:12
202:13,21,23
267:17,18,21
269:23 270:5
285:17,17
303:3,3,14,15
303:19 329:19
338:10,10
360:16,17,24
360:25 361:10
361:10,16,17
361:23,23
362:6,8,8,11,11
362:13,13,15
362:17,18
**nyscef** 156:18

**o**

**o** 4:2 159:2,2,2
159:4 237:7
321:23
**oa** 4:25 5:7
129:19
**oath** 5:12 8:8
**object** 78:18
86:18 105:21
141:18 273:25
274:15 289:20
**objection** 33:16
49:21 141:6
**objections**
331:4
**obligated** 8:12
**obligation** 5:12
297:20

**obligations**
84:25
**observance**
73:15 136:12
181:2 187:14
188:13 202:3
205:4 208:21
216:25 218:8
223:16,20,24
224:11,13
230:20 231:24
232:11 238:22
238:24 239:2
240:9
**observe** 139:23
191:3 199:10
**observed**
199:12,16
214:19 284:24
**observer**
188:19,23
189:3,7
**observing**
237:6
**obtain** 166:16
**obtained**
260:16 261:7,8
**obvious** 201:25
**obviously**
324:6
**occasion**
284:23 307:16
**occasions** 11:9
**occurred** 316:4
343:6

**october**   129:25
329:19 362:15
**offended**   73:13
**offer**   119:11,17
119:24 126:16
**offered**   44:18
162:24
**office**   16:14
17:15 18:21
19:3,19 20:11
34:9 39:3 48:8
52:11 53:4
54:11,16 59:5
60:24 61:22
62:15 67:16
96:25 97:2
115:8 156:17
166:22 167:24
173:5 181:2
191:25 195:16
197:20,21
198:5 213:17
220:2,6 224:21
227:10 239:14
243:15,15
250:5 253:2,16
259:25 263:9
308:12,15,17
308:19,22,23
308:25 309:2,6
320:5,10
333:11 360:13
**officer**   274:12
279:4 280:5
293:22 294:5

294:14
**officers**   50:13
51:11
**offices**   2:9
**official**   15:20
15:14 16:22
17:6,11 45:24
**oh**   13:12 18:3
21:16 25:21
28:20 41:12
54:8 79:8 83:4
94:9 98:2,22
101:20 108:12
118:16 120:8
121:3 122:3
125:5 126:14
127:6 128:14
128:16 148:22
149:5 150:9,22
154:10 156:20
161:25 197:23
209:2 213:6
246:25 248:17
249:3,8 253:23
253:24 256:4
257:12 286:13
317:19 319:15
319:19 340:6
**oig**   47:6,15,21
48:5 49:10
51:2,22 52:12
59:20 61:8
63:17 65:3
67:3,3,12,18

68:3 135:7
**oig's**   52:10 53:4
54:16 60:24
61:22 62:15
63:9 65:11,12
67:16 69:3
**okay**   4:15,24
5:10,25 6:3,6
6:20,21 7:8,9
7:12 9:5,19
10:2,18 11:8
12:14,15 13:20
14:8,11,16
16:2,20 17:5
17:12,19,25
19:2 20:2,4,11
20:18 21:12
22:23 24:7,20
25:14 28:3,17
29:20,25 31:16
31:24 33:24
34:14 36:8,10
37:4,7 38:21
39:6 40:3,16
40:23 41:5,24
41:25 43:5,16
43:23 44:25
45:20 46:6
47:4,13,22
48:4 50:4,25
51:18,18 53:2
54:6,15,24
55:17 56:6,6
56:19 57:7
58:11,20 59:3

60:4,23 61:12
62:7 64:3 66:3
66:20 68:9,14
68:19 70:10
71:15 72:2,7
72:14,17,23,25
73:20,22 75:4
75:6,18 76:14
76:17,18 77:11
77:16,18,21
78:12,24 79:8
80:14,19,20
81:5,13 82:22
83:24 84:12,16
84:23 85:6,14
86:7,21 87:5
87:13 88:4,9
89:19 90:5
91:3,21 93:16
94:11 95:6,24
96:3,6,14
98:18 99:4,6
99:16,19 100:5
100:14,19,23
101:6,13,25
102:2,17,25
103:8,12,15
104:4,7,17,21
106:24 107:9
107:12,18,24
108:19 109:12
109:15,19,22
110:3,10 111:8
112:4,5,14,19
113:2 114:5,14

**[okay - okay]**                                                           Page 47

| | | | |
|---|---|---|---|
| 114:17 115:10 | 167:20 168:7 | 230:12 232:3,7 | 281:14,19,25 |
| 116:2,13,16,25 | 170:21,25 | 232:10 236:15 | 282:19 283:16 |
| 117:3,4,10 | 171:9,20,21 | 237:4,22 | 283:21 284:5 |
| 118:6 119:5,9 | 172:14,22 | 238:15 239:12 | 284:22 285:8 |
| 119:20 120:15 | 173:7 174:3,19 | 240:4,23 | 285:13,19 |
| 120:21,25 | 174:20 175:8 | 242:14 243:9 | 286:2,18,25 |
| 122:7,14,17,17 | 176:21,22 | 244:9,25 246:6 | 287:14,19,21 |
| 123:4,17 124:2 | 177:4,5,22 | 246:11,14 | 288:2,5,15,16 |
| 124:3,8,14 | 178:5,6,21,24 | 247:9,14 248:8 | 288:18,22 |
| 125:6,22 126:2 | 179:4,12,15 | 248:13,22,25 | 290:12 291:7 |
| 126:13 127:6 | 181:5,9,12,21 | 249:16 250:2 | 291:12,16,18 |
| 127:21 128:5 | 186:4 187:8,19 | 251:3,7,17 | 292:2 293:2 |
| 128:10,17 | 188:11 191:15 | 252:16,22 | 295:7,10 |
| 129:3,11,23 | 192:22 193:7 | 253:22 254:11 | 296:21 297:5 |
| 130:4,4,8 | 193:18,22 | 255:8,23 | 297:11,25 |
| 131:3 132:9 | 194:9,25 | 256:18 257:9 | 298:11 299:6 |
| 134:5,24 135:5 | 196:25 198:4 | 257:16,17,23 | 299:17 301:6 |
| 135:10 140:4 | 199:24 200:4 | 259:6,10 | 302:4,6,23 |
| 140:14 141:15 | 200:12 201:7 | 260:10,14,15 | 303:5,17 304:6 |
| 143:22,22 | 202:15,21 | 261:9,12,23 | 304:10,15,20 |
| 144:11 147:9 | 203:10,16 | 262:4,18,23 | 306:14 307:3 |
| 147:23,23 | 205:17,25 | 263:3,18,24 | 310:9 311:5,8 |
| 148:8,13,16 | 206:2,10,11 | 264:10,22 | 312:6 319:4 |
| 149:23 150:21 | 207:6 208:12 | 265:8,11,19 | 320:2 321:6,15 |
| 152:3,6,20 | 208:16,25 | 266:3,7,13,23 | 322:2 323:12 |
| 153:4 154:14 | 210:24,25 | 267:20 268:2,6 | 323:17 325:9 |
| 155:13,19 | 211:19 214:16 | 268:14,15 | 325:15 326:6,9 |
| 157:6 158:6 | 214:22,25 | 269:11,16,18 | 326:21 327:6 |
| 159:13,20 | 215:5,24 216:4 | 270:6,16 | 327:18,22,25 |
| 160:2,23 161:6 | 216:20,21 | 271:10 274:9 | 328:2,10 |
| 161:13 162:9 | 217:2,20 219:4 | 274:20,20 | 329:16 330:20 |
| 162:14,15,22 | 219:13,18,22 | 276:2,3,10 | 330:24 331:7,8 |
| 163:4,8,12 | 220:5,24 221:7 | 277:19,22 | 331:21 332:9 |
| 164:19 165:3,8 | 222:18 223:8 | 278:3,6 279:12 | 332:18,18 |
| 166:8,12 167:9 | 225:9 226:3 | 279:16 280:14 | 333:19,20 |

**[okay - p000603]**                                                    Page 48

334:6,16,20
335:3,6,10,13
337:17 338:13
338:17,23
339:5,8,9
340:10,11,17
341:17,22
342:12 344:7,8
344:19,24
345:9,9,20,23
345:25 352:17
356:3 357:5
358:4,7
**old** 250:7,10
**omitted** 53:16
**once** 40:21 58:3
71:3 106:12
144:4 177:24
178:22 179:7
192:17,18
197:20 199:11
199:16 228:11
228:11,12
250:5 281:16
301:3 355:12
355:12
**ones** 36:20
39:12 71:12
175:11 244:23
244:24
**online** 95:25
111:3
**onset** 354:22
**open** 86:15,23

**opening** 122:5
126:24
**operating** 1:8
4:12
**opinion** 136:11
136:13,20
141:15 145:16
145:18,20,23
146:2,3,8
147:6 205:13
205:15 206:14
206:15 207:5
245:8,12
291:23 299:20
**opportunity**
80:5 229:4
264:3,12,25
265:5
**oral** 257:3
**order** 51:23
170:2 288:10
**orders** 85:6
**organization**
132:11,19
**original** 46:6
**originally** 49:8
**orthodox** 83:5
83:6,8 135:13
135:16,17
164:10,12
167:7,11,18
172:17 173:8
173:16 175:18
214:23 215:5
215:10,22

216:2 230:24
232:5 233:15
234:5 242:11
**outcome** 67:21
92:8,25 114:19
251:4 252:3,16
359:19
**outings** 306:2
**outside** 50:9
53:24 60:5
106:5 124:15
124:19 126:21
137:19 138:12
263:8,12
**overall** 127:13
**overload** 226:4
**overloaded**
223:14 225:15
226:15
**overloading**
229:19
**oversee** 289:13
**overwhelmed**
216:23
**own** 5:21 60:13
91:24 199:17

| **p** |
|---|

**p** 3:2,2 48:14
48:18,21 55:9
55:18,22,24
56:2 68:19
77:13 116:5
147:20 149:24
151:2,18
154:14 237:16

275:24
**p.m.** 158:9
159:3 205:20
218:6,7 233:4
271:13 358:16
**p000160** 77:3
360:21
**p000161** 77:4
360:21
**p000194** 68:12
360:19
**p000277**
237:13 361:19
**p000312** 193:2
361:14
**p000313** 193:3
361:14
**p000351** 116:8
361:6
**p000400**
147:16 361:12
**p000409**
147:17 361:12
**p000410** 12:19
360:11
**p000414** 12:20
360:11
**p000415** 48:10
360:14
**p000423** 48:10
360:14
**p000602**
119:14 361:8
**p000603**
119:15 361:8

**[page - people]**                                          Page 49

**page** 13:4,23
  48:16,18,21,25
  50:4,5 52:23
  56:7,7,19
  62:22 68:18
  77:13 99:8,23
  100:15 101:7
  103:18 107:11
  107:12 110:4
  110:11 112:6
  114:6 129:15
  129:16 148:8
  149:3,24
  151:18 159:24
  159:25 202:22
  203:8,11
  204:15,16
  212:5,6 237:15
  238:12 266:9
  268:6 270:4
  280:11,12
  286:4 287:12
  291:7,12,17,17
  303:19 333:20
  338:24 339:6
  344:24 357:10
  360:3,8 361:3
  362:3,23
**pages** 77:16
  81:2 147:21
  267:21 303:20
  304:7 338:13
  338:14
**paid** 50:12
  183:12,19,25

184:21 185:3,9
  185:16,20
  186:6,17 187:2
  187:4 189:19
  236:17 237:2
  240:9,10
**pandemic**
  220:4 237:5
  239:7,20
  243:16 253:15
  350:25 351:4
**paragraph**
  54:24 56:8,20
  82:23,23 83:2
  83:4,5,6,10,11
  176:23 193:18
  200:5 201:3,8
  201:20,22
  202:2 205:3
  207:7 208:12
  208:17,25
  216:13,13
  225:10 236:23
  243:10 244:9
  259:7,14
  260:10 261:12
  262:24 263:4
  263:23 266:9
  268:8,12
  277:23,24
  285:4 295:11
  295:19 297:12
  297:25 327:12
  327:15,22
  328:5,8,12

338:23 339:3,4
**paraphrasing**
  264:2 343:17
**park** 98:16
**part** 47:10
  57:22 172:6
  196:11 225:9
  271:17 332:21
**participate**
  52:2,9 163:13
  272:15 349:9
**participated**
  162:19 163:9
  164:4,6 347:22
**participating**
  91:6 169:7
**participation**
  175:7
**particular** 32:8
  119:23 145:10
  179:15 185:19
  265:19 289:14
  306:15
**parties** 359:17
**party** 70:4
  88:16 93:21
  162:16 349:8
  349:10
**pass** 129:8,8
**passed** 199:23
**passover** 120:2
  120:3,6 136:5
  209:19 213:6
  213:18 306:16
  306:24

**past** 9:15 24:3
  24:8 38:5
  298:4 351:23
**pattern** 230:6
  231:2,7 242:24
  319:24
**pause** 10:19
**pay** 68:25
  118:12 126:10
  126:10 130:5
  184:10,13
  341:19 343:15
  352:5 353:2,2
  353:3,4
**paying** 352:14
**payment** 57:8
  352:7
**pen** 102:6
**penalties** 114:8
  162:25
**penalty** 9:10,16
  9:20 10:6
  64:15 66:23
  68:24 70:22
  114:2 162:18
  162:23 165:13
  264:6 330:3,12
  330:16
**pending** 7:6
  70:16 88:6
  89:15,16,20
  249:14
**people** 54:3
  60:12 67:19
  68:7 77:23

