# EXHIBIT C

Page 1

1

2    UNITED STATES DISTRICT COURT

3    EASTERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - - x

5    AMELIA YEHOSHUA,

6              Plaintiff,

7                            Case No.

                             1:21-cv-04055-FB-SJB

8         -against-

9    MANHATTAN AND BRONX SURFACE TRANSIT OPERATING

     AUTHORITY, THE NEW YORK CITY TRANSIT

10   AUTHORITY, and WESLII KHAHAIFA,

11            Defendants.

12   - - - - - - - - - - - - - - - - - x

13                    7 Times Square

                      16th Floor

14                    New York, New York 10036

15                    October 18, 2023

                      10:10 a.m.

16

17      EXAMINATION BEFORE TRIAL of

18   LAWRENCE HEISLER, a Nonparty Witness herein,

19   taken by GABRIELLE M. VINCI, in the

20   above-entitled action, held at the above time

21   and place, pursuant to Subpoena, taken before

22   DEVORA HACKNER, a Stenographic Reporter and

23   Notary Public within and for the State of

24   New York.

25

Page 2

1
2 A P P E A R A N C E S:
3 NESENOFF & MILTENBERG, LLP
        Attorneys for Plaintiff
4       363 7th Avenue
        Fifth Floor
5       New York, New York 10001
        212-736-4500
6   BY:  GABRIELLE M. VINCI, ESQ.
          gvinci@nmllplaw.com
7
8
    SEYFARTH SHAW LLP
9       Attorneys for Defendants
        620 Eighth Avenue
10      32nd Floor
        New York, New York 10018-1405
11      212-218-5564
    BY:  DANIEL SMALL, ESQ.
12        dsmall@seyfarth.com
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2   F E D E R A L   S T I P U L A T I O N S
3
4       IT IS HEREBY STIPULATED AND
5   AGREED by and between the attorneys for
6   the respective parties herein, that
7   filing and sealing be and the same are
8   hereby waived.
9
10      IT IS FURTHER STIPULATED AND
11  AGREED that all objections, except as to
12  the form of the question, shall be
13  reserved to the time of the trial.
14
15      IT IS FURTHER STIPULATED AND
16  AGREED that the within deposition may be
17  signed and sworn to before any officer
18  authorized to administer an oath, with
19  the same force and effect as if signed
20  and sworn to before the Court.
21
22
23
24
25

Page 4

1           L. HEISLER
2           THE STENOGRAPHER:  And will
3   you be ordering a copy of the
4   transcript?
5           MR. SMALL:  Yes.
6           THE STENOGRAPHER:  Thank
7   you.
8 L A W R E N C E   H E I S L E R, the
9   witness herein, having been first duly
10  sworn by a Notary Public of the State of
11  New York, was examined and testified as
12  follows:
13          THE STENOGRAPHER:  State
14  your name for the record, please.
15          THE WITNESS:  Lawrence
16  Heisler.
17          THE STENOGRAPHER:  State
18  your address for the record,
19  please.
20          THE WITNESS:  8532 Abingdon
21  Road, Kew Gardens, New York,
22  11415.
23 EXAMINATION
24 BY MS. VINCI:
25      Q. Good morning, Mr. Heisler.

Page 5

1           L. HEISLER
2       A. Good morning.
3       Q. We met off of the record before
4   the deposition started.
5       A. Yeah.
6       Q. To reintroduce myself, my name
7   is Gabrielle Vinci.  I am the attorney
8   representing Amelia Yehoshua --
9       A. Yehoshua.
10      Q. Yehoshua.
11      A. Third syllable.
12      Q. Thank you.
13      A. Now, they made the same mistake
14  at the office.
15      Q. Okay.
16      -- in an action that she has
17  brought against the New York City
18  Transit Authority, the Manhattan and
19  Bronx Surface Transit Operating
20  Authority, and Weslii Khahaifa.  If I
21  refer to both of the transit
22  authorities simply as "Transit," is
23  that okay with you today?
24      A. It is.
25      Q. Okay.  Excellent.  We're here

2 (Pages 2 - 5)

Page 6

L. HEISLER

1
2  today to take your deposition, which I
3  believe you're familiar with what a
4  deposition is, but essentially, I'm
5  going to ask you questions about what
6  you know and remember.
7      A. Yeah.  You can skip that part.
8      Q. Okay.  For the record, though, I
9  will go over just some ground rules so
10  that today runs smoothly.
11      A. Sure.
12      Q. First and foremost, I ask that
13  you answer all of my questions
14  verbally.  It's difficult for the court
15  reporter to take down a nod of the head
16  or a gesture.  I'll also ask that you
17  allow me to finish my question before
18  you go on to answer it, and I'll allow
19  you to finish your answer before I
20  continue with my next question.
21      If you don't hear or you don't
22  understand a question, please let me
23  know.  I will rephrase it until it is
24  meaningful to you.  If you answer the
25  question, I will assume you understood

Page 7

L. HEISLER

1
2  it as it was posed.
3      And finally, I expect that we
4  will be here for a few hours today, but
5  it is a -- it is not -- well, if you
6  need a break at any time, please let me
7  know.  I'm happy to take as many breaks
8  as you need.  The only caveat to that
9  is if there's a question pending,
10  please answer the question and then
11  we'll go forward with the break.
12      A. Okay.
13      Q. Before we move forward, there
14  was a notice made to me yesterday
15  evening that you would be represented
16  here today by Transit's in-house
17  counsel, Robert Drinan?
18      A. Drinan.  That's not the case.
19      Q. Are you not represented by
20  Mr. Drinan?
21      A. Correct.
22      Q. Are you represented by any
23  counsel today?
24      A. Just myself.
25      Q. Okay.  Mr. Drinan, for personal

Page 8

L. HEISLER

1
2  reasons, is unable to be here this
3  morning, though he may join virtually
4  later this afternoon.  Do you have any
5  objection to moving forward outside of
6  Mr. Drinan's presence?
7      A. No.
8      MS. VINCI:  And Attorney
9  Small, just for the record, do
10  you have any objection to moving
11  forward without Mr. Drinan?
12      MR. SMALL:  No, I do not.
13      Q. What, if anything, did you do to
14  prepare for the deposition today, sir?
15      A. I read a lot of stuff.
16      Q. What stuff?
17      A. I looked over the disciplinary
18  findings, the one that led to Amelia's
19  termination.  I looked at the specific
20  charges.  I looked at the e-filed
21  papers in Supreme New York to
22  reconstruct what might have happened.
23  And I tried to reconstruct the events
24  going back to 2019, 2020 and '21.
25      So I did a lot of reading.

Page 9

L. HEISLER

1
2  Especially on the Alexander Hill case.
3  I also looked at the Rivera case.  I
4  remember the Chinn case.  Many of the
5  cases in the disciplinary charges were
6  ones that I was personally familiar
7  with.  I participated in some of the --
8  in crafting some of the trial
9  strategies.  And I probably -- not
10  probably.  I had more knowledge about
11  them, facts, than the authors of the
12  charges.
13      Q. Did the authors of the charges
14  -- well, strike that.
15      Do you know who authored either
16  of the disciplinary charges that were
17  issued to Amelia?
18      A. Okay.  Now, with the first one,
19  I'll tell you what happened.  I think
20  going back to like 2018 or 2019, I had
21  gotten a call from the inspector
22  general about Amelia having an outside
23  attorney represent her on a case.  The
24  guy was Sean Smith, one of the regulars
25  we used for EBTs.  He was on Court

L. HEISLER
1
2  Street, always available. He would
3  just walk over to Livingston Street.
4       And what the person wanted to
5  know was whether Amelia had any
6  influence on giving him depositions.
7  My off-the-cuff reaction was no, she
8  had absolutely no power to do that. I
9  remember double-checking both with
10 Weslii Khahaifa. Weslii checked. I
11 also checked in with Gregory George,
12 who was head of pretrial. And he
13 checked with Steven Wagner. And I
14 remember we had a whole spreadsheet of
15 all the depositions that Sean did for
16 us, and we checked and there was no
17 input, as I thought that there wouldn't
18 be.
19      So, you know, we assumed -- I
20 assumed, at that point, that the sole
21 issue was whether or not Amelia, sort
22 of as a quid pro quo, you represent me
23 on this, I'm going to send you
24 depositions, whether that was the case.
25 As it turned out, it wasn't. The

L. HEISLER
1
2  matter seemed to have been resolved.
3       Then I remember speaking to our
4  new general counsel, David Farber, and
5  he told me that there was another
6  issue, as well, whether Sean had been
7  working without compensation. So, you
8  know, truth be told, I was not aware
9  that there was a rule forbidding that.
10      My impression was that the sole
11 issue on these cases was whether there
12 was undue influence of some sort,
13 whether there was a quid pro quo. You
14 know, I told David, Gee, you know, I
15 didn't know that. And I said, If you
16 ask anyone on the floor, they would be
17 unaware of that rule.
18      So, you know, he was very loose
19 about it, and he said, Well, you know,
20 we might have to reinstruct the people
21 on the floor. And you know, certainly
22 the vendors, Sean wasn't aware of any
23 such rule.
24      All right. So there the matter
25 stood. We all assumed that it had been

L. HEISLER
1
2  resolved. Me, Weslii included. Then
3  there was a change in administration at
4  the inspector general's office. We had
5  a new one coming in who was Governor
6  Cuomo's appointment, and apparently
7  there was an agenda remission to crack
8  down on all sorts of violations,
9  technical or not.
10      So I remember it was in June,
11 during the height of COVID, I was going
12 to a drugstore to pick up a
13 prescription, and I get a call on my
14 cell from Farber and he says, You know
15 that issue we were talking about?
16 Amelia is going to be fired. So I
17 said, like, What? What's going on?
18      I was not involved. I had
19 absolutely no idea. What happened? He
20 said, I have no choice. There's a new
21 administration. Sean Smith wasn't
22 compensated and that violated our
23 rules. The governor is very strict
24 about enforcing ethics, Governor Cuomo.
25      And then I don't know whether

L. HEISLER
1
2  Amelia or someone sent me the inspector
3  general's report. I don't have that
4  with me. And it really detailed the
5  investigation. It revealed that Sean
6  was working on a contingent basis. In
7  other words, he would get a third, or
8  whatever it was, of any recovery. And
9  that's why he took the case. He also
10 thought that he could settle the case
11 quickly. He knew counsel or insurance
12 counsel on the other side.
13      You know, when I read that, I
14 thought, well, I mean, there's nothing
15 here. There is a contingent fee
16 arrangement, which is certainly
17 compensation, in my view. Some of the
18 richest lawyers in the city work on a
19 contingent basis.
20      So I got back to Farber and I
21 said, Has anyone vetted this? I mean,
22 you're going to look like a fool. How
23 are you firing someone for giving work
24 to a vendor for no compensation, when
25 he has a chance to get a third of the

Page 14

L. HEISLER

1    L. HEISLER
2 fee?
3        Oh, it's still nothing.  It's
4 not hourly, not that.  But the rule
5 didn't say anything about hourly
6 compensation.  So that's where we
7 stood.
8        I remember I spoke to Drinan and
9 I said, This is outrageous, for several
10 reasons, both on substance and,
11 number 2, why was I completely frozen
12 out of any discussion about this?  I
13 mean, usually a penalty is -- unless
14 you're -- unless you shoot your boss
15 for stealing money, is commensurate
16 with your years of service, your worth
17 to the Authority.  Why wasn't I
18 involved?  You know, I told Bob --
19        MR. SMALL:  Objection.  I
20    think we need to pause there for
21    a second, because --
22        MS. VINCI:  Yes.
23        MR. SMALL:  -- this is
24    clearly going into
25    attorney-client discussions, in

Page 15

L. HEISLER

1    L. HEISLER
2 terms of false representation of
3 Transit.
4        So I think we need to not
5 move forward with any discussions
6 you had with Bob with respect --
7        THE WITNESS:  This does not
8 relate to any legal issues, so
9 I'm going to disagree with you.
10 I hear your point, but I will
11 answer it, and if you think it's
12 inappropriate, you can move to
13 strike it.
14    Q.  Well, I am, actually, going to
15 ask you to stop.  I will pick up there.
16 I just want to kind of get back on
17 track with the day.  We'll revisit
18 that.
19    A.  Yeah.
20    Q.  And we'll talk about the -- that
21 first day a little later this
22 afternoon.
23        When did you first meet Amelia?
24    A.  I would guess either 2013 or
25 2014.  She had been hired by my

Page 16

L. HEISLER

1    L. HEISLER
2 predecessor, Wallace Gossett.  I think
3 she'd been assigned to New York County.
4 I met her when she was actually trying
5 a case in the Bronx.  Wallace told her
6 that he wanted to try her doing
7 something in a different county.  So we
8 consulted on trial strategy, legal
9 issues, and the like.
10    Q.  How would you describe your
11 relationship with Amelia while she
12 worked for Transit?
13    A.  Good.  I mean, you know, we
14 discussed legal issues, legal strategy.
15 She was fairly tenacious if she was on
16 trial.  She would call me at 9:00 or
17 10:00 at night, something I didn't
18 necessarily appreciate at the time.  My
19 wife certainly didn't appreciate it.
20 She would call me on Sunday.
21        Yeah, no, but she -- she relied
22 on me primarily for legal advice and
23 legal strategy.  She relied on Gail
24 Goode, who was head of the -- head of
25 trials at the time for trial strategy,

Page 17

L. HEISLER

1    L. HEISLER
2 in particular.
3    Q.  Would you describe her work as
4 an attorney as impressive?
5    A.  Certainly extremely successful.
6 I don't think she ever, quote, like
7 really like lost a trial.  There may
8 have been some verdicts against her,
9 but they were usually at the level that
10 we offered to settle, or at levels that
11 wasn't worth appealing.
12    Q.  Okay.  And how often would you
13 interact with Amelia while she was
14 working for Transit?  I know you said
15 you went over legal strategies with
16 her, she'd call you.
17    A.  Well, she was at the other end
18 of the hall.  More when I was -- well,
19 this didn't last that long.  Assume she
20 came in in 2013, I was still head of
21 appeals at that point.  As head of
22 appeals, I would basically be the go-to
23 person if people had legal questions.
24 So that would be quite frequent.  You
25 know, but it continued even when I was

5 (Pages 14 - 17)

Page 18

L. HEISLER

1
2  head of torts after middle of 2014, end
3  of 2014 through 2021.
4       See, if there were legal issues
5  that the trial attorneys seemed a
6  little puzzled about, you really wanted
7  to straighten that out to make sure
8  that they got the right answers.  And
9  if they had questions that I didn't
10 immediately know the answer to, I
11 wanted to make sure -- educate myself.
12     Q. You retired from the Transit
13 Authority in 2021; is that right?
14     A. Yeah, April 23, 2021.
15     Q. Okay.  So you just said you were
16 head of torts from 2014 to '21?
17     A. Yeah.
18     Q. Prior to that, you were head of
19 appeals?
20     A. Yes.  I would say from, let's
21 see, 1987 through 2014, give or take a
22 year going backwards.
23     Q. Continuing backwards, did you
24 hold any other role with Transit before
25 head of appeals?

Page 19

L. HEISLER

1
2     A. I was a pretrial attorney,
3  although I started doing appeals even
4  three years out of law school.  I would
5  also do the major motions on trial
6  cases, even while I was working in
7  examination and practice, which was the
8  formal pretrial unit.
9     Q. And for how long were you
10 performing those duties, a pretrial
11 attorney, major motions, exam and
12 practice, what time period?
13     A. '78 through '87 or '88, when I
14 became head of appeals.
15     Q. What law school did you graduate
16 from?
17     A. Brooklyn.
18     Q. And in what year?
19     A. '77.
20     Q. And then you were subsequently
21 admitted to practice in New York?
22     A. In '78.  Yeah.  I was working
23 for the TA before I was admitted.  In
24 those days, they would hire you even
25 before your bar admission and your

Page 20

L. HEISLER

1
2  title would be law clerk, and you'd
3  spend all day doing statutory hearings
4  and just tagging along.
5     Q. So has your entire legal career
6  been working for Transit?
7     A. No.  I had one -- a year's worth
8  of interregnum, an interruption.  I
9  worked in private practice for one year
10 for the late Brian Sheridan, who I met,
11 I believe, in the men's room in Supreme
12 Queens.  He mistook me for my brother.
13 They were working together on a class
14 action.  My brother was working for a
15 class action firm at that point.
16     And then when he saw me, he
17 offered me a position.  I worked for
18 him for a year, until he got into
19 trouble.  Got held in contempt, got
20 arrested, ultimately disbarred.  I went
21 back to the TA within the year.
22     So basically, except for that
23 one-year period, it's only TA.
24     Q. Okay.  And were you admitted to
25 practice in any other state besides

Page 21

L. HEISLER

1
2  New York?
3     A. No.
4     Q. Do you still maintain an active
5  law license in New York?
6     A. I have an active law license,
7  but I don't really practice, although
8  occasionally, people will still call me
9  for questions.
10     Q. So going back to Amelia --
11     A. Yeah.
12     Q. -- I'm going to hand you what
13 we'll mark --
14     MS. VINCI:  Counsel, any
15 objection to just continuing from
16 the prior deposition, in terms of
17 the exhibit markings?
18     MR. SMALL:  Not at all.
19     MS. VINCI:  We'll mark it as
20 Plaintiff's Exhibit 3, if you
21 could.
22     - - -
23     (Whereupon, Plaintiff's
24 Exhibit 3, a document, was marked
25 for identification.)

6 (Pages 18 - 21)

L. HEISLER

- - -

3    Q. So you were already perusing it,
4 but I will officially hand you
5 Exhibit 3, Mr. Heisler. Do you
6 recognize this document?
7    A. I do. It's -- I'll describe it.
8    Q. Please do.
9    A. Yeah, it's recommendation from
10 me to James Henly, who was then general
11 counsel, to promote Amelia. Now, I
12 know, though, my name is on it. I did
13 sign off on it. I would guess that the
14 bulk of this was written by Weslii.
15 The language is not really mine. And I
16 remember I would usually -- when there
17 was a promotion to be made, I would ask
18 the immediate supervisor to draft
19 something, I would review, make any
20 corrections.
21    Q. Okay. So looking at the first
22 sentence --
23    A. Yeah.
24    Q. -- it notes that Amelia has been
25 an integral part of the New York County

L. HEISLER

2 trial team; do you see that?
3    A. Yeah, I do see that.
4    Q. In your opinion, was Amelia an
5 integral part of the New York trial
6 team?
7    A. Yes, that cliche is true. And
8 again, it's not language I would have
9 used. But yes, it is true.
10    Q. In what way was Amelia an
11 integral part of the New York County
12 trial team?
13    A. I mean, she was an active trial
14 attorney. She was handling major
15 cases. She wasn't scared of trying
16 them. You had lawyers in that unit who
17 were a little gun-shy. Gun-shy, she
18 was not. And she was very tenacious.
19 She was also a firm believer that the
20 Authority were the good guys and she
21 brought a lot of passion to the work
22 that she did. She thought she was
23 doing good in defending the Authority.
24    Q. As of this time, so August 2017,
25 had that, sort of -- her style of

L. HEISLER

2 advocating for the Transit Authority,
3 to your knowledge, had that ruffled any
4 feathers in court?
5    A. No one ever complained. Didn't
6 receive a complaint from any of the
7 judges. And I was in contact -- at
8 that point, I was still in contact with
9 them fairly frequently. Maybe that's
10 an exaggeration, but I knew them. And
11 certainly, I didn't get any complaints
12 internally from Weslii. I mean, this
13 would not have gone upstairs if her
14 supervisor hadn't signed on. There had
15 been other situations where promotions
16 were held up because supervisors
17 wouldn't sign off on my recommendation.
18    Q. Okay. And what position was
19 Amelia in, and what was the position
20 she was trying to be promoted to, if
21 you can recall?
22    A. I don't know the precise
23 gradations, in terms of employment,
24 they had at that stage, so I can't tell
25 you. But it looks -- she went from

L. HEISLER

2 level A to level B. See, they keep
3 changing the nomenclature and the
4 lettering, so it's a little difficult.
5 But she was definitely going to make
6 more money.
7    Q. Okay.
8    A. That much, I know.
9    Q. You can put that to the side.
10    I want to turn your attention to
11 2016. There came a time in early 2016
12 that Amelia had approached you and
13 complained about interactions with
14 Weslii; is that correct?
15    A. Yes.
16    Q. Okay. Do you recall a time when
17 Amelia complained about an incident
18 involving Weslii not signing off on her
19 time sheet?
20    A. Yeah, I do. I think it was late
21 January, or maybe the beginning of
22 February 2016. So Fridays were rather
23 short, which meant if you were
24 Orthodox, you would be leaving the
25 office pretty early. I think we were

Page 26

L. HEISLER

1           L. HEISLER
2 talking about -- Sabbath would start,
3 let's say, a quarter to five. So if
4 you had to commute and you had to
5 prepare, you know, you would be cutting
6 it short, your workday, by a couple of
7 hours.
8     So I mean, it wasn't precisely
9 about that issue. She came to me and
10 said there had been a train delay of a
11 half hour or 45 minutes that day. She
12 was prepared to prove it. And she said
13 she was short on time, in terms of
14 accrued vacation. The day was short,
15 as it is, so she would have to take
16 time off. And given that she could
17 prove that there was delay, she asked
18 Weslii to excuse either 30 minutes or
19 45 minutes. So -- but she said that
20 Weslii would not do it.
21    All right. So I sort of knew,
22 rattling around in the back of my mind,
23 that we had had other episodes where
24 there were train delays, people would
25 bring in documentation, and the

Page 27

1           L. HEISLER
2 lateness would be excused. It was
3 especially prominent in our
4 investigations unit, who had access to
5 train schedules and could, you know,
6 easily prove that they were late for
7 20 minutes or half an hour. So I was
8 sort of a little annoyed.
9    I was annoyed for several
10 reasons. A, the appearance of the
11 whole thing struck me as a little
12 dangerous. You have someone who
13 explains that they need a little bit of
14 time, and it's complicated by her
15 Sabbath observance. So some people,
16 let's say reasonable jurors, might, in
17 the future, conclude that there was
18 something not quite on the up and up
19 going on here.
20    Number two, you're a manager.
21 Okay. You've got discretion to excuse
22 minor lateness. You have a valid
23 explanation for it. Why are you making
24 an issue out of this? I mean, this has
25 the chance to sort of explode, if not

Page 28

1           L. HEISLER
2 handled properly, into a black Jewish
3 thing, which obviously I did not want
4 to happen.
5    Two reasons. Under my
6 predecessor, there had been the
7 perception, that's all I'm committing
8 to, that there was a slant against
9 white men, maybe Jewish men, maybe
10 Jewish people. There hadn't been many
11 hired. Although we hired Amelia. But
12 she spoke Spanish, so he may not have
13 been aware that she was Jewish. You
14 know, but that's speculation. Wipe
15 that out. The bottom line is I did not
16 want to get drawn into what could be a
17 black Jewish thing.
18    Third, forget about all that.
19 In terms of morale, you've got a
20 successful trial attorney. The timing
21 was especially poor because she had won
22 a case not that long before,
23 Tate-Mitros, against a major
24 plaintiff's firm. So she was, you
25 know, up and coming. Why alienate her?

Page 29

1           L. HEISLER
2    I'm finally going back a bit to
3 the perception that Weslii might have
4 been acting out of improper motives.
5 Amelia might have reached that
6 conclusion because she had had a
7 difficult time at her prior employer,
8 Morris Duffy, who had given her trouble
9 about leaving on Friday. So she was
10 sensitive, or maybe alert, to the
11 reality.
12    So all of that sort of suggested
13 that, you know, you had a potential
14 catastrophe. So I was annoyed. Like
15 why are you, Weslii, putting me, why
16 are you putting your unit, why are you
17 putting the office in this position?
18 All right. We excuse people who win
19 trials. We give them off the following
20 day. Investigations routinely excuses
21 people when they have valid excuse for
22 transit lateness.
23    As a matter of fact, before I
24 spoke to Weslii, I consulted with a
25 supervisor in investigations, George

8 (Pages 26 - 29)

Page 30

L. HEISLER

1    L. HEISLER
2    Herrera, and, you know, I asked him, If
3    someone comes to you and they prove
4    that there was a transit delay, do you
5    unconditionally excuse that lateness?
6    And he said, Yes, of course I do.
7        So I was annoyed.  I went to
8    her.
9        Q. I'm going to stop you right
10   there.
11       A. Yeah.
12       Q. I want to stay on that first
13   discussion with Amelia.
14       A. Yeah.
15       Q. So Amelia tells you what
16   happened with Weslii and what the issue
17   is.  Does she say in that discussion
18   that she believed she was being
19   discriminated against because of her
20   religion?
21       A. I don't know that she did, but I
22   think she explained why the time was
23   important to her.  So it certainly
24   seemed to me that it played a role.
25       Q. Okay.

Page 31

1    L. HEISLER
2        A. Otherwise, you know, I wouldn't
3    have made as big an issue out of it.
4        Q. Okay.  So after you spoke with
5    Amelia, I believe you said you spoke
6    to --
7        A. Herrera.
8        Q. -- Mr. Herrera --
9        A. To George.
10       Q. -- who said investigations,
11   unconditionally --
12       A. Yeah.
13       Q. -- grant the excuse.  After
14   that, did you then speak to Weslii?
15       A. Yeah.
16       Q. Tell me about your discussion
17   with Weslii.
18       A. You know, I told her, What is
19   the big deal about giving Amelia half
20   hour, 45 minutes or whatever it was?
21   You know, I told her, You know she's
22   short of time.  Today is Friday.  Why
23   are you putting the entire office in a
24   position where you're going to divide
25   the staff, you're going to raise the

Page 32

1    L. HEISLER
2    possibility of a future lawsuit?
3        Basically, I was telling her why
4    are you putting a bull's-eye on your
5    back and the Transit Authority's back?
6    I mean, it makes no sense.  Just don't
7    put me in a position where I have to
8    sign off on some staff member wanting
9    30 minutes of excused time.
10       Q. And what was Weslii's response?
11       A. Oh, she was quiet at the moment,
12   a little taken aback.  Then I think a
13   couple of days, she sent me a very long
14   e-mail, where she explained at great
15   length that she wasn't trying to
16   prevent Amelia from practicing her
17   religion.  That she had never been
18   accused of anti-Semitism before, which
19   I was not accusing her.  And she was --
20   let's put it this way -- taken aback
21   and either sincere or protesting too
22   much, depending on your attitude.
23       Q. Okay.  I'm going to hand you
24   Exhibit 4.
25              - - -

Page 33

1    L. HEISLER
2        (Whereupon, Plaintiff's
3    Exhibit 4, a three-page document,
4    was marked for identification.)
5              - - -
6        Q. Mr. Heisler, you've just been
7    handed Exhibit 4.  Can you please just
8    take a moment to review that and let me
9    know if you recognize it.
10       A. Yeah, I do recognize it.  And I
11   remember the entire exchange.
12       So at the back of it, you have
13   the whole megillah where she reacts
14   with, in another context, people would
15   call fragility, white fragility, an
16   expression used when white people get
17   extremely offended, where they're
18   accused of racism.  Who me?  I'm good.
19   I'm not sending Amelia to the
20   concentration camps.  I'm a good
21   person.  All right.
22       You know, when I got that, I
23   thought to myself, gee, we're spending
24   hours on an issue about 30 or
25   40 minutes or 45 minutes' worth of time

9 (Pages 30 - 33)

Page 34

L. HEISLER

1    disrupting the unit. So I thought that
2    Weslii's reaction was a little dense,
3    lacking in self-awareness.
4        Nevertheless, you have to
5    understand, Weslii was also a superstar
6    performer. Okay. No question about
7    that. We needed her. She was
8    invaluable in rehabilitating our
9    reputation in Supreme New York. Before
10   she took over the unit, her
11   predecessor, Danielle Ruttman, had
12   managed to completely alienate the
13   entire bench in Supreme New York. We
14   would never settle any cases.
15   Everything wound up something like, All
16   right, you've got 2,500 on the file,
17   you have an hour to accept, otherwise I
18   send it to outside counsel. We were
19   trying, perhaps, a hundred cases a year
20   to verdict in New York County.
21       When I would attend mediation
22   conferences at the appellate division,
23   the people there were very aware of
24   what was going on in New York, and the

Page 35

L. HEISLER

1    mediator would often tell me, You know
2    what, they see your name, the judges
3    know what's going on, and they're not
4    amused. All right.
5        So Weslii and her colleague,
6    Paul Sasso, who was a claims examiner
7    who often worked with her, did a
8    wonderful job in getting the judges to
9    realize that we were reasonable, we
10   started settling cases. So I couldn't
11   run the department without Weslii.
12   Okay. No question about that. If you
13   ask me to rate her on her performance,
14   I would give her a ten. I would give
15   Amelia a ten. So that put me in a very
16   difficult position. I needed both of
17   them.
18       But, you know, I wanted to make
19   my point. I mean, you know, why are
20   you wasting all this time? You're
21   creating the possibility of litigation
22   down the line. So you'll notice that I
23   was very conciliatory toward her.
24   Okay. I did point out that I didn't

Page 36

L. HEISLER

1    think she was discriminating on the
2    basis of religion, you know, which is
3    true. The same thing could have
4    happened if a secular Jewish person had
5    done that to Amelia, or if Weslii had
6    done that to a Seventh-day Adventist.
7    So it's not a question of Jewish or
8    not.
9        She hadn't taken it into account
10   the fact that she had to take minimal
11   accommodations, maybe to satisfy the
12   requirements of the law, or to keep
13   the -- her unit functioning. So,
14   again, I assumed that things had
15   settled down, although I remember her
16   last words were, We'll agree to
17   disagree, which is not that promising.
18   But if you notice, she did sign off on
19   the 2017 promotion.
20       So things appeared to be okay
21   and, you know, things were running
22   smoothly.
23       Q. Did you -- so in that
24   conversation with Weslii, did you say

Page 37

L. HEISLER

1    to her this could be perceived as
2    discrimination? Or was it more think
3    about the optics of how this looks? Or
4    something else?
5        A. I told her nothing along those
6    lines because I wanted it ended,
7    period. In other words, if I said the
8    word "discrimination," she'd go into
9    another frenzy. You can't have that.
10   You know, I had a department to run
11   too. And I wanted her on board. I
12   wanted them both on board.
13       Q. So in her initial e-mail,
14   Weslii's initial e-mail to you, she
15   mentions being disturbed by being
16   accused of discriminating against
17   Amelia. Is there anything in your
18   conversation with her that you believe
19   she took to mean you were accusing her
20   of discrimination?
21       A. She clearly overreacted, I
22   think. I thought she was wrong. I
23   didn't use the word "discriminating"
24   against Jewish people. I mean, the

10 (Pages 34 - 37)

Page 38

L. HEISLER

1
2 implication was there. All right. You
3 have someone who's Orthodox, who needs
4 a little bit of time. Managers
5 routinely give it if there is a
6 documented transportation disturbance.
7 So why are you making a big deal?
8     So she understood it that way.
9 I may not have used the word, but
10 whether it was actual or perceived, in
11 my view, it didn't per se make a
12 difference, because I thought she was,
13 again, painting a bull's-eye on the
14 Authority's back and on her own. Why
15 are you doing this?
16     Q. Did you speak to anybody else at
17 Transit about this interaction with
18 Weslii?
19     A. No, I don't think so. No, I
20 didn't go higher to anyone. You know,
21 obviously I thought it was over. She
22 was, I wouldn't say reprimanded -- I
23 chastised her judgment. All right.
24 So --
25     Q. "Her," meaning Weslii's?

