# Exhibit 3

Page 1

1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF NEW YORK

3    _____

4    AMELIA YEHOSHUA,

5            Plaintiff,

6        v.                        Case No.

7    MANHATTAN AND BRONX SURFACE        1:21-cv-

8    TRANSIT OPERATING AUTHORITY;       04055-FBSJB

9    THE NEW YORK CITY TRANSIT

10    AUTHORITY; and WESLII KHAHAIFA,

11            Defendants.

12    _____

13            VIDEOCONFERENCE DEPOSITION OF

14                WESLII KHAHAIFA

15    DATE:         Tuesday, November 28, 2023

16    TIME:         10:09 a.m.

17    LOCATION:     Remote Proceeding

18                  New York, NY

19    REPORTED BY:  Jason Carr

20

21

22

23

24

25

Page 2

1    A P P E A R A N C E S
2  ON BEHALF OF PLAINTIFF AMELIA YEHOSHUA:
3    GABRIELLE VINCI, ESQUIRE (by videoconference)
4    Nesenoff & Miltenberg LLP
5    363 Seventh Avenue, Fifth Floor
6    New York, NY 10001
7    gvinci@nmllplaw.com
8    (212) 736-4500
9
10 ON BEHALF OF DEFENDANT THE NEW YORK CITY TRANSIT
11 AUTHORITY:
12    DANIEL SMALL, ESQUIRE (by videoconference)
13    Seyfarth Shaw LLP
14    620 Eighth Avenue, 32nd Floor
15    New York, NY 10018
16    dsmall@seyfarth.com
17
18    GENA USENHEIMER, ESQUIRE (by videoconference)
19    Seyfarth Shaw LLP
20    620 Eighth Avenue, 32nd Floor
21    New York, NY 10018
22    gusenheimer@seyfarth.com
23
24
25

Page 3

1       I N D E X
2  EXAMINATION:              PAGE
3    By Ms. Vinci            7
4
5       E X H I B I T S
6  NO.      DESCRIPTION      PAGE
7  Plaintiff:
8  Exhibit 4    Email between Witness,
9       Mr. Heisler, and Ms. Yehoshua,
10       Regarding Timesheet Deficit   64
11 Exhibit 5    Complaint Filed on Behalf of
12       Ms. Yehoshua          74
13 Exhibit 7    First DAN Notice, 6/12/2020  118
14 Exhibit 8    Document Regarding Second DAN 182
15 Exhibit 10   Memorandum from Witness
16       to David Farber        145
17 Exhibit 11   Email between Witness,
18       Ms. Yehoshua, and Ms. Urbont
19       Regarding Timesheet,
20       6/10/2020             94
21 Exhibit 12   Re: NYCT Employee's Ethics
22       Violations - Office of the
23       Inspector General, 1/23/2020  130
24
25

Page 4

1    E X H I B I T S (Cont'd)
2  NO.      DESCRIPTION          PAGE
3  Plaintiff (Cont'd):
4  Exhibit 13   Notice of Penalty
5       Implementation - New York
6       City Transit, 2/3/2021    136
7
8    D O C U M E N T S   R E Q U E S T E D
9  NO.      DESCRIPTION          PAGE
10 1       All Emails and Documents
11       Saved by Witness in Response
12       to Preservation Notice     17
13 2       All Case Lists Maintained by
14       Witness Noting Matters
15       Being Handled by Attorneys
16       in New York Trial Unit     81
17
18
19
20
21
22
23
24
25

Page 5

1       W. KHAHAIFA
2    THE REPORTER:  Good morning.  My name
3  is Jason Carr; I'm the reporter assigned
4  by Veritext to take the record of this
5  proceeding.  We're now on the record at
6  10:09 a.m.
7    This is the deposition of Weslii
8  Khahaifa taken in the matter of Amelia
9  Yehoshua versus Manhattan and Bronx
10 Surface Transit Operating Authority, The
11 New York City Transit Authority, and
12 Weslii Khahaifa on Tuesday, November 28,
13 2023, remotely, New York, New York.
14    I am a notary authorized to take
15 acknowledgments and administer oaths in
16 New York.  Parties agree that I will swear
17 in the witness remotely.
18    Additionally, absent an objection on
19 the record before the witness is sworn,
20 all parties and the witness understand and
21 agree that any certified transcript
22 produced from the recording of this
23 proceeding:
24    - is intended for all uses permitted
25 under applicable procedural and

2 (Pages 2 - 5)

W. KHAHAIFA

1
2  evidentiary rules and laws in the same
3  manner as a deposition recorded by
4  stenographic means; and
5  - shall constitute written
6  stipulation of such.
7  At this time will everyone in
8  attendance please identify yourself for
9  the record.
10  MS. VINCI: Good morning. Gabrielle
11  Vinci from Nesenoff & Miltenberg, counsel
12  for the plaintiff.
13  MR. SMALL: Daniel Small with
14  Seyfarth Shaw, my colleague Gena
15  Usenehner also with Seyfarth Shaw,
16  representing New York City Transit
17  Authority.
18  MS. KHAHAIFA: And my name is Weslii
19  Khahaifa. I am the witness, defendant.
20  THE REPORTER: Thank you.
21  Hearing no objection, I will now
22  swear in the witness.
23  Ms. Khahaifa, if you could just
24  please raise your right hand.
25  //

W. KHAHAIFA

1
2  WHEREUPON,
3  WESLII KHAHAIFA,
4  called as a witness and having been first
5  duly sworn to tell the truth, the whole
6  truth, and nothing but the truth, was
7  examined and testified as follows:
8  THE REPORTER: Okay, great.
9  You may begin.
10  EXAMINATION
11  BY MS. VINCI:
12  Q  Good morning, Ms. Khahaifa.
13  Thank you for being here today. As you
14  may have heard me say just moments ago, my
15  name is Gabrielle Vinci. I am the
16  attorney for Amelia Yehoshua in an action
17  she has brought against yourself, as well
18  as the Manhattan and Bronx Surface Transit
19  Operating Authority and the New York City
20  Transit Authority. If I refer to both of
21  those entities today simply as "Transit,"
22  is that okay with you?
23  A  Yes.
24  Q  Great. We're here today to take
25  your deposition, which means I'll be

W. KHAHAIFA

1
2  asking you questions about what you know,
3  what you can recall about the facts and
4  circumstances underlying Amelia's claims
5  in this action, and you are here to give
6  truthful testimony as to those facts and
7  circumstances. Do you understand that?
8  A  Yes.
9  Q  Have you ever been deposed
10  before?
11  A  No.
12  Q  So I'm going to go over some
13  sort of ground rules for today. They're
14  really just to help the deposition go
15  smoothly. You are an attorney; correct?
16  A  I am.
17  Q  Have you taken depositions
18  before?
19  A  I have.
20  Q  So you're probably already
21  familiar with these, but for the record, I
22  will go through them. The first is: I
23  will ask that all of your answers to my
24  questions be given verbally. It is for
25  the court reporter to take down every

W. KHAHAIFA

1
2  single word that is said in this room
3  today. It's difficult to note on a
4  transcript any sort of hand gesture or a
5  nod of the head; is that okay?
6  A  Yes.
7  Q  I'll also ask that you allow me
8  to finish my question before you go on
9  with your answer. And I will endeavor to
10  do the same, allow you to finish your
11  answer before I move on. If at any point
12  in time I start speaking over you or begin
13  a question before you finish your answer,
14  please let me know, and I will shut myself
15  off and allow you to complete your
16  response; okay?
17  A  Yes.
18  Q  The court reporter, before we
19  started today, mentioned that there may be
20  times when he needs clarification. If he
21  does stop you during your answer to
22  clarify your answer, I just want to make
23  certain he's not asking you to rephrase
24  your answer. If you could, to the best of
25  your ability, just restate exactly what

3 (Pages 6 - 9)

Page 10

W. KHAHAIFA

1
2  you had said so that he can have a clear
3  transcript; is that okay?
4      A   Yes.
5      Q   Let me know if you don't
6  understand a question or need me to
7  rephrase it. I'm happy to do so until it
8  becomes meaningful to you. If you answer
9  a question, I'm going to assume you
10 understood it as I posed it to you. Is
11 that all right?
12     A   Yes.
13     Q   Finally, feel free to ask me for
14 a break at any time, for any reason -- for
15 a  bathroom break, -- refreshments here,
16 if you need to speak with counsel. We'll
17 take as many breaks as you need. My only
18 caveat is, if there's a question pending
19 you please finish your answer to that
20 question, and then we'll take the break;
21 okay?
22     A   Yes.
23     Q   Is there any reason that you can
24 think of why you would not be able to
25 proceed with today's deposition?

Page 11

W. KHAHAIFA

1
2      A   No.
3      Q   Is there any reason you can
4  think of why you would not be able to
5  understand and truthfully answer my
6  questions today?
7      A   No.
8      Q   How did you prepare for your
9  deposition?
10     A   I reviewed some of the documents
11 from discovery.
12     Q   Which documents from discovery?
13     A   A memorandum that I sent to
14 David Farber, my anecdotal notes of the
15 complaints, and the answers.
16     Q   When you say the complaints and
17 the answers, what complaints and what
18 answers?
19     A   The complaints from this action
20 that were filed.
21     Q   So the complaint that was filed
22 on behalf of Ms. Yehoshua in this lawsuit?
23     A   Yes.
24     Q   When did you review those
25 documents?

Page 12

W. KHAHAIFA

1
2      A   Last night.
3      Q   And did you do anything else to
4  prepare for your deposition?
5      A   No, only conferred with my
6  counsel.
7      Q   Who was the counsel that you
8  conferred with?
9      A   Daniel Small and Gena
10 Usenheimer.
11     Q   And when did you confer --
12 strike that. Did you confer with Attorney
13 Small and Attorney Usenheimer together or
14 in separate meetings?
15     A   Together.
16     Q   How many times did you meet with
17 your attorneys in preparation for your
18 deposition?
19     A   I believe two times.
20     Q   Were those in-person meetings or
21 something else?
22     A   They were virtual.
23     Q   Was anybody present sort of on
24 your side of the virtual room during
25 either of those meetings?

Page 13

W. KHAHAIFA

1
2      A   Only me.
3      Q   How long were those meetings?
4      A   Two and a half hours and maybe
5  three to four hours.
6      Q   Did you discuss those meetings
7  with anybody outside of counsel?
8      A   No.
9      Q   Did you take any notes during
10 those meetings?
11     A   No.
12     Q   Other than speaking with counsel
13 in preparation for your deposition, did
14 you speak to anybody else at Transit
15 regarding your deposition?
16     A   No.
17     Q   What about anybody outside of
18 Transit? Friends? Family?
19     A   No.
20     Q   When did you first learn about
21 Ms. Yehoshua's lawsuit?
22     A   I don't remember the date, but
23 it was during the pandemic sometime.
24     Q   How did you first learn about
25 it?

4 (Pages 10 - 13)

W. KHAHAIFA

2    A  I believe I was sent an email
3 from HR, I believe.  I -- I don't recall
4 exactly who sent it, but I -- I -- someone
5 sent me an email, advising me of the
6 lawsuit.
7    Q    And at that time, did you learn
8 that you were named as a defendant in the
9 lawsuit?
10   A   Yes.
11   Q    What was your reaction to
12 learning about Ms. Yehoshua's lawsuit?
13   A   Shock.
14   Q    Did you speak to anybody after
15 learning about the lawsuit?
16   A   I did.
17   Q    Who did you speak to?
18   A   I spoke with, I believe it was,
19 HR.  I also spoke with counsel for
20 Transit.
21   Q    When you spoke with -- well, who
22 from HR Did you speak with?
23   A   I don't recall.
24   Q    During that discussion with HR,
25 was any counsel for Transit present?

W. KHAHAIFA

2    A  It wasn't a discussion.  It was
3 email, I believe.  Just it was an email
4 advising that the lawsuit was instituted
5 and that I should preserve all relevant
6 documents, et cetera.
7    Q    Okay.  So that's the email that
8 you received; correct?
9    A   Yes.
10   Q    Okay.  Did you respond to that
11 email from someone from HR?
12   A   I don't recall.
13   Q    And did you sort of do as
14 instructed, in terms of working to
15 preserve any relevant documents?
16   A   Yes, I did.
17   Q    How  did you go about doing
18 that?
19   A   I went through my emails and
20 saved those emails that I thought were
21 relevant.
22   Q    Had -- sorry.
23   A   I'm sorry.  I was going to say,
24 and any documents that were contained in
25 the emails.

W. KHAHAIFA

2    Q    Where did you save them?  In a
3 separate folder?  Did you print them out
4 and put them in a file cabinet?  How are
5 they saved?
6    A   I saved them in a separate
7 folder.
8    Q    How did you determine which
9 emails were relevant and which were not?
10   A   That's a good question.  So
11 we're talking about a complaint for
12 discrimination, and I believe, in my
13 mind -- I don't remember how I came to the
14 conclusion that it was referencing some
15 complaints from the judges, but I went
16 through all my emails that were relevant
17 to that topic.
18   Q    Did you save any emails
19 regarding Ms. Yehoshua that did not
20 discuss issues or complaints from judges?
21   A   I believe I may have later on.
22   Q    What did you do with the emails
23 and documents that you saved into that
24 separate file?
25   A   They're still there.

W. KHAHAIFA

2    Q    Okay.  So --
3    A   I may have -- I'm sorry.  I may
4 have printed some out as well.  Yeah,
5 that's it.
6        MS. VINCI:  So to the extent not
7    already provided, we will call for the
8    production of the emails and documents
9    saved by Ms. Khahaifa in response to the
10   preservation notice, and we'll follow up
11   in writing.
12       MR. SMALL:  All right.  Thank you.
13 BY MS. VINCI:
14   Q    Other than the current action,
15 have you ever been a defendant in any
16 other civil litigation?
17   A   Yes, I was.
18   Q    And when was that?
19   A   This was probably in the late
20 '90s.  Early '90s.
21   Q    And what was the nature of that
22 action?
23   A   Credit card.
24   Q    Can you elaborate what you mean
25 by "credit card"?

5 (Pages 14 - 17)

Page 18

W. KHAHAIFA

1
2    A    Credit -- credit card debt.
3 Yeah.
4    Q    Was that a collection of a debt?
5    A    Yes.
6    Q    Okay.  Any other times you've
7 been a defendant in a civil action?
8    A    No.
9    Q    Have you ever been arrested?
10    A    No.
11    Q    Safe to say you've never been
12 convicted of a crime then?
13    A    Safe to say.
14    Q    Just going back to the emails
15 and documents that you had preserved, what
16 did you do with that folder after you had
17 completed your review of your files?
18    A    It's still in my computer.
19    Q    Did you share it with anybody?
20 Did you do something else with it?  I
21 understand it still exists on your
22 computer, but --
23    A    I -- some of the documents have
24 been shared with counsel.
25    Q    Why have only some documents

Page 19

W. KHAHAIFA

1
2 been shared with counsel?
3    A    I think I saved things that
4 probably were not relevant and so were not
5 responsive to anything thus far that was
6 requested of me.
7    Q    Okay.  And you're aware that
8 Ms. Yehoshua's counsel had served
9 discovery demands, requests for the
10 production of documents from yourself and
11 Transit?
12    A    Yes.
13    Q    All right.  And did you review
14 those demands?
15    A    I believe I have.
16    Q    And to your knowledge, have you
17 produced all documents responsive to those
18 demands in your possession?
19    A    I believe I have.
20    Q    So you alluded to it before, but
21 is it your understanding Ms. Yehoshua's
22 claiming she had been discriminated
23 against on the basis of her religion in
24 this case?
25    A    Can you repeat that question?

Page 20

W. KHAHAIFA

1
2    Q    Well, let me just ask you.  What
3 is your understanding of Ms. Yehoshua's
4 claims in this case?
5    A    My understanding is that she's
6 claiming she was discriminated against
7 because of her religion and because she's
8 a white woman.
9    Q    Prior to this lawsuit, had you
10 ever learned of Ms. Yehoshua accusing you
11 of discrimination before?
12    A    No.
13    Q    Have you ever been accused of
14 discrimination by any other employee prior
15 to this lawsuit?
16    A    No.
17    Q    What was your reaction to
18 learning of Ms. Yehoshua's claims?
19    A    Shock.
20    Q    Anything other than shock?
21    A    Anger.
22    Q    Why were you angry?
23    A    Because it was untrue.
24    Q    And were you shocked for any
25 reason other than it was untrue?

Page 21

W. KHAHAIFA

1
2    A    Because I don't know why --
3 where she came up with her claim.  I was
4 also hurt.
5    Q    Why were you hurt?
6    A    Because, again, it was
7 unfounded.  There was no basis for it.
8 And there was never anything prior to this
9 that would lead to the thought that such a
10 claim would come.
11    Q    How long -- strike that.  You
12 used to work with Ms. Yehoshua at Transit;
13 correct?
14    A    Yes.
15    Q    How long did you work together?
16    A    From 2013, I believe, through
17 2020.
18    Q    And that was a time period that
19 you were both in the New York County trial
20 unit; is that right?
21    A    Yes.
22    Q    How would you describe your
23 relationship with Ms. Yehoshua during
24 those years?
25    A    I had a normal relationship with

6 (Pages 18 - 21)

W. KHAHAIFA

1
2 her during those years.
3    Q   What do you mean by "normal
4 relationship"?
5    A   We had a normal relationship.
6 She was an attorney in my unit that I
7 supervised, and our relationship was
8 normal.
9    Q   Did you have any objection to
10 Ms. Yehoshua being in your unit?
11   A   No, I didn't.
12   Q   Did you socialize with her
13 outside of work at all?
14   A   I did.
15   Q   When would you socialize with
16 her outside of work?
17   A   When we had our annual outings.
18 Also, I believe there were a couple of
19 other Transit functions, such as people's
20 retirement parties or, once in a while, we
21 would have a holiday party way back when.
22 Things like that.
23   Q   The annual outing.  What is the
24 annual outing?
25   A   Well, the annual outing was my

W. KHAHAIFA

1
2 unit, so my -- the trial unit, the New
3 York trial unit. Every year we got
4 together at the end of the year.
5    Q   Other than sort of
6 Transit-related or Transit-sponsored
7 events, did you socialize with Amelia
8 outside of work?
9    A   No.
10   Q   Did you socialize -- strike
11 that. How many other attorneys were in
12 your unit that you supervised?
13   A   At what time?
14   Q   Well, at any time. Were there
15 other attorneys in your unit that you
16 supervised, other than Amelia?
17   A   There -- there were other
18 attorneys at my unit and during various
19 times.
20   Q   Would you socialize with any
21 other attorneys in your unit outside of
22 any Transit-sponsored events?
23   A   Yes.
24   Q   Who are the attorneys that you
25 would socialize with?

W. KHAHAIFA

1
2    A   Jennifer Coyne.  And these are
3 at various times because, at times, there
4 were different amounts of attorneys in my
5 unit. Jennifer Coyne.  Alexandra
6 Vandoros.  And I think that's it, outside
7 of Transit functions.
8    Q   So you had mentioned before your
9 understanding Ms. Yehoshua's claiming
10 discrimination based on her religion;
11 correct?
12   A   Correct.
13   Q   Okay.  To your knowledge, what
14 religion does Ms. Yehoshua practice?
15   A   She's Jewish.
16   Q   How are you aware of that?
17   A   I'm pretty sure she told me at
18 some point.
19   Q   Do you recall at what point
20 Ms. Yehoshua mentioned she was Jewish?
21   A   No.
22   Q   What religion do you practice?
23   A   I don't.
24   Q   Do you consider yourself atheist
25 or agnostic or something else?

W. KHAHAIFA

1
2    A   Something else.
3    Q   Do you ascribe any sort of title
4 or label to your religious beliefs?
5    A   No.
6    Q   Were you raised in any type of
7 religion before stopping practicing?
8    A   Yes.
9    Q   What religion were you raised
10 in?
11   A   I believe it's called Gheez
12 Nation.
13   Q   Gheez Nation?  And to your
14 understanding, is Gheez Nation, is that
15 based on Christianity?  Is that an
16 offshoot of any sort of other religion?
17   A   I was very young when I was
18 involved, but my understanding of it, it's
19 kind of a combination of a lot of
20 different religions.
21   Q   And when did you start
22 practicing the Gheez Nation --
23   A   I don't remember.  I was a
24 child. I don't remember what age.
25   Q   Jennifer Coyne.  Do you know

7 (Pages 22 - 25)

Page 26

W. KHAHAIFA

1
2  what religion she practices?
3     A   I do not.
4     Q   What about Alex Vandoros?
5     A   I do not.
6     Q   Where did you earn your law
7  degree from?
8     A   In law school.
9     Q   In what year?
10    A   2000.
11    Q   And did you earn a J.D. at that
12 time?
13    A   Yes.
14    Q   Do you have any other degrees,
15 such as an LLM, like, beyond your J.D.?
16    A   No.
17    Q   Where did you attend
18 undergraduate school?
19    A   John Jay.
20    Q   And what degree or degrees did
21 you earn at John Jay?
22    A   A Bachelor of Science in legal
23 studies.
24    Q   And what year did you earn that
25 degree?

Page 27

W. KHAHAIFA

1
2     A   -- I want to say 1995.
3     Q   After earning your J.D. from
4  Brooklyn Law School, you were then
5  admitted to practice; correct?
6     A   Yes.
7     Q   In what jurisdiction or
8  jurisdictions were you admitted to
9  practice when you first got admitted?
10    A   New York.
11    Q   Are you admitted currently to
12 practice in any other jurisdictions?
13    A   Other than New York?
14    Q   Yes.
15    A   No.
16    Q   And do you still maintain an
17 active law license in New York?
18    A   Yes, I do.
19    Q   Have you ever had your law
20 license suspended or revoked?
21    A   No.
22    Q   After being admitted to practice
23 in New York, what was your first legal
24 position?
25    A   I was an attorney.

Page 28

W. KHAHAIFA

1
2     Q   Where?
3     A   Flomenhaft & Cannata.
4     Q   And what sort of law were you
5  practicing at that firm?
6     A   Plaintiff's personal injury.
7     Q   And for what time period were
8  you at Flomenhaft & Cannata?
9     A   I was there, I want to say,
10 January.  I believe I was there January of
11 2000 to October of 2000.
12    Q   And how did your employment
13 there end?
14    A   I got laid off after 9/11.
15    Q   What was your next position,
16 your next employment after Flomenhaft &
17 Cannata?
18    A   I did some consulting for -- the
19 name of the firm, I'm drawing a blank.
20 Sorry.
21    Q   We can leave a blank in the
22 transcript, and if it comes to you, you
23 can fill it in with your errata sheet.  So
24 you started consulting for another firm.
25 Was that firm here in Manhattan?

Page 29

W. KHAHAIFA

1
2     A   Yes.
3     Q   And what kind of cases were you
4  consulting on?
5     A   The same thing: plaintiff's
6  personal injury.
7     Q   And for how long did you
8  maintain that employment?
9     A   That was for maybe four or five
10 months.
11    Q   So did you start consulting
12 immediately after getting laid off?
13    A   No.
14    Q   So from what time period?  What
15 five-month time period?
16    A   I don't recall.
17    Q   What was your next position
18 after the consulting gig?
19    A   Then I was a consultant attorney
20 for New York City Transit.
21    Q   And when did you become a
22 consultant attorney for Transit?
23    A   That was in 2003.
24    Q   And how long did you hold that
25 role for Transit?

8 (Pages 26 - 29)

Page 30

W. KHAHAIFA

2    A    I was a consultant for a little
3 over a year.
4    Q    And so since that role, have you
5 worked with Transit up until the present
6 day?
7    A    Yes.
8    Q    Okay.  So if you could kind of
9 run through your history, your employment
10 history, with Transit?  So you were a
11 consultant attorney 2003 until around
12 2004.  What came next?
13    A    And then I was hired permanently
14 in 2004, and I've been there since.
15    Q    What were you hired as in 2004?
16    A    As an attorney.
17    Q    Were you in any specific
18 division at that time?
19    A    The torts division.
20    Q    Did your job title ever change
21 while in the torts division?
22    A    Yes.
23    Q    Okay.  When was the first change
24 to your job title?
25    A    The first change was when I was

Page 31

W. KHAHAIFA

2 hired permanently, so I became -- my title
3 was attorney.  And then I guess, after a
4 promotion at some point -- I don't
5 recall -- at -- at some point, my title
6 change to agency attorney.
7    Q    Did your title change after
8 becoming agency attorney?
9    A    Yes, it changed from agency
10 attorney to agency attorney II and then, I
11 believe, III.
12    Q    What is your current title?
13    A    Assistant general counsel.
14    Q    Okay.  So after agency attorney
15 three, what then was your title?
16    A    Assistant general counsel.
17    Q    When did you become the
18 assistant general counsel?
19    A    This I don't recall, but I
20 believe it is when I became the borough
21 chief for the New York trial unit, which
22 was in 2015, I believe.  January 2015.
23    Q    Prior to being the borough chief
24 of the New York trial unit, who was in
25 that role before you?

Page 32

W. KHAHAIFA

2    A    Danielle Ruttman.
3    Q    And so from 2013 to 2015,
4 Ms. Yehoshua was in the unit with you as
5 well; correct?
6    A    Correct.
7    Q    Were you aware of any issues
8 between Amelia and Danielle Ruttman?
9    A    Can you be more specific?
10    Q    Do you know if Amelia had ever
11 raised any complaints about Danielle
12 Ruttman?
13    A    I don't know if she raised
14 complaints about her.
15    Q    Did she ever complain to you
16 about Danielle Ruttman?
17    A    Yes.
18    Q    What did she complain to you
19 about Danielle Ruttman?
20    A    Just one complaint.  She --
21 Danielle -- she told me that Danielle
22 would not allow her to be in her office
23 with her door closed.
24    Q    Do you know if that issue was
25 ever brought to Ms. Ruttman's attention?

Page 33

W. KHAHAIFA

2    A    I believe it was.
3    Q    During the years you worked with
4 Amelia, both being under Danielle Ruttman,
5 how would you describe your relationship
6 with her?
7    A    Can you repeat that?  I'm sorry.
8 I just zoned out.
9    Q    Okay.  During the years that you
10 and Amelia both worked together in the
11 unit, under Danielle Ruttman, how would
12 you describe your relationship with
13 Amelia?
14    A    It was the same.  We had a
15 normal relationship.
16    Q    Did you work closely together?
17    A    We did not work closely
18 together.  I did work with her from time
19 to time.
20    Q    How would you describe Amelia,
21 as an attorney, during those years?
22    A    During those years, she was an
23 average attorney.
24    Q    Would you describe her as a good
25 worker?

Page 34

W. KHAHAIFA

1
2    A    In -- I wasn't monitoring her
3    work at that time, so I don't know.
4    Q    During the time that Danielle
5    Ruttman was the borough chief, did you
6    have any understanding of how cases were
7    divided amongst the attorneys in the New
8    York unit?
9    A    No.
10    Q    So you became the borough chief
11    around 2015; is that correct?
12    A    Correct.
13    Q    How did that come to be?  Did
14    you apply for the position?  Were you just
15    promoted out of the blue?
16    A    Well, I became acting borough
17    chief in 2014.  At that time Danielle
18    Ruttman was removed from the position by
19    Larry Heisler, and I filled in.
20    Q    Why was it that you filled in
21    after Ms. Ruttman was removed?
22    A    Because I assisted her on a
23    regular basis in her duties as the borough
24    chief.
25    Q    When you became the acting

Page 35

W. KHAHAIFA

1
2    borough chief, was there any sort of
3    orientation for how to perform in the role
4    or the duties of the role?
5    A    No.
6    Q    And then is it fair to say,
7    about a year later, in 2015, you were no
8    longer the acting borough chief but the
9    full-time borough chief?
10    A    I wouldn't say it was a year
11    later.  I would say it was a few months
12    later.
13    Q    What were your duties and
14    responsibilities as the borough chief,
15    when you assumed the full role in 2015?
16    A    As the borough chief, to
17    maintain the calendar for the unit; to
18    assign trials and other assignments to the
19    attorneys in the unit; to supervise the
20    attorneys in the unit; facilitate
21    settlements.  That's all I can think of
22    right now.  There are other things, but I
23    can't think of it now.  If I were looking
24    at my resume, at some point, I could
25    probably -- better.

Page 36

W. KHAHAIFA

1
2    Q    That's fine.  Did you maintain
3    your own caseload, or would you oversee
4    everybody else's?
5    A    At what point in time?
6    Q    In 2015.
7    A    Yes, I did.
8    Q    Did that ever change?
9    A    Yes.
10    Q    When did that change?
11    A    It was a gradual change, so it
12    wasn't at any one point.  I also was the
13    acting major case attorney after July of
14    2014, when the major case attorney
15    retired.
16    Q    And for how long did you remain
17    as the acting major case attorney?
18    A    That's hard to quantify.  At the
19    time I believe the only attorneys that
20    were in the unit was myself and Amelia.
21    And at some point, we gradually got more
22    attorneys, and I was able to relinquish
23    those cases.
24    Q    In 2015, when you became the
25    borough chief, how many attorneys were in

Page 37

W. KHAHAIFA

1
2    the unit?
3    A    I believe just myself and
4    Amelia.
5    Q    At that time do you recall how
6    many cases Amelia was handling?
7    A    At any given time, her caseload
8    was probably 15 to 20 cases.
9    Q    And was that for the whole time
10    that you were borough chief until 2020 or
11    just in 2015?
12    A    It's pretty much was steadily.
13    It's kind of difficult to quantify that
14    because it's -- there's so many variables
15    that go into what a caseload is.
16    Q    What are the variables?
17    A    You can have a case that you
18    have for trial purposes only, meaning that
19    the case is not yours until after the note
20    of issue's been filed, after a pretrial
21    conference has been held, and I assigned
22    it for trial purposes because I've
23    determined that it couldn't be settled.
24        Then you have the all-purposes
25    cases, which are cases that would be

W. KHAHAIFA

2 handled from the beginning, from a summons
3 and complaint, through trial. Then you
4 had just various assignments on cases that
5 were not yet assigned to an attorney, a
6 trial attorney, but they were on the trial
7 calendar at the time.
8    Q    Was the caseload -- and I
9 understand there's multiple factors of
10 what makes up the caseload. But the 15 to
11 20 cases that you testified Amelia would
12 have, on average, in any given time, was
13 that considered sort of the average or the
14 normal for attorneys in the New York unit?
15    A    In the trial unit, yes.
16    Q    In 2016 how many attorneys were
17 in the New York trial unit?
18    A    I don't recall when we got
19 the next attorney. It could have been
20 2016. It could have been 2017, but.
21    Q    Who was the next attorney?
22    A    The next attorney was either
23 John Jerman or Alexandra Vandoros. I
24 can't remember which of them came first.
25 It was -- it was around the same time. It

W. KHAHAIFA

2 wasn't a -- a long time between, but I
3 don't remember who came first.
4    Q    At that point how was it decided
5 what cases would be handled by the new
6 attorneys? First cases -- was it just all
7 new cases or what? Were cases
8 shifted around? How did you determine how
9 to reallocate?
10    A    I -- I -- as the need arose, I
11 did my calendar, for the most part,
12 monthly. I would see what cases are
13 coming up that were not assigned, and I
14 would assign them accordingly.
15    Q    Now as part of Amelia's
16 observance of her Jewish faith, she would
17 leave early on Fridays to observe the
18 Sabbath; correct?
19    A    Yes.
20    Q    Did that ever pose an issue in
21 your calendaring or maintenance of the
22 unit?
23    A    No.
24    Q    In 2018 how many attorneys were
25 there in the New York unit?

W. KHAHAIFA

2    A    In 2018 only 4.
3    Q    Okay. So would that be Amelia,
4 John Jerman, and Alex Vandoros, and one
5 more?
6    A    And Jennifer Coyne.
7    Q    What about in 2019?
8    A    In 2019 there were 3.
9    Q    Who left?
10    A    Jennifer Coyne.
11    Q    What about in 2020?
12    A    In 2020 it was also 3. Also,
13 can I go back? In 20 -- Jennifer Coyne
14 left in 2018, so at some point in 2018,
15 there were 3 as well.
16    Q    So in 2020 the 3 attorneys in
17 the New York unit, who were they?
18    A    Alexandra Vandoros, John Jerman,
19 and -- and Amelia.
20    Q    Is it true that, at some point
21 in 2020, Amelia was no longer with the New
22 York trial unit?
23    A    Yes.
24    Q    When did that happen?
25    A    March of 2020.

W. KHAHAIFA

2    Q    And why was she no longer with
3 the unit?
4    A    She was no longer with the unit
5 because she could no longer make
6 appearances in New York Supreme Court.
7    Q    And that was due to reports from
8 judges sitting in New York Supreme Court;
9 is that right?
10    A    Yes.
11    Q    Okay, we'll address that a
12 little bit more later. During the time
13 that you were borough chief and working
14 with Amelia in the unit, did trial
15 attorneys have assigned assistants?
16    A    Yes.
17    Q    Who is Amelia's assistant?
18    A    Adrian Thompson.
19    Q    To your knowledge, when did
20 Mr. Thompson become Amelia's trial
21 assistant?
22    A    I'm not sure.
23    Q    Was it before you became borough
24 chief?
25    A    I believe so, but I'm not sure.

