UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
AMELIA YEHOSHUA,

                                                   **Civil Action No.:**
                                                   **1:21-cv-04055**

                       **Plaintiff,**

    -against-

MANHATTAN AND BRONX SURFACE TRANSIT
OPERATING AUTHORITY, THE NEW YORK
CITY TRANSIT AUTHORITY, and WESLII
KHAHAIFA,

                             **Defendants.**
-----------------------------------------------------------------------X

## DECLARATION OF PLAINTIFF AMELIA DWECK YEHOSHUA IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I, Amelia Dweck Yehoshua, declare, under penalty of perjury, as follows:

    1.    I am the Plaintiff in this above captioned action.

    2.    I have read defendants Manhattan and Bronx Surface Transit Operating Authority's, the New York City Transit Authority's (collectively "Transit's"), and Weslii Khahaifa's ("Khahaifa's and, collectively with Transit, "Defendants") Motion for Summary Judgment and Statement of Facts (collectively the "Motion").

    3.    I submit this declaration in opposition to Defendants' Motion and to rebut Defendants' assertions in Defendants' Statement of Facts.

    4.    I worked for Transit from 2013 until my termination in October 2021.

    5.    I identify as an Orthodox Jewish woman and observe all Jewish holidays as well as the weekly Sabbath.

Case 1:21-cv-04055-FB-RML   Document 62-60   Filed 03/11/25   Page 2 of 12 PageID #: 2792

6. Over the course of my employment with Transit, I tried no less than twenty-five trials, at least eleven of them resulting in a defense verdict. See Exhibit A, attached hereto list of cases with presiding judges and outcomes noted. My record, based upon the amounts asked for by plaintiffs' counsels during such trial, I saved the city millions of dollars in potential verdicts.

7. I never had a trial before Justice ▮▮▮ though I did appear before her on several occasions, including during the *Wood v. Metropolitan Transportation Authority and New York City Transit Authority* matter, which was a case handled and assigned to my then-colleague, Alexandra Vandoros.

8. I was assigned to cover an appearance in the *Wood* matter related to a discovery dispute. I conferred with one of Transit's discovery/pre-trial attorneys regarding the case and what to report if asked by the judge. I was told to advise that the information being sought was publicly available to the plaintiffs.

9. I did so and Justice ▮▮▮ appeared to disagree with position on the matter. I do not recall other issues being discussed.

10. At no point in time did Justice ▮▮▮ advise that I was no longer welcome to appear in her part. Indeed, following this matter, I continued to be sent to appearances, and did in fact appear, before Justice ▮▮▮ without incident.

11. I respectfully contest each statement in Justice ▮▮▮ declaration.

12. I respectfully contest each statement in Justice Freed's declaration.

13. I respectfully contest each statement in Justice Frank's declaration.

14. To my knowledge, Justice Adams recused herself, and indeed should have recused herself, from cases wherein I was counsel of record due to our past working

relationship which presented, at minimum, the appearance of a conflict of interest. Judge Adams' recusal from my cases had nothing to do with any alleged misconduct or impropriety on my part.

15. Moreover, I was no longer working in New York Supreme Court, having been transferred to the Kings County trial unit, when Justice Adams replaced Justice ███.

16. The Justices' declarations are the first time that Transit has ever submitted any so-called "proof" of the alleged judge complaints against me.

17. I have never appeared before Justice Silvera and therefore any allegation that Justice Silvera asked that I not appear him his courtroom due to any alleged misconduct or behavior is meritless.

18. I was never advised by any judge that I was unwelcome to return to their part or that they had to recuse themselves from Transit cases due to their disdain, or any other feelings, about me.

19. In fact, several judges who I have appeared before have complimented my tenacity and professionalism while I was before them and after, including Justice Martin Schulman who may be willing to testify on my behalf at trial.

20. To my knowledge, the above judges, and in fact no other judges besides those that lodged the alleged complaint, were interviewed as part of Transit's supposed investigation.

21. During Transit's alleged investigation into the judges' complaints and resulting disciplinary notice, no one from Transit or otherwise hired by Transit spoke with me or interviewed me as part of the investigatory process.

22. Nor, to my knowledge, did anyone consult with my and Khahaifa's supervisor at the time, Lawrence Heisler.

23. My prior counsel, Karl Sleight, submitted a response to the charges lodged against me related to the alleged judge complaints against me. Compare Exhibit D, Disciplinary Action Notice No. 21-6314-0001 (the "Second DAN"), with Exhibit E, Appeal to Finding Related to Disciplinary Action Notice No. 21-6314-0001 (the "Second DAN"), with exhibits.

24. Attorney Sleight also represented me in connection to the first Disciplinary Action Notice No. 20-6314-0003 (the "First DAN") in July of 2020. Compare Exhibit B, Disciplinary Action Notice No. 20-6314-0003, with Exhibit C, Response to Disciplinary Action Notice No. 20-6314-0003, with exhibits.