**[people - plaintiff's]** Page 50

84:4,6 98:19
122:14 139:20
139:25 162:2
162:11,13
166:7,8 167:18
176:20 187:13
188:10,13
194:14,19
199:18 220:2
226:23 241:22
250:5 253:15
279:4,5,10,24
280:6 305:12
320:20,20,23
321:7,11,13
322:11,17
346:7,17 347:7
347:18 348:2
**perfect** 5:5
59:15 99:18
146:11 339:5
**perfectly**
132:15
**performance**
270:15
**performed**
263:8
**period** 98:7
124:5 138:22
140:5 226:3
235:7,8 239:9
258:7 351:10
353:14 354:25
355:2

**perjury** 9:10,16
9:21 10:6
114:2,8
**permission**
57:11 124:15
124:18
**permitted**
180:6 189:13
**persisted** 262:5
**person** 6:15
11:2 23:3 59:3
84:8,8,10
161:17 166:9
168:7 171:3
186:11,12
194:19 212:24
225:8 230:9
231:23 232:7,8
271:22 322:22
**personal** 33:4,9
33:11 34:18
35:14,16,19
36:7 46:11,14
46:22,24 47:23
48:2 50:10
51:24 53:6,24
60:5,23 61:6,7
61:21 62:17
63:7 65:9,18
66:3,6,7,11,12
66:16,17,21,25
69:16,20,22
70:7 78:3,7
138:12 169:19
170:15,19,22

170:24,25
188:2,5 197:17
198:14,19
207:11,14
219:4,9 223:5
224:23 225:4
234:24 260:4,7
265:22 266:2
268:20 270:12
280:14 282:8
282:12,15
284:2 295:14
295:22 298:6
299:17 302:16
302:20 328:23
329:3
**personally**
34:21 114:9
199:9 209:22
214:19
**personnel** 66:9
101:9
**pg** 363:6
**phone** 28:22
31:6,10 40:21
40:24,25 43:11
43:12 149:6,12
254:7 270:14
271:7,9,17
313:2 317:13
346:19
**photo** 19:12
20:20 155:25
156:4,5,8,9

**photographs**
18:10
**photos** 18:17
39:11 56:4
**physical** 90:6
**physically** 21:5
186:3 239:14
**pick** 123:3
216:11 266:7
**picture** 20:22
**pictures** 20:19
**pilar** 127:4
**place** 61:17
195:3 231:18
306:2 314:19
**plaintiff** 1:6 3:6
83:11 88:22
91:6,9,16
92:18 177:24
200:16 201:9
201:16,23
223:15 236:17
236:18,25
237:3 244:10
257:2 260:16
261:14 262:5
262:19 263:7
263:12 264:5
266:18,18
289:16 308:20
**plaintiff's** 13:4
14:9 68:19
119:10 245:23
263:25 287:11
308:16,19

**[plaintiff's - previously]**                                    Page 51

344:9,11
361:20 362:19
**plaintiffs** 91:15
276:18 278:10
278:16 279:20
**plan** 312:13
314:22 352:11
352:15
**plane** 91:18
**planned** 171:16
**planning**
333:12
**plans** 120:2,9
**played** 65:10
66:22
**plays** 170:16
**plaza** 115:9
**please** 23:22
24:7 29:3
33:20 40:4
41:5 43:11
63:14,22 65:6
65:16 67:11
70:10 72:5
82:22 83:2
87:7 94:3
111:3,17 114:5
124:23 153:11
161:15,16
176:24 187:24
201:18 203:23
205:10 207:7,7
208:12,16,25
210:11 211:4
213:14 225:12

225:13 226:9
231:9 236:20
237:22 241:2
248:15 259:6
259:13 262:23
266:8,14
270:23 272:22
277:22 280:10
281:14 283:17
293:3 295:7
304:15 326:4
327:22 328:2
328:10 330:20
333:20,25
338:7,12 339:5
**plenty** 189:6
**pocket** 352:8
352:15
**point** 6:3 16:20
63:23 96:23
102:4 103:2,2
108:13 140:24
171:10 216:6
238:25 245:6
245:11 269:6,8
340:7 347:8
**pointing** 143:8
202:6
**points** 27:9
50:6 114:9
**policy** 68:6
250:9,12
**poll** 118:10,23
**pops** 156:10

**position** 103:24
118:15 119:6
141:20
**positions** 119:5
123:12
**possession**
31:18 43:8,9
**possible** 18:16
43:2 44:15
56:14 101:22
112:18 121:17
173:21,23
176:2,4 177:19
251:13
**potential**
122:22
**pounced** 264:3
264:11,25
**power** 128:8
**practice** 100:9
123:5
**pre** 338:9
362:17
**preparation**
34:12 53:7
221:12,14,20
300:22
**prepare** 10:21
11:24 12:4,8
75:17 222:13
224:2,14
**prepared** 49:11
71:9,10 75:19
75:22,24
116:22 117:8

181:10 222:19
224:6 301:9
303:7,10 330:8
344:20
**preparing**
19:20 59:21
**presence**
215:13,15,21
**present** 3:21
11:11 43:16
59:10 62:13
116:20 142:3
279:22
**presented**
180:3 351:8
**pretrial** 55:4
**pretty** 121:3
263:4 266:19
301:2 332:21
**previous** 36:20
37:23 40:2
41:7 70:2 96:5
96:6,8 300:7
323:11
**previously**
23:13 76:13
78:22 90:20
99:22 113:3
149:20 241:6
241:10 245:2
246:20 250:22
255:5 301:16
315:20 323:8
325:22

**[primary - question]**                                    Page 52

**primary**
  108:22 109:4
  109:12
**prints**  99:24
**prior**  69:9
  93:20 130:12
  130:16 149:25
  152:12 219:20
  219:23 263:21
  278:8,18
  285:11 289:21
**private**  57:13
  103:24
**privilege**
  105:20 106:2,5
  106:9
**pro**  287:7,8
**probably**  16:4
  19:16 22:8
  28:10,16 30:3
  32:10,11 41:12
  90:10 97:14,15
  118:17 152:12
  152:14 154:16
  154:23 156:9
  194:8 277:4
  290:10
**problem**  58:6
  98:20 99:17
  190:10 354:15
**procedure**
  195:8
**proceeding**
  88:11 92:17,18
  94:20 95:2

**process**  169:15
**produce**  31:10
**produced**  13:9
  14:9,14 22:12
  25:4 30:23
  31:18 43:6
  77:19 99:23
  116:6 119:12
  147:23 150:13
  152:4 206:2
  237:17 238:14
**profession**
  353:7
**professional**
  2:11 86:9,10
  86:17,22
  132:10,19
  139:25 352:16
**prohibited**
  50:10 58:12
**promoted**
  137:2,3,7,16
**proper**  343:5
  343:10
**properly**
  342:11
**protected**
  164:16 175:21
**provide**  5:16
  21:24 23:8
  25:23 26:4
  27:4 65:6
  104:2 143:11
  144:6

**provided**  9:11
  9:16,21 10:7
  52:14 105:3
  111:22 117:24
  185:21 232:17
  285:11,20
  290:9 292:5
**provides**  50:8
  109:17 270:7
  285:3
**provisions**
  49:19 51:4
**pto**  238:9
  243:11
**public**  2:13 4:4
  50:13 51:10
  103:24 272:16
  272:17,21
  275:6,16
  276:15,17
  335:11,11
  358:25 359:8
  363:25
**publicly**  275:17
**punched**  19:18
  19:18
**purchased**
  287:25
**purporting**
  345:4
**purpose**  19:2
  19:13,14
  149:15,17
**purposes**  56:3

**pursuant**  180:4
**pursue**  127:11
  173:2
**pursued**  127:18
**pursuing**  169:3
  171:15
**put**  15:19 19:16
  21:17 38:6
  82:17 130:8
  149:6 161:23
  182:17 198:11
  247:9 272:22
  272:23 273:2,5
  350:5

**q**

**question**  5:5
  6:18,19,22,24
  7:7 8:24 9:23
  13:21 23:22
  26:8 35:3 43:5
  46:6 47:9,10
  52:6 53:9
  55:14 63:14,16
  65:16 72:2,11
  72:12,15 74:17
  78:2 79:9,17
  79:20 80:7
  86:6,20 87:7
  103:21 104:14
  104:23 105:11
  105:14,17,21
  107:3,6,10
  108:12 111:19
  111:22,24
  113:7,11,17

124:13 127:23
127:24 134:2
137:22 140:6
144:10,21
157:6 160:10
160:22 161:5,7
164:8 176:5
178:21 179:6
182:13 183:20
187:18,21,24
194:24 198:18
204:7,9,11,12
204:14 209:3
210:12,14
211:5 215:5
231:10 238:24
239:8,16 248:2
262:18 264:20
270:6,23 274:4
274:5 280:10
283:4 288:14
288:14 291:24
292:3 293:3
294:11,24
298:22 299:3
300:25 309:15
312:17 313:18
314:2 319:16
331:19 340:23
340:25 343:24
350:4
**questionable**
9:23
**questioned**
165:2 239:2,25

312:19 348:12
**questioning**
163:16 164:7
238:4,21
**questions**   4:19
5:17 6:17 7:10
7:14,22 20:3
52:11 79:16
80:6 103:20
111:17 130:20
206:8 240:18
293:4 334:21
335:20 336:6
358:8,10,12
**quickly**   6:9,10
117:12
**quintin**   321:23
**quote**   23:15

**r**

**r**   3:2 159:2
321:23 359:2
**race**   164:3
**rail**   96:16,19
98:25
**railroad**   98:21
98:22
**ramos**   232:8
**rarely**   138:14
**rate**   126:9,10
**rather**   141:10
141:16
**reach**   341:10
**reached**   121:16
144:4

**reaching**
253:19 334:8
**read**   23:21,23
52:7,8 53:8,10
55:15 63:13,15
63:22 65:5,15
65:17 72:16
79:8,10 87:11
91:14,19
102:13,17
103:3,7 113:10
113:12,14,16
114:13,14
121:4 159:22
159:24 176:23
187:16,25
193:22 194:22
200:5,11
203:12,15
204:13,15
205:23,25
206:10 207:7
208:12,15
211:4,6,24
212:3,5 216:17
216:20 220:19
231:9,11,12,14
260:11,14
262:23 263:20
266:9 268:7,11
268:14 270:24
277:22 278:5
280:11 281:14
281:16,18
283:17 294:25

295:7 299:7,9
299:15 304:7
314:2,4 319:17
319:18 327:22
327:25 330:22
330:24 331:7
333:4 338:25
339:3,5,8
346:13 351:12
363:6
**reading**   50:23
51:12,16 63:21
207:2 236:22
239:23 259:10
283:20
**reads**   341:18
363:6
**realized**   169:6
169:25 170:3
254:12
**really**   21:4
114:3 130:19
210:18 333:7
338:13
**realtime**   2:12
**reason**   7:6 8:3
13:7 14:12
16:25 18:20
33:5 46:23
54:21 56:16
59:16 76:2
91:13 100:25
108:15,22
109:4,12
110:11,14,16

**[reason - record]** Page 54

119:23 146:15
146:17 152:3
160:5,10,17,24
161:8 173:25
185:20 191:6,7
205:22 206:23
222:5 227:17
229:9,11
271:11 290:10
303:9 335:7
363:6
**reasonable**
184:6,18
186:14
**reasons** 56:5
74:19 108:23
239:23 311:21
326:25 328:21
341:15 342:3
342:18,18
**reassign** 306:25
307:2
**reassigned**
18:15 227:25
233:14 234:15
234:18 235:2
235:10 250:3,6
259:16 274:23
**recall** 9:6,10
10:5 11:10
12:3 16:16
18:22 24:11,16
24:18,21,23
25:10 27:19
28:5 29:22

30:11,12,14
32:7,9 36:18
37:8 38:14,23
55:5 60:16
89:3,7 93:17
93:19,20 94:3
94:13,18
126:11,12
132:13,15
133:2,21 134:5
134:25 137:3
140:18 142:21
142:24 145:10
145:12 151:14
151:17 152:7
154:11,12
176:12 192:14
192:16 200:2
213:4 221:22
224:5,8,10
253:8 257:24
296:11 304:4
310:8 312:7
314:16 320:15
326:23,24
335:25 336:5
336:15 338:5
345:19
**receive** 13:21
27:22 29:10
36:22 40:24
71:18,25
256:10
**received** 12:22
13:25 14:17,23

16:24 37:15
40:20,21 42:19
43:11 69:8
70:16 99:11
114:18,21
119:17 129:18
135:6 146:19
148:2 168:16
174:17 175:6
187:9 188:6
219:23 222:14
237:5 250:15
254:16 263:7
263:10 268:4
328:25 332:12
333:13
**receives** 84:8
**receiving** 23:18
30:9 33:22
34:5,9 40:6
224:21 247:20
256:5
**recent** 155:24
156:8
**recently** 119:12
**recess** 76:25
95:18 104:19
147:14 158:9
211:3 216:9
266:5 358:6
**recognition**
23:11
**recognize**
116:10 193:4
344:15