Page 39

L. HEISLER

1
2     A. Yeah. And I thought it was
3 over.
4     Q. Okay. Did you speak to Amelia
5 after speaking to Weslii?
6     A. I don't know. I mean, obviously
7 I spoke to Amelia. I didn't
8 necessarily speak to her about that.
9     Q. Okay. Following this incident,
10 did you become aware of any other
11 issues between Weslii and Amelia?
12     A. Yeah, fairly routine stuff.
13 Amelia would complain that Weslii would
14 dump cases on her without discussing
15 them. Often on Friday, when she was
16 prepared to leave the office. There
17 was some residue of ill feeling there.
18 But, you know, that goes with any --
19 often goes with any law office. So I
20 did not make much of it, you know.
21     The bottom line was the
22 New York unit was still functioning.
23 Weslii was doing a good job and Amelia
24 was doing a good job. As long as the
25 level of tension remained manageable,

Page 40

L. HEISLER

1
2 no big deal.
3     Q. Okay. How often would Amelia
4 complain that Weslii would dump cases
5 on her on Friday?
6     A. Occasionally. Occasionally. I
7 can't say it was a major part of our
8 conversations.
9     Q. Okay.
10     A. She did, ultimately, increase
11 the number of complaints about Weslii
12 and her interaction with her. They
13 weren't particular anti-Orthodox
14 complaints or about that -- or that,
15 but she felt that, again, Weslii wasn't
16 consulting with her, dumping cases on
17 her sometimes at the last minute. So,
18 you know, at a certain point, I began
19 to worry that Amelia might go looking
20 for another job and that it might not
21 work out.
22     So -- but however rocky the
23 relationship was, it hadn't turned
24 catastrophic. So I was willing to put
25 up with some tension, as long as I was

Page 41

L. HEISLER

1
2 sure that nothing catastrophic -- by
3 "catastrophic," I mean anything
4 relating to discrimination or Amelia
5 deciding to leave the TA.
6     You know, at a certain point,
7 too, she raised the possibility of
8 moving to another unit, or even leaving
9 trial work completely. Trial work is
10 very taxing physically, emotionally. I
11 think she had kids, so that was an
12 issue. And many of our trial
13 attorneys, after being in the trenches
14 for a while, would broach the
15 possibility of becoming a, quote, major
16 case attorney, which translates into
17 major case pretrial attorney. I don't
18 have to show up and try cases. So I
19 was a little worried about where things
20 were going.
21     Q. When did Amelia start to raise
22 the idea of transferring out of the
23 unit?
24     A. I would say 2018. Certainly by
25 the beginning of 2019, her complaints

11 (Pages 38 - 41)

Page 42

L. HEISLER
1
2  had increased.
3      Q. Her complaints against Weslii?
4      A. Yes. But, again, remember,
5  these are like routine -- not routine,
6  but workplace complaints. They weren't
7  Weslii is out to get me because I'm
8  leaving early on Friday or taking the
9  Jewish holidays off. She didn't say
10 that. But, of course, always lurking
11 in the back of my mind is that if there
12 was some sort of miscalculation, the
13 earlier episode could explode.
14     Q. Did Amelia ever say to you that
15 she felt she was being discriminated
16 against because she was Jewish by
17 Weslii?
18     A. No.
19     Q. Did she ever say to you, in
20 words or substance, that she felt
21 singled out because she was Jewish by
22 Weslii?
23     A. No.
24     Q. With respect to Amelia's
25 complaints about the work being dumped

Page 43

L. HEISLER
1
2  on her on Fridays, did you ever speak
3  to Weslii about that?
4      A. Yeah. Believe me, at that
5  point, I did not want to use the word
6  "Friday" and "Amelia" in any
7  conversation with Weslii. Number one.
8      Number two, the mere fact that
9  she was giving her cases on Friday
10 before she was leaving did not
11 conclusively convince me that there was
12 an antireligious motivation behind it.
13     Q. Okay.
14     MS. VINCI: Mark this as 5.
15        - - -
16     (Whereupon, Plaintiff's
17 Exhibit 5, an 18-page document,
18 was marked for identification.)
19        - - -
20     Q. Mr. Heisler, you have been
21 handed what we've marked as Plaintiff's
22 Exhibit 5. I don't expect you to read
23 it line by line. I will direct you to
24 certain paragraphs.
25     But have you ever seen this

Page 44

L. HEISLER
1
2  document before?
3      A. Yes. It's the complaint her
4  original attorney, Corey Stark, filed
5  in federal court.
6      Q. And by "her," you mean Amelia?
7      A. Yeah.
8      Q. Okay. So this is the complaint,
9  the initiating complaint in this action
10 filed on behalf of the plaintiff. When
11 did you first see this document?
12     A. I think before the first
13 scheduled EBT. I don't know whether
14 Bob sent me a copy or whether I got it
15 off Pacer myself.
16     Q. If you can turn to page 5, it
17 starts at the bottom, and just read
18 paragraphs 35 and 36 to yourself.
19     A. Okay.
20     Q. Okay. So in 35, we mentioned
21 certain issues or it mentions certain
22 examples of alleged disparate treatment
23 and harassment, the first being the
24 additional work assignments on Friday
25 that we've been talking about.

Page 45

L. HEISLER
1
2      During Amelia's complaints to
3  you about that issue, did she mention
4  that the assignments interfered with
5  her observance of the Sabbath?
6      A. No, she didn't mention that in
7  so many words. No.
8      Q. Did she say -- imply it in any
9  way?
10     A. If she did, I was not eager to
11 recognize the implication because it
12 would, again, put me in a rather
13 untenable position of having to try to
14 guess what Weslii's motivation was and
15 basically destroy the unit, which I was
16 unwilling to do, unless I had pretty
17 clear evidence of it.
18     Q. Okay. The next example noted
19 here in the complaint is stripping
20 Plaintiff of her trial assistant. Do
21 you recall a time when Plaintiff's
22 trial assistant was removed or changed?
23     A. Adrian Thompson was the trial
24 assistant. He was working with Amelia
25 and Weslii took him away. I don't

12 (Pages 42 - 45)

Page 46

L. HEISLER

1  remember the exact timing of when that
2  happened, though.  I think she
3  complained to me and then she
4  complained to Gail Goode, and I think
5  he was restored to her.
6      I mean, it was a little unusual.
7  There was no consultation one day, the
8  person who is your right-hand man,
9  right-hand individual, is there helping
10  you, the next day they're gone, so...
11     Q.  Did you have to do anything to
12  step in and rectify the issue?
13     A.  I may have spoken to Gayle and
14  the situation was rectified.
15     Q.  Did you ever speak to Weslii as
16  to why she removed Mr. Thompson as
17  Amelia's --
18     A.  No, once he was restored, the
19  problem was solved.
20     Q.  Okay.  The next example given
21  here is insisting that Plaintiff use
22  her paid time off allotment on Jewish
23  holidays, even when Plaintiff was
24  working.  Do you recall any instance or

Page 47

L. HEISLER

1  instances wherein Amelia complained
2  about that to you?
3     A.  Actually, it's a Jewish holiday,
4  you're not really working, and the
5  rules are that you have to take your
6  vacation time on it.  The only thing
7  that comes to mind is -- let's see.
8  There was some odd exchange after
9  Amelia was transferred to Brooklyn.
10  I'll get back -- we'll explore it, I
11  assume.
12     Weslii wanted, apparently,
13  nothing to do with her, et cetera.  But
14  then it turned out that she was still
15  doing her time sheets, which is, to put
16  it mildly, highly unusual, completely
17  inappropriate.  You're in the height of
18  COVID, you have someone who is not a
19  manager signing off.  So -- it was
20  during Shavuos, I believe, so all
21  synagogues, except those in Borough
22  Park and Williamsburg, were closed.
23     So Amelia had apparently been
24  reading some files at home, and I think

Page 48

L. HEISLER

1  she gave herself -- she put down that
2  she was working.  Weslii, for whatever
3  reason, I don't know why she had any
4  interaction with Amelia on the time
5  sheet front, totally, totally
6  inappropriate, leaving aside the
7  combustibility of the religious issues,
8  asked her why she took credit for that.
9      So I think Amelia explained that
10  even though it was a Jewish holiday,
11  synagogues were closed, so she did some
12  reading at home and that's why she
13  credited herself as working.  That's
14  the only thing I can think of.
15     Q.  How did that come to your
16  attention?
17     A.  Someone sent me an e-mail -- I
18  don't know if it was Amelia.  Someone
19  sent it to me.
20     Q.  Do you know how that issue got
21  resolved?
22     A.  No, I don't.  You know, again,
23  I'm still thinking about it today.
24  Again, leave aside the religious

Page 49

L. HEISLER

1  issues, it's extreme stupidity on two
2  counts.  A, you have someone
3  supervising and signing off on time
4  sheets of someone they're not
5  supervising.  The MTA was very strict
6  about that during COVID.
7      B, why does Amelia have anything
8  to do with Weslii, and especially on a
9  religious issue.  So, again, I mean,
10  what are you doing?
11     Q.  Did you ever speak to Weslii
12  about her continuing to approve
13  Amelia's time sheets?
14     A.  No, I don't know when I found
15  out about it.  Okay?  I don't think it
16  was contemporaneously.  It was not
17  contemporaneously.
18     Q.  Do you have any understanding
19  why Weslii continued to approve
20  Amelia's time sheets?
21     A.  No, you know, I'm curious.  I
22  don't know how or why.  I don't know
23  what Amelia's supervisor in Kings, Lisa
24  -- Weslii should not have been having

13 (Pages 46 - 49)

Page 50

L. HEISLER

1 anything to do with Amelia at that
2 point. Okay. I mean, use your brain,
3 for G-d's sake.
4    Q. Did Amelia complain to you that
5 the issue you just described, regarding
6 working from home on the Jewish
7 holiday, she saw as discrimination
8 against her from Weslii?
9    A. I don't recall that. I do not
10 recall that. It definitely didn't
11 happen, because if she had -- anyone
12 had told me that Weslii was still
13 signing off on her time sheets when she
14 was no longer in her unit, I would have
15 complained to the general counsel and,
16 you know, the MTA was very strict about
17 that. I mean, it would've put, I
18 think, Weslii's job on the line.
19    Q. How was it resolved that Weslii
20 stopped approving Amelia's time sheets?
21    A. I don't know. I don't know
22 whether she's still continuing to do
23 it. I don't know when it started. I
24 don't know when it stopped. All right.

Page 51

L. HEISLER

1 There was a major failure there
2 somewhere.
3    Q. Okay. And then going to the
4 complaints again, the last example
5 given is that Weslii is alleged to have
6 assigned Amelia a disproportionate
7 number of cases.
8    A. I can't tell you that, because I
9 don't know what the exact distribution
10 was. It's also likely that Amelia
11 would have gotten a good portion of the
12 heavier trials, because she had a good
13 record. I think at that point they had
14 three topnotch trial attorneys:
15 Amelia, possibly Jennifer Coyne, at
16 some point, and Alexandra Vandoros.
17    So unless I know the exact
18 breakdown, I can't tell you. I mean, I
19 suppose you could reconstruct it.
20    Q. Did Amelia ever complain to you
21 that she had been assigned an
22 overbearing or disproportionate amount
23 of cases?
24    A. Well, she definitely said that.

Page 52

L. HEISLER

1 She said she was given -- being given
2 too much work at the last minute.
3 Didn't have -- wasn't provided enough
4 time to discuss cases with Weslii.
5 That Weslii would just come into her
6 office and dump files on her table.
7    Q. Did you do anything in response
8 to those complaints?
9    A. No. Again, I was in a position
10 of having to balance complaints, some
11 of which were legitimate, with the need
12 to make sure that the unit would not
13 implode. So, you know, you can blame
14 me for being a little forgiving on what
15 might have been the dysfunctions of the
16 unit.
17    Q. Did you ever ask Weslii, after
18 receiving these complaints from Amelia,
19 for a breakdown --
20    A. No.
21    Q. -- of the distribution of cases
22 in the unit?
23    A. No.
24    Q. Did you ever tell Amelia that

Page 53

L. HEISLER

1 you had asked her for that?
2    A. No.
3    Q. Do you know if Weslii ever told
4 Amelia that you had asked her for that?
5    A. Oh, I definitely didn't ask. I
6 mean, if a question like that was
7 posed, it wouldn't be just to Weslii.
8 Maybe Gail Goode, who was head of the
9 trial unit, would ask the different
10 trial borough chiefs to give them
11 breakdowns and indicate who the cases
12 were assigned to.
13    Q. While Amelia was still working
14 under Weslii, did you ever see a
15 breakdown of the trials distributed to
16 the attorneys?
17    A. I'm sure I did, but it made no
18 impression on me.
19    MS. VINCI: Why don't we
20 take a quick ten-minute break for
21 the restroom.
22    THE WITNESS: Sure.
23    - - -
24    (Whereupon, a recess was

14 (Pages 50 - 53)

Page 54

L. HEISLER
1
2   taken at this time.)
3        - - -
4     Q. Mr. Heisler, we're back on the
5   record after a short break.  I did want
6   to ask you, sir, you brought and were
7   just looking through sort of a manila
8   folder of documents.  What documents do
9   you have with you today?
10    A. I have -- somewhere, I have a
11  whole bunch of stuff.  I have the last
12  set of charges that led to Amelia's
13  firing.  Let me see.  I have a lot of
14  -- let's see.  I have actually the
15  initial memo that you referred to the
16  e-mail, the lengthy e-mail, as well as
17  the exchange that we discussed earlier.
18  Some cases relating to some of the
19  issues, some of the charges.
20       I have a lot of information on
21  the Alexander Hill case that was -- not
22  Hill, Alexander Wood that formed one of
23  the charges against Amelia.  That was
24  actually very enlightening, I have to
25  say.  It sort of indicates why it was

Page 55

L. HEISLER
1
2   profoundly stupid not to consult with
3   me on these issues, frankly.
4        I have case law involving our
5   little dust-up with Justice Freed to
6   explain the motivation for calling her
7   action in the Rivera case collusion,
8   which was my contribution.  It wasn't
9   Amelia's.  And, you know, I'll explain
10  that this wasn't the first time it
11  happened with Justice Freed.
12       And yeah, just basically
13  summaries and case law.  I mean, there
14  are interesting legal issues, the power
15  of a court to exile an attorney
16  whenever they're displeased with their
17  conduct.  Justice Freed's ruling on
18  providing a missing witness charge or
19  missing document charge after the court
20  is responsible for excluding that
21  information.  You can press that a
22  little later.
23       But that's basically it.
24  90 percent of it is legal stuff.  Plus
25  the Alexander Wood case, which is

Page 56

L. HEISLER
1
2   interesting.
3     Q. Okay.  So you've alluded to a
4   number of times issues with judges
5   leading to a disciplinary notice to
6   Amelia, correct?
7     A. Yes.
8     Q. When did you first become aware
9   that there had been any complaints from
10  judges on the court about Amelia?
11    A. All right.  I'd say the first
12  time was probably in the middle of
13  November 2019.
14    Q. And how did you become aware?
15    A. Okay.  I think there was an
16  issue.  I think Amelia was covering a
17  case for Alexandra -- that's the Wood
18  case -- and the question was the proper
19  response to certain discovery requests.
20  So my initial impression was there was
21  a question of what happens when a
22  plaintiff asks the Transit Authority to
23  turn over material the Transit
24  Authority, on the strength of its own
25  efforts, had gotten from a third party.

Page 57

L. HEISLER
1
2   All right.
3        I think the attorney --
4   plaintiff's attorney was Jay Dankner,
5   whom we well knew he had gotten a
6   $10 million verdict against us, at the
7   same subway station, by the way, 14th
8   Street, a short while before.  And my
9   initial impression was that he wanted
10  surveillance tapes at the station.
11       Now, these tapes, even though
12  they're on TA property, are maintained
13  by the New York City Police Department.
14  So our investigators would reach out to
15  the PD and they would receive them.
16  The question, then, was if plaintiff
17  asks us to turn over that product, what
18  would our attitude be?  All right.  You
19  know, as a technical matter, you can
20  always tell the plaintiff, you know, we
21  got it, it's really available, serve a
22  subpoena.  We're short staffed.  We're
23  not going to do your work for you.  All
24  right.  That's one attitude.  It wasn't
25  an attitude I would necessarily

15 (Pages 54 - 57)

L. HEISLER

1 recommend because it would lead to
2 motion practice, complaints. I mean,
3 it wasn't worth the effort, you know,
4 but I wasn't sure.
5     So I actually remember talking
6 with Amelia and going to the office of
7 the head of the New York pretrial unit,
8 Cheri Ehrlich, and there was an
9 attorney there named Matt Finkel, and
10 his attitude was that, You tell them,
11 this is where I got it. Go ask them
12 for it.
13     I thought that was not cost
14 benefit productive, so I think there
15 was an issue with the tapes. So I
16 said, If you have the tape, just turn
17 it over. So I told her to do that.
18     Then I remember meeting Weslii
19 and she said there was another issue
20 with Judge Sokoloff. She told Amelia
21 what Judge Sokoloff wanted and it had
22 been worked out. That was possibly
23 November 9th. And it's also possible
24 that Judge Sokoloff had called Weslii
25

L. HEISLER

1 while that was going on. All right.
2     My next indication about any
3 trouble actually came from Judge
4 Sokoloff, too. It was November 19,
5 2019 at the Jewish music -- the Jewish
6 Lawyers Guild had an installation of
7 its officers. It was very cold. I was
8 there. And, you know, she introduced
9 herself. I don't know if I knew her or
10 not. She said, Oh, Amelia, shaking her
11 head. Her behavior is not something I
12 approve of.
13     Okay. You know, I thought, you
14 know, You're a judge, if there are
15 complaints, you have a whole panoply of
16 tools at your disposal. If she does
17 something wrong, you can hold a
18 hearing, you can impose sanctions. You
19 can punish her individually or you can
20 punish the Authority.
21     So it was a little strange that
22 at a party where everyone was feeling a
23 little bit too happy, that she would
24 raise that issue. But that was the
25

L. HEISLER

1 extent of it.
2     Before that, never heard a
3 complaint from any judge. Certainly
4 not any judge directly and certainly
5 not from Weslii.
6     Q. Okay.
7     A. I mean, if anything, the
8 complaints went the other way, with
9 Judge Freed. We'll get to that.
10     Q. When Weslii first alerted you to
11 a complaint from Judge Sokoloff in
12 November of 2019, did you speak with
13 her in person? Was this over the
14 phone? Over e-mail?
15     A. No, no. We were in the hallway.
16 It seemed like a very, very minor bump
17 in the road. I told her -- I told
18 Weslii that Amelia would exchange the
19 videos. There was another issue, but
20 it had been resolved. So to my mind,
21 in the larger scheme of things,
22 considering how catastrophic our
23 pretrial and discovery practice was,
24 where we were constantly ducking
25

L. HEISLER

1 motions to have our answers stricken,
2 often unsuccessfully. On a scale of 1
3 to 10, this barely made it to .5.
4     Q. When did you first become aware
5 that there had been subsequent
6 complaints from judges against Amelia?
7     A. All right. So sometime in
8 November or December, Weslii came into
9 my office and we had a -- what I would
10 characterize as a sort of bizarre
11 exchange. She looked at me --
12 actually, she wouldn't look at me, she
13 was smirking. And she said, The judges
14 don't like Amelia.
15     Hello? I mean, what does that
16 mean? The administrative judge doesn't
17 want her. Why? I don't know. I just
18 want to help the Authority. I'm just
19 worried about the Authority.
20     She may have told me Suzanne
21 Adams, who was a new judge, who had
22 worked with Amelia at Morris Duffy,
23 doesn't want to hear her cases. Hello?
24 Why? I don't know. I just want to
25

16 (Pages 58 - 61)

Page 62

L. HEISLER

1
2 help the Authority.
3     She may have mentioned Kathy
4 Freed, which, again, heightened my view
5 that the entire episode was bizarre,
6 because we -- I mean, the Transit
7 Authority had a history with Judge
8 Freed. It wasn't Amelia. It was both
9 Weslii and possibly Alexandra Vandoros
10 who had complained that she was unfair
11 to the Authority. She was short,
12 biased, and they didn't want to appear
13 before her.
14     At one point, I remember even
15 getting a call from the bar
16 association -- and I think Weslii may
17 have gotten one, too, I'm not sure --
18 and I relayed those complaints about
19 Judge Freed.
20     Q. Okay. So --
21     A. I also know that Judge Freed was
22 a bit peeved by the collusion episode,
23 which I will explain, if anything, we
24 were a little too easy on her.
25     MS. VINCI: So we'll have

Page 63

L. HEISLER

1
2 this marked as 6.
3     - - -
4     (Whereupon, Plaintiff's
5     Exhibit 6, a two-page document,
6     was marked for identification.)
7     - - -
8     Q. Mr. Heisler, you've been handed
9 what's been marked as Exhibit 6. Take
10 a moment to review that. Let me know
11 when you've had a chance.
12     A. Yes.
13     Q. Okay. So this appears to be a
14 chain between yourself and Weslii,
15 where she asks for some time to discuss
16 Judge Sokoloff's complaint against
17 Amelia and then notes Judge Freed and
18 Judge Frank had also complained.
19     A. Are those names there?
20     Q. At the top, you ask -- on the
21 first page, you ask who they are --
22     A. No, no. Freed and Frank. No.
23 Judge Freed and Judge Frank are not --
24     Q. Not in her initial e-mail.
25     A. Correct.

Page 64

L. HEISLER

1
2     Q. And then later she advises that
3 there were two others. You ask who the
4 two others were. And then she notes
5 it's Judge Freed and Judge Frank.
6     A. Okay. I will say at no point
7 did she ever tell me about Judge Frank.
8 She did mention Judge Freed, but I'm
9 going to cover Judge Frank and,
10 specifically, in relation to the charge
11 that appears in the March 2021
12 disciplinary letter.
13     Q. Okay.
14     A. If Weslii had read the
15 specification about Judge Frank to me,
16 my first question to her would have
17 been, Are you taking your medication?
18 I would have asked her, by the way,
19 What was the result of that case? The
20 Chinn case, she was trying it against
21 Nicholas Timko, one of the aging male
22 titans of the plaintiff's bar. It was
23 a long, drawn out, fairly boring case
24 about moisture or wetness in some lower
25 Manhattan subway station.