11 (Pages 38 - 41)

Page 42

W. KHAHAIFA

1
2    Q    Did you ever talk to
3 Mr. Thompson about Amelia's performance as
4 a trial attorney?
5    A    I don't know if I spoke to him
6 about her performance as a trial attorney.
7    Q    Did you speak to him about her
8 at all?
9    A    Yes.
10    Q    Tell me about those discussions.
11 What did you ask of him?  What did he
12 share with you?
13    A    I've had multiple discussions.
14 I don't -- I don't know what context, you
15 know.
16    Q    Well, in what context would you
17 speak about Amelia to Adrian Thompson?
18    A    I may have asked for upcoming
19 cases.  I may have asked, "Are the cases
20 prepared?"  Things of that nature.
21    Q    And what would Mr. Thompson
22 report to you?
23    A    Depending on the case, he would
24 tell me, "This one is coming up this time.
25 We haven't started on this one yet.  We

Page 43

W. KHAHAIFA

1
2 did on this one."  Various -- there's
3 nothing -- can't pinpoint one specific
4 thing.
5    Q    So is it fair to say you would
6 sort of ask him for updates or status
7 reports, and he would provide them to you?
8    A    No, I -- I would ask him, like,
9 as I said, I would ask him questions,
10 specific questions, as to their upcoming
11 calendar.  Status update, I would probably
12 ask her.
13    Q    And was this your practice
14 with -- strike that.  Did the other trial
15 attorneys also have assistants?
16    A    Yes.
17    Q    Was it your practice to ask the
18 other assistants specific questions about
19 cases being handled by their trial
20 attorneys?
21    A    Yes.
22    Q    At some point Mr. Thompson was
23 removed as Amelia's trial assistant.  Do
24 you remember that?
25    A    For a couple of hours, yes.

Page 44

W. KHAHAIFA

1
2    Q    Did you make the decision to
3 remove him as her trial assistant?
4    A    I made the decision to switch.
5    Q    Why?
6    A    Because I wanted to switch up
7 the procedures that everyone was working
8 under.  I wanted Amelia to become more
9 involved in her cases.  And I felt that
10 Adrian was the type of trial assistant
11 that would hinder that.
12    Q    What gave you the impression
13 that Adrian was hindering Amelia becoming
14 more involved in her trial cases?
15    A    I don't think I said that.  I
16 said he would hinder that process of her
17 becoming more involved in her cases, not
18 that he would hinder her from getting
19 involved in her -- her cases.
20    Q    What gave you the impression
21 that he would hinder that process?
22    A    Because he got very involved in
23 the cases.  I learned, at some point, that
24 he was doing more than he should have been
25 doing on the cases.  I've learned, on

Page 45

W. KHAHAIFA

1
2 various cases, that he knew the file
3 better than she knew the file or she
4 didn't know the file at all.
5    Q    How did you learn that Adrian
6 was doing more than he should have on
7 Amelia's files?
8    A    Because I asked her a question
9 about a case, and she didn't know anything
10 about it.  And then I asked him what he
11 had been doing on the case, and that's how
12 I learned.
13    Q    Did Adrian ever complain to you
14 about working with Amelia?
15    A    He didn't.  Not in the
16 beginning.  I think, at some point, I
17 believe he did complain to me at one
18 point.
19    Q    When did Adrian complain to you?
20    A    I don't recall.
21    Q    What specifically did Adrian
22 complain about?
23    A    I don't recall.
24    Q    Do you have -- or strike that.
25 How did Adrian complain to you?  Did he

12 (Pages 42 - 45)

W. KHAHAIFA

1
2  call you?  Write you an email?  Meeting?
3      A   I'm sure it was verbal.  I -- I
4  don't think he sent me any emails.  I
5  don't recall any emails.
6      Q   Did you take any notes regarding
7  Adrian's complaint?
8      A   I don't believe so, no.
9      Q   Did you report Adrian's
10  complaint to anybody else in Transit?
11      A   No.
12      Q   Did you speak to Amelia about
13  Adrian's complaint?
14      A   I might have.  I'm not sure.  I
15  don't recall.
16      Q   What can you recall doing in
17  response to Adrian's complaint?
18      A   Switching -- switching trial
19  assistants.  I'm sorry.
20      Q   When you would ask questions of
21  Adrian regarding Amelia's cases, would you
22  do that in person, by email, a mix of
23  both?
24      A   Usually, in person or a phone
25  call.

W. KHAHAIFA

1
2      Q   Would you email him at all about
3  Amelia's caseload or performance?
4      A   No.
5      Q   You never emailed Adrian about
6  what he was doing for Amelia?
7      A   I may have asked him a question
8  by email, but I never emailed him about
9  her performance, no.
10      Q   Who was the new assistant
11  briefly assigned to Amelia during the
12  switch?
13      A   Lilly Ramos.
14      Q   And who had Ms. Ramos been
15  assisting prior to the switch?
16      A   She was assisting Alexandra
17  Vandoros at that time.  And she also
18  had -- she had -- was the assistant on
19  some of the major cases, so her and Adrian
20  had some major cases that they were
21  assisting on.
22      Q   What was Ms. Yehoshua's response
23  to the switch in the assistants?
24      A   There was no response to me.
25      Q   Okay, is it your understanding

W. KHAHAIFA

1
2  there was a response to somebody else?
3      A   Yes.
4      Q   To who?
5      A   To Larry Heisler.
6      Q   How are you aware of Amelia's
7  response to Larry Heisler?
8      A   Gail Goode.
9      Q   Larry Heisler was the head of
10  torts; correct?
11      A   Yes, he was.
12      Q   What was Ms. Goode's position?
13      A   She was the head of trials.
14      Q   So as the borough chief,
15  Ms. Goode was a more direct supervisor; is
16  that right?
17      A   Correct.
18      Q   And then above her was
19  Mr. Heisler?
20      A   Correct.
21      Q   What did Ms. Goode tell you
22  about Amelia reaching out to Mr. Heisler,
23  regarding the switch in trial assistants?
24      A   She told me that Amelia had
25  complained to Larry about the switch, and

W. KHAHAIFA

1
2  that she -- as a trial attorney, you're
3  used to your assistant, and that she did
4  not want to be switched, and that I should
5  switch back
6      Q   Did Mr. Heisler ever speak to
7  you about Amelias' complaint?
8      A   No.
9      Q   What was your reaction to
10  hearing that Amelia had complained to
11  Larry?
12      A   My reaction was she didn't say
13  anything to me, so I didn't think she had
14  an issue with it.
15      Q   How did or how was Amelia
16  informed about the switch in trial
17  assistants?
18      A   I think I had a meeting with the
19  unit, and I made some other announcements,
20  and that was how it was made.
21      Q   What, if anything, was
22  Mr. Thompson's response to the switch?
23      A   I'm not sure.
24      Q   He never spoke to you about it
25  after it was announced?

13 (Pages 46 - 49)

Page 50

W. KHAHAIFA

1
2    A   He did speak to me after, but I
3 don't recall what -- in what context.
4    Q   Do you recall how he seemed
5 during that discussion?  Was he pleased?
6 Was he angry?  Upset?
7    A   He -- he seemed to be satisfied.
8    Q   After learning about Amelia's
9 complaint to Larry, what, if anything, did
10 you do?
11    A   I switched back.  I switched
12 Adrian back.
13    Q   Were you told to switch Adrian
14 back or you did it of your own volition?
15    A   I was told to switch Adrian
16 back.
17    Q   By who?
18    A   Gail Goode.
19    Q   So when Ms. Goode advised you of
20 Amelia's complaint to Mr. Heisler, did she
21 also, in that call, say, "And you have to
22 switch them back"?  Or did she just tell
23 you that there had been a complaint made?
24    A   It wasn't a call, but we had a
25 conversation about it.  I explained to her

Page 51

W. KHAHAIFA

1
2 why I switched him.  And she explained,
3 "Regardless of that, as a trial attorney,
4 you would want to be comfortable with your
5 trial assistant," and thought that he
6 should be changed back.
7    Q   Were you upset that Amelia had
8 complained about the switch in trial
9 attorneys?
10    A   No.
11    Q   Did you ever speak to Amelia
12 about her complaint to Mr. Heisler about
13 the switch in trial attorneys?
14    A   I don't think so.
15    Q   Did you ever speak directly with
16 Mr. Heisler about that issue?
17    A   I don't think so.
18       MS. VINCI:  Take just a two-minute
19    break to run to the restroom.  We'll go
20    off the record for a couple of minutes.
21       THE REPORTER:  Okay.  Off the record
22    at 11:04.
23       (Off the record.)
24       THE REPORTER:  Yes, back on record,
25    11:09.

Page 52

W. KHAHAIFA

1
2 BY MS. VINCI:
3    Q   Ms. Khahaifa, we just took a
4 short restroom break.  Do you understand
5 that you are still under oath?
6    A   Yes.
7    Q   I want to turn your attention to
8 early 2016, January, February 2016.  Do
9 you recall an issue arising regarding the
10 approval of Amelia's timesheets -- or a
11 timesheet?
12    A   Yes.
13    Q   Can you describe, sort of in
14 your own words, what happened?
15    A   Okay, well, I don't recall the
16 date.  I believe it was 2016.  So Amelia
17 came to me with her timesheet, and she
18 also had a late train report.  And she
19 told me that she was late on a specific
20 day couple of weeks ago because of the
21 train.  It happened to be a Friday, and
22 Fridays, she leaves an hour early.  So
23 because of this late train, she wasn't
24 able to make her seven hours.  So she
25 wanted me to excuse the deficit.

Page 53

W. KHAHAIFA

1
2       And I told her that I was not
3 certain that I was authorized to do that,
4 and I told her I would check with
5 timekeeping.  I reached out to
6 timekeeping.  They told me that it does
7 not excuse the deficit.  I spoke to other
8 borough chiefs to find out their opinion
9 of it and to see if their understanding of
10 it was the same.  They said the same:  it
11 does not excuse the deficit; it allows you
12 to make up the deficit.
13       And that was the issue, so I
14 told her I could not excuse the deficit.
15 She took issue, and it went to Larry.  He
16 excused it for her.
17    Q   In 2016 were attorneys expected
18 to maintain a certain minimum number of
19 hours in the unit?
20    A   You were required to do seven
21 hours per day.
22    Q   What would happen if, at the end
23 of the week, there was not seven hours per
24 day?
25    A   You would use your time to make

14 (Pages 50 - 53)

W. KHAHAIFA

1
2  it up, or you were docked.  And it was by
3  per day, not the end of the week, so I
4  couldn't -- I couldn't do six hours on
5  Monday and make it up on Friday.  I had to
6  do seven hours each day.
7      Q   When you say you could use your
8  time or you're docked, what time are you
9  referring to?
10     A   Your leave.
11     Q   So it'd be, like, you use an
12  hour of your paid time off?
13     A   You would use an hour of your
14  annual leave, which is, basically, your
15  vacation time.  You also have your
16  personal leave; you have floating
17  holidays.
18     Q   And if you didn't use your
19  vacation time, your annual time off, what
20  would happen?
21     A   Timekeeping would dock you for
22  the deficit.
23     Q   What happens when an attorney is
24  docked for a deficit?
25     A   I've never been docked for a

W. KHAHAIFA

1
2  deficit, but I believe that it's reflected
3  in your pay.
4      Q   Okay.  When you advised Amelia
5  that you could not excuse the deficit in
6  her time, what was her reaction to you?
7      A   Her reaction to me was that the
8  prior borough chief did it for her all the
9  time.
10     Q   Did you do anything to look into
11  whether or not that was true, that
12  Danielle Ruttman had done that for Amelia
13  previously?
14     A   No, Danielle Ruttman was no
15  longer there.
16     Q   What other borough chiefs did
17  you speak to other than the timekeeping?
18     A   I believe I spoke to Miriam
19  Bonett-Waters and Marie Stanley.  I
20  probably spoke to Sherri as well.
21     Q   What's Sherri's last name?
22     A   Sherri Ehrlich.
23     Q   When you spoke with timekeeping
24  about the issue, did you advise them that
25  Amelia was leaving early for the Sabbath?

W. KHAHAIFA

1
2      A   No, because it had already
3  occurred.  So, no, I didn't tell them that
4  she was leaving early for the Sabbath.
5  This was when she was presenting her
6  timesheet for approval.  This had occurred
7  two weeks prior.  She did not come to me
8  on the day that this occurred.
9      Q   In 2016 how often would
10 attorneys need to have their timesheets
11 approved?  Was it weekly, monthly,
12 something else?
13     A   Every two weeks.
14     Q   And what was the process for
15 getting it approved?
16     A   For getting the timesheet
17 approved?
18     Q   Yes.
19     A   They would present it.  They
20 would sign themselves, proving that it's
21 accurate.  And then it would come to me,
22 and I would sign.
23     Q   Prior to this incident in 2016,
24 had you had any issues approving Amelia's
25 timesheets?

W. KHAHAIFA

1
2      A   No, I didn't have an issue that
3  time approving her timesheet either.  I
4  had an issue excusing the deficit.
5      Q   Had Amelia ever asked you to
6  excuse a deficit prior to this incident?
7      A   No.
8      Q   To your understanding, what
9  happened next after you told Amelia that
10 you could not approve the deficit?
11     A   To my understanding, she went to
12 either Gail or Larry to approve it because
13 I told her I -- I would sign her
14 timesheet, but I would not excuse the
15 deficit because I didn't have the
16 authority to do so.  So I told her she was
17 perfectly okay to go to Larry Heisler or
18 Gail Goode, who may have the authority to
19 do so, but I did not.  So that was my
20 understanding of what she was going to do.
21     Q   Do you know if she went to
22 Mr. Heisler or Ms. Goode?
23     A   I believe she did.  I don't know
24 if she went to both or just one, but she
25 told me she would anyway if I didn't sign

Page 58

W. KHAHAIFA

1
2  it.
3      Q   What happened next after you
4  advised her, you know, "You could go above
5  me and see if they have authority to
6  approve the deficit"?
7      A   Like I said, I don't know who
8  she went to or if she went to both of
9  them.  I know, for a fact, that she spoke
10  with Larry Heisler.
11     Q   How do you know that for a fact?
12     A   Because Paul Sasso told me.
13     Q   Who's Paul Sasso?
14     A   Paul Sasso was the claims
15  manager that was in the unit as -- at the
16  time.
17     Q   What did Mr. Sasso tell you
18  about Amelia speaking to Mr. Heisler about
19  this issue?
20     A   He told me that Larry was upset
21  with me because I did not sign her
22  timesheet and that I was -- well, these
23  are not his words, but I'm
24  paraphrasing -- that I was interfering
25  with her Sabbath, and why am I doing that?

Page 59

W. KHAHAIFA

1
2      Q   Did Mr. Sasso say this was
3  something that Larry had said to him or
4  that he had overheard or something else?
5      A   It was paraphrased, and it was a
6  long time ago.  I just know that he told
7  me that Larry Heisler told him he was
8  upset.  He told me Larry cursed, and Larry
9  doesn't curse, so that made me upset.
10     Q   And Mr. Heisler spoke to you
11  about this issue directly; correct?
12     A   Eventually, yes.
13     Q   When did Mr. Heisler speak to
14  you about it?
15     A   I don't recall.  I -- I don't
16  think it was the same day.  At the time
17  Larry didn't speak directly to me at all
18  about anything.  He generally went through
19  Gail Goode or Paul Sasso.
20     Q   What was your relationship like
21  with Mr. Heisler in 2016?
22     A   I had a normal relationship with
23  him.
24     Q   Was there any tension between
25  the two of you, that he wouldn't directly

Page 60

W. KHAHAIFA

1
2  address things with you?
3      A   No, I -- he just didn't.
4      Q   Do you know if that is how he
5  would typically speak with the borough
6  chiefs?
7      A   I'm not sure; I just assumed
8  that that was normal behavior on his part.
9  I -- he -- my understanding of him and my
10  observation of him, that he was very much
11  to himself.  There were people who I did
12  observe him, you know, speak to -- Paul
13  was one that he spoke to regularly.  And
14  it just so happened that that was how the
15  communication was, at that time, in the
16  beginning.
17     Q   Who else did you observe Larry
18  speak to regularly?
19     A   I believe he spoke to Marie
20  Stanley.  Gail Goode.  But that's just my
21  observations.  I don't know to say that
22  those are the only people he spoke to.
23     Q   Sure.
24     A   That's just what I observed.
25     Q   And did you observe him speak to

Page 61

W. KHAHAIFA

1
2  anyone else regularly, besides Mr. Sasso,
3  Ms. Stanely, and Ms. Goode?
4      A   I mean, I don't know what
5  timeframe you're referring to, but I would
6  have to say those are the ones.  Maybe
7  Lisa Urbont.  But not -- no, I couldn't
8  say anybody else, oh, other than people in
9  the appeals unit, that worked under him.
10     Q   In 2016 how, if at all, would
11  you describe Larry's relationship with
12  Amelia?
13     A   I don't know.
14     Q   So when Larry did eventually
15  speak to you about the timekeeping or the
16  timesheet issue, can you kind of walk me
17  through what that conversation was?
18     A   I don't recall how it started,
19  or -- I know he came to my office.  And
20  we -- I don't remember how the
21  conversation started, but I explained to
22  him the situation.  I explained that I
23  felt that it was being blown out of
24  proportion.  I said that it was an issue
25  of procedure, nothing more.  And he told

16 (Pages 58 - 61)

W. KHAHAIFA

1
2  me that I had leeway to excuse certain
3  things.  I told him I didn't know that.  I
4  spoke to two timekeepers.  I spoke to
5  other borough chiefs.  And I don't
6  remember who else I may have spoken to,
7  but everybody said the same thing.
8      Q   During that discussion did
9  Mr. Heisler accuse you of interfering with
10 Amelia's Sabbath?
11     A   No, he didn't.
12     Q   Did he say anything to make you
13 believe that he was accusing you of
14 interfering with her Sabbath?
15     A   No.
16     Q   Did he say anything to make you
17 believe that Amelia had said that you were
18 interfering with her Sabbath?
19     A   I don't recall if he said
20 anything that made me believe that.
21     Q   Do you recall if he said that it
22 looked bad, that it appeared you had been
23 interfering with her observance of the
24 Sabbath?  Sorry.
25     A   No.  The only thing I remember

W. KHAHAIFA

1
2  him saying was that it was impossible for
3  her to make up the time.
4      Q   Were you upset after Larry had
5  come and talked to you about the issue?
6      A   I was upset at the insinuation
7  that I did something wrong and that --
8  that -- the idea that it would be seen as
9  something more than a procedural issue.
10     Q   What did Larry say or do, during
11 the meeting, that raised this idea it was
12 being seen as more than something, just a
13 procedural issue?
14     A   As I said, I don't think he said
15 anything during that meeting.  It was my
16 conversation that I had with Paul, prior
17 to that, that gave me that impression.
18     Q   Did you discuss your
19 conversation with Paul when Larry came to
20 talk to you about it?
21     A   I'm sure I did.  I don't recall.
22     Q   After speaking with Paul and
23 with Larry, did you believe that you had
24 been accused of discrimination against
25 Ms. Yehoshua?

W. KHAHAIFA

1
2      A   I believe that -- I don't
3  believe I was accused of discrimination.
4  I believe that she told him something that
5  was false.  That's what I thought.  And I
6  thought that he just took whatever she
7  said, hook, line, and sinker, and came to
8  whatever conclusion he came to.
9      Q   What was the false thing you
10 believe she said to Larry?
11     A   That I was interfering with her
12 Sabbath by not excusing this 45-minute
13 deficit on her timesheet.
14     Q   So I'm going to show you what
15 was previously marked Plaintiff's Exhibit
16 4.
17         (Plaintiff Exhibit 4 was marked
18         for identification.)
19         As much or as little time as you
20 would like, ma'am, to review that.  Let me
21 know when you're ready to proceed.
22         MR. SMALL:  While she's reviewing,
23     just to clarify, are we going to be using
24     the previously marked exhibit numbers?
25         MS. VINCI:  For -- yeah.

W. KHAHAIFA

1
2         MR. SMALL:  For those that you have?
3         MS. VINCI:  -- just to keep it clean.
4     There might be one or two here or there
5     that I need to mark, and I have exhibit
6     tabs in case we --
7  BY MS. VINCI:
8      Q   Have you reviewed Exhibit 4,
9  ma'am?
10     A   Yes, I have.
11     Q   Do you recognize this document?
12     A   Yes, I do.
13     Q   Can you identify it for the
14 record and say what it is?
15     A   It's an email between myself,
16 Larry, and Amelia, regarding this
17 timesheet issue that you're referring to.
18     Q   Okay.  So if you turn to page
19 two, which is your initiating email to
20 Mr. Heisler and Ms. Yehoshua, you're sort
21 of -- is it fair to say you are recounting
22 the issue and the discussion that you had
23 with Larry and your feelings following
24 that discussion?
25     A   Yes.

17 (Pages 62 - 65)

W. KHAHAIFA

1
2    Q   Okay.  So the last line of the
3  first paragraph, it reads: "To now be
4  accused of interfering with her," meaning
5  Amelia's, "religious observance of the
6  Sabbath is insulting, disappointing, and
7  could not be farther from the truth."  Do
8  you see that?
9    A   I see that.
10    Q   Okay.  What happened during your
11  discussion with Larry that you felt you
12  were being accused of interfering with
13  Amelia's religious observance?
14    A   As I said, I did not feel that
15  Larry said anything to me that made me
16  believe that.  It was my conversation with
17  Paul and the fact that she brought this to
18  Larry under these pretenses.
19    Q   But you were not present for
20  Amelia's discussion with Larry; correct?
21    A   I was not.  I was not.
22    Q   So the pretenses or false
23  statements that you assume were made to
24  Mr. Heisler, they are exactly that: your
25  assumptions; correct?

W. KHAHAIFA

1
2    A   Yes.
3    Q   Did you -- strike that.  After
4  your discussion with Mr. Heisler, did you
5  speak with Paul Sasso again about the
6  issue?
7    A   I -- I'm sure I did.  I don't
8  have a recollection.
9    Q   What makes you sure that you
10  did?
11    A   Because I was still upset about
12  this, and -- I don't know.  I'm just sure.
13  I had to speak to Paul every day, so I
14  can't see that I didn't speak to him about
15  this again.
16    Q   Okay.  So it just would have
17  been sort of what probably happened.  You
18  don't have a distinct recollection of
19  speaking to him again?
20    A   I have no recollection.
21    Q   Did you ever speak to Gail Goode
22  about this issue?
23    A   Yes.
24    Q   When did you speak to Gail Goode
25  about this issue?

W. KHAHAIFA

1
2    A   I don't know if I spoke to her.
3  I'm not sure, actually.
4    Q   You're not sure when, or you're
5  not sure if you did?
6    A   I'm not sure when.  I would have
7  spoken to her because she was my
8  supervisor.
9    Q   What, if anything, did Ms. Goode
10  remark about the situation?
11    A   I do not recall since I don't
12  recall my conversation with her.  I
13  just -- I know that, as my supervisor, I
14  would have gone to her.
15    Q   If, sort of, your feelings or
16  your interpretation of what happened, you
17  know, being accused of interfering with
18  Amelie's observance, if that came from
19  your discussion with Mr. Sasso, why was he
20  not copied on this email?
21    A   Because this was not his -- this
22  was not about him.
23    Q   But all of your feelings derived
24  from your discussion with him and what he
25  alleged Larry said to him; correct?

W. KHAHAIFA

1
2    A   Yes.
3    Q   All right.  So did you ever
4  advise Larry that your feelings about the
5  situation came from your discussion with
6  Mr. Sasso?
7    A   I'm sure I did.
8    Q   When you say you're sure you
9  did, is that something that you likely
10  would have done?  Or you have a distinct
11  recollection of doing that?
12    A   I'm -- it's something I would
13  likely have done because I didn't get this
14  conversation from Larry Heisler directly,
15  at first.
16    Q   Okay.
17    A   But I do not have a
18  recollection.
19    Q   When you say you didn't have
20  this information or this discussion -- I
21  apologize; I don't remember the exact word
22  you just used -- from Larry directly at
23  first, did you ever have a discussion with
24  Larry where you felt he was accusing you
25  of interfering with Amelia's observance of

Page 70

W. KHAHAIFA

1
2 the Sabbath?  Sorry.
3     A    No, I don't think I had a
4 conversation with Larry where I said he
5 was accusing me.  The only thing about
6 that was this -- this email exchange,
7 where, as I said, she went to him, in my
8 estimation, with her complaints, which I
9 believe were contrived and pretentious and
10 false.  I did not say that he accused me,
11 and he never specifically accused me.
12     Q    What led you to believe that
13 Amelia had gone to Larry with contrived,
14 pretentious, and false accusations?
15     A    Again, the conversation that I
16 had with Paul Sasso and him telling me of
17 Larry's reaction.
18     Q    Okay.  Did you ever speak to
19 Amelia about her discussion with
20 Mr. Heisler?
21     A    No.
22     Q    Did you ever speak to Amelia
23 about this email exchange that we see as
24 Exhibit 4?
25     A    No.  I just sent the email, and

Page 71

W. KHAHAIFA

1
2 I included her on it.
3     Q    Okay.  Following this -- well,
4 how did that incident get resolved if at
5 all?  Meaning the incident of the approval
6 of the deficit in her timesheet.
7     A    Larry Heisler, the head of
8 torts, signed off on her timesheet,
9 excusing the 45 minutes.
10     Q    Did you have any feelings good,
11 bad, or indifferent about Mr. Heisler
12 stepping in and doing that?
13     A    Indifference.
14     Q    Did you ever speak to anybody
15 else at Transit regarding this incident
16 with Amelia and her timesheet?  And when I
17 say that, I mean do you have a distinct
18 recollection of doing that?  Not "I would
19 have spoken to."
20     A    I do not have a distinct
21 recollection, other than speaking to Larry
22 and Paul, about this issue.
23     Q    When you spoke to Paul about the
24 issue, what was your reaction to hearing
25 what he reported Larry had said to him?

Page 72

W. KHAHAIFA

1
2     A    I cried.
3     Q    Did you cry to Larry when you
4 spoke with him?
5     A    No.
6     Q    Do you want to take a minute,
7 Ms. Khahaifa?
8     A    Yes.
9     Q    Okay.  We'll take a minute to go
10 off the record.
11        THE REPORTER:  Sure.  Off the record,
12     11:35.
13        (Off the record.)
14        THE REPORTER:  Back on the record,
15     11:38.
16        MS. VINCI:  Could you just read back
17     the last question and answer?
18        THE REPORTER:  Sure, one moment.
19        (The reporter read the record as
20        requested.)
21 BY MS. VINCI:
22     Q    Other than the email that we see
23 as Exhibit 4, did you ever discuss with
24 Larry your feelings about or stemming from
25 your conversation with Paul Sasso?

Page 73

W. KHAHAIFA

1
2     A    I don't recall.
3     Q    How, if at all, did this
4 incident affect your relationship with
5 Larry, moving forward?
6     A    It didn't affect my relationship
7 with Larry.
8     Q    How, if at all, did it affect
9 your relationship with Amelia?
10     A    It didn't affect my relationship
11 with Amelia either.
12     Q    Did you ever discuss with Amelia
13 that you thought she had raised a false
14 allegation to Larry, stemming from the
15 timesheet issue?
16     A    I never brought this issue up to
17 her again after this.  In my eyes, it was
18 over after this email exchange.
19     Q    Did she ever bring it up with
20 you after this email exchange?
21     A    No.  She never brought it up
22 with me ever.
23     Q    Following this incident in 2016,
24 were you aware of any other complaints
25 that Amelia had made against you to anyone

19 (Pages 70 - 73)

Page 74

W. KHAHAIFA

1
2 else at Transit?
3    A    No.
4    Q    I'm going to show you what we've
5 previously marked as Exhibit 5.
6        (Plaintiff Exhibit 5 was marked
7        for identification.)
8        Once again, ma'am, by all means,
9 you can take your time to read this line
10 by line.  I don't expect you to.  I'll,
11 you know, kind of point you to where I'd
12 like you to read, but take your time to
13 review it.  Let me know when you're ready
14 to proceed.
15    A    Okay.
16    Q    Do you recognize this document?
17    A    Yes.
18    Q    I'll represent to you that this
19 was the complaint that was filed on behalf
20 of Ms. Yehoshua, in this action, by her
21 prior counsel.  Have you ever seen this
22 document before?
23    A    Yes.
24    Q    Was this one of the complaints
25 that you reviewed in preparation for your

Page 75

W. KHAHAIFA

1
2 deposition?
3    A    Yes.
4    Q    If you can turn to page 5, it's
5 paragraph 31 and 32.  This refers to the
6 issue we've just been talking about,
7 relating to the timesheet and Ms.
8 Yehoshua's report to Mr. Heisler.  Do you
9 see that?
10    A    I do.
11    Q    Okay.  And then if you jump down
12 to paragraph 35, which continues on to the
13 next page, you can just read that to
14 yourself and let me know when you're
15 ready.
16    A    Read 31 through 35?
17    Q    Just 35.  If you'd like to read
18 before or after for context, by all means,
19 I will not stop you.
20    A    Okay.
21    Q    How if at all did -- well,
22 strike that.  Did you ever hear of
23 Ms. Yehoshua complaining about her
24 workload or work assignments after this
25 email exchange of 2016?

Page 76

W. KHAHAIFA

1
2    A    Did she -- did I ever hear of
3 her complaining?
4    Q    Yes.  Did anyone else tell you
5 Ms. Yehoshua's complaining about her
6 workload?
7    A    No.
8    Q    Did she ever complain to you
9 about her workload?
10    A    She complained to me about work,
11 and I guess that would encompass her
12 workload.
13    Q    What about work did she complain
14 of?
15    A    When I gave her assignments, she
16 would complain that she had these other
17 assignments that she still has to handle.
18    Q    Did Ms. Yehoshua's workload or
19 work assignments change in any way
20 following the timesheet incident in 2016?
21    A    No.
22    Q    In 2016 how were you dividing
23 work assignments between the attorneys in
24 the trial unit?
25    A    In 2016 I believe there were 3

Page 77

W. KHAHAIFA

1
2 attorneys there.  And as I said, I
3 would -- I would, monthly, look at my
4 trial calendar, and it was usually a
5 couple of months ahead.  And I would
6 determine which cases fit into the
7 attorneys' schedules.  And I would assign
8 them based off of that.  The ones that
9 needed to be handled by outside counsel,
10 they were cases that would go to outside
11 counsel.  Some of them based off the fact
12 that they were more complex.  And based
13 off of the surplus, so to speak, of cases
14 that I had after assigning to the in-house
15 attorneys.  And that's how I assigned it.
16    Q    Were there any sort of
17 guidelines, whether formally at Transit or
18 maybe that you just created yourself, to
19 know sort of when was too much for one
20 attorney to be taking on?  Was there
21 any -- keep work assignments below X
22 amount per attorney or caseload below X
23 amount of cases per attorney?
24    A    There were no guidelines.  And I
25 took it upon myself -- I kept the

Page 78

W. KHAHAIFA

1           W. KHAHAIFA
2  calendar, which consisted of each
3  attorney's trial calendar.  And that's how
4  I determined whether there was
5  availability.  It was on them to control
6  their calendar, with all the other cases.
7         In other words, when I assign
8  you a trial, and you have a trial three
9  months down the road on a specific date,
10 it would not be in your best interest to
11 adjourn this trial to that date.  So they
12 had great control of their own calendar.
13 The trials were assigned to them
14 sporadically, and it wasn't a heavy
15 caseload at all.
16        Most of the trial cases were not
17 tried.  Most of them were indeed settled,
18 and most of them were settled by me during
19 the pretrial conference.
20    Q   When you took over the role of
21 borough chief for the unit, to your
22 knowledge, did Transit have a bit of a bad
23 reputation with the New York Supreme
24 county judges?
25    A   I wouldn't say Transit had a bad

Page 79

W. KHAHAIFA

1           W. KHAHAIFA
2  reputation.  No.
3     Q   Was it expressed to you, at any
4  point after assuming or at the time you
5  assumed the role, that Transit wanting to
6  move more in the direction of showing the
7  courts that Transit would settle cases or
8  could resolve cases?
9     A   Yes, I would say that.  Can you
10 repeat that question?  I'm sorry.
11    Q   Sure.  At or around the time
12 that you became the borough chief in the
13 unit, did anyone express to you that, you
14 know, the judges wanted to see Transit
15 settling more cases and that is where the
16 direction of the unit should be, to try
17 and get cases resolved?
18    A   No, I don't think that's an
19 accurate statement.  What I can say is
20 that there was a reputation that Transit
21 wasn't settling cases.  And so when I took
22 over, there was definitely a goal of -- of
23 settling more cases.
24        More specifically, when Danielle
25 Ruttman was the borough chief, a lot of

Page 80

W. KHAHAIFA

1           W. KHAHAIFA
2  cases were not settling because she didn't
3  want to give authority beyond a certain
4  amount on certain cases.  And so a lot of
5  cases went to trial that that could have
6  been settled amicably.  So once I took
7  over, there was a goal of us getting more
8  settlements done, so.
9     Q   Going back to Ms. Yehoshua's
10 complaints about work, how often would she
11 complain about work to you, as you
12 described?
13    A   That's hard to say.  It was
14 generally when I was giving her an
15 assignment.  It wasn't every time, but she
16 complained.
17    Q   Did any other attorneys
18 complain -- we'll stick with 2016 -- about
19 already having assignments when you gave
20 them new work to do?
21    A   No.
22    Q   Okay.  At any point in time, did
23 Mr. Heisler ask you for a list of the
24 matters that Ms. Yehoshua was handling?
25    A   No, not that I recall.