25. The First DAN related to a complaint from my adversary in a personal litigation and accused me of violating Transit's policies by engaging a vendor, specifically an outside counsel, for personal legal services without compensation.

26. No such thing happened. While I did engage one of Transit's outside counsel to represent me in a personal matter, as many Transit attorneys and employees do and have done, there was at no point in time a quid pro quo relationship. Nor could there have been as I had no influence or authority to provide outside counsel with Transit related work or opportunities.

27. Rather, outside counsel agreed to be compensated on a contingency basis, something very common in his field.

28. As a result of Attorney Sleight's response to the First DAN, a 20-day suspension was levied against me.

4

29. Prior to the First DAN, my record with Transit had been impeccable; I was never the recipient of any disciplinary action, counselling, or negative marks to my file.

30. During my tenure with Transit, attorneys were expected to complete an 8-hour day, although an attorney's start and end times for each day could vary.

31. In light of my need to leave early on Fridays, particularly during the shorter winter months, in observance of the Sabbath, I would either arrive to work early or forego my one hour lunch break to be able to work the requisite amount of time before leaving for the Sabbath.

32. One Friday in January 2016, I was late to work due to a train delay. Because it was a Friday, I was unable to stay late to make up for the missed time caused by the train delay.

33. I presented Khahaifa, my then-supervisor, with a train incident report as proof of the train delay of 45-minutes during my commute to work. I asked Khahaifa to excuse the 45-minute lateness as I was unable to make up the time due to my observance of the Sabbath.

34. Latenesses were routinely excused in such circumstances by Khahaifa's predecessor and by other managers in the department. Indeed, I had been told that if I were ever late on a Friday due to a train delay, to simply bring in an incident report and the lateness would be excused.

35. Khahaifa would not excuse the lateness or sign off on my timesheet, and told me that it did not matter that the day in question coincided with my observance of the Sabbath.

36. I tried to tell Khahiafa that I would be willing to make up the time any other day, which was not the usual practice, but could not that day because of the Sabbath. Khahiafa would not speak to me about a different accommodation to make up the time, dismissed the special circumstance that it was the Sabbath, and told me I could only make up the time by staying late on the day of the lateness or be docked for the time.

37. It is my understanding that Khahaifa did not discuss the fact that the lateness coincided with my observance of the Sabbath with anyone she allegedly spoke to about excusing my late arrival.

38. My observance of the Sabbath was pertinent to my need to have the lateness excused, as it prevented me from being able to make up the lateness by staying later at work on that day and provided significant context as to why I requested the excusal.

39. I told Khahaifa that I would speak to Larry Heisler ("Heisler"), the then Head of Torts/Department Head and possibly Gaile Goode ("Goode"), the Head of Trials. Khaiafa told me to "go ahead" and talk to them.

40. After Khahaifa refused to excuse the lateness, I tried to speak with Goode but she was not in her office.

41. I then spoke with Heisler. I explained the situation to Heisler and complained to him that Khahaifa was discriminating against me.

42. Heisler advised me that he would excuse the lateness and sign off on my timesheet. Heisler said he would "take care of it".

43. It is my understanding that he then spoke with Khahaifa and relayed my complaint of discrimination to her.

6

44. Following this interaction, I was copied on an email from Khahaifa to Heisler wherein she referred to being accused of discriminating against me and interfering with my observance of the Sabbath. See Vinci Dec. at Ex. 4.

45. After the time keeping incident, and Khahaifa's understanding that I had made a complaint of discrimination against her to Heisler, my work environment got immeasurably worse.

46. Khahaifa would seemingly intentionally wait until after I had left the office on Fridays in observance of the Sabbath to email me new assignments or leave new cases or new work on my chair in my office for me to find on Monday morning.

47. There were times that these assignments and cases required my attention for work due on Monday, for example, a Monday morning deposition.

48. I began to panic on Friday afternoons, which affected my peace and ability to observe the Sabbath, as I never knew what new files would be waiting for me on Monday or what pressure I would be under when I returned to work the following week.

49. My work steadily increased following my complaint against Khahaifa.

50. There was no transparency as to the division of cases and work in the unit under Khahaifa. However, following the timesheet incident, it appeared that I was on trial far more often than my colleagues and handled a greater amount and/or more complex matters than my colleagues in the unit.

51. I complained to Heisler about having the largest caseload in the unit and being assigned more trials than any other attorney in the unit. In response, he said he would look into it.

52. Shortly thereafter, Khahaifa came into my office and removed several files from my office. It is my belief and understanding that Heisler requested a breakdown of the division of trials and, in an effort to make the division of labor look more fair, Khahaifa re-distributed what would have otherwise been my enormous workload to other attorneys.