**recollection**
16:2 27:12
42:9 53:13
54:19 110:8
142:11 247:10
**recommend**
65:11 66:13
263:15,16
265:6
**recommendat...**
62:24 63:4,9
65:12
**recommendat...**
50:2 62:23
63:23
**recommended**
63:17 64:15
66:15 67:4
68:3,5 142:19
265:6
**recommending**
66:23
**recommends**
64:9
**record** 5:23 6:6
6:15 23:23
48:17,23 50:23
52:8 53:10
55:15 63:15,22
65:17 67:18
68:17 72:16
76:24 79:10
86:5 87:8,9,11
94:24 95:17
99:13,19

[record - religion]                                                    Page 55

104:18 106:14
106:15 113:12
113:16 133:23
158:8 159:24
187:25 204:15
210:9,22 211:2
211:6 212:5
217:24 231:11
231:14 261:5
270:24 271:25
272:16,17,22
272:24 273:2,5
275:16 276:16
276:17 278:23
280:11 294:25
299:4,9,15
314:4 319:18
329:17 335:11
358:5,11
359:14
**records**  19:18
272:21
**recounted**
284:23
**recuse**  296:18
297:16
**recused**  297:4
**reduced**  70:21
70:21
**reduction**
70:23
**redwelds**
217:10
**refer**  4:19,24
4:25 86:23

134:13 208:19
264:14
**reference**
155:16 211:14
**referencing**
65:22,23
237:20 270:2
339:13
**referral**  123:16
123:18 263:10
**referred**  86:14
123:15 178:7
193:13,16
307:21
**referring**  4:22
22:25 133:4
152:2 170:6
192:24 193:8
193:12 218:2
223:11 232:15
237:4,10
244:23,24
271:2 288:12
335:8
**reflect**  244:18
291:8
**reflected**
288:20
**reflection**
59:15 82:6
110:7
**reflects**  288:19
**reform**  86:6
**refresh**  112:10
247:10

**refused**  56:21
57:5 227:25
**refute**  292:5
**regarding**
195:7 331:11
**regards**  56:3
155:8 166:21
187:13 256:2
319:16
**registered**  2:11
2:12
**regular**  121:7
**reinstate**
339:23
**reinstatement**
124:17
**relate**  67:12
108:20 115:23
201:3 264:20
331:23
**related**  40:22
76:12 109:7
138:12 200:24
310:18,21
327:3 359:17
**relations**
174:24
**relationship**
136:23 137:14
137:20 138:2,4
138:8,9,10,17
139:8,24
226:12 232:22
263:14

**relationships**
139:11
**relay**  152:20
245:7 323:12
**relayed**  181:22
256:4 265:14
265:23 283:22
283:23 323:8
324:13
**relevant**  188:21
289:5
**relied**  343:19
**relief**  82:16
**religion**  130:13
135:11 136:15
164:2,24
201:17,24
209:7 211:10
211:16 212:17
234:4 235:15
238:22 243:24
304:23 305:6
305:10 306:13
307:4,25 308:9
309:17,20
310:2,15,17
315:3,7,11
316:12,15,19
317:18 318:2
318:21 319:14
323:20 324:5,9
324:20 325:21
325:24 327:4
339:21 356:24

[religiosity - report]                                                    Page 56

| | | | |
|---|---|---|---|
| **religiosity** | 58:8,14,15,19 | 259:2 273:16 | 134:7 208:6 |
| 238:5 239:16 | 60:9,14 89:8 | 273:18 275:10 | 227:9,11,17 |
| **religious** | 90:18,23 91:4 | 275:12,14 | 228:13 237:25 |
| 135:19 190:19 | 91:5 92:2,10 | 276:11,12,15 | 259:25 285:4 |
| 201:10,13 | 93:15 94:2,21 | 276:16 277:3 | 289:22 290:2 |
| 202:3 205:4,21 | 102:19 103:11 | 278:5,11 | 292:7 |
| 206:13,17 | 110:2 111:7 | 279:17 281:7 | **removing** |
| 208:21 240:8 | 115:7 117:7 | 281:11 292:3 | 208:5,10 290:8 |
| 244:11,20 | 127:4 130:3 | 295:6 305:19 | **renovating** |
| 246:18 305:2 | 132:6 133:19 | 305:19 307:6 | 58:24 |
| 309:24 350:14 | 133:25 135:10 | 308:18 312:5 | **repeat**  55:13 |
| **rely**  229:5 | 140:18 143:21 | 312:10 313:13 | 79:17 84:15 |
| **remain**  81:24 | 144:6,8 151:12 | 314:20,24 | 87:6 105:13 |
| **remained** | 154:13 159:19 | 316:10 317:14 | 187:23 274:5 |
| 207:17 | 168:18 169:12 | 317:21 319:10 | 279:25 280:9 |
| **remember**  12:2 | 169:13,23 | 322:4,5,24 | 294:23 |
| 14:2,4,15,20 | 176:11,15 | 323:5,10,16 | **repeatedly** |
| 15:18,20,20 | 178:6 194:4,5 | 325:7,15,17 | 106:11 284:7 |
| 16:15 20:8,15 | 197:16 209:9 | 326:2,17,18,19 | 284:10 348:13 |
| 21:9 22:18,19 | 213:8,13 214:2 | 334:4,5,18 | **rephrase**  5:25 |
| 22:19 24:15,24 | 220:23 221:17 | 336:18,22,24 | 143:24 164:9 |
| 26:12,13,16,17 | 221:18 222:21 | 337:2 344:18 | 201:6 211:7 |
| 27:7,8,11,17,22 | 222:23 224:15 | 344:19,23 | 214:17 295:2 |
| 28:11,14,18,20 | 224:17,17 | 346:21 348:14 | **replaced** |
| 28:21,24 29:7 | 228:7,9 233:17 | 350:25 351:2 | 137:13 |
| 29:8 30:2,6 | 234:11 235:11 | 356:13 | **report**  47:21 |
| 32:22 37:2,6 | 235:19 242:6 | **remembered** | 48:5 49:10,17 |
| 37:10 38:2,12 | 243:19 244:3,8 | 194:6 320:3 | 50:21 51:2 |
| 38:20 39:20,22 | 249:3,10 | **remembering** | 52:12 53:12,14 |
| 40:10,15 41:17 | 250:17 251:4 | 32:18 | 59:22 62:21,22 |
| 41:21,23 42:13 | 251:13,16,23 | **remote**  96:22 | 65:4,5 73:4 |
| 42:14 43:2,4 | 252:5,15,16 | 122:20,22 | 135:7 179:22 |
| 44:14 45:19 | 253:4,25 | **removal**  233:18 | 180:2,10 |
| 54:7,10,13 | 256:24 258:15 | **removed**  75:16 | 181:17 182:7 |
| 55:11 57:23,25 | 258:17,23,24 | 76:11 90:7 | 182:10,24 |

[report - retaliate]                                                    Page 57

183:6 184:18
184:24 185:2
188:24 189:22
192:19 196:5
196:25 197:12
198:10,11
199:19 230:18
242:16 300:11
**reported**  1:23
268:17,22
270:8,13 271:7
278:2,7,15
282:9 284:7
**reporter**  2:11
2:12,13 6:6,14
52:16 105:8
128:7 257:18
324:22 348:20
356:8
**reports**  349:25
350:6
**represent**
31:14 50:10
57:11 99:10
168:25
**representation**
50:11 290:2
**represented**
279:21
**representing**
49:7 56:11
57:13 112:21
113:18
**reprimanded**
103:23 132:10

**request**  27:21
32:8 41:15
57:11 72:19
73:6 77:24
78:4,9 152:21
190:6,15
340:24
**requested**
36:12 42:10
247:17 260:16
**requesting**  42:8
42:13 244:17
257:13 260:24
**requests**  44:22
74:4 362:21
**require**  221:10
221:19
**required**  97:3
103:3 127:15
184:21,22
220:21 221:12
221:14 222:19
224:6
**requirement**
121:7,9
**reread**  270:22
**research**
105:25
**reserve**  358:13
**resign**  124:8,14
**resolve**  249:18
**respect**  72:2
142:14 145:24
157:5,22 162:4
175:5 280:17

**respectful**
85:21 86:3,17
**respond**  7:21
77:24 78:5
153:14 187:21
264:19 332:16
**responded**
74:16 169:4,5
264:17 271:24
**responding**
313:18
**responds**
154:15
**response**  22:17
27:9,16 38:11
65:6 69:8,12
69:13 71:10
104:5 107:2,6
114:3 144:8
150:3,4 165:19
165:22 220:21
244:25 245:16
245:24 246:15
251:18 252:14
253:5 256:25
258:3 264:16
272:10 301:3
302:2 330:20
331:2 334:24
361:21
**responses**
21:20 22:3
245:21 330:19
331:5

**responsibilities**
121:20 125:19
126:6 169:20
**responsible**
63:8 78:8
171:6
**responsive**
144:7 146:10
263:23
**rest**  294:13
**restrictions**
213:22
**restroom**
147:11 216:6
312:11 314:21
**result**  69:6 74:3
230:21,24
285:5
**resulting**  69:4
**results**  285:16
362:8
**resume**  100:23
101:2 116:4,8
116:14,17,18
116:22 117:2
125:2,4,6
130:19,22
361:5
**resumed**  159:5
**retainer**  56:22
57:7
**retaliate**  264:3
264:12,25
315:15

[retaliated - right]                                                           Page 58

| | | | |
|---|---|---|---|
| **retaliated** | 256:11,13,15 | 203:14 206:5,9 | 43:8,10 47:7 |
| 165:6 167:21 | 262:16,21 | 207:9 208:14 | 47:25 48:14 |
| 173:23 174:2 | 302:7,8,11 | 216:19 259:6,9 | 49:20 51:20 |
| 175:25 176:18 | 311:7,18,22 | 260:13 263:2 | 57:16 58:17 |
| 245:13 | 316:24 317:2 | 266:12 268:10 | 59:12 60:18 |
| **retaliating** | 317:22 318:13 | 278:4 281:17 | 62:20 63:20 |
| 164:6 300:15 | 318:24 319:21 | 283:19 295:9 | 68:9,17 76:6 |
| **retaliation** | 323:22 326:12 | 304:9 327:24 | 76:18 77:11 |
| 31:20 72:18 | 327:9 339:18 | 330:23 331:6 | 80:14,25 81:8 |
| 74:4 75:5,8 | 339:20 340:3,5 | 339:7 344:16 | 81:23 83:11,15 |
| 76:5 125:23 | 340:9,15 | 358:14 | 85:8,25 86:5 |
| 127:9 130:16 | 342:13,17,23 | **reviewed** 81:14 | 87:17 88:3,15 |
| 158:4 160:15 | 342:25 343:9 | **reviewing** 69:4 | 89:8,20 90:3 |
| 160:19,21,25 | 343:21,25 | 268:9 289:18 | 90:19 91:5 |
| 161:4,9,12 | 344:5 357:8 | 290:4 344:19 | 92:13 93:16 |
| 165:9,14 168:2 | **retire** 135:5 | **revisit** 106:7 | 94:15 95:8 |
| 173:10,20 | **retired** 15:17 | 159:14 | 97:13 98:3 |
| 176:4,10,10 | 16:3 134:19,20 | **rhyme** 227:17 | 99:4,17,21 |
| 229:16 230:16 | 134:25,25 | **ridiculous** | 100:19,25 |
| 230:21 245:17 | 137:9,10 140:4 | 86:16,24 87:15 | 101:6,13,25 |
| 258:2 264:21 | 140:9,10 153:4 | **right** 4:18 5:10 | 102:20 103:2 |
| 308:3,4 310:3 | 199:23 | 5:14 6:5,11,22 | 103:18 104:25 |
| 310:18,22 | **return** 174:12 | 7:5,10,12 8:3,7 | 105:3 109:13 |
| 315:14,25 | 174:14 234:22 | 8:11,17 9:3 | 110:15 111:12 |
| 326:9 | 333:13 | 10:18,20,24 | 111:16,17,21 |
| **retaliatory** | **returned** | 11:11,21 12:3 | 112:9 115:10 |
| 60:2 73:19,25 | 198:13 308:15 | 12:6,14,25 | 115:11 116:3 |
| 74:15 76:8 | 308:22 309:5 | 13:12,22 14:10 | 116:10 117:7 |
| 78:17 165:18 | **review** 11:14 | 14:16,18 15:2 | 117:10,16 |
| 174:6 191:13 | 11:17 81:8,10 | 16:18 17:20 | 118:3 119:7 |
| 225:17,22 | 99:21 102:15 | 18:20 20:14 | 120:14 121:11 |
| 234:8 235:18 | 103:6,8 117:12 | 23:7 28:3,14 | 121:25 123:7,8 |
| 240:5,12 | 129:4 177:2 | 29:20 31:9 | 124:3,23 125:9 |
| 242:13,15 | 181:12 193:24 | 35:13 36:10 | 125:12 126:2,9 |
| 243:13 244:7 | 197:3 200:10 | 42:5,18,25 | 127:25 129:9 |