Page 65

L. HEISLER

1
2     And, you know, she won. She
3 beat him. She beat him fair and
4 square. I don't believe Mr. Timko ever
5 moved to set the verdict aside. It
6 certainly was never set aside. There
7 was no appeal. So basically, Amelia
8 won her case against one of the better
9 lawyers in the city. So that's my
10 first exception.
11     The language in that charge is
12 weird and repulsive. Basically, you
13 have a judge of the Supreme Court
14 calling a trial attorney, female trial
15 attorney who appears before him a
16 "little girl." She acted like one of
17 his kids. There's no way if any male
18 attorney had appeared and pounded his
19 fists on the podium, that he would have
20 done anything remotely like that.
21     Number three, this episode with
22 holding her breath, can you imagine
23 that? She held her breath. I mean,
24 why would you put that in a
25 disciplinary charge when it seems so

17 (Pages 62 - 65)

Page 66

L. HEISLER

1
2  absolutely outlandish?  There's no way
3  Judge Frank would concede to that.
4      I mean, I don't think --
5  whatever I may think of the judiciary
6  on the Supreme Court, New York County,
7  they're not that stupid.  If I believe
8  for a second -- if anyone believed for
9  a second that this happened, they
10  should have reported him to the
11  commission on judicial conduct.  I
12  mean, the condescension toward women is
13  just absolutely striking.
14      As for Weslii, Amelia won the
15  case.  There's no sanction.  There's no
16  appeal.  There's nothing.  I would
17  consider that charge -- I mean, you
18  can't call it pretextual, because
19  there's no pretense.  It's basically
20  we're going to knife you in the back,
21  by the way, you held your breath, you
22  acted like a little girl.  Sure, you
23  won the case, but we have deeper issues
24  at stake here.
25      Q.  Okay.  We're going to go very

Page 67

L. HEISLER

1
2  in-depth in the judge's complaints and
3  that specification and at those charges
4  in a little while.
5      At the time of December 2019,
6  when Weslii brought these complaints
7  first to your attention, did she
8  discuss with you a way to respond to
9  the complaints?
10      A.  No.  Oh, it was I'm trying to
11  help the Authority.  Amelia -- Amelia
12  has to go.
13      Q.  So she wanted Amelia fired at
14  that time?
15      A.  I'm sure that would have
16  satisfied her, but my impression was
17  that at a minimum, she did not want her
18  in her unit.
19      Q.  Okay.  And by December of 2019,
20  Amelia had already been asking or
21  brought up the idea of transferring out
22  of the unit; is that right?
23      A.  Oh, yes.  And after the meetings
24  with Weslii, it became abundantly clear
25  that if they stayed together, there'd

Page 68

L. HEISLER

1
2  be a lawsuit, frankly.  I mean, no way
3  around it.  If you examine, for
4  example, the complaints about her
5  discovery responses and the way Weslii
6  reacted, in comparison to what other
7  members of the unit did, I mean the
8  disparate treatment was absolutely
9  stark.  I'll give you some cases on
10  that.  I'll give you an example.
11      A case called Cheryl Daniels.
12  That was a case that Alexandra Vandoros
13  handled where we failed -- I'll give
14  you the appellate division cite, if you
15  want it.  It went up to the court of
16  appeals, where further damage was done.
17  Daniels versus TA, 171 A.D.3d 601,
18  First Department 2019.  One of our
19  signature gap cases, which we get many.
20  There are gaps between the trains and
21  the platforms, because it's a very old
22  system and the topography of the
23  stations and the earth above shifts.
24  We face many, many suits on that point.
25  But we have a reason basis for

Page 69

L. HEISLER

1
2  tolerating gaps of anywhere from 2 to 6
3  inches.
4      We were prepared to present
5  experts, our own people to make that
6  point.  But unfortunately, we did not
7  exchange those names in time.  So we
8  basically have no experts.  We get
9  pulverized on our gap defense.  Case
10  goes up to the court of appeals, where
11  the court digs a deeper hole for us,
12  indicating that plaintiff's testimony
13  about informal standards is enough to
14  make out a prima facie case.
15      So there are two catastrophic
16  effects of our failure to comply with
17  disclosure.  All right.  That's in the
18  New York County unit.  So that strikes
19  me as vastly more serious than what
20  happened at the Wood case, where
21  basically nothing happened.
22      We've got another case,
23  Papadopoulos.  I don't have it with me.
24  The facts of that case involved
25  someone, may have been suffering from

L. HEISLER
2  mental illness, who decided to defecate
3  in the tunnel.  The claim against us
4  was that our operator left the station
5  too fast and couldn't stop in time.
6  The citation to that is 192 A.D.3d 430,
7  First Department 2021.
8      We had been asked to provide
9  evidence from cameras in front of the
10  train depicting the sight the train
11  operator would have had as he pulled
12  out of the station.  A major
13  complication is that the trains are not
14  equipped with such cameras, which we
15  should have pointed out.  We didn't.
16  We were dawdling on discovery.
17      Ultimately, Justice Sokoloff
18  issues a conditional preclusion order,
19  which means you have until, let's say,
20  March 1, 2025 to comply.  If you're
21  late, your answer is stricken.  So she
22  realized that we hadn't been on time,
23  but she overlooked it.  But the
24  appellate division didn't.  So we wound
25  up having to pay on a case where

L. HEISLER
2  someone is using the subway tunnels as
3  his personal bathroom.
4      And then you've got --
5      Q.  And who handled the Papadopoulos
6  case?
7      A.  That was in -- possibly New York
8  pretrial.
9      And then you've got a whole
10  bunch of other cases involving the MTA
11  lawyers that we use, where we have our
12  answers stricken.  I mean, just one
13  illustrative one, Cooper versus MTA,
14  186 A.D.3d 1150.  There's one that came
15  down two weeks ago involving Cullen and
16  Dykman, and Smith Mazure, 5091 Second
17  Avenue versus MTA, October 3, 2023.  I
18  don't know if it has an official cite
19  yet.
20      My point was that if you look at
21  the Wood case, if you actually go to
22  the docket sheet, if you actually look
23  at the documents, there's really
24  nothing there.  And if you want to go
25  into it in even greater depth, you'll

L. HEISLER
2  realize what got Judge Sokoloff annoyed
3  and why she was wrong, which should
4  have been explained to her.  Someone
5  should have explained it to her, but
6  there was no effort to do that.
7      Q.  Okay.
8      A.  That relates, by the way, to the
9  demand for witnesses.  All right?
10      Q.  Understood.
11      A.  Do you want me to --
12      Q.  We're going to get to that with
13  the specification in the DAN.
14      So who made the decision to
15  transfer Amelia out of the New York
16  unit --
17      A.  I did.
18      Q.  -- into the Kings County?
19      A.  You have to understand that
20  Weslii's encounter with me, again,
21  convinced me that this was only going
22  to end in a catastrophe.  Lisa in Kings
23  -- Lisa Hodes-Urbont, H-O-D-E-S, dash,
24  U-R-B-O-N-T, needed a trial attorney.
25  So it seemed that we could solve the

L. HEISLER
2  problem that way.
3      And I would say the final straw
4  that really persuaded me that Amelia
5  would have to go to Kings -- and it's
6  just not to satisfy Judge Sokoloff,
7  because she doesn't run the unit -- was
8  that on December 6, 2019, there was a
9  case that made the newspaper involving
10  a former corporation counsel who sued
11  the City.  I don't remember the name
12  immediately, but people in my office
13  knew him.  They weren't that impressed
14  with his efforts and thought that the
15  suit was meritless.  But the City
16  settled, I think it was in the Southern
17  District, for $600,000.
18      So, you know, it convinced me
19  that the possibility of a lawsuit was
20  real and if the City wound up paying
21  $600,000 on a case like that, where
22  plaintiff was able to obtain
23  employment, worked at decent firms
24  afterwards, I didn't want that hanging
25  over the office.  So off to Brooklyn.

Page 74

L. HEISLER

1
2     But before she went, she did try
3 one last case at the end of December,
4 despite the fact that no judges wanted
5 her there in the courthouse.  The case
6 was Adika, A-D-I-K-A, versus
7 New York City Transit Authority.  The
8 trial judge was Shlomo Hagler, no
9 relation to Marvin.  And, you know, the
10 case -- that case is worth looking at
11 for several reasons.
12     It shows that there were judges
13 who had no trouble trying cases with
14 Amelia.  And it also wound up in the
15 appellate division.  So plaintiff
16 there, it was Sullivan Papain, Nick
17 Papain tried the case.  Another aging
18 male star of the plaintiff's bar, good
19 guy, nice guy, talented attorney,
20 complained that Amelia had been guilty
21 of misconduct at trial.  But if you
22 read the appellate division decision --
23 you can get the case, I don't
24 necessarily have it here, A-D-I-K-A --
25 you'll see that the court said that

Page 75

L. HEISLER

1
2 there was no misconduct.
3     So that sort of, again,
4 undermines the point.  And if -- I know
5 I've touched basically on pretrial
6 stuff.  If you actually look at some of
7 the trial cases we had, they're much
8 bloodier and much more interesting.
9     Q. Staying on the Adika case, do
10 you recall during that case that Amelia
11 had a medical issue, an eye infection,
12 in particular?
13     A. No.  I remember talking to her
14 about it.  You know, I think it was
15 someone getting off the bus, stepping
16 into a defect in the roadway.  Her
17 adversary, as many trial attorneys do,
18 was always trying to sneak in hearsay.
19 You know, trying to sneak it in is a
20 perfectly legitimate tactic if you
21 think your adversary won't object.  So
22 I wouldn't necessarily frown upon that.
23 But she ultimately won the case.
24     Q. Do you recall Amelia complaining
25 to you about how Weslii was treating

Page 76

L. HEISLER

1
2 her while she was on the Adika trial?
3     A. No, I don't recall that.  What I
4 do recall about Adika is that plaintiff
5 moved to set the verdict aside, based
6 on weight of the evidence, counsel's
7 misconduct.  And, you know, on her own,
8 Weslii had shipped it off to outside
9 counsel, which made no sense because
10 Amelia knew the case.  So you would
11 basically have to pay outside counsel
12 thousands of additional dollars to
13 familiarize themselves with the
14 transcript, which I didn't think was
15 warranted at all.  I didn't find out
16 about it immediately.
17     And then it turned out that
18 she'd also assigned the case for
19 appellate purposes, which is totally
20 improper.  She has no idea, Weslii,
21 about who's competent as an appellate
22 attorney.  So that part, we grabbed
23 back.  So if you actually look at the
24 ultimate appeal, you'll notice that Tim
25 O'Shaughnessy, who is on our appeals

Page 77

L. HEISLER

1
2 unit, did the appeal for us.
3     Q. How was -- well, strike that.
4     When was Amelia transferred from
5 New York to Kings unit?
6     A. I don't know exactly.  I know
7 she tried a case in Kings County early
8 in 2020.  Okay.  I don't know if she
9 was out a little bit at the beginning
10 of the year or not.  But I would
11 certainly think that by the middle or
12 end of January, she should've had
13 nothing to do with New York.  I mean,
14 you really didn't want her at that
15 point.
16     I mean, one of the things that
17 struck me why they were, like, so
18 clueless about each other, when I told
19 Amelia that she was going to Kings, she
20 was absolutely overjoyed.  I said, you
21 know, By the way, Weslii would like you
22 out of New York County too.  She was
23 absolutely flabbergasted and floored.
24 She said, Why would she want me out of
25 her unit?  All right.  So she was

L. HEISLER
1
2  totally unaware that Weslii had the
3  daggers out for her.
4     Q. Do you know, was Weslii still
5  giving Amelia assignments after the
6  transfer to Kings unit?
7     A. I mean, she really should not
8  have been doing that. No way should
9  she have been doing that. Okay. She's
10  whining about how the transfer has to
11  be immediate, it's got to be done
12  immediate, it's got to be done
13  immediate. She starts shipping cases
14  out, costing us thousands of dollars,
15  why is she giving her cases?
16     Q. Did you ever hear Amelia
17  complain --
18     A. No.
19     Q. -- that she was still getting
20  assignments from Weslii?
21     A. No, I did not hear it. If I
22  heard it, I would have gone ballistic.
23     Q. So we've touched upon a couple
24  of times these disciplinary notices
25  that were issued to Amelia.

L. HEISLER
1
2     MS. VINCI: So we'll have
3  them marked -- we're up to 7 now.
4        - - -
5     (Whereupon, Plaintiff's
6  Exhibit 7, a four-page document,
7  was marked for identification.)
8        - - -
9     Q. Okay. Mr. Heisler, we started
10  to talk about it this morning, and then
11  we sort of stopped. But when did you
12  first learn about the first series of
13  charges against Amelia?
14     A. All right. So I'll sort of give
15  background on it. I was aware of the
16  initial series of charges related to
17  Sean Smith, the outside counsel. I
18  complained about it in my lack of
19  participation. Amelia, I knew had
20  gotten an attorney to represent her.
21  The reason I knew that is the guy
22  called me up, or left a voicemail. I
23  told Drinan, Drinan got in touch with
24  him and told him not to call.
25     I think in January of 2020, or

L. HEISLER
1
2  maybe even the end of December, Lisa
3  Urbont, who knew Amelia was coming to
4  her unit, said there had been a
5  favorable -- relatively favorable
6  disposition of the first encounter --
7  not encounter, the first series of
8  charges, and that Amelia would be
9  suspended for 20 days.
10     Q. Okay. So I'm going to hold you
11  just so we can kind of orient ourselves
12  in time. I'll hand you what's been
13  marked as Exhibit 7.
14     A. Yeah.
15     Q. Do you recognize that, sir?
16     A. Yes.
17     Q. Is this the first series of
18  charges that were issued to
19  Ms. Yehoshua?
20     A. Yes.
21     Q. Okay. When did you first see
22  this document?
23     A. Amelia e-mailed it to me on a
24  Friday. So I mean, you can work
25  backwards, depending on when she got

L. HEISLER
1
2  it. I knew it was coming because
3  Farber told me it was coming. So she
4  e-mailed me or she even spoke to me
5  about it.
6     The impression Farber had given
7  me is that it's a done deal. She's
8  cooked. So Amelia said she wanted to
9  talk to me about it. So I said, No, I
10  can't talk to you about it, obviously,
11  because we're not necessarily on the
12  same side. I said I will talk to your
13  husband. All right.
14     So we had this not-so-top-secret
15  meeting in front of the Columbus statue
16  in Supreme Kings Boerum Plaza. The
17  purpose of my meeting him was to try to
18  impress him, that he better get the
19  movers ready, because Amelia was done
20  for. This wasn't some little vendetta
21  that Weslii had cooked up. This was
22  not initially her doing.
23     Now, let me point that out.
24  You'll notice that Weslii's signature
25  appears on it. I told Weslii when she

Page 82

L. HEISLER

1
2   told me -- when she called me, Weslii
3   spoke to me about it, said, Gee, I
4   thought this had been resolved. Why is
5   this happening? So I said, This is
6   what it is. And then she told me
7   Farber wanted her to put her name on
8   it.
9       So I told her, Do not do that.
10  Don't do that. This decision was not
11  yours. You're going to wind up in a
12  lawsuit. But ultimately, she decided
13  to put her name. It should have been
14  Farber's there, but she put her name on
15  it. I told her husband, Get the movers
16  ready. It's over and done with. And
17  he -- I guess he decided to hire a
18  lawyer.
19      And apparently, I thought, hey,
20  you know, Lisa thought, too, over and
21  done with, it's resolved, she's going
22  to Brooklyn, or she was already in
23  Brooklyn. But she's going to be
24  working there and end of story.
25      Then --

Page 83

L. HEISLER

1
2       THE WITNESS: I'm just going
3   to speak in general terms,
4   because I know you might object
5   to it.
6   A. I got a puzzling call from
7   Jenna --
8       THE WITNESS: You were on
9   it. You remember that?
10  A. -- and Mr. Small.
11      MR. SMALL: Yeah, I'm going
12  to object. I don't know where
13  we're going with this, but I
14  don't think that we should be
15  disclosing any discussions that
16  you had with us at the time when
17  you were working for Transit. So
18  I don't know if we should --
19  A. Let me answer it. I'll just
20  speak very generally about the topics
21  of the second disciplinary letter,
22  which --
23      MR. SMALL: Object. We
24  really shouldn't be discussing --
25      THE WITNESS: Okay.

Page 84

L. HEISLER

1
2       MR. SMALL: -- anything that
3   we had discussed while you were
4   still a Transit employee. That's
5   fully covered by attorney-client
6   privilege. We should not be
7   discussing any of that.
8   Q. Let's stay on the first
9   disciplinary letter.
10  A. Yeah.
11  Q. So you mentioned earlier this
12  morning that you spoke to Mr. Farber?
13  A. Yeah.
14  Q. My understanding was there had
15  sort of been a change at the IG's
16  office. They were cracking down --
17  A. Yes. There was a new IG, Carol
18  Pokorny, who was a Cuomo appointee.
19  And again, depending on your attitude,
20  had heightened ethical sensibilities or
21  was looking for scalps.
22  Q. And at that time, Mr. Farber
23  said to you, It's a done deal --
24  A. Yes.
25  Q. -- Amelia's got to go?

Page 85

L. HEISLER

1
2   A. Okay. I've got no discretion
3   here. She broke a rule. She gave him
4   work. Didn't compensate him. He was
5   working for free. Clear violation.
6   She's out.
7   Q. How close or far in time was
8   that conversation relative to June 12,
9   2020?
10  A. Within a week.
11  Q. Okay. Did you speak to anybody
12  else at Transit within that week, so
13  between talking to Mr. Farber and the
14  June 12, 2020 date on the notice?
15      THE WITNESS: You can jump
16  up here.
17  A. Possibly Bob.
18  Q. Okay. I'm not going to ask you
19  for the content or the substance of any
20  discussions with counsel.
21      Other than Mr. Drinan, did you
22  talk to anybody else at Transit?
23  A. No.
24  Q. You had mentioned earlier this
25  morning feeling left out or frozen out

22 (Pages 82 - 85)

Page 86

L. HEISLER

1       L. HEISLER
2  of the decision with respect to this
3  disciplinary charge. Why did you feel
4  that way?
5      A. I'm head of the department.
6  I've been involved in a number of other
7  disciplinary cases against other
8  employees. I had been involved in a
9  case against an attorney named Lynn
10  Henderson. Another one -- that came
11  later. Alice Charles, Amanda Phillips,
12  and in all of them, my input was taken
13  into account. We had discussed
14  everything in great detail. And then
15  suddenly, the middle of the day to get
16  a rushed phone call from the general
17  counsel with no input was somewhat
18  striking, I thought.
19      Q. Okay. Other than speaking to
20  Amelia's husband that time outside of
21  Kings County Supreme, did you ever
22  speak to him again about the charges,
23  these first set of charges against
24  Amelia?
25      A. No.

Page 87

L. HEISLER

1       L. HEISLER
2      Q. Were you ever interviewed as
3  part of any investigation into the
4  first set of charges against Amelia?
5      A. No.
6      Q. Do you know if anyone was
7  interviewed in relation to these
8  charges?
9      A. I know absolutely nothing about
10  the process that went into the charges.
11      Q. Okay.
12      A. I don't know, for example,
13  whether the vendor was penalized, as
14  well. That's usually what happens. So
15  I have no idea.
16      Q. Okay.
17      A. Totally in the dark.
18      Q. And is that -- in your
19  experience, is that unusual,
20  considering you were the head of torts?
21      A. Yes. And considering that I
22  have been involved in other
23  disciplinary episodes, including to the
24  extent of personally wheeling a
25  person's belongings outside the

Page 88

L. HEISLER

1       L. HEISLER
2  building, having -- drafting personal
3  improvement plans. Yeah, so it was a
4  little unusual.
5      Q. Did Amelia ever express to you
6  that she felt these charges were
7  discriminatory?
8      A. She always felt that Weslii was
9  behind everything. Yes. Oh, she
10  totally and completely believed that
11  Weslii was behind the charge and, you
12  know, I mean, she saw her -- of course
13  she did. She saw her name on it. I
14  told Weslii, Don't put your name on it.
15  But she put her name on it.
16      Q. Do you know why Weslii put her
17  name on it?
18      A. Maybe she thought the costs were
19  worth it.
20      Q. Okay. Did you believe that the
21  issuance of these disciplinary charges
22  was discriminatory in any way?
23      A. Well, let's put it this way.
24  There doubtless were prior episodes
25  where vendors, if you want to call them

Page 89

L. HEISLER

1       L. HEISLER
2  that, had done favors for attorneys who
3  had no connection to assigning them
4  work. We had a vendor who would be a
5  photographer for accident scenes,
6  sometimes there might have been a
7  situation where someone called him to
8  do a wedding. There's one guy who did
9  -- who did closings for some of our
10  people, but you know, I don't know
11  whether they paid him or not.
12      So Farber seemed aware that
13  there had been prior episodes, but he
14  insisted that under the new regime,
15  there be zero tolerance.
16      Q. Are you aware of any other
17  Transit attorneys that were brought up
18  on similar charges as this first DAN?
19      A. No.
20      Q. To your knowledge, what was the
21  result of the first DAN?
22      A. She had been given a relatively
23  short suspension, which actually
24  shocked me, 'cause I was under the
25  impression that her career at the TA

23 (Pages 86 - 89)

Page 90

L. HEISLER

1
2  was over.
3      Q. The suspension was for 20 days,
4  correct?
5      A. Correct. That's four workweeks.
6      Q. Did you discuss that -- that
7  determination with Amelia?
8      A. No.
9      Q. How did you learn of that
10  determination --
11      A. Lisa.
12      Q. From Lisa.
13      A. Okay. Lisa told me about the
14  end result. And she told me -- also
15  told me that Weslii was furious. I
16  remember her exact words. Lisa said, I
17  like both Weslii and Amelia, but Weslii
18  is going nuts that Amelia wasn't fired.
19      Q. Did Lisa elaborate as to why
20  Weslii was, in her words, "going nuts"?
21      A. No. I mean, it puzzled me. I
22  mean, presumably, she had nothing to do
23  with Amelia after the separation,
24  although maybe I missed that. But they
25  should have had nothing to do with each

Page 91

L. HEISLER

1
2  other.
3      Q. Did you ever speak to Weslii
4  about the determination?
5      A. No.
6      Q. Did you ever speak to
7  Mr. Farber?
8      A. No. I mean, I was totally out
9  of the loop. Amelia had her own
10  attorneys. It was pointless. And
11  another factor to throw in, by the end
12  of January, I had announced that I was
13  going to retire. So I was basically a
14  lame duck at that point.
15      Q. Prior to the resolution of the
16  first DAN notice, were you aware that
17  Amelia had filed a complaint with the
18  New York State Division of Human
19  Rights?
20      A. Indirectly. I subsequently
21  learned of it.
22      Q. How did you learn of it?
23      A. I was being questioned. Again,
24  I couldn't understand why I was being
25  called about Amelia, why I was getting

Page 92

L. HEISLER

1
2  a call from Jenna. I thought
3  everything had been resolved. That's
4  it. And the only other way I had
5  learned about what happened, it made a
6  lot of sense, even though the Ezra
7  Glazer complaint in Supreme Kings --
8  Ezra's a little bit over the top, to
9  put it mildly -- but if you read it,
10  you sort of understand the chronology.
11      I was not aware that she was
12  pursuing any litigation. At that
13  point, I thought everything had been
14  resolved. And based -- that comes much
15  later. Based on whatever Ezra put in
16  his complaint, I sort of realized at
17  what point things were reaching another
18  boil.
19      Q. During Amelia's suspension is
20  when she was issued the second notice
21  of charges; is that right?
22      A. I guess you can reconstruct it,
23  but yeah.
24      Q. Okay. And that notice of
25  charges dealt with the 2019 complaints

Page 93

L. HEISLER

1
2  from the judges?
3      A. Yes, the ones that, like
4  spontaneous combustion, suddenly
5  appeared out of nowhere, yes.
6      MS. VINCI: So we'll mark
7  this, please.
8      - - -
9      (Whereupon, Plaintiff's
10  Exhibit 8, a four-page document,
11  was marked for identification.)
12      - - -
13      Q. Mr. Heisler, I'm handing you
14  what's been marked as Exhibit 8. You
15  can just review. Let me know if you
16  recognize that.
17      A. I do recognize it, yes.
18      Q. Okay. This is a second set of
19  charges that were issued to Amelia,
20  correct?
21      A. Uh-huh.
22      Q. Yes?
23      A. Yes, it is.
24      Q. Did you know, prior to March 29,
25  2021, that another set of charges were

24 (Pages 90 - 93)

Page 94

L. HEISLER

1       going to be issued to Amelia?
2       A. No.
3       Q. When did you first learn that
4  these charges had been issued?
5       A. When I received this e-mail.
6       MS. VINCI:  Just let the
7  record reflect that the witness
8  has handed me an e-mail, which
9  I'll have the court reporter mark
10  as an exhibit.
11          - - -
12      (Whereupon, Plaintiff's
13  Exhibit 9, a document, was marked
14  for identification.)
15          - - -
16      MR. SMALL:  Off the record.
17          - - -
18      (Whereupon, an
19  off-the-record discussion was
20  held at this time.)
21          - - -
22      MS. VINCI:  The witness has
23  handed me an e-mail that we've
24  marked as Exhibit 9.  I'm going

Page 95

L. HEISLER

1       to hand it to Counsel Small to
2  review.
3       MR. SMALL:  No objection.
4       Q. Mr. Heisler, this appears to be
5  an e-mail from Amelia to yourself and
6  Anna Ervolina; is that right?
7       A. Yeah.
8       Q. Who is Anna?
9       A. Anna was going to be my
10  replacement as head of torts.  She had
11  been head of appeals.  She knew Amelia.
12  They both worked at Morris Duffy.
13      Q. I'll hand this back to you, sir.
14      There appears to be an
15  attachment included in the e-mail.  Was
16  that attachment the second set of
17  charges?
18      A. Yes.
19      Q. Prior to learning about the
20  second set of charges, were you aware
21  that Weslii had written to David Farber
22  about the issues with the judges'
23  complaints against Amelia?
24      A. No.

Page 96

L. HEISLER

1       Q. So I'll hand you what we'll mark
2  as Exhibit 10.
3          - - -
4       (Whereupon, Plaintiff's
5  Exhibit 10, a seven-page
6  document, was marked for
7  identification.)
8          - - -
9       MR. SMALL:  Before you move
10  on, are you done with P9?
11      MS. VINCI:  I may or may not
12  be.
13      MR. SMALL:  Okay.  I just
14  want to, to the extent that
15  that's an e-mail from your client
16  and in the possession of your
17  client and has not yet been
18  produced in this case -- and I'm
19  not asserting it hasn't.  I just
20  can't remember all the documents
21  that were produced.  We ask that
22  you do, in fact, produce the
23  document during discovery.
24      MS. VINCI:  Noted.  And we

Page 97

L. HEISLER

1       will follow up on that.
2       Q. So I'll hand you what's been
3  marked as Exhibit 10.  And, again, I
4  don't expect you to read this line by
5  line, although you can if you would
6  like to.  My question is:  Have you
7  ever seen this before?
8       A. I don't think so, no.
9       Q. Okay.
10      A. Was this -- was this an exhibit
11  attached to the Supreme Kings filing?
12      Q. I don't know off the top of my
13  head.  I can say this was --
14      A. I may have seen some of the
15  exhibits in the Supreme Kings filing,
16  the Ezra Glazer slander and libel
17  complaint, but I think a lot of it was
18  sealed, so I don't know.
19      Q. Okay.  But this appears to be a
20  memorandum from Weslii to David Farber,
21  dated February 27, 2021, regarding
22  Amelia.  Do you see that?
23      A. Yeah.
24      Q. Okay.  And Weslii starts off the

25 (Pages 94 - 97)

Page 98

1        L. HEISLER
2 memorandum referring to the complaints
3 from judges she received in the latter
4 part of 2019. Do you see that?
5    A. Yeah.
6    Q. Okay. So I want to turn your
7 attention to the third page. It's
8 marked NYCTA 3285.
9    A. Yeah.
10    Q. And the third and fourth
11 paragraph down, it starts, "After the
12 phone call with the judge"; do you see
13 that?
14    A. Yeah.
15    Q. Okay. Can you read that
16 paragraph and the one right after it.
17    A. Yes.
18    Q. Okay. So this appears to be
19 referring to a conversation that Weslii
20 had with you the day that she received
21 Judge Sokoloff's complaint against
22 Amelia.
23       Do you recall having a
24 conversation with Weslii on that day
25 where you repeatedly cut her off?

Page 99

1        L. HEISLER
2    A. No, I don't have any
3 recollection of any conversation where
4 I repeatedly cut off anyone.
5    Q. In the initial discussion with
6 Weslii about Judge Sokoloff's
7 complaint, did you, in any way,
8 downplay the severity of Judge
9 Sokoloff's concerns?
10    A. I may have downplayed -- yes, I
11 would say so. I didn't think it was
12 particularly serious. I thought there
13 had been ultimate compliance, and I
14 think, if you actually examine the
15 e-filing, you'll see why I reached that
16 conclusion.
17    Q. If you turn the page, if you
18 could read to yourself the last
19 paragraph on page 3286, up to and
20 including the second paragraph on the
21 following page.
22    A. I'm reading through the second
23 paragraph?
24    Q. Right. So through the paragraph
25 that starts, "At 3 p.m."

Page 100

1        L. HEISLER
2    A. Yeah. That last sentence, I
3 also reminded him about my complaints
4 about Amelia's dishonesty and
5 unprofessional behavior throughout her
6 tenure with Transit, that's absolutely
7 untrue. Never happened. You will not
8 find a single e-mail addressed to me or
9 to anyone with Weslii complaining about
10 her, quote, dishonesty -- I would be
11 very careful about the use of such
12 words -- and unprofessional behavior
13 during her tenure.
14    Q. Okay. But Weslii wanted Amelia
15 out of the New York unit?
16    A. New York, yeah.
17    Q. Do you know why?
18    A. Well, if it looks like a duck
19 and quacks like a duck, you come to the
20 conclusion that it is a duck. Whether
21 she harbored some ill feelings tinged
22 with anti-Semitism, or she never
23 forgave Amelia about complaining to her
24 about the initial 30 to 45-minute
25 contretemps.

Page 101

1        L. HEISLER
2       Yes, that's my conclusion today.
3 And certainly, reading these charges,
4 some of which border on self-parody, my
5 only conclusion is, yes, she had some
6 sort of animus toward her, whether it's
7 based on religion or based on some
8 retaliatory motive. Revenge,
9 retribution or retaliation. I don't
10 think you can reach any other
11 conclusion.
12    Q. Okay. So in this portion of the
13 memorandum, she discusses a meeting she
14 had with you on January 9th at
15 3:00 p.m. in your office. Do you
16 recall that meeting?
17    A. No.
18    Q. Do you recall any meeting where
19 you told Weslii that you were not
20 worried about Judge Freed's complaints
21 about Amelia?
22    A. Yes, I have a firmer memory of
23 that. And the truth was, I wasn't
24 worried about Judge Freed for several
25 reasons.