Page 81

W. KHAHAIFA

1           W. KHAHAIFA
2     Q   At any point in time did
3  Mr. Heisler approach you about and speak
4  to you about the workload that
5  Ms. Yehoshua was handling?
6     A   No.
7     Q   Did you keep a, other than the
8  calendar that you maintained and could
9  oversee, did you keep any sort of list or
10 record of what assignments and what
11 matters each attorney was handling in the
12 unit?
13    A   I did at one point.
14    Q   At which point?
15    A   In the beginning.  In the very
16 beginning.
17    Q   When did you stop doing that?
18    A   I don't recall.  It just -- it
19 got too tedious.  And I couldn't keep up
20 with the lists, keeping up with the list,
21 so I stopped.
22        MS. VINCI:  So to the extent not
23    already provided, we'll call for the
24    production of any sort of case lists,
25    noting the matters being handled by the

21 (Pages 78 - 81)

Page 82

W. KHAHAIFA

1
2    attorneys in the New York trial unit, and
3    we'll follow up in writing.
4 BY MS. VINCI:
5    Q    Do you know if the attorneys
6 themselves kept their own list of the
7 matters and assignments that they had?
8    A    I have no idea.
9    Q    That was not a requirement for
10 them to do?
11    A    That was not a requirement for
12 me.  I think it would be smart to do it,
13 but I didn't require that.
14    Q    When you say that, maintaining
15 the lists, you know, part of the reason
16 was it was tedious; you could not keep up.
17 Was there, at some point, a noted increase
18 in the amount of matters being handled at
19 the New York County unit?
20    A    No, what I mean by that is I
21 handled the pretrial settlement
22 conferences, for the most part.  If I have
23 a case that I assigned to any specific
24 attorney, the trial date is four months
25 down the road, but I have a settlement

Page 83

W. KHAHAIFA

1
2 conference today.  And I conference the
3 case.  They may conference the case with
4 me as well.  And that case settles.
5         Now I have to go back to that
6 list and wipe that case off the list.  And
7 that's what I mean by it became too
8 tedious to continue doing it that way.
9    Q    Did you ever handle a pretrial
10 conference or a settlement conference with
11 Amelia?
12    A    Yes.
13    Q    How many times?
14    A    Multiple.
15    Q    How would you describe her
16 performance during those conferences?
17    A    For the most part, she didn't
18 perform during those conferences.  It was
19 her case.  If there were information that
20 I didn't have about the case, her role
21 would be to -- to add that information
22 during the negotiations.  I generally
23 negotiated the case.  There -- there
24 wasn't a lot of input on that front.
25    Q    And was that true for all the

Page 84

W. KHAHAIFA

1
2 attorneys who would accompany you to those
3 conferences?
4    A    Yes.
5    Q    Other than at settlement
6 conferences, did you accompany Amelia to
7 any other court appearances during the
8 time you worked with her?
9    A    I did.  Not -- and not in the
10 context of -- of her -- being her manager.
11    Q    In what context did you appear
12 with her?
13    A    Danielle Ruttman directed me to
14 go to court with her, to handle a
15 conference with a judge, on a case that
16 she was assigned for trial because there
17 had been a contentious, heated discussion
18 with the plaintiff's attorney, between her
19 and plaintiff's attorney.  And the judge
20 wanted that case conferenced.
21    Q    How would you describe Amelia's
22 demeanor during that conference that you
23 attended?
24    A    She was very adversarial.  Her
25 and the plaintiff's attorney were very,

Page 85

W. KHAHAIFA

1
2 like, I would say overly adversarial to
3 each other.  Very argumentative.  They
4 spoke over each other.  They didn't listen
5 to the judge when the judge was trying to
6 calm things down.
7    Q    Do you believe that Amelia was
8 being unprofessional during that
9 conference?
10    A    Yes.
11    Q    Do you believe that plaintiff's
12 counsel was being unprofessional during
13 the conference?
14    A    Yes.
15    Q    Did you report that to Danielle
16 Ruttman?
17    A    I believe I did.
18    Q    What, if anything, was done to
19 your knowledge?
20    A    I don't think anything was done.
21    Q    Other than that time that you
22 accompanied her at Danielle Ruttman's
23 request, while you were borough chief, did
24 you accompany Amelia to any court
25 appearance other than settlement

22 (Pages 82 - 85)

Page 86

```
                W. KHAHAIFA
1
2  conferences?
3      A   No, I don't think I did.  We may
4  have been in court at the same time, but
5  I -- to say I accompanied her?  No.
6      Q   That was my next question.  Did
7  you ever have any occasion, while you were
8  borough chief, to observe Amelia during a
9  court appearance other than, you know,
10 being there with her?  Were you in the
11 room for another case or any opportunity
12 to observe how she performed?
13     A   Yes.
14     Q   On how many times?
15     A   I can't count.
16     Q   Was this a weekly thing?
17 Monthly?  How often would it happen?
18     A   It's hard to quantify.  My
19 settlement conferences were weekly, but
20 there were also other conferences,
21 pretrial conference, compliance
22 conferences, where, occasionally, I would
23 be in court but not on any regular basis.
24 I've also observed her on -- on trials.
25 So I can't say with any specificity how
```

Page 87

```
                W. KHAHAIFA
1
2  often or how -- what the intervals were.
3      Q   How would you describe her as a
4  trial attorney, based on your
5  observations?
6      A   She was an average trial
7  attorney to me.
8      Q   Was she an effective trial
9  attorney?
10     A   She might have been.  Yeah, I
11 guess you could say that, depending on the
12 case.
13     Q   In 2016 do you recall how many
14 trials Amelia handled?
15     A   No.
16     Q   Do you recall how many trials
17 she won versus lost in 2016?
18     A   No.
19     Q   What about in 2017?
20     A   No.
21     Q   What about 2018?
22     A   No.
23     Q   What about -- same question for
24 2019?
25     A   No.
```

Page 88

```
                W. KHAHAIFA
1
2      Q   During the times that you were
3  able to observe her at trial, would you
4  describe any of her actions as being
5  unprofessional?
6      A   Yes.
7      Q   What was unprofessional about
8  what you observed?
9      A   Again, she was very -- overly
10 adversarial.  I've observed her speaking
11 over judges, yelling at judges, yelling at
12 her adversary.  Things like that.
13     Q   Did you ever speak to her about
14 your observations?
15     A   I did.
16     Q   And what was her response?
17     A   I don't recall.
18     Q   Did you ever write her up based
19 on your observations?
20     A   No.
21     Q   Did you ever complain to your
22 supervisors about your observations?
23     A   I did.
24     Q   Okay, and what was their
25 response?
```

Page 89

```
                W. KHAHAIFA
1
2      A   I don't recall.
3      Q   Do you know if they wrote her up
4  as a result of you telling them your
5  observations?
6      A   I do not think so.
7      Q   Did you continue to assign her
8  trials after having these observations?
9      A   Yes.
10     Q   If you felt that she was
11 unprofessional during trials, why would
12 you continue to assign them to her?
13     A   She wasn't unprofessional every
14 time she was on trial, and I don't believe
15 she was unprofessional every minute during
16 the trial.  I believe that that was part
17 of her personality and how she conducted
18 herself.  And I didn't think that that
19 would change, regardless of whether
20 somebody told someone that, whether there
21 were consequences doled out as a result,
22 and I don't think that any of them that I
23 saw rose to the level of her not being
24 able to go back into trial.
25     Q   Going back to the complaint and
```

23 (Pages 86 - 89)

W. KHAHAIFA

1
2 paragraph 35, there's a reference here:
3 "Alleged Khahaifa overloaded plaintiff
4 with new additional work assignments on
5 Fridays."  Do you see that?
6    A  I do.
7    Q  Would you assign Ms. Yehoshua
8 assignments on Fridays after she left for
9 the observance of the Sabbath?
10    A  I -- I assigned assignments to
11 everybody on any given day.  It was
12 random; it didn't matter.  Nothing that I
13 assigned was due immediately, so it was
14 irrelevant.
15    Q  Do you know if you had ever
16 given Ms. Yehoshua an assignment on Friday
17 that was due on Monday?
18    A  I doubt very seriously that I
19 would ever do that because I took my time
20 to make sure that everybody -- every
21 assignment that I gave to everyone, I made
22 sure they had enough time to do their
23 assignment.  I would not assign something
24 on a Friday that was due on Monday, other
25 than a deposition.  And that would have

W. KHAHAIFA

1
2 been assigned as soon as that deposition
3 was confirmed, which would not be in the
4 wee hours of the evening.
5    Q  Ms. Yehoshua left early on
6 Fridays; correct?
7    A  She left an hour early, yes.
8    Q  Did you ever assign Ms. Yehoshua
9 a deposition on Friday that was to move
10 forward on Monday?
11    A  I don't recall.  Can I just add
12 one thing also?
13    Q  Sure.
14    A  As far as the depositions go,
15 that calendar was done on a weekly basis,
16 so it's not something that happened the
17 day before, unless it was an emergency of
18 some sort.  So I do not think I ever
19 assigned her a deposition on Friday for
20 Monday.
21    Q  But you can't say for sure?
22    A  I can't.  I cannot.
23    Q  Were you ever told that
24 Ms. Yehoshua had complained about you
25 giving her work assignments on Friday?

W. KHAHAIFA

1
2    A  Never.
3    Q  Were you ever told that
4 Ms. Yehoshua complained that the
5 assignments you gave her interfered with
6 her observance of the Sabbath?
7    A  Never.
8    Q  This paragraph also goes on to
9 reference "is stripping plaintiff of her
10 trial assistant."  That would be
11 Mr. Thompson; correct?
12    A  That would be Mr. Thompson.
13    Q  Okay.  And we spoke about that
14 issue earlier this morning.  Is there
15 anything that we have not already spoken
16 about that you would like to add,
17 regarding that issue?
18    A  Regarding what issue?
19    Q  The change to Ms. Yehoshua's
20 trial assistant.
21    A  Oh, no, unless you have
22 something else to ask me.
23    Q  Okay.  This goes on to allege
24 that you insisted that Ms. Yehoshua use
25 her paid time off allotment on Jewish

W. KHAHAIFA

1
2 holidays even when she was working; you
3 see that?
4    A  I see.
5    Q  Okay.  Do you recall anything of
6 that nature happening?
7    A  No, I cannot -- I cannot force
8 anybody to do anything about their time
9 off.  They are the ones who decide what
10 type of time they use.
11    Q  When Ms. Yehoshua would not come
12 into work in observance of a Jewish
13 holiday, to your knowledge, did she have
14 to use any sort of time off allotment to
15 cover those hours?  Or was it
16 accommodated?
17    A  She used to -- for my
18 recollection, she used vacation time for
19 that, unless it was a holiday that was
20 observed generally by the -- the agency.
21    Q  Going to mark this as Exhibit --
22 continuing from our last batch of
23 exhibits, as Exhibit 11.  I came prepared
24 today.
25 //

Page 94

W. KHAHAIFA

1
2    (Plaintiff Exhibit 11 was marked
3    for identification.)
4        You can take a look at this,
5    ma'am.  Let me know when you're ready to
6    proceed.
7    A    Okay.
8    Q    Do you recognize this document?
9    A    I do.
10   Q    Can you identify it for the
11   record, state what it is?
12   A    It's an email between myself,
13   Amelia, and her then supervisor, Lisa
14   Urbont, regarding her timesheet.
15   Q    So and you're asking her
16   questions for as you're looking to approve
17   her timesheet; correct?
18   A    Yes.
19   Q    Why were you approving her
20   timesheet if you were not her supervisor?
21   A    Because they had not
22   procedurally changed it on paper yet.
23   Q    Had you raised that issue with
24   anybody?
25   A    I don't remember.

Page 95

W. KHAHAIFA

1
2    Q    Do you know if Ms. Urbont had
3    raised that issue with anybody?
4    A    I have no recollection.  I'm
5    sorry; I have no knowledge of whether she
6    did or not.  Sorry.
7    Q    So in this exchange,
8    Ms. Yehoshua is explaining that, although
9    May 29th was a Jewish holiday, she worked
10   from home.  And so, that is, she did not
11   take off on 5/29; correct?
12   A    Yes.
13   Q    Okay.  Why were you asking her
14   if she took off on May 29th?
15   A    Because she -- when she was in
16   my unit, she told me ahead of time all of
17   the Jewish holidays that she was taking
18   off.  And I knew that that was one of the
19   holidays, and so I asked her if she took
20   it off because she didn't indicate it on
21   her timesheet.  So I just wanted to know
22   whether she did or didn't so that I could
23   sign the timesheet.
24   Q    And when she indicated that she
25   did not take it off, that she had worked

Page 96

W. KHAHAIFA

1
2    from home, did you approve her timesheet?
3    A    I did.
4    Q    On this occasion was she
5    required or made to use her vacation time
6    for that day?
7    A    I believe she had to use her
8    time.  I don't know what time she used.  I
9    can't recall.
10   Q    To your knowledge, had she
11   raised any objection to having to use her
12   time for that day?
13   A    No, because that was the
14   procedure all along.  I'm sorry.  She
15   didn't use it.  She -- that day she did
16   not use.  She said she worked from home,
17   so she didn't use any time that day.  She
18   was paid for that day.  She didn't have to
19   use her allotted time.
20   Q    Okay.  Do you know any time or
21   can you recall any time that Ms. Yehoshua
22   reported that she worked on a Jewish
23   holiday but was still made to use her
24   vacation time for the day?
25   A    No.  I -- nobody would have to

Page 97

W. KHAHAIFA

1
2    use their vacation time if they worked on
3    the day.
4    Q    So we talked about Ms. Yehoshua
5    transferring to the Kings County unit;
6    correct?
7    A    Correct.
8    Q    Okay.  And I apologize if I
9    asked you this already, but when did that
10   go into effect?
11   A    So it was a gradual process.  It
12   was to begin January of 2020 and to be
13   transitioned by March 1st of 2020.  So,
14   officially, March 1, 2020, she was part of
15   the Kings unit.
16   Q    Who made the decision to
17   transfer Ms. Yehoshua to Kings County?
18   A    Larry Heisler.
19   Q    Did you have any involvement in
20   that decision?
21   A    I did not.
22   Q    Had you asked Mr. Heisler to
23   transfer Ms. Yehoshua out of the New York
24   unit?
25   A    I did not.

25 (Pages 94 - 97)

Page 98

W. KHAHAIFA

2    Q    Are you aware that Ms. Yehoshua
3 had repeatedly asked Mr. Heisler to
4 transfer her out of the unit?
5    A    No.
6    Q    Would it surprise you to hear
7 that Ms. Yehoshua wanted to be transferred
8 out of the unit?
9    A    Yes, it would.
10    Q    Why would that surprise you?
11    A    Because there was no indication
12 up until a complaint that she made to me
13 at one point, where she gave me an
14 indication that she probably wasn't cut
15 out to do trials.  And I took that as a
16 sign that she didn't want to be in my unit
17 again.  But prior to that, no.
18    Q    When was the complaint that she
19 indicated she did not want to do trials?
20    A    I don't recall.  This could have
21 been 2019.  I believe it was 2019.
22    Q    And if you can give me, as best
23 as you can, any context or description,
24 how did that come to your attention?
25    A    She called me.  I don't remember

Page 99

W. KHAHAIFA

2 if it was a voicemail or us talking on
3 phone, but she indicated that she had a
4 trial coming up and wanted me to reassign
5 it.  And it was also a conference that she
6 needed to adjourn or attend, and she
7 didn't want to do both.  And that's how it
8 came up.
9    Q    Okay, what was your response to
10 her?
11    A    My response to her was she has
12 to prioritize her caseload.  She had these
13 conferences well in advance notice, and
14 she should be able to adjourn it timely so
15 that it doesn't interfere.
16    Q    When a attorney in the New York
17 unit wanted to adjourn a conference, do
18 they need to seek your approval before
19 seeking that adjournment?
20    A    No.
21    Q    Would attorneys within the New
22 York trial unit sometimes cover for other
23 attorneys if one couldn't make an
24 appearance, and other would go in their
25 stead?

Page 100

W. KHAHAIFA

2    A    Yes.
3    Q    Did that require your approval
4 before it happened?
5    A    Yes.
6    Q    Why?
7    A    Because I needed to know who was
8 in the office and who was not in the
9 office.  I needed to know who was in court
10 and who was not in court.  It was an
11 attendance issue, basically.
12    Q    So was it that they needed your
13 preapproval or they just had to give you
14 notice that it's happening?
15    A    They had to give me notice.  And
16 in -- on some occasions, it would probably
17 be an approval issue also.  I mean, if
18 you're having someone cover your jury
19 selection, that would need to be approved.
20 But for the most part, it was just to -- a
21 notice thing.
22    Q    Did you ever speak to anyone at
23 Transit about Ms. Yehoshua report to you
24 that she wanted a trial reassigned and
25 this issue with the conference?

Page 101

W. KHAHAIFA

2    A    I don't think so.  Actually,
3 I -- I spoke to Larry about that issue.
4 Yeah, I did.  And I'm sure I spoke to Gail
5 as well.
6    Q    During that discussion with
7 Amelia, did she say to you she did not
8 want to do any trials anymore or just
9 wanted the one trial reassigned?
10    A    I don't think it was about the
11 one trial being assigned.  I -- I recall
12 her telling me that maybe she's not cut
13 out for this or something to that extent.
14 I can't sit here and tell you what she
15 meant by that.
16    Q    What did you understand her to
17 mean by that?
18    A    I understood her to mean that I
19 don't think she wanted to do trials.
20 Like, she was getting burned out.  It was
21 too much for her.
22    Q    Did you do anything to adjust
23 her caseload after you understood or
24 believed she was saying she was getting
25 burned out?

26 (Pages 98 - 101)

Page 102

W. KHAHAIFA

2    A   No, I didn't think there was
3 anything to do to her caseload 'cause she
4 didn't have a heavy caseload.
5    Q   What was her caseload at the
6 time?
7    A   I don't recall.
8    Q   Do you recall if it was greater
9 than the average 15-to-20 cases?
10    A   I doubt it was that, that it was
11 greater than that, but I can't tell you
12 right now.  But I can tell you that her
13 case load was small in reference and in
14 context to other attorneys' caseloads.
15    Q   What type of caseload were other
16 attorneys handling?
17    A   Three hundred, two hundred
18 cases.
19    Q   In the New York unit?
20    A   In the New York unit with
21 pretrial.
22    Q   How many pretrial cases did
23 Amelia have on her?
24    A   I'm not sure.  I didn't give her
25 too many because most of the pretrial

Page 103

W. KHAHAIFA

2 cases were -- tended to be major cases.  I
3 could guesstimate, but I -- I couldn't
4 tell you how many.  Most of her caseload
5 were trials.  So in other words, she had
6 these cases for trial purposes.  So if, at
7 the settlement conference, it was not
8 settled at any point before the trial,
9 then she would have that case for trial.
10    Q   How many trials were on the
11 other trial unit attorneys' caseload in
12 2019?
13    A   I would say they had comparable,
14 trialed.
15    Q   Did Amelia have the highest, the
16 largest caseload of trials?
17    A   Amelia had the lowest amount of
18 everything, but they were comparable in
19 terms of the trialed.
20    Q   Why did Amelia have the lowest
21 caseload?
22    A   Because, at a certain point, you
23 get tired of somebody pushing back and
24 telling you that they have these other
25 assignments.

Page 104

W. KHAHAIFA

2    Q   Did you ever speak with Amelia
3 about her pushing back and she can't do
4 that?
5    A   I did.
6    Q   How --
7    A   I don't think it was often at
8 all.  It was probably once.
9    Q   Okay.  When?
10    A   I don't remember.
11    Q   What was her response?
12    A   I don't remember.
13    Q   What is your understanding of
14 why Amelia transferred --
15    A   Because she could no longer
16 attend conferences in Supreme New York.
17 And therefore, she couldn't cover her own
18 cases.  She couldn't cover conferences,
19 and she couldn't try cases in New York
20 County.
21    Q   How did it come to your
22 knowledge that she was not allowed to
23 appear in New York County Supreme anymore?
24    A   I got called in by the
25 administrative judge who advised that she

Page 105

W. KHAHAIFA

2 had gotten multiple complaints from
3 multiple judges and that she was having
4 trouble finding trial judges to cover
5 cases that she had for trial.  And she was
6 afraid that she was not going to be able
7 to, at a certain point, because she
8 wouldn't have any judges left that didn't
9 have an issue with her.  And so she didn't
10 want her in courthouse.
11    Q   So it wasn't that you were told,
12 "If she comes in here, Amelia will be
13 physically removed"?  It was that it's
14 difficult to find a judge to hear her
15 cases?
16    A   I'm confused with your question.
17    Q   So you had said your
18 understanding of why she was transferred
19 was because she could no longer attend
20 conferences in New York County; correct?
21    A   Correct.
22    Q   Okay.  But the administrative
23 judge did not say she's not allowed to
24 attend conferences.  She said she was
25 having difficulty finding judges who

27 (Pages 102 - 105)

Page 106

W. KHAHAIFA

1
2 wanted Amelia to appear before them?
3    A    Correct, but that was not your
4 question to me.  Your question was how did
5 it come about to me that she was not
6 allowed to appear in Supreme New York
7 anymore.  There were other judges that
8 made complaints and said they didn't want
9 her in their courtrooms for conferences or
10 otherwise.  Not the administrative judge.
11 The administrative judge did not want her
12 in Supreme New York, period.
13    Q    But did any judge, clerk, anyone
14 at New York Supreme, say, "Amelia Yehoshua
15 is not allowed to step foot in this
16 courthouse"?
17    A    The administrative judge.
18    Q    She said, "She's not allowed to
19 come to the courthouse," or, "I do not
20 want her in the courthouse"?
21    A    Okay.  She -- she said she
22 didn't want her in the courthouse.  No,
23 there was no judge that said, "She is not
24 allowed, and I will arrest her."  No,
25 there was nobody who did that.  They all

Page 107

W. KHAHAIFA

1
2 expressed their opinions that they did not
3 want her in the courthouse.
4    Q    So your understanding that she
5 was transferred because of this issue with
6 the judges and not being welcomed in the
7 courthouse, why do you believe that is why
8 she was transferred?
9    A    Because that was the action that
10 Larry took after this happened.
11    Q    Would it surprise you to learn
12 that Mr. Heisler testified that the
13 judges' complaints had nothing to do with
14 Amelia's transfer?
15    A    Yes, that would surprise me.
16    Q    Did he ever tell you that the
17 complaints were the reason for Amelia's
18 transfer?
19    A    Yes, we had a specific
20 conversation of what was going to happen,
21 and that was the result.
22    Q    When was that conversation?
23    A    That conversation was -- I
24 believe it was in December of 2019.
25    Q    During that conversation, did

Page 108

W. KHAHAIFA

1
2 Mr. Heisler say, "Because of this, I will
3 transfer her to Kings County"?
4    A    What he said was he has no
5 alternative but to transfer her to Kings
6 County.
7    Q    How were you formally informed
8 of the transfer and the process for the
9 transfer for Amelia?
10    A    How was I formally informed?
11    Q    Yes.
12    A    My conversation with Larry.
13    Q    Okay.  So is that the December
14 2019 conversation?
15    A    Yes.
16    Q    So in that conversation, you
17 said Larry stated he has no alternative
18 but to transfer Amelia to Kings County.
19 So was it also, in that conversation,
20 decided, "I will transfer her, and this is
21 the process -- gradual -- "
22    A    Yes.  And that's when he said it
23 will start -- sorry, cut you off -- it
24 will start January of 2020.  That's when
25 Lisa is allowed to start giving her work.

Page 109

W. KHAHAIFA

1
2 And she would have to complete the
3 assignments that she had on her New York
4 cases, and they would be reassigned as she
5 completed.  And with the thought that, by
6 March 2020, she would be done with
7 everything New York.
8    Q    Did you insist on the transfer
9 being immediate?
10    A    No, I did not.
11    Q    Would it surprise you if Larry
12 testified that you insisted that it be
13 immediate?
14    A    Yes, it would.
15    Q    Would it surprise you if Larry
16 testified that, come January of 2020, you
17 should have had nothing to do with Amelia
18 and her work?
19    A    Yes, it would.
20    Q    Did you speak to Mr. Heisler
21 from January 2020 through March 1, 2020,
22 about your continued interactions with
23 Amelia and the work she was doing for the
24 New York unit?
25    A    No, I don't recall speaking to

28 (Pages 106 - 109)

Page 110

W. KHAHAIFA

1
2 him about that.
3    Q   Did you have any discussions
4 with Ms. Urbont prior to or at the time
5 of -- strike that.  Did you have any
6 discussions with Ms. Urbont, in or around
7 January of 2020, regarding Amelia's
8 transfer to her unit?
9    A   I don't recall.
10   Q   Did you ever feel that
11 Mr. Heisler favored Amelia?
12   A   Yes.
13   Q   Why?  What led you to believe
14 that?
15   A   Because she went to him.  She
16 did not have any regard for the chain of
17 command, and he allowed it.  He
18 entertained it regularly.  And she went to
19 him for everything.  Yeah.
20   Q   In your view, was there
21 something improper about Amelia going to
22 Larry about her complaints or concerns?
23   A   Other than disregarding the
24 chain of command, no.
25   Q   If she had not disregarded the

Page 111

W. KHAHAIFA

1
2 chain of command, would she have then,
3 instead of going to Larry, gone to Gail?
4    A   I'm sorry; I don't understand
5 your question.
6    Q   If Ms. Yehoshua had an issue
7 regarding you, if she were respecting the
8 chain of command, who would you expect her
9 to go to regarding that issue?
10   A   I would still expect her to come
11 to me, but can't control people.
12   Q   There was nothing, no policy, at
13 Transit that you're aware of that stated
14 Ms. Yehoshua could not go directly to
15 Larry?
16   A   No, but the chain of command is
17 the chain of command.
18   Q   Anything else that you observed
19 or felt that led to your belief that Larry
20 favored Amelia?
21   A   I mean, other than those
22 observations, I mean, you know, he -- he
23 helped her a lot with her work.  He got
24 other people to help her with her work.
25 For instance, the appeals attorney was

Page 112

W. KHAHAIFA

1
2 often tasked with doing her research, on
3 her cases, when she's on trial.  And,
4 yeah, just things like that.
5    Q   Do you know of any other
6 attorneys in your unit who would go to
7 Larry for help with a legal issue or the
8 trials they were handling?
9    A   I'm not sure.  I know a lot of
10 people went to Larry when they needed
11 help.  But not -- they didn't have the
12 speed dial.
13   Q   And you felt that Amelia had
14 Larry on speed dial?
15   A   I know she had him on speed
16 dial.
17   Q   How do you know she had him on
18 speed dial?
19   A   Because she called him all the
20 time.
21   Q   How often would the other
22 attorneys call Larry?
23   A   I don't think people call Larry
24 very often.
25   Q   Okay.  How often did you observe

Page 113

W. KHAHAIFA

1
2 other attorneys call Larry?
3    A   I didn't.
4    Q   How often did you observe Amelia
5 call Larry?
6    A   I observed her call Larry a few
7 times.
8    Q   And what is a few?
9    A   I don't know.
10   Q   Five?  Ten?  Twenty?
11   A   I don't know.  I don't know.
12   Q   Do you know if Mr. Heisler is
13 also Jewish?  Correct?
14   A   Yes.
15   Q   Did you believe that the fact
16 that both he and Amelia were Jewish
17 "lended" anything to his favoritism of
18 her?
19   A   No, I didn't know what "lended"
20 to his favoritism of her.  I still don't.
21   Q   Did you ever confront Larry
22 about what you believe to be his
23 favoritism of Amelia?
24   A   No.
25   Q   Why not?

29 (Pages 110 - 113)

Page 114

W. KHAHAIFA

1
2    A    Because I'm not going to
3    confront my boss.
4        Q    Did you feel that his favoritism
5    of Amelia interfered with your ability to
6    be Amelia's supervisor?
7        A    At times.  I mean, I brought it
8    to his attention, but.
9        Q    What specifically did you bring
10   to his attention?
11       A    Just her behavior and my
12   inability to do my job when she's not
13   allowing me to do my job.
14       Q    And what was his response?
15       A    I don't recall.
16       Q    Starting in January of 2020,
17   did, to your knowledge, Ms. Urbont give
18   Ms. Yehoshua any work assignments?
19       A    I don't know about work
20   assignments.  I just know that we had a
21   trial at some point.  I don't recall.
22       Q    Did you ever speak to Ms. Urbont
23   at the time of Amelia's transfer, so
24   January 2020, about your issues with
25   Amelia?

Page 115

W. KHAHAIFA

1
2    A    I don't think so.
3        Q    Did you ever speak, at that
4    time, to Ms. Urbont about your feeling
5    that Amelia was favorited by Mr. Heisler?
6        A    No.
7            MS. VINCI:  We can take a -- go off
8        the record for a minute.
9            THE REPORTER:  Sure.  Off the record
10       at 12:28.
11           (Off the record.)
12           THE REPORTER:  Okay, back on record
13       12:29.
14   BY MS. VINCI:
15       Q    Okay.  Do you recall
16   Ms. Yehoshua handling the Stephanie Adika
17   trial?
18       A    Yes.
19       Q    When was that?
20       A    That -- I think that was in
21   2019.  Latter part of 2019, I believe.
22       Q    Did you have any opportunity to
23   observe Amelia during that trial?
24       A    I think I did -- I think I did
25   go there for a brief period.  I'm not --

Page 116

W. KHAHAIFA

1
2    I -- I don't remember, but I -- I think I
3    did.
4        Q    During that trial did it come to
5    your attention that Amelia had become ill
6    with an eye infection?
7        A    I don't recall.
8        Q    Do you recall her submitting a
9    doctor's note to you regarding an eye
10   infection?
11       A    No, I don't recall.
12       Q    Do you recall her sending you a
13   picture of her swollen eye due to
14   conjunctivitis?
15       A    I don't recall -- I recall her
16   sending me pictures, but I'm not sure
17   when.
18       Q    During the Adika trial, did
19   Ms. Yehoshua ever complain to you about
20   work she was being given in addition to
21   the trial?
22       A    I don't recall.
23       Q    Do you recall a time, during
24   that trial, that you called Ms. Yehoshua
25   and she started crying because of how

Page 117

W. KHAHAIFA

1
2    often you were assigning her things and
3    texting her?
4        A    No.
5            MS. VINCI:  So as we discussed, now
6        would be a good time to take a lunch
7        break.  It is 12:31, so I think we said 30
8        minutes.  Come back around one o'clock?
9            THE WITNESS:  Okay.
10           MS. VINCI:  Okay.
11           THE REPORTER:  Okay.  Off the record,
12       12:31.
13           (Off the record.)
14           THE REPORTER:  Back on the record at
15       1:10 p.m.
16   BY MS. VINCI:
17       Q    Welcome back, Ms. Khahaifa.  We
18   just took a short lunch break.  Do you
19   understand that you're still under oath,
20   ma'am?
21       A    Yes.
22       Q    Following Amelia's transfer to
23   the Kings County unit, which I believe you
24   testified became effective around March
25   2020; is that right?

30 (Pages 114 - 117)

Page 118

W. KHAHAIFA

1
2    A    Correct.
3    Q    Following that transfer Amelia
4  was issued a notice of disciplinary
5  charges, otherwise known as a DAN.  Do you
6  recall that?
7    A    I do.
8    Q    When did you first learn about
9  the first DAN?
10    A    I first learned about the first
11  DAN, probably, the day before or the same
12  day that it was issued.
13    Q    Right.  So at or about the time
14  that it was issued?
15    A    Yes.
16    Q    How did you learn about it?
17    A    I got a call or an email from
18  David Farber.
19    Q    So I'll show you what was
20  previously marked as Exhibit 7.
21        (Plaintiff Exhibit 7 was marked
22        for identification.)
23        Take as long or as short of a
24  time as you would like to review that.
25  Let me know when you're ready to proceed.

Page 119

W. KHAHAIFA

1
2    A    Okay.
3    Q    Do you recognize this exhibit?
4    A    I do.
5    Q    Is this the first DAN notice to
6  Ms. Yehoshua that we just started talking
7  about?
8    A    Yes.
9    Q    Okay.  And it's dated June 12,
10  2020; correct?
11    A    Yes.
12    Q    At that time you were no longer
13  Ms. Yehoshua's supervisor; correct?
14    A    Correct.
15    Q    That was Ms. Urbont who had
16  taken over?
17    A    Correct.
18    Q    To your knowledge, why was
19  Mr. Farber calling you to discuss this
20  DAN?
21    A    I do not know.
22    Q    Did you ever ask him why he was
23  calling you?
24    A    No, I did not.
25    Q    Do you know if he spoke with Ms.

Page 120

W. KHAHAIFA

1
2  Urbont?
3    A    I have no idea.
4    Q    What did Mr. Farber tell you,
5  during that call, when you first learned
6  about the DAN?
7    A    He told me that there had been
8  an investigation by the IG's office and
9  that they were recommending dismissal.
10    Q    Were you aware, prior to
11  speaking to Mr. Farber, that there had
12  been an investigation by the Inspector
13  General's office?
14    A    No, I wasn't.
15    Q    Had you ever been contacted by
16  anyone from the Inspector General,
17  regarding Amelia?
18    A    Yes.
19    Q    When was that?
20    A    I don't recall when that was.  I
21  don't recall.
22    Q    Who contacted you?
23    A    I don't recall that either.
24    Q    Okay.  What, if anything -- was
25  any information was shared by that person

Page 121

W. KHAHAIFA

1
2  from the IG's office with you at that
3  time?
4    A    They asked me questions.
5    Q    What kind of questions?
6    A    With regard to outside counsel.
7  Basically, they wanted to know whether
8  Amelia had the authority to hire outside
9  counsel to do work.
10    Q    Did she have that authority?
11    A    She had limited authority, yes.
12    Q    What were the limits of her
13  authority?
14    A    She had the authority to have
15  outside counsel cover a deposition.  She
16  didn't have authority to retain outside
17  counsel for all purposes on any case.
18    Q    If she wanted to have an outside
19  counsel cover a deposition, would she
20  first need to seek approval from you or a
21  different supervisor to do so?
22    A    Generally speaking, no.  If it
23  were one of her cases, that -- that would
24  be the instance where she would hire an
25  outside counsel.  One of her cases that

31 (Pages 118 - 121)

Page 122

W. KHAHAIFA

1
2 were assigned to her, and she
3 weren't -- wasn't able to cover it for
4 whatever reason, she would have outside
5 counsel cover it and wouldn't necessarily
6 have to seek approval for that.
7    Q   What, if any, other information
8 did you provide to this representative
9 from the IG's office?
10   A   It was basically that.  Just
11 what her -- her authority was, in terms of
12 hiring outside counsel.
13   Q   Did you ask any questions of
14 this person from the IG's office?
15   A   No, I did not.
16   Q   Did you make any inquiries as to
17 why you were being asked questions about
18 Amelia from the IG's office?
19   A   No, I did not.
20   Q   Were you curious?
21   A   I was.
22   Q   But you didn't do anything to
23 sort of find more information about why?
24   A   No, I figured anything that I
25 was privy to, I would have known, and so.