53. As my workload increased, Khahaifa reassigned my trial assistant, Adrian Thompson ("Thompson") without explanation.

54. At no point did Khahaifa advise me or, to my knowledge, Thompson that she believed I relied too heavily on him or that our working relationship hindered my professional development or skills.

55. Thompson never complained to me that I was overusing him as a trial assistant or otherwise assigning him work outside of his purview as a trial assistant.

56. I am not aware of any such complaints being made by him to others within Transit.

57. To the contrary, I had a very effective working relationship with Thompson and my ability to work with him helped make me, and I believe him, a better advocate for Transit.

58. It was not common in my years of experience at Transit for attorneys and their trial assistants to be broken up.

59. After the announcement, Thompson and I asked other units if their assistants had been reassigned and were advised that we were the only pair broken up.

60. Thompson advised me that rather than be reassigned to another Transit attorney, he was tasked with working with outside counsel.

61. To my knowledge, Heisler ran into Thompson in the elevator and asked why we had been separated to which Thompson advised he had not wanted to be reassigned but it was out of his control.

62. Thereafter, Thompson was assigned back to working with me.

63. I understand that Thompson has submitted a declaration in support of Transit's motion to dismiss my case. I do not understand his motivations for submitting the declaration; however, I have reason to believe from information gathered from persons within Transit who are scared of retaliation for coming forward that in exchange for his statement, Khahaifa promised and awarded Thompson with a promotion, calling into question the credibility of his statement.

64. Indeed, following submission of Defendants' motion papers, on or about August 30, 2024, Thompson became a claims manager court prep for the Torts Tower. See Exhibit f, copy of email regarding Thompson's promotion.

65. During one of my trials in New York County Supreme Court, I was scheduled to appear before a different judge on an unrelated matter. I learned that my colleague, Jon Jerman ("Jerman"), was going to be in court on the day of the appearance and he offered to cover the appearance for me to seek an adjournment in light of my ongoing trial.

66. After Jerman made this offer, I sought out Khahaifa to ask if Jerman could appear in my stead due to the trial, but she was not in her office.

67. In light of the conflict in my schedule, and the importance of the ongoing trial, Jerman graciously covered the other appearance and requested the adjournment.

68. Afterwards, it came to my knowledge that Khahaifa yelled at Jerman for helping me in court with the appearance.

69. As a result of the worsening work environment in the NY Trial unit, I begged Heisler for a transfer out of the unit as I could not take being in such a toxic environment any longer.

70. After months of asking for a transfer, Heisler finally transferred me to the Kings County trial unit.

71. My transfer was based upon my complaints of improper and unequal treatment from Khahaifa.

72. Following my transfer, Khahaifa should have had nothing to do with my work or assignments as I was then being supervised by Lisa Urbont. Despite this, Khahaifa continued to follow up with me about my prior NY cases and continued to watch and oversee my timesheet. This should not have been happening and was only fixed after my complaint about it.

73. Despite Khahaifa stating that it only occurred due to an issue "on paper", to my knowledge she never did anything to correct the issue and instead used the alleged administrative error to her advantage to continue to monitor and harass me after my transfer.

74. Indeed, her harassment became so severe that I had cried in court due to the constant phone calls she made to me to ask where I was, even after I was no longer in her unit.

75. In June of 2020, despite not being my supervisor any longer for months, Khahaifa served me with the First DAN.

76. Khahaifa should not have been tasked with serving me with the First DAN as she was no longer my supervisor at the time.

77. With respect to the allegations in the First DAN, I had been interviewed by representatives of the Inspector General's office years prior and truthfully reported that I had engaged outside counsel on a contingency basis to represent me in a personal litigation.

78. I was not otherwise interviewed as part of any investigation into the First DAN by Transit or anyone hired by Transit.

79. I received a 20-day suspension as a result of the First DAN.

80. I was fully prepared to come back to work following my 20-day suspension and had been conferring with my then-supervisor, Lisa Urbont, about my return to the office and the files that I would be handling upon my return.

81. During my suspension, however, I was served, again by Khahaifa, with the Second DAN.

82. To my knowledge, Khahaifa bypassed the chain of command and did not involve Urbont (my supervisor at the time) or Heisler in the steps leading up to the Second DAN.

83. Nor were Urbont or Heisler consulted or kept in the loop of what was happening with respect to the Second DAN, a very uncommon practice in my experience at Transit.

**[INTENTIONALLY LEFT BLANK]**

**[SIGNATURE PAGE TO FOLLOW]**

84.     I believe, particularly with respect to Heisler, that he was frozen out of the process due to his continued support of me during my employment and his knowledge that the judge complaints were meritless and not worthy of harsh punishment, as he described during his deposition. See Vinci Dec. at Ex. 2.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

Executed on November 26, 2024 at Brooklyn, New York.

Amelia Dweck Yehoshua