**[right - saw]**                                                      Page 59

| | | | **s** |
|---|---|---|---|
| 129:14 130:2,6 | 238:24 239:22 | 165:11 301:4 | **s**  3:2 4:2 89:25 |
| 130:7,10 132:9 | 243:6,9 245:19 | 301:11 302:3 | 159:2,2,2,4 |
| 132:16 134:11 | 245:20 246:15 | 302:15 305:2 | 237:7 |
| 134:16 136:14 | 247:5 248:2,11 | 309:24 340:2 | **sabbath**  34:10 |
| 141:24 145:7,7 | 248:23 251:2,3 | 342:22 | 73:6,14 180:3 |
| 146:14,18 | 251:5,11 | **rmr**  1:24 | 181:2 187:13 |
| 147:11 149:25 | 256:22 257:15 | 359:25 | 188:13,18,23 |
| 151:4 152:16 | 257:17 259:3 | **road**  96:17,19 | 189:3,4,7 |
| 152:18,22,24 | 259:21 262:2 | 98:25 | 191:3,7 202:4 |
| 153:5 154:17 | 262:23 265:20 | **role**  65:10 | 205:4 208:22 |
| 156:10 159:13 | 267:12 270:4 | 66:22 170:16 | 216:25 218:8 |
| 161:13 162:9 | 272:3 274:19 | **room**  15:7 | 218:10,13 |
| 162:25 165:3 | 276:6,14,24 | 43:14,17 269:9 | 220:6,22 |
| 166:6,8 168:7 | 280:18 281:25 | 278:9,16,21,22 | 221:10 223:17 |
| 170:9,14,18 | 282:14 283:2,3 | 278:25 279:2,3 | 223:21 224:11 |
| 171:13 174:9 | 283:16 286:8 | 279:9,25 280:3 | 224:13 230:20 |
| 175:24 176:11 | 287:3,7 288:9 | 280:4 | 308:7 |
| 176:12,16,21 | 290:13 291:18 | **rpr**  1:24 359:25 | **salary**  107:21 |
| 177:18 179:12 | 296:23 298:14 | **rq**  152:20 | 107:22 110:4,7 |
| 181:12,14,19 | 303:20 305:22 | **rule**  186:10 | 120:23 129:20 |
| 182:19 184:2 | 305:23 309:12 | 196:6,22,22 | 129:21 131:18 |
| 185:16 186:25 | 310:6 312:5,8 | **ruling**  85:24 | **sanction**  133:3 |
| 189:4,5,8 | 316:2 318:4 | 86:2 105:24 | 133:16,18,22 |
| 190:2 192:22 | 320:7 321:6 | **run**  147:10 | **sanctioned** |
| 193:4 196:7,24 | 325:10,15 | 246:20 | 134:2 |
| 197:15 199:16 | 326:15,21 | **runs**  267:21 | **sat**  279:2 |
| 200:4 202:8,20 | 327:11 331:15 | **ruttman**  15:17 | **satisfaction** |
| 203:3,3,24 | 331:15 332:3 | 16:3,12 36:6,8 | 349:2,4 |
| 207:11 209:10 | 333:17,19 | 179:20,21 | **satisfied**  349:3 |
| 210:15 211:24 | 337:20 338:12 | 180:8 181:15 | **saw**  35:4,6,8 |
| 216:8 218:11 | 338:21 344:14 | 184:9 189:25 | 56:10 117:4 |
| 219:24 223:13 | 354:7 355:23 | 196:23 197:4,8 | 140:2 198:12 |
| 224:9 226:2,7 | 358:4,13 | 197:18 198:25 | 205:24 217:15 |
| 227:22 233:12 | **rights**  70:15 | 199:14 | 219:2 234:20 |
| 234:11 236:15 | 71:14,24 | | |

**[saw - seen]**                                                    Page 60

| | | | |
|---|---|---|---|
| 245:4 253:17 | 151:2,20,20 | 77:13 96:20 | 246:4 257:14 |
| 279:8 | 155:13,24 | 111:2 129:16 | 285:22,24 |
| **saying**   25:10 | 188:3 194:10 | 155:21 163:2,7 | 286:6 287:14 |
| 30:7 40:11 | 195:6,15 202:2 | 172:25 174:18 | 287:17,18 |
| 42:20 46:2 | 203:21 204:17 | 174:18 177:4 | 288:5,6 289:8 |
| 55:11 57:25 | 204:19,23 | 193:18 236:24 | 290:17,21,22 |
| 58:19 64:13,14 | 205:2,20 | 238:12 265:12 | 290:24 291:9 |
| 68:8 106:12 | 206:22 250:9 | 267:13 277:23 | 291:14 306:23 |
| 109:9 116:19 | 266:19 287:8 | 277:24 284:6 | 310:8 338:24 |
| 121:13,15 | 287:15 289:23 | 285:3 287:15 | 339:2,4 341:20 |
| 143:16 150:15 | 290:8 297:25 | 291:17 295:18 | 352:2,7 |
| 150:15 159:19 | 300:16 330:3 | 333:2,2,14 | **seeing**   224:18 |
| 168:10 169:2 | 345:2 | 338:25 339:9 | 352:16 |
| 186:24 190:12 | **scanner**   182:17 | 351:15,16 | **seek**   124:15,18 |
| 196:2,10 205:9 | **scanners**   183:4 | 355:18 | 142:20 170:2 |
| 218:21 250:17 | **scared**   210:15 | **seconds**   173:3 | 352:3,13 |
| 269:15 276:15 | **scenario**   87:4 | **section**   74:24 | 354:19 |
| 276:16 291:20 | **scene**  348:19,21 | **sections**   51:10 | **seeking**   82:16 |
| 292:12,16 | 348:21 | 51:11 | 153:22,24 |
| 297:19,21 | **scheduled** | **see**   14:6,10 | 344:7 345:10 |
| 304:18 310:23 | 180:6 | 51:14 56:22 | 345:15 |
| 323:15 326:10 | **scheduling** | 84:5 100:15,21 | **seem**   130:6 |
| 349:25 351:18 | 281:9 | 101:10,17,18 | 213:25 |
| **says**   14:7,21 | **scooter**   88:25 | 102:5,10 | **seemed**   157:11 |
| 50:2,5,17,20,24 | 89:24 94:5 | 107:13,15 | 172:2 |
| 51:4,15,16,17 | **scope**   105:25 | 109:20 111:17 | **seems**   32:7 |
| 54:18 63:20 | **screamed** | 111:19 116:21 | 49:12 82:21 |
| 64:14 65:5,20 | 308:17 | 150:4 151:19 | 107:20 194:18 |
| 68:24 70:24 | **se**   287:7,8 | 152:7,18 | 272:8 283:7 |
| 83:5 101:18 | **search**   285:16 | 155:25 193:20 | 299:20 |
| 102:24 103:14 | 362:7 | 197:23 203:24 | **seen**   48:13 49:4 |
| 107:22 108:17 | **second**   28:15 | 203:25 206:11 | 52:22,25 68:14 |
| 110:16 114:7 | 32:10 36:13,17 | 216:15 219:2 | 77:14,16 81:3 |
| 116:20 117:17 | 38:13 39:21,22 | 237:3,15 | 128:23 129:10 |
| 148:10,24 | 50:4 54:25 | 238:11 245:20 | 202:15,16,17 |

**[seen - signed]**                                          Page 61

206:3 246:3
267:23 290:7
303:24 304:2
329:21
**selected** 109:25
**selecting**
311:10
**send** 43:3 156:6
156:11 217:9
219:11 220:14
254:18
**sending** 18:13
18:13 25:2
26:18 264:5
**senior** 61:9
275:22
**sense** 27:20
55:12 64:19
74:19 110:18
129:3 150:11
150:17 231:21
231:23 239:9
239:21 283:11
**sent** 15:2 45:25
46:4,7,12
73:12 83:20
149:9 151:5
152:23 188:16
203:11 218:3
218:19 220:9
254:13 271:13
332:25 338:18
344:17,22
**sentence** 22:25
54:25 56:20,22

57:10,17 58:4
154:22 177:5
193:20,22
194:9,23 205:2
205:12 206:12
206:22 216:14
216:17 236:22
236:24 240:24
259:11 261:22
268:15 278:6
284:6 295:18
296:21 339:9
**sentences** 178:7
193:19 195:5
195:15 203:21
263:6 270:17
341:18 345:11
**series** 265:13
356:18
**serious** 136:16
**seriously**
136:15 160:7,8
160:12,13
161:2,10,12
**served** 344:20
**service** 330:4
**services** 263:8
**set** 120:22
125:19 177:7
177:10,23
201:3 245:25
289:15 359:12
359:22 361:21
**settled** 92:9,11
122:5

**settles** 106:13
**seventh** 3:7
**seyfarth** 2:9
3:12
**shabbos** 135:20
**shakes** 6:5
**shaking** 290:6
**shame** 345:12
345:21 356:15
357:7
**shameful**
348:24 356:19
356:22
**share** 174:3
**shared** 337:18
**shavuot** 237:6
**shaw** 2:9 3:12
**sheepshead**
98:16
**sheet** 73:11
180:23 182:22
182:23 183:3
185:15 192:10
197:3 198:6,7
198:11,13,13
198:25 363:2
**sheets** 182:18
197:19 238:3
261:19
**sherri** 277:7
**shomer** 135:20
**short** 350:7
**show** 22:7 25:3
26:2 30:18,21
36:23 37:16

39:14 40:6
41:9 128:18
292:11 312:20
**showed** 11:18
18:10 19:11,12
20:19,21 22:6
25:6 26:19
31:6 32:20
38:16 39:10
62:2 247:19
**showing** 28:20
28:21
**shown** 304:4
**shows** 292:9
**sic** 107:14,14
165:17
**sick** 19:6 21:6
21:11 307:20
**side** 48:14
274:18
**sides** 163:15
283:9
**sign** 75:17
180:23,23
182:22 185:15
192:9 198:25
265:5 358:14
**signature** 112:6
112:11 359:24
363:20
**signed** 9:9,15
9:20 10:5
46:17,23 47:2
65:14 66:2,14
66:21 69:19,21

**[signed - speak]** Page 62

69:25 73:11
75:20 76:2
112:25 165:14
246:4 299:21
351:8
**significant**
39:10
**signing** 112:20
114:7
**signs** 75:11
**silvera** 295:19
295:23 297:6
298:21
**similar** 28:7,17
36:20 37:12
38:4 39:12
41:7 58:23
128:24 203:17
252:8
**simply** 193:19
**single** 19:21
186:11,12
308:11 311:20
318:8 346:15
351:5
**sit** 278:22
**sitting** 79:12
151:13 257:23
280:4,7 281:22
298:15 312:6
313:2 320:15
321:2
**situation** 58:23
169:12 185:19
203:17

**situations**
169:13
**six** 75:15 97:2,4
97:6 103:20
237:25 352:9
352:10
**sixth** 349:16
**sjb** 1:6
**skillset** 236:8
**sklarin** 107:14
**slate** 106:12
**sleep** 348:25
350:20 351:20
353:15,16,18
354:4,6,6,14,20
**sleeping** 353:11
354:17
**sleight** 69:9,12
263:22 264:15
278:23 285:11
285:20,21
291:21,21,22
292:5 339:23
**sloan** 107:14
**slone** 96:12
98:8 108:2,5
118:9 123:10
124:5
**slow** 6:10
**slur** 173:16
215:9,14,17,21
215:25
**slurs** 167:17
209:17,21,24
214:19,22

215:2
**small** 3:17
**smart** 168:8,8
168:12,19
169:10 170:8
171:25 172:16
173:4,15,19
174:4 337:4,15
**smart's** 169:15
172:11
**smith** 56:10,21
57:11,12 58:5
58:9,12
**sokoloff** 133:24
268:17,21
270:7,13 271:7
271:18,22
272:9 273:8,20
274:25 275:4
275:25 276:5
276:20 277:18
277:18 278:12
279:12,19
280:15,25
281:8
**solicited** 50:9
**somebody**
44:11 165:21
283:23
**son** 88:21 89:24
91:10 94:5
**son's** 90:15
**soon** 18:15
170:4

**sorry** 17:19
52:5 64:21
65:12 67:17
79:8 87:10
102:9 105:8
107:10 108:13
113:9 125:5
128:14 130:18
133:10 143:23
148:22 176:8
200:8 205:23
214:17 217:22
225:14 230:14
253:24 256:4
257:20 281:19
298:17 301:17
306:10 307:11
313:11,11
324:22 325:10
334:22 337:13
344:7 348:20
356:8
**sought** 124:17
124:20 139:25
168:24
**sound** 129:25
203:3
**sounds** 130:7
**source** 50:10
51:5 58:12
123:13 349:6
**spanish** 125:7
**speak** 12:10
52:10 54:16
61:3,11 125:10