26 (Pages 98 - 101)

L. HEISLER

1        L. HEISLER
2        What Judge Freed was complaining
3   about was a line in the Rivera case --
4   it was actually in the motion papers, I
5   believe. Rivera was a case involving
6   someone slipping on a supposedly wet
7   staircase. There were some records at
8   issue, a wash team, it's boring. The
9   question was whether we had turned
10  those records over. All right. Amelia
11  claimed that plaintiff had never
12  directly requested them, which may well
13  have been true. One of the
14  occupational hazards of suing the TA,
15  the TA has a whole bunch of departments
16  and if you don't ask for the right
17  record, you won't get it. Fair or
18  unfair. We had our own problems
19  dealing with the different departments,
20  so we would simply turn over what
21  plaintiffs asked for.
22       The case had been placed on the
23  trial calendar, which meant that
24  plaintiff had asserted an affidavit
25  that they were satisfied with

1        L. HEISLER
2   disclosure. So the question was
3   whether a particular record, wash team
4   record, which Amelia claimed would show
5   that the wash team, which supposedly
6   douses the stairway with water, hadn't
7   been at work before plaintiff fell.
8        Plaintiff insisted that he
9   hadn't gotten records in time. I'm
10  going to remain agnostic about that.
11  Amelia may have felt that he had waived
12  the right to those records by not -- by
13  putting the case on the trial calendar.
14       So Judge Freed precludes us from
15  putting those records in. Admitting
16  those records, records that would've
17  been quite helpful. Maybe yes, maybe
18  she's right, maybe she's not, wouldn't
19  have been a big deal.
20       But then she goes a step
21  further. She's going to charge the
22  jury, Ladies and gentlemen of the jury,
23  you may infer that the wash records
24  would not have supported the Transit
25  Authority's case and that is the reason

1        L. HEISLER
2   why the Transit Authority did not
3   produce them. Like whoa. The Transit
4   Authority did not produce them, not
5   because they're unhelpful. They are
6   quite helpful. They didn't produce
7   them because you precluded us, period.
8   So what are you telling the jury?
9        The entire court, all the
10  lawyers there know that what she said
11  is not true. Couple that with
12  plaintiff's counsel, You heard the
13  judge. You heard what she said. Where
14  are those records? Do you think for a
15  moment that if those records would help
16  their case, they wouldn't produce it?
17       Okay. Bad enough. So I
18  insisted, you put the word "collusion"
19  in there. If anyone deserves blame,
20  it's me, not her. But the blame I
21  deserve is for not noting that Judge
22  Freed had done precisely the same thing
23  in another Transit case, Han, H-A-N,
24  versus New York City Transit Authority.
25       That case involved -- I don't

1        L. HEISLER
2   know if you recall it, an iconic photo
3   on the front page of The Post, when
4   they were still coming out and people
5   were buying them, of an Asian gentleman
6   on the track bed trying to chin himself
7   up, while, to his right, you could see
8   the headlights of a subway train
9   advancing. Let's say it did not end
10  well. In any event, his survivors
11  sued. And there was a request for the
12  train operator's deposition.
13       To make a long story short. We
14  ignored approximately six or seven
15  orders, arguing that he wasn't well.
16  He was psychologically damaged and
17  couldn't show up. At one point, the
18  judge then in charge of the case,
19  Michael Stallman, actually called the
20  train operator, who said, No, I can
21  show up. Hello? What's going on? So
22  we don't look that good.
23       We get outside counsel, who
24  promises to produce the train operator.
25  Then we move to delay things. Finally,

27 (Pages 102 - 105)

Page 106

```
1           L. HEISLER
2    we say, all right, we're going to
3    produce him, let's say, January 15th.
4    Our outside counsel has a medical
5    emergency, and then when January 15th
6    comes along, it turns out that we fired
7    the train operator, so he's no longer
8    under our control.
9           On the whole, the shenanigans in
10   the Han case make whatever happened in
11   Wood look very, very benign.  So it
12   winds up before Justice Freed.  And
13   again, the story will have a surprising
14   ending.  She precludes us from
15   producing the train operator, and also
16   precludes us from producing any
17   document the operator drafted, which
18   would indicate that he stopped as soon
19   as he could.
20          And then she does something
21   else.  Her signature move, she also
22   says there will be an adverse inference
23   charge given at the trial.  The jury
24   will be told the reason the Transit
25   Authority is not producing the train
```

Page 107

```
1           L. HEISLER
2    operator is he wouldn't help their
3    case, and the same applies to the
4    documents.
5           Now, our outside counsel,
6    Armienti, actually challenged that
7    decision.  They pointed out that there
8    was case law.  Once you preclude
9    someone, you cannot mislead the jury,
10   and then sort of tell them that the
11   reason they're not producing the
12   witness or the material is because it
13   would not help their case.  And if you
14   look at the Han case, there are a
15   couple of cases cited.
16          There is a case called Bzezi,
17   B-Z-E-Z-I, and -- I have the case
18   somewhere here.  Here it is, Bonomo.
19   Bzezi versus -- this also won't be easy
20   -- Eldib, as it sounds, 112 A.D.3d 772.
21   Bonomo versus City of New York, 78
22   A.D.3d 1094.  There's actually another
23   one, too, Giraldo, G-I-R-A-L-D-O,
24   versus Rossberg, 297 A.D.2d 534.
25          These cases are all referred to
```

Page 108

```
1           L. HEISLER
2    by Justice Freed in her Han decision,
3    which was issued on December 2018.
4    It's a decision on a motion to reargue
5    her earlier decision, both precluding
6    and ordering an adverse inference
7    charge.
8       Q.  And was it because of this
9    history with Judge Freed that you were
10   not particularly worried about what she
11   was complaining about regarding Amelia?
12      A.  And the fact that it was my
13   words.  I mean, she -- Amelia didn't
14   come up with the word "collusion," and
15   she didn't cite the somewhat irrelevant
16   De Michel case.  So she had nothing
17   really to do with it.  Okay.
18      Q.  Did you tell Weslii that it was
19   you who had instructed Amelia to add
20   the collusion point into the case?
21      A.  No.  I'll tell you why.  Because
22   when Weslii came to me about Judge
23   Freed, she wasn't specific.  She was
24   not really -- she didn't mention -- for
25   example, she didn't mention Judge
```

Page 109

```
1           L. HEISLER
2    Frank.  She didn't give me any details
3    about Judge Freed.  If she had
4    mentioned the collusion point, I would
5    have set her straight.
6           By the way, the Han decision,
7    both the preclusion, and as a
8    consequence, the adverse inference were
9    reversed by the appellate division.  So
10   despite the fact that we had
11   disregarded six or seven court orders,
12   many of those derelictions occurring in
13   the New York trial unit, the appellate
14   division felt that wasn't serious
15   enough.
16          So that point, again, fortifies
17   two issues.  A, the Wood case was
18   minor, trivial.  There's nothing there.
19   There's no there there.  B, Justice
20   Freed's displeasure about Han did not
21   survive appellate's scrutiny.  And
22   number three, we didn't like Justice
23   Freed, not because of what happened
24   with her and Amelia.  Amelia may have
25   thought that she was wrong.  But our
```

28 (Pages 106 - 109)

Page 110

L. HEISLER

1
2  complaints related to her general
3  attitude toward the TA.
4      Q. During any conversation with
5  Weslii about the complaints against
6  Amelia, did you tell her that Amelia
7  was not going anywhere, so she should
8  just forget it?
9      A. I was initially annoyed with the
10  idea that she would come in, raise the
11  -- not -- basically smirking and not
12  giving me any details about the
13  particular cases, and thinking that she
14  could get someone transferred.  The
15  truth is, certainly by the middle of
16  December, I realized that for the sake
17  of avoiding a lawsuit, Amelia would
18  have to leave New York.
19      Q. Okay.  So after learning and
20  receiving a copy of the second DAN
21  notice from Amelia, what did you do?
22      A. Nothing.  Actually, I was trying
23  to find my response to her to the
24  April 6th letter with the attachment.
25  She might have it.  I couldn't find it.

Page 111

L. HEISLER

1
2  But I remember what I wrote to her.
3      Q. What did you write to her?
4      A. I write, I'm sorry, there is
5  nothing I can do.  I have nothing to do
6  with this and I am completely out of
7  the loop.
8      Q. And, again, was that unusual for
9  you to have been completely out of the
10  loop when this --
11      A. Yes.
12      Q. -- disciplinary procedure
13  started?
14      A. Yes.  Yes.
15      Q. Did you discuss being left out
16  of the procedure with anyone at
17  Transit?
18      A. No.  With whom?  I got it 4/6
19  and I was set to leave 4/23.  I mean,
20  at that point, I was struggling with
21  getting Mr. Farber to sign time sheets
22  of mine that were six months, a year
23  overdue, without which I could not
24  collect a pension.
25      Q. Did you ever speak to Lisa about

Page 112

L. HEISLER

1
2  the new charges against Amelia?
3      A. Yeah.  I may have spoken about
4  it to her, generally.  I think she was
5  annoyed.  And she was also annoyed that
6  she was not -- she was a little lowered
7  down that no one had told her here it
8  is, one of her top trial attorneys to
9  whom she had assigned a whole raft of
10  cases, and suddenly, boom, no trial
11  attorney.
12      Q. To your knowledge, was Lisa
13  involved at all in the issuance of the
14  second DAN?
15      A. Definitely not.  What I do
16  recall, I think, is that she, possibly
17  on the first one, had e-mailed Farber
18  and Farber had e-mailed back to me,
19  Tell her not to bother me.  Maybe not
20  as harshly, but tell her not to write
21  to me about this.
22      Q. Is that unusual that Mr. Farber
23  would ask a supervisor of someone under
24  charges not to discuss them with him?
25      A. Certainly me, I would think.  I

Page 113

L. HEISLER

1
2  would think so, yes.  I mean, I had
3  been involved in employment decisions
4  involving two African American women,
5  one, I think she was Irish, woman.  So
6  it seemed odd that the only person I
7  was not involved with was an Orthodox
8  woman.  But maybe it's not that odd.
9      Q. If you don't mind me asking,
10  sir, what religion do you practice?
11      A. This one (indicating).
12          MS. VINCI:  Let the record
13      reflect that the witness is now
14      wearing a yarmulke.
15      Q. So is that to assume that you
16  are Jewish, sir?
17      A. That's a good assumption.  And
18  it's a good assumption that I'm also
19  Orthodox.
20      Q. Do you have any opinion or
21  belief as to -- well, strike that.
22          Do you believe that you being
23  left out of the disciplinary procedures
24  related to Amelia has anything to do
25  with you also being an Orthodox Jew?

29 (Pages 110 - 113)

Page 114

L. HEISLER

1
2    A. Everything.
3    Q. Why do you believe that?
4    A. Several reasons. A, I had been
5    involved in decisions regarding members
6    of other ethnic groups. African
7    American women, as I mentioned before.
8    B, I mean, not to toot my horn, but in
9    terms of knowledge, both of tort law
10   and the details of the particular
11   cases, there was no one in the building
12   who knew more than I did about them. I
13   knew more about the Rivera case than
14   Weslii did. I knew more about the
15   legal implications, the relevant case
16   law.
17       So it seemed to me that it was
18   almost suicidal, the Authority to make
19   these decisions without consulting me.
20   I mean, it would have been in their
21   best interest. They can decide
22   whatever they want, but if you have,
23   for example, blaming Amelia for Justice
24   Freed's complaint, I mean, why not
25   question me? They must have known. I

Page 115

L. HEISLER

1
2    think someone must have told them that
3    I'm the one who gave her that line.
4        The situation with Judge Frank.
5    I mean, how could you put that in a
6    disciplinary charge and have the
7    general counsel sign off on that?
8    Imagine if that ever became public.
9    Transit disciplines lawyer for holding
10   breath in court, a first. Judge
11   complains about childlike character of
12   an attorney who bests head of the
13   New York State trial association and
14   wins a defense verdict.
15       Come on. You're making the
16   Authority look like a complete idiot.
17   Why are you signing off on that without
18   talking to someone who knows what's
19   going on or how it's going to sound?
20   So, yes.
21       Q. Were you ever interviewed, not
22   by Attorney Small's firm, but were you
23   ever interviewed by anyone within
24   Transit's law department regarding the
25   charges, the second set of charges

Page 116

L. HEISLER

1
2    against Amelia?
3    A. No.
4    Q. Do you know if anybody else was
5    interviewed?
6    A. No. Clearly, Weslii was, since
7    it's her handiwork. Well, it's not her
8    handiwork, someone has to sign off on
9    it. But let's assume they're partners
10   in crime. I'd be curious to know.
11   Q. Do you know why Weslii pursued
12   the issue of the complaints with David
13   Farber two to three years after they
14   were received?
15   A. It's even more, actually, if you
16   look at Judge Freed. Was that a 2017
17   case, end of 2017, the Rivera case
18   might have been. Yeah, I mean, it's
19   just odd, which fortifies the earlier
20   point I made that these charges are
21   basically a poorly executed hit job.
22   Q. Did you ever share the opinion
23   that these charges were poorly executed
24   hit job, or words to that effect, to
25   anyone at Transit?

Page 117

L. HEISLER

1
2    A. No, I was basically -- by the
3    time they came down, I was out.
4    Q. Okay. So going through the
5    specifications, the first
6    specification, looking at the charges,
7    which are Exhibit 8 --
8    A. Let me get that.
9    Q. Yes. Please take your time.
10   Okay.
11   A. Specification 1?
12   Q. Yes. So that deals with the
13   complaint from Judge Sokoloff related
14   to the Wood case, which we've talked
15   about at length. Is there any other
16   personal knowledge regarding that
17   specification that you have not yet
18   testified to today?
19   A. Yes.
20   Q. Okay. Please elaborate.
21   A. I mean, you can call it
22   personal. But, you know, I was curious
23   about what happened. So if you
24   actually go to the e-filed document, if
25   you look at the PC orders, the CC

Page 118

L. HEISLER

1    L. HEISLER
2  orders, you can sort of understand what
3  happened with respect to the witnesses.
4  All right.
5      We had apparently gotten a
6  report from the police department that
7  listed, apparently, a whole bunch of
8  people as witnesses.  All right.  We
9  had a whole raft of our own reports,
10  19, that Amelia turned over.  That
11  doubtless contained the names of
12  probably overlapping witnesses.
13      Now, when someone asks us,
14  Please provide the names and addresses
15  of witnesses, what people in our office
16  do, and it may not be the best policy,
17  they're going to respond something like
18  this, and this is what Amelia did.
19  Please be advised that the names of any
20  witnesses are contained in the annexed
21  reports.  All right.
22      So we don't answer the question
23  directly.  We're sort of a little hide
24  the ball.  But we're not -- if you
25  think about it, you can see why we're

Page 119

1    L. HEISLER
2  doing it.  We don't know who these
3  people are.  If our bus driver says, I
4  saw this guy run a red light and hit my
5  bus, obviously, bus driver works for
6  us, we would disclose it.  If someone
7  comes over to the bus operator, that's
8  one removed.  If another agency gathers
9  information, that's even one more
10  removed, so that's why some people -- I
11  don't know if I would do it that way.
12  I might phrase it a little differently.
13  Enclosed, please find the following
14  names, who, according to these accident
15  reports, may be witnesses.
16      But that's what she did.  And if
17  you look at the reports, that's what
18  she did in this case with respect to
19  witnesses.  So the notion that we were
20  hiding witnesses is not entirely true.
21  What is true is that she was reluctant,
22  without a bit of a fight, to give Jay
23  Dankner the DD5, which are reports
24  composed not by the Transit Authority,
25  but by the New York City Police

Page 120

1    L. HEISLER
2  Department.
3      And I can understand why,
4  because although you won't find this
5  anywhere, Dankner, a very skilled trial
6  attorney, good guy, in general, had
7  been playing his own hardball.  At the
8  deposition of plaintiff, he repeatedly
9  instructed him not to answer any
10  questions, pointing out that we had
11  asked those questions at a statutory
12  examination.  Oh, no.  Oh, if you think
13  I'm going to let Transit ask these same
14  questions again, whoa, you've got
15  another thing coming.  Whoa.  Talk
16  about brazen.  I mean, you can't do
17  that.  We get two cracks.  You don't
18  like it?  Get your buddies in the
19  legislature to change the law.
20      So, in a sense, we were playing
21  tit for tat.  If you look at one of the
22  e-filed documents, an October 2019
23  letter that Dankner sent to the judge,
24  he said, I did try to get it from the
25  City.  I filed a FOIL request, but they

Page 121

1    L. HEISLER
2  sent me back redacted information.
3      Well, yes, that's what happens.
4  A FOIL request will get you a quick
5  response, but many agencies are just
6  going to black out a lot of stuff.
7  What you should have done is serve a
8  subpoena on the corp counsel.  Okay.
9  Do your own work.
10      As it was, on November 9th, we
11  turned over the information.  So this
12  notion that there was any lasting
13  damage done is fairly ridiculous,
14  especially in light of what you've
15  heard about our prior history of
16  discovery compliance.  It's a total,
17  total setup.  Total.
18      Q.  Okay.  Did you ever hear any
19  complaint from, or purportedly from
20  Judge Sokoloff, that Amelia was having
21  lunch in the jury room?
22      A.  No, not directly from her.  I
23  heard it -- I know it's in the charges,
24  yeah.
25      Q.  Okay.  Specification 2 deals

1        L. HEISLER
2  with the alleged complaint from Judge
3  Frank, which we've talked about today.
4  Is there anything that you have not
5  testified to related to your personal
6  knowledge of Judge Frank's complaint?
7      A. No.  But, you know, every time I
8  read it, I get furious, assuming this
9  happened.  If it did happen, there's
10  something incredibly wrong with the
11  justice system in New York County.
12  There's something incredibly wrong that
13  you can get three or four judges --
14  assuming this happened, which I have my
15  doubts -- suddenly have this
16  behind-the-scenes conclave, where they
17  decide, boom, expulsion, you're out.  I
18  mean, where do you get that notion that
19  you can do that?
20        New York law is very, very
21  strict on that.  Matter of AG, 69
22  New York 2d 1, judges do not have
23  inherent power to exile people they
24  don't like in New York.  They may have
25  it in federal court, if they follow

1        L. HEISLER
2  very, very tight due process
3  procedures.  But the notion that judges
4  can simply order someone to leave,
5  without any hearing whatsoever, is
6  ridiculous.
7      The appellate division will not
8  even issue a secret letter of reprimand
9  to an attorney without giving that
10  attorney a chance to respond.
11      Q. Other than during the one --
12  that one time that Judge Sokoloff had
13  approached you during an event, did
14  Judge Sokoloff ever complain to you
15  directly about Amelia?
16      A. Just very vaguely at the Jewish
17  Lawyers Guild dinner.  That's it.
18      Q. But nothing besides that?
19      A. No.
20      Q. What about Judge Frank, did
21  Judge Frank ever complain to you
22  directly?
23      A. No.  We never had any contact
24  with him.  The only -- I do remember
25  that Amelia and I and someone who had

1        L. HEISLER
2  worked with Judge Frank at the Kings DA
3  spoke, because we were not familiar
4  with Judge Frank.
5      Q. But no discussion about
6  complaints against Amelia?
7      A. No.
8      Q. Okay.  Looking at Specification
9  3, this is the issues related to Judge
10  Freed's alleged complaints, which
11  you've testified to today.  Is there
12  anything else that you have not
13  testified to related to your personal
14  knowledge of this specification?
15      A. No.  I noticed you haven't asked
16  me about the hair dryer.
17      Q. Do you have any personal
18  knowledge about this allegation that
19  Amelia was drying her hair in the
20  courtroom jury box?
21      A. I was wondering, it was after
22  opening statements?  Did she kick the
23  jury out?  I mean, how exactly did that
24  happen?  So she travels from her home
25  in Brooklyn to New York County and

1        L. HEISLER
2  suddenly discovers that her hair is a
3  little damp, jumps into the jury box,
4  kicks the jury out and then starts
5  drying her hair?  I assume she has some
6  views or different account of that.  I
7  mean, did anyone sort of explore that?
8      Q. Well, you tell me.  Do you know
9  if anyone at Transit explored that
10  specific complaint --
11      A. No.
12      Q. -- from Judge Freed?
13      A. No.
14      Q. Have you received directly any
15  complaints from Judge Freed related to
16  Amelia?
17      A. No.
18      Q. During your time working with
19  Amelia, did you have any opportunities
20  to observe her in court?
21      A. No, I -- no.  What I did receive
22  once was a call from Judge Martin
23  Shulman, who was trying a case with
24  Amelia.  He was apparently one of the
25  judges who didn't have any trouble

32 (Pages 122 - 125)

Page 126

1        L. HEISLER
2  doing that.  He's now in the appellate
3  division.  So Amelia was trying to
4  persuade him that he was wrong on a
5  point of law, and she actually
6  persuaded him to call me.
7      Q. Did Judge Shulman complain about
8  Amelia during that call?
9      A. No.
10      Q. Has any judge, other than that
11  one time with Judge Sokoloff, has any
12  judge complained directly to you about
13  Amelia's performance in court?
14      A. No.
15      Q. Moving on to Specification 5.
16        MS. VINCI:  Let's take a
17      five-minute break.
18          - - -
19        (Whereupon, a recess was
20      taken at this time.)
21          - - -
22      Q. So going back to Exhibit 8,
23  which is the second set of charges
24  against Amelia.  Looking at
25  Specification No. 5.  It starts

Page 127

1        L. HEISLER
2  regarding an allegation that Judge
3  Adams said that she was going to recuse
4  herself from all cases that Amelia was
5  involved in.  Do you see that?
6      A. I do.
7      Q. Did you ever hear of Judge Adams
8  recusing herself from Amelia's cases,
9  prior to this charge?
10      A. This, maybe Weslii told me about
11  that.  I know they worked together at
12  Morris Duffy.  I also knew that Judge
13  Adams had recused herself from hearing
14  all cases with the City of New York.
15        So actually, I asked Weslii why
16  but, you know, maybe there was a
17  reason.  Maybe Judge Adams was
18  uncomfortable with the relationship
19  they had at Morris Duffy.  But Amelia
20  had never appeared before her.  So I
21  was sort of a little puzzled by why
22  this counted as some aspect of
23  wrongdoing.  When Weslii came to see
24  me, and it further convinced me that
25  the complaints were not that sincere.

Page 128

1        L. HEISLER
2      Q. Okay.  Did Judge Adams ever say
3  directly to you that she would not
4  preside over Amelia's cases because of
5  any alleged misconduct by Amelia?
6      A. Once again, Amelia never
7  appeared before her.  So no.  And I
8  never spoke to Judge Adams.
9      Q. What about Judge Silvera?
10      A. Don't know the man.  Don't know
11  if Amelia ever appeared before him.
12  Never spoke to me.
13      Q. Do you have any understanding as
14  to why the charges alleged Judge
15  Silvera would not welcome Amelia in his
16  courtroom?
17      A. Actually says you are not to
18  appear in his courtroom.
19      Q. Do you know why Judge Silvera
20  would allegedly have that mandate?
21      A. I have no idea.  I mean, it
22  makes no sense.  Maybe he didn't like
23  the shape of her nose.
24      Q. But Weslii never said anything
25  one way or the other as to why Judge

Page 129

1        L. HEISLER
2  Silvera --
3      A. No.  No.
4      Q. -- allegedly said that?
5        And then the last one,
6  Administrative Judge Kaplan, did you
7  ever hear, other than in these charges,
8  that Judge Kaplan had said Amelia was
9  not welcome in the courthouse?
10      A. No.  I mean, Weslii may have made
11  some vague mention of it.  I strongly
12  doubt it happened.  The notion that you
13  have the administrative judge issuing
14  an edict like that, not that there was
15  any evidence of it, it's not in any
16  court file, there's no decision, no
17  hearing, nothing, is sort of mind
18  boggling, to say the least.  And how
19  are you going to enforce that?  Have an
20  unwelcome mat out of the front door at
21  60 Center, distribute photos of Amelia,
22  warning, this woman has been known to
23  hold her breath during trial, has
24  childlike qualities.
25        So no, I don't believe it.  If

33 (Pages 126 - 129)

Page 130

L. HEISLER

1    L. HEISLER
2 it did happen, we've got something very
3 seriously wrong in Supreme New York.
4    Q. To your knowledge, what was the
5 result of the second DAN?
6    A. I don't quite know, actually. I
7 don't know whether she left, whether
8 she was fired. She was placed on
9 nonpaid suspension. I don't know
10 whether Farber ever issued a follow-up
11 decision --
12    Q. Okay.
13    A. -- on it.
14    Q. So I'll represent to you that
15 her employment was terminated. And at
16 that time, though, you had stopped
17 working for Transit, correct?
18    A. Yeah, 4/23.
19    Q. Okay. After -- did Amelia ever
20 discuss with you her dismissal from the
21 Transit Authority?
22    A. No.
23    Q. Have you spoken to Amelia since
24 your retirement?
25    A. Yeah, on two occasions. I think

Page 131

1    L. HEISLER
2 I wished her a happy birthday, and a
3 good new year, before the Jewish
4 holidays.
5    Q. Have you spoken to her about
6 this litigation since your retirement?
7    A. No.
8    Q. Have you spoken to her husband
9 about this litigation?
10    A. Yes.
11    Q. What have you spoken to her
12 husband about?
13    A. All right. So I'll give you a
14 little bit of a background to that. Do
15 you remember there was an earlier --
16 you weren't involved, your firm was not
17 involved.
18    Corey Stark was her attorney. I
19 don't know if there was a
20 miscommunication or not, but I wound up
21 showing up at his office on a very cold
22 day and, you know, I was there alone,
23 and he was pressing me, You have to get
24 her to settle the case. You have to
25 get her to settle the case. She'll

Page 132

1    L. HEISLER
2 listen to you. She trusts you.
3    I told him that I didn't -- you
4 know, I was frank. I thought the
5 liability and the charges were a slam
6 dunk for her. I've never hidden my
7 opinion on that. I wasn't aware
8 precisely of her damages. He may not
9 have known that the Transit Authority
10 will cover punitive damages for its
11 employees, so he may have
12 underestimated the value of the case.
13    But he kept pressing me, They
14 made a good offer. So -- but nothing
15 came of it, other than the fact that I
16 did ask him, I was sort of wondering
17 why was I locked out of the process?
18 And he told me they told him that
19 because I was Orthodox and couldn't
20 expect to be -- couldn't be expected to
21 be impartial. Okay.
22    Yeah, that's what he said. He
23 didn't have to say it. Probably not
24 the wisest thing to say. Maybe it was.
25 Anyway, that Sunday, super Sunday, I

Page 133

1    L. HEISLER
2 was walking on Queens Boulevard and her
3 husband called me and, you know, he
4 just said he didn't think much of the
5 offer and he said as a matter of
6 principle, he wouldn't put up with
7 religious discrimination. And that's
8 basically where it ended.
9    Q. Okay. Have you talked to Weslii
10 about this litigation?
11    A. No. And I don't think she'll be
12 talking to me after she reads this
13 deposition.
14    Q. What about Lisa, have you talked
15 to her about this litigation?
16    A. No.
17    Q. During the time that Amelia was
18 working with Lisa in the Kings County
19 unit, did Lisa ever bring to your
20 attention complaints that Amelia made
21 to her about religious discrimination?
22    A. No.
23    MS. VINCI: I don't have
24 anything further for you, sir.
25 Thank you very much for coming

34 (Pages 130 - 133)

Page 134

1        L. HEISLER
2   today.
3        THE WITNESS:  Thank you.
4        MS. VINCI:  Very much
5   appreciated.
6        THE WITNESS:  Okay.  Are we
7   done?
8        MR. SMALL:  I'm probably
9   going to have questions.  I think
10  it makes sense to take a lunch
11  break, though, now, given the
12  time.
13         - - -
14      (Whereupon, a lunch break
15  was taken at this time.)
16         - - -
17      MR. SMALL:  Just to clarify,
18  defense is not going to ask any
19  questions.
20      MS. VINCI:  Okay.  So we are
21  done.
22      And Mr. Heisler, you will
23  get a copy of the transcript to
24  review.  And again, I thank you
25  so much for your time today.