Page 123

W. KHAHAIFA

1
2    Q   Prior to that call from the IG's
3 office, had you been aware of Amelia
4 working with an outside counsel for
5 personal purposes?
6    A   No.
7    Q   Had you been aware that Amelia
8 had a personal civil litigation ongoing
9 with her contractor?
10   A   No.
11   Q   At the time that you learned
12 about the first DAN from Mr. Farber, did
13 you talk to anybody about that?
14   A   Did I talk to anybody about the
15 DAN?
16   Q   When you first learned about it,
17 did you speak -- I'll break it up.  Did
18 you speak to Mr. Heisler about "I just
19 learned this is going to happen"?
20   A   I did.
21   Q   What did you and Mr. Heisler
22 discuss if you can recall the substance?
23   A   I can't recall the substance.  I
24 just know that I, after speaking with
25 David Farber, I either emailed him or I

Page 124

W. KHAHAIFA

1
2 texted him, "I'm sure you already know
3 about this, but please give me a call."
4    Q   Okay, when you say you emailed
5 or texted him, you mean Mr. Heisler?
6    A   Meaning Mr. Heisler, yes.  I
7 told him, "I just spoke with David Farber.
8 I'm sure you're aware, but please give me
9 a call."
10   Q   And did Mr. Heisler give you a
11 call?
12   A   I think he gave me a number to
13 call him.
14   Q   Did you then speak with him over
15 the phone?
16   A   I did.
17   Q   What was the sum and substance
18 of that discussion?
19   A   I just told him the sum and
20 substance of the conversation that I had
21 with David Farber and what was going to
22 happen.  And that was it.
23   Q   What was Mr. Heisler's response?
24   A   His response was that I
25 shouldn't sign since I had no involvement.

Page 125

W. KHAHAIFA

1
2 I really don't have to be involved, so.
3    Q   During that discussion with
4 Mr. Farber, did he ask you to sign the
5 DAN?
6    A   Yes.
7    Q   And what was your response to
8 him at that time?
9    A   I signed the DAN.
10   Q   So on that call, did you tell
11 him, "Yes, I will sign it"?  Was it left
12 open-ended?
13   A   No, it was -- it was understood
14 that he was sending it to me.  I needed to
15 sign it.  And I signed it.
16   Q   Okay.  So it wasn't a request
17 that you sign it; it was "I'm sending this
18 to you to sign"?
19   A   Yes.  It -- it was not a
20 request.
21   Q   Did you have any discomfort with
22 signing the DAN?
23   A   I did.
24   Q   Why?
25   A   Because I had no involvement

32 (Pages 122 - 125)

W. KHAHAIFA

1
2  with it.
3      Q   Did you express that to
4  Mr. Farber?
5      A   I think I did.
6      Q   What was his response?
7      A   I don't recall.
8      Q   After speaking to Mr. Heisler,
9  did you rethink signing the DAN?
10     A   No.
11     Q   Other than saying, you know,
12  "You don't have to sign this because
13  you're not involved in it," did
14  Mr. Heisler give any other reason why he
15  was advising you not to sign the DAN?
16     A   No.
17     Q   Did he ever tell you he did not
18  think that it would look good, given your
19  history with Amelia?
20     A   No.
21     Q   Okay.  So following that phone
22  call with Mr. Farber, what was your
23  next -- well, following the phone call
24  with Mr. Heisler, about the phone call
25  from Mr. Farber, what was the next step in

W. KHAHAIFA

1
2  the process in terms of your involvement
3  with the DAN?
4      A   I wasn't involved in the process
5  of the DAN.  All I did was signed it and
6  sent it to Amelia.
7      Q   Okay.  So after you spoke with
8  those two gentlemen, did you then -- well,
9  strike that.  Had you received a copy of
10  the DAN to sign prior to speaking with
11  Mr. Heisler?
12     A   I believe so.
13     Q   And had you reviewed the DAN
14  prior to speaking with Mr. Heisler?
15     A   I believe so.
16     Q   Were any of the allegations in
17  the DAN surprising to you?
18     A   Yes.
19     Q   Why?
20     A   Because I had no idea that that
21  was happening.
22     Q   Did you discuss your surprise at
23  the allegations with Mr. Heisler?
24     A   Nope.
25     Q   Did you ever tell Mr. Heisler

W. KHAHAIFA

1
2  you thought that this issue had already
3  been resolved?
4      A   No.  I didn't know that it was
5  ever an issue.
6      Q   Did you read the DAN prior to
7  signing it?
8      A   I did.
9      Q   Did you have any questions
10  regarding the DAN?
11     A   No, I didn't.
12     Q   Do you know who drafted the DAN?
13     A   I have no idea.
14     Q   If you look at the last page of
15  the DAN, there's a number of individuals
16  CC'ed on the form.
17     A   Yes.
18     Q   Do you know who C. Costa at OLR
19  is?
20     A   I think he is from HR or
21  Labor -- Office of Labor Relations.  I
22  refer to them as HR for some reason.  I
23  don't know.
24     Q   Okay.  Do you know Mr. Costa's
25  first name?

W. KHAHAIFA

1
2      A   No, I don't remember.
3      Q   Did you ever speak to Mr. Costa
4  about this DAN?
5      A   I don't think I spoke to him
6  about the DAN.
7      Q   Okay.  Did you ever speak to him
8  not about the DAN specifically but about
9  the allegations in the DAN?
10     A   No.
11     Q   What about H. Smart?  Who is
12  H. Smart?
13     A   That's Helen Smart.  She's part
14  of the law department, and I think she's
15  kind of the liaison between labor
16  relations and the law department.
17     Q   Did you ever speak to Ms. Smart
18  about this DAN?
19     A   No.
20     Q   What about the allegations in
21  the DAN?
22     A   No.
23     Q   Do you know what, if any,
24  involvement she had in creating, drafting
25  this DAN?

33 (Pages 126 - 129)

Page 130

W. KHAHAIFA

2    A    I don't know who created it,
3  what involvement anybody had in it.  I
4  don't know anything about that.
5    Q    Prior to signing the DAN, did
6  you ask anybody any questions about the
7  allegations that were in there?
8    A    No.
9    Q    Okay.  So is it fair to say you
10  received it, read it, and then signed it?
11    A    I received that.  I received the
12  investigation report from the OIG's office
13  and was told to sign it, and I signed it.
14    Q    So we mark this as Exhibit 12.
15        (Plaintiff Exhibit 12 was marked
16        for identification.)
17        Ma'am, I'm showing you what I've
18  marked as Exhibit 12.  Just take your time
19  to review that.  Let me know when you're
20  ready.  Certainly don't need you to read
21  it line by line, but you're welcome to if
22  you'd like.
23    A    Okay.
24    Q    Okay.  Is this the OIG's report
25  that you just testified receiving along

Page 131

W. KHAHAIFA

2  with a copy of the DAN?
3    A    Yes.
4    Q    And was that the first time that
5  you had seen this report?
6    A    Yes.
7    Q    Looking through the report, if
8  you go to the second page, under the
9  heading "OIG's Interviews of NYC Transit
10  Employees," that first paragraph states:
11  "The Transit Attorney's," meaning
12  Amelia's, "supervisor, the Assistant
13  General Counsel, Torts Division
14  (Supervisor)."  Do you know if that is
15  referring to you?
16    A    I assume they are referring to
17  me.
18    Q    Okay.  And then it goes on to
19  restate or paraphrase what the supervisor,
20  presumably you, told to the IG's office.
21  In reading that, does that refresh your
22  recollection at all about your discussion
23  with the OIG's office prior to learning
24  about the DAN?
25    A    Does it refresh my recollection

Page 132

W. KHAHAIFA

2  about the conversation?
3    Q    Yes.
4    A    I just -- I didn't -- not recall
5  it.  I just told you the conversation that
6  I had with the OIG.  And, yeah, it's the
7  same.
8    Q    Okay.  Other than what's
9  reflected here, you don't recall saying
10  anything else to the OIG's office?
11    A    No.
12    Q    Were you ever asked to give the
13  OIG's office any documents or access to
14  records?
15    A    I'm sorry?
16    Q    Were you ever asked to give
17  anyone from the OIG's office any documents
18  or access to records?
19    A    No.
20    Q    Do you have any idea how the
21  IG's office was able to review
22  Ms. Yehoshua's work email account?
23    A    Nope.
24    Q    Now looking to the end of the
25  OIG's report, under "Recommendations" on

Page 133

W. KHAHAIFA

2  page nine, the first recommendation is the
3  "NYC Transit should impose discipline on
4  the Transit Attorney as it deems
5  appropriate."  Do you see that?
6    A    I see that.
7    Q    And in the DAN, we see that the
8  recommended discipline is dismissal;
9  correct?
10    A    Yes.
11    Q    Do you have any idea who made
12  the determination that dismissal was the
13  appropriate sanction?
14    A    No, I don't.
15    Q    Did you ever speak to anyone
16  about that recommended dismissal?
17    A    No, I didn't.
18    Q    Did you have any opinion about
19  that recommended dismissal?
20    A    No, I didn't.
21    Q    At the time that you first
22  learned about the DAN, did you speak to
23  Ms. Urbont about it?
24    A    No, I didn't.
25    Q    Why not?

34 (Pages 130 - 133)

Page 134

W. KHAHAIFA

1
2    A   Because I didn't think that that
3 was a conversation for me to have with
4 her.
5    Q   Well, you knew that one of her
6 employees was potentially going to be
7 subject to termination.  You did not think
8 it was appropriate to let her know that
9 was happening?
10    A   I did not know -- I did not
11 think that was my place to tell her.
12 Either the general counsel or the head of
13 torts would make that conversation with
14 her.  That was above my paygrade.
15    Q   Did you make any inquiries into
16 whether or not that conversation did take
17 place, either through Larry Heisler or
18 general counsel?
19    A   No, I did not.
20    Q   For you, other than -- or I
21 should say, after signing this DAN, you
22 then sent it to Ms. Yehoshua; correct?
23    A   I did.
24    Q   Did you have any discussions
25 with her at that time regarding the DAN or

Page 135

W. KHAHAIFA

1
2 its contents?
3    A   No, I didn't.
4    Q   After sending it to her, what,
5 if anything, was your involvement in the
6 process of adjudicating the DAN, for lack
7 of a better word?
8    A   I was not involved in that
9 process.
10    Q   Did she ask you for -- or either
11 her or her counsel, ask you for extensions
12 of time to respond to the DAN?
13    A   She asked -- she emailed
14 everyone that was on the DAN, requesting
15 time.  Yes.
16    Q   And you responded to her that
17 that request was denied; correct?
18    A   I was directed to respond to her
19 that the request was denied, yes.
20    Q   Who directed you to respond to
21 her?
22    A   David Farber.
23    Q   Did he give you any reason why
24 to say the request was denied?
25    A   I don't recall.

Page 136

W. KHAHAIFA

1
2    Q   In looking at Exhibit 12 and
3 Exhibit 7, the OIG's report was issued
4 January 23, 2020.  Do you see that?
5    A   I see it.
6    Q   And then the DAN is dated June
7 12, 2020.
8    A   Correct.
9    Q   Do you have any understanding
10 why it took six months for the DAN to be
11 issued after the OIG's report?
12    A   I had no involvement in the DAN;
13 I have no idea how the process works.  No.
14    Q   Do you know what was the
15 ultimate outcome of the first DAN?
16    A   I believe the recommended
17 penalty of dismissal, I think, was
18 converted to a suspension.
19    Q   Mark this as Exhibit 13.
20       (Plaintiff Exhibit 13 was marked
21       for identification.)
22       You recognize this document,
23 ma'am?
24    A   No, I don't.
25    Q   Have you ever seen this document

Page 137

W. KHAHAIFA

1
2 before today?
3    A   I don't think I have.
4    Q   So I will represent to you that
5 this is the notice of penalty, dated
6 February 3, 2021, in connection with the
7 first DAN that was issued to Ms. Yehoshua
8 that we've been talking about this
9 afternoon.  And if you'll see here, says:
10 "Based upon my consideration of that
11 response and review of the available
12 records, the originally recommended
13 disciplinary penalty of dismissal from
14 service is hereby modified to 20 days of
15 suspension without pay."  Do you see that?
16    A   I see that.
17    Q   How did you first learn that the
18 recommended penalty of dismissal was
19 converted to a suspension?
20    A   I do not recall.
21    Q   Do you recall when you learned
22 that?
23    A   No.
24    Q   What, if anything, was your
25 reaction to hearing or learning that --

35 (Pages 134 - 137)

Page 138

W. KHAHAIFA

1
2     A   I had no reaction --
3     Q   -- she was not dismissed but
4   suspended?
5     A   I did not have a reaction.
6     Q   Did you have any feeling, good,
7   bad, or otherwise, regarding the decision?
8     A   I didn't.  I didn't want to see
9   anybody lose their job.
10    Q   Would it surprise you if
11  Ms. Urbont described your reaction to the
12  suspension as "furious"?
13    A   Yes, it would surprise me.
14    Q   Would it surprise you if she
15  described your reaction as "going nuts"?
16    A   Yes, it definitely would
17  surprise me.
18    Q   Did you speak to Ms. Urbont
19  about the conclusion of the first DAN at
20  the time that you learned about it?
21    A   I -- I do not believe so.
22    Q   Did you speak to Mr. Heisler?
23    A   I don't think I spoke to anybody
24  about the conclusion.
25    Q   Are you aware that, in December

Page 139

W. KHAHAIFA

1
2   2020, Ms. Yehoshua had filed a complaint
3   with the New York State Division of Human
4   Rights against the Transit Authority?
5     A   I -- I think I became aware of
6   it at some point, but I don't know when.
7   I can't keep track of things that were
8   filed.
9     Q   How did you become aware of that
10  complaint?
11    A   Probably, the same way I got --
12  I was aware of the -- the summons and
13  complaint that she filed.
14    Q   Did you speak to anybody, other
15  than counsel at Transit, regarding the DHR
16  complaint?
17    A   No.
18    Q   Do you recall if you became
19  aware of the complaint before or after you
20  learned of the suspension?
21    A   I have no idea.
22    Q   After Ms. Yehoshua transfer to
23  the Kings County unit became effective, so
24  March 2020, did you have any further
25  interactions with her?

Page 140

W. KHAHAIFA

1
2     A   After her transfer became --
3     Q   Effective.
4     A   -- effective March 2020?  Other
5   than email, no.
6     Q   And was that similar to the
7   email that we saw regarding her
8   timesheets, where you check up on things
9   of that nature?
10    A   Correct.
11    Q   Okay.  At what point did you
12  stop approving Ms. Yehoshua's timesheets?
13    A   When they switched her over on
14  paper.  I don't know when that was.
15  That's something that I have no control
16  over.
17    Q   Were you told at any point, "We
18  made a mistake, and we're switching her
19  over"?  Or did it just happen?
20    A   No, it just happened.
21    Q   How often, after March of 2020,
22  would you need to interact with
23  Ms. Yehoshua over email?
24    A   I didn't interact with her
25  often.  I interacted with her to find out

Page 141

W. KHAHAIFA

1
2   the status of the remaining cases that she
3   had open assignments on.
4     Q   So would you have to do that, if
5   you had to estimate -- and I understand
6   it's an estimation -- was that a weekly
7   reach out to her?  Monthly?
8     A   I -- I don't remember how often
9   it was.
10    Q   Okay.  When the transfer became
11  effective, what happened to the cases that
12  Ms. Yehoshua had been working on for the
13  trial unit, the New York trial unit?
14    A   Those cases -- her cases were
15  intermittently reassigned.  The cases that
16  remained with her, after her transfer,
17  still had open assignments.  So once she
18  completed the open assignments that she
19  had, those cases were also reassigned.  So
20  that's why I checked up on the status of
21  the cases, to find out if she was done so
22  that I could reassign them.
23    Q   So it's very possible the
24  misunderstanding's on my part.  So as of
25  March 2020, did Ms. Yehoshua still have

36 (Pages 138 - 141)

Page 142

W. KHAHAIFA

1
2 open cases from the New York trial unit
3 that she was working to wrap up?
4    A   Yes.
5    Q   Okay.  And those were the cases
6 that you would check up on?
7    A   Correct.
8    Q   At that point do you recall how
9 many open matters she was still handling
10 for the New York trial unit?
11    A   No, I can't recall.  There
12 weren't a lot, though, because most of
13 them had been reassigned.
14    Q   Did you ever speak to Amelia
15 about the first DAN?
16    A   No.
17    Q   Or her suspension?
18    A   No.
19    Q   During the time Amelia was
20 suspended, there was a second DAN issued
21 to her.  Do you recall that?
22    A   No.
23    Q   After the suspension went into
24 place in February of 2021, do you recall
25 reaching out to Mr. Farber regarding

Page 143

W. KHAHAIFA

1
2 complaints that you had received about
3 Amelia from judges sitting in New York
4 Supreme?
5    A   I did not reach out to
6 Mr. Farber about that.  I had a
7 conversation with Mr. Farber, and during
8 the span of that conversation, Mr. Farber
9 asked me why Amelia was no longer in my
10 unit.  And I told him why.
11    Q   When was that conversation with
12 Mr. Farber?
13    A   I do not recall.  It was in
14 2021.  I believe that.  I -- I don't
15 recall.
16    Q   Do you recall if it was before
17 or after Ms. Yehoshua was put on
18 suspension?
19    A   I don't know when I learned
20 about her suspension because I was kept
21 out of the loop of all of that stuff.
22 After I signed the DAN, I didn't know what
23 was happening, so I don't know when I
24 learned of her suspension.  And I believe
25 I learned that through counsel, but I

Page 144

W. KHAHAIFA

1
2 couldn't tell you when.
3    Q   All right.  What was the context
4 of your discussion with Mr. Farber?
5    A   I don't recall, but I'm sure it
6 had to do with the first -- the issuance
7 of the first DAN or the -- the complaint
8 that was filed.  I'm not -- I'm not
9 certain.  I don't remember.
10    Q   Did you take any notes during
11 that discussion?
12    A   No.
13    Q   Other than asking why
14 Ms. Yehoshua was no longer in the New York
15 trial unit, what, if anything else, did
16 Mr. Farber ask you about Amelia?
17    A   I believe he asked me who was
18 her current supervisor.
19    Q   Anything else that you can
20 recall?
21    A   That's -- that's all I can
22 remember.
23    Q   When Mr. Farber asked you why
24 Amelia was no longer in your unit, what
25 did you respond to him?

Page 145

W. KHAHAIFA

1
2    A   I told him because she could no
3 longer make appearances in New York
4 Supreme Court.
5    Q   And what was his reaction?
6    A   He wanted to know why.
7    Q   And what did you tell him at
8 that point?
9    A   And I told him about the judges'
10 complaints and the requests that she not
11 appear in New York Supreme Court.
12    Q   I'll show you what we previously
13 marked as Exhibit 10 -- .
14        (Plaintiff Exhibit 10 was marked
15        for identification.)
16        Take your time to review that,
17 ma'am.  Let me know when you're ready to
18 proceed.
19        You recognize this document?
20    A   I do.
21    Q   Can you identify it for the
22 record, state what it is?
23    A   This is a memo from me to David
24 Farber, explaining what happened and
25 circumstances surrounding her not being

37 (Pages 142 - 145)

Page 146

1           W. KHAHAIFA
2  able to go -- Amelia not being able to go
3  to Supreme New York.
4      Q    Why did you write this
5  memorandum to Mr. Farber?
6      A    He asked for it.
7      Q    Was that during the conversation
8  you just testified about
9      A    Yes, it is.
10     Q    Prior to February of 2021, had
11 you alerted Mr. Farber to any of the
12 judges' complaints?
13     A    No, I did not.
14     Q    Why not?
15     A    Because I told my supervisor.
16     Q    Your supervisor, you're
17 referring to Mr. Heisler?
18     A    Mr. Heisler and Ms. Goode.  I
19 figured any escalation would come from
20 them.
21     Q    So looking at your
22 memorandum -- well, the judges' complaints
23 that you noted, you received them in 2019
24 and early 2020; is that correct?
25     A    Believe they were 2019, yes,

Page 147

1           W. KHAHAIFA
2  and -- yeah, that's correct.
3      Q    And at that time, you had
4  reported them to Mr. Heisler and
5  Ms. Goode; correct?
6      A    Yes.
7      Q    What was the response -- we'll
8  take them in turn -- from Ms. Goode?
9      A    For Ms. Goode, I believe -- I
10 believe that she -- I don't remember what
11 her response was, actually.
12     Q    What about from Mr. Heisler?
13     A    The first time I believe Larry
14 was a little indifferent.  He thought that
15 I was blowing it out of proportion and
16 didn't think it was anything to worry
17 about.
18     Q    Were you concerned by that
19 reaction?
20     A    I was concerned by that
21 reaction. I was also concerned at the
22 judges' complaints.
23     Q    So having brought the complaints
24 to your supervisor's attention and being
25 concerned with his reaction, did you do

Page 148

1           W. KHAHAIFA
2  anything at that time to escalate the
3  matter yourself?
4      A    No, I didn't.
5      Q    Why not?
6      A    Because he agreed that we were
7  going to have a discussion later to
8  determine what, if anything, was going to
9  be done.
10     Q    Did you have that discussion?
11     A    Eventually, we did.
12     Q    When did you have that next
13 discussion?
14     A    I think that was in December,
15 when it was decided that she was going to
16 go to the Kings County.
17     Q    Did you believe that the
18 transfer to Kings County was a adequate
19 remedy for the situation involving the
20 judges' complaints?
21     A    Yes, I did it because there was
22 no way that she could appear in Supreme
23 New York.
24     Q    In your experience, how common,
25 if at all, was it for judges to complain

Page 149

1           W. KHAHAIFA
2  to Transit supervisors about Transit
3  attorneys?
4      A    I can only speak to my
5  experience, and it never happened before.
6      Q    Had you ever heard of it
7  happening before even if you were not
8  personally involved?
9      A    No, not that I can recall.
10     Q    To your knowledge, was there any
11 procedure in place for dealing with
12 situations involving judges' complaints
13 against attorneys?
14     A    Not that I'm aware of.
15     Q    Was there any protocol for
16 noting such issues in the personnel record
17 of the attorney involved?
18     A    Not that I'm aware of.
19     Q    Did you do anything in 2019,
20 early 2020, when you received the
21 complaints, to note them in a Amelia's
22 record?
23     A    I noted -- I made notes for
24 myself, that I took "anecdotals," and I
25 made notes myself so that I could recall

38 (Pages 146 - 149)

Page 150

W. KHAHAIFA

1
2 the details.
3    Q   But those notes weren't -- well,
4 let me ask you.  Did you share those notes
5 with anyone at the time?
6    A   I did not.
7    Q   Okay.  Were they included in
8 Amelia's disciplinary record or personnel
9 record?
10    A   They were not.
11    Q   So my question was, at the time
12 that you received these complaints, did
13 you do anything to make a note in Amelia's
14 record of the complaints?
15    A   Yeah, I have no access to
16 Amelia's record.  That would be HR.  The
17 only way for that to happen is if a formal
18 memorandum or something were written up
19 and sent to HR, and I don't even know what
20 the procedure is for that.  I have no
21 access to her employee file.
22    Q   Okay.  You did not create a
23 formal memorandum, such as what we see in
24 Exhibit 10, in 2019; correct?
25    A   I did not.

Page 151

W. KHAHAIFA

1
2    Q   Why not?
3    A   Because there was no need for me
4 to.
5    Q   Well, you testified that you
6 were very concerned about the judges'
7 complaints; correct?
8    A   Correct.
9    Q   Okay.  Did you feel that what
10 the judges were reporting, if true, would
11 be something worthy of disciplinary action
12 against Amelia?
13    A   Yes, I did.
14    Q   Okay.  So why did you not make a
15 memorandum or institute any process to
16 seek disciplinary action at that time?
17    A   I don't have the power to
18 institute a process.  What I did was I
19 reported it to my supervisors, which was
20 the head of trials and the head of torts.
21 It is above my paygrade for anything that
22 happens beyond that.  I don't have the
23 power to make anything else happen.
24    Q   But if you had provided, as you
25 said, a formal memorandum, at that time,

Page 152

W. KHAHAIFA

1
2 is it your understanding that a
3 disciplinary process would have been
4 started?
5    A   No, it would have been a request
6 that would have been made from my
7 superiors to memorialize what happened, as
8 in the case with David Farber.  He asked
9 me for a memorandum memorializing what
10 happened.  It's not something that I would
11 just do and say, "Here.  Put it in her
12 file," or, "Here.  Take action."  That is
13 not in my purview.
14    Q   Okay.  And you were never asked,
15 prior to your discussion with Mr. Farber,
16 to make such a memorandum; correct?
17    A   I was not asked.
18    Q   Were you frustrated that
19 disciplinary action had not been taken?
20    A   No, I was not.
21    Q   Did you have any feelings, good,
22 bad, or indifferent, regarding
23 Mr. Heisler's response to notice of the
24 judges' complaints?
25    A   I didn't think that it was a

Page 153

W. KHAHAIFA

1
2 smart response.  I had concern with what I
3 was going to do with her cases because I
4 couldn't always have coverage for her, so
5 I was concerned with that.
6    Q   But you did not report his
7 response to any of his supervisors?
8    A   No, he -- his -- there was --
9 his response was to transfer her.
10    Q   Well, that was the second
11 response.  His first response, where he
12 sort of blew it off?
13    A   Blew it off.  Right.
14    Q   You did not report that to any
15 of his supervisors?
16    A   I didn't because it wasn't -- we
17 didn't conclude.  He -- we were going to
18 meet, but when I informed him, initially,
19 of what happened, he thought that I was
20 blowing it out of proportion, so.  But
21 that's not to say that that's where he
22 stopped.  So there was nothing for me to
23 report to anybody at that time.
24    Q   So let's go through the judges'
25 complaints.  And by all means, you can use

39 (Pages 150 - 153)

Page 154

W. KHAHAIFA

1
2  Exhibit 10 to refresh your recollection if
3  you need to.  The first judge noted here
4  is Judge Sokoloff.  Do you see that?
5      A   Yes.
6      Q   What case was Amelia handling
7  before Judge Sokoloff that resulted in
8  this complaint?
9      A   The Alexander Wood case.
10     Q   And in your own words, can you
11 describe what was reported to you by Judge
12 Sokoloff?
13     A   Judge Sokoloff, basically, told
14 me that she was lying to her about
15 discovery in this case.
16     Q   Was the Alexander Wood case
17 Ms. Yehoshua's case?
18     A   Yes.
19     Q   Was it not Alexandra Vandoros's
20 case?
21         MS. VINCI:  Gena or Jason, I think
22 someone's playing a voicemail that we can
23 hear.
24         THE REPORTER:  Yes, it's -- it's
25 coming from Gena.

Page 155

W. KHAHAIFA

1
2      THE WITNESS:  Can't see Jason
3  anymore.
4      THE REPORTER:  Yes, it's coming from
5  Gena.  Yeah, she muted.
6      THE WITNESS:  Okay.
7      MS. VINCI:  Okay.
8      (Off the record.)
9      THE WITNESS:  Okay.
10     MS. VINCI:  Okay.
11     THE WITNESS:  Repeat the question.
12     MS. VINCI:  Yeah, Jason, did you get
13 the last --
14     Sorry, Gena.  Not a problem, Gena.
15     Can you repeat the last question,
16 please?
17     THE REPORTER:  Sure, one moment.
18     (The reporter read the record as
19     requested.)
20     THE WITNESS:  Okay.
21     No, it was not Alexandra Vandoros'
22 case.
23 BY MS. VINCI:
24     Q   Was it eventually transferred to
25 Attorney Vandoros?

Page 156

W. KHAHAIFA

1
2      A   It was eventually transferred to
3  her, yes.
4      Q   When was it transferred?
5      A   I believe in January 2020.
6      Q   Why was it not transferred
7  immediately after Judge Sokoloff's
8  complaint?
9      A   Because I was not transferring
10 her cases at that time.  Her cases were
11 only transferred when it was decided that
12 she was going to be transferred out of the
13 unit.
14     Q   Well, as the borough chief, did
15 you have the authority to move -- to
16 reassign cases between the attorneys in
17 your unit?
18     A   Yes.
19     Q   Okay.  So why was the Wood case
20 not reassigned away from Amelia in
21 November of 2019, when you got this
22 complaint from Judge Sokoloff?
23     A   Because that was not a reason
24 for this case to be reassigned.  Because
25 she was lying to the judge, I should

Page 157

W. KHAHAIFA

1
2  reassign this case?
3      Q   Well, were you concerned based
4  on the judge's report about how Amelia was
5  handling the case?
6      A   I was concerned that she was
7  untruthful to the judge.  The judge did
8  not discuss how Amelia was handling the
9  case.
10     Q   Okay.  Other than the judge
11 reporting that Amelia had been untruthful
12 about discovery, what, if anything else,
13 did Judge Sokoloff raise to you during
14 that November 7, 2019, call?
15     A   She basically just said that
16 there were other judges that had concerns.
17 And she -- I'm not sure if it was during
18 that call that she mentioned another
19 instance where she had an issue with
20 Amelia, in the sense that she found her in
21 her jury room speaking to represented
22 plaintiffs without their attorneys.
23     Q   And was that concerning to you?
24     A   That was concerning.
25     Q   After speaking with Judge

40 (Pages 154 - 157)

Page 158

W. KHAHAIFA

1
2 Sokoloff on November 7th, what did you do
3 next to address the complaints that she
4 had raised?
5    A   After speaking to Judge
6 Sokoloff?
7    Q   Yes.
8    A   I spoke to Gail Goode, and I
9 spoke to Larry Heisler.
10   Q   And was that the first
11 discussion that we talked about a little
12 bit ago, where Larry seemed indifferent
13 but left it open for further discussion?
14   A   Yes.
15   Q   Okay.  Did you speak to anybody
16 else at Transit about Judge Sokoloff's
17 complaint?
18   A   I'm sure I did, but I don't
19 recall who.
20   Q   Did you speak to Amelia about
21 it?
22   A   I definitely spoke to Amelia.
23   Q   Okay.  And what did Amelia have
24 to say about what occurred?
25   A   She basically said that the

Page 159

W. KHAHAIFA

1
2 judge was wrong, and that the judge was
3 acting improperly, and that she just
4 wanted her to exchange something that
5 plaintiff was not entitled to in
6 discovery.
7    Q   What, if any, action did you
8 take with Amelia, other than talking to
9 her about it, to address Judge Sokoloff's
10 complaint?
11   A   I didn't take any action with
12 Amelia to address the judge's complaint,
13 other than to tell her that that behavior
14 is not acceptable.
15   Q   In your memorandum to
16 Mr. Farber, you reference the call with
17 Judge Sokoloff on November 7th -- sorry.
18 And you state that the judge "was calling
19 you directly from the bench to express her
20 extreme dissatisfaction with Amelia's
21 unethical and unprofessional behavior."
22 Do you see that?
23   A   I see that.
24   Q   Did Judge Sokoloff describe
25 Amelia's behavior as "unethical and

Page 160

W. KHAHAIFA

1
2 unprofessional"?
3    A   She did.
4    Q   Following receipt of this
5 complaint from Judge Sokoloff, to your
6 knowledge, did Amelia continue to appear
7 before her?
8    A   Following this complaint?
9    Q   Yes.
10   A   No, she did not.
11   Q   Were Amelia's cases before Judge
12 Sokoloff given to other attorneys?
13   A   No, they were not right away,
14 not until she was transferred out of the
15 unit.
16   Q   So how did it come to be, if you
17 know, that Amelia stopped appearing before
18 Judge Sokoloff following November 7, 2019?
19   A   Because Judge Sokoloff said she
20 did not want her in her courtroom anymore,
21 I agreed to send someone on Amelia's
22 appearances until we figured out what was
23 going to be happening with Larry -- well,
24 you know, until Larry decided what was
25 going to be happening.