**[speak - statement]**                                                Page 63

| | | | |
|---|---|---|---|
| 141:24 143:16 | 281:25 282:2 | 119:14 128:21 | 97:18 120:4 |
| 144:20 149:21 | 282:21,25 | 147:16,20 | 124:4 132:5 |
| 153:10 154:16 | 283:17,21 | 193:2 202:12 | 134:22 136:25 |
| 154:24 180:24 | 284:6,23 | 237:13 267:17 | 137:5 179:14 |
| 186:9,11 | 292:21 295:7 | 269:23 270:5 | 197:24 217:4,5 |
| 187:13 188:12 | 298:16 | 285:16 303:3 | 313:8 |
| 191:20,21,22 | **specifics** 60:15 | 303:14 329:19 | **starting** 13:4 |
| 191:23,24 | 276:11,12 | 338:10 360:11 | 48:21 52:24 |
| 192:2 255:3 | **spoke** 11:5 | 360:14,16,19 | 72:23 108:24 |
| 279:15 340:23 | 17:15 36:11 | 360:21,24 | 129:15,20 |
| 343:12 | 38:25 60:21 | 361:5,8,10,12 | 177:4 217:2 |
| **speaking** 6:16 | 61:8,23 140:11 | 361:14,16,19 | 288:18 333:25 |
| 188:16 233:17 | 140:14 186:13 | 361:23 362:6,8 | **starts** 56:21 |
| 278:9,16 | 186:14 188:10 | 362:10,13,15 | 102:4 109:15 |
| 279:17,23 | 194:10,14 | 362:17 | 148:17 152:23 |
| 320:23 325:12 | 195:4,6,17,18 | **stand** 44:17 | 154:15 193:19 |
| 326:17 | 255:9 277:21 | 106:15,16 | 202:23 216:14 |
| **speaks** 49:21 | 279:19 344:6 | 243:8 | 277:25 338:24 |
| 68:21 167:8 | 346:16 | **standing** | **state** 2:13 |
| **special** 122:12 | **spoken** 60:25 | 312:11 | 50:13 51:10 |
| 139:24 | 140:8 156:14 | **stark** 104:24 | 70:15 71:14,23 |
| **specialty** | 311:24 | **stark's** 156:17 | 88:11 89:10 |
| 122:10 | **sporadically** | **start** 6:20 72:7 | 117:18,21 |
| **specific** 20:3 | 355:5 | 72:10,23 | 165:11 188:17 |
| 37:17 42:9 | **ss** 359:5 | 107:18 109:17 | 256:25 301:4 |
| 53:13 60:15 | **stamp** 48:22 | 114:21,22 | 301:10 302:2 |
| 107:2 217:23 | 68:18 100:15 | 115:2 119:20 | 302:14 339:25 |
| **specifically** 5:6 | 100:17 101:15 | 119:25 120:13 | 342:21 343:22 |
| 42:9,12 109:6 | 101:16 155:24 | 162:14 168:10 | 359:4,9 |
| 115:7 322:2,4 | 237:16 267:21 | 177:19 178:13 | **stated** 56:21 |
| 347:25 | 303:21 | 179:8 231:22 | 57:10 58:4 |
| **specification** | **stamped** 12:19 | 305:11 321:14 | **statement** 55:7 |
| 268:7 276:2 | 48:10,14 52:19 | **started** 15:16 | 55:16 56:13,17 |
| 277:23 278:24 | 68:12 77:3 | 45:20 73:7,20 | 58:9 194:2 |
| 281:15,20,23 | 95:12 116:5,8 | 96:20 97:14,17 | 292:13 297:5 |

**[statements - support]**                                          Page 64

| | | | |
|---|---|---|---|
| **statements** | **street**  89:24 | 39:23,25 42:17 | 351:18 |
| 59:17 102:5,10 | 122:18 | 42:23 69:11 | **summarized** |
| 111:13 115:19 | **strike**  34:15 | 248:5 251:10 | 52:12 |
| 122:6 334:17 | 45:11 51:19 | 251:24 252:22 | **summary**  53:3 |
| 334:22,23 | 71:21 88:4 | 256:21 276:4 | 128:21,25 |
| **states**  1:2 54:25 | 114:18 138:15 | 279:14 284:3 | 361:9 |
| 56:8 83:11 | **stripped** | 323:2 338:22 | **summer**  97:12 |
| 268:15 339:10 | 225:11 226:8 | **substantiated** | 97:15 |
| **stating**  73:13 | 231:5 | 350:6 | **sun**  97:17 |
| **station**  98:24 | **struggle**  236:13 | **substantive** | **sunday**  19:24 |
| **status**  117:11 | **style**  235:22 | 129:17 | **sundays**  97:7 |
| 154:3,5,8,13 | 236:4 | **subtlety**  263:14 | **sundown**  97:11 |
| 167:7,11 | **subheading** | **subway**  179:17 | **sunset**  97:12 |
| 172:17 173:8 | 50:5 | **succeed**  318:15 | **superior**  84:20 |
| 175:17 230:24 | **subject**  20:17 | **successful** | 335:14 |
| 232:5 233:14 | 67:3 | 227:3 349:5 | **supervisor**  15:8 |
| 234:4 286:6 | **submission** | 351:22 | 15:12 16:17,22 |
| **stay**  123:3 | 109:16 292:4 | **sued**  54:2 94:5 | 17:6 45:22,24 |
| **stemmed** | **submitted** | 134:9 | 61:11 75:11,16 |
| 309:22 | 101:3,14,18,20 | **suffer**  349:20 | 84:20 153:6 |
| **stems**  304:24 | 111:13 112:16 | **suffered**  346:7 | 240:6,14 262:6 |
| 323:24 326:13 | 113:8 114:15 | 351:7 | 264:2 332:9 |
| **steps**  245:2 | **submitting** | **suffering** | 334:24 335:9 |
| **stop**  98:21 | 114:2 | 345:13 346:3 | 335:14 |
| 178:21 350:22 | **subpoena** | 350:10,19 | **supervisors** |
| **stopped**  230:10 | 99:12 | 351:9 | 15:11 |
| 292:6 | **subscribed** | **suggest**  156:3 | **support**  31:19 |
| **store**  352:25 | 358:22 363:21 | 286:8,22 | 34:4 72:21 |
| **stories**  266:22 | **subsection** | 316:18 339:19 | 74:7 76:7 |
| 267:10 327:19 | 51:21 | **suggested** | 79:13 162:10 |
| **story**  58:25 | **subsequently** | 334:24 | 162:19 163:9 |
| 179:2 266:16 | 194:10 | **suggests**  272:6 | 163:13 165:9 |
| 274:18 357:3 | **substance** | **sum**  36:18 | 165:16 166:13 |
| **straight**  99:14 | 32:14 36:18 | 37:11,20 38:4 | 167:9,14 |
| 99:19 | 37:11,21 38:4 | 39:23,25 323:2 | 168:14 169:10 |

**[support - take]**                                                    Page 65

172:11,15,19
173:22 175:2
176:3,9,10
177:8 178:3,22
190:18 191:4,9
196:12 200:13
200:23 201:12
201:19 207:15
209:11 214:4
217:17 222:6
223:14 225:21
227:14 228:5
232:4 233:13
234:3,8 236:21
237:23 238:18
240:5,11 241:9
241:15 242:9
242:15 250:21
250:24 255:14
255:24 256:9
257:7 259:14
259:19 260:18
261:15,24
262:10,13,16
262:20 263:19
264:11,24
266:15 267:2,9
281:22 282:20
282:24 283:5
285:9 292:21
297:11 298:24
299:11 300:6
300:17,20
301:7,13 302:6
306:7 309:18

309:25 310:13
310:20 311:6
316:18,25
317:16 318:10
318:19,23
319:2,12,21
322:15 323:18
324:2,17
325:20 326:10
327:7,15 328:3
328:7 336:2,11
336:17,24
337:10,17,24
339:20 340:4
340:14,21
341:7,13
342:17 344:4
345:21 356:21
357:6
**supporting**
43:6 266:20,24
**supports**  70:11
72:5 75:7
78:15 79:3
208:17 216:22
225:14 226:10
241:3 304:21
**supposed**
182:21,25
214:12 231:20
238:21 287:4
**supreme**  89:10
149:2 150:3
285:16 287:22
362:7

**sure**  5:20 6:4
8:23 22:4,13
45:2 61:15,18
80:5 81:13
112:18 113:6
123:4 140:16
140:17 147:12
151:16 152:19
170:9 189:9
200:17,18
211:8 216:8
218:9 238:15
241:14 265:8
281:20 290:14
312:4 320:12
330:25 335:4
339:2,6 344:17
344:22 356:16
357:2
**surface**  1:8
4:12
**surprised**
139:15,18
235:21,25
236:3,7,11,14
**surround**
213:15
**suspend**  340:3
341:19 342:4
343:15
**suspended**
103:22 110:23
111:19 329:2
342:8 349:21

**suspending**
165:13
**suspension**
68:25 69:18
70:22,24 79:4
79:24 106:17
124:6 135:6
302:13 328:4
333:10
**suspensions**
328:24
**suspicious**
165:23 172:23
**sustain**  91:18
**sustained**  91:17
**swipe**  177:13
177:13 309:2,4
347:2,4
**swollen**  21:7
**sworn**  5:11
358:22 363:21
**symptom**
354:23
**symptoms**
352:22 353:10

**t**

**t**  89:25 159:2
237:7 321:23
359:2,2
**ta**  4:21 5:8
**take**  7:8 11:24
29:14,17 30:15
49:3 56:22
57:7 61:17
67:4 73:9

**[take - termination]**

| | | | |
|---|---|---|---|
| 76:20,22 96:16 | 246:20 248:15 | 25:19,25 29:3 | 307:3 319:11 |
| 119:3 122:23 | 254:17 265:17 | 29:6 32:23 | 319:20 321:15 |
| 135:22 147:12 | 273:6 277:16 | 36:25 40:4 | 321:18 322:3 |
| 160:6,11,18,24 | 279:6 285:13 | 41:5 43:12 | 322:23 328:2,6 |
| 161:9,11 | 286:20 310:16 | 48:15 57:12,20 | 329:12 332:6 |
| 192:12,12 | 313:3 320:19 | 58:11 60:6 | 333:25 335:14 |
| 206:4,6 208:9 | 321:7 341:5,9 | 67:11 70:10 | 339:13 340:20 |
| 216:8 237:24 | 341:10 342:5,6 | 72:5 74:10 | 341:25 342:12 |
| 238:3,7 239:3 | 342:6 343:18 | 75:6 76:6 | 342:16 345:9 |
| 239:5,19 240:3 | 343:19 | 140:12 143:18 | 345:20 346:4 |
| 245:2 263:5 | **talked**  18:3 | 161:16 162:9 | 349:14,22 |
| 265:11 266:4 | 19:4 93:22 | 165:8,21 | 350:9 356:21 |
| 274:18 286:9 | 118:8 186:20 | 166:12 178:13 | **telling**  9:6 |
| 304:6 306:2 | 191:15,18 | 178:22 179:2,4 | 19:15 21:3 |
| 307:17 313:9 | 195:13 247:15 | 198:6,7 201:18 | 30:11 55:5 |
| 314:19 350:21 | **talking**  6:20 | 208:16 209:5 | 84:9 87:14 |
| 352:8,10,12 | 40:23 45:5 | 210:2,8 212:19 | 106:21 194:22 |
| **taken**  54:10 | 127:5 134:14 | 212:25 213:14 | 273:17 274:7 |
| 76:25 95:18 | 155:2 174:15 | 216:21 225:12 | 306:11 322:7 |
| 104:19 147:14 | 174:16 201:20 | 225:13,20 | 324:6 329:14 |
| 156:5 158:9 | 201:21 203:19 | 226:9 233:7 | 332:24 335:2 |
| 211:3 216:9 | 209:4 219:5,7 | 235:13,13,17 | 351:2,12 |
| 266:5 358:6 | 235:8 251:8 | 236:20 237:22 | **tells**  84:10 |
| **takes**  136:15,16 | 255:22 272:9 | 238:17 243:10 | **ten**  291:3,5 |
| **talk**  6:9 25:13 | 289:9,10 | 243:14,18,21 | 297:15 |
| 36:17 73:11 | 308:11 322:6 | 244:2,6,13 | **term**  57:23 |
| 134:11 137:18 | 322:11,16 | 245:7,11 | **terminated** |
| 140:22 141:2,4 | 323:14 334:13 | 246:11 248:15 | 103:23 111:6 |
| 141:8,11,16 | 342:5 347:25 | 255:13 257:6 | 115:14 330:2 |
| 149:19 169:22 | **tech**  131:17 | 258:8,12,14,16 | **termination** |
| 170:13 173:13 | **tell**  5:13,21,25 | 259:13 261:15 | 63:12 106:18 |
| 178:9,18 | 8:12,17 9:2,3 | 266:14 272:17 | 115:23 129:24 |
| 180:15,15 | 15:14,15 17:12 | 273:10 279:12 | 163:6 263:17 |
| 191:17 210:23 | 20:6,21,24 | 285:8 304:15 | 302:18 |
| 230:19 239:11 | 22:5,6 24:7 | 304:21 305:8 | |

**testified** 4:5
16:21 20:6,18
22:14 23:7
25:14 26:7
29:21 32:6
34:16 36:11,13
36:14 37:17
41:24 42:2,5,7
43:10 45:4,5
45:21 46:8
47:22 60:4
71:17 75:18,21
75:25 121:23
123:7 146:14
149:20 159:6
159:15 163:8
169:9 171:10
171:21 181:13
181:14 186:25
189:23 196:21
197:14 210:19
217:20 220:24
221:8 224:4
228:13 241:7
241:10 242:2
244:15 251:24
257:11,12,14
257:17 261:10
264:13,24
265:3,7,14
270:10 274:20
276:3,10
301:16,18,20
303:6 307:9
310:7,24

315:21 316:4,6
317:7 319:4
320:6 321:22
325:2,8,22
326:5,7 327:13
327:14,18
334:20 340:13
341:14,17
350:11 352:2
352:17 355:2
356:10,25
357:4 358:2
**testify** 7:17
37:24 157:3
321:20 324:12
326:4
**testifying** 40:14
41:19 185:13
196:3 320:21
356:14
**testimony** 8:5
8:25 23:5
31:17 33:12,17
33:18 34:14,25
45:3 77:8
82:14 94:12,19
113:3 114:15
114:16 140:16
143:9 159:10
159:14 160:2
171:18 177:15
177:20 186:4
189:12,16
193:15 211:22
212:11 218:20