Page 135

1        L. HEISLER
2      THE WITNESS:  Thank you.
3      (Time noted:  2:16 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 136

1        L. HEISLER
2      INSTRUCTIONS TO WITNESS
3
4      Please read your deposition over
5   carefully and make any necessary
6   corrections.  You should state the
7   reason in the appropriate space on the
8   errata sheet for any corrections that
9   are made.
10      After doing so, please sign the
11  errata sheet and date it.
12      You are signing same subject to
13  the changes you have noted on the errata
14  sheet, which will be attached to your
15  deposition.
16      It is imperative that you return
17  the original errata sheet to the
18  deposing attorney within thirty (30)
19  days of receipt of the deposition
20  transcript by you.  If you fail to do
21  so, the deposition transcript may be
22  deemed to be accurate and may be used in
23  court.
24
25

Page 137

1        L. HEISLER
2         - - - - - -
        E R R A T A
3         - - - - - -
4  PAGE  LINE  CHANGE
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25  ____  ____  _____

35 (Pages 134 - 137)

Page 138

```
 1
 2        A C K N O W L E D G E M E N T
 3  STATE OF NEW YORK)
 4                    :SS
 5  COUNTY OF _____)
 6     I, LAWRENCE HEISLER, hereby certify that I
 7  have read the transcript of my testimony taken
 8  under oath on October 18, 2023, that the
 9  transcript is a true, complete and correct
10  record of what was asked, answered and said
11  during my testimony under oath, and that the
12  answers on the record as given by me are true
13  and correct, except for the corrections or
14  changes in form or substance, if any, noted in
15  the attached Errata Sheet.
16
17  _____
18  LAWRENCE HEISLER
19
20  Signed and subscribed to
21  before me, this _____ day
22  of _____, _____.
23
24  _____
25  Notary Public
```

Page 140

```
 1
 2          C E R T I F I C A T E
 3     I, DEVORA HACKNER, a stenographic reporter
 4  and Notary Public within and for the State of
 5  New York, do hereby certify:
 6     That the witness(es) whose testimony is
 7  hereinbefore set forth was duly sworn by me,
 8  and the foregoing transcript is a true record
 9  of the testimony given by such witness(es).
10     I further certify that I am not related to
11  any of the parties to this action by blood or
12  marriage, and that I am in no way interested
13  in the outcome of this matter.
14
15
16
17  _____
18  DEVORA HACKNER
19
20
21
22
23
24
25
```

Page 139

```
 1
 2        I N D E X   O F   W I T N E S S E S
 3  WITNESS:  LAWRENCE HEISLER
 4  EXAMINATION BY                PAGE
 5  MS. VINCI                4
 6        I N D E X   O F   E X H I B I T S
 7  EXHIBIT      DESCRIPTION          PAGE
 8  Exhibit 3     Document        21
    Exhibit 4     Three-page document   33
 9  Exhibit 5     18-page document     43
    Exhibit 6     Two-page document    63
10  Exhibit 7     Four-page document   79
    Exhibit 8     Four-page document   93
11  Exhibit 9     Document       94
    Exhibit 10    Seven-page document  96
12
       (*Indicates exhibit(s) retained by counsel)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 141