Page 161

W. KHAHAIFA

1
2    Q   Who was sent on Amelia's
3 appearances before Judge Sokoloff at that
4 time?
5    A   John Jerman and Alexandra
6 Vandoros.  They were the only two
7 attorneys left in the unit.
8    Q   You mentioned that Judge
9 Sokoloff referred to other judges who also
10 had issues with Amelia; is that correct?
11   A   Correct.
12   Q   Who were the other judges?
13   A   At the time of that first phone
14 call, I don't think she told me who the
15 other judges were.  After I met with her,
16 I learned that the other judges were Judge
17 Freed, Judge Frank, and I was told there
18 were others, but names weren't given.
19   Q   Well, okay.  So Judge Sokoloff
20 let you know that Judge Freed and Judge
21 Frank also had issues with Amelia?
22   A   Correct.
23   Q   Did Judge Sokoloff also say,
24 "There are others," and not give names, or
25 did you get that information somewhere

41 (Pages 158 - 161)

Page 162

W. KHAHAIFA

1
2  else?
3     A   I got that from Judge Sokoloff.
4     Q   When did you meet with Judge
5  Sokoloff, following your November 2019
6  call with her?
7     A   I believe I met with her the
8  following month.  I think in December.  I
9  avoided it.
10    Q   I'm sorry; you avoided it?
11    A   I avoided the meeting.
12    Q   How did you avoid the meeting?
13    A   I avoided it by not calling her
14  back to set it up.
15    Q   So following this phone call on
16  November 7th, did Judge Sokoloff then make
17  inquiries to have a meeting with you?
18    A   She -- she let me know, at --
19  during that conversation, that she wanted
20  to meet.
21    Q   What made you finally give in
22  and meet with Judge Sokoloff?
23    A   I think she called or she sent
24  word for me to call to, I guess, to
25  schedule the -- the meeting.  I don't

Page 163

W. KHAHAIFA

1
2  recall exactly how, but it was at her
3  prompting.
4     Q   And where did you meet with her?
5     A   I met with her in her chambers.
6     Q   And what was discussed during
7  that meeting?
8     A   Basically, the -- the activities
9  that took place at her conference during
10 the Wood case.
11    Q   And was it at that meeting that
12 she raised that Judge Freed and Judge
13 Frank also had issues with Amelia?
14    A   Yes, she did.
15    Q   What did you do in response to
16 that information?
17    A   In response to the information
18 that they had complaints?
19    Q   Yes.
20    A   Oh, I didn't do anything.  She
21 walked me over to Judge Freed's part, but
22 her court attorney told her that she
23 wasn't available and that I should come
24 back tomorrow because she wanted to speak
25 to me.  She then walked me to Judge Frank

Page 164

W. KHAHAIFA

1
2  and left me with Judge Frank in his
3  chambers.
4     Q   Did you speak to Judge Frank at
5  that time about Amelia?
6     A   Yes.
7     Q   And what did Judge Frank report
8  to you at that time?
9     A   Judge Frank basically reported
10 to me the same, I guess, opinion of her
11 behavior.  He basically told me that he
12 was a little bit perturbed with her at the
13 last trial that she had before him.  I
14 think it was the Chin trial.  And he
15 didn't want her in his courtroom if he
16 could help it.
17    Q   The Chin trial.  Did Ms. Goode
18 also work that trial with Amelia?
19    A   Ms. Goode could have.  As I said
20 before, the chain of command was often
21 thwarted, so I don't know when and if she
22 went to Ms. Goode or to Larry.  So it's
23 very possible that she did.
24    Q   Okay.  If Amelia wanted
25 assistance on a trial from another

Page 165

W. KHAHAIFA

1
2  attorney, would she have to, given the
3  chain of command, would she have to ask
4  you for permission?
5     A   No.
6     Q   If another attorney was
7  assisting Amelia on a trial, is that
8  something that you would be told of?
9     A   If another attorney were
10 assisting?  Or what do you mean by that?
11    Q   Well, so my question was: Was
12 Ms. Goode assisting and working the trial,
13 the Chin trial, with Amelia?
14    A   I don't know.  You would have to
15 ask Ms. Goode or Amelia 'cause, like I
16 said, things that happened with that
17 arena, I was not advised.  I was not told.
18 I found out, at times, after the fact or I
19 don't know ever.  So I don't know that she
20 was working with her.  I have no idea.
21    Q   Did you advise Ms. Goode of
22 Judge Frank's complaints about Amelia?
23    A   I did.
24    Q   What was her response?
25    A   I don't recall her response.

42 (Pages 162 - 165)

Page 166

W. KHAHAIFA

1
2    Q   Was that in a conversation
3 separate from the second conversation with
4 Larry?
5    A   It was in a conversation -- I
6 believe I spoke to her first. The first
7 conversation I had, I think, was with her.
8 I don't know if Larry was around. And I
9 don't recall what her reaction was; I do
10 recall her being concerned. I don't know
11 what her feelings were, though. And I
12 then spoke to Larry as well.
13    Q   Did you speak to Amelia about
14 Judge Frank's complaints?
15    A   I don't know if I spoke to her
16 and broke down each person's complaint. I
17 don't know if I spoke to her after I met
18 with Judge Freed and Judge Frank -- I'm
19 sorry -- Judge Frank and Judge Sokoloff
20 and Freed. I know I did speak to her
21 about the initial complaints. I'm not
22 sure -- to answer your question, I
23 don't -- sorry.
24    Q   It's okay.
25    A   I don't know if I spoke to her

Page 167

W. KHAHAIFA

1
2 about the other judges' complaints. I
3 don't recall.
4    Q   After speaking with Judge Frank,
5 did Amelia continue to appear before him?
6    A   Well, Judge Frank was not the
7 Transit judge. Judge Sokoloff presided
8 over the Transit court, so she was the
9 Transit judge. So if Amelia had cases,
10 they belonged to Judge Sokoloff's part.
11 Any conferences that came up, any motions
12 that came up would be in Judge Sokoloff's
13 part.
14        Judge Frank was not the -- the
15 Transit judge. Judge Frank was a judge
16 that presided over one of Amelia's trials.
17 You would get different judges that would
18 preside over the trials. You're not
19 relegated only to the Transit judge when
20 it came to trials. So can you repeat your
21 question? Sorry.
22    Q   Following your discussion with
23 Judge Frank, to your knowledge, did Amelia
24 ever appear before him again?
25    A   I do not think she appeared

Page 168

W. KHAHAIFA

1
2 before him again because she was out of
3 the unit by then, and the only way for her
4 to appear before him again would have been
5 to be assigned him as a trial judge.
6    Q   Okay. Did you eventually speak
7 to Judge Freed?
8    A   I did.
9    Q   Okay. And what did Judge Freed
10 report to you at the time you spoke with
11 her?
12    A   Judge Freed report the same
13 as -- as the other judges. She reported
14 that she was unprofessional, that she was
15 dishonest. Late for court a lot. Judge
16 Freed was a little angrier than the other
17 judges. Excuse me. She basically
18 recalled a trial, the Maria Garcia case,
19 and she printed out the -- the post-trial
20 motion decision to give to me, to show --
21 to illustrate most of the issues that she
22 had with her during the trial.
23        She was upset that she was --
24 she was accused of colluding with the
25 plaintiff. And she took great offense to

Page 169

W. KHAHAIFA

1
2 that and wanted me to see the decision. I
3 had no idea about any of this stuff at
4 that time.
5    Q   Did you ever discuss with Amelia
6 Judge Freed's complaints about her?
7    A   I don't recall if I did or not.
8    Q   Did you ever discuss Judge
9 Freed's complaint regarding being accused
10 of colluding with the plaintiff with
11 Amelia?
12    A   I don't recall. If I spoke to
13 her about Judge Freed, I would have spoken
14 to her about all of what Judge Freed said,
15 but I don't recall whether I did or not.
16    Q   Were you aware that the
17 allegation of collusion against Judge
18 Freed was included by Mr. Heisler in the
19 paper submitted to the court?
20    A   I didn't know that -- that Larry
21 submitted papers to the court, so I -- I
22 don't know what you're referring to.
23    Q   Did you ever speak to
24 Mr. Heisler specifically about Judge
25 Freed's complaint?

43 (Pages 166 - 169)

Page 170

W. KHAHAIFA

1
2    A    Yes, I did.
3    Q    What was his response?
4    A    He -- I don't recall if I got
5 all of it out.  He was cutting me off at
6 some point.  I guess, basically, when it,
7 I guess, it became the same story, and he
8 just started cutting me off.  I don't
9 think he wanted to hear the rest of it.
10 And just we were going to discuss it.
11    Q    Were you aware of any issues
12 that Transit had had previously with Judge
13 Freed?
14    A    The Transit had?
15    Q    Yes.
16    A    I don't -- I don't understand
17 your question.
18    Q    Did Mr. Heisler, in any way,
19 indicate to you that Judge freed had a
20 history of not liking Transit attorneys?
21 Sorry.
22    A    I don't know if he expressed
23 that.  I got the sense that Judge Freed
24 was not a fan of Transit.
25    Q    What gave you that sense?

Page 171

W. KHAHAIFA

1
2    A    Just people's experiences with
3 her.  Alexandra had a bad experience with
4 her.  John Jerman, on the other hand, had
5 excellent experience with her and loved
6 her.  But that Transit had a problem with
7 her?  No.  There were judges that we
8 thought were probably more pro-plaintiff
9 than others, but to say that we -- there
10 was a problem with Transit with Judge
11 Freed...
12    Q    What other judges raised
13 complaints about Amelia to you?
14    A    I don't know that they raised
15 complaints, but I got -- we met with the
16 new Transit judge, which was Judge Suzanne
17 Adams, in 2020.  And she just told me that
18 she would recuse herself and asked that I
19 send someone else, other than Amelia, to
20 her part.
21    Q    Did she give a reason why?
22    A    She refused to give a reason
23 why.  I did ask.
24    Q    Were you aware that Judge Adams
25 and Amelia had worked together at a prior

Page 172

W. KHAHAIFA

1
2 place of employment?
3    A    I don't recall when I learned
4 that.  I don't know if I learned it
5 beforehand or after, but, yes, I did
6 become aware of that.
7    Q    Do you recall if you learned
8 that before or after sending this
9 memorandum to David Farber?
10    A    I would have had to have
11 because -- yeah, it would had to have been
12 before I sent this memorandum.
13    Q    Did you assume that Judge Adams
14 did not want Amelia to appear before her
15 for any reason related to Amelia's
16 professionalism?
17    A    I assumed that it was probably
18 something regarding her prior interactions
19 with Amelia because I also learned, later
20 on, that she also worked with Alexandra
21 Vandoros, and she never made the same
22 complaint.  So I assumed it had to have
23 been something that -- between their
24 interactions, but I couldn't possibly try
25 to guess.

Page 173

W. KHAHAIFA

1
2    Q    Well, at the time that Judge
3 Adams advised you she'd be recusing
4 herself, did you know that she had
5 previously worked with Ms. Vandoros?
6    A    I don't recall.
7    Q    At that time you did not know
8 that she had previously worked with
9 Ms. Yehoshua?
10    A    At the time when the judge made
11 those comments?
12    Q    Told you that she would recuse.
13    A    Yeah, I don't think I knew at
14 that time.
15    Q    When did you learn that Judge
16 Adams had previously worked with Attorney
17 Vandoros?
18    A    I don't recall.
19    Q    How did you learn that?
20    A    I don't recall.  Probably from
21 Alexandra herself.
22    Q    Did you discuss the judges'
23 complaints with Alexandra?
24    A    I believe I did at some point,
25 yes.

44 (Pages 170 - 173)

W. KHAHAIFA
1
2      Q   Okay.  What prompted you to
3   discuss the complaints with Alexandra?
4      A   I knew that I was going to have
5   to send her to court.  And I believe the
6   judge had also complained to her as well.
7      Q   What makes you believe that the
8   judges complained to Alexandria?
9      A   I think that -- I think the
10  judge, at some point, told me, and I think
11  that Alexandra told me as well.
12     Q   Which judge?
13     A   Sokoloff.
14     Q   What did Alexandra tell you
15  Judge Sokoloff had said to her about
16  Amelia?
17     A   I don't recall the conversation.
18  I just recall that the judge told her and
19  she was upset at her behavior in court.
20     Q   During your discussions with
21  Larry about the judges' complaints, did he
22  ever tell you that Amelia wasn't going
23  anywhere?
24     A   Yeah, he did.
25     Q   When did that happen?  During

W. KHAHAIFA
1
2   which discussion?
3      A   I think it was when I said, "Can
4   we please have the discussion?" after it
5   not happening.  Because I need to figure
6   out what I'm doing with my calendar.  I
7   need to be able -- I need to know who I'm
8   sending where to do what.  And that's when
9   he said -- I'm sorry, no.  Yeah.
10  Basically, that was -- I was trying to get
11  him to do something, if anything, to
12  advise me what was going to happen.
13         And he's like, "Well, she's not
14  going anywhere, so forget that," which
15  that came out of left field.  All I wanted
16  to know is "What are we doing?  How am I
17  going to get my calendar done?" so.
18     Q   Just so I can understand the
19  chronology, you have the first discussion
20  with Larry.  He seems indifferent, but he
21  leaves it open for further discussion.
22     A   Mm-hmm.
23     Q   And then was it then that you
24  followed up about that further discussion,
25  to say, "I need some direction about how I

W. KHAHAIFA
1
2   handle my calendar," and he said,
3   "Amelia's not going anywhere"?
4      A   I followed up because we were
5   supposed to have -- we had a set date that
6   we were going to meet, and it never
7   happened.  So I followed up to find out
8   when are we going to meet to discuss this
9   issue.  And I believe that's when.
10     Q   And did you follow up with him
11  in a phone call to him?  In an email?
12     A   I sent him an email.  And then I
13  think we -- he came by my office or -- or
14  I went by his office, and we had a
15  conversation about it.
16     Q   And then after that, was the
17  next discussion with Larry, regarding
18  Amelia and the judges' complaints, that
19  second discussion where you testified it
20  was determined she'd be transferred?
21     A   So the second discussion where I
22  just testified about, that was after I met
23  with the judges in December.  And then
24  when we finally met again after that,
25  that's when it was decided that she would

W. KHAHAIFA
1
2   be transferred to -- to the Kings unit.
3      Q   Okay.
4      A   I can't tell you the timeframe
5   between that conversation, the second
6   conversation, and that.
7      Q   Well, I'm just trying to figure
8   out -- so I think it's because before you
9   testified there were two conversations,
10  and now there's three.  So there was the
11  first conversation -- he's indifferent but
12  leaves it open.  There's the second
13  conversation now where he says, "She's not
14  going anywhere."
15     A   Right.
16     Q   And then there's -- is the third
17  conversation the conversation where it's
18  determined she will be transferred to
19  Kings?
20     A   I believe -- I believe the third
21  conversation was the meeting, where he
22  decided -- he made the decision she'd be
23  transferred to Kings.
24     Q   Okay.
25     A   And I could be confusing the

45 (Pages 174 - 177)

Page 178

W. KHAHAIFA

1
2 number of conversations that we have, but
3 that's my memory of it.
4     Q    All we're asking for is your
5 memory of it.  Okay.  What was your
6 reaction when he said, "She's not going
7 anywhere"?
8     A    I just wanted to know what was
9 going to happen.  I just needed to have a
10 body to cover my cases in court.  And so I
11 wanted to know what we were going to do.
12     Q    Were you concerned by his
13 response when he said, "She's not going
14 anywhere"?
15     A    No.
16     Q    Did you speak to any other
17 Transit authority, besides Ms. Vandoros,
18 about the judges' complaints against
19 Amelia?
20     A    You mean Transit attorneys?
21     Q    Yes.
22     A    I don't remember.  I don't
23 remember.  It's very possible.  I remember
24 that I may have inquired about what
25 happened, if -- if any of the pretrial

Page 179

W. KHAHAIFA

1
2 attorneys observed what happened.  I don't
3 remember who.  I don't remember the extent
4 of the conversation.  But I do remember
5 that I inquired.
6     Q    So we left off with the last
7 judge being Judge Adams.  Who, if anyone
8 else, what -- or which, if anyone else,
9 judge raised complaints to you about
10 Amelia?
11     A    Okay, so that same day with
12 Judge Adams, we also met with Judge Love,
13 who was also a new Transit attorney --
14 Transit judge, who's handling cases that
15 included the City, where the City was also
16 a codefendant.  And while I was there,
17 Judge Silvera stopped in to talk to
18 another attorney and proceeded to tell me
19 he also didn't want her in his unit -- I
20 mean, in his -- in his courtroom.
21     Q    Do you recall which case Amelia
22 had appeared on before Judge Silvera?
23     A    No.  I didn't ask.
24     Q    Did you ask Judge Silvera why he
25 did not want Amelia in his courtroom?

Page 180

W. KHAHAIFA

1
2     A    No, I didn't.
3     Q    Any other judges?
4     A    Just Judge Kaplan, but that's it
5 that I can think of.
6     Q    Judge Kaplan.  That was the
7 administrative judge?
8     A    That's the administrative judge,
9 yes.
10     Q    And we talked previously about
11 her discussing with you the other judges'
12 complaints.  She's having difficulty being
13 able to assign judges to Amelia's case.
14 She really would prefer Amelia not appear
15 anymore.  Was anything else reported to
16 you by Judge Kaplan at that time?
17     A    About Amelia?
18     Q    Yes.
19     A    Not that I can recall.  That
20 was, basically, the sum and substance of
21 conversation about Amelia.  That wasn't
22 the purpose of my meeting with her, but
23 that -- that was the conversation about
24 Amelia.
25     Q    What was the purpose of your

Page 181

W. KHAHAIFA

1
2 meeting with Judge Kaplan?
3     A    She wanted to discuss
4 alternative dispute resolution, you know,
5 settling more cases and getting rid of
6 more cases.  Dispositions.
7     Q    Prior to -- or strike that.
8 Other than sending this memorandum to
9 David Farber, did you send it to anybody
10 else?
11     A    No.
12     Q    Did you advise Mr. Heisler that
13 you'd had this discussion with Mr. Farber
14 and he had made a request for this
15 memorandum?
16     A    No.
17     Q    Did you discuss that with
18 Gail Goode?
19     A    No.
20     Q    What is your understanding of
21 what occurred next or as a result of this
22 memorandum?
23     A    What's my understanding?
24     Q    Yes.
25     A    I don't know because I was not

46 (Pages 178 - 181)

W. KHAHAIFA

1
2 involved with anything that happened
3 after.
4    Q    -- previously marked as Exhibit
5 8.
6        (Plaintiff Exhibit 8 was marked
7        for identification.)
8        Please take your time to review
9 that. Let me know when you're ready to
10 proceed.
11        Have you ever seen this document
12 before?
13    A    Yes.
14    Q    When did you first see this
15 document?
16    A    At Amelia's deposition couple of
17 months ago.
18    Q    Prior to Amelia's deposition,
19 you had never viewed this document?
20    A    No, I did not.
21    Q    So I'm going to say, prior to
22 learning of this lawsuit -- we'll cap it
23 there -- were you aware that Mr. Farber
24 had issued another DAN to Amelia,
25 regarding the judges' complaints?

W. KHAHAIFA

1
2    A    I was not aware that he issued
3 another Dan to Amelia until her deposition
4 a couple of months ago.
5    Q    Okay. After sending the
6 memorandum to Mr. Farber, did you have any
7 further discussions with him about the
8 complaints the judges had raised?
9    A    No.
10    Q    Did you have any further
11 discussions with him about Amelia?
12    A    No.
13    Q    Do you know if Ms. Urbont was
14 involved in any way in the second DAN?
15    A    I have no idea.
16    Q    What about Mr. Heisler? Do you
17 know if he was involved in any way?
18    A    I -- I do not know. I did not
19 learn about this DAN until her deposition
20 a couple of weeks ago. Months ago.
21 Sorry.
22    Q    Okay. Do you know how Amelia's
23 employment with Transit ended?
24    A    I found out about how her
25 employment ended, probably, a year ago.

W. KHAHAIFA

1
2    Q    How did you find out how her
3 employment ended?
4    A    Because they took the -- her
5 name off the door.
6    Q    At that time did you make any
7 inquiries as to why her name was being
8 taken off the door?
9    A    I made no inquiries about her,
10 about anything.
11    Q    At that time did you learn that
12 she had been terminated?
13    A    I didn't. I didn't learn that
14 until, like I said, I saw that they took
15 her name off the door. And I heard rumor.
16    Q    Okay. Did you ever ask
17 Ms. Urbont about what happened to Amelia?
18    A    No.
19    Q    Did you ever ask Mr. Heisler?
20    A    No.
21    Q    Are you still in contact with
22 Mr. Heisler?
23    A    No.
24    Q    What about with Ms. Urbont?
25    A    No. I still have her

W. KHAHAIFA

1
2 information. I have her phone number, but
3 we -- we haven't been talking.
4        MS. VINCI: I think I might be able
5    to wrap up if I could just take five
6    minutes and go back over my notes.
7        MR. SMALL: Okay. Let's take --
8    well, maybe go off the record first?
9        MS. VINCI: Sure.
10        We can go off the record, Jason.
11        THE REPORTER: We're off the record
12    at 2:22.
13        (Off the record.)
14        THE REPORTER: Okay, on the record,
15    2:38.
16        MS. VINCI: Thank you.
17 BY MS. VINCI:
18    Q    Ms. Khahaifa, we had talked
19 earlier this morning about the, I'll say,
20 attempted switch to the trial assistants
21 within the unit. Do you recall that?
22    A    Yes.
23    Q    Who was Adrian Thompson assigned
24 to assist as a result of the switch? From
25 Amelia to who?

47 (Pages 182 - 185)

Page 186

W. KHAHAIFA

1
2    A    I believe -- I believe he was
3    assigned to Alexandra Vandoros. I believe
4    I switched them because Stacey generally
5    works with the outside counselors, so,
6    yeah.
7    Q    Okay. And were you aware of any
8    complaints Mr. Thompson made about the
9    switch to his assignment?
10   A    With Alexandra Vandoros?
11   Q    If he had complained that he was
12   no longer being assigned to Amelia?
13   A    No. I'm not aware of any such
14   complaints.
15   Q    When we had testified about
16   certain sort of, I call them, Transit-
17   sponsored outings or socializations, and
18   you mentioned the annual outing for the
19   unit. Do you recall that?
20   A    Yes.
21   Q    In addition to the annual
22   outing, would you also go out with members
23   of your unit, say, like, after work one
24   day or after a workweek to sort of send
25   off the week?

Page 187

W. KHAHAIFA

1
2    A    I went out with a lot of people
3    after work, including people in my unit.
4    Q    And was it sort of an open
5    invitation for anyone in the unit to join?
6    A    It was not -- I mean, the only
7    thing that was an invitation was the --
8    the outings. If I went out with somebody,
9    I went out with somebody who I -- we had a
10   conversation, "Hey you want to go out?
11   Let's go."
12       MS. VINCI: I don't have any further
13   questions for you. Your counsel may, so
14   can't cut you loose yet, but thank you
15   very much for being here this morning.
16       MR. SMALL: Actually, no further
17   questions from us, but we reserve the
18   right to review the deposition transcript.
19       MS. VINCI: Okay, that concludes
20   today. Thank you very much for being
21   here, ma'am.
22       THE WITNESS: Okay. Thank you.
23   Thank you.
24       MS. VINCI: I will take those.
25       THE WITNESS: "Ma'am." I -- I feel

Page 188

W. KHAHAIFA

1
2    so old when people say that to me.
3        THE REPORTER: -- Gabrielle, if you
4    are still ordering a copy of -- of the
5    transcript?
6        MS. VINCI: Yes, I am ordering a copy
7    of the transcript.
8        THE REPORTER: Okay.
9        MS. VINCI: Can I get a regular and a
10   mini copy?
11       THE REPORTER: Okay. Okay.
12       MR. SMALL: We'll be ordering as
13   well.
14       MS. VINCI: And then, Jason, the
15   exhibits I've marked today, can I just
16   email you a copy of them with a sticker on
17   it?
18       THE REPORTER: Yes, that'd be great.
19       MS. VINCI: Okay.
20       And I'll copy you on that, Daniel, so
21   you have that as well.
22       MR. SMALL: Great. Great.
23       THE REPORTER: Okay, off the record
24   at 2:42.
25

Page 189

W. KHAHAIFA

1
2    (Whereupon, at 2:42 p.m., the
3    proceeding was concluded.)
4
5
6    _____
     WESLII KHAHAIFA
7
8
9    Subscribed and sworn to before me
10   this ___ day of _____, 2023.
11
12
     _____
13       Notary public
14
15
16
17
18
19
20
21
22
23
24
25

48 (Pages 186 - 189)

Page 190

CERTIFICATE OF DEPOSITION OFFICER

1         CERTIFICATE OF DEPOSITION OFFICER
2       I, JASON CARR, the officer before whom the
3  foregoing proceedings were taken, do hereby certify that
4  any witness(es) in the foregoing proceedings, prior to
5  testifying, were duly sworn; that the proceedings were
6  recorded by me and thereafter reduced to typewriting by a
7  qualified transcriptionist; that said digital audio
8  recording of said proceedings are a true and accurate
9  record to the best of my knowledge, skills, and ability;
10 that I am neither counsel for, related to, nor employed by
11 any of the parties to the action in which this was taken;
12 and, further, that I am not a relative or employee of any
13 counsel or attorney employed by the parties hereto, nor
14 financially or otherwise interested in the outcome of this
15 action.
16
17
18
19
20 JASON CARR
     Notary Public in and for the
21   State of New York
22
23
24
25

Page 191

CERTIFICATE OF TRANSCRIBER

1         CERTIFICATE OF TRANSCRIBER
2       I, LISA PARK, do hereby certify that this
3  transcript was prepared from the digital audio recording of
4  the foregoing proceeding, that said transcript is a true
5  and accurate record of the proceedings to the best of my
6  knowledge, skills, and ability; that I am neither counsel
7  for, related to, nor employed by any of the parties to the
8  action in which this was taken; and, further, that I am not
9  a relative or employee of any counsel or attorney employed
10 by the parties hereto, nor financially or otherwise
11 interested in the outcome of this action.
12
13
14 LISA PARK
15
16
17
18
19
20
21
22
23
24
25

Page 192

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

1
2    CASE NAME: Yehoshua v. Manhattan And Bronx Surface Transit
     Operating Authority, Et Al.
3    DATE OF DEPOSITION: 11/28/2023
     WITNESSES' NAME: Weslii Khahaifa
4
5  PAGE  LINE (S)    CHANGE     REASON
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21         Weslii Khahaifa
22 SUBSCRIBED AND SWORN TO BEFORE ME
   THIS ____ DAY OF _____, 20__.
23
24
25 (NOTARY PUBLIC)      MY COMMISSION EXPIRES:

49 (Pages 190 - 192)

[& - 620]                                                                    Page 1

## &

**&**   2:4 6:11 28:3 28:8,16

## 0

**04055**   1:8

## 1

**1**   4:10 97:14 109:21
**1/23/2020**   3:23
**10**   3:15 145:13 145:14 150:24 154:2
**10001**   2:6
**10018**   2:15,21
**10:09**   1:16 5:6
**11**   3:17 93:23 94:2
**11/28/2023**   192:3
**118**   3:13
**11:04**   51:22
**11:09**   51:25
**11:35**   72:12
**11:38**   72:15
**12**   3:21 119:9 130:14,15,18 136:2,7
**12:28**   115:10
**12:29**   115:13
**12:31**   117:7,12
**13**   4:4 136:19 136:20
**130**   3:23

**136**   4:6
**145**   3:16
**15**   37:8 38:10 102:9
**17**   4:12
**182**   3:14
**1995**   27:2
**1:10**   117:15
**1:21**   1:7
**1st**   97:13

## 2

**2**   4:13
**2/3/2021**   4:6
**20**   37:8 38:11 40:13 102:9 137:14 192:22
**2000**   26:10 28:11,11
**2003**   29:23 30:11
**2004**   30:12,14 30:15
**2013**   21:16 32:3
**2014**   34:17 36:14
**2015**   31:22,22 32:3 34:11 35:7,15 36:6 36:24 37:11
**2016**   38:16,20 52:8,8,16 53:17 56:9,23 59:21 61:10 73:23 75:25

76:20,22,25 80:18 87:13,17
**2017**   38:20 87:19
**2018**   39:24 40:2,14,14 87:21
**2019**   40:7,8 87:24 98:21,21 103:12 107:24 108:14 115:21 115:21 146:23 146:25 149:19 150:24 156:21 157:14 160:18 162:5
**2020**   21:17 37:10 40:11,12 40:16,21,25 97:12,13,14 108:24 109:6 109:16,21,21 110:7 114:16 114:24 117:25 119:10 136:4,7 139:2,24 140:4 140:21 141:25 146:24 149:20 156:5 171:17
**2021**   137:6 142:24 143:14 146:10
**2023**   1:15 5:13 189:10

**212**   2:8
**23**   136:4
**28**   1:15 5:12
**29029**   191:13
**29th**   95:9,14
**2:22**   185:12
**2:38**   185:15
**2:42**   188:24 189:2

## 3

**3**   40:8,12,15,16 76:25 137:6
**30**   117:7
**30628**   190:19
**31**   75:5,16
**32**   75:5
**32nd**   2:14,20
**35**   75:12,16,17 90:2
**363**   2:5

## 4

**4**   3:8 40:2 64:16,17 65:8 70:24 72:23
**45**   64:12 71:9

## 5

**5**   3:11 74:5,6 75:4
**5/29**   95:11

## 6

**6/10/2020**   3:20
**6/12/2020**   3:13
**620**   2:14,20

**64** 3:10

**7**

**7** 3:3,13 118:20
  118:21 136:3
  157:14 160:18
**736-4500** 2:8
**74** 3:12
**7th** 158:2
  159:17 162:16

**8**

**8** 3:14 182:5,6
**81** 4:16

**9**

**9/11** 28:14
**90s** 17:20,20
**94** 3:20

**a**

**a.m.** 1:16 5:6
**ability** 9:25
  114:5 190:9
  191:6
**able** 10:24 11:4
  36:22 52:24
  88:3 89:24
  99:14 105:6
  122:3 132:21
  146:2,2 175:7
  180:13 185:4
**above** 48:18
  58:4 134:14
  151:21
**absent** 5:18
**acceptable**
  159:14

**access** 132:13
  132:18 150:15
  150:21
**accommodated**
  93:16
**accompanied**
  85:22 86:5
**accompany**
  84:2,6 85:24
**account** 132:22
**accurate** 56:21
  79:19 190:8
  191:5
**accusations**
  70:14
**accuse** 62:9
**accused** 20:13
  63:24 64:3
  66:4,12 68:17
  70:10,11
  168:24 169:9
**accusing** 20:10
  62:13 69:24
  70:5
**acknowledg...**
  5:15
**acting** 34:16,25
  35:8 36:13,17
  159:3
**action** 7:16 8:5
  11:19 17:14,22
  18:7 74:20
  107:9 151:11
  151:16 152:12
  152:19 159:7

159:11 190:11
  190:15 191:8
  191:11
**actions** 88:4
**active** 27:17
**activities** 163:8
**actually** 68:3
  101:2 147:11
  187:16
**adams** 171:17
  171:24 172:13
  173:3,16 179:7
  179:12
**add** 83:21
  91:11 92:16
**addition**
  116:20 186:21
**additional** 90:4
**additionally**
  5:18
**address** 41:11
  60:2 158:3
  159:9,12
**adequate**
  148:18
**adika** 115:16
  116:18
**adjourn** 78:11
  99:6,14,17
**adjournment**
  99:19
**adjudicating**
  135:6
**adjust** 101:22

**administer**
  5:15
**administrative**
  104:25 105:22
  106:10,11,17
  180:7,8
**admitted** 27:5
  27:8,9,11,22
**adrian** 41:18
  42:17 44:10,13
  45:5,13,19,21
  45:25 46:21
  47:5,19 50:12
  50:13,15
  185:23
**adrian's** 46:7,9
  46:13,17
**advance** 99:13
**adversarial**
  84:24 85:2
  88:10
**adversary**
  88:12
**advise** 55:24
  69:4 165:21
  175:12 181:12
**advised** 50:19
  55:4 58:4
  104:25 165:17
  173:3
**advising** 14:5
  15:4 126:15
**affect** 73:4,6,8
  73:10

**[afraid - amount]**

| | | | |
|---|---|---|---|
| **afraid** 105:6 | 129:9,20 130:7 | 70:22 71:16 | 171:19,25 |
| **afternoon** | **allege** 92:23 | 73:9,11,12,25 | 172:14,19 |
| 137:9 | **alleged** 68:25 | 83:11 84:6 | 174:16,22 |
| **age** 25:24 | 90:3 | 85:7,24 86:8 | 176:18 178:19 |
| **agency** 31:6,8,9 | **allotment** | 87:14 94:13 | 179:10,21,25 |
| 31:10,14 93:20 | 92:25 93:14 | 101:7 102:23 | 180:14,17,21 |
| **agnostic** 24:25 | **allotted** 96:19 | 103:15,17,20 | 180:24 182:24 |
| **ago** 7:14 52:20 | **allow** 9:7,10,15 | 104:2,14 | 183:3,11 |
| 59:6 158:12 | 32:22 | 105:12 106:2 | 184:17 185:25 |
| 182:17 183:4 | **allowed** 104:22 | 106:14 108:9 | 186:12 |
| 183:20,20,25 | 105:23 106:6 | 108:18 109:17 | **amelia's** 8:4 |
| **agree** 5:16,21 | 106:15,18,24 | 109:23 110:11 | 39:15 41:17,20 |
| **agreed** 148:6 | 108:25 110:17 | 110:21 111:20 | 42:3 43:23 |
| 160:21 | **allowing** | 112:13 113:4 | 45:7 46:21 |
| **ahead** 77:5 | 114:13 | 113:16,23 | 47:3 48:6 50:8 |
| 95:16 | **allows** 53:11 | 114:5,25 115:5 | 50:20 52:10 |
| **al** 192:2 | **alluded** 19:20 | 115:23 116:5 | 56:24 62:10 |
| **alerted** 146:11 | **alternative** | 118:3 120:17 | 66:5,13,20 |
| **alex** 26:4 40:4 | 108:5,17 181:4 | 121:8 122:18 | 69:25 84:21 |
| **alexander** | **amelia** 1:4 2:2 | 123:3,7 126:19 | 107:14,17 |
| 154:9,16 | 5:8 7:16 23:7 | 127:6 142:14 | 110:7 114:6,23 |
| **alexandra** 24:5 | 23:16 32:8,10 | 142:19 143:3,9 | 117:22 131:12 |
| 38:23 40:18 | 33:4,10,13,20 | 144:16,24 | 149:21 150:8 |
| 47:16 154:19 | 36:20 37:4,6 | 146:2 151:12 | 150:13,16 |
| 155:21 161:5 | 38:11 40:3,19 | 154:6 156:20 | 159:20,25 |
| 171:3 172:20 | 40:21 41:14 | 157:4,8,11,20 | 160:11,21 |
| 173:21,23 | 42:17 44:8,13 | 158:20,22,23 | 161:2 167:16 |
| 174:3,11,14 | 45:14 46:12 | 159:8,12 160:6 | 172:15 176:3 |
| 186:3,10 | 47:6,11 48:22 | 160:17 161:10 | 180:13 182:16 |
| **alexandria** | 48:24 49:10,15 | 161:21 163:13 | 182:18 183:22 |
| 174:8 | 51:7,11 52:16 | 164:5,18,24 | **amelias** 49:7 |
| **allegation** | 55:4,12,25 | 165:7,13,15,22 | **amelie's** 68:18 |
| 73:14 169:17 | 57:5,9 58:18 | 166:13 167:5,9 | **amicably** 80:6 |
| **allegations** | 61:12 62:17 | 167:23 169:5 | **amount** 77:22 |
| 127:16,23 | 65:16 70:13,19 | 169:11 171:13 | 77:23 80:4 |