219:13,17,18
219:19 228:17
242:4 244:18
265:16 325:24
335:4 353:17
359:15
**text** 18:12,16
22:8,10 25:3,4
26:19 30:19,22
31:4,5,10,18
40:8,11 41:9
147:15,25
148:16,24
149:3,9,11,25
150:16 151:5
151:23 152:9
152:10,11,14
152:15,16,23
153:9 154:15
156:6 157:11
255:4 309:8
361:12 362:23
**texted** 157:12
157:13 254:7
**texting** 312:24
314:8,9
**texts** 39:10
148:5 317:8
**thank** 76:17
80:19 95:7
107:9 116:2
125:2 148:17
148:24 150:2
257:22 283:2
358:8

**therapy** 90:7
**theresa** 166:10
166:13 167:5
167:17 168:11
173:25 175:12
337:3,7
**thing** 28:25
30:3 49:12
64:10,12
118:23 145:7,8
155:3,4 168:11
172:22 178:13
178:15 203:2
232:18 275:14
278:17 301:2
315:18
**things** 19:15
144:24 156:19
160:13 198:10
199:25 212:12
212:13 218:22
218:25 223:9,9
223:19 226:16
229:25 230:7
230:11 231:20
232:20 242:16
265:17 271:19
271:21 283:9
318:16,16
323:15 324:3
346:13 355:18
**think** 8:4 13:10
15:22 16:10,21
20:16 21:8
55:9,16 57:24

**[think - time]**                                                    Page 68

59:9 60:22
74:2 76:4
79:12,15 84:4
84:4 87:16
92:20,20 93:5
95:4,5 96:19
105:23 106:4
107:22 114:23
127:13,13
128:10 132:5
135:18 137:9
138:16,20,25
139:2,4,20
142:22 144:4,7
146:12,17
158:6 160:13
163:21 164:4
167:8,23
169:23 172:20
173:25 177:11
180:8 181:7,8
182:17 183:16
184:5 194:4
199:7 200:14
200:14 204:17
204:19 211:21
213:21 222:12
226:2 227:25
233:16,24
238:12 239:24
242:5 245:20
246:20,23
248:7 249:8
250:14 253:10
265:3 266:3

272:19 273:12
276:12,23
281:10 283:8
285:21 289:5
291:22 297:15
304:24 310:9
310:16 311:17
312:9 315:5
318:14 319:23
321:2,2 324:21
324:23 328:5
334:7,7 337:19
337:22 341:14
342:24 343:24
350:12 356:5
357:4
**thinking**  194:5
194:6 224:20
**third**  41:6
54:24 68:7
102:3,4,7,9
**thompson**
211:12,13
212:9 226:11
227:5,6,8,10
228:2 258:11
258:12 259:15
322:22,23
323:8 324:4,13
324:19 325:14
325:16 326:11
**thought**  17:19
20:23 93:14
102:9 120:8
127:18 128:12

144:14,16,22
146:13 184:7
234:19 235:14
235:17 236:4
243:11,21
244:6 277:4
299:5 313:25
319:15 334:23
339:18 341:15
343:17,20
348:17
**thousand**
118:20 119:3
123:21 224:16
**threaten**
133:16 171:14
**threatened**
133:3 134:6
171:12
**threatening**
133:22
**threats**  133:18
**three**  11:7
15:10 21:10
32:7 33:2
52:23 90:10
127:16,19
129:9 131:10
193:19 199:24
267:3 301:2
302:13 303:19
304:7 338:14
342:18,18,21
**thumb**  261:15
262:19

**thursday**  306:3
306:5
**time**  6:15,16
7:8 10:5 14:20
14:23 15:10,22
16:21,24 17:2
17:5 18:3
19:18,21 21:8
21:11,17 23:17
23:20 24:5,8
24:22 25:12,17
26:14,24 27:19
28:8 29:2
32:10,22 36:13
36:17 37:7
42:17 73:5,11
77:24 78:5,10
85:4,12 94:4
95:20 96:9
97:8,24 98:7
100:15,17
101:14,15,16
101:19,20
103:9 104:10
106:13 107:24
109:2,7,8,10,11
110:24,25
114:18 116:23
119:24 120:4
129:5 133:2
134:6 138:22
140:14,17
143:23 144:2
147:5 150:18
154:6,9 155:24

**[time - told]**                                                    Page 69

| | | | |
|---|---|---|---|
| 156:14 157:7 | 219:11,15 | 188:18 | 164:9 165:5 |
| 157:15,19 | 220:8 221:7 | **timekeeping** | 176:17 190:22 |
| 158:7 159:3 | 222:9,13,24 | 209:3,7,12 | 190:23,24 |
| 163:21 167:15 | 224:5 226:3 | 213:9 246:24 | 200:13 218:17 |
| 172:3,7 173:2 | 235:6,8,12 | **times**  9:5 10:24 | 228:7 241:7 |
| 173:3 174:21 | 236:17 237:2 | 11:7 23:13 | 242:3 244:15 |
| 176:13 177:19 | 238:2,10 239:9 | 32:7,11,12,19 | 257:6,23 258:5 |
| 178:17 179:23 | 240:9,10 245:6 | 34:24 36:14,15 | 261:10 264:24 |
| 180:3,6,14,23 | 245:11 252:19 | 37:23 42:24 | 265:13 281:22 |
| 182:18,22,23 | 253:3 258:7 | 94:11 199:9 | 298:15 301:18 |
| 183:3,7,12,13 | 261:6,19 266:4 | 200:2 214:18 | 301:20 310:7 |
| 183:19,25 | 279:18,19 | 214:25 257:15 | 310:25 311:24 |
| 184:2,6,11,12 | 281:5,10 288:5 | 257:16 258:16 | 312:7 316:5 |
| 184:22 185:3,5 | 295:6 296:12 | 301:3 305:5 | 320:6,16 321:2 |
| 185:9,15,22 | 296:15 299:14 | 306:11 308:5,8 | 335:18 336:4,8 |
| 186:2,7,17,20 | 301:5 304:17 | 311:24 | 336:14,21 |
| 187:3,4,10 | 305:9 307:3,10 | **timing**  165:23 | 337:13 338:3 |
| 188:24,25 | 308:11,12 | 165:25 225:5 | 345:7,22 350:2 |
| 189:3,7,13,17 | 309:10 312:10 | **tines**  32:4 | 353:20 358:8 |
| 189:19,25 | 312:24 317:5 | **title**  99:25 | **together**  136:6 |
| 190:4,5,8,13,15 | 318:8 325:10 | 100:4 128:24 | 139:5 169:8 |
| 190:24 191:16 | 334:18 346:5 | **titled**  101:11 | 173:3 198:9,12 |
| 192:9,21 | 346:15,17 | **today**  4:11,18 | 213:24 231:19 |
| 196:11,16,24 | 347:9 349:11 | 5:13 7:13,25 | 297:15 321:19 |
| 197:3,12,19 | 349:12 350:17 | 8:5,8 10:22 | **told**  17:15,24 |
| 198:6,7,11,12 | 351:10,21 | 11:15,22 25:5 | 18:6,8,8,15 |
| 198:12,13,15 | 353:14 354:22 | 31:11 41:20 | 22:14 25:14 |
| 198:17,20,20 | 354:25 355:3 | 58:21 74:21 | 26:7 29:4 |
| 198:25 199:6 | 356:9 358:9,16 | 75:2 79:13 | 37:22 38:24 |
| 199:12,15,24 | **timekeeper** | 80:4,8 82:2,3,9 | 50:25 53:19,21 |
| 206:4,6 212:20 | 186:15,16,21 | 82:18,21 92:15 | 54:8 56:9 |
| 212:21 213:21 | 186:23 194:11 | 93:21 104:12 | 57:17 58:14,15 |
| 215:8 217:11 | 194:12 | 115:22 151:13 | 58:22,25 60:18 |
| 217:15 218:3,5 | **timekeepers** | 157:20 159:10 | 60:20 61:10,17 |
| 218:12,18 | 180:13 188:16 | 161:18,23 | 61:22 73:8,8,9 |

**[told - transcript]**                                      Page 70

| | | | |
|---|---|---|---|
| 75:20 76:7,9 | 227:19,21,24 | 347:13 349:17 | **totally** 356:25 |
| 78:14 79:2,14 | 228:2,4 229:2 | 355:16 | **touch** 142:23 |
| 79:19 80:5 | 229:7 233:9,12 | **tolerate** 21:22 | 339:24 |
| 106:25 107:4 | 234:2,7,20,20 | 22:15,24 | **touro** 117:24 |
| 108:19 115:16 | 235:19 241:25 | **toll** 21:5 | **tov** 148:10,11 |
| 140:10 142:8 | 253:24 254:16 | **ton** 34:11 | 148:11,14 |
| 144:24 151:8 | 258:11 259:24 | **tony** 329:7,10 | **towards** 25:21 |
| 151:12,15 | 261:24 262:9 | 329:12 | 27:3 59:21 |
| 156:13,19,25 | 262:12,15,20 | **took** 21:5,7,10 | 173:10 301:8 |
| 157:7,14 | 263:18 265:9 | 77:8 90:2 | 319:25,25 |
| 163:25 164:22 | 265:24 272:16 | 96:18 98:4,23 | **traffic** 97:25 |
| 164:24 169:17 | 272:22 274:10 | 124:9,22 | **train** 25:12,17 |
| 169:22,24,24 | 275:15 277:20 | 128:10 156:9 | 26:24 73:3,3 |
| 170:3,7,12,20 | 278:24 279:9 | 160:13 179:17 | 98:24 99:3 |
| 170:22 173:2 | 280:15 281:3 | 195:3 228:3 | 177:25 178:8 |
| 178:8 179:25 | 281:21 282:19 | 234:3 265:4 | 178:18,25 |
| 180:7,14,16 | 282:22 292:20 | 339:10 351:14 | 179:16,17,24 |
| 181:15 184:9 | 293:22 294:15 | 353:6,7 | 180:2,5,10 |
| 184:23,25 | 294:15 298:14 | **top** 14:20 56:20 | 181:15 182:6,9 |
| 186:19 188:18 | 304:20 306:23 | 77:22 99:24 | 183:2,10,23 |
| 191:20 192:4 | 307:19 311:25 | 101:7 110:10 | 184:3,10,18,21 |
| 193:19 194:17 | 314:11 321:12 | 117:10 129:7 | 184:24 185:2 |
| 194:21 195:7 | 321:16 323:14 | 129:23,23 | 186:6,8 187:11 |
| 195:10,22 | 324:8 325:6,17 | 131:4 149:24 | 188:8 189:21 |
| 196:17 197:15 | 326:17,22,25 | 151:19 203:11 | 189:24 190:15 |
| 199:3 200:12 | 327:6 329:4 | 205:19 | 192:19 196:4 |
| 200:22 201:2 | 332:14,17 | **topics** 142:9 | 200:25 230:18 |
| 201:11 203:17 | 333:10,17 | **tort** 100:3 | 240:3 242:16 |
| 209:10,25 | 334:24 335:9 | **torts** 122:9 | 247:3 |
| 210:19 211:9 | 335:17,21 | 134:20 137:12 | **training** 57:18 |
| 211:15,25 | 336:7,10,13,16 | 138:17,21 | 58:3 |
| 212:2,9,24 | 336:19,23 | 139:8,13,16 | **trains** 185:8 |
| 213:2,18 | 337:6,9,12,13 | 183:11 188:7 | **transcript** |
| 226:24 227:8 | 337:20,23 | 199:15 343:3 | 193:14 331:20 |
| 227:10,12,18 | 346:8,11,14,21 | 344:2 | 363:2 |

**[transfer - true]**                                              Page 71

| | | | |
|---|---|---|---|
| **transfer** 18:8 | 56:9,10 58:6 | 335:14,19,24 | 231:6 233:22 |
| 22:22 24:3,9 | 58:10 62:25 | 336:3 354:11 | 235:6 241:4,23 |
| 24:23 26:15 | 63:8,17,24,25 | **transparency** | 250:4 260:17 |
| 27:13,14 28:6 | 65:2 66:4,8 | 45:15 241:18 | 270:19 275:7,8 |
| 36:12 42:8,10 | 67:4 88:6 | **transparent** | 275:9,11,23 |
| 42:13 46:5 | 109:17 111:6 | 225:2 | 278:25 281:10 |
| 98:24 146:5,7 | 111:10 121:24 | **transpired** | 282:11,13 |
| 244:17 247:17 | 124:6,9,19 | 164:21 | 283:8,10,11,25 |
| 249:12,18 | 126:17,22,23 | **traveling** 96:4 | 284:7 286:17 |
| 256:14,15 | 127:25 128:3 | **treat** 347:6 | 289:14 293:25 |
| 257:13 260:16 | 129:5 130:5 | **treated** 127:15 | 294:2 307:15 |
| 260:24 261:7 | 131:13,22 | 346:10,23 | 311:12,16,17 |
| 261:13 340:7 | 132:4 134:23 | 347:5,16 | 314:9,10 318:6 |
| 349:18 | 137:11 138:4 | **treating** 262:5 | 318:6,8,15,18 |
| **transferred** | 138:23 139:22 | **treatment** 30:4 | 320:21 321:20 |
| 21:23 23:19 | 145:25 153:5 | 30:8,9 31:19 | 321:24 322:8,9 |
| 24:5 25:9,15 | 160:11,25 | 216:15 243:2 | 347:8 349:8 |
| 26:22 27:21,25 | 161:14 177:6,9 | 255:21 328:4 | 351:5 |
| 29:11 37:19 | 177:23 207:13 | 354:19 | **trials** 19:25 |
| 41:13,15 42:21 | 209:5 215:13 | **trial** 18:9 19:6 | 138:6 227:3 |
| 46:3 72:19 | 215:17,20,25 | 19:16,21,22 | 241:21 346:6 |
| 74:5 75:10 | 235:14 243:10 | 21:18 34:7,17 | 348:4,4 |
| 145:13 160:20 | 257:25 263:9 | 34:22 35:7,8 | **tried** 83:12 |
| 240:7 248:17 | 268:22 269:13 | 35:10,10,15 | 145:11 242:18 |
| 248:21 249:22 | 270:14,25 | 39:3 43:15 | 286:14 287:4 |
| 296:24 298:19 | 271:3,11 | 44:4,7 45:12 | 322:10 341:10 |
| 301:11 317:20 | 280:16 282:6 | 45:13 55:2,10 | **tries** 145:7,9 |
| 317:23 342:19 | 283:23 285:22 | 56:5 57:14 | **trouble** 58:17 |
| 349:15 | 289:13 291:13 | 94:19 121:21 | 58:18 354:17 |
| **transferring** | 292:6,7,10 | 121:23 122:2,3 | **true** 13:3,8,13 |
| 17:16,24 | 293:8,11 | 122:4,21 153:7 | 13:24 14:13 |
| **transit** 1:8,9 | 294:17,19,19 | 199:21 225:11 | 44:19 49:9 |
| 4:12,13,20,20 | 294:21 295:3 | 226:8,11,17,18 | 50:18,22 53:3 |
| 5:2 12:7 15:9 | 295:16 296:7 | 226:23 228:14 | 55:7,16,17 |
| 15:23 50:8 | 302:17 328:19 | 229:3,5,22 | 56:13 57:14,15 |