```
 1
 2          LAWYER'S NOTES
    PAGE/LINE  NOTE
 3  _____
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25
```

36 (Pages 138 - 141)

**[& - 8]**                                                                 Page 1

## &

**&**   2:3

## 0

**04055**   1:7

## 1

**1**   61:3 70:20
   117:11 122:22
**10**   57:6 61:4
   96:3,6 97:4
   139:11
**10001**   2:5
**10018-1405**
   2:10
**10036**   1:14
**1094**   107:22
**10:00**   16:17
**10:10**   1:15
**112**   107:20
**11415**   4:22
**1150**   71:14
**12**   85:8,14
**14th**   57:7
**15th**   106:3,5
**16th**   1:13
**171**   68:17
**18**   1:15 43:17
   138:8 139:9
**186**   71:14
**19**   59:5 118:10
**192**   70:6
**1987**   18:21
**1:21**   1:7

## 2

**2**   14:11 69:2
   121:25
**2,500**   34:17
**20**   27:7 80:9
   90:3
**2013**   15:24
   17:20
**2014**   15:25
   18:2,3,16,21
**2016**   25:11,11
   25:22
**2017**   23:24
   36:20 116:16
   116:17
**2018**   9:20
   41:24 108:3
**2019**   8:24 9:20
   41:25 56:13
   59:6 60:13
   67:5,19 68:18
   73:8 92:25
   98:4 120:22
**2020**   8:24 77:8
   79:25 85:9,14
**2021**   18:3,13,14
   64:11 70:7
   93:25 97:22
**2023**   1:15
   71:17 138:8
**2025**   70:20
**21**   8:24 18:16
   139:8
**212-218-5564**
   2:11

**212-736-4500**
   2:5
**23**   18:14
**24727**   140:17
**27**   97:22
**29**   93:24
**297**   107:24
**2:16**   135:3
**2d**   122:22

## 3

**3**   21:20,24 22:5
   71:17 99:25
   124:9 139:8
**30**   26:18 32:9
   33:24 100:24
   136:18
**3285**   98:8
**3286**   99:19
**32nd**   2:10
**33**   139:8
**35**   44:18,20
**36**   44:18
**363**   2:4
**3:00**   101:15

## 4

**4**   32:24 33:3,7
   139:5,8
**4/23**   111:19
   130:18
**4/6**   111:18
**40**   33:25
**43**   139:9
**430**   70:6

**45**   26:11,19
   31:20 33:25
   100:24

## 5

**5**   43:14,17,22
   44:16 61:4
   126:15,25
   139:9
**5091**   71:16
**534**   107:24

## 6

**6**   63:2,5,9 69:2
   73:8 139:9
**60**   129:21
**600,000**   73:17
   73:21
**601**   68:17
**620**   2:9
**63**   139:9
**69**   122:21
**6th**   110:24

## 7

**7**   1:13 79:3,6
   80:13 139:10
**77**   19:19
**772**   107:20
**78**   19:13,22
   107:21
**79**   139:10
**7th**   2:4

## 8

**8**   93:10,14
   117:7 126:22
   139:10

[8532 - alleged]

**8532** 4:20
**87** 19:13
**88** 19:13

**9**

**9** 94:14,25
139:11
**90** 55:24
**93** 139:10
**94** 139:11
**96** 139:11
**9:00** 16:16
**9th** 58:24
101:14 121:10

**a**

**a.d.2d** 107:24
**a.d.3d** 68:17
70:6 71:14
107:20,22
**a.m.** 1:15
**aback** 32:12,20
**abingdon** 4:20
**able** 73:22
**above** 1:20,20
68:23
**absolutely** 10:8
12:19 66:2,13
68:8 77:20,23
87:9 100:6
**abundantly**
67:24
**accept** 34:18
**access** 27:4
**accident** 89:5
119:14

**accommodati...**
36:12
**account** 36:10
86:13 125:6
**accrued** 26:14
**accurate**
136:22
**accused** 32:18
33:18 37:17
**accusing** 32:19
37:20
**acted** 65:16
66:22
**acting** 29:4
**action** 1:20
5:16 20:14,15
44:9 55:7
140:11
**active** 21:4,6
23:13
**actual** 38:10
**actually** 15:14
16:4 47:4
54:14,24 58:6
59:4 61:13
71:21,22 75:6
76:23 89:23
99:14 102:4
105:19 107:6
107:22 110:22
116:15 117:24
126:5 127:15
128:17 130:6
**adams** 61:22
127:3,7,13,17

128:2,8
**add** 108:19
**additional**
44:24 76:12
**address** 4:18
**addressed**
100:8
**addresses**
118:14
**adika** 74:6 75:9
76:2,4
**administer**
3:18
**administration**
12:3,21
**administrative**
61:17 129:6,13
**admission**
19:25
**admitted** 19:21
19:23 20:24
**admitting**
103:15
**adrian** 45:23
**advancing**
105:9
**adventist** 36:7
**adversary**
75:17,21
**adverse** 106:22
108:6 109:8
**advice** 16:22
**advised** 118:19
**advises** 64:2

**advocating**
24:2
**affidavit**
102:24
**african** 113:4
114:6
**afternoon** 8:4
15:22
**ag** 122:21
**agencies** 121:5
**agency** 119:8
**agenda** 12:7
**aging** 64:21
74:17
**agnostic** 103:10
**ago** 71:15
**agree** 36:17
**agreed** 3:5,11
3:16
**alert** 29:10
**alerted** 60:11
**alexander** 9:2
54:21,22 55:25
**alexandra**
51:17 56:17
62:9 68:12
**alice** 86:11
**alienate** 28:25
34:13
**allegation**
124:18 127:2
**alleged** 44:22
51:6 122:2
124:10 128:5
128:14

**allegedly**
128:20 129:4
**allotment**
46:23
**allow** 6:17,18
**alluded** 56:3
**amanda** 86:11
**amelia** 1:5 5:8
9:17,22 10:5
10:21 12:16
13:2 15:23
16:11 17:13
21:10 22:11,24
23:4,10 24:19
25:12,17 28:11
29:5 30:13,15
31:5,19 32:16
33:19 35:16
36:6 37:18
39:4,7,11,13,23
40:3,19 41:4
41:21 42:14
43:6 44:6
45:24 47:2,10
47:24 48:5,10
48:19 49:8
50:2,5 51:7,11
51:16,21 52:19
52:25 53:5,14
54:23 56:6,10
56:16 58:7,21
59:11 60:19
61:7,15,23
62:8 63:17
65:7 66:14

67:11,11,13,20
72:15 73:4
74:14,20 75:10
75:24 76:10
77:4,19 78:5
78:16,25 79:13
79:19 80:3,8
80:23 81:8,19
86:24 87:4
88:5 90:7,17
90:18,23 91:9
91:17,25 93:19
94:2 95:6,12
95:24 97:23
98:22 100:14
100:23 101:21
102:10 103:4
103:11 108:11
108:13,19
109:24,24
110:6,6,17,21
112:2 113:24
114:23 116:2
118:10,18
121:20 123:15
123:25 124:6
124:19 125:16
125:19,24
126:3,8,24
127:4,19 128:5
128:6,11,15
129:8,21
130:19,23
133:17,20

**amelia's** 8:18
42:24 45:2
46:18 49:14,21
49:24 50:21
54:12 55:9
84:25 86:20
92:19 100:4
126:13 127:8
128:4
**american** 113:4
114:7
**amount** 51:23
**amused** 35:5
**animus** 101:6
**anna** 95:7,9,10
**annexed**
118:20
**announced**
91:12
**annoyed** 27:8,9
29:14 30:7
72:2 110:9
112:5,5
**answer** 6:13,18
6:19,24 7:10
15:11 18:10
70:21 83:19
118:22 120:9
**answered**
138:10
**answers** 18:8
61:2 71:12
138:12
**anti** 32:18
40:13 100:22

**antireligious**
43:12
**anybody** 38:16
85:11,22 116:4
**anyway** 132:25
**apparently**
12:6 47:13,24
82:19 118:5,7
125:24
**appeal** 65:7
66:16 76:24
77:2
**appealing**
17:11
**appeals** 17:21
17:22 18:19,25
19:3,14 68:16
69:10 76:25
95:12
**appear** 62:12
128:18
**appearance**
27:10
**appeared** 36:21
65:18 93:5
127:20 128:7
128:11
**appears** 63:13
64:11 65:15
81:25 95:5,15
97:20 98:18
**appellate** 34:23
68:14 70:24
74:15,22 76:19
76:21 109:9,13

[appellate - awareness]                                                    Page 4

| | | | |
|---|---|---|---|
| 123:7 126:2 | 70:8 102:21 | **attachment** | **authority** 1:9 |
| **appellate's** | 120:11 124:15 | 95:16,17 | 1:10 5:18,20 |
| 109:21 | 127:15 138:10 | 110:24 | 14:17 18:13 |
| **applies** 107:3 | **asking** 67:20 | **attend** 34:22 | 23:20,23 24:2 |
| **appointee** | 113:9 | **attention** 25:10 | 56:22,24 59:21 |
| 84:18 | **asks** 56:22 | 48:17 67:7 | 61:19,20 62:2 |
| **appointment** | 57:17 63:15 | 98:7 133:20 | 62:7,11 67:11 |
| 12:6 | 118:13 | **attitude** 32:22 | 74:7 104:2,4 |
| **appreciate** | **aspect** 127:22 | 57:18,24,25 | 104:24 106:25 |
| 16:18,19 | **asserted** 102:24 | 58:11 84:19 | 114:18 115:16 |
| **appreciated** | **asserting** 96:20 | 110:3 | 119:24 130:21 |
| 134:5 | **assigned** 16:3 | **attorney** 5:7 | 132:9 |
| **approached** | 51:7,22 53:13 | 8:8 9:23 14:25 | **authority's** |
| 25:12 123:13 | 76:18 112:9 | 17:4 19:2,11 | 32:5 38:14 |
| **appropriate** | **assigning** 89:3 | 23:14 28:20 | 103:25 |
| 136:7 | **assignments** | 41:16,17 44:4 | **authorized** |
| **approve** 49:13 | 44:24 45:4 | 55:15 57:3,4 | 3:18 |
| 49:20 59:13 | 78:5,20 | 58:10 65:14,15 | **authors** 9:11 |
| **approving** | **assistant** 45:20 | 65:18 72:24 | 9:13 |
| 50:21 | 45:22,24 | 74:19 76:22 | **available** 10:2 |
| **approximately** | **association** | 79:20 84:5 | 57:21 |
| 105:14 | 62:16 115:13 | 86:9 112:11 | **avenue** 2:4,9 |
| **april** 18:14 | **assume** 6:25 | 115:12,22 | 71:17 |
| 110:24 | 17:19 47:12 | 120:6 123:9,10 | **avoiding** |
| **arguing** 105:15 | 113:15 116:9 | 131:18 136:18 | 110:17 |
| **armienti** 107:6 | 125:5 | **attorneys** 2:3,9 | **aware** 11:8,22 |
| **arrangement** | **assumed** 10:19 | 3:5 18:5 41:13 | 28:13 34:24 |
| 13:16 | 10:20 11:25 | 51:15 53:17 | 39:10 56:8,14 |
| **arrested** 20:20 | 36:15 | 75:17 89:2,17 | 61:5 79:15 |
| **asian** 105:5 | **assuming** 122:8 | 91:10 112:8 | 89:12,16 91:16 |
| **aside** 48:7,25 | 122:14 | **august** 23:24 | 92:11 95:21 |
| 65:5,6 76:5 | **assumption** | **authored** 9:15 | 132:7 |
| **asked** 26:17 | 113:17,18 | **authorities** | **awareness** 34:4 |
| 30:2 48:9 53:2 | **attached** 97:12 | 5:22 | |
| 53:5 64:18 | 136:14 138:15 | | |

[b - bronx]                                                          Page 5

| b | | | |
|---|---|---|---|
| **b**  25:2 49:8 | 76:11 91:13 | **bests**  115:12 | **boring**  64:23 |
| 72:24 107:17 | 110:11 116:21 | **better**  65:8 | 102:8 |
| 109:19 114:8 | 117:2 133:8 | 81:18 | **borough**  47:22 |
| 139:6 | **basis**  13:6,19 | **biased**  62:12 | 53:11 |
| **back**  8:24 9:20 | 36:3 68:25 | **big**  31:3,19 | **boss**  14:14 |
| 13:20 15:16 | **bathroom**  71:3 | 38:7 40:2 | **bother**  112:19 |
| 20:21 21:10 | **beat**  65:3,3 | 103:19 | **bottom**  28:15 |
| 26:22 29:2 | **becoming** | **birthday**  131:2 | 39:21 44:17 |
| 32:5,5 33:12 | 41:15 | **bit**  27:13 29:2 | **boulevard** |
| 38:14 42:11 | **bed**  105:6 | 38:4 59:24 | 133:2 |
| 47:11 54:4 | **began**  40:18 | 62:22 77:9 | **box**  124:20 |
| 66:20 76:23 | **beginning** | 92:8 119:22 | 125:3 |
| 95:14 112:18 | 25:21 41:25 | 131:14 | **brain**  50:3 |
| 121:2 126:22 | 77:9 | **bizarre**  61:11 | **brazen**  120:16 |
| **background** | **behalf**  44:10 | 62:5 | **break**  7:6,11 |
| 79:15 131:14 | **behavior**  59:12 | **black**  28:2,17 | 53:21 54:5 |
| **backwards** | 100:5,12 | 121:6 | 126:17 134:11 |
| 18:22,23 80:25 | **belief**  113:21 | **blame**  52:14 | 134:14 |
| **bad**  104:17 | **believe**  6:3 | 104:19,20 | **breakdown** |
| **balance**  52:11 | 20:11 31:5 | **blaming**  114:23 | 51:19 52:20 |
| **ball**  118:24 | 37:19 43:4 | **blood**  140:11 | 53:16 |
| **ballistic**  78:22 | 47:21 65:4 | **bloodier**  75:8 | **breakdowns** |
| **bar**  19:25 | 66:7 88:20 | **board**  37:12,13 | 53:12 |
| 62:15 64:22 | 102:5 113:22 | **bob**  14:18 15:6 | **breaks**  7:7 |
| 74:18 | 114:3 129:25 | 44:14 85:17 | **breath**  65:22 |
| **barely**  61:4 | **believed**  30:18 | **boerum**  81:16 | 65:23 66:21 |
| **based**  76:5 | 66:8 88:10 | **boggling** | 115:10 129:23 |
| 92:14,15 101:7 | **believer**  23:19 | 129:18 | **brian**  20:10 |
| 101:7 | **belongings** | **boil**  92:18 | **bring**  26:25 |
| **basically**  17:22 | 87:25 | **bonomo**  107:18 | 133:19 |
| 20:22 32:3 | **bench**  34:14 | 107:21 | **broach**  41:14 |
| 45:15 55:12,23 | **benefit**  58:15 | **boom**  112:10 | **broke**  85:3 |
| 65:7,12 66:19 | **benign**  106:11 | 122:17 | **bronx**  1:9 5:19 |
| 69:8,21 75:5 | **best**  114:21 | **border**  101:4 | 16:5 |
| | 118:16 | | |

[brooklyn - charge]

**brooklyn** 19:17
  47:10 73:25
  82:22,23
  124:25
**brother** 20:12
  20:14
**brought** 5:17
  23:21 54:6
  67:6,21 89:17
**buddies** 120:18
**building** 88:2
  114:11
**bulk** 22:14
**bull's** 32:4
  38:13
**bump** 60:17
**bunch** 54:11
  71:10 102:15
  118:7
**bus** 75:15
  119:3,5,5,7
**buying** 105:5
**bzezi** 107:16,19

**c**

**c** 2:2 4:8 138:2
  140:2,2
**calendar**
  102:23 103:13
**call** 9:21 12:13
  16:16,20 17:16
  21:8 33:15
  62:15 66:18
  79:24 83:6
  86:16 88:25
  92:2 98:12

117:21 125:22
  126:6,8
**called** 58:25
  68:11 79:22
  82:2 89:7
  91:25 105:19
  107:16 133:3
**calling** 55:6
  65:14
**cameras** 70:9
  70:14
**camps** 33:20
**career** 20:5
  89:25
**careful** 100:11
**carefully** 136:5
**carol** 84:17
**case** 1:7 7:18
  9:2,3,4,23
  10:24 13:9,10
  16:5 28:22
  41:16,17 54:21
  55:4,7,13,25
  56:17,18 64:19
  64:20,23 65:8
  66:15,23 68:11
  68:12 69:9,14
  69:20,22,24
  70:25 71:6,21
  73:9,21 74:3,5
  74:10,10,17,23
  75:9,10,23
  76:10,18 77:7
  86:9 96:19
  102:3,5,22

103:13,25
  104:16,23,25
  105:18 106:10
  107:3,8,13,14
  107:16,17
  108:16,20
  109:17 114:13
  114:15 116:17
  116:17 117:14
  119:18 125:23
  131:24,25
  132:12
**cases** 9:5 11:11
  19:6 23:15
  34:15,20 35:11
  39:14 40:4,16
  41:18 43:9
  51:8,24 52:5
  52:22 53:12
  54:18 61:24
  68:9,19 71:10
  74:13 75:7
  78:13,15 86:7
  107:15,25
  110:13 112:10
  114:11 127:4,8
  127:14 128:4
**catastrophe**
  29:14 72:22
**catastrophic**
  40:24 41:2,3
  60:23 69:15
**cause** 89:24
**caveat** 7:8

**cc** 117:25
**cell** 12:14
**center** 129:21
**certain** 40:18
  41:6 43:24
  44:21,21 56:19
**certainly** 11:21
  13:16 16:19
  17:5 24:11
  30:23 41:24
  60:4,5 65:6
  77:11 101:3
  110:15 112:25
**certify** 138:6
  140:5,10
**cetera** 47:14
**chain** 63:14
**challenged**
  107:6
**chance** 13:25
  27:25 63:11
  123:10
**change** 12:3
  84:15 120:19
  137:4
**changed** 45:22
**changes** 136:13
  138:14
**changing** 25:3
**character**
  115:11
**characterize**
  61:11
**charge** 55:18
  55:19 64:10

**[charge - complaints]**

65:11,25 66:17
86:3 88:11
103:21 105:18
106:23 108:7
115:6 127:9
**charges** 8:20
9:5,12,13,16
54:12,19,23
67:3 79:13,16
80:8,18 86:22
86:23 87:4,8
87:10 88:6,21
89:18 92:21,25
93:19,25 94:5
95:18,21 101:3
112:2,24
115:25,25
116:20,23
117:6 121:23
126:23 128:14
129:7 132:5
**charles** 86:11
**chastised** 38:23
**checked** 10:10
10:11,13,16
**checking** 10:9
**cheri** 58:9
**cheryl** 68:11
**chiefs** 53:11
**childlike**
115:11 129:24
**chin** 105:6
**chinn** 9:4 64:20
**choice** 12:20

**chronology**
92:10
**citation** 70:6
**cite** 68:14 71:18
108:15
**cited** 107:15
**city** 1:9 5:17
13:18 57:13
65:9 73:11,15
73:20 74:7
104:24 107:21
119:25 120:25
127:14
**claim** 70:3
**claimed** 102:11
103:4
**claims** 35:7
**clarify** 134:17
**class** 20:13,15
**clear** 45:17
67:24 85:5
**clearly** 14:24
37:22 116:6
**clerk** 20:2
**cliche** 23:7
**client** 14:25
84:5 96:16,18
**close** 85:7
**closed** 47:23
48:12
**closings** 89:9
**clueless** 77:18
**cold** 59:8
131:21

**colleague** 35:6
**collect** 111:24
**collusion** 55:7
62:22 104:18
108:14,20
109:4
**columbus**
81:15
**combustibility**
48:8
**combustion**
93:4
**come** 48:16
52:6 100:19
108:14 110:10
115:15
**comes** 30:3
47:8 92:14
106:6 119:7
**coming** 12:5
28:25 80:3
81:2,3 105:4
120:15 133:25
**commensurate**
14:15
**commission**
66:11
**committing**
28:7
**commute** 26:4
**comparison**
68:6
**compensate**
85:4

**compensated**
12:22
**compensation**
11:7 13:17,24
14:6
**competent**
76:21
**complain** 39:13
40:4 50:5
51:21 78:17
123:14,21
126:7
**complained**
24:5 25:13,17
46:4,5 47:2
50:16 62:10
63:18 74:20
79:18 126:12
**complaining**
75:24 100:9,23
102:2 108:11
**complains**
115:11
**complaint** 24:6
44:3,8,9 45:19
60:4,12 63:16
91:17 92:7,16
97:18 98:21
99:7 114:24
117:13 121:19
122:2,6 125:10
**complaints**
24:11 40:11,14
41:25 42:3,6
42:25 45:2

**[complaints - county]** Page 8

51:5 52:9,11
52:19 56:9
58:3 59:16
60:9 61:7
62:18 67:2,6,9
68:4 92:25
95:24 98:2
100:3 101:20
110:2,5 116:12
124:6,10
125:15 127:25
133:20
**complete**
115:16 138:9
**completely**
14:11 34:13
41:9 47:17
88:10 111:6,9
**compliance**
99:13 121:16
**complicated**
27:14
**complication**
70:13
**comply** 69:16
70:20
**composed**
119:24
**concede** 66:3
**concentration**
33:20
**concerns** 99:9
**conciliatory**
35:24

**conclave**
122:16
**conclude** 27:17
**conclusion** 29:6
99:16 100:20
101:2,5,11
**conclusively**
43:11
**condescension**
66:12
**conditional**
70:18
**conduct** 55:17
66:11
**conferences**
34:23
**connection**
89:3
**consequence**
109:8
**consider** 66:17
**considering**
60:23 87:20,21
**constantly**
60:25
**consult** 55:2
**consultation**
46:8
**consulted** 16:8
29:24
**consulting**
40:16 114:19
**contact** 24:7,8
123:23

**contained**
118:11,20
**contemporan...**
49:17,18
**contempt** 20:19
**content** 85:19
**context** 33:14
**contingent** 13:6
13:15,19
**continue** 6:20
**continued**
17:25 49:20
**continuing**
18:23 21:15
49:13 50:23
**contretemps**
100:25
**contribution**
55:8
**control** 106:8
**conversation**
36:25 37:19
43:7 85:8
98:19,24 99:3
110:4
**conversations**
40:8
**convince** 43:11
**convinced**
72:21 73:18
127:24
**cooked** 81:8,21
**cooper** 71:13
**copy** 4:3 44:14
110:20 134:23

**corey** 44:4
131:18
**corp** 121:8
**corporation**
73:10
**correct** 7:21
25:14 56:6
63:25 90:4,5
93:20 130:17
138:9,13
**corrections**
22:20 136:6,8
138:13
**cost** 58:14
**costing** 78:14
**costs** 88:18
**counsel** 7:17,23
11:4 13:11,12
21:14 22:11
34:19 50:16
73:10 76:9,11
79:17 85:20
86:17 95:2
104:12 105:23
106:4 107:5
115:7 121:8
139:12
**counsel's** 76:6
**counted** 127:22
**counts** 49:3
**county** 16:3,7
22:25 23:11
34:21 66:6
69:18 72:18
77:7,22 86:21

**[county - delay]**                                                    Page 9

122:11 124:25
133:18 138:5
**couple** 26:6
32:13 78:23
104:11 107:15
**course** 30:6
42:10 88:12
**court** 1:2 3:20
6:14 9:25 24:4
44:5 55:15,19
56:10 65:13
66:6 68:15
69:10,11 74:25
94:10 104:9
109:11 115:10
122:25 125:20
126:13 129:16
136:23
**courthouse**
74:5 129:9
**courtroom**
124:20 128:16
128:18
**cover** 64:9
132:10
**covered** 84:5
**covering** 56:16
**covid** 12:11
47:19 49:7
**coyne** 51:16
**crack** 12:7
**cracking** 84:16
**cracks** 120:17
**crafting** 9:8

**creating** 35:22
**credit** 48:9
**credited** 48:14
**crime** 116:10
**cuff** 10:7
**cullen** 71:15
**cuomo** 12:24
84:18
**cuomo's** 12:6
**curious** 49:22
116:10 117:22
**cut** 98:25 99:4
**cutting** 26:5
**cv** 1:7

**d**

**d** 3:2 72:23
74:6,24 107:23
138:2 139:2,6
**d's** 50:4
**da** 124:2
**daggers** 78:3
**damage** 68:16
121:13
**damaged**
105:16
**damages** 132:8
132:10
**damp** 125:3
**dan** 72:13
89:18,21 91:16
110:20 112:14
130:5
**dangerous**
27:12

**daniel** 2:11
**danielle** 34:12
**daniels** 68:11
68:17
**dankner** 57:4
119:23 120:5
120:23
**dark** 87:17
**dash** 72:23
**date** 85:14
136:11
**dated** 97:22
**david** 11:4,14
95:22 97:21
116:12
**dawdling** 70:16
**day** 15:17,21
20:3 26:11,14
29:20 36:7
46:8,11 86:15
98:20,24
131:22 138:21
**days** 19:24
32:13 80:9
90:3 136:19
**dd5** 119:23
**de** 108:16
**deal** 31:19 38:7
40:2 81:7
84:23 103:19
**dealing** 102:19
**deals** 117:12
121:25
**dealt** 92:25

**december** 61:9
67:5,19 73:8
74:3 80:2
108:3 110:16
**decent** 73:23
**decide** 114:21
122:17
**decided** 70:2
82:12,17
**deciding** 41:5
**decision** 72:14
74:22 82:10
86:2 107:7
108:2,4,5
109:6 129:16
130:11
**decisions** 113:3
114:5,19
**deemed** 136:22
**deeper** 66:23
69:11
**defecate** 70:2
**defect** 75:16
**defendants**
1:11 2:9
**defending**
23:23
**defense** 69:9
115:14 134:18
**definitely** 25:5
50:11 51:25
53:6 112:15
**delay** 26:10,17
30:4 105:25

**[delays - distribute]** Page 10

| | | | |
|---|---|---|---|
| **delays** 26:24 | **deserves** | **disciplinary** | **discussed** 16:14 |
| **demand** 72:9 | 104:19 | 8:17 9:5,16 | 54:17 84:3 |
| **dense** 34:3 | **despite** 74:4 | 56:5 64:12 | 86:13 |
| **department** | 109:10 | 65:25 78:24 | **discusses** |
| 35:12 37:11 | **destroy** 45:15 | 83:21 84:9 | 101:13 |
| 57:13 68:18 | **detail** 86:14 | 86:3,7 87:23 | **discussing** |
| 70:7 86:5 | **detailed** 13:4 | 88:21 111:12 | 39:14 83:24 |
| 115:24 118:6 | **details** 109:2 | 113:23 115:6 | 84:7 |
| 120:2 | 110:12 114:10 | **disciplines** | **discussion** |
| **departments** | **determination** | 115:9 | 14:12 30:13,17 |
| 102:15,19 | 90:7,10 91:4 | **disclose** 119:6 | 31:16 94:20 |
| **depending** | **devora** 1:22 | **disclosing** | 99:5 124:5 |
| 32:22 80:25 | 140:3,18 | 83:15 | **discussions** |
| 84:19 | **difference** | **disclosure** | 14:25 15:5 |
| **depicting** 70:10 | 38:12 | 69:17 103:2 | 83:15 85:20 |
| **deposing** | **different** 16:7 | **discovers** 125:2 | **dishonesty** |
| 136:18 | 53:10 102:19 | **discovery** | 100:4,10 |
| **deposition** 3:16 | 125:6 | 56:19 60:24 | **dismissal** |
| 5:4 6:2,4 8:14 | **differently** | 68:5 70:16 | 130:20 |
| 21:16 105:12 | 119:12 | 96:24 121:16 | **disparate** 44:22 |
| 120:8 133:13 | **difficult** 6:14 | **discretion** | 68:8 |
| 136:4,15,19,21 | 25:4 29:7 | 27:21 85:2 | **displeased** |
| **depositions** | 35:17 | **discriminated** | 55:16 |
| 10:6,15,24 | **digs** 69:11 | 30:19 42:15 | **displeasure** |
| **depth** 67:2 | **dinner** 123:17 | **discriminating** | 109:20 |
| 71:25 | **direct** 43:23 | 36:2 37:17,24 | **disposal** 59:17 |
| **derelictions** | **directly** 60:5 | **discrimination** | **disposition** |
| 109:12 | 102:12 118:23 | 37:3,9,21 41:4 | 80:6 |
| **describe** 16:10 | 121:22 123:15 | 50:8 133:7,21 | **disproportion...** |
| 17:3 22:7 | 123:22 125:14 | **discriminatory** | 51:7,23 |
| **described** 50:6 | 126:12 128:3 | 88:7,22 | **disregarded** |
| **description** | **disagree** 15:9 | **discuss** 52:5 | 109:11 |
| 139:7 | 36:18 | 63:15 67:8 | **disrupting** 34:2 |
| **deserve** 104:21 | **disbarred** | 90:6 111:15 | **distribute** |
| | 20:20 | 112:24 130:20 | 129:21 |

[distributed - emotionally]                                    Page 11

**distributed**
  53:16
**distribution**
  51:10 52:22
**district**  1:2,3
  73:17
**disturbance**
  38:6
**disturbed**
  37:16
**divide**  31:24
**division**  34:23
  68:14 70:24
  74:15,22 91:18
  109:9,14 123:7
  126:3
**docket**  71:22
**document**
  21:24 22:6
  33:3 43:17
  44:2,11 55:19
  63:5 79:6
  80:22 93:10
  94:14 96:7,24
  106:17 117:24
  139:8,8,9,9,10
  139:10,11,11
**documentation**
  26:25
**documented**
  38:6
**documents**
  54:8,8 71:23
  96:21 107:4
  120:22

**doing**  16:6 19:3
  20:3 23:23
  38:15 39:23,24
  47:16 49:11
  78:8,9 81:22
  119:2 126:2
  136:10
**dollars**  76:12
  78:14
**door**  129:20
**double**  10:9
**doubt**  129:12
**doubtless**  88:24
  118:11
**doubts**  122:15
**douses**  103:6
**downplay**  99:8
**downplayed**
  99:10
**draft**  22:18
**drafted**  106:17
**drafting**  88:2
**drawn**  28:16
  64:23
**drinan**  7:17,18
  7:20,25 8:11
  14:8 79:23,23
  85:21
**drinan's**  8:6
**driver**  119:3,5
**drugstore**
  12:12
**dryer**  124:16
**drying**  124:19
  125:5

**dsmall**  2:12
**duck**  91:14
  100:18,19,20
**ducking**  60:25
**due**  123:2
**duffy**  29:8
  61:23 95:13
  127:12,19
**duly**  4:9 140:7
**dump**  39:14
  40:4 52:7
**dumped**  42:25
**dumping**  40:16
**dunk**  132:6
**dust**  55:5
**duties**  19:10
**dykman**  71:16
**dysfunctions**
  52:16

**e**

**e**  2:2,2 3:2,2 4:8
  4:8,8,8 8:20
  32:14 37:14,15
  48:18 54:16,16
  60:15 63:24
  72:23 80:23
  81:4 94:6,9,24
  95:6,16 96:16
  99:15 100:8
  107:17 112:17
  112:18 117:24
  120:22 137:2
  138:2,2,2
  139:2,2,2,6,6
  140:2,2

**eager**  45:10
**earlier**  42:13
  54:17 84:11
  85:24 108:5
  116:19 131:15
**early**  25:11,25
  42:8 77:7
**earth**  68:23
**easily**  27:6
**eastern**  1:3
**easy**  62:24
  107:19
**ebt**  44:13
**ebts**  9:25
**edict**  129:14
**educate**  18:11
**effect**  3:19
  116:24
**effects**  69:16
**effort**  58:4 72:6
**efforts**  56:25
  73:14
**ehrlich**  58:9
**eighth**  2:9
**either**  9:15
  15:24 26:18
  32:21
**elaborate**  90:19
  117:20
**eldib**  107:20
**emergency**
  106:5
**emotionally**
  41:10

| | | | |
|---|---|---|---|
| **employee** 84:4 | **es** 140:6,9 | **examples** 44:22 | **exile** 55:15 |
| **employees** 86:8 | **especially** 9:2 | **excellent** 5:25 | 122:23 |
| 132:11 | 27:3 28:21 | **except** 3:11 | **expect** 7:3 |
| **employer** 29:7 | 49:9 121:14 | 20:22 47:22 | 43:22 97:5 |
| **employment** | **esq** 2:6,11 | 138:13 | 132:20 |
| 24:23 73:23 | **essentially** 6:4 | **exception** | **expected** |
| 113:3 130:15 | **et** 47:14 | 65:10 | 132:20 |
| **enclosed** | **ethical** 84:20 | **exchange** 33:11 | **experience** |
| 119:13 | **ethics** 12:24 | 47:9 54:17 | 87:19 |
| **encounter** | **ethnic** 114:6 | 60:19 61:12 | **experts** 69:5,8 |
| 72:20 80:6,7 | **evening** 7:15 | 69:7 | **explain** 55:6,9 |
| **ended** 37:7 | **event** 105:10 | **excluding** | 62:23 |
| 133:8 | 123:13 | 55:20 | **explained** |
| **enforce** 129:19 | **events** 8:23 | **excuse** 26:18 | 30:22 32:14 |
| **enforcing** | **evidence** 45:17 | 27:21 29:18,21 | 48:10 72:4,5 |
| 12:24 | 70:9 76:6 | 30:5 31:13 | **explains** 27:13 |
| **enlightening** | 129:15 | **excused** 27:2 | **explanation** |
| 54:24 | **exact** 46:2 | 32:9 | 27:23 |
| **entire** 20:5 | 51:10,18 90:16 | **excuses** 29:20 | **explode** 27:25 |
| 31:23 33:11 | **exactly** 77:6 | **executed** | 42:13 |
| 34:14 62:5 | 124:23 | 116:21,23 | **explore** 47:11 |
| 104:9 | **exaggeration** | **exhibit** 21:17 | 125:7 |
| **entirely** 119:20 | 24:10 | 21:20,24 22:5 | **explored** 125:9 |
| **entitled** 1:20 | **exam** 19:11 | 32:24 33:3,7 | **express** 88:5 |
| **episode** 42:13 | **examination** | 43:17,22 63:5 | **expression** |
| 62:5,22 65:21 | 1:17 4:23 19:7 | 63:9 79:6 | 33:16 |
| **episodes** 26:23 | 120:12 139:4 | 80:13 93:10,14 | **expulsion** |
| 87:23 88:24 | **examine** 68:3 | 94:11,14,25 | 122:17 |
| 89:13 | 99:14 | 96:3,6 97:4,11 | **extent** 60:2 |
| **equipped** 70:14 | **examined** 4:11 | 117:7 126:22 | 87:24 96:15 |
| **errata** 136:8,11 | **examiner** 35:7 | 139:7,8,8,9,9 | **extreme** 49:2 |
| 136:13,17 | **example** 45:18 | 139:10,10,11 | **extremely** 17:5 |
| 138:15 | 46:21 51:5 | 139:11,12 | 33:17 |
| **ervolina** 95:7 | 68:4,10 87:12 | **exhibits** 97:16 | **eye** 32:4 38:13 |
| | 108:25 114:23 | | 75:11 |

[ezra - form]    Page 13

| | | | |
|---|---|---|---|
| **ezra** 92:6,15 97:17 | 89:12 91:7 95:22 97:21 | **files** 47:25 52:7 | 87:4 89:18,21 91:16 94:4 |
| **ezra's** 92:8 | 111:21 112:17 | **filing** 3:7 97:12 97:16 99:15 | 112:17 115:10 117:5 |
| **f** | 112:18,22 116:13 130:10 | **final** 73:3 | **fists** 65:19 |
| **f** 3:2 139:2,6 140:2 | **farber's** 82:14 | **finally** 7:3 29:2 105:25 | **five** 26:3 126:17 |
| **face** 68:24 | **fast** 70:5 | **find** 76:15 100:8 110:23 | **flabbergasted** 77:23 |
| **facie** 69:14 | **favorable** 80:5 80:5 | 110:25 119:13 120:4 | **floor** 1:13 2:4 2:10 11:16,21 |
| **fact** 29:23 36:11 43:8 74:4 96:23 108:12 109:10 132:15 | **favors** 89:2 | **findings** 8:18 | **floored** 77:23 |
| | **fb** 1:7 | **finish** 6:17,19 | **foil** 120:25 121:4 |
| | **feathers** 24:4 | **finkel** 58:10 | **folder** 54:8 |
| **factor** 91:11 | **february** 25:22 97:22 | **fired** 12:16 67:13 90:18 106:6 130:8 | **follow** 97:2 122:25 130:10 |
| **facts** 9:11 69:24 | **federal** 44:5 122:25 | **firing** 13:23 54:13 | **following** 29:19 39:9 99:21 119:13 |
| **fail** 136:20 | **fee** 13:15 14:2 | **firm** 20:15 23:19 28:24 115:22 131:16 | **follows** 4:12 |
| **failed** 68:13 | **feel** 86:3 | | **fool** 13:22 |
| **failure** 51:2 69:16 | **feeling** 39:17 59:23 85:25 | **firmer** 101:22 | **forbidding** 11:9 |
| **fair** 65:3 102:17 | **feelings** 100:21 | **firms** 73:23 | **force** 3:19 |
| **fairly** 16:15 24:9 39:12 64:23 121:13 | **fell** 103:7 | **first** 4:9 6:12 9:18 15:21,23 22:21 30:12 44:11,12,23 55:10 56:8,11 60:11 61:5 63:21 64:16 65:10 67:7 68:18 70:7 79:12,12 80:6 80:7,17,21 84:8 86:23 | **foregoing** 140:8 |
| **false** 15:2 | **felt** 40:15 42:15 42:20 88:6,8 103:11 109:14 | | **foremost** 6:12 |
| **familiar** 6:3 9:6 124:3 | **female** 65:14 | | **forgave** 100:23 |
| **familiarize** 76:13 | **fifth** 2:4 | | **forget** 28:18 110:8 |
| **far** 85:7 | **fight** 119:22 | | **forgiving** 52:15 |
| **farber** 11:4 12:14 13:20 81:3,6 82:7 84:12,22 85:13 | **file** 34:17 129:16 | | **form** 3:12 138:14 |
| | **filed** 8:20 44:4 44:10 91:17 117:24 120:22 120:25 | | |

**[formal - going]** Page 14

| | | g | giraldo 107:23 |
|---|---|---|---|
| formal 19:8 | 109:3,23 | | girl 65:16 |
| formed 54:22 | 116:16 125:12 | g 50:4 107:23 | 66:22 |
| former 73:10 | 125:15 | 138:2 | give 18:21 |
| forth 140:7 | freed's 55:17 | gabrielle 1:19 | 29:19 35:15,15 |
| fortifies 109:16 | 101:20 109:20 | 2:6 5:7 | 38:5 53:11 |
| 116:19 | 114:24 124:10 | gail 16:23 46:5 | 68:9,10,13 |
| forward 7:11 | frenzy 37:10 | 53:9 | 79:14 109:2 |
| 7:13 8:5,11 | frequent 17:24 | gap 68:19 69:9 | 119:22 131:13 |
| 15:5 | frequently 24:9 | gaps 68:20 69:2 | given 26:16 |
| found 49:15 | friday 29:9 | gardens 4:21 | 29:8 46:21 |
| four 79:6 90:5 | 31:22 39:15 | gathers 119:8 | 51:6 52:2,2 |
| 93:10 122:13 | 40:5 42:8 43:6 | gayle 46:14 | 81:6 89:22 |
| 139:10,10 | 43:9 44:24 | gee 11:14 33:23 | 106:23 134:11 |
| fourth 98:10 | 80:24 | 82:3 | 138:12 140:9 |
| fragility 33:15 | fridays 25:22 | general 9:22 | giving 10:6 |
| 33:15 | 43:2 | 11:4 22:10 | 13:23 31:19 |
| frank 63:18,22 | front 48:6 70:9 | 50:16 83:3 | 43:9 78:5,15 |
| 63:23 64:5,7,9 | 81:15 105:3 | 86:16 110:2 | 110:12 123:9 |
| 64:15 66:3 | 129:20 | 115:7 120:6 | glazer 92:7 |
| 109:2 115:4 | frown 75:22 | general's 12:4 | 97:17 |
| 122:3 123:20 | frozen 14:11 | 13:3 | go 6:9,18 7:11 |
| 123:21 124:2,4 | 85:25 | generally 83:20 | 17:22 37:9 |
| 132:4 | fully 84:5 | 112:4 | 38:20 40:19 |
| frank's 122:6 | functioning | gentleman | 58:12 66:25 |
| frankly 55:3 | 36:14 39:22 | 105:5 | 67:12 71:21,24 |
| 68:2 | furious 90:15 | gentlemen | 73:5 84:25 |
| free 85:5 | 122:8 | 103:22 | 117:24 |
| freed 55:5,11 | further 3:10,15 | george 10:11 | goes 39:18,19 |
| 60:10 62:4,8 | 68:16 103:21 | 29:25 31:9 | 69:10 103:20 |
| 62:19,21 63:17 | 127:24 133:24 | gesture 6:16 | going 6:5 8:24 |
| 63:22,23 64:5 | 140:10 | getting 35:9 | 9:20 10:23 |
| 64:8 101:24 | future 27:17 | 62:15 75:15 | 12:11,16,17 |
| 102:2 103:14 | 32:2 | 78:19 91:25 | 13:22 14:24 |
| 104:22 106:12 | | 111:21 | 15:9,14 18:22 |
| 108:2,9,23 | | | |

**[going - heard]**

21:10,12 25:5
27:19 29:2
30:9 31:24,25
32:23 34:25
35:4 41:20
51:4 57:23
58:7 59:2 64:9
66:20,25 72:12
72:21 77:19
80:10 82:11,21
82:23 83:2,11
83:13 85:18
90:18,20 91:13
94:2,25 95:10
103:10,21
105:21 106:2
110:7 115:19
115:19 117:4
118:17 120:13
121:6 126:22
127:3 129:19
134:9,18
**good**  4:25 5:2
16:13 23:20,23
33:18,20 39:23
39:24 51:12,13
74:18 105:22
113:17,18
120:6 131:3
132:14
**goode**  16:24
46:5 53:9
**gossett**  16:2
**gotten**  9:21
51:12 56:25

57:5 62:17
79:20 103:9
118:5
**governor**  12:5
12:23,24
**grabbed**  76:22
**gradations**
24:23
**graduate**  19:15
**grant**  31:13
**great**  32:14
86:14
**greater**  71:25
**gregory**  10:11
**ground**  6:9
**groups**  114:6
**guess**  15:24
22:13 45:14
82:17 92:22
**guild**  59:7
123:17
**guilty**  74:20
**gun**  23:17,17
**guy**  9:24 74:19
74:19 79:21
89:8 119:4
120:6
**guys**  23:20
**gvinci**  2:6

**h**

**h**  4:8 72:23
104:23 139:6
**hackner**  1:22
140:3,18

**hagler**  74:8
**hair**  124:16,19
125:2,5
**half**  26:11 27:7
31:19
**hall**  17:18
**hallway**  60:16
**han**  104:23
106:10 107:14
108:2 109:6,20
**hand**  21:12
22:4 32:23
46:9,10 80:12
95:2,14 96:2
97:3
**handed**  33:7
43:21 63:8
94:9,24
**handing**  93:13
**handiwork**
116:7,8
**handled**  28:2
68:13 71:5
**handling**  23:14
**hanging**  73:24
**happen**  28:4
50:12 122:9
124:24 130:2
**happened**  8:22
9:19 12:19
30:16 36:5
46:3 55:11
66:9 69:20,21
92:5 100:7
106:10 109:23

117:23 118:3
122:9,14
129:12
**happening**  82:5
**happens**  56:21
87:14 121:3
**happy**  7:7
59:24 131:2
**harassment**
44:23
**harbored**
100:21
**hardball**  120:7
**harshly**  112:20
**hazards**  102:14
**head**  6:15
10:12 16:24,24
17:20,21 18:2
18:16,18,25
19:14 53:9
58:8 59:12
86:5 87:20
95:11,12 97:14
115:12
**headlights**
105:8
**hear**  6:21 15:10
61:24 78:16,21
121:18 127:7
129:7
**heard**  60:3
78:22 104:12
104:13 121:15
121:23

**[hearing - identification]**                                                     Page 16

**hearing**   59:19
  123:5  127:13
  129:17
**hearings**   20:3
**hearsay**   75:18
**heavier**   51:13
**height**   12:11
  47:18
**heightened**
  62:4  84:20
**heisler**   1:18  4:1
  4:16,25  5:1  6:1
  7:1  8:1  9:1
  10:1  11:1  12:1
  13:1  14:1  15:1
  16:1  17:1  18:1
  19:1  20:1  21:1
  22:1,5  23:1
  24:1  25:1  26:1
  27:1  28:1  29:1
  30:1  31:1  32:1
  33:1,6  34:1
  35:1  36:1  37:1
  38:1  39:1  40:1
  41:1  42:1  43:1
  43:20  44:1
  45:1  46:1  47:1
  48:1  49:1  50:1
  51:1  52:1  53:1
  54:1,4  55:1
  56:1  57:1  58:1
  59:1  60:1  61:1
  62:1  63:1,8
  64:1  65:1  66:1
  67:1  68:1  69:1

  70:1  71:1  72:1
  73:1  74:1  75:1
  76:1  77:1  78:1
  79:1,9  80:1
  81:1  82:1  83:1
  84:1  85:1  86:1
  87:1  88:1  89:1
  90:1  91:1  92:1
  93:1,13  94:1
  95:1,5  96:1
  97:1  98:1  99:1
  100:1  101:1
  102:1  103:1
  104:1  105:1
  106:1  107:1
  108:1  109:1
  110:1  111:1
  112:1  113:1
  114:1  115:1
  116:1  117:1
  118:1  119:1
  120:1  121:1
  122:1  123:1
  124:1  125:1
  126:1  127:1
  128:1  129:1
  130:1  131:1
  132:1  133:1
  134:1,22  135:1
  136:1  137:1
  138:6,18  139:3
**held**   1:20  20:19
  24:16  65:23
  66:21  94:21

**hello**   61:16,24
  105:21
**help**   61:19  62:2
  67:11  104:15
  107:2,13
**helpful**   103:17
  104:6
**helping**   46:10
**henderson**
  86:10
**henly**   22:10
**hereinbefore**
  140:7
**herrera**   30:2
  31:7,8
**hey**   82:19
**hidden**   132:6
**hide**   118:23
**hiding**   119:20
**higher**   38:20
**highly**   47:17
**hill**   9:2  54:21
  54:22
**hire**   19:24
  82:17
**hired**   15:25
  28:11,11
**history**   62:7
  108:9  121:15
**hit**   116:21,24
  119:4
**hodes**   72:23
**hold**   18:24
  59:18  80:10
  129:23

**holding**   65:22
  115:9
**hole**   69:11
**holiday**   47:4
  48:11  50:8
**holidays**   42:9
  46:24  131:4
**home**   47:25
  48:13  50:7
  124:24
**horn**   114:8
**hour**   26:11
  27:7  31:20
  34:18
**hourly**   14:4,5
**hours**   7:4  26:7
  33:24
**house**   7:16
**huh**   93:21
**human**   91:18
**hundred**   34:20
**husband**   81:13
  82:15  86:20
  131:8,12  133:3

**i**

**iconic**   105:2
**idea**   12:19
  41:22  67:21
  76:20  87:15
  110:10  128:21
**identification**
  21:25  33:4
  43:18  63:6
  79:7  93:11
  94:15  96:8

**idiot**  115:16
**ig**  84:17
**ig's**  84:15
**ignored**  105:14
**illness**  70:2
**illustrative**
  71:13
**imagine**  65:22
  115:8
**immediate**
  22:18 78:11,12
  78:13
**immediately**
  18:10 73:12
  76:16
**impartial**
  132:21
**imperative**
  136:16
**implication**
  38:2 45:11
**implications**
  114:15
**implode**  52:14
**imply**  45:8
**important**
  30:23
**impose**  59:19
**impress**  81:18
**impressed**
  73:13
**impression**
  11:10 53:19
  56:20 57:9
  67:16 81:6

89:25
**impressive**  17:4
**improper**  29:4
  76:20
**improvement**
  88:3
**inappropriate**
  15:12 47:18
  48:7
**inches**  69:3
**incident**  25:17
  39:9
**included**  12:2
  95:16
**including**  87:23
  99:20
**increase**  40:10
**increased**  42:2
**incredibly**
  122:10,12
**indicate**  53:12
  106:18
**indicates**  54:25
  139:12
**indicating**
  69:12 113:11
**indication**  59:3
**indirectly**
  91:20
**individual**
  46:10
**individually**
  59:20
**infection**  75:11

**infer**  103:23
**inference**
  106:22 108:6
  109:8
**influence**  10:6
  11:12
**informal**  69:13
**information**
  54:20 55:21
  119:9 121:2,11
**inherent**
  122:23
**initial**  37:14,15
  54:15 56:20
  57:9 63:24
  79:16 99:5
  100:24
**initially**  81:22
  110:9
**initiating**  44:9
**input**  10:17
  86:12,17
**insisted**  89:14
  103:8 104:18
**insisting**  46:22
**inspector**  9:21
  12:4 13:2
**installation**
  59:7
**instance**  46:25
**instances**  47:2
**instructed**
  108:19 120:9
**instructions**
  136:2

**insurance**
  13:11
**integral**  22:25
  23:5,11
**interact**  17:13
**interaction**
  38:17 40:12
  48:5
**interactions**
  25:13
**interest**  114:21
**interested**
  140:12
**interesting**
  55:14 56:2
  75:8
**interfered**  45:4
**internally**
  24:12
**interregnum**
  20:8
**interruption**
  20:8
**interviewed**
  87:2,7 115:21
  115:23 116:5
**introduced**
  59:9
**invaluable**  34:9
**investigation**
  13:5 87:3
**investigations**
  27:4 29:20,25
  31:10

**investigators**
   57:14
**involved**   12:18
   14:18 69:24
   86:6,8 87:22
   104:25 112:13
   113:3,7 114:5
   127:5 131:16
   131:17
**involving**   25:18
   55:4 71:10,15
   73:9 102:5
   113:4
**irish**   113:5
**irrelevant**
   108:15
**issuance**   88:21
   112:13
**issue**   10:21
   11:6,11 12:15
   26:9 27:24
   30:16 31:3
   33:24 41:12
   45:3 46:13
   48:21 49:10
   50:6 56:16
   58:16,20 59:25
   60:20 75:11
   102:8 116:12
   123:8
**issued**   9:17
   78:25 80:18
   92:20 93:19
   94:2,5 108:3
   130:10

**issues**   15:8 16:9
   16:14 18:4
   39:11 44:21
   48:8 49:2
   54:19 55:3,14
   56:4 66:23
   70:18 95:23
   109:17 124:9
**issuing**   129:13

**j**

**james**   22:10
**january**   25:21
   77:12 79:25
   91:12 101:14
   106:3,5
**jay**   57:4 119:22
**jenna**   83:7 92:2
**jennifer**   51:16
**jew**   113:25
**jewish**   28:2,9
   28:10,13,17
   36:5,8 37:25
   42:9,16,21
   46:23 47:4
   48:11 50:7
   59:6,6 113:16
   123:16 131:3
**job**   35:9 39:23
   39:24 40:20
   50:19 116:21
   116:24
**join**   8:3
**judge**   58:21,22
   58:25 59:4,15
   60:4,5,10,12

61:17,22 62:7
62:19,21 63:16
63:17,18,23,23
64:5,5,7,8,9,15
65:13 66:3
72:2 73:6 74:8
98:12,21 99:6
99:8 101:20,24
102:2 103:14
104:13,21
105:18 108:9
108:22,25
109:3 115:4,10
116:16 117:13
120:23 121:20
122:2,6 123:12
123:14,20,21
124:2,4,9
125:12,15,22
126:7,10,11,12
127:2,7,12,17
128:2,8,9,14,19
128:25 129:6,8
129:13
**judge's**   67:2
**judges**   24:7
   35:3,9 56:4,10
   61:7,14 74:4
   74:12 93:2
   95:23 98:3
   122:13,22
   123:3 125:25
**judgment**
   38:23

**judicial**   66:11
**judiciary**   66:5
**jump**   85:15
**jumps**   125:3
**june**   12:10 85:8
   85:14
**jurors**   27:16
**jury**   103:22,22
   104:8 106:23
   107:9 121:21
   124:20,23
   125:3,4
**justice**   55:5,11
   55:17 70:17
   106:12 108:2
   109:19,22
   114:23 122:11

**k**

**k**   74:6,24 138:2
**kaplan**   129:6,8
**kathy**   62:3
**keep**   25:2 36:13
**kept**   132:13
**kew**   4:21
**khahaifa**   1:10
   5:20 10:10
**kick**   124:22
**kicks**   125:4
**kids**   41:11
   65:17
**kind**   15:16
   80:11
**kings**   49:24
   72:18,22 73:5
   77:5,7,19 78:6

**[kings - law]**                                                              Page 19

| | | | |
|---|---|---|---|
| 81:16 86:21 | 52:14 53:4 | **knows**  115:18 | 101:1 102:1 |
| 92:7 97:12,16 | 55:9 57:19,20 | **l** | 103:1 104:1 |
| 124:2 133:18 | 58:4 59:9,10 | **l**  3:2,2 4:1,8,8 | 105:1 106:1 |
| **knew**  13:11 | 59:14,15 61:18 | 5:1 6:1 7:1 8:1 | 107:1,23 108:1 |
| 24:10 26:21 | 61:25 62:21 | 9:1 10:1 11:1 | 109:1 110:1 |
| 57:5 59:10 | 63:10 65:2 | 12:1 13:1 14:1 | 111:1 112:1 |
| 73:13 76:10 | 71:18 73:18 | 15:1 16:1 17:1 | 113:1 114:1 |
| 79:19,21 80:3 | 74:9 75:4,14 | 18:1 19:1 20:1 | 115:1 116:1 |
| 81:2 95:12 | 75:19 76:7 | 21:1 22:1 23:1 | 117:1 118:1 |
| 114:12,13,14 | 77:6,6,8,21 | 24:1 25:1 26:1 | 119:1 120:1 |