[amount - assistant]                                                                    Page 4

82:18 103:17
**amounts** 24:4
**anecdotal**
11:14
**anecdotals**
149:24
**anger** 20:21
**angrier** 168:16
**angry** 20:22
50:6
**announced**
49:25
**announcements**
49:19
**annual** 22:17
22:23,24,25
54:14,19
186:18,21
**answer** 9:9,11
9:13,21,22,24
10:8,19 11:5
72:17 166:22
**answers** 8:23
11:15,17,18
**anybody** 12:23
13:7,14,17
14:14 18:19
46:10 61:8
71:14 93:8
94:24 95:3
123:13,14
130:3,6 138:9
138:23 139:14
153:23 158:15
181:9

**anymore** 101:8
104:23 106:7
155:3 160:20
180:15
**anyway** 57:25
**apologize** 69:21
97:8
**appeals** 61:9
111:25
**appear** 84:11
104:23 106:2,6
145:11 148:22
160:6 167:5,24
168:4 172:14
180:14
**appearance**
85:25 86:9
99:24
**appearances**
41:6 84:7
145:3 160:22
161:3
**appeared** 62:22
167:25 179:22
**appearing**
160:17
**applicable** 5:25
**apply** 34:14
**approach** 81:3
**appropriate**
133:5,13 134:8
**approval** 52:10
56:6 71:5
99:18 100:3,17
121:20 122:6

**approve** 57:10
57:12 58:6
94:16 96:2
**approved**
56:11,15,17
100:19
**approving**
56:24 57:3
94:19 140:12
**arena** 165:17
**argumentative**
85:3
**arising** 52:9
**arose** 39:10
**arrest** 106:24
**arrested** 18:9
**ascribe** 25:3
**asked** 42:18,19
45:8,10 47:7
57:5 95:19
97:9,22 98:3
121:4 122:17
132:12,16
135:13 143:9
144:17,23
146:6 152:8,14
152:17 171:18
**asking** 8:2 9:23
94:15 95:13
144:13 178:4
**assign** 35:18
39:14 77:7
78:7 89:7,12
90:7,23 91:8
180:13

**assigned** 5:3
37:21 38:5
39:13 41:15
47:11 77:15
78:13 82:23
84:16 90:10,13
91:2,19 101:11
122:2 168:5
185:23 186:3
186:12
**assigning** 77:14
117:2
**assignment**
80:15 90:16,21
90:23 186:9
**assignments**
35:18 38:4
75:24 76:15,17
76:19,23 77:21
80:19 81:10
82:7 90:4,8,10
91:25 92:5
103:25 109:3
114:18,20
141:3,17,18
**assist** 185:24
**assistance**
164:25
**assistant** 31:13
31:16,18 41:17
41:21 43:23
44:3,10 47:10
47:18 49:3
51:5 92:10,20
131:12

**[assistants - basically]**    Page 5

| | | | |
|---|---|---|---|
| **assistants** | 30:16 31:3,6,8 | 112:22 113:2 | 98:2 111:13 |
| 41:15 43:15,18 | 31:10,10,14 | 149:3,13 | 120:10 123:3,7 |
| 46:19 47:23 | 33:21,23 36:13 | 156:16 157:22 | 124:8 138:25 |
| 48:23 49:17 | 36:14,17 38:5 | 160:12 161:7 | 139:5,9,12,19 |
| 185:20 | 38:6,19,21,22 | 170:20 178:20 | 149:14,18 |
| **assisted** 34:22 | 42:4,6 49:2 | 179:2 | 169:16 170:11 |
| **assisting** 47:15 | 51:3 54:23 | **audio** 190:7 | 171:24 172:6 |
| 47:16,21 165:7 | 77:20,22,23 | 191:3 | 182:23 183:2 |
| 165:10,12 | 81:11 82:24 | **authority** 1:8 | 186:7,13 |
| **assume** 10:9 | 84:18,19,25 | 1:10 2:11 5:10 | **b** |
| 66:23 131:16 | 87:4,7,9 99:16 | 5:11 6:17 7:19 | |
| 172:13 | 111:25 133:4 | 7:20 57:16,18 | **b** 3:5 4:1 |
| **assumed** 35:15 | 149:17 155:25 | 58:5 80:3 | **bachelor** 26:22 |
| 60:7 79:5 | 163:22 165:2,6 | 121:8,10,11,13 | **back** 18:14 |
| 172:17,22 | 165:9 173:16 | 121:14,16 | 22:21 40:13 |
| **assuming** 79:4 | 179:13,18 | 122:11 139:4 | 49:5 50:11,12 |
| **assumptions** | 190:13 191:9 | 156:15 178:17 | 50:14,16,22 |
| 66:25 | **attorney's** 78:3 | 192:2 | 51:6,24 72:14 |
| **atheist** 24:24 | 131:11 | **authorized** | 72:16 80:9 |
| **attempted** | **attorneys** 4:15 | 5:14 53:3 | 83:5 89:24,25 |
| 185:20 | 12:17 23:11,15 | **availability** | 103:23 104:3 |
| **attend** 26:17 | 23:18,21,24 | 78:5 | 115:12 117:8 |
| 99:6 104:16 | 24:4 34:7 | **available** | 117:14,17 |
| 105:19,24 | 35:19,20 36:19 | 137:11 163:23 | 162:14 163:24 |
| **attendance** 6:8 | 36:22,25 38:14 | **avenue** 2:5,14 | 185:6 |
| 100:11 | 38:16 39:6,24 | 2:20 | **bad** 62:22 |
| **attended** 84:23 | 40:16 41:15 | **average** 33:23 | 71:11 78:22,25 |
| **attention** 32:25 | 43:15,20 51:9 | 38:12,13 87:6 | 138:7 152:22 |
| 52:7 98:24 | 51:13 53:17 | 102:9 | 171:3 |
| 114:8,10 116:5 | 56:10 76:23 | **avoid** 162:12 | **based** 24:10 |
| 147:24 | 77:2,7,15 | **avoided** 162:9 | 25:15 77:8,11 |
| **attorney** 7:16 | 80:17 82:2,5 | 162:10,11,13 | 77:12 87:4 |
| 8:15 12:12,13 | 84:2 99:21,23 | **aware** 19:7 | 88:18 137:10 |
| 22:6 27:25 | 102:14,16 | 24:16 32:7 | 157:3 |
| 29:19,22 30:11 | 103:11 112:6 | 48:6 73:24 | **basically** 54:14 |
| | | | 100:11 121:7 |

[basically - called]                                                          Page 6

122:10 154:13
157:15 158:25
163:8 164:9,11
168:17 170:6
175:10 180:20
**basis**  19:23
21:7 34:23
86:23 91:15
**batch**  93:22
**bathroom**
10:15
**becoming**  31:8
44:13,17
**beginning**  38:2
45:16 60:16
81:15,16
**behalf**  2:2,10
3:11 11:22
74:19
**behavior**  60:8
114:11 159:13
159:21,25
164:11 174:19
**belief**  111:19
**beliefs**  25:4
**believe**  12:19
14:2,3,18 15:3
16:12,21 19:15
19:19 21:16
22:18 25:11
28:10 31:11,20
31:22 33:2
36:19 37:3
41:25 45:17
46:8 52:16

55:2,18 57:23
60:19 62:13,17
62:20 63:23
64:2,3,4,10
66:16 70:9,12
76:25 85:7,11
85:17 89:14,16
96:7 98:21
107:7,24
110:13 113:15
113:22 115:21
117:23 127:12
127:15 136:16
138:21 143:14
143:24 144:17
146:25 147:9
147:10,13
148:17 156:5
162:7 166:6
173:24 174:5,7
176:9 177:20
177:20 186:2,2
186:3
**believed**  101:24
**belonged**
167:10
**bench**  159:19
**best**  9:24 78:10
98:22 190:9
191:5
**better**  35:25
45:3 135:7
**beyond**  26:15
80:3 151:22

**bit**  41:12 78:22
158:12 164:12
**blank**  28:19,21
**blew**  153:12,13
**blowing**  147:15
153:20
**blown**  61:23
**blue**  34:15
**body**  178:10
**bonett**  55:19
**borough**  31:20
31:23 34:5,10
34:16,23 35:2
35:8,9,14,16
36:25 37:10
41:13,23 48:14
53:8 55:8,16
60:5 62:5
78:21 79:12,25
85:23 86:8
156:14
**boss**  114:3
**break**  10:14,15
10:20 51:19
52:4 117:7,18
123:17
**breaks**  10:17
**brief**  115:25
**briefly**  47:11
**bring**  73:19
114:9
**broke**  166:16
**bronx**  1:7 5:9
7:18 192:2

**brooklyn**  27:4
**brought**  7:17
32:25 66:17
73:16,21 114:7
147:23
**burned**  101:20
101:25

**c**

**c**  2:1 4:8 128:18
**cabinet**  16:4
**calendar**  35:17
38:7 39:11
43:11 77:4
78:2,3,6,12
81:8 91:15
175:6,17 176:2
**calendaring**
39:21
**call**  17:7 46:2
46:25 50:21,24
81:23 112:22
112:23 113:2,5
113:6 118:17
120:5 123:2
124:3,9,11,13
125:10 126:22
126:23,24
157:14,18
159:16 161:14
162:6,15,24
176:11 186:16
**called**  7:4 25:11
98:25 104:24
112:19 116:24
162:23

[calling - clerk]

**calling** 119:19
119:23 159:18
162:13
**calm** 85:6
**cannata** 28:3,8
28:17
**cap** 182:22
**card** 17:23,25
18:2
**carr** 1:19 5:3
190:2,20
**case** 1:6 4:13
19:24 20:4
36:13,14,17
37:17,19 42:23
45:9,11 65:6
81:24 82:23
83:3,3,4,6,19
83:20,23 84:15
84:20 86:11
87:12 102:13
103:9 121:17
152:8 154:6,9
154:15,16,17
154:20 155:22
156:19,24
157:2,5,9
163:10 168:18
179:21 180:13
192:2
**caseload** 36:3
37:7,15 38:8
38:10 47:3
77:22 78:15
99:12 101:23

102:3,4,5,15
103:4,11,16,21
**caseloads**
102:14
**cases** 29:3 34:6
36:23 37:6,8
37:25,25 38:4
38:11 39:5,6,7
39:7,12 42:19
42:19 43:19
44:9,14,17,19
44:23,25 45:2
46:21 47:19,20
77:6,10,13,23
78:6,16 79:7,8
79:15,17,21,23
80:2,4,5 102:9
102:18,22
103:2,2,6
104:18,19
105:5,15 109:4
112:3 121:23
121:25 141:2
141:11,14,14
141:15,19,21
142:2,5 153:3
156:10,10,16
160:11 167:9
178:10 179:14
181:5,6
**cause** 102:3
165:15
**caveat** 10:18
**cc'ed** 128:16

**certain** 9:23
53:3,18 62:2
80:3,4 103:22
105:7 144:9
186:16
**certainly**
130:20
**certificate**
190:1 191:1
**certified** 5:21
**certify** 190:3
191:2
**cetera** 15:6
**chain** 110:16
110:24 111:2,8
111:16,17
164:20 165:3
**chambers**
163:5 164:3
**change** 30:20
30:23,25 31:6
31:7 36:8,10
36:11 76:19
89:19 92:19
192:5
**changed** 31:9
51:6 94:22
**charges** 118:5
**check** 53:4
140:8 142:6
**checked** 141:20
**chief** 31:21,23
34:5,10,17,24
35:2,8,9,14,16
36:25 37:10

41:13,24 48:14
55:8 78:21
79:12,25 85:23
86:8 156:14
**chiefs** 53:8
55:16 60:6
62:5
**child** 25:24
**chin** 164:14,17
165:13
**christianity**
25:15
**chronology**
175:19
**circumstances**
8:4,7 145:25
**city** 1:9 2:10
4:6 5:11 6:16
7:19 29:20
179:15,15
**civil** 17:16 18:7
123:8
**claim** 21:3,10
**claiming** 19:22
20:6 24:9
**claims** 8:4 20:4
20:18 58:14
**clarification**
9:20
**clarify** 9:22
64:23
**clean** 65:3
**clear** 10:2
**clerk** 106:13

closed   32:23
closely   33:16
   33:17
codefendant
   179:16
colleague   6:14
collection   18:4
colluding
   168:24 169:10
collusion
   169:17
combination
   25:19
come   21:10
   34:13 56:7,21
   63:5 93:11
   98:24 104:21
   106:5,19
   109:16 111:10
   116:4 117:8
   146:19 160:16
   163:23
comes   28:22
   105:12
comfortable
   51:4
coming   39:13
   42:24 99:4
   154:25 155:4
command
   110:17,24
   111:2,8,16,17
   164:20 165:3
comments
   173:11

commission
   192:25
common
   148:24
communication
   60:15
comparable
   103:13,18
complain   32:15
   32:18 45:13,17
   45:19,22,25
   76:8,13,16
   80:11,18 88:21
   116:19 148:25
complained
   48:25 49:10
   51:8 76:10
   80:16 91:24
   92:4 174:6,8
   186:11
complaining
   75:23 76:3,5
complaint   3:11
   11:21 16:11
   32:20 38:3
   46:7,10,13,17
   49:7 50:9,20
   50:23 51:12
   74:19 89:25
   98:12,18 139:2
   139:10,13,16
   139:19 144:7
   154:8 156:8,22
   158:17 159:10
   159:12 160:5,8

166:16 169:9
169:25 172:22
complaints
   11:15,16,17,19
   16:15,20 32:11
   32:14 70:8
   73:24 74:24
   80:10 105:2
   106:8 107:13
   107:17 110:22
   143:2 145:10
   146:12,22
   147:22,23
   148:20 149:12
   149:21 150:12
   150:14 151:7
   152:24 153:25
   158:3 163:18
   165:22 166:14
   166:21 167:2
   169:6 171:13
   171:15 173:23
   174:3,21
   176:18 178:18
   179:9 180:12
   182:25 183:8
   186:8,14
complete   9:15
   109:2
completed
   18:17 109:5
   141:18
complex   77:12
compliance
   86:21

computer
   18:18,22
concern   153:2
concerned
   147:18,20,21
   147:25 151:6
   153:5 157:3,6
   166:10 178:12
concerning
   157:23,24
concerns
   110:22 157:16
conclude
   153:17
concluded
   189:3
concludes
   187:19
conclusion
   16:14 64:8
   138:19,24
conducted
   89:17
confer   12:11,12
conference
   37:21 78:19
   83:2,2,3,10,10
   84:15,22 85:9
   85:13 86:21
   99:5,17 100:25
   103:7 163:9
conferenced
   84:20
conferences
   82:22 83:16,18

84:3,6 86:2,19
86:20,22 99:13
104:16,18
105:20,24
106:9 167:11
**conferred** 12:5
12:8
**confirmed** 91:3
**confront**
113:21 114:3
**confused**
105:16
**confusing**
177:25
**conjunctivitis**
116:14
**connection**
137:6
**consequences**
89:21
**consider** 24:24
**consideration**
137:10
**considered**
38:13
**consisted** 78:2
**constitute** 6:5
**consultant**
29:19,22 30:2
30:11
**consulting**
28:18,24 29:4
29:11,18
**cont'd** 4:1,3

**contact** 184:21
**contacted**
120:15,22
**contained**
15:24
**contentious**
84:17
**contents** 135:2
**context** 42:14
42:16 50:3
75:18 84:10,11
98:23 102:14
144:3
**continue** 83:8
89:7,12 160:6
167:5
**continued**
109:22
**continues**
75:12
**continuing**
93:22
**contractor**
123:9
**contrived** 70:9
70:13
**control** 78:5,12
111:11 140:15
**conversation**
50:25 61:17,21
63:16,19 66:16
68:12 69:14
70:4,15 72:25
107:20,22,23
107:25 108:12

108:14,16,19
124:20 132:2,5
134:3,13,16
143:7,8,11
146:7 162:19
166:2,3,5,7
174:17 176:15
177:5,6,11,13
177:17,17,21
179:4 180:21
180:23 187:10
**conversations**
177:9 178:2
**converted**
136:18 137:19
**convicted**
18:12
**copied** 68:20
**copy** 127:9
131:2 188:4,6
188:10,16,20
**correct** 8:15
15:8 21:13
24:11,12 27:5
32:5,6 34:11
34:12 39:18
48:10,17,20
59:11 66:20,25
68:25 91:6
92:11 94:17
95:11 97:6,7
105:20,21
106:3 113:13
118:2 119:10
119:13,14,17

133:9 134:22
135:17 136:8
140:10 142:7
146:24 147:2,5
150:24 151:7,8
152:16 161:10
161:11,22
**costa** 128:18
129:3
**costa's** 128:24
**counsel** 6:11
10:16 12:6,7
13:7,12 14:19
14:25 18:24
19:2,8 31:13
31:16,18 74:21
77:9,11 85:12
121:6,9,15,17
121:19,25
122:5,12 123:4
131:13 134:12
134:18 135:11
139:15 143:25
187:13 190:10
190:13 191:6,9
**counselors**
186:5
**count** 86:15
**county** 21:19
78:24 82:19
97:5,17 104:20
104:23 105:20
108:3,6,18
117:23 139:23
148:16,18

**couple** 22:18
43:25 51:20
52:20 77:5
182:16 183:4
183:20
**court** 1:1 8:25
9:18 41:6,8
84:7,14 85:24
86:4,9,23
100:9,10 145:4
145:11 163:22
167:8 168:15
169:19,21
174:5,19
178:10
**courthouse**
105:10 106:16
106:19,20,22
107:3,7
**courtroom**
160:20 164:15
179:20,25
**courtrooms**
106:9
**courts** 79:7
**cover** 93:15
99:22 100:18
104:17,18
105:4 121:15
121:19 122:3,5
178:10
**coverage** 153:4
**coyne** 24:2,5
25:25 40:6,10
40:13

**create** 150:22
**created** 77:18
130:2
**creating** 129:24
**credit** 17:23,25
18:2,2
**cried** 72:2
**crime** 18:12
**cry** 72:3
**crying** 116:25
**curious** 122:20
**current** 17:14
31:12 144:18
**currently** 27:11
**curse** 59:9
**cursed** 59:8
**cut** 98:14
101:12 108:23
187:14
**cutting** 170:5,8
**cv** 1:7

**d**

**d** 3:1 4:8,8
**dan** 3:13,14
118:5,9,11
119:5,20 120:6
123:12,15
125:5,9,22
126:9,15 127:3
127:5,10,13,17
128:6,10,12,15
129:4,6,8,9,18
129:21,25
130:5 131:2,24
133:7,22

134:21,25
135:6,12,14
136:6,10,12,15
137:7 138:19
142:15,20
143:22 144:7
182:24 183:3
183:14,19
**daniel** 2:12
6:13 12:9
188:20
**danielle** 32:2,8
32:11,16,19,21
32:21 33:4,11
34:4,17 55:12
55:14 79:24
84:13 85:15,22
**date** 1:15 13:22
52:16 78:9,11
82:24 176:5
192:3
**dated** 119:9
136:6 137:5
**david** 3:16
11:14 118:18
123:25 124:7
124:21 135:22
145:23 152:8
172:9 181:9
**day** 30:6 52:20
53:21,24 54:3
54:6 56:8
59:16 67:13
90:11 91:17
96:6,12,15,17

96:18,24 97:3
118:11,12
179:11 186:24
189:10 192:22
**days** 137:14
**dealing** 149:11
**debt** 18:2,4
**december**
107:24 108:13
138:25 148:14
162:8 176:23
**decide** 93:9
**decided** 39:4
108:20 148:15
156:11 160:24
176:25 177:22
**decision** 44:2,4
97:16,20 138:7
168:20 169:2
177:22
**deems** 133:4
**defendant** 2:10
6:19 14:8
17:15 18:7
**defendants**
1:11
**deficit** 3:10
52:25 53:7,11
53:12,14 54:22
54:24 55:2,5
57:4,6,10,15
58:6 64:13
71:6
**definitely** 79:22
138:16 158:22

**degree** 26:7,20
  26:25
**degrees** 26:14
  26:20
**demands** 19:9
  19:14,18
**demeanor**
  84:22
**denied** 135:17
  135:19,24
**department**
  129:14,16
**depending**
  42:23 87:11
**deposed** 8:9
**deposition** 1:13
  5:7 6:3 7:25
  8:14 10:25
  11:9 12:4,18
  13:13,15 75:2
  90:25 91:2,9
  91:19 121:15
  121:19 182:16
  182:18 183:3
  183:19 187:18
  190:1 192:3
**depositions**
  8:17 91:14
**derived** 68:23
**describe** 21:22
  33:5,12,20,24
  52:13 61:11
  83:15 84:21
  87:3 88:4
  154:11 159:24

**described**
  80:12 138:11
  138:15
**description** 3:6
  4:2,9 98:23
**details** 150:2
**determination**
  133:12
**determine** 16:8
  39:8 77:6
  148:8
**determined**
  37:23 78:4
  176:20 177:18
**dhr** 139:15
**dial** 112:12,14
  112:16,18
**different** 24:4
  25:20 121:21
  167:17
**difficult** 9:3
  37:13 105:14
**difficulty**
  105:25 180:12
**digital** 190:7
  191:3
**direct** 48:15
**directed** 84:13
  135:18,20
**direction** 79:6
  79:16 175:25
**directly** 51:15
  59:11,17,25
  69:14,22
  111:14 159:19

**disappointing**
  66:6
**disciplinary**
  118:4 137:13
  150:8 151:11
  151:16 152:3
  152:19
**discipline**
  133:3,8
**discomfort**
  125:21
**discovery**
  11:11,12 19:9
  154:15 157:12
  159:6
**discriminated**
  19:22 20:6
**discrimination**
  16:12 20:11,14
  24:10 63:24
  64:3
**discuss** 13:6
  16:20 63:18
  72:23 73:12
  119:19 123:22
  127:22 157:8
  169:5,8 170:10
  173:22 174:3
  176:8 181:3,17
**discussed** 117:5
  163:6
**discussing**
  180:11
**discussion**
  14:24 15:2

**50:5 62:8**
  65:22,24 66:11
  66:20 67:4
  68:19,24 69:5
  69:20,23 70:19
  84:17 101:6
  124:18 125:3
  131:22 144:4
  144:11 148:7
  148:10,13
  152:15 158:11
  158:13 167:22
  175:2,4,19,21
  175:24 176:17
  176:19,21
  181:13
**discussions**
  42:10,13 110:3
  110:6 134:24
  174:20 183:7
  183:11
**dishonest**
  168:15
**dismissal** 120:9
  133:8,12,16,19
  136:17 137:13
  137:18
**dismissed**
  138:3
**dispositions**
  181:6
**dispute** 181:4
**disregarded**
  110:25

**disregarding**
110:23
**dissatisfaction**
159:20
**distinct** 67:18
69:10 71:17,20
**district** 1:1,2
**divided** 34:7
**dividing** 76:22
**division** 30:18
30:19,21
131:13 139:3
**dock** 54:21
**docked** 54:2,8
54:24,25
**doctor's** 116:9
**document** 3:14
65:11 74:16,22
94:8 136:22,25
145:19 182:11
182:15,19
**documents**
4:10 11:10,12
11:25 15:6,15
15:24 16:23
17:8 18:15,23
18:25 19:10,17
132:13,17
**doing** 15:17
44:24,25 45:6
45:11 46:16
47:6 58:25
69:11 71:12,18
81:17 83:8
109:23 112:2

175:6,16
**doled** 89:21
**door** 32:23
184:5,8,15
**doubt** 90:18
102:10
**drafted** 128:12
**drafting** 129:24
**drawing** 28:19
**dsmall** 2:16
**due** 41:7 90:13
90:17,24
116:13
**duly** 7:5 190:5
**duties** 34:23
35:4,13

**e**

**e** 2:1,1 3:1,5 4:1
4:8,8,8,8
**earlier** 92:14
185:19
**early** 17:20
39:17 52:8,22
55:25 56:4
91:5,7 146:24
149:20
**earn** 26:6,11,21
26:24
**earning** 27:3
**eastern** 1:2
**effect** 97:10
**effective** 87:8
117:24 139:23
140:3,4 141:11

**ehrlich** 55:22
**eighth** 2:14,20
**either** 12:25
38:22 57:3,12
73:11 120:23
123:25 134:12
134:17 135:10
**elaborate** 17:24
**else's** 36:4
**email** 3:8,17
14:2,5 15:3,3,7
15:11 46:2,22
47:2,8 65:15
65:19 68:20
70:6,23,25
72:22 73:18,20
75:25 94:12
118:17 132:22
140:5,7,23
176:11,12
188:16
**emailed** 47:5,8
123:25 124:4
135:13
**emails** 4:10
15:19,20,25
16:9,16,18,22
17:8 18:14
46:4,5
**emergency**
91:17
**employed**
190:10,13
191:7,9

**employee** 20:14
150:21 190:12
191:9
**employee's**
3:21
**employees**
131:10 134:6
**employment**
28:12,16 29:8
30:9 172:2
183:23,25
184:3
**encompass**
76:11
**endeavor** 9:9
**ended** 125:12
183:23,25
184:3
**entertained**
110:18
**entities** 7:21
**entitled** 159:5
**errata** 28:23
192:1
**es** 190:4
**escalate** 148:2
**escalation**
146:19
**esquire** 2:3,12
2:18
**estimate** 141:5
**estimation** 70:8
141:6
**et** 15:6 192:2

[ethics - filed]

ethics 3:21
evening 91:4
events 23:7,22
eventually
  59:12 61:14
  148:11 155:24
  156:2 168:6
everybody 36:4
  62:7 90:11,20
evidentiary 6:2
exact 69:21
exactly 9:25
  14:4 66:24
  163:2
examination
  3:2 7:10
examined 7:7
excellent 171:5
exchange 70:6
  70:23 73:18,20
  75:25 95:7
  159:4
excuse 52:25
  53:7,11,14
  55:5 57:6,14
  62:2 168:17
excused 53:16
excusing 57:4
  64:12 71:9
exhibit 3:8,11
  3:13,14,15,17
  3:21 4:4 64:15
  64:17,24 65:5
  65:8 70:24
  72:23 74:5,6

93:21,23 94:2
118:20,21
119:3 130:14
130:15,18
136:2,3,19,20
145:13,14
150:24 154:2
182:4,6
exhibits 93:23
  188:15
exists 18:21
expect 74:10
  111:8,10
expected 53:17
experience
  148:24 149:5
  171:3,5
experiences
  171:2
expires 192:25
explained
  50:25 51:2
  61:21,22
explaining 95:8
  145:24
express 79:13
  126:3 159:19
expressed 79:3
  107:2 170:22
extensions
  135:11
extent 17:6
  81:22 101:13
  179:3

extreme 159:20
eye 116:6,9,13
eyes 73:17

**f**

facilitate 35:20
fact 58:9,11
  66:17 77:11
  113:15 165:18
factors 38:9
facts 8:3,6
fair 35:6 43:5
  65:21 130:9
faith 39:16
false 64:5,9
  66:22 70:10,14
  73:13
familiar 8:21
family 13:18
fan 170:24
far 19:5 91:14
farber 3:16
  11:14 118:18
  119:19 120:4
  120:11 123:12
  123:25 124:7
  124:21 125:4
  126:4,22,25
  135:22 142:25
  143:6,7,8,12
  144:4,16,23
  145:24 146:5
  146:11 152:8
  152:15 159:16
  172:9 181:9,13
  182:23 183:6

farther 66:7
favored 110:11
  111:20
favorited 115:5
favoritism
  113:17,20,23
  114:4
fbsjb 1:8
february 52:8
  137:6 142:24
  146:10
feel 10:13 66:14
  110:10 114:4
  151:9 187:25
feeling 115:4
  138:6
feelings 65:23
  68:15,23 69:4
  71:10 72:24
  152:21 166:11
felt 44:9 61:23
  66:11 69:24
  89:10 111:19
  112:13
field 175:15
fifth 2:5
figure 175:5
  177:7
figured 122:24
  146:19 160:22
file 16:4,24
  45:2,3,4
  150:21 152:12
filed 3:11 11:20
  11:21 37:20

**[filed - generally]**

74:19 139:2,8
139:13 144:8
**files** 18:17 45:7
**fill** 28:23
**filled** 34:19,20
**finally** 10:13
162:21 176:24
**financially**
190:14 191:10
**find** 53:8
105:14 122:23
140:25 141:21
176:7 184:2
**finding** 105:4
105:25
**fine** 36:2
**finish** 9:8,10,13
10:19
**firm** 28:5,19,24
28:25
**first** 3:13 7:4
8:22 13:20,24
27:9,23 30:23
30:25 38:24
39:3,6 66:3
69:15,23 118:8
118:9,10,10
119:5 120:5
121:20 123:12
123:16 128:25
131:4,10 133:2
133:21 136:15
137:7,17
138:19 142:15
144:6,7 147:13

153:11 154:3
158:10 161:13
166:6,6 175:19
177:11 182:14
185:8
**fit** 77:6
**five** 29:9,15
113:10 185:5
**floating** 54:16
**flomenhaft**
28:3,8,16
**floor** 2:5,14,20
**folder** 16:3,7
18:16
**follow** 17:10
82:3 176:10
**followed**
175:24 176:4,7
**following** 65:23
71:3 73:23
76:20 117:22
118:3 126:21
126:23 160:4,8
160:18 162:5,8
162:15 167:22
**follows** 7:7
**foot** 106:15
**force** 93:7
**foregoing**
190:3,4 191:4
**forget** 175:14
**form** 128:16
**formal** 150:17
150:23 151:25

**formally** 77:17
108:7,10
**forward** 73:5
91:10
**found** 157:20
165:18 183:24
**four** 13:5 29:9
82:24
**frank** 161:17
161:21 163:13
163:25 164:2,4
164:7,9 166:18
166:19 167:4,6
167:14,15,23
**frank's** 165:22
166:14
**free** 10:13
**freed** 161:17,20
163:12 166:18
166:20 168:7,9
168:12,16
169:13,14,18
170:13,19,23
171:11
**freed's** 163:21
169:6,9,25
**friday** 52:21
54:5 90:16,24
91:9,19,25
**fridays** 39:17
52:22 90:5,8
91:6
**friends** 13:18
**front** 83:24

**frustrated**
152:18
**full** 35:9,15
**functions** 22:19
24:7
**furious** 138:12
**further** 139:24
158:13 175:21
175:24 183:7
183:10 187:12
187:16 190:12
191:8

**g**

**gabrielle** 2:3
6:10 7:15
188:3
**gail** 48:8 50:18
57:12,18 59:19
60:20 67:21,24
101:4 111:3
158:8 181:18
**garcia** 168:18
**gena** 2:18 6:14
12:9 154:21,25
155:5,14,14
**general** 3:23
31:13,16,18
120:16 131:13
134:12,18
**general's**
120:13
**generally** 59:18
80:14 83:22
93:20 121:22
186:4

**[gentlemen - happened]**

**gentlemen**
127:8
**gesture** 9:4
**getting** 29:12
44:18 56:15,16
80:7 101:20,24
181:5
**gheez** 25:11,13
25:14,22
**gig** 29:18
**give** 8:5 80:3
98:22 100:13
100:15 102:24
114:17 124:3,8
124:10 126:14
132:12,16
135:23 161:24
162:21 168:20
171:21,22
**given** 8:24 37:7
38:12 90:11,16
116:20 126:18
160:12 161:18
165:2
**giving** 80:14
91:25 108:25
**go** 8:12,14,22
9:8 15:17
37:15 40:13
51:19 57:17
58:4 72:9
77:10 83:5
84:14 89:24
91:14 97:10
99:24 111:9,14

112:6 115:7,25
131:8 146:2,2
148:16 153:24
185:6,8,10
186:22 187:10
187:11
**goal** 79:22 80:7
**goes** 92:8,23
131:18
**going** 8:12 10:9
15:23 18:14
57:20 64:14,23
74:4 80:9
89:25 93:21
105:6 107:20
110:21 111:3
114:2 123:19
124:21 134:6
138:15 148:7,8
148:15 153:3
153:17 156:12
160:23,25
170:10 174:4
174:22 175:12
175:14,17
176:3,6,8
177:14 178:6,9
178:11,13
182:21
**good** 5:2 6:10
7:12 16:10
33:24 71:10
117:6 126:18
138:6 152:21