57:20,21,22
58:10 77:18
81:15,17,20,24
82:2,3,24 83:3
83:13 110:20
111:22,23,25
112:3,22
113:20 114:12
116:13 117:24
119:16 125:7
125:16,20
126:3,6 128:6
183:5 194:2
208:8 212:2,7
214:10 229:2
234:14,16,25
235:3 246:9
249:12,15,16
268:2 273:20
273:23 274:3,6
274:8,22 275:2
275:3 278:13
278:14,17
280:24 283:4
284:25 285:6,9
297:21 333:5,7
359:14

**trustworthy**
144:12 145:2
146:15

**truth** 5:13,13
8:12,15,18,21
9:2,3,6,7
292:12 335:2

**truthful** 5:16
7:2 8:4 9:11
84:14,18 104:4
211:23 212:11
334:21,22

**truthfully** 7:18

**try** 33:13 83:19
306:14,23
332:20

**trying** 20:2
32:24 33:3,6
33:10 45:6
176:15 207:3
240:8 311:13
343:13

**tuesday** 148:18
148:25 150:3,9
150:9,12 195:6

**tuition** 353:3

**turn** 83:2,10
112:4 114:5
246:14 266:8
272:21 333:20
338:13 344:24

**twenty** 56:15
70:24 79:24
135:6

**twice** 36:13
118:17 144:5
199:17 274:11

**two** 21:6 32:11
36:14 70:16
77:16 78:23
88:5,15 93:18
95:16 98:4

111:17 120:7,7
129:15 130:19
162:25 164:22
164:25 178:7
193:18 194:19
195:15 198:10
199:25 203:21
224:16 235:2
252:11,24
253:2 257:3,15
257:16 270:16
279:5 301:5
304:7 338:13
340:2 342:20
344:25 345:11
355:6

**type** 75:23
137:25

**typed** 112:11

**typically** 6:14
220:5,11 239:5
239:19 288:2

**u**

**u** 4:2 159:4
237:7

**uh** 149:18
247:18

**unable** 224:2
353:14 354:4

**unbecoming**
274:12

**uncertainty**
351:11 354:12

**unclarity**
250:19

**unclear** 212:4
250:15

**under** 5:12
7:24 8:8 9:9,16
9:20 10:6 18:7
50:7 57:16
62:22 63:23
76:13 91:15
93:3 100:5,9
101:13 102:2
103:2 107:21
109:15 114:2,6
114:7 121:10
148:9 155:23
189:24 196:23
249:13 261:14
262:19 279:3
280:4 281:15
286:6 287:14
334:22 344:25
346:3 349:12

**underlying**
353:23

**understand**
4:15,21 5:2,11
5:24 7:3,4,14
8:8,11,14
20:25 46:2
58:22 63:16
64:16 68:22
71:20 72:11
74:12 85:12
86:20 87:3
108:12 112:19
113:18,25

**[understand - usenheimer]**                                         Page 73

| | | | |
|---|---|---|---|
| 134:14 143:19 | 187:12 188:12 | 37:20 41:13,15 | **unprepared** |
| 146:6 170:10 | 195:25 196:2 | 42:21 44:21 | 284:8,12 |
| 171:5 177:8 | 196:20,22 | 45:7,13,15 | **unprofessional** |
| 183:20 185:18 | 199:4 226:20 | 55:10,19 72:20 | 268:19 284:9 |
| 190:9 195:24 | 228:15 286:25 | 76:11,13 | 284:20 |
| 196:18,21 | 330:8,10,14 | 122:12,13 | **unquote** 23:15 |
| 211:14 227:18 | 350:3 | 146:5 153:7 | **unsure** 128:11 |
| 233:3 234:21 | **understood** | 160:20 224:25 | **untrue** 111:13 |
| 246:6 252:12 | 6:24 18:17 | 240:7 241:24 | 301:15 |
| 253:11 294:8 | 42:20 113:7 | 242:19 243:4 | **unusual** 53:25 |
| 294:24 297:3 | 183:18 186:5 | 249:5,13 250:3 | 60:6 194:5 |
| 299:22,25 | 231:2,2,3,5,18 | 250:6,7,8 | 276:23 |
| 330:5,6,7 | 250:5 | 255:17 256:12 | **unverified** |
| 335:3 343:14 | **unemployed** | 256:16 258:20 | 266:17 |
| 354:2 | 96:9 | 260:6,17 | **upset** 227:4,11 |
| **understandable** | **unethical** | 261:18 275:24 | 254:17 273:20 |
| 297:16 | 268:19 284:8 | 296:24 298:18 | 276:21,22,24 |
| **understanding** | 284:16 298:5 | 298:20 301:12 | 277:2,3 308:15 |
| 34:12 47:4,13 | 298:12 | 301:25 305:12 | **urbont** 153:3 |
| 47:17,19 50:20 | **unfair** 30:8 | 317:20,24 | 240:14 332:3,4 |
| 51:22 59:16 | 31:19 32:23,25 | 340:8 342:20 | **use** 53:23 60:4 |
| 63:4 64:11,25 | 33:23 34:13 | 346:24 347:8 | 184:14,16 |
| 69:2,20 81:21 | 45:12 127:19 | 347:11 349:15 | 236:17,25 |
| 85:9,16 99:25 | 242:25 255:21 | **united** 1:2 | 238:9 240:9 |
| 100:16 101:15 | 259:23 347:5 | **units** 226:22 | 296:4 307:18 |
| 101:21 102:21 | **unfairly** 243:3 | 343:2,23 344:2 | 307:19,20 |
| 102:22 103:13 | **unfortunately** | **unlawful** 74:14 | **used** 27:18 |
| 104:25 105:5 | 347:7 | 157:22 | 37:10 38:2 |
| 105:16 112:15 | **unhappy** 40:5 | **unofficial** | 56:4 58:9 66:8 |
| 136:7 139:19 | **unit** 17:16,25 | 16:17 | 143:18 153:5 |
| 141:16 148:14 | 18:7,9 22:22 | **unofficially** | 295:25 296:8 |
| 149:7,9 155:15 | 26:16 27:21 | 15:13,15,16 | 322:25 354:8 |
| 169:14 181:17 | 32:24 33:2,5 | 17:7,10,13,14 | **usenheimer** |
| 181:21 182:9 | 33:22 34:6,20 | 45:22 | 3:16 4:7,10 |
| 183:9,22 187:8 | 35:16,25 36:12 | | 12:14 23:21 |

**[usenheimer - want]**                                        Page 74

| | | | w |
|---|---|---|---|

48:4,20 52:14
53:8 55:13
63:13 65:15
68:9 76:17,22
77:5 80:19
87:6 95:6,15
95:19 99:16
104:17,20
105:15,23
113:10,14
116:2 119:9
147:12,18
148:22 152:20
158:6 159:8
187:15,23
192:22 202:8
204:13 206:6
210:10,25
211:4,19 216:7
216:10 231:9
237:8 245:19
257:20,22
266:3,6 267:12
269:16,19
270:22 280:9
285:14 289:25
299:7 302:23
313:16,21,24
329:16 338:6
344:8 358:4,7
358:15 360:5
**using**  57:23
184:15 243:11
**usual**  233:9

**usually**  287:21

**v**

**v**  237:7 295:7
363:3
**vacation**  109:2
109:8,10 120:4
307:20
**valuable**  349:6
**vandoros**
270:19 293:14
296:4,16,19
**varieties**
122:11
**various**  77:23
88:12 208:8
**vendor**  58:13
**veracity**  166:17
342:9
**verbal**  259:4
**verbalize**  6:4
**verbatim**  20:15
258:23
**verdict**  21:8
83:13 289:15
349:17
**verdicts**  83:20
349:5 351:23
**verification**
246:4,7,12
**verified**  19:17
245:24 246:8
350:7 361:20
**version**  152:21
350:7 362:23

**vervenio**
107:14
**vinci**  3:9 33:16
48:17,22 49:21
50:16 72:12
78:18 79:7
86:18 99:13
105:13,19
106:10 124:13
141:6,18
148:20 178:24
187:17,20
194:24 206:4,7
210:13 216:5
273:25 274:15
288:12 289:20
291:24 299:3
313:14,19,23
331:4,19
358:12
**violated**  49:18
51:3
**violation**  50:12
51:6,9,14
**virtually**  11:3
**visit**  120:11,12
**voicemail**
152:24 153:14
153:19
**voicemails**
40:13
**vs**  1:7

**w**  321:23
**wait**  25:13
76:16 79:15
99:2 105:7,10
194:24
**waited**  222:9
222:10
**waiting**  128:12
128:14 269:9
313:3 351:13
**waiving**  106:8
**walk**  44:16
98:23,23 99:2
**walked**  59:5
173:4 279:2,8
293:21
**walking**  312:11
**wallace**  137:7,9
137:12,13
**want**  5:6 6:4
10:2 36:10
74:8 77:7
82:17 90:19
104:15 123:24
124:12 141:4
153:10 156:7
156:21 157:3
157:11 159:11
159:13 169:24
170:9 178:11
178:25 179:6
185:17 187:4
196:21 200:14
210:16,22

**[want - weslii]**

| | | | |
|---|---|---|---|
| 211:24 212:3 | **wants** 313:20 | 123:2 180:9 | 194:14 195:10 |
| 227:8,21 | **watch** 75:23 | 196:6 270:19 | 195:13 201:16 |
| 231:12,23 | **water** 313:15 | 275:8,8,11 | 201:22 203:12 |
| 232:2,10 249:9 | 313:17,19 | 355:12 | 204:3 205:14 |
| 249:9 253:7 | **way** 10:9,13,13 | **weekend** 108:8 | 205:19 206:12 |
| 254:8,12 255:3 | 17:3 27:16 | **weeks** 19:6 | 206:18 207:12 |
| 256:18 263:5 | 47:20 74:15 | 121:19,22 | 209:6,16 |
| 265:12 268:11 | 81:16 84:21 | 228:3 235:2 | 210:20 211:14 |
| 272:23 273:2 | 91:19 97:11 | 355:5 | 211:25 212:2,9 |
| 281:20 293:17 | 146:24 163:12 | **welcome** 298:3 | 212:15 213:4 |
| 294:9 307:15 | 163:19 165:6 | **went** 21:6 | 214:10,19 |
| 314:10,11,13 | 167:22 170:21 | 32:20 73:7,11 | 215:9 219:10 |
| 319:5 326:3 | 175:25 196:15 | 120:11,11 | 219:14 223:6 |
| 327:12 332:19 | 209:13 225:5 | 156:17 180:14 | 225:5,10,15 |
| 335:3 339:2 | 229:25 230:17 | 180:15,24 | 226:14 228:16 |
| 341:16,17 | 243:13 276:18 | 191:20,25 | 228:17 229:2 |
| 346:25 352:3 | 300:21 302:10 | 229:25 230:18 | 230:23 233:13 |
| 352:10 356:16 | 304:16 307:24 | 269:9 277:16 | 234:3,21 |
| 357:2 | 309:16 317:25 | 308:24,25 | 236:16 240:24 |
| **wanted** 18:8,15 | 328:16 334:25 | 325:3 330:15 | 247:20 249:4 |
| 21:22 23:19 | 341:23 342:14 | 346:8 348:14 | 249:17 250:21 |
| 25:9,15 26:21 | 346:9 347:7,13 | **weslii** 1:9 3:23 | 254:9 259:18 |
| 35:18 41:13 | 352:20,20,21 | 4:14 16:17 | 260:5 262:5,6 |
| 45:8 109:23 | 359:19 | 17:6 21:25 | 263:25 264:3 |
| 110:11 111:10 | **ways** 163:22 | 23:4 33:13 | 264:11,25 |
| 133:23 140:22 | 172:10,12 | 40:23,24 43:19 | 265:15,24,24 |
| 140:25 141:8 | **weather** 279:7 | 43:25 44:11,19 | 266:15 267:10 |
| 149:19,21 | 280:8 | 45:21 46:8,12 | 271:12,24 |
| 185:15 227:24 | **webcivil** 285:15 | 61:8,22 62:14 | 273:7,14 276:5 |
| 228:2 234:22 | 362:7 | 65:10 66:21,22 | 277:17 300:14 |
| 237:24 238:3 | **wednesday** | 69:23 77:22 | 300:21 303:7 |
| 240:9 253:11 | 1:18 | 166:24 178:3 | 303:10 304:22 |
| 261:18,19,21 | **week** 19:23 | 178:22 181:23 | 305:9 306:12 |
| 265:8 312:18 | 97:2,4,5,6,16 | 185:15 187:9 | 312:2 316:7 |
| 316:6 | 121:5,8,24,25 | 188:6,12 190:2 | 319:5 320:15 |