| 127:12 | 78:4 82:20 | 27:1 28:1 29:1 | 121:1 122:1 |
| **knife**  66:20 | 83:4,12,18 | 30:1 31:1 32:1 | 123:1 124:1 |
| **know**  6:6,23 | 87:6,9,12 | 33:1 34:1 35:1 | 125:1 126:1 |
| 7:7 9:15 10:5 | 88:12,16 89:10 | 36:1 37:1 38:1 | 127:1 128:1 |
| 10:19 11:8,14 | 89:10 93:15,24 | 39:1 40:1 41:1 | 129:1 130:1 |
| 11:14,15,18,19 | 97:13,19 | 42:1 43:1 44:1 | 131:1 132:1 |
| 11:21 12:14,25 | 100:17 104:10 | 45:1 46:1 47:1 | 133:1 134:1 |
| 13:13 14:18 | 105:2 116:4,10 | 48:1 49:1 50:1 | 135:1 136:1 |
| 16:13 17:14,25 | 116:11 117:22 | 51:1 52:1 53:1 | 137:1 138:2 |
| 18:10 22:12 | 119:2,11 | 54:1 55:1 56:1 | **lack**  79:18 |
| 24:22 25:8 | 121:23 122:7 | 57:1 58:1 59:1 | **lacking**  34:4 |
| 26:5 27:5 | 125:8 127:11 | 60:1 61:1 62:1 | **ladies**  103:22 |
| 28:14,25 29:13 | 127:16 128:10 | 63:1 64:1 65:1 | **lame**  91:14 |
| 30:2,21 31:2 | 128:10,19 | 66:1 67:1 68:1 | **language**  22:15 |
| 31:18,21,21 | 130:6,7,9 | 69:1 70:1 71:1 | 23:8 65:11 |
| 33:9,22 35:2,4 | 131:19,22 | 72:1 73:1 74:1 | **larger**  60:22 |
| 35:19,20 36:3 | 132:4 133:3 | 75:1 76:1 77:1 | **lasting**  121:12 |
| 36:22 37:11 | **knowledge** | 78:1 79:1 80:1 | **late**  20:10 |
| 38:20 39:6,18 | 9:10 24:3 | 81:1 82:1 83:1 | 25:20 27:6 |
| 39:20 40:18 | 89:20 112:12 | 84:1 85:1 86:1 | 70:21 |
| 41:6 44:13 | 114:9 117:16 | 87:1 88:1 89:1 | **lateness**  27:2 |
| 48:4,19,21,23 | 122:6 124:14 | 90:1 91:1 92:1 | 27:22 29:22 |
| 49:15,22,23,23 | 124:18 130:4 | 93:1 94:1 95:1 | 30:5 |
| 50:17,22,22,24 | **known**  114:25 | 96:1 97:1 98:1 | **law**  19:4,15 |
| 50:25 51:10,18 | 129:22 132:9 | 99:1 100:1 | 20:2 21:5,6 |

| | | | |
|---|---|---|---|
| 36:13 39:19 | **led** 8:18 54:12 | 141:2 | **longer** 50:15 |
| 55:4,13 107:8 | **left** 70:4 79:22 | **lines** 37:7 | 106:7 |
| 114:9,16 | 85:25 111:15 | **lisa** 49:24 72:22 | **look** 13:22 |
| 115:24 120:19 | 113:23 130:7 | 72:23 80:2 | 61:13 71:20,22 |
| 122:20 126:5 | **legal** 15:8 16:8 | 82:20 90:11,12 | 75:6 76:23 |
| **lawrence** 1:18 | 16:14,14,22,23 | 90:13,16,19 | 105:22 106:11 |
| 4:15 138:6,18 | 17:15,23 18:4 | 111:25 112:12 | 107:14 115:16 |
| 139:3 | 20:5 55:14,24 | 133:14,18,19 | 116:16 117:25 |
| **lawsuit** 32:2 | 114:15 | **listed** 118:7 | 119:17 120:21 |
| 68:2 73:19 | **legislature** | **listen** 132:2 | **looked** 8:17,19 |
| 82:12 110:17 | 120:19 | **litigation** 35:22 | 8:20 9:3 61:12 |
| **lawyer** 82:18 | **legitimate** | 92:12 131:6,9 | **looking** 22:21 |
| 115:9 | 52:12 75:20 | 133:10,15 | 40:19 54:7 |
| **lawyer's** 141:2 | **length** 32:15 | **little** 15:21 18:6 | 74:10 84:21 |
| **lawyers** 13:18 | 117:15 | 23:17 25:4 | 117:6 124:8 |
| 23:16 59:7 | **lengthy** 54:16 | 27:8,11,13 | 126:24 |
| 65:9 71:11 | **letter** 64:12 | 32:12 34:3 | **looks** 24:25 |
| 104:10 123:17 | 83:21 84:9 | 38:4 41:19 | 37:4 100:18 |
| **lead** 58:2 | 110:24 120:23 | 46:7 52:15 | **loop** 91:9 111:7 |
| **leading** 56:5 | 123:8 | 55:5,22 59:22 | 111:10 |
| **learn** 79:12 | **lettering** 25:4 | 59:24 62:24 | **loose** 11:18 |
| 90:9 91:22 | **level** 17:9 25:2 | 65:16 66:22 | **lost** 17:7 |
| 94:4 | 25:2 39:25 | 67:4 77:9 | **lot** 8:15,25 |
| **learned** 91:21 | **levels** 17:10 | 81:20 88:4 | 23:21 54:13,20 |
| 92:5 | **liability** 132:5 | 92:8 112:6 | 92:6 97:18 |
| **learning** 95:20 | **libel** 97:17 | 118:23 119:12 | 121:6 |
| 110:19 | **license** 21:5,6 | 125:3 127:21 | **lower** 64:24 |
| **leave** 39:16 | **light** 119:4 | 131:14 | **lowered** 112:6 |
| 41:5 48:25 | 121:14 | **livingston** 10:3 | **lunch** 121:21 |
| 110:18 111:19 | **likely** 51:11 | **llp** 2:3,8 | 134:10,14 |
| 123:4 | **line** 28:15 | **locked** 132:17 | **lurking** 42:10 |
| **leaving** 25:24 | 35:23 39:21 | **long** 17:19 19:9 | **lynn** 86:9 |
| 29:9 41:8 42:8 | 43:23,23 50:19 | 28:22 32:13 | |
| 43:10 48:7 | 97:5,6 102:3 | 39:24 40:25 | |
| | 115:3 137:4 | 64:23 105:13 | |

| m | | | |
| --- | --- | --- | --- |

**m** 1:19 2:6
138:2
**made** 5:13 7:14
22:17 31:3
53:18 61:4
72:14 73:9
76:9 92:5
116:20 129:10
132:14 133:20
136:9
**mail** 32:14
37:14,15 48:18
54:16,16 60:15
63:24 94:6,9
94:24 95:6,16
96:16 100:8
**mailed** 80:23
81:4 112:17,18
**maintain** 21:4
**maintained**
57:12
**major** 19:5,11
23:14 28:23
40:7 41:15,17
51:2 70:12
**make** 18:7,11
22:19 25:5
35:19 38:11
39:20 52:13
69:5,14 105:13
106:10 114:18
136:5
**makes** 32:6
128:22 134:10

**making** 27:23
38:7 115:15
**male** 64:21
65:17 74:18
**man** 46:9
128:10
**manageable**
39:25
**managed** 34:13
**manager** 27:20
47:20
**managers** 38:4
**mandate**
128:20
**manhattan** 1:9
5:18 64:25
**manila** 54:7
**march** 64:11
70:20 93:24
**mark** 21:13,19
43:14 93:6
94:10 96:2
**marked** 21:24
33:4 43:18,21
63:2,6,9 79:3,7
80:13 93:11,14
94:14,25 96:7
97:4 98:8
**markings** 21:17
**marriage**
140:12
**martin** 125:22
**marvin** 74:9
**mat** 129:20

**material** 56:23
107:12
**matt** 58:10
**matter** 11:2,24
29:23 57:19
122:21 133:5
140:13
**mazure** 71:16
**mean** 13:14,21
14:13 16:13
23:13 24:12
26:8 27:24
32:6 35:20
37:20,25 39:6
41:3 44:6 46:7
49:10 50:3,18
51:19 53:7
55:13 58:3
60:8 61:16,17
62:6 65:23
66:4,12,17
68:2,7 71:12
77:13,16 78:7
80:24 88:12
90:21,22 91:8
108:13 111:19
113:2 114:8,20
114:24 115:5
116:18 117:21
120:16 122:18
124:23 125:7
128:21 129:10
**meaning** 38:25
**meaningful**
6:24

**means** 70:19
**meant** 25:23
102:23
**mediation**
34:22
**mediator** 35:2
**medical** 75:11
106:4
**medication**
64:17
**meet** 15:23
**meeting** 58:19
81:15,17
101:13,16,18
**meetings** 67:23
**megillah** 33:13
**member** 32:8
**members** 68:7
114:5
**memo** 54:15
**memorandum**
97:21 98:2
101:13
**memory** 101:22
**men** 28:9,9
**men's** 20:11
**mental** 70:2
**mention** 45:3,6
64:8 108:24,25
129:11
**mentioned**
44:20 62:3
84:11 85:24
109:4 114:7

**mentions** 37:16
44:21
**mere** 43:8
**meritless** 73:15
**met** 5:3 16:4
20:10
**michael** 105:19
**michel** 108:16
**middle** 18:2
56:12 77:11
86:15 110:15
**mildly** 47:17
92:9
**million** 57:6
**miltenberg** 2:3
**mind** 26:22
42:11 47:8
60:21 113:9
129:17
**mine** 22:15
111:22
**minimal** 36:11
**minimum**
67:17
**minor** 27:22
60:17 109:18
**minute** 40:17
52:3 53:21
100:24 126:17
**minutes** 26:11
26:18,19 27:7
31:20 32:9
33:25,25
**miscalculation**
42:12

**miscommuni...**
131:20
**misconduct**
74:21 75:2
76:7 128:5
**mislead** 107:9
**missed** 90:24
**missing** 55:18
55:19
**mistake** 5:13
**mistook** 20:12
**mitros** 28:23
**moisture** 64:24
**moment** 32:11
33:8 63:10
104:15
**money** 14:15
25:6
**months** 111:22
**morale** 28:19
**morning** 4:25
5:2 8:3 79:10
84:12 85:25
**morris** 29:8
61:23 95:13
127:12,19
**motion** 58:3
102:4 108:4
**motions** 19:5
19:11 61:2
**motivation**
43:12 45:14
55:6
**motive** 101:8

**motives** 29:4
**move** 7:13 15:5
15:12 96:10
105:25 106:21
**moved** 65:5
76:5
**movers** 81:19
82:15
**moving** 8:5,10
41:8 126:15
**mta** 49:6 50:17
71:10,13,17
**music** 59:6

**n**

**n** 2:2 3:2 4:8
72:24 104:23
138:2,2 139:2
139:2,6
**name** 4:14 5:6
22:12 35:3
73:11 82:7,13
82:14 88:13,14
88:15,17
**named** 58:10
86:9
**names** 63:19
69:7 118:11,14
118:19 119:14
**necessarily**
16:18 39:8
57:25 74:24
75:22 81:11
**necessary**
136:5

**need** 7:6,8
14:20 15:4
27:13 52:12
**needed** 34:8
35:17 72:24
**needs** 38:3
**nesenoff** 2:3
**never** 32:17
34:15 60:3
65:6 100:7,22
102:11 123:23
127:20 128:6,8
128:12,24
132:6
**nevertheless**
34:5
**new** 1:3,9,14,14
1:24 2:5,5,10
2:10 4:11,21
5:17 8:21 11:4
12:5,20 16:3
19:21 21:2,5
22:25 23:5,11
34:10,14,21,25
39:22 57:13
58:8 61:22
66:6 69:18
71:7 72:15
74:7 77:5,13
77:22 84:17
89:14 91:18
100:15,16
104:24 107:21
109:13 110:18
112:2 115:13

119:25 122:11
122:20,22,24
124:25 127:14
130:3 131:3
138:3 140:5
**newspaper**
73:9
**nice** 74:19
**nicholas** 64:21
**nick** 74:16
**night** 16:17
**nmllplaw.com**
2:6
**nod** 6:15
**nomenclature**
25:3
**nonpaid** 130:9
**nonparty** 1:18
**nose** 128:23
**notary** 1:23
4:10 138:25
140:4
**note** 141:2
**noted** 45:18
96:25 135:3
136:13 138:14
**notes** 22:24
63:17 64:4
141:2
**notice** 7:14
35:23 36:19
56:5 76:24
81:24 85:14
91:16 92:20,24
110:21

**noticed** 124:15
**notices** 78:24
**noting** 104:21
**notion** 119:19
121:12 122:18
123:3 129:12
**november**
56:13 58:24
59:5 60:13
61:9 121:10
**number** 14:11
27:20 40:11
43:7,8 51:8
56:4 65:21
86:6 109:22
**nuts** 90:18,20
**nycta** 98:8

**o**

**o** 3:2 72:23,24
107:23 138:2
139:2,6
**o'shaughnessy**
76:25
**oath** 3:18 138:8
138:11
**object** 75:21
83:4,12,23
**objection** 8:5
8:10 14:19
21:15 95:4
**objections** 3:11
**observance**
27:15 45:5
**observe** 125:20

**obtain** 73:22
**obviously** 28:3
38:21 39:6
81:10 119:5
**occasionally**
21:8 40:6,6
**occasions**
130:25
**occupational**
102:14
**occurring**
109:12
**october** 1:15
71:17 120:22
138:8
**odd** 47:9 113:6
113:8 116:19
**offended** 33:17
**offer** 132:14
133:5
**offered** 17:10
20:17
**office** 5:14 12:4
25:25 29:17
31:23 39:16,19
52:7 58:7
61:10 73:12,25
84:16 101:15
118:15 131:21
**officer** 3:17
**officers** 59:8
**official** 71:18
**officially** 22:4
**oh** 14:3 32:11
53:6 59:11

67:10,23 88:9
120:12,12
**okay** 5:15,23
5:25 6:8 7:12
7:25 9:18
17:12 18:15
20:24 22:21
24:18 25:7,16
27:21 30:25
31:4 32:23
34:7 35:13,25
36:21 39:4,9
40:3,9 43:13
44:8,19,20
45:18 46:21
49:16 50:3
51:4 56:3,15
59:14 60:7
62:20 63:13
64:6,13 66:25
67:19 72:7
77:8 78:9 79:9
80:10,21 83:25
85:2,11,18
86:19 87:11,16
88:20 90:13
92:24 93:18
96:14 97:10,20
97:25 98:6,15
98:18 100:14
101:12 104:17
108:17 110:19
117:4,10,20
121:8,18,25
124:8 128:2

**[okay - people]**

130:12,19
132:21 133:9
134:6,20
**old** 68:21
**once** 46:19
107:8 125:22
128:6
**ones** 9:6 93:3
**opening** 124:22
**operating** 1:9
5:19
**operator** 70:4
70:11 105:20
105:24 106:7
106:15,17
107:2 119:7
**operator's**
105:12
**opinion** 23:4
113:20 116:22
132:7
**opportunities**
125:19
**optics** 37:4
**order** 70:18
123:4
**ordering** 4:3
108:6
**orders** 105:15
109:11 117:25
118:2
**orient** 80:11
**original** 44:4
136:17

**orthodox** 25:24
38:3 40:13
113:7,19,25
132:19
**outcome**
140:13
**outlandish** 66:2
**outrageous**
14:9
**outside** 8:5
9:22 34:19
76:8,11 79:17
86:20 87:25
105:23 106:4
107:5
**overbearing**
51:23
**overdue** 111:23
**overjoyed**
77:20
**overlapping**
118:12
**overlooked**
70:23
**overreacted**
37:22
**own** 38:14
56:24 69:5
76:7 91:9
102:18 118:9
120:7 121:9

**p**

**p** 2:2,2 3:2
**p.m.** 99:25
101:15 135:3

**p9** 96:11
**pacer** 44:15
**page** 33:3
43:17 44:16
63:5,21 79:6
93:10 96:6
98:7 99:17,19
99:21 105:3
137:4 139:4,7
139:8,9,9,10,10
139:11 141:2
**paid** 46:23
89:11
**painting** 38:13
**panoply** 59:16
**papadopoulos**
69:23 71:5
**papain** 74:16
74:17
**papers** 8:21
102:4
**paragraph**
98:11,16 99:19
99:20,23,24
**paragraphs**
43:24 44:18
**park** 47:23
**parody** 101:4
**part** 6:7 22:25
23:5,11 40:7
76:22 87:3
98:4
**participated**
9:7

**participation**
79:19
**particular** 17:2
40:13 75:12
103:3 110:13
114:10
**particularly**
99:12 108:10
**parties** 3:6
140:11
**partners** 116:9
**party** 56:25
59:23
**passion** 23:21
**paul** 35:7
**pause** 14:20
**pay** 70:25
76:11
**paying** 73:20
**pc** 117:25
**pd** 57:15
**peeved** 62:22
**penalized**
87:13
**penalty** 14:13
**pending** 7:9
**pension** 111:24
**people** 11:20
17:23 21:8
26:24 27:15
28:10 29:18,21
33:14,16 34:24
37:25 69:5
73:12 89:10
105:4 118:8,15

| | | | |
|---|---|---|---|
| 119:3,10 | **photo** 105:2 | **playing** 120:7 | **policy** 118:16 |
| 122:23 | **photographer** | 120:20 | **poor** 28:21 |
| **perceived** 37:2 | 89:5 | **plaza** 81:16 | **poorly** 116:21 |
| 38:10 | **photos** 129:21 | **please** 4:14,19 | 116:23 |
| **percent** 55:24 | **phrase** 119:12 | 6:22 7:6,10 | **portion** 51:12 |
| **perception** | **physically** | 22:8 33:7 93:7 | 101:12 |
| 28:7 29:3 | 41:10 | 117:9,20 | **posed** 7:2 53:8 |
| **perfectly** 75:20 | **pick** 12:12 | 118:14,19 | **position** 20:17 |
| **performance** | 15:15 | 119:13 136:4 | 24:18,19 29:17 |
| 35:14 126:13 | **place** 1:21 | 136:10 | 31:24 32:7 |
| **performer** 34:7 | **placed** 102:22 | **plus** 55:24 | 35:17 45:13 |
| **performing** | 130:8 | **podium** 65:19 | 52:10 |
| 19:10 | **plaintiff** 1:6 2:3 | **point** 10:20 | **possession** |
| **period** 19:12 | 44:10 45:20 | 15:10 17:21 | 96:17 |
| 20:23 37:8 | 46:22,24 56:22 | 20:15 24:8 | **possibility** 32:2 |
| 104:7 | 57:16,20 73:22 | 35:20,25 40:18 | 35:22 41:7,15 |
| **person** 10:4 | 74:15 76:4 | 41:6 43:5 50:3 | 73:19 |
| 17:23 33:21 | 102:11,24 | 51:14,17 62:14 | **possible** 58:24 |
| 36:5 46:9 | 103:7,8 120:8 | 64:6 68:24 | **possibly** 51:16 |
| 60:14 113:6 | **plaintiff's** | 69:6 71:20 | 58:23 62:9 |
| **person's** 87:25 | 21:20,23 28:24 | 75:4 77:15 | 71:7 85:17 |
| **personal** 7:25 | 33:2 43:16,21 | 81:23 91:14 | 112:16 |
| 71:3 88:2 | 45:21 57:4 | 92:13,17 | **post** 105:3 |
| 117:16,22 | 63:4 64:22 | 105:17 108:20 | **potential** 29:13 |
| 122:5 124:13 | 69:12 74:18 | 109:4,16 | **pounded** 65:18 |
| 124:17 | 79:5 93:9 | 111:20 116:20 | **power** 10:8 |
| **personally** 9:6 | 94:13 96:5 | 126:5 | 55:14 122:23 |
| 87:24 | 104:12 | **pointed** 70:15 | **practice** 19:7 |
| **persuade** 126:4 | **plaintiffs** | 107:7 | 19:12,21 20:9 |
| **persuaded** 73:4 | 102:21 | **pointing** | 20:25 21:7 |
| 126:6 | **plans** 88:3 | 120:10 | 58:3 60:24 |
| **perusing** 22:3 | **platforms** | **pointless** 91:10 | 113:10 |
| **phillips** 86:11 | 68:21 | **pokorny** 84:18 | **practicing** |
| **phone** 60:15 | **played** 30:24 | **police** 57:13 | 32:16 |
| 86:16 98:12 | | 118:6 119:25 | |

**precise** 24:22
**precisely** 26:8
  104:22 132:8
**preclude** 107:8
**precluded**
  104:7
**precludes**
  103:14 106:14
  106:16
**precluding**
  108:5
**preclusion**
  70:18 109:7
**predecessor**
  16:2 28:6
  34:12
**prepare** 8:14
  26:5
**prepared** 26:12
  39:16 69:4
**prescription**
  12:13
**presence** 8:6
**present** 69:4
**preside** 128:4
**press** 55:21
**pressing**
  131:23 132:13
**presumably**
  90:22
**pretense** 66:19
**pretextual**
  66:18
**pretrial** 10:12
  19:2,8,10

41:17 58:8
60:24 71:8
75:5
**pretty** 25:25
  45:16
**prevent** 32:16
**prima** 69:14
**primarily**
  16:22
**principle** 133:6
**prior** 18:18
  21:16 29:7
  88:24 89:13
  91:15 93:24
  95:20 121:15
  127:9
**private** 20:9
**privilege** 84:6
**pro** 10:22
  11:13
**probably** 9:9
  9:10 56:12
  118:12 132:23
  134:8
**problem** 46:20
  73:2
**problems**
  102:18
**procedure**
  111:12,16
**procedures**
  113:23 123:3
**process** 87:10
  123:2 132:17

**produce** 96:23
  104:3,4,6,16
  105:24 106:3
**produced**
  96:19,22
**producing**
  106:15,16,25
  107:11
**product** 57:17
**productive**
  58:15
**profoundly**
  55:2
**prominent** 27:3
**promises**
  105:24
**promising**
  36:18
**promote** 22:11
**promoted**
  24:20
**promotion**
  22:17 36:20
**promotions**
  24:15
**proper** 56:18
**properly** 28:2
**property** 57:12
**protesting**
  32:21
**prove** 26:12,17
  27:6 30:3
**provide** 70:8
  118:14

**provided** 52:4
**providing**
  55:18
**psychologica...**
  105:16
**public** 1:23
  4:10 115:8
  138:25 140:4
**pulled** 70:11
**pulverized** 69:9
**punish** 59:20
  59:21
**punitive** 132:10
**purportedly**
  121:19
**purpose** 81:17
**purposes** 76:19
**pursuant** 1:21
**pursued** 116:11
**pursuing** 92:12
**put** 25:9 32:7
  32:20 35:16
  40:24 45:12
  47:16 48:2
  50:18 65:24
  82:7,13,14
  88:14,15,16,23
  92:9,15 104:18
  115:5 133:6
**putting** 29:15
  29:16,17 31:23
  32:4 103:13,15
**puzzled** 18:6
  90:21 127:21

| | | | |
|---|---|---|---|
| **puzzling** 83:6 | **quote** 17:6 | 99:22 101:3 | 105:2 112:16 |
| **q** | 41:15 100:10 | **reads** 133:12 | **receipt** 136:19 |
| | **r** | **ready** 81:19 | **receive** 24:6 |
| **quacks** 100:19 | | 82:16 | 57:15 125:21 |
| **qualities** | **r** 2:2 3:2 4:8,8 | **real** 73:20 | **received** 94:6 |
| 129:24 | 72:24 107:23 | **reality** 29:11 | 98:3,20 116:14 |
| **quarter** 26:3 | 137:2,2 140:2 | **realize** 35:10 | 125:14 |
| **queens** 20:12 | **racism** 33:18 | 72:2 | **receiving** 52:19 |
| 133:2 | **raft** 112:9 | **realized** 70:22 | 110:20 |
| **question** 3:12 | 118:9 | 92:16 110:16 | **recess** 53:25 |
| 6:17,20,22,25 | **raise** 31:25 | **really** 13:4 17:7 | 126:19 |
| 7:9,10 34:7 | 41:21 59:25 | 18:6 21:7 | **recognize** 22:6 |
| 35:13 36:8 | 110:10 | 22:15 47:5 | 33:9,10 45:11 |
| 53:7 56:18,21 | **raised** 41:7 | 57:21 71:23 | 80:15 93:16,17 |
| 57:16 64:16 | **rate** 35:14 | 73:4 77:14 | **recollection** |
| 97:7 102:9 | **rather** 25:22 | 78:7 83:24 | 99:3 |
| 103:2 114:25 | 45:12 | 108:17,24 | **recommend** |
| 118:22 | **rattling** 26:22 | **reargue** 108:4 | 58:2 |
| **questioned** | **reach** 57:14 | **reason** 48:4 | **recommendat...** |
| 91:23 | 101:10 | 68:25 79:21 | 22:9 24:17 |
| **questions** 6:5 | **reached** 29:5 | 103:25 106:24 | **reconstruct** |
| 6:13 17:23 | 99:15 | 107:11 127:17 | 8:22,23 51:20 |
| 18:9 21:9 | **reaching** 92:17 | 136:7 | 92:22 |
| 120:10,11,14 | **reacted** 68:6 | **reasonable** | **record** 4:14,18 |
| 134:9,19 | **reaction** 10:7 | 27:16 35:10 | 5:3 6:8 8:9 |
| **quick** 53:21 | 34:3 | **reasons** 8:2 | 51:14 54:5 |
| 121:4 | **reacts** 33:13 | 14:10 27:10 | 94:8,17,20 |
| **quickly** 13:11 | **read** 8:15 13:13 | 28:5 74:11 | 102:17 103:3,4 |
| **quid** 10:22 | 43:22 44:17 | 101:25 114:4 | 113:12 138:10 |
| 11:13 | 64:14 74:22 | **recall** 24:21 | 138:12 140:8 |
| **quiet** 32:11 | 92:9 97:5 | 25:16 45:21 | **records** 102:7 |
| **quite** 17:24 | 98:15 99:18 | 46:25 50:10,11 | 102:10 103:9 |
| 27:18 103:17 | 122:8 136:4 | 75:10,24 76:3 | 103:12,15,16 |
| 104:6 130:6 | 138:7 | 76:4 98:23 | 103:16,23 |
| **quo** 10:22 | **reading** 8:25 | 101:16,18 | 104:14,15 |
| 11:13 | 47:25 48:13 | | |

**[recovery - result]** Page 28

| | | | |
|---|---|---|---|
| **recovery** 13:8 | **relation** 64:10 | **remission** 12:7 | **request** 105:11 |
| **rectified** 46:15 | 74:9 87:7 | **remotely** 65:20 | 120:25 121:4 |
| **rectify** 46:13 | **relationship** | **removed** 45:22 | **requested** |
| **recuse** 127:3 | 16:11 40:23 | 46:17 119:8,10 | 102:12 |
| **recused** 127:13 | 127:18 | **repeatedly** | **requests** 56:19 |
| **recusing** 127:8 | **relative** 85:8 | 98:25 99:4 | **requirements** |
| **red** 119:4 | **relatively** 80:5 | 120:8 | 36:13 |
| **redacted** 121:2 | 89:22 | **rephrase** 6:23 | **reserved** 3:13 |
| **refer** 5:21 | **relayed** 62:18 | **replacement** | **residue** 39:17 |
| **referred** 54:15 | **relevant** 114:15 | 95:11 | **resolution** |
| 107:25 | **relied** 16:21,23 | **report** 13:3 | 91:15 |
| **referring** 98:2 | **religion** 30:20 | 118:6 | **resolved** 11:2 |
| 98:19 | 32:17 36:3 | **reported** 66:10 | 12:2 48:22 |
| **reflect** 94:8 | 101:7 113:10 | **reporter** 1:22 | 50:20 60:21 |
| 113:13 | **religious** 48:8 | 6:15 94:10 | 82:4,21 92:3 |
| **regarding** 50:6 | 48:25 49:10 | 140:3 | 92:14 |
| 97:22 108:11 | 133:7,21 | **reports** 118:9 | **respect** 15:6 |
| 114:5 115:24 | **reluctant** | 118:21 119:15 | 42:24 86:2 |
| 117:16 127:2 | 119:21 | 119:17,23 | 118:3 119:18 |
| **regime** 89:14 | **remain** 103:10 | **represent** 9:23 | **respective** 3:6 |
| **regulars** 9:24 | **remained** 39:25 | 10:22 79:20 | **respond** 67:8 |
| **rehabilitating** | **remember** 6:6 | 130:14 | 118:17 123:10 |
| 34:9 | 9:4 10:9,14 | **representation** | **response** 32:10 |
| **reinstruct** | 11:3 12:10 | 15:2 | 52:8 56:19 |
| 11:20 | 14:8 22:16 | **represented** | 110:23 121:5 |
| **reintroduce** 5:6 | 33:11 36:16 | 7:15,19,22 | **responses** 68:5 |
| **relate** 15:8 | 42:4 46:2 58:6 | **representing** | **responsible** |
| **related** 79:16 | 58:19 62:14 | 5:8 | 55:20 |
| 110:2 113:24 | 73:11 75:13 | **reprimand** | **restored** 46:6 |
| 117:13 122:5 | 83:9 90:16 | 123:8 | 46:19 |
| 124:9,13 | 96:21 111:2 | **reprimanded** | **restroom** 53:22 |
| 125:15 140:10 | 123:24 131:15 | 38:22 | **result** 64:19 |
| **relates** 72:8 | **reminded** | **repulsive** 65:12 | 89:21 90:14 |
| **relating** 41:4 | 100:3 | **reputation** | 130:5 |
| 54:18 | | 34:10 | |

**retained** 139:12

**retaliation** 101:9

**retaliatory** 101:8

**retire** 91:13

**retired** 18:12

**retirement** 130:24 131:6

**retribution** 101:9

**return** 136:16

**revealed** 13:5

**revenge** 101:8

**reversed** 109:9

**review** 22:19 33:8 63:10 93:15 95:3 134:24

**revisit** 15:17

**richest** 13:18

**ridiculous** 121:13 123:6

**right** 11:24 18:8,13 26:21 29:18 30:9 33:21 34:17 35:5 38:2,23 46:9,10 50:25 56:11 57:2,18 57:24 59:2 61:8 67:22 69:17 72:9 77:25 79:14

81:13 92:21 95:7 98:16 99:24 102:10 102:16 103:12 103:18 105:7 106:2 118:4,8 118:21 131:13

**rights** 91:19

**rivera** 9:3 55:7 102:3,5 114:13 116:17

**road** 4:21 60:18

**roadway** 75:16

**robert** 7:17

**rocky** 40:22

**role** 18:24 30:24

**room** 20:11 121:21

**rossberg** 107:24

**routine** 39:12 42:5,5

**routinely** 29:20 38:5

**ruffled** 24:3

**rule** 11:9,17,23 14:4 85:3

**rules** 6:9 12:23 47:6

**ruling** 55:17

**run** 35:12 37:11 73:7 119:4

**running** 36:22

**runs** 6:10

**rushed** 86:16

**ruttman** 34:12

**s**

**s** 2:2 3:2,2 4:8 72:23 139:2,2 139:2,6,12

**sabbath** 26:2 27:15 45:5

**sake** 50:4 110:16

**sanction** 66:15

**sanctions** 59:19

**sasso** 35:7

**satisfied** 67:16 102:25

**satisfy** 36:12 73:6

**saw** 20:16 50:8 88:12,13 119:4

**says** 12:14 106:22 119:3 128:17

**scale** 61:3

**scalps** 84:21

**scared** 23:15

**scenes** 89:5 122:16

**scheduled** 44:13

**schedules** 27:5

**scheme** 60:22

**school** 19:4,15

**scrutiny** 109:21

**se** 38:11

**sealed** 97:19

**sealing** 3:7

**sean** 9:24 10:15 11:6,22 12:21 13:5 79:17

**second** 14:21 66:8,9 71:16 83:21 92:20 93:18 95:17,21 99:20,22 110:20 112:14 115:25 126:23 130:5

**secret** 81:14 123:8

**secular** 36:5

**see** 18:4,21 23:2,3 25:2 35:3 44:11 47:8 53:15 54:13,14 74:25 80:21 97:23 98:4,12 99:15 105:7 118:25 127:5,23

**seemed** 11:2 18:5 30:24 60:17 72:25 89:12 113:6 114:17

**seems** 65:25

**seen** 43:25 97:8 97:15

**self** 34:4 101:4
**semitism** 32:18
  100:22
**send** 10:23
  34:19
**sending** 33:19
**sense** 32:6 76:9
  92:6 120:20
  128:22 134:10
**sensibilities**
  84:20
**sensitive** 29:10
**sent** 13:2 32:13
  44:14 48:18,20
  120:23 121:2
**sentence** 22:22
  100:2
**separation**
  90:23
**series** 79:12,16
  80:7,17
**serious** 69:19
  99:12 109:14
**seriously** 130:3
**serve** 57:21
  121:7
**service** 14:16
**set** 54:12 65:5,6
  76:5 86:23
  87:4 93:18,25
  95:17,21 109:5
  111:19 115:25
  126:23 140:7
**settle** 13:10
  17:10 34:15

131:24,25
**settled** 36:16
  73:16
**settling** 35:11
**setup** 121:17
**seven** 96:6
  105:14 109:11
  139:11
**seventh** 36:7
**several** 14:9
  27:9 74:11
  101:24 114:4
**severity** 99:8
**seyfarth** 2:8
**seyfarth.com**
  2:12
**shaking** 59:11
**shape** 128:23
**share** 116:22
**shavuos** 47:21
**shaw** 2:8
**she'd** 16:3
  17:16 37:9
  76:18
**she'll** 131:25
  133:11
**sheet** 25:19
  48:6 71:22
  136:8,11,14,17
  138:15
**sheets** 47:16
  49:5,14,21
  50:14,21
  111:21

**shenanigans**
  106:9
**sheridan** 20:10
**shifts** 68:23
**shipped** 76:8
**shipping** 78:13
**shlomo** 74:8
**shocked** 89:24
**shoot** 14:14
**short** 25:23
  26:6,13,14
  31:22 54:5
  57:8,22 62:11
  89:23 105:13
**should've**
  77:12
**show** 41:18
  103:4 105:17
  105:21
**showing** 131:21
**shows** 74:12
**shulman**
  125:23 126:7
**shy** 23:17,17
**side** 13:12 25:9
  81:12
**sight** 70:10
**sign** 22:13
  24:17 32:8
  36:19 111:21
  115:7 116:8
  136:10
**signature** 68:19
  81:24 106:21
  140:17

**signed** 3:17,19
  24:14 138:20
**signing** 25:18
  47:20 49:4
  50:14 115:17
  136:12
**silvera** 128:9
  128:15,19
  129:2
**similar** 89:18
**simply** 5:22
  102:20 123:4
**sincere** 32:21
  127:25
**single** 100:8
**singled** 42:21
**sir** 8:14 54:6
  80:15 95:14
  113:10,16
  133:24
**situation** 46:15
  89:7 115:4
**situations**
  24:15
**six** 105:14
  109:11 111:22
**sjb** 1:7
**skilled** 120:5
**skip** 6:7
**slam** 132:5
**slander** 97:17
**slant** 28:8
**slipping** 102:6
**small** 2:11 4:5
  8:9,12 14:19

14:23 21:18
83:10,11,23
84:2 94:17
95:2,4 96:10
96:14 134:8,17
**small's** 115:22
**smirking** 61:14
110:11
**smith** 9:24
12:21 71:16
79:17
**smoothly** 6:10
36:23
**sneak** 75:18,19
**sokoloff** 58:21
58:22,25 59:5
60:12 70:17
72:2 73:6
117:13 121:20
123:12,14
126:11
**sokoloff's**
63:16 98:21
99:6,9
**sole** 10:20
11:10
**solve** 72:25
**solved** 46:20
**somewhat**
86:17 108:15
**soon** 106:18
**sorry** 111:4
**sort** 10:21
11:12 23:25
26:21 27:8,25

29:12 42:12
54:7,25 61:11
75:3 79:11,14
84:15 92:10,16
101:6 107:10
118:2,23 125:7
127:21 129:17
132:16
**sorts** 12:8
**sound** 115:19
**sounds** 107:20
**southern** 73:16
**space** 136:7
**spanish** 28:12
**speak** 31:14
38:16 39:4,8
43:2 46:16
49:12 60:13
83:3,20 85:11
86:22 91:3,6
111:25
**speaking** 11:3
39:5 86:19
**specific** 8:19
108:23 125:10
**specifically**
64:10
**specification**
64:15 67:3
72:13 117:6,11
117:17 121:25
124:8,14
126:15,25
**specifications**
117:5

**speculation**
28:14
**spend** 20:3
**spending** 33:23
**spoke** 14:8
28:12 29:24
31:4,5 39:7
81:4 82:3
84:12 124:3
128:8,12
**spoken** 46:14
112:3 130:23
131:5,8,11
**spontaneous**
93:4
**spreadsheet**
10:14
**square** 1:13
65:4
**ss** 138:4
**staff** 31:25 32:8
**staffed** 57:22
**stage** 24:24
**staircase** 102:7
**stairway** 103:6
**stake** 66:24
**stallman**
105:19
**standards**
69:13
**star** 74:18
**stark** 44:4 68:9
131:18
**start** 26:2
41:21

**started** 5:4 19:3
35:11 50:24
79:9 111:13
**starts** 44:17
78:13 97:25
98:11 99:25
125:4 126:25
**state** 1:23 4:10
4:13,17 20:25
91:18 115:13
136:6 138:3
140:4
**statements**
124:22
**states** 1:2
**station** 57:7,10
64:25 70:4,12
**stations** 68:23
**statue** 81:15
**statutory** 20:3
120:11
**stay** 30:12 84:8
**stayed** 67:25
**staying** 75:9
**stealing** 14:15
**stenographer**
4:2,6,13,17
**stenographic**
1:22 140:3
**step** 46:13
103:20
**stepping** 75:15
**steven** 10:13
**stipulated** 3:4
3:10,15

**[stood - tagging]**                                                    Page 32

**stood** 11:25
14:7
**stop** 15:15 30:9
70:5
**stopped** 50:21
50:25 79:11
106:18 130:16
**story** 82:24
105:13 106:13
**straight** 109:5
**straighten** 18:7
**strange** 59:22
**strategies** 9:9
17:15
**strategy** 16:8
16:14,23,25
**straw** 73:3
**street** 10:2,3
57:8
**strength** 56:24
**stricken** 61:2
70:21 71:12
**strict** 12:23
49:6 50:17
122:21
**strike** 9:14
15:13 77:3
113:21
**strikes** 69:18
**striking** 66:13
86:18
**stripping** 45:19
**strongly** 129:11
**struck** 27:11
77:17

**struggling** 111:20
**stuff** 8:15,16
39:12 54:11
55:24 75:6
121:6
**stupid** 55:2
66:7
**stupidity** 49:2
**style** 23:25
**subject** 136:12
**subpoena** 1:21
57:22 121:8
**subscribed** 138:20
**subsequent** 61:6
**subsequently** 19:20 91:20
**substance** 14:10 42:20
85:19 138:14
**subway** 57:7
64:25 71:2
105:8
**successful** 17:5
28:20
**suddenly** 86:15
93:4 112:10
122:15 125:2
**sued** 73:10
105:11
**suffering** 69:25
**suggested** 29:12

**suicidal** 114:18
**suing** 102:14
**suit** 73:15
**suits** 68:24
**sullivan** 74:16
**summaries** 55:13
**sunday** 16:20
132:25,25
**super** 132:25
**superstar** 34:6
**supervising** 49:4,6
**supervisor** 22:18 24:14
29:25 49:24
112:23
**supervisors** 24:16
**supported** 103:24
**suppose** 51:20
**supposedly** 102:6 103:5
**supreme** 8:21
20:11 34:10,14
65:13 66:6
81:16 86:21
92:7 97:12,16
130:3
**sure** 6:11 18:7
18:11 41:2
52:13 53:18,23
58:5 62:17
66:22 67:15

**surface** 1:9
5:19
**surprising** 106:13
**surveillance** 57:10
**survive** 109:21
**survivors** 105:10
**suspended** 80:9
**suspension** 89:23 90:3
92:19 130:9
**suzanne** 61:21
**sworn** 3:17,20
4:10 140:7
**syllable** 5:11
**synagogues** 47:22 48:12
**system** 68:22
122:11

**t**

**t** 3:2,2 72:24
137:2 138:2
139:2,6 140:2
140:2
**ta** 19:23 20:21
20:23 41:5
57:12 68:17
89:25 102:14
102:15 110:3
**table** 52:7
**tactic** 75:20
**tagging** 20:4

**take** 6:2,15 7:7
 18:21 26:15
 33:8 36:11
 47:6 53:21
 63:9 117:9
 126:16 134:10
**taken** 1:19,21
 32:12,20 36:10
 54:2 86:12
 126:20 134:15
 138:7
**talented** 74:19
**talk** 15:20
 79:10 81:9,10
 81:12 85:22
 120:15
**talked** 117:14
 122:3 133:9,14
**talking** 12:15
 26:2 44:25
 58:6 75:13
 85:13 115:18
 133:12
**tape** 58:17
**tapes** 57:10,11
 58:16
**tat** 120:21
**tate** 28:23
**taxing** 41:10
**team** 23:2,6,12
 102:8 103:3,5
**technical** 12:9
 57:19
**tell** 9:19 24:24
 31:16 35:2

51:9,19 52:25
 57:20 58:11
 64:7 107:10
 108:18,21
 110:6 112:19
 112:20 125:8
**telling** 32:3
 104:8
**tells** 30:15
**ten** 35:15,16
 53:21
**tenacious** 16:15
 23:18
**tension** 39:25
 40:25
**tenure** 100:6,13
**terminated**
 130:15
**termination**
 8:19
**terms** 15:2
 21:16 24:23
 26:13 28:19
 83:3 114:9
**testified** 4:11
 117:18 122:5
 124:11,13
**testimony**
 69:12 138:7,11
 140:6,9
**thank** 4:6 5:12
 133:25 134:3
 134:24 135:2
**thing** 27:11
 28:3,17 36:4

47:7 48:15
 104:22 120:15
 132:24
**things** 36:15,21
 36:22 41:19
 60:22 77:16
 92:17 105:25
**think** 9:19
 14:20 15:4,11
 16:2 17:6
 25:20,25 30:22
 32:12 36:2
 37:3,23 38:19
 41:11 44:12
 46:3,5 47:25
 48:10,15 49:16
 50:19 51:14
 56:15,16 57:3
 58:15 62:16
 66:4,5 73:16
 75:14,21 76:14
 77:11 79:25
 83:14 97:9,18
 99:11,14
 101:10 104:14
 112:4,16,25
 113:2,5 115:2
 118:25 120:12
 130:25 133:4
 133:11 134:9
**thinking** 48:24
 110:13
**third** 5:11 13:7
 13:25 28:18
 56:25 98:7,10

**thirty** 136:18
**thompson**
 45:23 46:17
**thought** 10:17
 13:10,14 23:22
 33:23 34:2
 37:23 38:12,21
 39:2 58:14
 59:14 73:14
 82:4,19,20
 86:18 88:18
 92:2,13 99:12
 109:25 132:4
**thousands**
 76:12 78:14
**three** 19:4 33:3
 51:15 65:21
 109:22 116:13
 122:13 139:8
**throw** 91:11
**tight** 123:2
**tim** 76:24
**time** 1:20 3:13
 7:6 16:18,25
 19:12 23:24
 25:11,16,19
 26:13,16 27:14
 29:7 30:22
 31:22 32:9
 33:25 35:21
 38:4 45:21
 46:23 47:7,16
 48:5 49:4,14
 49:21 50:14,21
 52:5 54:2

**[time - trial]**

55:10 56:12
63:15 67:5,14
69:7 70:5,22
80:12 83:16
84:22 85:7
86:20 94:21
103:9 111:21
117:3,9 122:7
123:12 125:18
126:11,20
130:16 133:17
134:12,15,25
135:3
**times** 1:13 56:4
78:24
**timing** 28:20
46:2
**timko** 64:21
65:4
**tinged** 100:21
**tit** 120:21
**titans** 64:22
**title** 20:2
**today** 5:23 6:2
6:10 7:4,16,23
8:14 31:22
48:24 54:9
101:2 117:18
122:3 124:11
134:2,25
**together** 20:13
67:25 127:11
**told** 11:5,8,14
14:18 16:5
31:18,21 37:6

50:13 53:4
58:18,21 60:18
60:18 61:21
77:18 79:23,24
81:3,25 82:2,6
82:9,15 88:14
90:13,14,15
101:19 106:24
112:7 115:2
127:10 132:3
132:18,18
**tolerance** 89:15
**tolerating** 69:2
**took** 13:9 34:11
37:20 45:25
48:9
**tools** 59:17
**toot** 114:8
**top** 63:20 81:14
92:8 97:13
112:8
**topics** 83:20
**topnotch** 51:15
**topography**
68:22
**tort** 114:9
**torts** 18:2,16
87:20 95:11
**total** 121:16,17
121:17
**totally** 48:6,6
76:19 78:2
87:17 88:10
91:8

**touch** 79:23
**touched** 75:5
78:23
**toward** 35:24
66:12 101:6
110:3
**track** 15:17
105:6
**train** 26:10,24
27:5 70:10,10
105:8,12,20,24
106:7,15,25
**trains** 68:20
70:13
**transcript** 4:4
76:14 134:23
136:20,21
138:7,9 140:8
**transfer** 72:15
78:6,10
**transferred**
47:10 77:4
110:14
**transferring**
41:22 67:21
**transit** 1:9,9
5:18,19,21,22
15:3 16:12
17:14 18:12,24
20:6 24:2
29:22 30:4
32:5 38:17
56:22,23 62:6
74:7 83:17
84:4 85:12,22

89:17 100:6
103:24 104:2,3
104:23,24
106:24 111:17
115:9 116:25
119:24 120:13
125:9 130:17
130:21 132:9
**transit's** 7:16
115:24
**translates**
41:16
**transportation**
38:6
**travels** 124:24
**treating** 75:25
**treatment**
44:22 68:8
**trenches** 41:13
**trial** 1:17 3:13
9:8 16:8,16,25
17:7 18:5 19:5
23:2,5,12,13
28:20 41:9,9
41:12 45:20,22
45:23 51:15
53:10,11 65:14
65:14 72:24
74:8,21 75:7
75:17 76:2
102:23 103:13
106:23 109:13
112:8,10
115:13 120:5
129:23

trials  16:25
  29:19 51:13
  53:16
tried  8:23
  74:17 77:7
trivial  109:18
trouble  20:19
  29:8 59:4
  74:13 125:25
true  23:7,9
  36:4 102:13
  104:11 119:20
  119:21 138:9
  138:12 140:8
trusts  132:2
truth  11:8
  101:23 110:15
try  16:6 41:18
  45:13 74:2
  81:17 120:24
trying  16:4
  23:15 24:20
  32:15 34:20
  64:20 67:10
  74:13 75:18,19
  105:6 110:22
  125:23 126:3
tunnel  70:3
tunnels  71:2
turn  25:10
  44:16 56:23
  57:17 58:17
  98:6 99:17
  102:20

turned  10:25
  40:23 47:15
  76:17 102:9
  118:10 121:11
turns  106:6
two  27:20 28:5
  43:8 49:2 63:5
  64:3,4 69:15
  71:15 109:17
  113:4 116:13
  120:17 130:25
  139:9

**u**

u  3:2 72:24
uh  93:21
ultimate  76:24
  99:13
ultimately
  20:20 40:10
  70:17 75:23
  82:12
unable  8:2
unaware  11:17
  78:2
uncomfortable
  127:18
unconditiona...
  30:5 31:11
under  28:5
  53:15 89:14,24
  106:8 112:23
  138:8,11
underestimated
  132:12

undermines
  75:4
understand
  6:22 34:6
  72:19 91:24
  92:10 118:2
  120:3
understanding
  49:19 84:14
  128:13
understood
  6:25 38:8
  72:10
undue  11:12
unfair  62:10
  102:18
unfortunately
  69:6
unhelpful
  104:5
unit  19:8 23:16
  27:4 29:16
  34:2,11 36:14
  39:22 41:8,23
  45:15 50:15
  52:13,17,23
  53:10 58:8
  67:18,22 68:7
  69:18 72:16
  73:7 77:2,5,25
  78:6 80:4
  100:15 109:13
  133:19
united  1:2

unprofessional
  100:5,12
unsuccessfully
  61:3
untenable
  45:13
untrue  100:7
unusual  46:7
  47:17 87:19
  88:4 111:8
  112:22
unwelcome
  129:20
unwilling  45:16
upstairs  24:13
urbont  72:23
  80:3
use  37:24 43:5
  46:22 50:3
  71:11 100:11
used  9:25 23:9
  33:16 38:9
  136:22
using  71:2
usually  14:13
  17:9 22:16
  87:14

**v**

vacation  26:14
  47:7
vague  129:11
vaguely  123:16
valid  27:22
  29:21

**[value - weslii]**

| | | | |
|---|---|---|---|
| **value** 132:12 | **violation** 85:5 | **warranted** | 87:10 |
| **vandoros** 51:17 | **violations** 12:8 | 76:15 | **weslii** 1:10 5:20 |
| 62:9 68:12 | **virtually** 8:3 | **wash** 102:8 | 10:10,10 12:2 |
| **vastly** 69:19 | **voicemail** | 103:3,5,23 | 22:14 24:12 |
| **vendetta** 81:20 | 79:22 | **wasting** 35:21 | 25:14,18 26:18 |
| **vendor** 13:24 | | **water** 103:6 | 26:20 29:3,15 |

**w**

| | | | |
|---|---|---|---|
| 87:13 89:4 | **w** 4:8 138:2 | **way** 23:10 | 29:24 30:16 |
| **vendors** 11:22 | 139:2 | 32:20 38:8 | 31:14,17 34:6 |
| 88:25 | **wagner** 10:13 | 45:9 57:7 60:9 | 35:6,12 36:6 |
| **verbally** 6:14 | **waived** 3:8 | 64:18 65:17 | 36:25 38:18 |
| **verdict** 34:21 | 103:11 | 66:2,21 67:8 | 39:5,11,13,23 |
| 57:6 65:5 76:5 | **walk** 10:3 | 68:2,5 72:8 | 40:4,11,15 |
| 115:14 | **walking** 133:2 | 73:2 77:21 | 42:3,7,17,22 |
| **verdicts** 17:8 | **wallace** 16:2,5 | 78:8 86:4 | 43:3,7 45:25 |
| **versus** 68:17 | **want** 15:16 | 88:22,23 92:4 | 46:16 47:13 |
| 71:13,17 74:6 | 25:10 28:3,16 | 99:7 109:6 | 48:3 49:9,12 |
| 104:24 107:19 | 30:12 43:5 | 119:11 128:25 | 49:20,25 50:9 |
| 107:21,24 | 54:5 61:18,19 | 140:12 | 50:13,20 51:6 |
| **vetted** 13:21 | 61:24,25 62:12 | **we've** 43:21 | 52:5,6,18 53:4 |
| **videos** 60:20 | 67:17 68:15 | 44:25 69:22 | 53:8,15 58:19 |
| **view** 13:17 | 71:24 72:11 | 78:23 94:24 | 58:25 60:6,11 |
| 38:11 62:4 | 73:24 77:14,24 | 117:14 122:3 | 60:19 61:9 |
| **views** 125:6 | 88:25 96:15 | 130:2 | 62:9,16 63:14 |
| **vinci** 1:19 2:6 | 98:6 114:22 | **wearing** 113:14 | 64:14 66:14 |
| 4:24 5:7 8:8 | **wanted** 10:4 | **wedding** 89:8 | 67:6,24 68:5 |
| 14:22 21:14,19 | 16:6 18:6,11 | **week** 85:10,12 | 75:25 76:8,20 |
| 43:14 53:20 | 35:19 37:7,12 | **weeks** 71:15 | 77:21 78:2,4 |
| 62:25 79:2 | 37:13 47:13 | **weight** 76:6 | 78:20 81:21,25 |
| 93:6 94:7,23 | 57:9 58:22 | **weird** 65:12 | 82:2 88:8,11 |
| 96:12,25 | 67:13 74:4 | **welcome** | 88:14,16 90:15 |
| 113:12 126:16 | 81:8 82:7 | 128:15 129:9 | 90:17,17,20 |
| 133:23 134:4 | 100:14 | **went** 17:15 | 91:3 95:22 |
| 134:20 139:5 | **wanting** 32:8 | 20:20 24:25 | 97:21,25 98:19 |
| **violated** 12:22 | **warning** | 30:7 60:9 | 98:24 99:6 |
| | 129:22 | 68:15 74:2 | 100:9,14 |

101:19 108:18
108:22 110:5
114:14 116:6
116:11 127:10
127:15,23
128:24 129:10
133:9
**weslii's** 32:10
34:3 37:15
38:25 45:14
50:19 72:20
81:24
**wet** 102:6
**wetness** 64:24
**whatsoever**
123:5
**wheeling** 87:24
**whining** 78:10
**white** 28:9
33:15,16
**whoa** 104:3
120:14,15
**wife** 16:19
**williamsburg**
47:23
**willing** 40:24
**win** 29:18
**wind** 82:11
**winds** 106:12
**wins** 115:14
**wipe** 28:14
**wisest** 132:24
**wished** 131:2
**witness** 1:18
4:9,15,20 15:7

53:23 55:18
83:2,8,25
85:15 94:8,23
107:12 113:13
134:3,6 135:2
136:2 139:3
140:6,9
**witnesses** 72:9
118:3,8,12,15
118:20 119:15
119:19,20
**woman** 113:5,8
129:22
**women** 66:12
113:4 114:7
**won** 28:21 65:2
65:8 66:14,23
75:23
**wonderful** 35:9
**wondering**
124:21 132:16
**wood** 54:22
55:25 56:17
69:20 71:21
106:11 109:17
117:14
**word** 37:9,24
38:9 43:5
104:18 108:14
**words** 13:7
36:17 37:8
42:20 45:7
90:16,20
100:12 108:13
116:24

**work** 13:18,23
17:3 23:21
40:21 41:9,9
42:25 44:24
52:3 57:23
80:24 85:4
89:4 103:7
121:9
**workday** 26:6
**worked** 16:12
20:9,17 35:8
58:23 61:23
73:23 95:13
124:2 127:11
**working** 11:7
13:6 17:14
19:6,22 20:6
20:13,14 45:24
46:25 47:5
48:3,14 50:7
53:14 82:24
83:17 85:5
125:18 130:17
133:18
**workplace** 42:6
**works** 119:5
**workweeks**
90:5
**worried** 41:19
61:20 101:20
101:24 108:10
**worry** 40:19
**worth** 14:16
17:11 20:7
33:25 58:4

74:10 88:19
**would've** 50:18
103:16
**wound** 34:16
70:24 73:20
74:14 131:20
**write** 111:3,4
112:20
**written** 22:14
95:22
**wrong** 37:23
59:18 72:3
109:25 122:10
122:12 126:4
130:3
**wrongdoing**
127:23
**wrote** 111:2

---

**x**

**x** 1:4,12 139:2
139:6,6

---

**y**

**yarmulke**
113:14
**yeah** 5:5 6:7
15:19 16:21
18:14,17 19:22
21:11 22:9,23
23:3 25:20
30:11,14 31:12
31:15 33:10
39:2,12 43:4
44:7 55:12
80:14 83:11

84:10,13 88:3
92:23 95:8
97:24 98:5,9
98:14 100:2,16
112:3 116:18
121:24 130:18
130:25 132:22
**year**  18:22
19:18 20:9,18
20:21,23 34:20
77:10 111:22
131:3
**year's**  20:7
**years**  14:16
19:4 116:13
**yehoshua**  1:5
5:8,9,10 80:19
**yesterday**  7:14
**york**  1:3,9,14
1:14,24 2:5,5
2:10,10 4:11
4:21 5:17 8:21
16:3 19:21
21:2,5 22:25
23:5,11 34:10
34:14,21,25
39:22 57:13
58:8 66:6
69:18 71:7
72:15 74:7
77:5,13,22
91:18 100:15
100:16 104:24
107:21 109:13
110:18 115:13

119:25 122:11
122:20,22,24
124:25 127:14
130:3 138:3
140:5

**z**

**z**  107:17,17
**zero**  89:15

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