**goode** 48:8,15
48:21 50:18,19
57:18,22 59:19
60:20 61:3
67:21,24 68:9
146:18 147:5,8
147:9 158:8
164:17,19,22
165:12,15,21
181:18
**goode's** 48:12
**gotten** 105:2
**gradual** 36:11
97:11 108:21
**gradually**
36:21
**great** 7:8,24
78:12 168:25
188:18,22,22
**greater** 102:8
102:11
**ground** 8:13
**guess** 31:3
76:11 87:11
162:24 164:10
170:6,7 172:25
**guesstimate**
103:3
**guidelines**
77:17,24
**gusenheimer**
2:22
**gvinci** 2:7

**h**

**h** 3:5 4:1
129:11,12
**half** 13:4
**hand** 6:24 9:4
171:4
**handle** 76:17
83:9 84:14
176:2
**handled** 4:15
38:2 39:5
43:19 77:9
81:25 82:18,21
87:14
**handling** 37:6
80:24 81:5,11
102:16 112:8
115:16 142:9
154:6 157:5,8
179:14
**happen** 40:24
53:22 54:20
86:17 107:20
123:19 124:22
140:19 150:17
151:23 174:25
175:12 178:9
**happened**
52:14,21 57:9
58:3 60:14
66:10 67:17
68:16 91:16
100:4 107:10
140:20 141:11
145:24 149:5

152:7,10
153:19 165:16
176:7 178:25
179:2 182:2
184:17
**happening** 93:6
100:14 127:21
134:9 143:23
149:7 160:23
160:25 175:5
**happens** 54:23
151:22
**happy** 10:7
**hard** 36:18
80:13 86:18
**head** 9:5 48:9
48:13 71:7
134:12 151:20
151:20
**heading** 131:9
**hear** 75:22 76:2
98:6 105:14
154:23 170:9
**heard** 7:14
149:6 184:15
**hearing** 6:21
49:10 71:24
137:25
**heated** 84:17
**heavy** 78:14
102:4
**heisler** 3:9
34:19 48:5,7,9
48:19,22 49:6
50:20 51:12,16

57:17,22 58:10
58:18 59:7,10
59:13,21 62:9
65:20 66:24
67:4 69:14
70:20 71:7,11
75:8 80:23
81:3 97:18,22
98:3 107:12
108:2 109:20
110:11 113:12
115:5 123:18
123:21 124:5,6
124:10 126:8
126:14,24
127:11,14,23
127:25 134:17
138:22 146:17
146:18 147:4
147:12 158:9
169:18,24
170:18 181:12
183:16 184:19
184:22
**heisler's** 124:23
152:23
**held** 37:21
**helen** 129:13
**help** 8:14
111:24 112:7
112:11 164:16
**helped** 111:23
**hereto** 190:13
191:10

**hey** 187:10
**highest** 103:15
**hinder** 44:11
44:16,18,21
**hindering**
44:13
**hire** 121:8,24
**hired** 30:13,15
31:2
**hiring** 122:12
**history** 30:9,10
126:19 170:20
**hmm** 175:22
**hold** 29:24
**holiday** 22:21
93:13,19 95:9
96:23
**holidays** 54:17
93:2 95:17,19
**home** 95:10
96:2,16
**hook** 64:7
**hour** 52:22
54:12,13 91:7
**hours** 13:4,5
43:25 52:24
53:19,21,23
54:4,6 91:4
93:15
**house** 77:14
**hr** 14:3,19,22
14:24 15:11
128:20,22
150:16,19

**human** 139:3
**hundred**
102:17,17
**hurt** 21:4,5

**i**

**idea** 63:8,11
82:8 120:3
127:20 128:13
132:20 133:11
136:13 139:21
165:20 169:3
183:15
**identification**
64:18 74:7
94:3 118:22
130:16 136:21
145:15 182:7
**identify** 6:8
65:13 94:10
145:21
**ig's** 120:8 121:2
122:9,14,18
123:2 131:20
132:21
**ii** 31:10
**iii** 31:11
**illustrate**
168:21
**immediate**
109:9,13
**immediately**
29:12 90:13
156:7
**implementati...**
4:5

**impose** 133:3
**impossible** 63:2
**impression** 44:12,20 63:17
**improper** 110:21
**improperly** 159:3
**inability** 114:12
**incident** 56:23 57:6 71:4,5,15 73:4,23 76:20
**included** 71:2 150:7 169:18 179:15
**including** 187:3
**increase** 82:17
**indicate** 95:20 170:19
**indicated** 95:24 98:19 99:3
**indication** 98:11,14
**indifference** 71:13
**indifferent** 71:11 147:14 152:22 158:12 175:20 177:11
**individuals** 128:15
**infection** 116:6 116:10

**information** 69:20 83:19,21 120:25 122:7 122:23 161:25 163:16,17 185:2
**informed** 49:16 108:7,10 153:18
**initial** 166:21
**initially** 153:18
**initiating** 65:19
**injury** 28:6 29:6
**input** 83:24
**inquired** 178:24 179:5
**inquiries** 122:16 134:15 162:17 184:7,9
**insinuation** 63:6
**insist** 109:8
**insisted** 92:24 109:12
**inspector** 3:23 120:12,16
**instance** 111:25 121:24 157:19
**institute** 151:15 151:18
**instituted** 15:4
**instructed** 15:14

**insulting** 66:6
**intended** 5:24
**interact** 140:22 140:24
**interacted** 140:25
**interactions** 109:22 139:25 172:18,24
**interest** 78:10
**interested** 190:14 191:11
**interfere** 99:15
**interfered** 92:5 114:5
**interfering** 58:24 62:9,14 62:18,23 64:11 66:4,12 68:17 69:25
**intermittently** 141:15
**interpretation** 68:16
**intervals** 87:2
**interviews** 131:9
**investigation** 120:8,12 130:12
**invitation** 187:5,7
**involved** 25:18 44:9,14,17,19 44:22 125:2

126:13 127:4 135:8 149:8,17 182:2 183:14 183:17
**involvement** 97:19 124:25 125:25 127:2 129:24 130:3 135:5 136:12
**involving** 148:19 149:12
**irrelevant** 90:14
**issuance** 144:6
**issue** 32:24 39:20 49:14 51:16 52:9 53:13,15 55:24 57:2,4 58:19 59:11 61:16,24 63:5,9,13 65:17,22 67:6 67:22,25 71:22 71:24 73:15,16 75:6 92:14,17 92:18 94:23 95:3 100:11,17 100:25 101:3 105:9 107:5 111:6,9 112:7 128:2,5 157:19 176:9
**issue's** 37:20
**issued** 118:4,12 118:14 136:3

136:11 137:7
142:20 182:24
183:2
**issues** 16:20
32:7 56:24
114:24 149:16
161:10,21
163:13 168:21
170:11
**it'd** 54:11

**j**

**j.d.** 26:11,15
27:3
**january** 28:10
28:10 31:22
52:8 97:12
108:24 109:16
109:21 110:7
114:16,24
136:4 156:5
**jason** 1:19 5:3
154:21 155:2
155:12 185:10
188:14 190:2
190:20
**jay** 26:19,21
**jennifer** 24:2,5
25:25 40:6,10
40:13
**jerman** 38:23
40:4,18 161:5
171:4
**jewish** 24:15,20
39:16 92:25
93:12 95:9,17

96:22 113:13
113:16
**job** 30:20,24
114:12,13
138:9
**john** 26:19,21
38:23 40:4,18
161:5 171:4
**join** 187:5
**judge** 84:15,19
85:5,5 104:25
105:14,23
106:10,11,13
106:17,23
154:3,4,7,11,13
156:7,22,25
157:7,7,10,13
157:25 158:5
158:16 159:2,2
159:9,17,18,24
160:5,11,18,19
161:3,8,16,17
161:19,20,20
161:23 162:3,4
162:16,22
163:12,12,21
163:25 164:2,4
164:7,9 165:22
166:14,18,18
166:19,19
167:4,6,7,7,9
167:10,12,14
167:15,15,15
167:19,23
168:5,7,9,12,15

169:6,8,13,14
169:17,24
170:12,19,23
171:10,16,16
171:24 172:13
173:2,10,15
174:6,10,12,15
174:18 179:7,7
179:9,12,12,14
179:17,22,24
180:4,6,7,8,16
181:2
**judge's** 157:4
159:12
**judges** 16:15
16:20 41:8
78:24 79:14
88:11,11 105:3
105:4,8,25
106:7 107:6,13
143:3 145:9
146:12,22
147:22 148:20
148:25 149:12
151:6,10
152:24 153:24
157:16 161:9
161:12,15,16
167:2,17
168:13,17
171:7,12
173:22 174:8
174:21 176:18
176:23 178:18
180:3,11,13

182:25 183:8
**july** 36:13
**jump** 75:11
**june** 119:9
136:6
**jurisdiction**
27:7
**jurisdictions**
27:8,12
**jury** 100:18
157:21

**k**

**kaplan** 180:4,6
180:16 181:2
**keep** 65:3 77:21
81:7,9,19
82:16 139:7
**keeping** 81:20
**kept** 77:25 82:6
143:20
**khahaifa** 1:10
1:14 5:1,8,12
6:1,18,19,23
7:1,3,12 8:1
9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
17:9 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1

| | | | |
|---|---|---|---|
| 41:1 42:1 43:1 | 128:1 129:1 | 121:5 129:15 | 121:7 123:24 |
| 44:1 45:1 46:1 | 130:1 131:1 | **kings** 97:5,15 | 124:2 126:11 |
| 47:1 48:1 49:1 | 132:1 133:1 | 97:17 108:3,5 | 128:4,12,18,23 |
| 50:1 51:1 52:1 | 134:1 135:1 | 108:18 117:23 | 128:24 129:23 |
| 52:3 53:1 54:1 | 136:1 137:1 | 139:23 148:16 | 130:2,4,19 |
| 55:1 56:1 57:1 | 138:1 139:1 | 148:18 177:2 | 131:14 134:8 |
| 58:1 59:1 60:1 | 140:1 141:1 | 177:19,23 | 134:10 136:14 |
| 61:1 62:1 63:1 | 142:1 143:1 | **knew** 45:2,3 | 139:6 140:14 |
| 64:1 65:1 66:1 | 144:1 145:1 | 95:18 134:5 | 143:19,22,23 |
| 67:1 68:1 69:1 | 146:1 147:1 | 173:13 174:4 | 145:6,17 |
| 70:1 71:1 72:1 | 148:1 149:1 | **know** 8:2 9:14 | 150:19 160:17 |
| 72:7 73:1 74:1 | 150:1 151:1 | 10:5 21:2 | 160:24 161:20 |
| 75:1 76:1 77:1 | 152:1 153:1 | 25:25 32:10,13 | 162:18 164:21 |
| 78:1 79:1 80:1 | 154:1 155:1 | 32:24 34:3 | 165:14,19,19 |
| 81:1 82:1 83:1 | 156:1 157:1 | 42:5,14,15 | 166:8,10,15,17 |
| 84:1 85:1 86:1 | 158:1 159:1 | 45:4,9 57:21 | 166:20,25 |
| 87:1 88:1 89:1 | 160:1 161:1 | 57:23 58:4,7,9 | 169:20,22 |
| 90:1,3 91:1 | 162:1 163:1 | 58:11 59:6 | 170:22 171:14 |
| 92:1 93:1 94:1 | 164:1 165:1 | 60:4,12,21 | 172:4 173:4,7 |
| 95:1 96:1 97:1 | 166:1 167:1 | 61:4,13,19 | 175:7,16 178:8 |
| 98:1 99:1 | 168:1 169:1 | 62:3 64:21 | 178:11 181:4 |
| 100:1 101:1 | 170:1 171:1 | 67:12 68:2,13 | 181:25 182:9 |
| 102:1 103:1 | 172:1 173:1 | 68:17 74:11,13 | 183:13,17,18 |
| 104:1 105:1 | 174:1 175:1 | 75:14 77:19 | 183:22 |
| 106:1 107:1 | 176:1 177:1 | 79:14 82:5,15 | **knowledge** |
| 108:1 109:1 | 178:1 179:1 | 86:9 89:3 | 19:16 24:13 |
| 110:1 111:1 | 180:1 181:1 | 90:15 94:5 | 41:19 78:22 |
| 112:1 113:1 | 182:1 183:1 | 95:2,21 96:8 | 85:19 93:13 |
| 114:1 115:1 | 184:1 185:1,18 | 96:20 100:7,9 | 95:5 96:10 |
| 116:1 117:1,17 | 186:1 187:1 | 111:22 112:5,9 | 104:22 114:17 |
| 118:1 119:1 | 188:1 189:1,6 | 112:15,17 | 119:18 149:10 |
| 120:1 121:1 | 192:3,21 | 113:9,11,11,12 | 160:6 167:23 |
| 122:1 123:1 | **kind** 25:19 29:3 | 113:19 114:19 | 190:9 191:6 |
| 124:1 125:1 | 30:8 37:13 | 114:20 118:25 | **known** 118:5 |
| 126:1 127:1 | 61:16 74:11 | 119:21,25 | 122:25 |

**[label - look]**

**l**

**label** 25:4
**labor** 128:21
  128:21 129:15
**lack** 135:6
**laid** 28:14
  29:12
**largest** 103:16
**larry** 34:19
  48:5,7,9,25
  49:11 50:9
  53:15 57:12,17
  58:10,20 59:3
  59:7,8,8,17
  60:17 61:14
  63:4,10,19,23
  64:10 65:16,23
  66:11,15,18,20
  68:25 69:4,14
  69:22,24 70:4
  70:13 71:7,21
  71:25 72:3,24
  73:5,7,14
  97:18 101:3
  107:10 108:12
  108:17 109:11
  109:15 110:22
  111:3,15,19
  112:7,10,14,22
  112:23 113:2,5
  113:6,21
  134:17 147:13
  158:9,12
  160:23,24
  164:22 166:4,8

  166:12 169:20
  174:21 175:20
  176:17
**larry's** 61:11
  70:17
**late** 17:19
  52:18,19,23
  168:15
**law** 26:6,8 27:4
  27:17,19 28:4
  129:14,16
**laws** 6:2
**lawsuit** 11:22
  13:21 14:6,9
  14:12,15 15:4
  20:9,15 182:22
**lead** 21:9
**learn** 13:20,24
  14:7 45:5
  107:11 118:8
  118:16 137:17
  173:15,19
  183:19 184:11
  184:13
**learned** 20:10
  44:23,25 45:12
  118:10 120:5
  123:11,16,19
  133:22 137:21
  138:20 139:20
  143:19,24,25
  161:16 172:3,4
  172:7,19
**learning** 14:12
  14:15 20:18

  50:8 131:23
  137:25 182:22
**leave** 28:21
  39:17 54:10,14
  54:16
**leaves** 52:22
  175:21 177:12
**leaving** 55:25
  56:4
**led** 70:12
  110:13 111:19
**leeway** 62:2
**left** 40:9,14
  90:8 91:5,7
  105:8 125:11
  158:13 161:7
  164:2 175:15
  179:6
**legal** 26:22
  27:23 112:7
**lended** 113:17
  113:19
**level** 89:23
**liaison** 129:15
**license** 27:17
  27:20
**likely** 69:9,13
**liking** 170:20
**lilly** 47:13
**limited** 121:11
**limits** 121:12
**line** 64:7 66:2
  74:9,10 130:21
  130:21 192:5

**lisa** 61:7 94:13
  108:25 191:2
  191:14
**list** 80:23 81:9
  81:20 82:6
  83:6,6
**listen** 85:4
**lists** 4:13 81:20
  81:24 82:15
**litigation** 17:16
  123:8
**little** 30:2 41:12
  64:19 147:14
  158:11 164:12
  168:16
**llc** 192:1
**llm** 26:15
**llp** 2:4,13,19
**load** 102:13
**location** 1:17
**long** 13:3 21:11
  21:15 29:7,24
  36:16 39:2
  59:6 118:23
**longer** 35:8
  40:21 41:2,4,5
  55:15 104:15
  105:19 119:12
  143:9 144:14
  144:24 145:3
  186:12
**look** 55:10 77:3
  94:4 126:18
  128:14

[looked - memorandum]

**looked**  62:22
**looking**  35:23
　94:16 131:7
　132:24 136:2
　146:21
**loop**  143:21
**loose**  187:14
**lose**  138:9
**lost**  87:17
**lot**  25:19 79:25
　80:4 83:24
　111:23 112:9
　142:12 168:15
　187:2
**love**  179:12
**loved**  171:5
**lowest**  103:17
　103:20
**lunch**  117:6,18
**lying**  154:14
　156:25

**m**

**m**  4:8
**ma'am**  64:20
　65:9 74:8 94:5
　117:20 130:17
　136:23 145:17
　187:21,25
**made**  44:4
　49:19,20 50:23
　59:9 62:20
　66:15,23 73:25
　90:21 96:5,23
　97:16 98:12
　106:8 133:11

140:18 149:23
149:25 152:6
162:21 172:21
173:10 177:22
181:14 184:9
186:8
**maintain**  27:16
29:8 35:17
36:2 53:18
**maintained**
　4:13 81:8
**maintaining**
　82:14
**maintenance**
　39:21
**major**  36:13,14
36:17 47:19,20
103:2
**make**  9:22 41:5
44:2 52:24
53:12,25 54:5
62:12,16 63:3
90:20 99:23
122:16 134:13
134:15 145:3
150:13 151:14
151:23 152:16
162:16 184:6
**makes**  38:10
67:9 174:7
**manager**  58:15
84:10
**manhattan**  1:7
5:9 7:18 28:25
192:2

**manner**  6:3
**march**  40:25
97:13,14 109:6
109:21 117:24
139:24 140:4
140:21 141:25
**maria**  168:18
**marie**  55:19
60:19
**mark**  65:5
93:21 130:14
136:19
**marked**  64:15
64:17,24 74:5
74:6 94:2
118:20,21
130:15,18
136:20 145:13
145:14 182:4,6
188:15
**matter**  5:8
90:12 148:3
**matters**  4:14
80:24 81:11,25
82:7,18 142:9
**mean**  17:24
22:3 61:4
71:17 82:20
83:7 100:17
101:17,18
111:21,22
114:7 124:5
165:10 178:20
179:20 187:6

**meaning**  37:18
66:4 71:5
124:6 131:11
**meaningful**
　10:8
**means**  6:4 7:25
74:8 75:18
153:25
**meant**  101:15
**meet**  12:16
153:18 162:4
162:20,22
163:4 176:6,8
**meeting**  46:2
49:18 63:11,15
162:11,12,17
162:25 163:7
163:11 177:21
180:22 181:2
**meetings**  12:14
12:20,25 13:3
13:6,10
**members**
　186:22
**memo**  145:23
**memorandum**
　3:15 11:13
　146:5,22
　150:18,23
　151:15,25
　152:9,16
　159:15 172:9
　172:12 181:8
　181:15,22
　183:6

**memorialize**
152:7
**memorializing**
152:9
**memory**  178:3
178:5
**mentioned**  9:19
24:8,20 157:18
161:8 186:18
**met**  161:15
162:7 163:5
166:17 171:15
176:22,24
179:12
**miltenberg**  2:4
6:11
**mind**  16:13
**mini**  188:10
**minimum**
53:18
**minute**  51:18
64:12 72:6,9
89:15 115:8
**minutes**  51:20
71:9 117:8
185:6
**miriam**  55:18
**mistake**  140:18
**misunderstan...**
141:24
**mix**  46:22
**mm**  175:22
**modified**
137:14

**moment**  72:18
155:17
**moments**  7:14
**monday**  54:5
90:17,24 91:10
91:20
**monitoring**
34:2
**month**  29:15
162:8
**monthly**  39:12
56:11 77:3
86:17 141:7
**months**  29:10
35:11 77:5
78:9 82:24
136:10 182:17
183:4,20
**morning**  5:2
6:10 7:12
92:14 185:19
187:15
**motion**  168:20
**motions**  167:11
**move**  9:11 79:6
91:9 156:15
**moving**  73:5
**multiple**  38:9
42:13 83:14
105:2,3
**muted**  155:5

**n**

**n**  2:1 3:1 4:8
**name**  5:2 6:18
7:15 28:19

55:21 128:25
184:5,7,15
192:2,3
**named**  14:8
**names**  161:18
161:24
**nation**  25:12,13
25:14,22
**nature**  17:21
42:20 93:6
140:9
**necessarily**
122:5
**need**  10:6,16,17
39:10 56:10
65:5 99:18
100:19 121:20
130:20 140:22
151:3 154:3
175:5,7,7,25
**needed**  77:9
99:6 100:7,9
100:12 112:10
125:14 178:9
**needs**  9:20
**negotiated**
83:23
**negotiations**
83:22
**neither**  190:10
191:6
**nesenoff**  2:4
6:11
**never**  18:11
21:8 47:5,8

49:24 54:25
70:11 73:16,21
92:2,7 149:5
152:14 172:21
176:6 182:19
**new**  1:2,9,18
2:6,10,15,21
4:5,16 5:11,13
5:13,16 6:16
7:19 21:19
23:2 27:10,13
27:17,23 29:20
31:21,24 34:7
38:14,17 39:5
39:7,25 40:17
40:21 41:6,8
47:10 78:23
80:20 82:2,19
90:4 97:23
99:16,21
102:19,20
104:16,19,23
105:20 106:6
106:12,14
109:3,7,24
139:3 141:13
142:2,10 143:3
144:14 145:3
145:11 146:3
148:23 171:16
179:13 190:21
192:1
**night**  12:2
**nine**  133:2

nmllplaw.com
  2:7
nod   9:5
nope   127:24
  132:23
normal   21:25
  22:3,5,8 33:15
  38:14 59:22
  60:8
notary   5:14
  189:13 190:20
  192:25
note   9:3 37:19
  116:9 149:21
  150:13
noted   82:17
  146:23 149:23
  154:3
notes   11:14
  13:9 46:6
  144:10 149:23
  149:25 150:3,4
  185:6
notice   3:13 4:4
  4:12 17:10
  99:13 100:14
  100:15,21
  118:4 119:5
  137:5 152:23
noting   4:14
  81:25 149:16
november   1:15
  5:12 156:21
  157:14 158:2
  159:17 160:18

162:5,16
number   53:18
  124:12 128:15
  178:2 185:2
numbers   64:24
nuts   138:15
ny   1:18 2:6,15
  2:21
nyc   131:9
  133:3
nyct   3:21

**o**

o   4:8
o'clock   117:8
oath   52:5
  117:19
oaths   5:15
objection   5:18
  6:21 22:9
  96:11
observance
  39:16 62:23
  66:5,13 68:18
  69:25 90:9
  92:6 93:12
observation
  60:10
observations
  60:21 87:5
  88:14,19,22
  89:5,8 111:22
observe   39:17
  60:12,17,25
  86:8,12 88:3
  112:25 113:4

115:23
observed   60:24
  86:24 88:8,10
  93:20 111:18
  113:6 179:2
occasion   86:7
  96:4
occasionally
  86:22
occasions
  100:16
occurred   56:3
  56:6,8 158:24
  181:21
october   28:11
offense   168:25
office   3:22
  32:22 61:19
  100:8,9 120:8
  120:13 121:2
  122:9,14,18
  123:3 128:21
  130:12 131:20
  131:23 132:10
  132:13,17,21
  176:13,14
officer   190:1,2
officially   97:14
offshoot   25:16
oh   61:8 92:21
  163:20
oig   132:6
oig's   130:12,24
  131:9,23
  132:10,13,17

132:25 136:3
  136:11
okay   7:8,22 9:5
  9:16 10:3,21
  15:7,10 17:2
  18:6 19:7
  24:13 30:8,23
  31:14 33:9
  40:3 41:11
  47:25 51:21
  52:15 55:4
  57:17 65:18
  66:2,10 67:16
  69:16 70:18
  71:3 72:9
  74:15 75:11,20
  80:22 88:24
  92:13,23 93:5
  94:7 95:13
  96:20 97:8
  99:9 104:9
  105:22 106:21
  108:13 112:25
  115:12,15
  117:9,10,11
  119:2,9 120:24
  124:4 125:16
  126:21 127:7
  128:24 129:7
  130:9,23,24
  131:18 132:8
  140:11 141:10
  142:5 150:7,22
  151:9,14
  152:14 155:6,7

155:9,10,20
156:19 157:10
158:15,23
161:19 164:24
166:24 168:6,9
174:2 177:3,24
178:5 179:11
183:5,22
184:16 185:7
185:14 186:7
187:19,22
188:8,11,11,19
188:23
**old** 188:2
**olr** 128:18
**once** 22:20 74:8
80:6 104:8
141:17
**ones** 61:6 77:8
93:9
**ongoing** 123:8
**open** 125:12
141:3,17,18
142:2,9 158:13
175:21 177:12
187:4
**operating** 1:8
5:10 7:19
192:2
**opinion** 53:8
133:18 164:10
**opinions** 107:2
**opportunity**
86:11 115:22

**ordering** 188:4
188:6,12
**orientation**
35:3
**originally**
137:12
**outcome**
136:15 190:14
191:11
**outing** 22:23,24
22:25 186:18
186:22
**outings** 22:17
186:17 187:8
**outside** 13:7,17
22:13,16 23:8
23:21 24:6
77:9,10 121:6
121:8,15,16,18
121:25 122:4
122:12 123:4
186:5
**overheard** 59:4
**overloaded**
90:3
**overly** 85:2
88:9
**oversee** 36:3
81:9
**own** 36:3 50:14
52:14 78:12
82:6 104:17
154:10

## p

**p** 2:1,1
**p.m.** 117:15
189:2
**page** 3:2,6 4:2,9
65:18 75:4,13
128:14 131:8
133:2 192:5
**paid** 54:12
92:25 96:18
**pandemic**
13:23
**paper** 94:22
140:14 169:19
**papers** 169:21
**paragraph**
66:3 75:5,12
90:2 92:8
131:10
**paraphrase**
131:19
**paraphrased**
59:5
**paraphrasing**
58:24
**park** 191:2,14
**part** 39:11,15
60:8 82:15,22
83:17 89:16
97:14 100:20
115:21 129:13
141:24 163:21
167:10,13
171:20

**parties** 5:16,20
22:20 190:11
190:13 191:7
191:10
**party** 22:21
**paul** 58:12,13
58:14 59:19
60:12 63:16,19
63:22 66:17
67:5,13 70:16
71:22,23 72:25
**pay** 55:3
137:15
**paygrade**
134:14 151:21
**penalty** 4:4
136:17 137:5
137:13,18
**pending** 10:18
**people** 60:11,22
61:8 111:11,24
112:10,23
187:2,3 188:2
**people's** 22:19
171:2
**perfectly** 57:17
**perform** 35:3
83:18
**performance**
42:3,6 47:3,9
83:16
**performed**
86:12
**period** 21:18
28:7 29:14,15

106:12 115:25
**permanently**
30:13 31:2
**permission**
165:4
**permitted** 5:24
**person** 12:20
46:22,24
120:25 122:14
**person's**
166:16
**personal** 28:6
29:6 54:16
123:5,8
**personality**
89:17
**personally**
149:8
**personnel**
149:16 150:8
**perturbed**
164:12
**phone** 46:24
99:3 124:15
126:21,23,24
161:13 162:15
176:11 185:2
**physically**
105:13
**picture** 116:13
**pictures** 116:16
**pinpoint** 43:3
**place** 134:11,17
142:24 149:11
163:9 172:2

**plaintiff** 1:5 2:2
3:7 4:3 6:12
64:17 74:6
90:3 92:9 94:2
118:21 130:15
136:20 145:14
159:5 168:25
169:10 171:8
182:6
**plaintiff's** 28:6
29:5 64:15
84:18,19,25
85:11
**plaintiffs**
157:22
**playing** 154:22
**please** 6:8,24
9:14 10:19
124:3,8 155:16
175:4 182:8
**pleased** 50:5
**point** 9:11
24:18,19 31:4
31:5 35:24
36:5,12,21
39:4 40:14,20
43:22 44:23
45:16,18 74:11
79:4 80:22
81:2,13,14
82:17 98:13
103:8,22 105:7
114:21 139:6
140:11,17
142:8 145:8

170:6 173:24
174:10
**policy** 111:12
**pose** 39:20
**posed** 10:10
**position** 27:24
28:15 29:17
34:14,18 48:12
**possession**
19:18
**possible** 141:23
164:23 178:23
**possibly** 172:24
**post** 168:19
**potentially**
134:6
**power** 151:17
151:23
**practice** 24:14
24:22 27:5,9
27:12,22 43:13
43:17
**practices** 26:2
**practicing** 25:7
25:22 28:5
**preapproval**
100:13
**prefer** 180:14
**preparation**
12:17 13:13
74:25
**prepare** 11:8
12:4
**prepared** 42:20
93:23 191:3

**present** 12:23
14:25 30:5
56:19 66:19
**presenting** 56:5
**preservation**
4:12 17:10
**preserve** 15:5
15:15
**preserved**
18:15
**preside** 167:18
**presided** 167:7
167:16
**presumably**
131:20
**pretenses** 66:18
66:22
**pretentious**
70:9,14
**pretrial** 37:20
78:19 82:21
83:9 86:21
102:21,22,25
178:25
**pretty** 24:17
37:12
**previously**
55:13 64:15,24
74:5 118:20
145:12 170:12
173:5,8,16
180:10 182:4
**print** 16:3
**printed** 17:4
168:19

**prior**   20:9,14
21:8 31:23
47:15 55:8
56:7,23 57:6
63:16 74:21
98:17 110:4
120:10 123:2
127:10,14
128:6 130:5
131:23 146:10
152:15 171:25
172:18 181:7
182:18,21
190:4
**prioritize**   99:12
**privy**   122:25
**pro**   171:8
**probably**   8:20
17:19 19:4
35:25 37:8
43:11 55:20
67:17 98:14
100:16 104:8
118:11 139:11
171:8 172:17
173:20 183:25
**problem**
155:14 171:6
171:10
**procedural**
5:25 63:9,13
**procedurally**
94:22
**procedure**
61:25 96:14

149:11 150:20
**procedures**
44:7
**proceed**   10:25
64:21 74:14
94:6 118:25
145:18 182:10
**proceeded**
179:18
**proceeding**
1:17 5:5,23
189:3 191:4
**proceedings**
190:3,4,5,8
191:5
**process**   44:16
44:21 56:14
97:11 108:8,21
127:2,4 135:6
135:9 136:13
151:15,18
152:3
**produced**   5:22
19:17
**production**
17:8 19:10
81:24
**professionali...**
172:16
**promoted**
34:15
**promotion**   31:4
**prompted**
174:2

**prompting**
163:3
**proportion**
61:24 147:15
153:20
**protocol**
149:15
**provide**   43:7
122:8
**provided**   17:7
81:23 151:24
**proving**   56:20
**public**   189:13
190:20 192:25
**purpose**   180:22
180:25
**purposes**   37:18
37:22,24 103:6
121:17 123:5
**purview**   152:13
**pushing**   103:23
104:3
**put**   16:4 143:17
152:11

**q**

**qualified**   190:7
**quantify**   36:18
37:13 86:18
**question**   9:8,13
10:6,9,18,20
16:10 19:25
45:8 47:7
72:17 79:10
86:6 87:23
105:16 106:4,4

111:5 150:11
155:11,15
165:11 166:22
167:21 170:17
**questions**   8:2
8:24 11:6 43:9
43:10,18 46:20
94:16 121:4,5
122:13,17
128:9 130:6
187:13,17

**r**

**r**   2:1 4:8
**raise**   6:24
157:13
**raised**   25:6,9
32:11,13 63:11
73:13 94:23
95:3 96:11
158:4 163:12
171:12,14
179:9 183:8
**ramos**   47:13,14
**random**   90:12
**reach**   141:7
143:5
**reached**   53:5
**reaching**   48:22
142:25
**reaction**   14:11
20:17 49:9,12
55:6,7 70:17
71:24 137:25
138:2,5,11,15
145:5 147:19

147:21,25
166:9 178:6
**read** 72:16,19
74:9,12 75:13
75:16,17 128:6
130:10,20
155:18
**reading** 131:21
**reads** 66:3
**ready** 64:21
74:13 75:15
94:5 118:25
130:20 145:17
182:9
**reallocate** 39:9
**really** 8:14
125:2 180:14
**reason** 10:14
10:23 11:3
20:25 82:15
107:17 122:4
126:14 128:22
135:23 156:23
171:21,22
172:15 192:5
**reassign** 99:4
141:22 156:16
157:2
**reassigned**
100:24 101:9
109:4 141:15
141:19 142:13
156:20,24
**recall** 8:3 14:3
14:23 15:12

24:19 29:16
31:5,19 37:5
38:18 45:20,23
46:5,15,16
50:3,4 52:9,15
59:15 61:18
62:19,21 63:21
68:11,12 73:2
80:25 81:18
87:13,16 88:17
89:2 91:11
93:5 96:9,21
98:20 101:11
102:7,8 109:25
110:9 114:15
114:21 115:15
116:7,8,11,12
116:15,15,22
116:23 118:6
120:20,21,23
123:22,23
126:7 132:4,9
135:25 137:20
137:21 139:18
142:8,11,21,24
143:13,15,16
144:5,20 149:9
149:25 158:19
163:2 165:25
166:9,10 167:3
169:7,12,15
170:4 172:3,7
173:6,18,20
174:17,18
179:21 180:19

185:21 186:19
**recalled** 168:18
**receipt** 160:4
**received** 15:8
127:9 130:10
130:11,11
143:2 146:23
149:20 150:12
**receiving**
130:25
**recognize**
65:11 74:16
94:8 119:3
136:22 145:19
**recollection**
67:8,18,20
69:11,18 71:18
71:21 93:18
95:4 131:22,25
154:2
**recommendat...**
133:2
**recommendat...**
132:25
**recommended**
133:8,16,19
136:16 137:12
137:18
**recommending**
120:9
**record** 5:4,5,19
6:9 8:21 51:20
51:21,23,24
65:14 72:10,11
72:13,14,19