| | | | |
|---|---|---|---|
| 321:4 322:3 | 358:13 359:11 | 326:2 | 261:19 263:9 |
| 323:18 324:3 | 359:15,21 | **work**  19:22 | 294:21 295:25 |
| 324:14,18 | 360:3 | 31:3 34:11 | 296:4,8 346:10 |
| 325:3,12,18,23 | **witnessed** | 35:14 55:8 | 348:23,24,25 |
| 326:10,17,23 | 199:25 278:8 | 57:3 68:5 73:2 | 349:24 350:13 |
| 333:24,25 | **witnesses** | 95:21 96:22 | 354:10,18 |
| 334:3 336:14 | 275:13 276:13 | 97:6,12 119:17 | **worked**  15:9 |
| **weslii's**  78:3 | **witnessing** | 120:6,10 122:9 | 67:23 97:6 |
| 163:17 202:23 | 198:24 | 122:20,23 | 98:7 107:15 |
| 224:24 253:14 | **woman**  15:7 | 131:13 137:19 | 121:23 127:10 |
| **whereof**  359:21 | 58:23 | 138:12 153:5 | 132:3 136:23 |
| **white**  148:21 | **women**  127:14 | 154:4 177:14 | 138:4,22 139:5 |
| **willing**  289:12 | 127:16 | 177:19,25 | 179:13 180:18 |
| **win**  20:14 | **won**  18:23 | 179:18 182:11 | 182:12 183:4 |
| 322:9 349:2 | 20:12 311:16 | 182:25 183:6 | 183:12 197:10 |
| **winter**  97:23 | 322:12 348:4,4 | 183:19,23 | 198:20,20 |
| **wipe**  106:12 | 351:5 | 184:2,20 185:4 | 217:7 293:10 |
| **wish**  271:25 | **wood**  270:17 | 185:6,10,11,22 | 296:13,16 |
| **withdraw** | 274:21,22 | 186:2,7,17 | 297:22 349:23 |
| 210:16 | **word**  14:2,5,6 | 187:3,5,6,7 | **worker**  118:10 |
| **withheld**  148:6 | 14:15 49:3 | 189:11,20 | 118:23 |
| **witness**  4:3 | 58:18 63:11 | 190:14 196:3 | **workers**  168:19 |
| 44:17 48:23 | 83:4 259:22 | 196:10 199:6 | 168:21 169:3 |
| 52:7 72:14 | 285:24 | 206:24 216:23 | 169:16,21 |
| 76:20 87:10 | **words**  20:15 | 220:11 221:10 | 170:17,23 |
| 93:21 94:14,16 | 27:17 37:10 | 221:24 223:15 | 171:4,22 |
| 106:8 113:13 | 38:2,6 46:4 | 225:16 226:4 | 259:19 312:10 |
| 147:10 159:5 | 51:14 58:2,8 | 227:18,19 | 312:12,16 |
| 187:19 194:25 | 114:6 133:19 | 229:4,20 230:7 | 315:18,19,21 |
| 231:12 269:18 | 143:18 184:13 | 231:2,3,7,19 | **working**  18:11 |
| 275:4 278:20 | 184:14,16 | 233:4 234:22 | 19:24 56:8 |
| 288:15 292:2 | 186:18 207:3 | 238:4 240:2 | 96:11,19 104:9 |
| 294:23 299:5 | 232:13 253:8 | 250:7,10,19 | 108:2,4 118:9 |
| 299:14 313:15 | 273:18 300:11 | 252:9 253:2 | 119:20 124:4 |
| 314:3 331:21 | 322:24 325:17 | 255:18 259:16 | 127:20 134:22 |

**[working - yehoshua]**                                          Page 77

| | | | |
|---|---|---|---|
| 138:8,8,10 | **wrap** 78:12 | 351:11,16,16 | 190:7 203:18 |
| 184:11,12 | **write** 25:25 | **x** | 224:17 255:20 |
| 185:8 190:10 | 53:5 148:11,11 | **x** 360:2 | 297:15 301:23 |
| 197:9 220:2,3 | 148:18,19 | **y** | **yehezkel** |
| 226:12 227:7,9 | 254:8 265:5 | **y** 4:2 159:4 | 131:12 331:12 |
| 228:3 230:9,10 | 306:17,22 | **yeah** 8:20 11:5 | **yehoshua** 1:5 |
| 230:25 232:22 | 348:2 | 14:8 16:13 | 1:16 2:8 4:1 |
| 236:12,19 | **writer** 74:11 | 54:8 90:6 | 5:1 6:1 7:1 8:1 |
| 237:3 239:8,13 | **writing** 15:19 | 108:11 109:23 | 9:1 10:1 11:1 |
| 239:15,22 | 15:21 31:23 | 148:23 150:15 | 12:1,21 13:1 |
| 243:15,17,22 | 66:16 71:19,25 | 163:7 176:14 | 14:1 15:1 16:1 |
| 249:6 250:10 | 211:21 290:7 | 192:23 309:11 | 17:1 18:1 19:1 |
| 252:12,25 | 303:6 306:16 | **year** 15:25 | 20:1 21:1 22:1 |
| 297:14 308:18 | 311:11 313:4 | 28:11,15,16 | 23:1 24:1 25:1 |
| 349:12 350:24 | 328:21 339:22 | 29:24 32:20 | 26:1 27:1 28:1 |
| **workload** | **written** 65:19 | 33:3 34:24 | 29:1 30:1 31:1 |
| 34:19 35:17,20 | 80:3 114:11 | 35:2 58:3 | 32:1 33:1 34:1 |
| 224:25 | 250:9,11 | 92:10 97:11 | 35:1 36:1 37:1 |
| **works** 167:24 | 264:15 301:2 | 118:17 127:17 | 38:1 39:1 40:1 |
| 197:23 | 301:25 348:3 | 149:9 213:7,8 | 41:1 42:1 43:1 |
| **worry** 54:8,12 | **wrong** 53:23 | 213:13 228:9 | 44:1 45:1 46:1 |
| 58:19,25 61:13 | 54:22 125:13 | 242:18,20 | 47:1 48:1,12 |
| 173:13 332:17 | 143:2,5,9 | 257:3 287:2,19 | 49:1 50:1 51:1 |
| **worrying** | 203:23 205:8 | 287:21 288:19 | 52:1,22 53:1 |
| 353:12,13 | 205:10 258:19 | 290:19 305:17 | 54:1,25 55:1 |
| **worse** 32:21,21 | 272:7 274:18 | 305:19 306:18 | 56:1,8,21 57:1 |
| 40:7,7 226:17 | **wrongdoing** | 306:19,20 | 57:10,17 58:1 |
| 230:3,3 347:14 | 337:5 | 351:6 | 58:4 59:1 60:1 |
| 347:15,15 | **wrote** 44:2 47:3 | **years** 56:15 | 61:1 62:1 63:1 |
| 349:13 350:2 | 108:16 110:11 | 73:21 75:14 | 64:1 65:1 66:1 |
| **worsened** 30:5 | 159:20 169:2 | 76:10,10,13 | 67:1 68:1,14 |
| **worst** 346:15 | 181:3 188:9 | 83:19 90:10 | 69:1 70:1 71:1 |
| 348:16 | 263:22 299:18 | 129:9 173:12 | 72:1 73:1 74:1 |
| **worthy** 235:23 | 300:18 306:17 | 179:23 190:4,5 | 75:1 76:1 77:1 |
| | 343:14 346:13 | | 77:7 78:1 79:1 |

**[yehoshua - yehoshua]**                                          Page 78

| | | | |
|---|---|---|---|
| 80:1,4,25 81:1 | 151:1 152:1 | 221:1 222:1 | 291:1 292:1 |
| 82:1 83:1 84:1 | 153:1 154:1 | 223:1 224:1 | 293:1 294:1 |
| 85:1 86:1 87:1 | 155:1 156:1 | 225:1 226:1 | 295:1 296:1 |
| 87:17 88:1 | 157:1 158:1 | 227:1 228:1 | 297:1 298:1 |
| 89:1 90:1 91:1 | 159:1 160:1 | 229:1 230:1 | 299:1 300:1 |
| 91:11,14,15 | 161:1 162:1 | 231:1 232:1 | 301:1 302:1 |
| 92:1 93:1 94:1 | 163:1 164:1 | 233:1 234:1 | 303:1 304:1 |
| 95:1,20 96:1 | 165:1 166:1 | 235:1 236:1 | 305:1 306:1 |
| 97:1 98:1 99:1 | 167:1 168:1 | 237:1 238:1 | 307:1 308:1 |
| 99:9 100:1 | 169:1 170:1 | 239:1 240:1 | 309:1 310:1 |
| 101:1 102:1 | 171:1 172:1 | 241:1 242:1 | 311:1 312:1 |
| 103:1 104:1 | 173:1 174:1 | 243:1 244:1 | 313:1 314:1 |
| 105:1 106:1 | 175:1 176:1 | 245:1 246:1 | 315:1 316:1 |
| 107:1 108:1 | 177:1 178:1 | 247:1 248:1 | 317:1 318:1 |
| 109:1 110:1 | 179:1 180:1 | 249:1 250:1 | 319:1 320:1 |
| 111:1 112:1 | 181:1 182:1 | 251:1 252:1 | 321:1 322:1 |
| 113:1 114:1 | 183:1 184:1 | 253:1 254:1 | 323:1 324:1 |
| 115:1 116:1 | 185:1 186:1 | 255:1 256:1 | 325:1 326:1 |
| 117:1 118:1 | 187:1 188:1 | 257:1 258:1 | 327:1 328:1 |
| 119:1 120:1 | 189:1 190:1 | 259:1 260:1 | 329:1 330:1 |
| 121:1 122:1 | 191:1 192:1 | 261:1 262:1 | 331:1,12 332:1 |
| 123:1 124:1 | 193:1 194:1 | 263:1 264:1 | 333:1 334:1 |
| 125:1 126:1 | 195:1 196:1 | 265:1 266:1 | 335:1 336:1 |
| 127:1 128:1,23 | 197:1 198:1 | 267:1,23 268:1 | 337:1 338:1,12 |
| 129:1 130:1 | 199:1 200:1 | 269:1 270:1 | 339:1 340:1 |
| 131:1,12 132:1 | 201:1 202:1 | 271:1 272:1 | 341:1 342:1 |
| 133:1 134:1 | 203:1 204:1 | 273:1 274:1 | 343:1 344:1,14 |
| 135:1 136:1 | 205:1 206:1 | 275:1 276:1 | 345:1 346:1 |
| 137:1 138:1 | 207:1 208:1 | 277:1 278:1 | 347:1 348:1 |
| 139:1 140:1 | 209:1 210:1 | 279:1 280:1 | 349:1 350:1 |
| 141:1 142:1 | 211:1 212:1 | 281:1 282:1 | 351:1 352:1 |
| 143:1 144:1 | 213:1 214:1 | 283:1 284:1 | 353:1 354:1 |
| 145:1 146:1 | 215:1 216:1 | 285:1 286:1 | 355:1 356:1 |
| 147:1 148:1 | 217:1 218:1 | 287:1 288:1 | 357:1 358:1,20 |
| 149:1 150:1 | 219:1 220:1 | 289:1 290:1 | 359:11 360:5 |

**[yehoshua - zealous]**                                    Page 79

| | |
|---|---|
| 363:3,4 | **youngest**  91:10 |
| **yelled**  43:13,19 | **z** |
| 44:9 | **zealous**  283:10 |
| **yep**  254:10 | |
| **yontif**  135:22 | |
| **york**  1:3,9,17 | |
| 1:17 2:10,10 | |
| 2:14 3:8,8,15 | |
| 3:15 4:13 | |
| 26:15 35:16 | |
| 37:20 45:7 | |
| 50:13 51:10 | |
| 56:9,10 58:6 | |
| 58:10 62:25 | |
| 63:24 70:14 | |
| 71:14,23 72:19 | |
| 89:11 95:21 | |
| 96:9 101:3,8 | |
| 115:11 117:17 | |
| 118:7,10 | |
| 126:17,21,23 | |
| 145:25 165:11 | |
| 255:12,15,17 | |
| 256:5 260:6 | |
| 266:16 287:2 | |
| 287:22 291:13 | |
| 297:2 298:18 | |
| 301:4,10 302:2 | |
| 302:14 317:20 | |
| 317:23 327:20 | |
| 339:25 340:8 | |
| 342:19,21 | |
| 359:4,9 | |
| **young**  283:12 | |
| 283:13,14 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.