```
 1
 2              A C K N O W L E D G E M E N T
 3     STATE OF NEW YORK)
 4                        :SS
 5     COUNTY OF  Queens    )
 6        I, LAWRENCE HEISLER, hereby certify that I
 7     have read the transcript of my testimony taken
 8     under oath on October 18, 2023, that the
 9     transcript is a true, complete and correct
10     record of what was asked, answered and said
11     during my testimony under oath, and that the
12     answers on the record as given by me are true
13     and correct, except for the corrections or
14     changes in form or substance, if any, noted in
15     the attached Errata Sheet.
16
17     _____
18     LAWRENCE HEISLER
19
20     Signed and subscribed to
21     before me, this  22  day
22     of  November , 2023
23
24     _____
25     Notary Public
```

PRADEEP AGARWAL
NOTARY PUBLIC-STATE OF NEW YORK
No. 01AG6127808
Qualified in Queens County
My Commission Expires 05-31-2025

Page 137

```
 1                      L.  HEISLER

 2                   -   -   -   -   -   -

                         E   R   R   A   T   A

 3                   -   -   -   -   -   -

 4      PAGE    LINE    CHANGE

 5       12      7    "OR MISSION" INSTEAD OF "REMISSION"

 6       ____   ____   TRANSCRIPTION ERROR

 7       58      9    "Sherri" INSTEAD OF "Cheri"

 8       ____   ____   SPELLING ERROR

 9       18      12    "immediately" FOR "immediate"

10       ____   ____   TRANSCRIPTION ERROR

11       112     6    "Lowered" INSTEAD OF "Lowyer"

12       ____   ____   Transcription Error

13       124     21    "was it" INSTEAD OF "it was"

14       ____   ____   TRANSCRIPTION ERROR.

15       ____   ____   _____

16       ____   ____   _____

17       ____   ____   _____

18       ____   ____   _____

19       ____   ____   _____

20       ____   ____   _____

21       ____   ____   _____

22       ____   ____   _____

23       ____   ____   _____

24       ____   ____   _____

25       ____   ____   _____
```