81:10 94:11
115:8,9,11,12
117:11,13,14
145:22 149:16
149:22 150:8,9
150:14,16
155:8,18 185:8
185:10,11,13
185:14 188:23
190:9 191:5
**recorded** 6:3
190:6
**recording** 5:22
190:8 191:3
**records** 132:14
132:18 137:12
**recounting**
65:21
**recuse** 171:18
173:12
**recusing** 173:3
**reduced** 190:6
**refer** 7:20
128:22
**reference** 90:2
92:9 102:13
159:16
**referencing**
16:14
**referred** 161:9
**referring** 54:9
61:5 65:17
131:15,16
146:17 169:22

**refers** 75:5
**reflected** 55:2
    132:9
**refresh** 131:21
    131:25 154:2
**refreshments**
    10:15
**refused** 171:22
**regard** 110:16
    121:6
**regarding** 3:10
    3:14,19 13:15
    16:19 46:6,21
    48:23 52:9
    65:16 71:15
    92:17,18 94:14
    110:7 111:7,9
    116:9 120:17
    128:10 134:25
    138:7 139:15
    140:7 142:25
    152:22 169:9
    172:18 176:17
    182:25
**regardless** 51:3
    89:19
**regular** 34:23
    86:23 188:9
**regularly** 60:13
    60:18 61:2
    110:18
**related** 23:6
    172:15 190:10
    191:7

**relating** 75:7
**relations**
    128:21 129:16
**relationship**
    21:23,25 22:4
    22:5,7 33:5,12
    33:15 59:20,22
    61:11 73:4,6,9
    73:10
**relative** 190:12
    191:9
**relegated**
    167:19
**relevant** 15:5
    15:15,21 16:9
    16:16 19:4
**religion** 19:23
    20:7 24:10,14
    24:22 25:7,9
    25:16 26:2
**religions** 25:20
**religious** 25:4
    66:5,13
**relinquish**
    36:22
**remain** 36:16
**remained**
    141:16
**remaining**
    141:2
**remark** 68:10
**remedy** 148:19
**remember**
    13:22 16:13
    25:23,24 38:24

39:3 43:24
    61:20 62:6,25
    69:21 94:25
    98:25 104:10
    104:12 116:2
    129:2 141:8
    144:9,22
    147:10 178:22
    178:23,23
    179:3,3,4
**remote** 1:17
**remotely** 5:13
    5:17
**remove** 44:3
**removed** 34:18
    34:21 43:23
    105:13
**repeat** 19:25
    33:7 79:10
    155:11,15
    167:20
**repeatedly** 98:3
**rephrase** 9:23
    10:7
**report** 42:22
    46:9 52:18
    75:8 85:15
    100:23 130:12
    130:24 131:5,7
    132:25 136:3
    136:11 153:6
    153:14,23
    157:4 164:7
    168:10,12

**reported** 1:19
    71:25 96:22
    147:4 151:19
    154:11 164:9
    168:13 180:15
**reporter** 5:2,3
    6:20 7:8 8:25
    9:18 51:21,24
    72:11,14,18,19
    115:9,12
    117:11,14
    154:24 155:4
    155:17,18
    185:11,14
    188:3,8,11,18
    188:23
**reporting**
    151:10 157:11
    192:1
**reports** 41:7
    43:7
**represent**
    74:18 137:4
**representative**
    122:8
**represented**
    157:21
**representing**
    6:16
**reputation**
    78:23 79:2,20
**request** 85:23
    125:16,20
    135:17,19,24
    152:5 181:14

**requested** 19:6
72:20 155:19
**requesting**
135:14
**requests** 19:9
145:10
**require** 82:13
100:3
**required** 53:20
96:5
**requirement**
82:9,11
**research** 112:2
**reserve** 187:17
**resolution**
181:4
**resolve** 79:8
**resolved** 71:4
79:17 128:3
**respecting**
111:7
**respond** 15:10
135:12,18,20
144:25
**responded**
135:16
**response** 4:11
9:16 17:9
46:17 47:22,24
48:2,7 49:22
88:16,25 99:9
99:11 104:11
114:14 124:23
124:24 125:7
126:6 137:11

147:7,11
152:23 153:2,7
153:9,11,11
163:15,17
165:24,25
170:3 178:13
**responsibilities**
35:14
**responsive** 19:5
19:17
**rest** 170:9
**restate** 9:25
131:19
**restroom** 51:19
52:4
**result** 89:4,21
107:21 181:21
185:24
**resulted** 154:7
**resume** 35:24
**retain** 121:16
**rethink** 126:9
**retired** 36:15
**retirement**
22:20
**review** 11:24
18:17 19:13
64:20 74:13
118:24 130:19
132:21 137:11
145:16 182:8
187:18
**reviewed** 11:10
65:8 74:25
127:13

**reviewing**
64:22
**revoked** 27:20
**rid** 181:5
**right** 6:24
10:11 17:12
19:13 21:20
35:22 41:9
48:16 69:3
102:12 117:25
118:13 144:3
153:13 160:13
177:15 187:18
**rights** 139:4
**road** 78:9
82:25
**role** 29:25 30:4
31:25 35:3,4
35:15 78:20
79:5 83:20
**room** 9:2 12:24
86:11 157:21
**rose** 89:23
**rules** 6:2 8:13
**rumor** 184:15
**run** 30:9 51:19
**ruttman** 32:2,8
32:12,16,19
33:4,11 34:5
34:18,21 55:12
55:14 79:25
84:13 85:16
**ruttman's**
32:25 85:22

**s**

**s** 2:1 3:5 4:1,8,8
192:5
**sabbath** 39:18
55:25 56:4
58:25 62:10,14
62:18,24 64:12
66:6 70:2 90:9
92:6
**safe** 18:11,13
**sanction**
133:13
**sasso** 58:12,13
58:14,17 59:2
59:19 61:2
67:5 68:19
69:6 70:16
72:25
**satisfied** 50:7
**save** 16:2,18
**saved** 4:11
15:20 16:5,6
16:23 17:9
19:3
**saw** 89:23
140:7 184:14
**saying** 63:2
101:24 126:11
132:9
**says** 137:9
177:13
**schedule**
162:25
**schedules** 77:7

school 26:8,18
  27:4
science 26:22
second 3:14
  131:8 142:20
  153:10 166:3
  176:19,21
  177:5,12
  183:14
see 39:12 53:9
  58:5 66:8,9
  67:14 70:23
  72:22 75:9
  79:14 90:5
  93:3,4 133:5,6
  133:7 136:4,5
  137:9,15,16
  138:8 150:23
  154:4 155:2
  159:22,23
  169:2 182:14
seek 99:18
  121:20 122:6
  151:16
seeking 99:19
seemed 50:4,7
  158:12
seems 175:20
seen 63:8,12
  74:21 131:5
  136:25 182:11
selection
  100:19
send 160:21
  171:19 174:5

181:9 186:24
sending 116:12
  116:16 125:14
  125:17 135:4
  172:8 175:8
  181:8 183:5
sense 157:20
  170:23,25
sent 11:13 14:2
  14:4,5 46:4
  70:25 127:6
  134:22 150:19
  161:2 162:23
  172:12 176:12
separate 12:14
  16:3,6,24
  166:3
seriously 90:18
served 19:8
service 137:14
set 162:14
  176:5
settle 79:7
settled 37:23
  78:17,18 80:6
  103:8
settlement
  82:21,25 83:10
  84:5 85:25
  86:19 103:7
settlements
  35:21 80:8
settles 83:4
settling 79:15
  79:21,23 80:2

181:5
seven 52:24
  53:20,23 54:6
seventh 2:5
seyfarth 2:13
  2:19 6:14,15
seyfarth.com
  2:16,22
share 18:19
  42:12 150:4
shared 18:24
  19:2 120:25
shaw 2:13,19
  6:14,15
she'd 173:3
  176:20 177:22
sheet 28:23
  192:1
sherri 55:20,22
sherri's 55:21
shifted 39:8
shock 14:13
  20:19,20
shocked 20:24
short 52:4
  117:18 118:23
show 64:14
  74:4 118:19
  145:12 168:20
showing 79:6
  130:17
shut 9:14
side 12:24
sign 56:20,22
  57:13,25 58:21

95:23 98:16
  124:25 125:4
  125:11,15,17
  125:18 126:12
  126:15 127:10
  130:13
signature
  190:19 191:13
signed 71:8
  125:9,15 127:5
  130:10,13
  143:22
signing 125:22
  126:9 128:7
  130:5 134:21
silvera 179:17
  179:22,24
similar 140:6
simply 7:21
single 9:2
sinker 64:7
sit 101:14
sitting 41:8
  143:3
situation 61:22
  68:10 69:5
  148:19
situations
  149:12
six 54:4 136:10
skills 190:9
  191:6
small 2:12 6:13
  6:13 12:9,13
  17:12 64:22

65:2 102:13
185:7 187:16
188:12,22
**smart** 82:12
129:11,12,13
129:17 153:2
**smoothly** 8:15
**socializations**
186:17
**socialize** 22:12
22:15 23:7,10
23:20,25
**sokoloff** 154:4
154:7,12,13
156:22 157:13
158:2,6 159:17
159:24 160:5
160:12,18,19
161:3,9,19,23
162:3,5,16,22
166:19 167:7
174:13,15
**sokoloff's**
156:7 158:16
159:9 167:10
167:12
**somebody** 48:2
89:20 103:23
187:8,9
**someone's**
154:22
**soon** 91:2
**sorry** 15:22,23
17:3 28:20
33:7 46:19

62:24 70:2
79:10 95:5,6
96:14 108:23
111:4 132:15
155:14 159:17
162:10 166:19
166:23 167:21
170:21 175:9
183:21
**sort** 8:13 9:4
12:23 15:13
23:5 25:3,16
28:4 35:2
38:13 43:6
52:13 65:20
67:17 68:15
77:16,19 81:9
81:24 91:18
93:14 122:23
153:12 186:16
186:24 187:4
**span** 143:8
**speak** 10:16
13:14 14:14,17
14:22 42:7,17
46:12 49:6
50:2 51:11,15
55:17 59:13,17
60:5,12,18,25
61:15 67:5,13
67:14,21,24
70:18,22 71:14
77:13 81:3
88:13 100:22
104:2 109:20

114:22 115:3
123:17,18
124:14 129:3,7
129:17 133:15
133:22 138:18
138:22 139:14
142:14 149:4
158:15,20
163:24 164:4
166:13,20
168:6 169:23
178:16
**speaking** 9:12
13:12 58:18
63:22 67:19
71:21 88:10
109:25 120:11
121:22 123:24
126:8 127:10
127:14 157:21
157:25 158:5
167:4
**specific** 30:17
32:9 43:3,10
43:18 52:19
78:9 82:23
107:19
**specifically**
45:21 70:11
79:24 114:9
129:8 169:24
**specificity**
86:25
**speed** 112:12
112:14,15,18

**spoke** 14:18,19
14:21 42:5
49:24 53:7
55:18,20,23
58:9 59:10
60:13,19,22
62:4,4 68:2
71:23 72:4
85:4 92:13
101:3,4 119:25
124:7 127:7
129:5 138:23
158:8,9,22
166:6,12,15,17
166:25 168:10
169:12
**spoken** 62:6
68:7 71:19
92:15 169:13
**sponsored** 23:6
23:22 186:17
**sporadically**
78:14
**stacey** 186:4
**stanely** 61:3
**stanley** 55:19
60:20
**start** 9:12
25:21 29:11
108:23,24,25
**started** 9:19
28:24 42:25
61:18,21
116:25 119:6
152:4 170:8

| | | | |
|---|---|---|---|
| **starting** 114:16 | **story** 170:7 | 144:18 146:15 | **surprise** 98:6 |
| **state** 94:11 | **strike** 12:12 | 146:16 | 98:10 107:11 |
| 139:3 145:22 | 21:11 23:10 | **supervisor's** | 107:15 109:11 |
| 159:18 190:21 | 43:14 45:24 | 147:24 | 109:15 127:22 |
| **stated** 108:17 | 67:3 75:22 | **supervisors** | 138:10,13,14 |
| 111:13 | 110:5 127:9 | 88:22 149:2 | 138:17 |
| **statement** | 181:7 | 151:19 153:7 | **surprising** |
| 79:19 | **stripping** 92:9 | 153:15 | 127:17 |
| **statements** | **studies** 26:23 | **supposed** 176:5 | **surrounding** |
| 66:23 | **stuff** 143:21 | **supreme** 41:6,8 | 145:25 |
| **states** 1:1 | 169:3 | 78:23 104:16 | **suspended** |
| 131:10 | **subject** 134:7 | 104:23 106:6 | 27:20 138:4 |
| **status** 43:6,11 | **submitted** | 106:12,14 | 142:20 |
| 141:2,20 | 169:19,21 | 143:4 145:4,11 | **suspension** |
| **stead** 99:25 | **submitting** | 146:3 148:22 | 136:18 137:15 |
| **steadily** 37:12 | 116:8 | **sure** 24:17 | 137:19 138:12 |
| **stemming** | **subscribed** | 41:22,25 46:3 | 139:20 142:17 |
| 72:24 73:14 | 189:9 192:22 | 46:14 49:23 | 142:23 143:18 |
| **stenographic** | **substance** | 60:7,23 63:21 | 143:20,24 |
| 6:4 | 123:22,23 | 67:7,9,12 68:3 | **suzanne** 171:16 |
| **step** 106:15 | 124:17,20 | 68:4,5,6 69:7,8 | **swear** 5:16 |
| 126:25 | 180:20 | 72:11,18 79:11 | 6:22 |
| **stephanie** | **sum** 124:17,19 | 90:20,22 91:13 | **switch** 44:4,6 |
| 115:16 | 180:20 | 91:21 101:4 | 47:12,15,23 |
| **stepping** 71:12 | **summons** 38:2 | 102:24 112:9 | 48:23,25 49:5 |
| **stick** 80:18 | 139:12 | 115:9 116:16 | 49:16,22 50:13 |
| **sticker** 188:16 | **superiors** 152:7 | 124:2,8 144:5 | 50:15,22 51:8 |
| **stipulation** 6:6 | **supervise** 35:19 | 155:17 157:17 | 51:13 185:20 |
| **stop** 9:21 75:19 | **supervised** | 158:18 166:22 | 185:24 186:9 |
| 81:17 140:12 | 22:7 23:12,16 | 185:9 | **switched** 49:4 |
| **stopped** 81:21 | **supervisor** | **surface** 1:7 | 50:11,11 51:2 |
| 153:22 160:17 | 48:15 68:8,13 | 5:10 7:18 | 140:13 186:4 |
| 179:17 | 94:13,20 114:6 | 192:2 | **switching** |
| **stopping** 25:7 | 119:13 121:21 | **surplus** 77:13 | 46:18,18 |
| | 131:12,14,19 | | 140:18 |

**[swollen - three]**                                                          Page 33

| | | | |
|---|---|---|---|
| **swollen** 116:13 | **tasked** 112:2 | 177:9 186:15 | 115:2,20,24,24 |
| **sworn** 5:19 7:5 | **tedious** 81:19 | **testifying** 190:5 | 116:2 117:7 |
| 189:9 190:5 | 82:16 83:8 | **testimony** 8:6 | 124:12 126:5 |
| 192:22 | **tell** 7:5 42:10 | **texted** 124:2,5 | 126:18 128:20 |
| **t** | 42:24 48:21 | **texting** 117:3 | 129:5,14 134:2 |
| | 50:22 56:3 | **thank** 6:20 7:13 | 134:7,11 |
| **t** 3:5 4:1,8,8 | 58:17 76:4 | 17:12 185:16 | 136:17 137:3 |
| **tabs** 65:6 | 101:14 102:11 | 187:14,20,22 | 138:23 139:5 |
| **take** 5:4,14 | 102:12 103:4 | 187:23 | 147:16 148:14 |
| 7:24 8:25 | 107:16 120:4 | **that'd** 188:18 | 152:25 154:21 |
| 10:17,20 13:9 | 125:10 126:17 | **thing** 29:5 43:4 | 161:14 162:8 |
| 46:6 51:18 | 127:25 134:11 | 62:7,25 64:9 | 162:23 164:14 |
| 72:6,9 74:9,12 | 144:2 145:7 | 70:5 86:16 | 166:7 167:25 |
| 94:4 95:11,25 | 159:13 174:14 | 91:12 100:21 | 170:9 173:13 |
| 115:7 117:6 | 174:22 177:4 | 187:7 | 174:9,9,10 |
| 118:23 130:18 | 179:18 | **things** 19:3 | 175:3 176:13 |
| 134:16 144:10 | **telling** 70:16 | 22:22 35:22 | 177:8 180:5 |
| 145:16 147:8 | 89:4 101:12 | 42:20 60:2 | 185:4 |
| 152:12 159:8 | 103:24 | 62:3 85:6 | **third** 177:16,20 |
| 159:11 182:8 | **ten** 113:10 | 88:12 112:4 | **thompson** |
| 185:5,7 187:24 | **tended** 103:2 | 117:2 139:7 | 41:18,20 42:3 |
| **taken** 5:8 8:17 | **tension** 59:24 | 140:8 165:16 | 42:17,21 43:22 |
| 119:16 152:19 | **terminated** | **think** 10:24 | 92:11,12 |
| 184:8 190:3,11 | 184:12 | 11:4 19:3 24:6 | 185:23 186:8 |
| 191:8 | **termination** | 35:21,23 44:15 | **thompson's** |
| **talk** 42:2 63:20 | 134:7 | 45:16 46:4 | 49:22 |
| 123:13,14 | **terms** 15:14 | 49:13,18 51:14 | **thought** 15:20 |
| 179:17 | 103:19 122:11 | 51:17 59:16 | 21:9 51:5 64:5 |
| **talked** 63:5 | 127:2 | 63:14 70:3 | 64:6 73:13 |
| 97:4 158:11 | **testified** 7:7 | 79:18 82:12 | 109:5 128:2 |
| 180:10 185:18 | 38:11 107:12 | 85:20 86:3 | 147:14 153:19 |
| **talking** 16:11 | 109:12,16 | 89:6,18,22 | 171:8 |
| 75:6 99:2 | 117:24 130:25 | 91:18 101:2,10 | **three** 13:5 |
| 119:6 137:8 | 146:8 151:5 | 101:19 102:2 | 31:15 78:8 |
| 159:8 185:3 | 176:19,22 | 104:7 112:23 | 102:17 177:10 |

**[thwarted - transcriptionist]**

**thwarted**
164:21
**time** 1:16 6:7
9:12 10:14
14:7 21:18
23:13,14 26:12
28:7 29:14,15
30:18 33:18,19
34:3,4,17 35:9
36:5,19 37:5,7
37:9 38:7,12
38:25 39:2
41:12 42:24
47:17 53:25
54:8,8,12,15,19
54:19 55:6,9
57:3 58:16
59:6,16 60:15
63:3 64:19
74:9,12 79:4
79:11 80:15,22
81:2 84:8
85:21 86:4
89:14 90:19,22
92:25 93:8,10
93:14,18 95:16
96:5,8,8,12,17
96:19,20,21,24
97:2 102:6
110:4 112:20
114:23 115:4
116:23 117:6
118:13,24
119:12 121:3
123:11 125:8

130:18 131:4
133:21 134:25
135:12,15
138:20 142:19
145:16 147:3
147:13 148:2
150:5,11
151:16,25
153:23 156:10
161:4,13 164:5
164:8 168:10
169:4 173:2,7
173:10,14
180:16 182:8
184:6,11
**timeframe** 61:5
177:4
**timekeepers**
62:4
**timekeeping**
53:5,6 54:21
55:17,23 61:15
**timely** 99:14
**times** 9:20
12:16,19 18:6
23:19 24:3,3
83:13 86:14
88:2 113:7
114:7 165:18
**timesheet** 3:10
3:19 52:11,17
56:6,16 57:3
57:14 58:22
61:16 64:13
65:17 71:6,8

71:16 73:15
75:7 76:20
94:14,17,20
95:21,23 96:2
**timesheets**
52:10 56:10,25
140:8,12
**tired** 103:23
**title** 25:3 30:20
30:24 31:2,5,7
31:12,15
**today** 7:13,21
7:24 8:13 9:3
9:19 11:6 83:2
93:24 137:2
187:20 188:15
**today's** 10:25
**together** 12:13
12:15 21:15
23:4 33:10,16
33:18 171:25
**told** 24:17
32:21 48:24
50:13,15 52:19
53:2,4,6,14
57:9,13,16,25
58:12,20 59:6
59:7,8 61:25
62:3 64:4
89:20 91:23
92:3 95:16
105:11 120:7
124:7,19
130:13 131:20
132:5 140:17

143:10 145:2,9
146:15 154:13
161:14,17
163:22 164:11
165:8,17
171:17 173:12
174:10,11,18
**tomorrow**
163:24
**took** 52:3 53:15
64:6 77:25
78:20 79:21
80:6 90:19
95:14,19 98:15
107:10 117:18
136:10 149:24
163:9 168:25
184:4,14
**topic** 16:17
**torts** 30:19,21
48:10 71:8
131:13 134:13
151:20
**track** 139:7
**train** 52:18,21
52:23
**transcriber**
191:1
**transcript** 5:21
9:4 10:3 28:22
187:18 188:5,7
191:3,4
**transcriptionist**
190:7

**transfer** 97:17
97:23 98:4
107:14,18
108:3,5,8,9,18
108:20 109:8
110:8 114:23
117:22 118:3
139:22 140:2
141:10,16
148:18 153:9
**transferred**
98:7 104:14
105:18 107:5,8
155:24 156:2,4
156:6,11,12
160:14 176:20
177:2,18,23
**transferring**
97:5 156:9
**transit** 1:8,9
2:10 4:6 5:10
5:11 6:16 7:18
7:20,21 13:14
13:18 14:20,25
19:11 21:12
22:19 23:6,6
23:22 24:7
29:20,22,25
30:5,10 46:10
71:15 74:2
77:17 78:22,25
79:5,7,14,20
100:23 111:13
131:9,11 133:3
133:4 139:4,15

149:2,2 158:16
167:7,8,9,15,19
170:12,14,20
170:24 171:6
171:10,16
178:17,20
179:13,14
183:23 186:16
192:2
**transitioned**
97:13
**trial** 4:16 21:19
23:2,3 31:21
31:24 37:18,22
38:3,6,6,15,17
40:22 41:14,20
42:4,6 43:14
43:19,23 44:3
44:10,14 46:18
48:23 49:2,16
51:3,5,8,13
76:24 77:4
78:3,8,8,11,16
80:5 82:2,24
84:16 87:4,6,8
88:3 89:14,16
89:24 92:10,20
99:4,22 100:24
101:9,11 103:6
103:8,9,11
105:4,5 112:3
114:21 115:17
115:23 116:4
116:18,21,24
141:13,13

142:2,10
144:15 164:13
164:14,17,18
164:25 165:7
165:12,13
168:5,18,19,22
185:20
**trialed** 103:14
103:19
**trials** 35:18
48:13 78:13
86:24 87:14,16
89:8,11 98:15
98:19 101:8,19
103:5,10,16
112:8 151:20
167:16,18,20
**tried** 78:17
**trouble** 105:4
**true** 40:20
55:11 83:25
151:10 190:8
191:4
**truth** 7:5,6,6
66:7
**truthful** 8:6
**truthfully** 11:5
**try** 79:16
104:19 172:24
**trying** 85:5
175:10 177:7
**tuesday** 1:15
5:12
**turn** 52:7 65:18
75:4 147:8

**twenty** 113:10
**two** 12:19 13:4
51:18 56:7,13
59:25 62:4
65:4,19 102:17
127:8 161:6
177:9
**type** 25:6 44:10
93:10 102:15
**typewriting**
190:6
**typically** 60:5

**u**

**u** 4:8,8
**ultimate**
136:15
**under** 5:25
33:4,11 44:8
52:5 61:9
66:18 117:19
131:8 132:25
**undergraduate**
26:18
**underlying** 8:4
**understand**
5:20 8:7 10:6
11:5 18:21
38:9 52:4
101:16 111:4
117:19 141:5
170:16 175:18
**understanding**
19:21 20:3,5
24:9 25:14,18
34:6 47:25

53:9 57:8,11
57:20 60:9
104:13 105:18
107:4 136:9
152:2 181:20
181:23
**understood**
10:10 101:18
101:23 125:13
**unethical**
159:21,25
**unfounded**
21:7
**unit** 4:16 21:20
22:6,10 23:2,2
23:3,12,15,18
23:21 24:5
31:21,24 32:4
33:11 34:8
35:17,19,20
36:20 37:2
38:14,15,17
39:22,25 40:17
40:22 41:3,4
41:14 49:19
53:19 58:15
61:9 76:24
78:21 79:13,16
81:12 82:2,19
95:16 97:5,15
97:24 98:4,8
98:16 99:17,22
102:19,20
103:11 109:24
110:8 112:6

117:23 139:23
141:13,13
142:2,10
143:10 144:15
144:24 156:13
156:17 160:15
161:7 168:3
177:2 179:19
185:21 186:19
186:23 187:3,5
**united** 1:1
**unprofessional**
85:8,12 88:5,7
89:11,13,15
159:21 160:2
168:14
**untrue** 20:23
20:25
**untruthful**
157:7,11
**upcoming**
42:18 43:10
**update** 43:11
**updates** 43:6
**upset** 50:6 51:7
58:20 59:8,9
63:4,6 67:11
168:23 174:19
**urbont** 3:18
61:7 94:14
95:2 110:4,6
114:17,22
115:4 119:15
120:2 133:23
138:11,18

183:13 184:17
184:24
**use** 53:25 54:7
54:11,13,18
92:24 93:10,14
96:5,7,11,15,16
96:17,19,23
97:2 153:25
**used** 21:12 49:3
69:22 93:17,18
96:8
**usenheimer**
2:18 6:15
12:10,13
**uses** 5:24
**using** 64:23
**usually** 46:24
77:4

| v |
| --- |

**v** 1:6 192:2
**vacation** 54:15
54:19 93:18
96:5,24 97:2
**vandoros** 24:6
26:4 38:23
40:4,18 47:17
155:21,25
161:6 172:21
173:5,17
178:17 186:3
186:10
**vandoros's**
154:19
**variables** 37:14
37:16

**various** 23:18
24:3 38:4 43:2
45:2
**verbal** 46:3
**verbally** 8:24
**veritext** 5:4
192:1
**versus** 5:9
87:17
**videoconfere...**
1:13 2:3,12,18
**view** 110:20
**viewed** 182:19
**vinci** 2:3 3:3
6:10,11 7:11
7:15 17:6,13
51:18 52:2
64:25 65:3,7
72:16,21 81:22
82:4 115:7,14
117:5,10,16
154:21 155:7
155:10,12,23
185:4,9,16,17
187:12,19,24
188:6,9,14,19
**violations** 3:22
**virtual** 12:22
12:24
**voicemail** 99:2
154:22
**volition** 50:14

[w - white]                                                                                    Page 37

| w | | | |
|---|---|---|---|
| **w**  5:1 6:1 7:1 | 104:1 105:1 | 174:1 175:1 | **waters**  55:19 |
| 8:1 9:1 10:1 | 106:1 107:1 | 176:1 177:1 | **way**  22:21 |
| 11:1 12:1 13:1 | 108:1 109:1 | 178:1 179:1 | 76:19 83:8 |
| 14:1 15:1 16:1 | 110:1 111:1 | 180:1 181:1 | 139:11 148:22 |
| 17:1 18:1 19:1 | 112:1 113:1 | 182:1 183:1 | 150:17 168:3 |
| 20:1 21:1 22:1 | 114:1 115:1 | 184:1 185:1 | 170:18 183:14 |
| 23:1 24:1 25:1 | 116:1 117:1 | 186:1 187:1 | 183:17 |
| 26:1 27:1 28:1 | 118:1 119:1 | 188:1 189:1 | **we've**  74:4 75:6 |
| 29:1 30:1 31:1 | 120:1 121:1 | **walk**  61:16 | 137:8 |
| 32:1 33:1 34:1 | 122:1 123:1 | **walked**  163:21 | **wee**  91:4 |
| 35:1 36:1 37:1 | 124:1 125:1 | 163:25 | **week**  53:23 |
| 38:1 39:1 40:1 | 126:1 127:1 | **want**  9:22 27:2 | 54:3 186:25 |
| 41:1 42:1 43:1 | 128:1 129:1 | 28:9 49:4 51:4 | **weekly**  56:11 |
| 44:1 45:1 46:1 | 130:1 131:1 | 52:7 72:6 80:3 | 86:16,19 91:15 |
| 47:1 48:1 49:1 | 132:1 133:1 | 98:16,19 99:7 | 141:6 |
| 50:1 51:1 52:1 | 134:1 135:1 | 101:8 105:10 | **weeks**  52:20 |
| 53:1 54:1 55:1 | 136:1 137:1 | 106:8,11,20,22 | 56:7,13 183:20 |
| 56:1 57:1 58:1 | 138:1 139:1 | 107:3 138:8 | **welcome** |
| 59:1 60:1 61:1 | 140:1 141:1 | 160:20 164:15 | 117:17 130:21 |
| 62:1 63:1 64:1 | 142:1 143:1 | 172:14 179:19 | **welcomed** |
| 65:1 66:1 67:1 | 144:1 145:1 | 179:25 187:10 | 107:6 |
| 68:1 69:1 70:1 | 146:1 147:1 | **wanted**  44:6,8 | **went**  15:19 |
| 71:1 72:1 73:1 | 148:1 149:1 | 52:25 79:14 | 16:15 39:7 |
| 74:1 75:1 76:1 | 150:1 151:1 | 84:20 95:21 | 53:15 57:11,21 |
| 77:1 78:1 79:1 | 152:1 153:1 | 98:7 99:4,17 | 57:24 58:8,8 |
| 80:1 81:1 82:1 | 154:1 155:1 | 100:24 101:9 | 59:18 70:7 |
| 83:1 84:1 85:1 | 156:1 157:1 | 101:19 106:2 | 80:5 110:15,18 |
| 86:1 87:1 88:1 | 158:1 159:1 | 121:7,18 145:6 | 112:10 142:23 |
| 89:1 90:1 91:1 | 160:1 161:1 | 159:4 162:19 | 164:22 176:14 |
| 92:1 93:1 94:1 | 162:1 163:1 | 163:24 164:24 | 187:2,8,9 |
| 95:1 96:1 97:1 | 164:1 165:1 | 169:2 170:9 | **weslii**  1:10,14 |
| 98:1 99:1 | 166:1 167:1 | 175:15 178:8 | 5:7,12 6:18 7:3 |
| 100:1 101:1 | 168:1 169:1 | 178:11 181:3 | 189:6 192:3,21 |
| 102:1 103:1 | 170:1 171:1 | **wanting**  79:5 | **white**  20:8 |
| | 172:1 173:1 | | |

wipe 83:6

witness 3:8,15
3:17 4:11,14
5:17,19,20
6:19,22 7:4
117:9 155:2,6
155:9,11,20
187:22,25
190:4

witnesses'
192:3

woman 20:8

won 87:17

wood 154:9,16
156:19 163:10

word 9:2 69:21
135:7 162:24

words 52:14
58:23 78:7
103:5 154:10

work 21:12,15
22:13,16 23:8
33:16,17,18
34:3 75:24
76:10,13,19,23
77:21 80:10,11
80:20 90:4
91:25 93:12
108:25 109:18
109:23 111:23
111:24 114:18
114:19 116:20
121:9 132:22
164:18 186:23
187:3

worked 30:5
33:3,10 61:9
84:8 95:9,25
96:16,22 97:2
171:25 172:20
173:5,8,16

worker 33:25

working 15:14
41:13 44:7
45:14 93:2
123:4 141:12
142:3 165:12
165:20

workload
75:24 76:6,9
76:12,18 81:4

works 136:13
186:5

workweek
186:24

worry 147:16

worthy 151:11

wrap 142:3
185:5

write 46:2
88:18 146:4

writing 17:11
82:3

written 6:5
150:18

wrong 63:7
159:2

wrote 89:3

| x |
| --- |
| x 3:1,5 4:1 77:21,22 |

| y |
| --- |

yeah 17:4 18:3
64:25 87:10
101:4 110:19
112:4 132:6
147:2 150:15
155:5,12
172:11 173:13
174:24 175:9
186:6

year 23:3,4
26:9,24 30:3
35:7,10 183:25

years 21:24
22:2 33:3,9,21
33:22

yehoshua 1:4
2:2 3:9,12,18
5:9 7:16 11:22
16:19 20:10
21:12,23 22:10
24:14,20 32:4
63:25 65:20
74:20 75:23
80:24 81:5
90:7,16 91:5,8
91:24 92:4,24
93:11 95:8
96:21 97:4,17
97:23 98:2,7
100:23 106:14
111:6,14

114:18 115:16
116:19,24
119:6 134:22
137:7 139:2,22
140:23 141:12
141:25 143:17
144:14 173:9
192:2

yehoshua's
13:21 14:12
19:8,21 20:3
20:18 24:9
47:22 75:8
76:5,18 80:9
92:19 119:13
132:22 140:12
154:17

yelling 88:11
88:11

york 1:2,9,18
2:6,10,15,21
4:5,16 5:11,13
5:13,16 6:16
7:19 21:19
23:3 27:10,13
27:17,23 29:20
31:21,24 34:8
38:14,17 39:25
40:17,22 41:6
41:8 78:23
82:2,19 97:23
99:16,22
102:19,20
104:16,19,23
105:20 106:6

**[york - zoned]**                                                          Page 39

| |
| --- |
| 106:12,14 |
| 109:3,7,24 |
| 139:3 141:13 |
| 142:2,10 143:3 |
| 144:14 145:3 |
| 145:11 146:3 |
| 148:23 190:21 |
| 192:1 |
| **young**  25:17 |
| **z** |
| **zoned**  33:8 |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.