# EXHIBIT C

**HARRIS BEACH** PLLC

ATTORNEYS AT LAW

July 6, 2020

677 BROADWAY, SUITE 1101
ALBANY, NEW YORK 12207
518.427.9700

**KARL J. SLEIGHT**
MEMBER
DIRECT:  518.701.2716
FAX:  518.427.0235
KSLEIGHT@HARRISBEACH.COM

*Via Email at david.farber@nyct.com*

David Farber, General Counsel
MTA NYC Transit
130 Livingston Plaza
12th Floor
Brooklyn, NY 11201

> RE:  Response to Notice of Disciplinary Charges
> Your File: DAN No. 20-6314-0003

Dear Mr. Farber:

The following is the formal response of Amelia (Dweck) Yehoshua, an Executive Agency Counsel at New York City Transit ("NYCT"), a subsidiary of the Metropolitan Transit Authority ("MTA") to the Notice of Disciplinary Charges dated June 12, 2020 ("Notice").

Introduction

Ms. Yehoshua has been charged with various violations of three separate categories of principles, (1) the Rules and Regulations Governing Employees of MTA New York City Transit (the "Rules" or "Rules and Regulations"), (2) the MTA All-Agency Computer And Social Media Usage Policy Directive ("Computer Policy"); and (3) the New York State Public Officers Law ("State Ethics Law"). The Notice seeks the termination of Ms. Yehoshua and required a response, if any, to be filed on or before June 30, 2020. An extension of time to respond was requested and was granted to July 6, 2020. These Charges stem from an inquiry conducted by the MTA Inspector General ("MTA IG") and a report issued by that agency dated January 23, 2020 ("IG Report").

The underlying premise of the Notice is that by entering into a bargain for consideration contract for legal services on a contingency basis, and due to the negative outcome of the litigation the Private Attorney did not earn a fee, thus the services provided to Ms. Yehoshua were a prohibited gift. That factual and legal premise is deeply flawed. The Notice also states that use by Ms. Yehoshua of her NYCT computer, on a few occasions, is a violation of the NYCT rules, despite the fact that neither the IG Report or Notice suggest that the use was anything beyond the "occasional and incidental", which is permitted under the existing agency polices. To the extent that agency policies drafted by the MTA or NYCT are internally conflicting, subjective or unclear, these polices must be read in favor of Ms. Yehoshua.

CONFIDENTIAL

July 6, 2020
Page 2

HARRIS BEACH ⁝
ATTORNEYS AT LAW

For the reasons set forth herein, the termination of Ms. Yehoshua under these circumstances would be irrational, arbitrary and capricious, and compound a hostile NYCT workplace setting that was punctuated by mistreatment of Ms. Yehoshua based on her religious faith. Despite some of the past treatment she has been subjected to, Ms. Yehoshua is professionally fulfilled by the subject matter of the work she undertakes on behalf of NYCT. Ms. Yehoshua regrets that this matter has risen to its current status at NYCT. She is now in an improved work environment with a new supervisor and seeks a mutually acceptable resolution to this matter short of termination. Termination is a gravely disproportionate response to the situation particularly under these circumstances and weak rationale.

Preliminary Procedures

Ms. Yehoshua received the Notice, IG Report, and excerpts of certain Rules and the Computer Policy of the MTA from Weslii Khahaifa, Borough Litigation Chief, New York County, Torts Unit, NYCT Department of Law ("Khahaifa"). by email on June 12, 2020. See attached the email and attached documents respectively as **Exhibits "A", "B", "C", and "D"**.

Given the gravity of the punishment sought by NYCT, Ms. Yehoshua recently retained the law firm of Harris Beach, PLLC to represent her in this disciplinary matter. On June 19, 2020, her counsel sent a letter to David Farber, General Counsel of the NYCT seeking an extension of time to respond to the Notice given the recent retention and the Covid-19 public health crisis, and asked that records related to this matter be preserved and secured (See attached as **Exhibit "E"**). In response, I eventually received email communications and had several telephone calls with Robert Drinan of the NYCT counsel's office. In those communications, I was advised that in order to receive an extension of time to response, Ms. Yehoshua would be required to use her accrued leave days equal to the number of days of the extension request. By letter dated June 26, 2020, I advised the NYCT that Ms. Yehoshua would reluctantly use three leave days for July 1, 2, and 3 in order to receive an extension through Monday July, 6, 2020 (See attached as **Exhibit "F"**).[1] The extension request was granted by NYCT.

Background

Ms. Yehoshua is a faithful and practicing Orthodox Jewish woman, who is married and the mother of three children ages 11, 13, and 15. She is an attorney licensed to practice in the State of New York since 1998. She is a graduate of Hunter College and the Jacob D. Fuchsberg School of Law at Touro Law Center. She began her professional career at the law firm of Cheven Keely and Hatzis in 1998. In April, 2013 Ms. Yehoshua was hired on behalf of NYCT to handle trials in the New York Trials Unit of the Torts Division. Ms. Yehoshua has successfully handled significant litigation matters, including hearings and depositions on serious injury and wrongful death cases and tried major cases on behalf of the NYCT. A sample of some of the significant matters she has handled for the NYCT are attached as **Exhibit "G"**. As a result, Ms. Yehoshua

---

[1] July 3, 2020 was a recognized holiday for the NYCT therefore it was not necessary for Ms. Yehoshua to use accrued leave for that day.

CONFIDENTIAL

July 6, 2020
Page 3

**HARRIS BEACH** PLLC
ATTORNEYS AT LAW

regularly received praise from supervisors and colleagues, with the exception of her then direct immediate supervisor Khahaifa. Attached hereto are emails written by Ms. Khahaifa's superiors related to Ms. Yehoshua's exceptional job performance, including praise from Theresa Murphy, Gail Goode, Larry Heisler, Jim Henley, and Anna Ervolina (See attached as **Exhibit "H"**). Ms. Yehoshua has broad-based support within her litigation unit and has the respect of her colleagues, and is highly respected in the Courts where she represents the NYCT. Upon information and belief, if asked both Larry Heisler and Lisa Urbont would confirm Ms. Yehoshua is well-liked by her colleagues and is a valuable asset and excellent trial attorney for the NYCT.[2]

Ms. Yehoshua was assigned in the litigation Torts Unit of the NYCT. Unfortunately, from 2015 to 2019 Ms. Yehoshua's immediate supervisor was Khahaifa. Ms. Yehoshua's employment environment was extraordinary difficult, and she suffered greatly at the hands of Khahaifa as she was subjected to discrimination and hostility from her supervisor based solely on her Orthodox Jewish faith. The situation became so intolerable that in February, 2016 Khahaifa's supervisor Lawrence Heisler had to counsel Khahaifa about her actions, which is confirmed in an email sent by Khahaifa, who did not appreciate this counseling. Ms. Yehoshua was copied on that email (see, email attached hereto as **Exhibit "I"**).

The mistreatment of Ms. Yehoshua continued even up until last month when Khahaifa sent an email to Ms. Yehoshua questioning why Ms. Yehoshua did not use a vacation day in observance of a Jewish holiday (Shavuot). This religious persecution resulted in Ms. Yehoshua explaining her level of religiosity in an emailed response to Khahaifa, a civil rights topic on which no government employee should be questioned (See attached as **Exhibit "J"**). A review of the unit caseload supports the point that Khahaifa singled out Ms. Yehoshua to do more work and more trials than any other lawyer in her unit. Just last year in 2019, Ms. Yehoshua tried five (5) cases to verdict while the other two lawyers in her unit combined did fewer. Despite this workload, Khahaifa removed her trial assistant for no explicable reason until Mr. Heisler intervened and returned the assistant to working with Ms. Yehoshua. Fridays were supposed to be a joyous day for religious Jews, however for Ms. Yehoshua they were fraught with fear and anxiety that Khahaifa would leave an enormous amount of work on her desk the minute she left for the day.

We expect there are other documents in the possession of the MTA and NYCT reflecting this situation and have asked that they be preserved and secured. Importantly, it is Khahaifa who is the signatory to this June 12, 2020 Notice, the mechanism to terminate Ms. Yehoshua. We are confused why Khahaifa would maintain such a prominent role in the disciplinary process after Ms. Yehoshua had been supervised by Lisa Urbont well prior to June, 2020 (See attached email as **Exhibit "K"**).

---

[2] On July 2, 2020, counsel for Ms. Yehoshua called Larry Heisler to gain additional insight regarding Ms. Yehoshua. Mr. Heisler did not return the call, instead soon thereafter Robert Dninan called counsel and stated that Mr. Heisler would not be permitted to speak with counsel for Ms. Yehoshua.

CONFIDENTIAL

July 6, 2020
Page 4

HARRIS BEACH ⅊
ATTORNEYS AT LAW

The Allegations in the Underlying Matter

In essence this Notice (and IG investigation) is based on the incorrect assumption that Ms. Yehoshua hired an attorney on a contingency basis to represent her in a private litigation matter was interpreted as an improper "gift" and occasionally used her NYCT email to communicate regarding that litigation. For this, the NYCT is recommending that Ms. Yehoshua be terminated from her position at the agency.

The MTA Inspector General Report

The Notice in this case was preceded by the January 23, 2020 IG Report.[3] The IG Report is a critical component of the Notice that formats and bases its Charges and Specifications on the IG Report. Upon review and analysis, the IG Report that forms the basis of this disciplinary matter is severely lacking in several basis requirements of a sound investigative report.

IG Report General Flaws

As a threshold item, it is critical to understand that an IG in the State, whether the Office of the State Inspector General ("OSIG") or one of the few IG's that are tethered to a specific agency have limited functions. More importantly, an IG report includes no process by which the subject of an IG report can adequately present their position or point of view for inclusion in the record. The IG has complete discretion to use, or not use, information from the target or subject of the inquiry. This one-sided process can result in highly misleading reports when either the IG's office acts beyond its authority or does not include in its process a mechanism that allows the subject's position to be included in the final IG report. Both infirmities exist in the IG Report in this case.

OSIG and the MTA IG both have very similar processes and failings. In recent months, the State has taken a far more active role in the operations of the MTA, including changes in the office of the MTA IG.[4]

In January, 2011, the New York State Bar Association issued a report entitled *Task Force on Government Ethics* ("NYSBA Report") (See, https://nysba.org/app/uploads/2020/01/FinalReportTaskForceonGovernmentEthics013111.pdfweb citation). In the NYSBA Report, the Task Force noted that, "[i]n the world we live in today, with its 24-hour news cycle and innumerable different means of disseminating information, an entire life's work and reputation in public service may be irreversibly damaged in an instant" (See, NYSBA Report at p. 38). The NYSBA Report noted that, "[a]nother problem with investigations conducted by the Inspector General is the lack of a full and fair opportunity to respond ... no law requires that the Inspector General's office allow a response prior to public release of a report or even after the report has

---

[3] Formally entitled as *NYCT Employee's Ethics Violations (Transit Attorney) MTA/OIG [Report] #2020-02*.

[4] See, *New MTA Inspector General asserts she's independent from Cuomo*, NY Post, June 17, 2019 (As of July 6, 2020, See at: http://www.nydailynews.com/new-york/ny-mta-inspector-general-carolyn-pokorny-cuomo-20190617-e3ovbxpjrfh45fjv36gzv5cwpq-story.html)

CONFIDENTIAL

July 6, 2020
Page 5

**HARRIS BEACH** ꟼ𝗅𝖼
ATTORNEYS AT LAW

been released. As a result, an individual named in a report has no opportunity to challenge the statements made by the Inspector General" (See, NYSBA Report at p. 39).

Moreover, the IG Report also veers well outside its jurisdiction in seeking to tag Ms. Yehoshua with violations of Public Officers Law §73(5). In the Findings section of its report, the IG Report unequivocally states that Ms. Yehoshua's hiring of an attorney violated POL §73(5), §74(d), and §74(f). Simply put, the MTA IG has no legal authority to make any finding whatsoever that Ms. Yehoshua violated these sections of the state Public Officers Law ("POL"). The interpretation of these POL sections are exclusively within the purview of the Joint Commission on Public Ethics ("JCOPE"). Executive Law §94(1) specifically states that JCOPE "shall have and exercise the powers and duties set forth in this section with respect to…state officers and employees, as defined in sections seventy-three… of the public officers law.[5] As such, the findings and conclusions of the MTA IG concerning POL §73(5) regarding gifts are improper and outside of its jurisdiction. Not surprisingly, they are also misguided, lack the institutional expertise of JCOPE, and do not comport with the interpretive history of Public Officers Law §73 and §74.

Ms. Yehoshua fully cooperated with the MTA IG process and was interviewed by the MTA IG regarding this matter. She has not been privy to the information and records that led to the conclusions in the IG Report. As a result of a Freedom of Information Law (FOIL) request filed by Ms. Yehoshua, the only item that Ms. Yehoshua received was a redacted copy of the complaint filed by her opponent (defendant) in her personal litigation, see attached hereto as **Exhibit "L"**. As such, she is not fully able to defend herself in the context of this disciplinary matter.

IG Report Specific Flaws

According to the IG Report, Ms. Yehoshua had been involved in a private litigation matter from 2009 through 2019. (IG Report, § I, A, p.2). During some of this period, Ms. Yehoshua hired a lawyer ("Private Attorney"), whose practice also includes some outside counsel work for the NYCT. Ms. Yehoshua had met the Private Attorney "while working at her first job at a law firm" prior to her employment with the NYCT and whom she had known "for nearly 20 years" (IG Report, § II, B, 2, i, p.3). Ms. Yehoshua drafted "all the court documents" (IG Report, § II, B, 2, p.3). Ms. Yehoshua and the Private Attorney entered into a contingency agreement to represent Ms. Yehoshua in the case. The Private Attorney told the MTA IG he had hoped that he could resolve the litigation with the insurance company and garner 30% of the settlement as a fee (IG Report § II, B, 3, i-ii, p.4). Unable to resolve the matter, instead the case went to trial and a verdict not in favor of Ms. Yehoshua was rendered. (IG Report, § II, B, 3, ii, p.4). Because the case ended with Ms. Yehoshua receiving nothing under the contingent fee agreement the Private Attorney also received no fee or payment.

---

[5] As an employee of the NYCT Ms. Yehoshua is a "state officer or employee" for purposes of POL §73, 73-a, and 74 and investigations of such are the responsibility of JCOPE pursuant to Executive Law §94(13)(a).

CONFIDENTIAL

July 6, 2020
Page 6

**HARRIS BEACH** ᴾᴸᴸᶜ
ATTORNEYS AT LAW

Notably, outside of Ms. Yehoshua's personal litigation matter, there was no professional relationship or interaction of note between Ms. Yehoshua and the Private Attorney. As the IG Report notes, the Private Attorney stated that Ms. Yehoshua was not in a position to give him work "because she is not a manager and he does not submit his invoices to her." (IG Report § II, B, 3, i, p.4). In essence, Ms. Yehoshua does not have the ability to reward or influence anything related to the Private Attorney's work for the NYCT.

Despite these facts, apparently unfamiliar with the nature of contingency fee arrangements, the MTA IG  concluded that Ms. Yehoshua "solicited free legal services from a Prohibited Source" (IG Report § III, A, 1, p.5), concluding the contingency fee representation "would _certainly_ be considered a gift from a Prohibited Source" (IG Report § III, A, 1, p.5)(emphasis added).[6] The IG Report itself is riddled with speculation and flawed underpinnings and speculation that form the basis for the unwarranted conclusions regarding Ms. Yehoshua.

The MTA IG concluded that "[a]lthough [Ms. Yehoshua] does not have the authority to assign the [Private Attorney] work, she _might_ have occasion to review work he previously performed on one of her cases" (IG Report § III, A, 2, p. 5-6). The MTA IG therefore concludes that Ms. Yehoshua's "personal interest in his presentation of her _might_ prevent her from properly reporting problems with the Outside Counsel's work product. "Might". "Might". These conclusions are acknowledged speculation.

The MTA IG also concluded that the lack of a formal written retainer agreement "_could_ raise suspicion that [Ms. Yehoshua] is engaged in a course of conduct that _might_ violate the public trust" (IG Report § III, A, 3, p.6). "Could." "Might".  Again, this is unfounded speculation.

The MTA IG also concluded that Ms. Yehoshua violated §8.04 of the MTA policy regarding computer use, stating that by using her NYCT email and asking a colleague for her legal thoughts on her personal matter, she "used MTA computer resources and personnel for personal purposes". As such, the MTA IG applies a draconian and strict liability standard that does not comport with the MTA policy. The MTA IG fails to acknowledge the MTA policy that permits "occasional and incidental" personal use of an MTA email, which is not a violation of the policy. Notably, nowhere in the IG Report is the number of times that Ms. Yehoshua allegedly used the MTA email system related to her personal litigation noted. To the extent such a use of the MTA/NYCT email system may have happened, it was certainly occasional and incidental. In applying an improperly rigid standard that is inconsistent with MTA policy, the IG Report finding violations of the MTA policy, and as carried over into the Notice, is irrational, arbitrary and capricious.

---

[6] Contingency fee agreement are widely accepted fee arrangements so long as the attorney representing the client does not enter in such a fee arrangement in criminal or matrimonial case. The personal litigation at issue involved a home construction matter and was thus appropriate for a contingent fee for the Private Attorney.

CONFIDENTIAL

**HARRIS BEACH** <sup>PLLC</sup>
ATTORNEYS AT LAW

## The Charges Contained in the Notice

The Notice parrots the findings and conclusions contained in the IG Report and as a result they are hopelessly flawed, irrational, arbitrary and capricious on their face. In addition, the Notice is overly broad and fails to cite facts substantiating that the conduct of Ms. Yehoshua was a breach of the policy sections set forth in the Notice. Moreover, the Notice also cites to sections of the Rules and Regulations, Computer Policy, and State Ethics Law that were not at issue under these circumstances.

## Charge I

Charge I is delineated as violations of the MTA Rules and Regulations as follows:

Improper Performance of Duty, Conflict of Interest, Improper Use/Failure to Safeguard Authority Property, Theft of Time Wages, Gross Misconduct and/or Conduct Unbecoming an Authority Employee. The Notice cites the implication of the following enumerated Rules and Regulations: 2(a), 2(b), 4(a), 4(b), 4(c), 10(a), 12(a), 12(f), 13(b), and 13(i).

The cited Rule and Ms. Yehoshua's Employee Response is set forth below. As her response to the Notice, Ms. Yehoshua takes issues with each rule, policy and statute as applied to her situation alleging a breach. This response restates the rule or principle that she is alleged to have violated and for each instance provides her Employee Response.

## Rule 2 - Knowledge of and Compliance with Rules

Rule 2(a): *These rules, which govern the operation of the New York City Transit System, are applicable to you and must be obeyed by all employees.*

Employee Response: Ms. Yehoshua does not dispute that she is an employee of the NYCT, a subsidiary of the MTA, and thus subject to the rules and policies issued by the MTA and the NYCT. Ms. Yehoshua denies that her conduct violated the rules cited in the Notice. To the extent that agency policies drafted by the MTA or NYCT are internally conflicting, subjective or unclear, these polices must be interpreted for the benefit of Ms. Yehoshua.

Rule 2(b): *Employees who violate any of these rules may be disciplined in accordance with the Civil Service Law or their collective bargaining agreement or authority policy, as applicable. Disobedience of these rules or of instructions or any neglect of duty, or any disorder, or any act or omission prejudicial to efficiency or discipline, or any interference with the normal operation of train or bus service or maintenance of the New York City Transit System, shall be reason for charges of misconduct and incompetence and such misconduct or incompetence will be subject to penalty of dismissal, demotion, suspension or other penalty as the authority shall impose.*

CONFIDENTIAL

July 6, 2020
Page 8

# HARRIS BEACH ⌐

ATTORNEYS AT LAW

Employee Response: Ms. Yehoshua generally acknowledges that employees of the MTA and NYCT may be subjected to discipline proportionate to the rule(s) and policy(s) that were actually violated. Ms. Yehoshua does not recall being provided copies of the Rules and Regulations and Computer Policy by the MTA or NYCT prior to June 13, 2020.

Rule 4 – General Duties and Obligations of Employees

Rule 4(a): *Employees are required at all times to perform their duties in accordance with these rules, Policy Instructions and their division's instructions. They must not, whether on or off duty, engage in activities which will interfere with the proper performance of their duties.*

Employee Response: Ms. Yehoshua submits that she performed her duties in accordance with the Rules. The allegations contained in the Notice are unrelated to, or interfere with the performance of her duties on behalf of the MTA and NYCT.

Rule 4(b): *Employees while on duty are under the authority of and must obey the orders of supervision. They must, within their qualifications, perform such duties, in addition to those set forth herein, as the superiors to whom they report may direct. Safety rules, manual of instructions, policy instructions, special instructions, etc. in force prior to, or promulgated by Department or Division Heads subsequent to the adoption of these rules, shall have the same force and effect as though set forth in full in this Rule Book.*

Employee Response: Ms. Yehoshua submits that she performed her duties in accordance with the Rules and obeyed orders of supervisors. As previously stated, Ms. Yehoshua was subjected to improper conduct by her former supervisor based on her religion (Orthodox Jewish) and her former supervisor was counselled on the matter. The allegations contained in the Notice are unrelated to the performance of her duties on behalf of the MTA and NYCT. Ms. Yehoshua submits that she did not willfully violate rules, but to extent that she used her office email occasionally and incidentally punishment by termination is not a proper or proportionate disciplinary response.

Rule 4(c): *Employees must render every assistance in their power in carrying out these rules and must report to their supervisors any violation thereof.*

Employee Response: Ms. Yehoshua submits that she did not willfully violate rules, but to the extent that she used her office email occasionally and incidentally, punishment by termination is not a proportionate disciplinary response. Ms. Yehoshua denies violations of the Rules and Regulations as it relates to purported gifts from the Private Attorney, as a contingent fee agreement is not a gift.

CONFIDENTIAL

July 6, 2020
Page 9

**HARRIS BEACH** ⸚
ATTORNEYS AT LAW

Rule 10 – Conduct of Employees

Rule 10(a): *Employees are required to avoid behavior which would tend to create adverse criticism of the Authority or of the System. Their conduct, whether on or off duty on System property, is required to be such as to merit the confidence and respect of the public in their superiors.*

Employee Response: Ms. Yehoshua submits that she did not willfully violate rules, but to the extent that she used her office email occasionally and incidentally punishment by termination is not a proper or proportionate disciplinary response. Ms. Yehoshua submits that the rule prohibiting "adverse criticism of the Authority or the System" to the extent it relates to the IG Report, and may implicate State and Federal constitutional principles of free speech is legally infirm and improper. Moreover, to the extent that Ms. Yehoshua was the target or subject of a MTA IG inquiry, that standing alone does not violate this Rule. Ms. Yehoshua is a hardworking and successful attorney for the NYCT and as such she brings credit to the agency, and does not "create adverse criticism of the Authority".

Rule 12 – Code of Ethics

Rule 12(a): *No officer or employee of the Authority shall have any interest, financial or otherwise direct or indirect, or engage in any business or transaction of professional activity or incur any obligation of any nature, which is or may be in conflict with the proper discharge of his or her duties.*

Employee Response: Ms. Yehoshua has no "interest, financial or otherwise" at issue in this matter. Likewise, Ms. Yehoshua did not "incur any obligation … in conflict with the proper discharge of her duties" by hiring the Private Attorney on a contingent basis. As the IG Report specifically detailed, Ms. Yehoshua had no supervisory role at NYCT or in the payment of vouchers that could form the basis for a conflict. The IG Report relies on rank speculation and disregards the fact that there is no nexus forming a conflict and is thus flawed and should be disregarded by the NYCT in considering discipline in this matter. Moreover, in order to be a violation the conflict must be related to "the proper discharge of her duties", and neither the Notice nor the IG Report set forth facts supporting an impact on Ms. Yehoshua's duties as an attorney for the NYCT.

Rule 12(f): *The MTA All-Agency Code of Ethics also sets forth the employee conduct that this Rule 12 prohibits, as well as exceptions to and illustrations of prohibited and permitted conduct. In addition, the New York State Joint Commission on Public Ethics (JCOPE) issues opinions and regulations governing employee conduct under the State Ethics in Government Act.[7] JCOPE regulations place restrictions on employees who hold policy-making positions in addition to*

---

[7] This policy statement is outdated. The Ethics in Government Act was passed in 1987. The State laws have been dramatically overhauled twice in recent years, first by the Public Employee Ethics Reform Act of 2007 (PEERA) and again by the Public Integrity Reform Act of 2011 (PIRA).

CONFIDENTIAL

HARRIS BEACH ⸗
ATTORNEYS AT LAW

*those stated in this Rule 12. Employees are advised to refer to the MTA All-Agency Code of Ethics, submit questions to the Authority's Ethics Committee, and refer to published opinions and regulations of the JCOPE in seeking further guidance for adhering to this Rule.*

Employee Response: This Rule was not breached by Ms. Yehoshua. However, importantly, this agency rule affirmatively directs employees to the "published opinions and regulations of the JCOPE in seeking further guidance for adhering to this Rule". A survey of opinion and JCOPE regulations confirm that Ms. Yehoshua did not violate the principles suggested by the IG Report and the Notice (See reference to JCOPE regulations regarding Prohibited Sources herein).

Rule 13 – System Property; Protection Thereof; E-mail and Internet; Return of Property Issued to Employees

Rule 13(b)(1): *Employees shall not confer, borrow, or take System property for personal use nor shall they willfully damage the same. They shall protect System property from damage or theft by others at all times to the best of their ability and must unite, when necessary, to protect System property. All Authority property is for official use only (including all intellectual work product such as email). Authority property may not be modified without authorization. Employees may only use official Authority software on Authority computers. Use of other licensed software (vendor owned or employee owned) is not permitted. However, in certain instances, with permission of senior Authority management, vendor owned software may be used for testing (beta) purposes only. Employees are required to report promptly any theft or damage to System property.*

Employee Response: The bulk of this Rule is not at issue, i.e. damage/theft of Authority property, modification of property, vendor-owned property. The Computer Policy permits occasional and incidental use of Authority email, as such this Rule was not violated (See related arguments and policy references herein).

Rule 13(b)(2): *In order to protect the safety and security of the System, the sale, distribution or disclosure of Authority manuals, drawings, design plans, information, uniforms, policies or related materials to non-employees is strictly prohibited. Employees cannot disclose, distribute or sell such materials through the Internet, any other media, or by any means without the written permission of his/her Department/Division Head.*

Employee Response: The Notice is unclear and references only "Rule 13(b)". It appears that Rule 13(b)(2) is not implicated under these facts. Nothing in the IG Report or the Notice support a violation of this Rule.

Rule 13(i): *This applies to all users of the Authority's computing resources, whether on-site or from remote locations. When employee is given access to the Authority's Computer resources, it is their responsibility to assume appropriate use. Employees or "users" should not engage in computer misconduct. Such misconduct includes, but is not limited to the following: accessing servers or accounts that are unauthorized, knowingly introducing or sharing malicious programs*

CONFIDENTIAL

July 6, 2020
Page 11

**HARRIS BEACH** ᴾᴸᴸᶜ
ATTORNEYS AT LAW

*into the Authority's computing environment (e.g. viruses, worms, Trojan horses, email bombs, etc…), and without specific authorization, knowingly altering or removing data or information technology equipment that is the sole property of the Authority.*

Employee Response: Ms. Yehoshua did limit her email communications to "appropriate use" and did comply with the Computer Policy permitting occasional and incidental usage. Ms. Yehoshua did not engage in any "computer misconduct", share any "malicious programs" or alter or change the IT equipment of the Authority.

Specifications Charge I: Charge I contains a series of four (4) "Specifications" apparently designed to provide a factual basis for the alleged misconduct. Upon closer scrutiny and review of the applicable Rules and facts, the alleged violations are suspect and the proposed penalty of termination is gravely disproportionate.

Specification I: *On or about 2014 through January 31, 2019, you engage in conduct that either constitutes a conflict of interest or the appearance of a conflict of interest in that you retained the services of an attorney, known to you to be vendor serving as outside counsel to the Authority, for a personal civil litigation matter, and did so without providing payment to the attorney for the legal services provided to you. You also failed to seek or obtain the approval of the Authority's Ethics Officer prior to engaging in such attorney-client with the aforementioned Authority-retained outside counsel.*

Employee Response: Entering into a contractual agreement that depending on the outcome could have resulted in a fee worth 30% of the judgment is not the equivalent of utilizing free legal services. It is black letter law that bargained for consideration is not a gift. The consideration in this matter was the potential 30% value of the verdict. Both Ms. Yehoshua and the Private Attorney accepted and entered into this business contract and both agreed to the risk/reward dynamic which is completely proper under the rules governing attorneys in the State of New York. Ms. Yehoshua was not required to seek "approval of the Authority's Ethics Officer" because it was not foreseeable that the hiring of the Private Attorney could implicate the ethics rules. And, the hiring did not breach government ethics principles.

Specification II: *On or about February 2015 through November 2018, without proper authorization from the Authority, you improperly utilized Authority electronic mail, Internet, computer systems and other resources to communicate with an attorney, known to you to be a vendor of legal services as outside counsel to the Authority, regarding your personal litigation matter. Your correspondence included the exchange of draft documents, scheduling, court filings and other non-Authority matters engaging the legal services of the vendor on a personal civil litigation matter.*

Employee Response: Both the IG Report and the Notice fail to indicate the number of times Ms. Yehoshua may have used her NYCT work email to transmit a document or correspond with her Private Attorney. Upon information and belief, that number is very small and qualifies as "occasional and incidental personal use" which is permissible under the agency Computer Policy

CONFIDENTIAL

July 6, 2020
Page 12

**HARRIS BEACH** ꟼ
ATTORNEYS AT LAW

and MTA Policy at Section IV(A) (see, IG Report at § III, B, 2, p. 7). The subjective nature of the level of permissible usage is insufficiently defined to provide advance notice to NYCT employees who may occasionally use their NYCT computer to communicate on non-Agency matters. In addition, even if Ms. Yehoshua is found to have violated the Computer Policy, termination is a highly improper and disproportionate response and penalty.

Specification III: *On or about February 8, 2018, without proper authorization from the Authority, you utilized Authority computer systems and other resources to communicate via electronic mail with an expert witness regarding your personal litigation matter during scheduled work hours.*

Employee Response: Notably, this Specification references a single day in a personal civil litigation matter that according to the IG Report spanned from 2014 through January 31, 2019 (see, IG Report § II, A, p.2). Nearly, by definition this communication is "occasional and incidental" and as such does not violate the Authority policies. Certainly, even by this subjective standard, nominal usage as referenced herein does not rise to the level of punishment by termination.

Specification IV: *On or about May 7, 2014, without proper authorization from the Authority, you utilized Authority computer systems and other resources to communicate via electronic mail with a colleague regarding your personal litigation matter during scheduled work hours. Your correspondence included the exchange of draft documents seeking your colleague's legal opinion of the document.*

Employee Response: Similar to Specification III, this Specification references a single day in a personal civil litigation matter that according to the IG Report spanned from 2014 through January 31, 2019 (see, IG Report §II, A, p.2). Nearly, by definition this communication is "occasional and incidental" and as such does not violate the Authority policies. Certainly, even by this subjective standard, nominal usage as referenced herein does not rise to the level of punishment by termination. Oddly, the IG Report suggests that bouncing a legal issue off of a colleague rises to the level of using MTA "personnel for personal purposes". (see, IG Report § III, A, 3, p.6). It does not appear that the NYCT embraced this position, but such a suggestion is ridiculous on its face.

Charge II

Charge II is delineated as violations of the MTA Rules and Regulations, Computer Policy and State Ethics Law as follows:

Solicitation/Receipt of a Prohibited Gift, Conflict of Interest, Violation of the Public Trust, Improper Use of MTA Property, Gross Misconduct and/or Conduct Unbecoming an Authority Employee. The Notice cites the implication of the following enumerated 4(a) of the MTA

CONFIDENTIAL

July 6, 2020
Page 13

**HARRIS BEACH** ⸗
ATTORNEYS AT LAW

All-Agency Computer And Social Media Usage Policy Directive[8]; Sections 2.01, 4.01, 4.02 and 8.04 of the MTA All-Agency Code of Ethics; and NY Public Officers Law §73(5)(a).

Computer Policy Directive Rule 4(a): *This Policy directive is not restated verbatim in its entirety. It spans pages 4-8 of the Policy and is attached at Exhibit "D" herein.*

Employee Response: The Notice is vague concerning this Rule, which includes a number of subdivisions, making it difficult for Ms. Yehoshua to properly respond. Most significant within this Rule is the permissibility of "occasional and incidental" computer usage. Such occasional and incidental usage is permitted when it does "not interfere with the conduct of MTA Agency business" (See, Rule IV, A, 2, a). Occasional and incidental usage is also permitted if it "only account[s] for an incidental amount of the Computer User's time" (See, Rule IV, A, 2, c). Notably, this occasional and incidental exception, states that "Computer Users engaging in *excessive* personal use are subject to disciplinary or other action as determined by the MTA Agency" (emphasis added), which suggests that use that does *not* rise to the level of "excessive" is *not* subject to discipline.

Code Section 2.01: *This Code of Ethics directive is not restated verbatim in its entirety. It is attached at Exhibit "D" herein.*

Employee Response: Ms. Yehoshua reiterates that her bargained for consideration contingent fee contract was not a gift. Even if the NYCT ignored the principles needed to make that a gift, it fails under the applicable standards. This Rule makes it clear that the "Prohibited Source" rule regarding gifts is not a strict liability standard. Stated another way, even in situations where something is a gift the fact that the gift giver does business with the agency and the gift receiver is an agency employee is not in and of itself dispositive of the issue. For example, § 2.01 of the Code of Ethics sates that, "[e]mployees may accept gifts from employees of a Prohibited Source if these Gifts are reflective of a personal relationship independent of the relationship between the Prohibited Source and the MTA". Under this rule, "[e]mployees are permitted to accept discounts or special offers from a Prohibited Source so long as these discounts or special offers are generally available to similarly situated employees of other public or private organizations". In this case, contingent fee arrangements are widely used and available to all litigants. Even assuming arguendo that a contingent fee were a gift from a Prohibited Source, these fee arrangements are available to the general public and as such are not prohibited gifts.

The JCOPE promulgated regulations regarding an Interested Source a/k/a/ Prohibited Source set forth the principles as it relates to gifts from such sources (see, 19 NYCRR 933.3(a)). JCOPE finds gifts from an Interest Source "presumptively prohibited" *unless* three criteria are met, "(1) it is not reasonable to infer that the Gift was intended to influence the Covered Person; (2) the Gift could not reasonably be expected to influence the Covered Person in the performance of his or her official duties; and (3) it is not reasonable to infer that the Gift was intended as a reward for any official action on the Covered Person's part." Ms. Yehoshua submits that the

---

[8] The effective date of the policy is March 5, 2015.

CONFIDENTIAL

July 6, 2020
Page 14

HARRIS BEACH ⸰
ATTORNEYS AT LAW

contingent fee arrangement was not a gift, and even under a JCOPE analysis, since the contingent retainer arrangement could not support an inference that the arrangement was intended to influence Ms. Yehoshua, it was unrelated to her official duties, and was not a reward, the contingent retainer does not violate the Prohibited Source gift rule.[9]

Code Section 4.01: *Employee should not have any interest, personal, financial or otherwise, direct or indirect, or engage in a business or transaction or professional activity or incur any obligation of any nature, which is or may be in conflict with the proper discharge of his or her duties. Employees must notify the Agency Ethics Officer or Ethics Committee directly regarding a possible conflict of interest. Employees must not only avoid conflict of interest with the MTA but also even the appearance of a conflict.*

Employee Response: The prerequisite for application of this Rule is a conflict of interest, which does not exist in this case. Based on the pre-existing relationship between Ms. Yehoshua and the Private Attorney, the lack of any overlap in their professional work, or any ability for the Private Attorney to exert any undue influence affecting Ms. Yehoshua and there was no conflict of interest or any appearance of a conflict of interest with the operations of NYCT. The "Reminders" section of this Rule states that, "if an Employee *is uncertain* as to whether a given situation creates a real or potential conflict of interest, such Employee *should* promptly disclose that situation to, and seek guidance from, his or her supervisor, Department Head, the applicable Agency Ethics Committee, or MTA Chief Compliance Officer" (emphasis added). In this situation, Ms. Yehoshua had no reason to believe that hiring the Private Attorney whom she had known prior to working for NYCT based on a contingent fee contract would be considered an actual or potential conflict of interest. Ms. Yehoshua had no ability to give favoritism, work, or anything else to the Private Attorney from her position at the NYCT. As such, she did not have any uncertainty at the time of the propriety of the professional engagement (and does not now). Moreover, the Reminder does not require that an agency employee must contact the Agency Ethics Officer or Ethics Committee, but states that that an employee "should" have such a consultation when a conflict may exist.

Code Section 4.02: *Employees shall not engage in a course of conduct that will raise suspicion among the public that they are likely to be engaged in acts that are in violation of the public trust. Employee shall avoid even the appearance that they can be improperly (1) influenced in the performance of their official duties or (2) induced to violate the public trust or impair their independence of judgment in the exercise of their official duties* (emphasis added).

Employee Response: This excerpt from the MTA Code of Ethics is taken in large part from Public Officer Law §74(3)(h), which applies to all State employees.[10] In order to violate this

_____

[9] As referenced herein, MTA and NYCT policies recommend employees use JCOPE regulations for guidance in ethics matters.
[10] POL §74(3)(h) states, "[a]n officer or employee of a state agency, member of the legislature or legislative employee should endeavor to pursue a course of conduct which will not raise suspicion among the public that he or she is likely to be engaged in acts that are in violation of his or her trust."

CONFIDENTIAL

July 6, 2020
Page 15

**HARRIS BEACH ⸚**
ATTORNEYS AT LAW

section, the element that it be "likely" the acts of employee will raise suspicion among the public that the actions are in violation of the public trust must exists. Here, it is most unlikely that Ms. Yehoshua's hiring of the Private Attorney would raise concerns among the public, particularly because Ms. Yehoshua had no ability to reciprocate favoritism, work, etc. from her line attorney position at the NYCT. Additionally, the "appearance" of a conflict may exist if the enumerated scenarios, neither which exist in this case. Neither the IG Report nor the Notice provide any substantiated facts supporting the notion that Ms. Yehoshua's official duties were influenced. Likewise, there is no suggestion that there was any impairment of her professional judgment and there is no suggestion that any professional situation requiring her judgment was even remotely affected by the professional hiring of the Private Attorney.

Section 8.04: *This agency Code of Ethics regarding Prohibition Against Use of MTA Property is not restated verbatim in its entirety. It is attached at Exhibit "D" herein.*

Employee Response: This Code of Ethics rules specifically states that, "key computers may be used for incidental and necessary personal purposes, such as sending personal electronic messages, provided that such use is in a limited amount and duration does not conflict with the proper exercise of the duties of the MTA employee" (See, § 8.04 (d)). As such, since Ms. Yehoshua's use of her MTA (NYCT) computer was "incidental and necessary for personal purposes", she did not violate this Rule. Even assuming arguendo that the use exceeded the standard of "incidental and necessary for personal use", the few occasions at issue do not justify termination which would be grossly disproportionate to the alleged offense.

POL Section 73(5)(a): *No statewide elected official, state officer or employee, individual whose name has been submitted by the governor to the senate for confirmation to become a state officer or employee, member of the legislature or legislative employee shall, directly or indirectly: (a) solicit, accept or receive any gift having more than a nominal value, whether in the form of money, service, loan, travel, lodging, meals, refreshments, entertainment, discount, forbearance or promise, or in any other form, under circumstances in which it <u>could reasonably be inferred that the gift was intended to influence him or her</u>, or could reasonably be <u>expected to influence him or her, in the performance of his or her official duties</u> or was intended as a reward for any official action on his or her part. No person shall, directly or indirectly, offer or make any such gift to a statewide elected official, or any state officer or employee, member of the legislature or legislative employee under such circumstances* (emphasis added).

Employee Response: POL §73(5)(a) includes important language in understanding why the IG Report methodology is misguided. In order to be an improper gift to a state employee, the gift must be given "under circumstances in which it could reasonably be inferred that the gift was intended to influence ..." This is the most critical element of the principle, as not all gifts are improper and violate government ethics laws. There must be a nexus between the giving of the gift and the effort to improperly influence in order for the government employee to engage in misconduct. By way of illustration, if Person A and Person B are high school classmates, lifelong friends and neighbors and Person A is a custodian at NYCT and Person B is a subway car vendor that regularly engages with the NYCT, and Person A accepts NY Yankee tickets from Person B

CONFIDENTIAL

NYCTA 000090

July 6, 2020
Page 16

HARRIS BEACH ㎩
ATTORNEYS AT LAW

the statute has not been violated, despite the underlying agency-vendor dynamic. The reason, the necessary element of "reasonably [] inferred …improper influence" is absent. Person A, the custodian is unable to influence Person B's efforts to sell subway cars to the NYCT. Likewise, in the situation at bar, the IG Report acknowledges that Ms. Yehoshua had a professional relationship with the Private Attorney prior to being employed by NYCT. Ms. Yehoshua does not hold a position at NYCT where it could be reasonably inferred that she could improperly influence NYCT matters involving the Private Attorney. Even if their paths crossed on a NYCT issue, that alone would not cause a violation of the gift prohibition so long as their work together did not evolve into either inferred or actual improper influence. Speculation does not meet the statutory standard.

As set forth herein there is no violation of NY Public Officer Law §73(5)(a) governing gifts to state officers or employees in this matter. As such, that allegation should be stricken from the Notice.

Charge II Specifications: Charge II contains a series of five (5) "Specifications" apparently designed to provide a factual basis for the alleged misconduct. Upon closer scrutiny and review of the applicable Rules and facts, the alleged violations are suspect and the proposed penalty of termination is gravely disproportionate.

Specification I: *The Authority repeats and realleges Specifications I, II, III, IV to Charge I above.*

Employee Response: Ms. Yehoshua repeats and realleges her responses to Specifications I, II, III, and IV of Charge I above.

Specification II: *You solicited and/or received a prohibited gift by accepting the services of an attorney, known to you to be a vendor serving as outside counsel to the Authority, for a personal civil litigation matter without providing payment to the attorney for the legal services provided to you.*

Employee Response: The premise that a contract for professional services on a contingent fee basis is a gift is deeply flawed. The contingent fee was bargained for and included a risk/reward component. As such, it is not a gift as defined under the law. A gift cannot be outcome dependent, for example, had Ms. Yehoshua won her case and the Private Attorney been paid 30% of the judgment as a fee, no reasonable person could have suggested the 30% fee was a gift. It would be compensation for professional services. The only difference is the contracting parties' (Ms. Yehoshua and Private Attorney) willingness to incorporate a bargained for risk/reward element into their contract. There is no gift in this matter.

Specification III: *You violated conflict of interest regulations by engaging the services of an attorney, known to you to be a vendor serving as outside counsel to the Authority, for a personal civil litigation matter. You failed to report the possibility of a conflict of interest to the Agency Ethics Officer or Ethics Committee. You failed to avoid the appearance of a conflict of interest.*

CONFIDENTIAL

July 6, 2020
Page 17

**HARRIS BEACH** ᴾᴸᴸᶜ
ATTORNEYS AT LAW

Employee Response: Ms. Yehoshua hired the Private Attorney whom she had had a professional relationship with prior to beginning work at the NYCT, which is not improper (See, IG Report, §II, B, 2, I p.3). The Specification misstates the Rule and obligations of Ms. Yehoshua, as it states that Ms. Yehoshua is required to report "the possibility of a conflict of interest". In fact, Ms. Yehoshua had no reason to believe under these facts and circumstances that hiring the Private Attorney whom she had a long-standing professional relationship with, and had virtually no professional interaction with in her NYCT capacity could be a "possible conflict". Moreover, there is no rule or policy that specifically prohibits contingent fee arrangements or equates contingent fee contracts to gifts under applicable Authority policy. No conflict of interest existed, and because of the lack of any interactions between Ms. Yehoshua and the Private Attorney on NYCT business there was no basis for to suggest an appearance of a conflict of interest. As such, Ms. Yehoshua had no reporting obligations to the Agency Ethics Officer or the Ethics Committee.

Specification IV: *You violated the public trust by engaging the services of an attorney, known to you to be a vendor serving as outside counsel to the Authority, for personal civil litigation matter without providing payment to the attorney for the legal services provided to you. You failed to avoid the appearance of an undue influence or impaired judgment in violation of the public trust.*

Employee Response: There was no conflict of interest that implicated the public trust because Ms. Yehoshua was not in any position to made special accommodations or improperly assist the Private Attorney. Because there was no conflict of interest this allegation is unsupported. A contingency fee agreement does not equate to a gift, and the fact that because of the result (verdict) no payment was due and owing does not equate to an improper gift.

Specification V: *You engage in Improper Use of MTA Property by utilizing authority computer systems and other resources in the furtherance of your personal civil litigation matter.*

Employee Response: Both the IG Report and the Notice fail to indicate the number of times Ms. Yehoshua may have used her NYCT work email to transmit a document or correspond with her Private Attorney. Upon information and belief, that number is very small and qualifies as "occasional and incidental personal use" which is permissible under the agency Computer Policy and MTA Policy at Section IV(A) (see, IG Report at §III, B, 2 (p. 7)). The subjective nature of the level of permissible usage is insufficiently defined to provide advance notice to NYCT employees who may occasionally use their NYCT computer to communicate in non-Agency matters. In addition, even if Ms. Yehoshua is found to have violated the Computer Policy, termination is a highly improper and disproportionate response and penalty.

CONFIDENTIAL

July 6, 2020
Page 18

HARRIS BEACH ᴾᴸᴸᶜ
ATTORNEYS AT LAW

Conclusion

Ms. Yehoshua is a highly successful attorney who has represented NYCT in stellar fashion as a professional attorney. Despite being subjected to improper treatment in the workplace due to her strong religious beliefs, she greatly enjoys the work she does on behalf of NYCT and in particular given her new supervisory chain of command. For the reasons set forth herein, Ms. Yehoshua did not violate the Rules and Regulations, Computer Policy, or State Ethics Law. To the extent that there may be loose and subjective measures of whether her conduct was proper, no rationale conclusion supports punishment by termination. Under these circumstances, it would be irrational, arbitrary and capricious to terminate Ms. Yehoshua. Ms. Yehoshua regrets that this matter has risen to its current status at NYCT. A more mild and proportionate resolution, such as additional training for Ms. Yehoshua appears to be a logical path forward for both Ms. Yehoshua and the NYCT.

Very truly yours,

HARRIS BEACH PLLC

*Karl J. Sleight*

Karl J. Sleight

KJS:dlc
cc:    Thomas Quigley, General Counsel, MTA (via email to Tquigley@mtahq.org)
       Kim Moore-Ward, VP Labor Relations, NYCT (via email to kim.moore-ward@nyct.com
       Michael J. Garner, Chief Diversity Officer (via email at mgarner@mtahq.org)
       Robert Drinan (via email at Robert.Drinan@nyct.com)

CONFIDENTIAL

# EXHIBIT A

CONFIDENTIAL

NYCTA 000094

From: a d <acadia7357@yahoo.com>
Sent: Thursday, June 18, 2020 10:14 AM
To: Karl J. Sleight
Subject: Fw: Please see attachments - Part 1 of 3 emails
Attachments: A. Yehoshua_M39484 FINAL    (6-12-20).pdf; OIG report.pdf; Yehoshua - excerpts of rules, regulations, law-compressed.pdf

Mr. Sleight,
Here is the first email I received from my former manager, Weslii Khahaifa. There are 3 attachments below.
Amelia

From: Khahaifa, Weslii <Weslii.Khahaifa@nyct.com>
Sent: Friday, June 12, 2020 1:23:45 PM
To: Yehoshua, Amelia <Amelia.Yehoshua@nyct.com>
Cc: Farber, David <David.Farber@nyct.com>; Murphy, Theresa <Theresa.Brennan-Murphy@nyct.com>; Smart, Helen <Helen.Smart@nyct.com>; Costa, Craig <Craig.Costa@nyct.com>
Subject: Disciplinary Action Letter (DAN)

Amelia,

Please see attached.

Thanks,

**Weslii Khahaifa, Esq.**

*Borough Litigation Chief, New York County*

*130 Livingston Street, 11th Fl.*

*Brooklyn, New York 11201*

*(718)694-3991 Telephone*

*(718)694-1023 Fax*

Confidentiality Note: This e-mail, and any attachment to it, may contain privileged and confidential information and is intended for the use of the individual(s) or entity named on the e-mail. Unauthorized disclosure of this message is prohibited. If you have received this message in error, please notify the sender immediately by return e-mail and destroy this message and all copies thereof, including all attachments.

CONFIDENTIAL

NYCTA 000095

# EXHIBIT B

CONFIDENTIAL

NYCTA 000096

A. Yehoshua, Pass No. M39484
DAN No. 20-6314-0003
Page 1 of 4

 **New York City Transit**

**Via First Class and Certified U.S. Mail and Electronic Mail**

**June 12, 2020**

**Amelia Yehoshua, Executive Agency Counsel**
**2211 Avenue T**
**Brooklyn, NY 11229**

Re:    Notice of Disciplinary Charges, DAN No. 20-6314-0003

This is an official notice of disciplinary action in that you violated MTA New York City Transit / Manhattan and Bronx Surface Transit Operating Authority (together, the "Authority") Rules 2(a), 2(b), 4(a), 4(b), 4(c), 10(a), 12(a), 12(f), 13(b) and 13(i) of the *Rules and Regulations Governing Employees of MTA New York City Transit ("Rules and Regulations")*; Section 4(a) of the *MTA All-Agency Computer And Social Media Usage Policy Directive;* Sections 2.01, 4.01, 4.02 and 8.04 of the *MTA All- Agency Code of Ethics*; and Section 73(5)(a) of the New York State *Public Officers Law.*

At the times hereinafter set forth, you were a non-represented Executive Agency Counsel, Non-Managerial, Level B, assigned to the Torts Division, Department of Law.

The Charges preferred against you are as follows:

### CHARGE I

Improper Performance of Duty, Conflict of Interest, Improper Use/Failure to Safeguard Authority Property, Theft of Time/Wages, Gross Misconduct and/or Conduct Unbecoming an Authority Employee in that you violated Rules 2(a), 2(b), 4(a), 4(b), 4(c), 10(a), 12(a), 12(f), 13(b) and 13(i) of the *Rules and Regulations.*

CONFIDENTIAL

A. Yehoshua, Pass No. M39484
DAN No. 20-6314-0003
Page 2 of 4

**Specification I:**

On or about 2014 through January 31, 2019, you engaged in conduct that either constitutes a conflict of interest or the appearance of a conflict of interest in that you retained the services of an attorney, known to you to be a vendor serving as outside counsel to the Authority, for a personal civil litigation matter, and did so without providing payment to the attorney for the legal services provided to you. You also failed to seek or obtain the approval of the Authority's Ethics Officer prior to engaging in such attorney-client with the aforementioned Authority-retained outside counsel.

**Specification II:**

On or about February 2015 through November 2018, without proper authorization from the Authority, you improperly utilized Authority electronic mail, internet, computer systems and other resources to communicate with an attorney, known to you to be a vendor of legal services as outside counsel to the Authority, regarding your personal litigation matter. Your correspondence included the exchange of draft documents, scheduling, court filings and other non-Authority matters engaging the legal services of the vendor on a personal civil litigation matter.

**Specification III:**

On or about February 8, 2018, without proper authorization from the Authority, you utilized Authority computer systems and other resources to communicate via electronic mail with an expert witness regarding your personal litigation matter during scheduled work hours.

**Specification IV:**

On or about May 7, 2014, without proper authorization from the Authority, you utilized Authority computer systems and other resources to communicate via electronic mail with a colleague regarding your personal litigation matter during scheduled work hours. Your correspondence included the exchange of draft documents seeking your colleague's legal opinion of the document.

**CHARGE II**

Solicitation/Receipt of a Prohibited Gift, Conflict of Interest, Violation of the Public Trust, Improper Use of MTA Property, Gross Misconduct and/or Conduct Unbecoming an Authority Employee in that you violated Section 4(a) the *MTA All-*

CONFIDENTIAL

A. Yehoshua, Pass No. M39484
DAN No. 20-6314-0003
Page 3 of 4

*Agency Computer And Social Media Usage Policy Directive;* Sections 2.01, 4.01, 4.02 and 8.04 of the *MTA All- Agency Code of Ethics*; and Section 73(5)(a) of the New York State *Public Officers Law.*

### Specification I:

The Authority repeats and re-alleges Specifications I, II, III and IV of Charge I, above.

### Specification II:

You solicited and/or received a prohibited gift by accepting the services of an attorney, known to you to be a vendor serving as outside counsel to the Authority, for a personal civil litigation matter without providing payment to the attorney for the legal services provided to you.

### Specification III:

You violated conflict of interest regulations by engaging the services of an attorney, known to you to be a vendor serving as outside counsel to the Authority, for a personal civil litigation matter. You failed to report the possibility of a conflict of interest to the Agency Ethics Officer or Ethic Committee. You failed to avoid the appearance of a conflict of interest.

### Specification IV:

You violated the public trust by engaging the services of an attorney, known to you to be a vendor serving as outside counsel to the Authority, for a personal civil litigation matter without providing payment to the attorney for the legal services provided to you. You failed to avoid the appearance of undue influence or impaired judgment in violation of the public trust.

### Specification V:

You engaged in Improper Use of MTA Property by utilizing Authority computer systems and other resources in the furtherance of your personal civil litigation matter.

### RECOMMENDED PENALTY

Based on the nature of the charges, including Failure to Comply, Insubordination, Non-Performance of Duty, Absent Without Official Leave, Gross Misconduct and/or

CONFIDENTIAL

A. Yehoshua, Pass No. M39484
DAN No. 20-6314-0003
Page 4 of 4

Conduct Unbecoming an Authority Employee, the recommended penalty is
**Dismissal** from service. You may submit a written response to this disciplinary
action notice. Please provide your response to David Farber, General Counsel, by
close of business on June 30, 2020

Your written response must be directed to **David Farber, General Counsel, Law
Department, MTA NYC Transit, 130 Livingston Plaza, 12th Floor, Brooklyn, NY
11201, and via electronic mail to** david.farber@nyct.com.. Your written
response will be reviewed and considered in determining the outcome of this
disciplinary action notice. Failure to submit a written response by June 30, 2020
shall result in implementation of the recommended penalty.

Sincerely,

**Weslii Khahaifa**
**Borough Litigation Chief, New York County**
**Torts Unit**
**Department of Law**

*Encl: MTA Rules & Regulations (excerpts)*
*MTA All-Agency Computer and Social Media Usage Policy Directive (excerpts)*
*MTA All- Agency Code of Ethics (excerpts)*
*NYS Public Officers Law Section 73 (excerpts)*

cc:     D. Farber, Law
        T. Murphy, Law
        H. Smart, Law
        C. Costa, OLR
        File

CONFIDENTIAL

# EXHIBIT C

CONFIDENTIAL

NYCTA 000101

---

**MTA/OIG Report #2020-02**                                                                 **January 2020**

---



### Office of the Inspector General
**Metropolitan Transportation Authority**
One Penn Plaza, 11th Floor, Suite 1110
New York, NY 10119
212-878-0000

**Carolyn Pokorny**
**MTA Inspector General**

January 23, 2020

Andrew Byford
President
MTA New York City Transit
2 Broadway, 20th Floor
New York, NY 10004

**Re: NYCT Employee's Ethics Violations
(Transit Attorney)
MTA/OIG #2020-02**

Dear Mr. Byford:

The Office of the MTA Inspector General (OIG) has concluded its investigation into allegations against a New York City Transit (NYC Transit) Executive Agency Counsel (Transit Attorney). It was alleged that the Transit Attorney retained a lawyer (Outside Counsel), a longtime contracted vendor for NYC Transit, to represent her in a personal litigation and did not pay the Outside Counsel for his legal services. The OIG has substantiated the allegations. In addition, the OIG also found that the Transit Attorney used MTA resources to correspond with the Outside Counsel and others for her personal litigation. The OIG further found that the Outside Counsel was not provided with a copy of the MTA Vendor Code of Ethics.

We recommend that the Transit Attorney be disciplined by NYC Transit as it deems appropriate. We further recommend that the MTA ensure that all outside counsels working on personal injury matters are provided with a copy of the MTA Vendor Code of Ethics and review its retainer agreements with them to ensure that counsel certify that they have received, and will abide by, the MTA Vendor Code of Ethics. [1] The Transit Attorney's conduct also appears to violate the New York State Public Officers Law. Accordingly, we are forwarding this matter to the New York State Joint Commission on Public Ethics (JCOPE) for action as it may deem appropriate.

---

[1] The MTA advised that retainer agreements for outside counsel, other than those that work on personal injury matters, have the Vendor Code of Ethics incorporated in their retainer agreements.

---

**Office of the MTA Inspector General**                                                           1

CONFIDENTIAL

NYCTA 000102

## I.    BACKGROUND

NYC Transit hired the Transit Attorney in April 2013 as a trial attorney in its Law Department Torts Division (Torts Division). The Transit Attorney was in private practice for 17 years before joining NYC Transit's Torts Division.

The Outside Counsel has worked as outside counsel to the Tort Division since 1990 and his practice has consisted primarily of NYC Transit work since 2005. The Attorney's retainer agreement with the MTA dates back to May 7, 2004.

## II.    INVESTIGATION

### A. Record Review

According to the court records, the Transit Attorney has been a plaintiff in civil litigation against her former construction contractor since 2009 (the Personal Case). The Outside Counsel represented the Transit Attorney in the Personal Case from 2014 to January 31, 2019. On January 15, 2019, the Transit Attorney lost her Personal Case after a trial. On January 31, 2019, the day after the OIG interviewed the Transit Attorney, the Outside Counsel was replaced on the Personal Case.

An OIG review of the Transit Attorney's work email account revealed that, from at least May 2016 through November 2018, she used her work email to correspond with the Outside Counsel about her Personal Case, including sending draft documents, scheduling, court filings, and other matters. In addition, the Transit Attorney used her work email to correspond with an expert witness for her Personal Case and sent draft documents to another Torts Division employee during work hours to get her colleague's opinion of the document. The Transit Attorney does not supervise this colleague.

The emails established that the Transit Attorney was aware that the MTA routinely retained Outside Counsel, as they corresponded with each other regarding NYC Transit litigation matters that they had in common.

The OIG also reviewed the Outside Counsel's retainer agreement with the MTA, dated May 7, 2004. This agreement was amended in 2005 and 2018 to update the fee schedule and other terms. None of the documents incorporate the MTA Vendor Code of Ethics. However, the 2004 agreement does require the Outside Counsel to "provide the [NYC Transit's] General Counsel with full disclosure" as to "any client or clients who may have conflicting, inconsistent, diverse or otherwise discordant interests from those of the Authority."

### B. OIG's Interviews of NYC Transit Employees

#### 1. The Transit Attorney's Supervisor

The Transit Attorney's supervisor, the Assistant General Counsel, Torts Division (Supervisor) stated that generally, outside counsel conducts the discovery phase, including the

---

**Office of the MTA Inspector General**                                          2

CONFIDENTIAL

depositions and preparing the Note of Issue for trial. Then, a NYC Transit trial attorney is assigned to conduct the trial. Once a NYC Transit trial attorney is assigned, pretrial work, including most depositions, has usually been completed. Typically, an NYC Transit trial attorney's only contact with outside counsel would be to discuss the outside counsel's work during the discovery phase, including the depositions taken by the outside counsel. The Supervisor stated that sometimes an NYC Transit trial attorney can ask outside counsel to take a deposition, but that this happens infrequently. The NYC Transit trial attorney does not have contact with outside counsel prior to the trial attorney's assignment to a case. A designated supervisor is responsible for assigning matters to outside counsel. The NYC Transit trial attorney does not approve or submit outside counsel's bills.

   *2. The Transit Attorney*

   i.   The Outside Counsel's Representation of the Transit Attorney

   The Transit Attorney stated that she has known the Outside Counsel for nearly 20 years. She met him while working at her first job at a law firm, to which the Outside Counsel provided outside counsel services. She stated that they saw each other in court and at social functions at co-workers' homes.

   Regarding her Personal Case, in 2005, she signed an agreement with a contractor to convert a single-family home to a two-family home. According to the Transit Attorney, the contractor did not meet its contractual obligations. The Transit Attorney paid a retainer to an attorney who, in 2009, filed a summons and complaint that the Transit Attorney drafted. The Transit Attorney later moved to dismiss the case without prejudice so that she could pursue her cause of action at a later time.

   After she began working at NYC Transit in 2013, the Transit Attorney saw the Outside Counsel and approached him about representing her in the Personal Case. She stated that although he was the attorney listed on the filings, she drafted all of the court documents. The OIG's review of her NYC Transit emails confirms that she drafted the litigation documents. The Transit Attorney stated that the Outside Counsel refused to take a retainer or any other payment from her. The Transit Attorney stated that she did not request permission from her supervisor or the NYC Transit Ethics Officer to have the Outside Counsel represent her.

   ii.  Ethics Training

   The Transit Attorney confirmed that she has received MTA Ethics training, completed the annual certification, and has reviewed the MTA Code of Ethics. She claimed that she believed that because the Outside Counsel was not an NYC Transit employee, his representation of her was not a problem. She further stated that she did not think having the Outside Counsel represent her would present a conflict "because [the Outside Counsel] represents both plaintiffs and defendants." When OIG investigators explained that the Outside Counsel is considered a "prohibited source" under the MTA Code of Ethics §1.01 (Definitions p. 6), she insisted that because she could not assign work to the Outside Counsel she had not violated any ethical rules.

CONFIDENTIAL

NYCTA 000104

*3. The Outside Counsel's Interview*

    i.   The Outside Counsel's Work at NYC Transit

The Outside Counsel has been retained by the Torts Division since 1990, and worked on NYC Transit matters almost exclusively since 2005. The Outside Counsel stated that most of his work involves taking depositions, reviewing Notes of Issue, and conducting trials for NYC Transit. He estimated that 1% to 2% of his work may be related to work that is assigned to the Transit Attorney. The Outside Counsel stated that he did not believe that the Transit Attorney was in a position to give him work because she is not a manager and he does not submit his invoices to her. The Outside Counsel stated that he submits his invoices to one of the four employees in the Examination and Practices unit, not to the attorney assigned to the case. The Outside Counsel stated that he usually gets his assignments from the Hearing Officer, although sometimes an NYC Transit attorney will reach out to him directly if another NYC Transit attorney is unavailable to conduct a deposition. The Outside Counsel stated that only a Borough Chief can assign a trial.

    ii.   The Outside Counsel's Representation of the Transit Attorney

The Outside Counsel stated that the Transit Attorney first approached him about representing her in her Personal Case in 2007 or 2008, but he declined because he primarily handled personal injury work. He did not think he would be a good choice to represent her for a construction case. The Outside Counsel stated that, at the time, the Transit Attorney was working at the same law firm as one of his friends.

When the Transit Attorney began working at NYC Transit she mentioned to the Outside Counsel that the litigation had not been resolved. She again asked if he would represent her, and he agreed to on a contingency fee basis, but did not put the agreement in writing. When asked why he changed his mind about taking on a construction case in 2014, he explained that the Transit Attorney had not been served well by her prior counsel, who also did not engage in construction litigation. The Outside Counsel noted that an insurance company represented the defendant. He had hoped to settle the matter with the insurer and that he would get 30% of the settlement, which represented the contingency fee. After a seven-day jury trial, a verdict was rendered against the Transit Attorney. Not long after the trial concluded, and the day after the Transit Attorney was interviewed by the OIG, the Outside Counsel was substituted for different counsel. The Outside Counsel stated that the Transit Attorney paid all the filing fees related to the litigation.

    iii.   MTA Vendor Code of Ethics

The Outside Counsel stated that he never received a copy of the MTA Vendor Code of Ethics. OIG investigators explained to the Outside Counsel that under the MTA Vendor Code of Ethics, he is prohibited from providing gifts to MTA employees, which included providing free legal services to a MTA employee.

CONFIDENTIAL

NYCTA 000105

### III.   POLICIES AND ANALYSIS

#### A. MTA All-Agency Code of Ethics

*1.  § 2.01: Gift Prohibition*

The MTA All-Agency Code of Ethics, Section 2.01, Gift Prohibition-Zero Tolerance, states, in pertinent part:

> Employees are prohibited from soliciting or receiving Gifts, directly or indirectly, from any Prohibited Source.[2]

The Transit Attorney solicited free legal services from a Prohibited Source.  The Outside Counsel was a Prohibited Source, as he provides services to NYC Transit's Law Department, and more specifically the Tort Divisions where the Transit Attorney is employed.  The Outside Counsel represented the Transit Attorney throughout her litigation including conducting a seven-day trial without compensation.  Although the Outside Counsel told OIG investigators that he had agreed to take the case on contingency, he nevertheless provided the Transit Attorney with a valuable service for free.  Therefore, his representation would certainly be considered a gift from a Prohibited Source.

*2.  § 4.01: Conflict of Interest*

The MTA All-Agency Code of Ethics, Section 4.01, Conflict of Interest, states, in pertinent part:

> Employees shall not have any interest, personal, financial or otherwise, direct or indirect, or engage in any business or transaction or professional activity or incur any obligation of any nature, which is or may be in conflict with the proper discharge of his or her duties.
>
> Employees must notify their Agency Ethics Officer or Ethics Committee directly regarding any possible Conflict of Interest.
>
> Employees must not only avoid Conflicts of Interest with the MTA but also even the appearance of a conflict.

The Transit Attorney's soliciting and accepting the Outside Counsel's representation of her in private litigation created a conflict of interest.  Although the Transit Attorney does not have the authority to assign the Outside Counsel work, she might have occasion to review work

---

[2] A Prohibited Source is defined in the Code of Ethics, section 1.01, as "a Vendor, including any person, seller of goods or services, bidder, proposer, consultant, contractor, trade, contractor or industry association, or any person/entity with which your MTA Agency is doing business . . . whose activities directly of in directly benefit your Agency, or who have a history of doing business with your Agency in the recent past."

CONFIDENTIAL

NYCTA 000106

he previously performed on one of her cases.  Her personal interest in his representation of her might prevent her from properly reporting problems with the Outside Counsel's work product.

### 3.  § 4.02: Public Trust

The MTA All-Agency Code of Ethics, Section 4.02, Public Trust, states, in pertinent part:

(a) Employees shall not engage in a course of conduct that will raise suspicion among the public that they are likely to be engaged in acts that are in violation of the public trust.  Employees shall avoid even the appearance that they can be improperly (1) influenced in the performance of their official duties or (2) induced to violate the public trust or impair their independence of judgment in the exercise of their official duties.

(c) Employees shall not by their conduct give reasonable basis for the impression that any person can improperly influence them or unduly enjoy their favor in the performance of their official duties, or that they are affected by kinship, rank position or influence of any party or person.

The Outside Counsel's representation of the Transit Attorney on contingency without a retainer agreement could raise suspicion that the Transit Attorney is engaged in a course of conduct that might violate the public trust.  To someone unfamiliar with how the NYC Transit Torts Division assigns work to outside counsel, the arrangement between the Outside Counsel and Transit Attorney might suggest that outside counsel may not be selected on merit, thereby appearing to put personal interest ahead of the needs of NYC Transit.

### 4.  § 8.04: Use of MTA Property

The MTA All-Agency Code of Ethics, Section 8.04, Prohibition Against the Use of MTA Property, states, in pertinent part:

MTA's names, logos, supplies, equipment, computer resources, personnel and other resources may not be utilized for non-governmental purposes, including for personal purposes or for outside activities of any kind.

The Transit Attorney used her NYC Transit email to send documents relating to her Personal Case to the Outside Counsel and an expert witness, and to a co-worker's NYC Transit email during work hours to request her opinion.  Therefore, she used MTA computer resources and personnel for personal purposes.

CONFIDENTIAL

NYCTA 000107

**B. MTA All-Agency Computer and Social Media Usage Policy Directive**

The MTA All-Agency Computer and Social Media Usage Policy Directive, Section IV(A), General Guidelines, states, in pertinent part:

1. Computer Users are required to protect Computer Resources –
   both Information Assets and Physical Assets, and are responsible
   for the following:

   a. Preserving and protecting Computer Resources by following all
      password, protection and disposal requirements; and

   b. Using Computer Resources solely for their intended purposes.

2. Occasional and incidental personal use must be consistent with the
   requirements and guidelines of this policy directive.

As described above, the Transit Attorney improperly used MTA computer resources. The use of her work computer was not occasional and incidental personal use.

**C. New York State Public Officers Law**

*1.  § 73(5)(a): Gifts*

Public Officers Law section 73(5)(a) states, in pertinent part:

No . . . state officer or employee shall, directly or indirectly

(a) solicit, accept or receive any gift having more than a nominal
value, whether in the form of money, service, loan, travel, lodging,
meals, refreshments, entertainment, discount, forbearance or promise,
or in any other form, under circumstances in which it could reasonably
be inferred that the gift was intended to influence him, or could
reasonably be expected to influence him, in the performance of his
official duties or was intended as a reward for any official action on
his part....

As discussed above, in the context of the MTA All-Agency Code of Ethics, § 2.01, by soliciting and accepting the Outside Counsel's free legal representation in the Personal Case, the Transit Attorney improperly accepted a gift.

Office of the MTA Inspector General                                                               7

CONFIDENTIAL

NYCTA 000108

2.  *§ 74: Conflict of Interest*

Public Officers Law section 74 states, in pertinent part:

d. No officer or employee of a state agency . . . should use or attempt to use his or her official position to secure unwarranted privileges or exemptions for himself or herself or others, including but not limited to, the misappropriation to himself, herself or to others of the property, services or other resources of the state for private business or other compensated nongovernmental purposes.

**** 

f. An officer or employee of a state agency . . . should not by his or her conduct give reasonable basis for the impression that any person can improperly influence him or her or unduly enjoy his or her favor in the performance of his or her official duties, or that he or she is affected by the kinship, rank, position or influence of any party or person.

As an Executive Agency Counsel in the division that utilizes the Outside Counsel's services as outside counsel, the Transit Attorney was able to use her position to secure free representation in her Personal Case from the Outside Counsel. Moreover, the Transit Attorney's representation by the Outside Counsel could reasonably create the impression that the Outside Counsel may benefit in his future work with the NYC Transit Torts Division through his free representation of the Transit Attorney.

## IV.    FINDINGS

1.  The Transit Attorney solicited and hired the Outside Counsel, a Prohibited Source, to represent her in personal litigation for which representation he was not paid, in violation of MTA All-Agency Code of Ethics §§ 2.01 and 4.02, and NYS Public Officers Law §§ 73(5), 74(d) and 74(f).

2.  The Transit Attorney failed to recognize the conflict of interest and seek guidance or notify the NYC Transit Ethics Officer in violation of MTA All-Agency Code of Ethics § 4.01.

3.  The Transit Attorney used her NYC Transit email and her co-worker to conduct personal business related to non-NYC Transit litigation in violation of the MTA All-Agency Code of Ethics § 8.04.

4.  The Transit Attorney used her NYC Transit email to conduct personal business related to non-NYC Transit litigation in violation of the MTA All-Agency Computer and Social Media Usage Policy Directive § IV(A).

5.  The MTA did not ensure that the Outside Counsel received the MTA Vendor Code of Ethics when it was adopted in 2008.

CONFIDENTIAL

NYCTA 000109

## V.    RECOMMENDATIONS

1.  NYC Transit should impose discipline on the Transit Attorney as it deems appropriate.

2.  NYC Transit should review the retainer agreement to require compliance with the MTA Code of Ethics and provide the Outside Counsel with the MTA Vendor Code of Ethics.

3.  The MTA should ensure that a copy of the MTA Vendor Code of Ethics is provided to outside counsel working on personal injury matters (it already does so for other matters) and review its retainer agreements with them to ensure that counsel certify that they have received, and will abide by, the MTA Vendor Code of Ethics.

As always, we appreciate your continued courtesy and cooperation. Please advise me within 30 days of any action you intend to take and the result of any action taken. Should you have any questions, or need additional information, please contact Executive Deputy Inspector General for Legal Pei Pei Cheng-de Castro at (212) 878-0072.

Very truly yours,

/S/
Carolyn Pokorny

cc: Thomas Quigley, General Counsel, MTA Headquarters
David Farber, General Counsel, NYC Transit
Kim Moore-Ward, V.P. Labor Relations, NYC Transit
Paige Graves, Ethics Officer, NYC Transit
Monica Stamm, General Counsel, NYS Joint Commission on Public Ethics

CONFIDENTIAL

NYCTA 000110

# EXHIBIT D

CONFIDENTIAL

NYCTA 000111

R&R Table of Cont.Redux_RulesBook TextText Chap1  3/15/16  8:56 AM  Page 1



# RULES AND REGULATIONS

**Revised January 2016**

**Governing Employees of MTA New York City Transit Authority, Manhattan and Bronx Surface Transit Operating Authority, and South Brooklyn Railway**

CONFIDENTIAL

R&R Chap 1 Redux_RulesBook TextTest Chap1  3/14/16  9:56 AM  Page 2

## Chapter 1  Rules & Regulations 2016



GENERAL RULES APPLICABLE TO ALL EMPLOYEES

# GENERAL RULES APPLICABLE TO ALL EMPLOYEES

Many of the following rules specify conduct that is important to the safety of workers, customers and the public.

The rules set forth in this Rule Book that prescribe employee conduct relating to the safe operation of trains and buses are intended to place a higher standard of care on employees than is required by law, to protect against any, not just negligent, damage, injury or loss of life in the operation of the trains and buses and in the performance of all work on or near tracks, stations and other Authority property (unless otherwise indicated in a specific rule, "Authority" as used in this Book means New York City Transit Authority, Manhattan and Bronx Surface Transit Operating Authority and South Brooklyn Railway Company).

A violation of these rules that causes injury or damage may result in disciplinary action against an employee even though such violation does not constitute negligence under the law.

## APPOINTMENTS TO POSITIONS; ASSIGNMENT TO WORK

### Rule 1

**1(a)** Appointments and promotions to Transit Authority positions shall be in accordance with the Civil Service Law and the Public Authorities Law of the State of New York and the Rules and Regulations of the City Personnel Director.

**1(b)** Employees shall be assigned to work in the position for which they have been qualified and to the department to which the Authority, or the appointing officer for the Authority, may direct.

**1(c)** The Authority reserves the right to assign a disabled employee to any position such employee is, in the opinion of the Authority, competent to fill and to make assignments to special duties in any class or grade, except as otherwise provided in an applicable labor agreement and/or applicable policy instruction.  An employee who has been temporarily relieved from service by reason of a medical or mental impairment which incapacitates such employee from properly performing his/her assigned duties or an employee who has been reassigned to a position entailing restricted or alternative duties will, unless in the meantime his/her employment has been terminated, be restored to service or assigned to such employee's original assignment when, in the opinion of the medical staff of the Authority, the cause of disability has been corrected or improved to such an extent as to warrant return to service or to such original assignment.

## KNOWLEDGE OF AND COMPLIANCE WITH RULES

### Rule 2

**2(a)** These rules, which govern the operation of the New York City Transit System, are applicable to and must be obeyed by all employees.

**2(b)** Employees who violate any of these rules may be disciplined in accordance with the Civil Service Law or their collective bargaining agreement or Authority policy, as applicable. Disobedience of these rules or of instructions or any neglect of duty, or any disorder, or any

2

NYCTA 000113

### Rules & Regulations 2016

act or omission prejudicial to efficiency or discipline, or any interference with the normal operation of train or bus service or maintenance of the New York City Transit System, shall be reason for charges of misconduct and incompetence and such misconduct or incompetence will be subject to penalty of dismissal, demotion, suspension or such other penalty as the Authority shall impose.

**2(c)** One copy of these rules will be provided to every employee of the System, for which a receipt will be required. Additional copies may be supplied, at the discretion of the Authority, for a satisfactory reason, for which an appropriate charge shall be made.

**2(d)** Employees must be conversant with and obey the rules that govern their particular duties and all special instructions issued by their superiors. Employees whose duties are concerned with the actual operation of the rapid transit system must be conversant with the rules governing the duties of other employees similarly engaged; employees whose duties are concerned with the actual operation of the surface transit system must be conversant with the rules governing the duties of other employees similarly engaged. If in doubt as to the meaning of any rule or instruction, employees must obtain an explanation from their superiors.

**2(e)** All employees must have their copies of these rules available for reference while on duty.

### ADDRESS AND TELEPHONE NUMBERS

### Rule 3

It is the obligation of each employee to keep the Authority informed as to his/her correct name, actual residential street address (Post Office Boxes will not be accepted) and telephone number. Employees shall also provide the Authority with a name, address and telephone number of an individual to contact in the event of an emergency. Any changes must be reported, not later than 7 calendar days following the change, to the Business Service Center (BSC), and as per the instructions of your Department or Division Head, if any. Report such changes to the BSC by the internet portal www.mtabsc.info and selecting the "All About Me" icon, or by calling the BSC at 646-376-0123, or by emailing the BSC Change of Address Form available through the portal to bscservice@mtabsc.org, or by faxing it to 212-852-8700.

### GENERAL DUTIES AND OBLIGATIONS OF EMPLOYEES

### Rule 4

**4(a)** Employees are required at all times to perform their duties in accordance with these rules, Policy Instructions and their division's instructions. They must not, whether on or off duty, engage in activities which will interfere with the proper performance of their duties.

**4(b)** Employees while on duty are under the authority of and must obey the orders of supervision. They must, within their qualifications, perform such duties, in addition to those set forth herein, as the superiors to whom they report may direct. Safety rules, manuals of instructions, policy instructions, special instructions, etc., in force prior to, or promulgated by Department or Division Heads subsequent to the adoption of these rules, shall have the same force and effect as though set forth in full in this Rule Book.

**4(c)** Employees must render every assistance in their power in carrying out these rules and must report to their superiors any violation thereof.

3

CONFIDENTIAL

NYCTA 000114

## Rules & Regulations 2016

**9(c)** Unless ordered by the Authority in disciplinary proceedings, a permanent employee, who has been assigned or promoted provisionally to a higher title shall not, upon return to his/her permanent classification, lose by reason of such temporary assignment, any rights or preference status accruing to such employee in the lower classification, including any increased rate of pay, if any, which the rules and regulations or rate schedules of the Authority would have entitled him/her to receive had he/she continued without interruption in his/her permanent classification.

### CONDUCT OF EMPLOYEES

### Rule 10

**10(a)** Employees are required to avoid behavior which would tend to create adverse criticism of the Authority or of the System. Their conduct, whether on or off duty on System property, is required to be such as to merit the confidence and respect of the public and their superiors.

**10(b)** Employees, while on duty must be suitably attired and must present a neat appearance. Employees whose duties bring them into contact with the public may wear beards or mustaches so long as they are kept neat and trim. No personal appearance, attire or behavior unsuitable for the public service will be permitted.

**10(c)** Employees must treat all customers and their fellow employees with courtesy, avoid argument and exercise patience, forbearance and self-control under all conditions. They must be attentive and helpful without being offensive.

**10(d)** Employees must not make threatening gestures towards, or commit assault or battery against, any person, nor use loud, uncivil, indecent or profane language, even under the greatest provocation.

**10(e)** Possession or use of firearms or other weapons on System property, whether on or off duty, is prohibited.

**10(f)** Employees required to wear uniforms must at all times when on duty wear the prescribed uniform and badge. The uniform must be kept neat and in good repair. While on duty, uniformed employees, at times when their work assignments involve contact with the public or it is reasonable to conclude that they will come into contact with the public, are not permitted to wear buttons, badges, or other insignia other than those specified as part of the regulation uniform unless otherwise approved in writing by the appropriate Division Head.

While on duty, employees who are required to wear safety vests, hard hats, or other items, which identify them as employees of the Authority or operate equipment identifiable as Authority equipment, are not permitted to wear buttons, badges or other insignia when their duties involve contact with the public or it is reasonable to conclude that they will come into contact with the public.

Employees, while on authorized breaks in areas out of the public view such as crew, swing, or lunch rooms, are not subject to this prohibition against wearing non-Authority issued buttons, badges, or other insignia.

Nothing contained in this rule or its exception shall be interpreted to restrict the Authority in its rights to maintain safe, orderly and efficient work environment.

7

CONFIDENTIAL

NYCTA 000115

## Chapter 1  Rules & Regulations 2016



**GENERAL RULES APPLICABLE TO ALL EMPLOYEES**

### CODE OF ETHICS
#### Rule 12

Rule 12 sets forth conduct that is prohibited by the New York State Ethics in Government Act, the Public Authorities Law, and Authority policy to protect against employees promoting private, non-governmental interests over their duty to act in the best interests of the Authority and of the State of New York.  These rules do not apply to rights or obligations that employees have under other laws, judicial proceedings, or court orders.

**12(a)** No officer or employee of the Authority:

1. Shall have any interest, financial or otherwise, direct or indirect, or engage in any business or transaction or professional activity or incur any obligation of any nature, which is or may be in conflict with the proper discharge of his or her duties.

2. Shall have any interest, direct or indirect, in any contract entered into by the Authority.

3. Shall, directly or through any organization of which he/she is a member, or corporation of which he/she owns or controls ten per cent or more of the stock, sell goods or services valued in excess of $25.00 to any other State or City Agency, unless such goods or services are provided pursuant to an award or contract let after public notice and competitive bidding.

4. Shall disclose confidential information, without proper authorization or use confidential information to further his/her personal interests.

5. Shall use or attempt to use his/her position to secure unwarranted privileges or exemptions for himself/herself or others.

6. Shall request, solicit or receive a gift, on behalf of himself/herself or on behalf of a charitable, social/fraternal or political organization or cause, from any person or corporation or other enterprise that does business with or seeks to do business with the Authority.

7. Shall offer or seek advancement, favoritism or promotion within the Authority on his/her own behalf or on behalf of others in exchange for political, social/fraternal or charitable contributions or activity.

8. Shall give or promise to give any portion of his/her compensation or any money or valuable thing to any person, nor shall any person accept any such money, or valuable thing, in connection with appointment, employment, promotion, assignment, or reassignment by the Authority; nor shall he/she directly or indirectly, make (or request that other employees of the Authority make) any contribution or pay any assessment in order to secure promotion, compensation or to affect job status, duties or function, or in consideration of being appointed or employed at the Authority.

12

R&R Chap 1 Redux_RulesBook TextTest Chap1  3/14/16  9 56 AM  Page 13

## Rules & Regulations 2016

**9.** Shall make personal investments in enterprises which he/she has reason to believe may be directly involved in decisions to be made by him/her or which will otherwise create conflict between his/her duty in the public interest and his/her private interest.

**10.** Shall pursue a course of conduct which will raise suspicion among the public that he/she is likely to be engaged in acts that are in violation of his/her trust.

**11.** Not used.

**12(b)** No officer or employee of the Authority:

**1.** Shall directly or indirectly, act or appear on behalf of any individual, firm, or corporation, in any business dealing with, or any matter before, the Authority, or any State agency; or in any court proceeding against the interests of the Authority, or the State, other than as a fact witness.

**2.** Shall engage in other employment or self-employment which would constitute a conflict of interest or otherwise tend to impair his/her judgment or effectiveness in the exercise of official duties.

**12(c)** No employee engaged in the award and administration of contracts:

**1.** Shall participate in the selection, award, or administration of a contract if the employee, any family member, his/her partner, or an organization that employs or is about to employ any of them, has a financial or other interest in the contract.

**2.** Shall disclose information, whether or not such information is confidential information, if it relates to a pending procurement, unless he/she is designated to do so by the Division of Materiel. Such designated personnel may not disclose information in such a manner as to undermine the procurement process by giving one vendor a competitive advantage over any other.

**12(d)** No officer or employee of the Authority:

**1.** Shall run for partisan elective office if such candidacy would violate federal statutes and regulations governing Authority employees.

**2.** Shall conduct political activities during work hours, or use Authority property, including, without limitation, equipment, vehicles, and office space, for personal or political activities under any circumstances.

**3.** Shall use his/her position or influence for the purpose of interfering with or affecting the result of an election or nomination for office.

**12(e)** No officer or employee of the Authority:

**1.** Shall, within two years after termination of Authority employment, appear before the Authority or receive compensation for, or render compensated services on behalf of, any person, firm, corporation, or association in relation to any case, proceeding or application or any other matter before the Authority. In addition, no former employee shall ever appear, practice, communicate or otherwise render any services or receive compensation for such services

13

CONFIDENTIAL

NYCTA 000117

R&R Chap 1 Redux_RulesBook TextTest Chap1  3/14/16  9 56 AM  Page 14

## Chapter 1  Rules & Regulations 2016

### GENERAL RULES APPLICABLE TO ALL EMPLOYEES

rendered before the Authority or any State agency for, or on behalf of, any person, firm, corporation or other entity in relation to any case, proceeding or transaction with respect to which such person was directly concerned and in which he/she personally participated during the period of service or employment, or which was under his/her active consideration.

**2.** Shall solicit, negotiate for or accept any employment or agree to contract to render services with or to any private person, firm or corporation or other entity who or which is involved in any matter in which the employee is directly concerned or personally participating on behalf of the Authority.

**3.** Shall accept employment or engage in any business or professional activity which will impair judgment in the exercise of his/her current official duties or require disclosure of confidential information obtained during the course of Authority employment.

**12(f)** The MTA All-Agency Code of Ethics also sets forth the employee conduct that this Rule 12 prohibits, as well as exceptions to and illustrations of prohibited and permitted conduct. In addition, the New York State Joint Commission on Public Ethics (JCOPE) issues opinions and regulations governing employee conduct under the State Ethics in Government Act. JCOPE regulations place restrictions on employees who hold policy-making positions in addition to those stated in this Rule 12. Employees are advised to refer to the MTA All-Agency Code of Ethics, submit questions to the Authority's Ethics Committee, and refer to published opinions and regulations of the JCOPE in seeking further guidance for adhering to this Rule.

### SYSTEM PROPERTY; PROTECTION THEREOF; E-MAIL AND INTERNET; RETURN OF PROPERTY ISSUED TO EMPLOYEES

#### Rule 13

**13(a)** Employees must be thoroughly acquainted with, and qualified to operate, all equipment which they may be required to handle in the performance of their duties. Supervision is obligated to ensure that employees are thoroughly acquainted with, and qualified to operate, all equipment which they may be required to handle in the performance of their duties.

**13(b)1** Employees shall not convert, borrow, or take System property for personal use nor shall they willfully damage the same. They shall protect System property from damage or theft by others at all times to the best of their ability and must unite, when necessary, to protect System property. All Authority property is for official use only (including all intellectual work products such as e-mail). Authority property may not be modified without authorization. Employees may only use official Authority software on Authority computers. Use of other licensed software (vendor owned or employee owned) is not permitted. However, in certain instances, with the permission of senior Authority management, vendor owned software may be used for testing (beta) purposes only. Employees are required to report promptly any theft of or damage to System property.

14

CONFIDENTIAL

NYCTA 000118

Rules & Regulations 2016



**13(b)2** In order to protect the safety and security of the system, the sale, distribution or disclosure of Authority manuals, drawings, design plans, information, uniforms, policies or related materials to non-employees is strictly prohibited. Employees cannot disclose, distribute or sell such materials through the Internet, any other media, or by any means without the written permission of his/her Department/Division Head.

**13(c)** Employees will be responsible for all property entrusted to them and must see that such property is not misused and is kept in good order. In the event of fire, wreck, or accident affecting System property or any destruction or theft thereof, the employee responsible for such property must report to such employee's division office, at the earliest opportunity, the extent of damage to or loss of such property.

**13(d)** The Authority does not pay for tools owned by and used by employees or for any other personal property which may be lost or stolen except to the extent allowed under an appropriate collective bargaining agreement. Employees who leave personal property at their work location or in lockers or tool boxes do so at their own risk.

**13(e)** Defective, damaged, or worn out property or equipment of the System which may come to the attention of an employee, whether or not such property or equipment is entrusted to the care of the employee, must be reported promptly by the employee to such employee's superior, giving a brief description of the property or equipment, where located, and to what extent defective, damaged or worn out. The oral report must be followed by a written report, when required.

**13(f)** Employees must give a receipt for badges, Authority passes, books of rules, keys, tools and other property of the Authority which may be issued to them and must take care of and guard such property. Employees will be required to pay for any property entrusted to their care and use which is lost or damaged. Employees absent from duty for more than 30 days on account of sickness or otherwise, when their superiors require them, must return to the superior, or to an office of the System designated by such superior, all property of the System entrusted to them. Upon leaving the service, employees must return all property which has been issued to them. In the event of failure to return such property on the last day of work, they will not be given their final pay until such property has been returned or until they have paid for such property.

**13(g)** Employees must not change or interfere with, in any manner whatsoever, any equipment of the System except with proper authority and in the performance of their duties.

**13(h)** Employees are forbidden to buy or cause to be made, or otherwise to obtain or possess, without authority, keys to fit any door, gate, locker, or other lock on equipment of the System.

**13(i)** This applies to all users of the Authority's Computing resources, whether on-site or from remote locations. When an employee is given access to the Authority's Computer resources, it is their responsibility to assume appropriate use. Employees or "users" should not engage in computer misconduct. Such misconduct includes, but is not limited to the following: accessing servers or accounts that are unauthorized, knowingly introducing or sharing malicious programs into the Authority's computing environment (e.g. viruses, worms, Trojan Horses, e-mail bombs, etc...), and without specific authorization, knowingly altering or removing data or information technology equipment that is sole property of the Authority.

15

CONFIDENTIAL

NYCTA 000119


Metropolitan Transportation Authority

**All Agency Policy Directive**

## COMPUTER AND SOCIAL MEDIA USAGE

| Policy Number | Responsible Agency/Department | Effective Date | Page |
|---|---|---|---|
| 11-033 | MTA IT Department | March 5, 2015 | 1 of 15 |

### I.    PURPOSE

The purpose of this policy is to provide and establish All-Agency standards and guidelines for the acquisition, installation, maintenance, and acceptable use of Computer Resources.

Computer Resources are provided by the Metropolitan Transportation Authority and its affiliated and subsidiary agencies to employees and other authorized individuals to assist them with their work responsibilities and duties. Use of such resources is subject to a variety of laws, regulations, and MTA Agency policies. Inappropriate use may expose the MTA Agencies to risks including virus attacks, network compromises, and legal liability.

Making users aware of the parameters of acceptable use is an essential part of assuring that the Computer Resources are used only for intended purposes and will help mitigate the potential that inappropriate uses will expose the MTA Agencies to unnecessary risks.

### II.    SCOPE

This policy directive applies to:

**A.**    All directors, officers and employees of the Metropolitan Transportation Authority ("MTA"), MTA Long Island Rail Road, MTA Capital Construction Company, MTA Bridges and Tunnels, MTA Bus Company, MTA Metro-North Railroad, MTA New York City Transit, including the Manhattan and Bronx Surface Transit Operating Authority and the Staten Island Rapid Transit Operating Authority, and all future subsidiary or affiliated agencies of the MTA. These entities are referred to in this Policy Directive as the ("MTA Agencies"); and

**B.**    Any other entity or person who uses Computer Resources owned, managed or controlled by the MTA Agencies including, but not limited to, interns, temporary employees, consultants, vendors, contractors, and guests.

### III.    DEFINITIONS

**Agency Approved Internet Services Provider**:    an Internet service provider approved by the applicable MTA Agency.

---

Issued: MTA Chairman and Chief Executive Officer

MTA Corporate Compliance                    Internal Control Number: GRC003069/003098

 **Metropolitan Transportation Authority**

**All Agency Policy Directive**

### COMPUTER AND SOCIAL MEDIA USAGE

| Policy Number | Responsible Agency/Department | Effective Date | Page |
|---|---|---|---|
| 11-033 | MTA IT Department | March 5, 2015 | 2 of 15 |

**MTA IT Standards and Procedures:** computer resource operating standards and procedures that currently exist or may be adopted in the future, as the same may be modified, amended or supplemented. Agency Standards and Procedures may refer to a particular MTA Agency's standards and procedures or those adopted on an All-Agency basis which can be found on each MTA Agency Intranet.

**Approved MTA Agency Software:** software that
- is authorized by the MTA Chief Information Officer or their designee;
- is owned by or licensed to the applicable MTA Agency;
- has been tested and installed in accordance with MTA Agency Standards and Procedures; and
- is listed in the MTA Technology Standards document.

**Approved MTA Agency Hardware:** devices that have been tested and approved for use at any MTA Agency, such as personal computers ("PCs"), printing devices, telecommunication devices, data storage devices, MTA Agency-issued mobile devices, including but not limited to, laptops, tablets and notebooks, handhelds, personal digital assistants ("PDAs"), and smart phones, servers and Communications Networks.

**Communication Networks:** the collection of network segments, nodes, systems, and other associated devices that are fully managed, controlled and operated by any MTA Agency.

**Computer Resources:** items purchased or leased with MTA Agency funds, or under the custody or control of the MTA, including but not limited to, devices such as PCs, printing devices, telecommunication devices, mobile devices, including but not limited to laptops, tablets and notebooks, handhelds and PDAs, smart phones, servers, Communication Networks, and software owned by, contracted for, or under the custody or control of any MTA Agency at any location. In addition, Computer Resources include all data and information and data storage devices, and the MTA Agency-wide network, including e-mail and the Internet and network infrastructure – Information and Physical.

**Computer User:** any user of Computer Resources, including employees, temporary employees, directors, officers, interns, consultants, contractors, vendors and guests.

---

Issued: MTA Chairman and Chief Executive Officer
MTA Corporate Compliance                          Internal Control Number: GRC003069/003098

CONFIDENTIAL

NYCTA 000121

 **Metropolitan Transportation Authority**

## All Agency Policy Directive

### COMPUTER AND SOCIAL MEDIA USAGE

| Policy Number | Responsible Agency/Department | Effective Date | Page |
|---|---|---|---|
| 11-033 | MTA IT Department | March 5, 2015 | 3 of 15 |

**Confidential Information**: information that is available to a Computer User only because of such a Computer User's position within an MTA Agency and which is treated by such MTA Agency as being confidential or which the Computer User has reason to believe is confidential. Information does not have to be formally labeled "confidential" to be confidential, and may include, but not be limited to, the following categories of information:

- employees' and their dependents' dates of birth, social security numbers, driver's license numbers, credit and debit card numbers with or without access passwords, personal health information, home address and phone numbers, employee benefits information; and

- MTA Agency intellectual property assets, security-sensitive infrastructure and operations information, and security procedures, including, without limitation, designs, plans, blueprints, drawings, security infrastructure and protocols, mobilization plans and non-public procurement, human resources or labor relations information.

**Information Assets**: intangible items that include, but are not limited to, passwords, software and data.

**LAN (Local Area Network)**: a computer network that spans a relatively small area (a single building or group of buildings). A LAN connected to a LAN over long distances is known as a **WAN (Wide Area Network)**.

**MTA Agency Network**: a set of communication and data networks that allows transfer of information between users at various geographical points, shared use of application and storage servers, printers, fax machines, telecommunication devices and use of e-mail, instant messaging applications and Internet.

**MTA Chief Information Officer ("MTA CIO")**: MTA senior executive responsible for enterprise information technology and computer systems that support MTA's mission. The MTA CIO manages the MTA IT Department.


**Metropolitan Transportation Authority**

## All Agency Policy Directive

### COMPUTER AND SOCIAL MEDIA USAGE

| Policy Number | Responsible Agency/Department | Effective Date | Page |
|---|---|---|---|
| 11-033 | MTA IT Department | March 5, 2015 | 4 of 15 |

**MTA IT Department:** the department within MTAHQ responsible for ensuring at a minimum that all IT services ranging from mainframe, server, network, data center, applications, security, help desk, telecommunications and program/project management work collaboratively to deliver agreed-upon service levels and capabilities to each agency while maximizing efficiency.

**Physical Assets:** tangible items, including, but not limited to, desktop PCs, printing devices, telecommunication devices, MTA Agency-issued mobile devices such as laptops, tablets and notebooks, handhelds and PDAs, smart phones, servers and Communications Networks.

**Social Media:** utilizes mobile and web-based technologies to create highly interactive platforms through which individuals and communities share, co-create, discuss, and modify user-generated content, such as Facebook, Twitter, Linkedin, You Tube, Flickr, Instagram, etc.

IV.  **RESPONSIBILITIES**

A.  **General Guidelines**

1. Computer Users are required to protect Computer Resources – both Information Assets and Physical Assets, and are responsible for the following:

   a. Preserving and protecting Computer Resources by following all password, protection and disposal requirements; and

   b. Using Computer Resources solely for their intended purposes. Examples of misuse include, but are not limited to, viewing inappropriate internet sites or allowing unauthorized persons to use Computer Resources. (See Prohibited Uses Section IV B. 2)

Issued: MTA Chairman and Chief Executive Officer

MTA Corporate Compliance                                      Internal Control Number: GRC003069/003098

CONFIDENTIAL

 Metropolitan Transportation Authority

**All Agency Policy Directive**

## COMPUTER AND SOCIAL MEDIA USAGE

| Policy Number | Responsible Agency/Department | Effective Date | Page |
|---|---|---|---|
| 11-033 | MTA IT Department | March 5, 2015 | 5 of 15 |

2.  Occasional and incidental personal use must be consistent with the requirements and guidelines of this policy directive. Such uses are permitted only with the restrictions outlined below:

    a.  Must be subordinate and subject to the business needs of MTA Agency and not interfere with the conduct of MTA Agency business;

    b.  Must not interfere or disrupt in any way other Computer Users, Computer Resources or other MTA Agency services or equipment;

    c.  Must be occasional and only account for an incidental amount of a Computer User's time;

    d.  Must be restricted to Computer Users and does not extend to the Computer User's family members or other third parties;

    e.  Must not be used in violation of any of the Prohibited Uses described in Section IV.B.2 of this Policy Directive; and

    f.  Computer Users engaging in excessive personal use are subject to disciplinary or other action as determined by the MTA Agency.

3.  E-mail

    a.  Computer Users must keep in mind that e-mails from MTA and its Agencies are visible representations of the MTA and its Agencies. E-mails can be immediately broadcasted globally, and can be received by unintended parties. Computer Users must be cognizant that all written communications may be made public, monitored, reviewed and disclosed in litigation or other proceeding. Accordingly, Computer Users should use Computer Resources in a professional and responsible manner.

Issued: MTA Chairman and Chief Executive Officer

MTA Corporate Compliance                   Internal Control Number: GRC003069/003098

CONFIDENTIAL

NYCTA 000124



## All Agency Policy Directive

### COMPUTER AND SOCIAL MEDIA USAGE

| Policy Number | Responsible Agency/Department | Effective Date | Page |
|---|---|---|---|
| 11-033 | MTA IT Department | March 5, 2015 | 6 of 15 |

    b.  MTA IT Department will add to every e-mail a standard confidentiality and mis-transmission footer, stating the following:

> "Confidentiality Note: This e-mail, and any attachment to it, may contain privileged and confidential information and is intended for the use of the individual(s) or entity named on the e-mail. Unauthorized disclosure of this message is prohibited. If you have received this message in error, please notify the sender immediately by return e-mail and destroy this message and all copies thereof, including all attachments."

    c.  MTA IT Department must encrypt all e-mails.

    d.  Only MTA IT Department approved e-mail systems may be used for sending and receiving business related e-mails; this includes the use of MTA Webmail. Computer Users may use their personal devices, such as a home computers or smart phones, to access MTA Agency Webmail or through the Citrix environment.

    e.  During an emergency declared by the Governor or the MTA Chairman, use of personal email accounts to conduct MTA Business is permitted only if the MTA IT Department's approved e-mail systems are not available.

    f.  E-mails must not be used in violation of any of the Prohibited Uses described in Section IV.B.2 of this policy directive.

4.    Internet Access

    a.  The Internet must be used responsibly. Excessive use of the Internet for non-MTA Agency business purposes can be a drain on productivity by interfering with a Computer User's work responsibilities and MTA Agency resources.

    b.  Computer Users must obtain written permission from the applicable MTA Agency to be granted Internet access.

Issued: MTA Chairman and Chief Executive Officer
MTA Corporate Compliance                  Internal Control Number: GRC003069/003098

CONFIDENTIAL

 **Metropolitan Transportation Authority**

## All Agency Policy Directive

### COMPUTER AND SOCIAL MEDIA USAGE

| Policy Number | Responsible Agency/Department | Effective Date | Page |
|---|---|---|---|
| 11-033 | MTA IT Department | March 5, 2015 | 7 of 15 |

    c.  The Internet must not be used in violation of any of the Prohibited Uses described in Section IV.B.2 of this policy directive.

5.    Passwords and Authorization

    Computer Users must adhere to applicable MTA Agency Standards and Procedures for password use, including controls on password length, re-use, allowable passwords and frequency of password changes.

6.    Privacy and Monitoring

    a.  Computer Users have no expectation of privacy with respect to e-mail messages sent or received, Internet usage, or files, information or data stored on Computer Resources.

    b.  Computer Resources and MTA Agency Networks, including any information contained therein, may be monitored or reviewed by the MTA, Agencies and other authorized entities.

    c.  The MTA and its Agencies reserve the right to inspect, and/or examine, at any time, Computer Resources.

**B.**    **General Details**

1.    Acceptable Uses

    Computer Resources are provided to Computer Users to assist them with assigned work responsibilities and duties, and are intended to be used only for that purpose. Computer Users may use Computer Resources to:

    a.  Further the MTA Agency's mission;
    b.  Deliver MTA Agency's services;
    c.  Facilitate MTA Agency business-related research and access to information;
    d.  Discover new ways to use resources to enhance MTA Agency services;
    e.  Increase efficiency; or
    f.  Promote staff development.

CONFIDENTIAL

NYCTA 000126



**All Agency Policy Directive**

## COMPUTER AND SOCIAL MEDIA USAGE

| Policy Number | Responsible Agency/Department | Effective Date | Page |
|---------------|-------------------------------|----------------|------|
| 11-033 | MTA IT Department | March 5, 2015 | 8 of 15 |

As set forth above, Computer Users may use Computer Resources for occasional and incidental personal use (see Section IV.A.2).

2. Prohibited Uses

Computer Users are not permitted to use Computer Resources to:

a. Violate any laws and regulations;

b. Conduct any form of activity that would violate MTA Policies or Procedures, including but not limited to:

   i. the use of Computer resources to engage in outside employment/activities or engage in private marketing or private advertising of products or services;

   ii. engage in any conduct which would violate any of the MTA Agencies' Equal Employment Opportunity and Sexual and Other Unlawful Harassment Policies; or

   iii. engage in political activity or solicit for or promote any not-for-profit, religious, political or personal causes. (See MTA Code of Ethics – Sections 4.07, 4.08 and 8.04);

c. Circumvent, probe, disengage or test security measures, unless such activity is part of their job responsibilities;

d. Write personal, non-business related communications in a manner that could reasonably be interpreted as official MTA Agency communication or policy;

e. Surf, display, receive, send, forward, store, or distribute offensive, sexually explicit, pornographic or obscene text or images; or any discriminatory or racist jokes or other material. If a Computer User accidentally connects to these sites, the Computer User must disconnect from those sites immediately and report the incident to their supervisor

CONFIDENTIAL

NYCTA 000127

 **Metropolitan Transportation Authority**

### All Agency Policy Directive

## COMPUTER AND SOCIAL MEDIA USAGE

| Policy Number | Responsible Agency/Department | Effective Date | Page |
|---|---|---|---|
| 11-033 | MTA IT Department | March 5, 2015 | 9 of 15 |

or, in the case of a non-employee Computer User, to an MTA Agency manager;

f.  Engage in mass distribution of any communication materials such as chain letters without written authorization from your Agency Ethics Officer and MTA Corporate Communication;

g.  Use any Computer Resources without having completed the attached "MTA Computer and Social Media Usage Computer User Acknowledgement Form" or an electronic equivalent thereof;

h.  Physically damage Computer Resources;

i.  Use hardware or computing devices which are not compliant with Agency Standards and Procedures;

j.  Fail to return Computer Resources upon termination of employment, or upon request by the applicable MTA Agency;

k.  Attach employee owned personal computing devices (laptops, PC's and handhelds) to the MTA Agency Network, even if they are being used to support an MTA Agency business function, without approval from the MTA's Chief Information Officer or their designee;

l.  Install, delete, copy or modify Approved MTA Agency Software;

m.  Configure, enable, disable or tamper with any Computer Resource;

n.  Attach or disconnect Computers Resources to or from the MTA Agency Network, except MTA Agency purchased laptops and handhelds, after initial setup by MTA Agency IT Department support staff;

o.  Open e-mail attachments received from unknown senders;

p.  Download unauthorized software, including, but not limited to utilities, drivers or tools (freeware/shareware), music, movie files and pictures;

---

Issued: MTA Chairman and Chief Executive Officer

MTA Corporate Compliance                    Internal Control Number: GRC003069/003098

CONFIDENTIAL



**All Agency Policy Directive**

### COMPUTER AND SOCIAL MEDIA USAGE

| Policy Number | Responsible Agency/Department | Effective Date | Page |
|---|---|---|---|
| 11-033 | MTA IT Department | March 5, 2015 | 10 of 15 |

q. Obtain unauthorized access to MTA Agency Networks, servers or accounts;

r. Deliberately introduce destructive programs (e.g., viruses, worms, Trojan horses) to MTA Agency servers, networks or firewalls;

s. Engage in gambling and/or stock trading; or

t. Download licensed, trademarked or copyrighted material without appropriate permission from the owner of such material.

3. Social Media

a. MTA Agency Business-related Communications

Social networking technologies, such as Facebook, Linkedin, and Twitter, can help drive MTA's mission and support professional development.

However, improper uses of social media may raise a number of security and reputational risks and the potential for widespread damage to MTA. Authorized use of social networking technologies is subject to the following:

i. Computer Users must obtain permission from MTA Corporate Communications prior to conducting any MTA Agency business on social media accounts.

ii. All MTA Agency policies and work rules apply when an employee participates in a social network or using social media technologies for business use. Computer Users are responsible for all of their online activities that are conducted with a MTA Agency e-mail address; can be traced to MTA's domain; and/or use Computer Resources.

iii. Computer Users must not discuss or post MTA Agency Confidential Information.

Issued: MTA Chairman and Chief Executive Officer

MTA Corporate Compliance                    Internal Control Number: GRC003069/003098

CONFIDENTIAL

 Metropolitan Transportation Authority

## All Agency Policy Directive

### COMPUTER AND SOCIAL MEDIA USAGE

| Policy Number | Responsible Agency/Department | Effective Date | Page |
|---|---|---|---|
| 11-033 | MTA IT Department | March 5, 2015 | 11 of 15 |

    iv.  Computer Users should be transparent when participating in any online community, disclosing their identities and affiliation with the MTA Agencies.

    v.  Computer Users should communicate in a professional manner, and adhere to the following:

- Be direct, informative and brief;
- Fact-check posts and include links to source information, if possible;
- Perform spell and grammar checks; and
- Correct errors promptly.

    vi.  Computer Users must obtain permission from MTA Corporate Communications before publishing photographs, videos or quotes of others.

    vii.  Computer Users must also obtain permission of all identifiable participants before publishing photographs, videos, or quotes of others.

    viii.  With the exception of authorized communications on behalf of the MTA Press Office, MTA Arts for Transit, the New York Transit Museum, and the MTA Agencies (each of which has designated one or more social media content managers), Computer Users may not use social media sites to store or distribute information (including text, photographs, and/or video) relating to internal MTA events.

b. Personal Communications

    i.  When not representing MTA, Computer Users who publish personal or professional opinions may not invoke their MTA Agency title.

CONFIDENTIAL

NYCTA 000130



## All Agency Policy Directive

### COMPUTER AND SOCIAL MEDIA USAGE

| Policy Number | Responsible Agency/Department | Effective Date | Page |
|---|---|---|---|
| 11-033 | MTA IT Department | March 5, 2015 | 12 of 15 |

ii.  In cases where Computer Users publish personal or professional opinions which include information identifying them as an MTA employee, they must use a disclaimer such as the following where technically feasible: "The postings on this site are my own and do not necessarily represent the position, strategy or opinion of the MTA."

iii.  Nothing in this policy directive is intended to restrict personal use of social networking during Computer User's personal time using non-MTA Agency resources unless such use relates to non public internal MTA events. However, users must avoid engaging in conduct that would raise suspicion among the public that they are violating the public's trust (see MTA Code of Ethics Section 4.02).

4.  Violations

MTA employees who violate this policy directive may be subject to discipline, up to and including dismissal. Computer Users who violate this policy directive may also be subjected to individual civil and/or criminal liability and/or other appropriate actions.

The applicable MTA Agency may revoke or restrict the use of Computer Resources where a Computer User fails or refuses to sign the MTA All-Agency Computer and Social Media Usage Policy Acknowledgement Form.

V.  **PROCEDURE**

**All Agencies – Department Management:**  For new Computer Users who will require access to Computer Resources, provide a copy of the MTA All-Agency Computer and Social Media Usage Policy Directive to the Computer User prior to allowing access to Computer Resources.

For existing Computer Users with access to Computer Resources, provide a copy of the MTA All-Agency Computer and Social Media Usage Policy Directive to the Computer User, within two-months from the effective date of this policy directive.

Issued: MTA Chairman and Chief Executive Officer

MTA Corporate Compliance                                Internal Control Number: GRC003069/003098

CONFIDENTIAL



## All-Agency

# CODE OF ETHICS

Adopted by the MTA Board December 16, 2015

CONFIDENTIAL

## ——ALL-AGENCY CODE OF **ETHICS**——

actual or potential violations of laws, regulations or policies and procedures are protected under MTA All-Agency Whistleblower Protection Policy, No. 11-041 and will not be subjected to punitive sanctions, reprisals, or other penalties solely for reporting such violations. Employees who file an intentionally false report may be subject to appropriate disciplinary penalty, up to and including dismissal as well as civil or criminal charges.

### Section 1.07 Cooperation with Audits and Investigations

Employees must cooperate fully and honestly with audits and investigations conducted by the MTA Inspector General, Joint Commission on Public Ethics, Auditor General, Chief Compliance Officer, Agency Ethics Officer, or other governmental agencies. Failure to so cooperate will subject an Employee to appropriate disciplinary penalty, up to and including dismissal.

### Section 1.08 Mandatory Ethics Training

Employees subject to the financial disclosure requirements of Section 6.01 of this Code must complete a comprehensive ethics training course within three months of becoming subject to that requirement.

Employees subject to the financial disclosure requirements and such other Employees as may be determined by their Agency Ethics Officer or Ethics Committee are required to attend continuing ethics training every three years.

### Section 1.09 Certifications

Employees upon hire must certify to the MTA Code of Ethics by signing an Acknowledgment Form. Additionally, Employees are required to annually sign a certification attesting to their familiarity with the MTA Code of Ethics.

### Chapter 2: Gifts, Awards, and Honoraria

#### Section 2.01 Gift Prohibition – Zero Tolerance

Employees are prohibited from soliciting or receiving Gifts, directly or indirectly, from any Prohibited Source. The defined term "Gift" does not include items of truly nominal value. **(See definitions of "Gifts" and "Items of Nominal Value.")**

However, Employees may accept Gifts from employees of a Prohibited Source if these Gifts are reflective of a personal relationship independent of the relationship between the Prohibited Source and the MTA. For example, if the sibling of an MTA Agency Employee worked for a Prohibited Source, the MTA Agency

CONFIDENTIAL

NYCTA 000133

Employee could nonetheless accept a Gift that reflects this personal relationship. In addition, an Employee can accept a modest, reasonable, and customary offering on an extraordinary occasion, such as a wedding, retirement, funeral, or serious illness. A Gift shall not be considered representative of a personal relationship, if the donor seeks to charge or deduct the value of the Gift as a business expense or seeks reimbursement from a Prohibited Source or when gifts from the same Prohibited Source are offered to multiple Employees at or about the same time.

Employees are permitted to accept discounts or special offers from a Prohibited Source so long as those discounts or special offers are generally available to similarly situated employees of other public and private sector organizations. Employees should check with their Agency Ethics Officer before accepting such discounts or special offers from a Prohibited Source.

Under no circumstances may an Employee accept an item, even an Item of Nominal Value, under circumstances in which it could be reasonably inferred that the item was intended to influence the Employee, or could reasonably be expected to influence the Employee, in the performance of the Employee's official duties or was intended as a reward for any official action on such Employee's part.

**Reminders:**

(a)   Employees should avoid accepting numerous items of nominal value from the same Prohibited Source because their aggregate value is likely to exceed the nominal threshold. The MTA will aggregate the value of items received from the same Prohibited Source in any 12-month period.

(b)   Accepting Gifts in connection with the performance of official duties from persons or entities *other than* Prohibited Sources could still be a violation of State law and this Code, if it could be reasonably inferred that the Gift was intended to influence the Employee, or could reasonably be expected to influence the Employee, in the performance of the Employee's official duties or was intended as a reward for any official action on such Employee's part.

(c)   Proof that an Employee was actually influenced by a Gift is not necessary for a finding of a violation of this Code or State Ethics Law.

(d)   Employees should use caution in accepting such items they believe are of nominal value because it may not always be easy to determine if an item is truly of nominal value.

(e)   An Employee may not designate a friend, Family Member, or entity (such as

CONFIDENTIAL

## Chapter 4: Conflicts Of Interest, Other Employment, and Political Activities



**Section 4.01 Conflicts of Interest/Recusal**

### Conflict of Interest

Employees shall not have any interest, personal, financial or otherwise, direct or indirect, or engage in any business or transaction or professional activity or incur any obligation of any nature, which is or may be in conflict with the proper discharge of his or her duties.

Employees must notify their Agency Ethics Officer or Ethics Committee directly regarding any possible Conflict of Interest.

Employees must not only avoid Conflicts of Interest with the MTA but also even the appearance of a conflict.

**Reminders:**

(a)  If an Employee is uncertain as to whether a given situation creates a real or apparent Conflict of Interest, such Employee should promptly disclose that situation to, and seek guidance from, his or her supervisor, Department Head, the applicable Agency Ethics Officer or Ethics Committee, or MTA Chief Compliance Officer.

(b)  With respect to all work an Employee performs, such Employee must be vigilant about the existence of any circumstances, interests, or relationships which might create or might be reasonably perceived by others as constituting a Conflict of Interest. If an Employee is uncertain as to whether a given situation creates a real or apparent Conflict of Interest, such Employee must promptly disclose that situation to, and seek guidance from, such Employee's Agency Ethics Officer, Ethics Committee, or MTA Chief Compliance Officer. In order to avoid a Conflict of Interest or the appearance of one, it may be necessary for Employees to seek recusal from involvement with a matter creating the Conflict of Interest or the appearance of a Conflict of Interest. Employees must adhere strictly to the Conflict of Interest guidance they receive from their applicable Agency Ethics Officer or Ethics Committee.

> **Examples:** It could be a Conflict of Interest if an Employee participated in a transaction involving an MTA Agency in which transaction the Employee or someone associated with the Employee (Family Member

CONFIDENTIAL

# ─ALL-AGENCY CODE OF **ETHICS**─

or by a Business or financial relationship) had, directly or indirectly, a financial or other private interest (other than a de minimis financial interest as discussed in Section 4.04 below).

It could be a Conflict of Interest if an Employee participates in a transaction or business decision in their official capacity involving someone with whom they have a personal relationship.

**Recusal**

If an Employee believes he or she has an actual or apparent Conflict of Interest involving the MTA on a particular matter, the Employee shall not participate in the matter pending a determination by their Agency Ethics Officer. Recusals are at the Agency's discretion and shall be approved only if practical and in the best interests of the applicable MTA Agency.

The recusal requires that the Employee not participate directly or indirectly in any discussion or decision that in any way relates to the matter that gives rise to the Conflict of Interest.

The recusal must be in writing and contain:

(a)   The nature of the actual or apparent Conflict of Interest;

(b)   A delegation of authority to a non-subordinate employee;

(c)   Any requirements and conditions of the recusal;

(d)   The period of time the recusal will remain in effect;

(e)   The approval of the Agency Ethics Officer; and

(f)   The concurrence of the Chief Compliance Officer.

A copy of the recusal must be sent to all employees who are likely to work on the matter giving rise to the recusal.

**Section 4.02 Public Trust**

(a)   Employees shall not engage in a course of conduct that will raise suspicion among the public that they are likely to be engaged in acts that are in violation of the public trust. Employees shall avoid even the appearance that they can be improperly (1) influenced in the performance of their official duties or (2) induced to violate the public trust or impair

> *"Employees shall not engage in a course of conduct that will raise suspicion among the public that they are in violation of the public trust."*

NYCTA 000136

# ——ALL-AGENCY CODE OF **ETHICS**——

they directly or indirectly supervise or manage to work for or with them as full-time, part-time, or temporary employees or as consultants in any outside business entity.

### Section 8.03 Financial Transactions between Employees

MTA managers and supervisors are prohibited from engaging in financial transactions with Employees whom they directly or indirectly supervise or manage. MTA managers and supervisors may not obtain or use or attempt to use the credit of any Employee whom they directly or indirectly supervise or manage as applicant, maker, co-signer, or endorser of any credit instrument in any connection with a loan or similar transaction.

### Section 8.04 Prohibition Against the Use of MTA Property

MTA's names, logos, supplies, equipment, computer resources, personnel, and other resources may not be utilized for non-governmental purposes, including for personal purposes or for outside activities of any kind except as may be specifically authorized herein:

a)  Official stationery may not be used for non-governmental purposes, nor may MTA resources be used to mail personal correspondence. The designation "personal" on MTA Agency stationery means only that the contents are meant for the personal viewing of the addressee and not that the sender is acting unofficially. All letters and other written materials printed on such official stationery are considered official, and thus the designation "unofficial" has no meaning and may not be used

b)  Under no circumstances may MTA mail, postage, internal office mail, or inter city couriers be used for non-governmental purposes.

c)  MTA telephones may not be used for non-governmental long distance calls, except for toll free calls, collect calls, and calls billed to a personal telephone number. MTA telephones may be used for incidental and necessary personal local calls that are of limited number and duration and do not conflict with the proper exercise of the duties of the Employee.

d)  MTA computer resources may be used for incidental and necessary personal purposes, such as sending personal electronic mail messages, provided that such use is in a limited amount and duration and does not conflict with the proper exercise of the duties of the Employee. (See MTA Computer Usage and Social Media Policy Directive)

NYCTA 000137

PUBLIC OFFICERS LAW
ARTICLE 4.  POWERS AND DUTIES OF PUBLIC OFFICERS

NY CLS Pub O § 73  (2008)

§ 73.  Business or professional activities by state officers and employees and party officers

1. As used in this section:

(a) The term "compensation" shall mean any money, thing of value or financial benefit conferred in return for services rendered or to be rendered. With regard to matters undertaken by a firm, corporation or association, compensation shall mean net revenues, as defined in accordance with generally accepted accounting principles as defined by the state ethics commission or legislative ethics committee in relation to persons subject to their respective jurisdictions.

(b) The term "licensing" shall mean any state agency activity, other than before the division of corporations and state records in the department of state, respecting the grant, denial, renewal, revocation, enforcement, suspension, annulment, withdrawal, recall, cancellation or amendment of a license, permit or other form of permission conferring the right or privilege to engage in (i) a profession, trade, or occupation or (ii) any business or activity regulated by a regulatory agency as defined herein, which in the absence of such license, permit or other form of permission would be prohibited.

(c) The term "legislative employee" shall mean any officer or employee of the legislature but it shall not include members of the legislature.

(d) The term "ministerial matter" shall mean an administrative act carried out in a prescribed manner not allowing for substantial personal discretion.

(e) The term "regulatory agency" shall mean the banking department, insurance department, state liquor authority, department of agriculture and markets, department of education, department of environmental conservation, department of health, division of housing and community renewal, department of state, other than the division of corporations and state records, department of public service, the industrial board of appeals in the department of labor and the department of law, other than when the attorney general or his agents or employees are performing duties specified in section sixty-three of the executive law.

(f) The term "representative capacity" shall mean the presentation of the interests of a client or other person pursuant to an agreement, express or implied, for compensation for services.

(g) The term "state agency" shall mean any state department, or division, board, commission, or bureau of any state department, any public benefit corporation, public authority or commission at least one of whose members is appointed by the governor, or the state university of New York or the city university of New York, including all their constituent units except community colleges of the state university of New York and the independent institutions operating statutory or contract colleges on behalf of the state.

1

CONFIDENTIAL

NYCTA 000138

(h) The term "statewide elected official" shall mean the governor, lieutenant governor, comptroller or attorney general.

(i) The term "state officer or employee" shall mean:
    (i) heads of state departments and their deputies and assistants other than members of the board of regents of the university of the state of New York who received no compensation or are compensated on a per diem basis;
    (ii) officers and employees of statewide elected officials;
    (iii) officers and employees of state departments, boards, bureaus, divisions, commissions, councils or other state agencies other than officers of such boards, commissions or councils who receive no compensation or are compensated on a per diem basis; and
    (iv) members or directors of public authorities, other than multi-state authorities, public benefit corporations and commissions at least one of whose members is appointed by the governor, who receive compensation other than on a per diem basis, and employees of such authorities, corporations and commissions.

(j) The term "city agency" shall mean a city, county, borough or other office, position, administration, department, division, bureau, board, commission, authority, corporation or other agency of government, the expenses of which are paid in whole or in part from the city treasury, and shall include the board of education, the board of higher education, school boards, city and community colleges, community boards, the New York city transit authority, the New York city housing authority and the Triborough bridge and tunnel authority, but shall not include any court or corporation or institution maintaining or operating a public library, museum, botanical garden, arboretum, tomb, memorial building, aquarium, zoological garden or similar facility.

(k) The term "political party chairman" shall mean:
    (i) the chairman of the state committee of a party elected as provided in <u>section 2-112 of the election law</u> and his or her successor in office;
    (ii) the chairman of a county committee elected as provided in <u>section 2-112 of the election law</u> and his or her successor in office from a county having a population of three hundred thousand or more or who receives compensation or expenses, or both, during the calendar year aggregating thirty thousand dollars or more; and
    (iii) that person (usually designated by the rules of a county committee as the "county leader" or "chairman of the executive committee") by whatever title designated, who pursuant to the rules of a county committee or in actual practice, possesses or performs any or all of the following duties or roles, provided that such person was elected from a county having a population of three hundred thousand or more or was a person who received compensation or expenses, or both, from constituted committee or political committee funds, or both, during the reporting period aggregating thirty thousand dollars or more:
    (A) the principal political, executive and administrative officer of the county committee;
    (B) the power of general management over the affairs of the county committee;
    (C) the power to exercise the powers of the chairman of the county committee as provided for in the rules of the county committee;
    (D) the power to preside at all meetings of the county executive committee, if such a committee is created by the rules of the county committee or exists de facto, or any other committee or subcommittee of the county committee vested by such rules with or having de facto the power of general management over the affairs of the county committee at times when the county committee is not in actual session;

2

CONFIDENTIAL

NYCTA 000139

goods or services having a value in excess of twenty-five dollars to any state agency, or (ii) contract for or provide such goods or services with or to any private entity where the power to contract, appoint or retain on behalf of such private entity is exercised, directly or indirectly, by a state agency or officer thereof, unless such goods or services are provided pursuant to an award or contract let after public notice and competitive bidding. This paragraph shall not apply to the publication of resolutions, advertisements or other legal propositions or notices in newspapers designated pursuant to law for such purpose and for which the rates are fixed pursuant to law.

(b) No political party chairman of a county wholly included in a city with a population of more than one million, or firm or association of which such person is a member, or corporation, ten per centum or more of the stock of which is owned or controlled directly or indirectly by such person, shall (i) sell any goods or services having a value in excess of twenty-five dollars to any city agency, or (ii) contract for or provide such goods or services with or to any private entity where the power to contract, appoint or retain on behalf of such private entity is exercised directly or indirectly, by a city agency or officer thereof, unless such goods or services are provided pursuant to an award or contract let after public notice and competitive bidding. This paragraph shall not apply to the publication of resolutions, advertisements or other legal propositions or notices in newspapers designated pursuant to law for such purpose and for which the rates are fixed pursuant to law.

(c) For purposes of this subdivision, the term "services" shall not include employment as an employee.

5. No statewide elected official, state officer or employee, individual whose name has been submitted by the governor to the senate for confirmation to become a state officer or employee, member of the legislature or legislative employee shall, directly or indirectly [fig 1] :

(a) solicit, accept or receive any gift having more than a nominal value [fig 1] , whether in the form of money, service, loan, travel, lodging, meals, refreshments, entertainment, [fig 2] discount, forbearance or promise, or in any other form, under circumstances in which it could reasonably be inferred that the gift was intended to influence him, or could reasonably be expected to influence him, in the performance of his official duties or was intended as a reward for any official action on his part. No person shall, directly or indirectly, offer or make any such gift to a statewide elected official, or any state officer or employee, member of the legislature or legislative employee under such circumstances.

(b) solicit, accept or receive any gift, as defined in section one-c of the legislative law, from any person who is prohibited from delivering such gift pursuant to section one-m of the legislative law unless under the circumstances it is not reasonable to infer that the gift was intended to influence him; or

(c) permit the solicitation, acceptance, or receipt of any gift, as defined in section one-c of the legislative law, from any person who is prohibited from delivering such gift pursuant to section one-m of the legislative law to a third party including a charitable organization, on such official's designation or recommendation or on his or her behalf, under circumstances where it is reasonable to infer that the gift was intended to influence him.

4

CONFIDENTIAL

NYCTA 000140

# EXHIBIT E

CONFIDENTIAL

NYCTA 000141

**HARRIS BEACH** PLLC
ATTORNEYS AT LAW

June 19, 2020

677 BROADWAY, SUITE 1101
ALBANY, NEW YORK 12207
518.427.9700

**KARL J. SLEIGHT**
MEMBER
DIRECT:    518.701.2716
FAX:       518.427.0235
KSLEIGHT@HARRISBEACH.COM

Via Certified Mail
and Email at david.farber@nyct.com

David Farber, General Counsel
MTA NYC Transit
130 Livingston Plaza
12 the Floor
Brooklyn, NY 11201

> RE:    Amelia Yehoshua, Executive Agency Counsel
>        Your File: DAN No. 20-6314-0003

Dear Mr. Farber:

Please be advised that I have recently been retained to represent Amelia Yehoshua in connection with the Notice of Disciplinary Charges ("Notice") dated June 12, 2020.

As an initial matter, given my recent retention as counsel I would request that the deadline for responding to the allegations contained in the Notice be extended until July 24, 2020. The current deadline is June 30, 2020.

In addition, please take any and all necessary steps to ensure that all records related to Ms. Yehoshua and the allegations contained in the Notice are preserved and secured. "Record" should be broadly construed and be consistent with the definition of "record" as set forth in Public Officers Law §86 subdivision (4), and shall mean any information kept, held, filed, produced or reproduced by, with or for an agency, in any physical form.

If you have any questions regarding this matter, please do not hesitate to contact me.

Very truly yours,

HARRIS BEACH PLLC

Karl J. Sleight

KJS:dlc

CONFIDENTIAL

NYCTA 000142

# EXHIBIT F

CONFIDENTIAL

NYCTA 000143

# HARRIS BEACH ⅏

ATTORNEYS AT LAW

June 26, 2020

677 BROADWAY, SUITE 1101
ALBANY, NEW YORK 12207
518.427.9700

**KARL J. SLEIGHT**
MEMBER
DIRECT:   518.701.2716
FAX:       518.427.0235
KSLEIGHT@HARRISBEACH.COM

*Via Email at david.farber@nyct.com*

David Farber, General Counsel
MTA NYC Transit
130 Livingston Plaza
12th Floor
Brooklyn, NY 11201

      RE:   Amelia (Zweck) Yehoshua
             Your File: DAN No. 20-6314-0003

Dear Mr. Farber:

On June 19, 2020 I sent you a letter regarding the above-captioned matter seeking an extension until July 24, 2020 to respond to the Notice of Disciplinary charges ("Notice") seeking to terminate my client, Ms. Yehoshua. Thereafter I received a communication from Robert Drinan regarding the matter and have had several conversations with him regarding the situation.

On the issue of an extension, I was told by Mr. Drinan that in order to receive an extension it would be necessary for my client to use vacation leave days equal to the time sought for the extension.

Although I have never heard of a State agency utilizing such a rule, we are requesting that Ms. Yehoshua have until July 6, 2020 to file a response to the Notice. Given that the original deadline was June 30, 2020, Ms. Yehoshua will use three vacation days for July 1, 2, and 3. As you are likely aware, Ms. Yehoshua has been working predominantly from home due to the Covid-19 public health crisis.

Please advise if this is satisfactory and confirm the extension under the rule we have been advised is customary under the policies of the NYCT.

Thank you.

           Very truly yours,

           HARRIS BEACH PLLC

           Karl J. Sleight

CONFIDENTIAL

NYCTA 000144

June 19, 2020
Page 2

**HARRIS BEACH** PLLC
ATTORNEYS AT LAW

KJS/dlc

cc:    Kim Moore-Ward, V.P. Labor Relations, NYC Transit
(Via email kim.moore-ward@nyct.com)

Robert Drinan (via email at Robert.Drinan@nyct.com)

CONFIDENTIAL

NYCTA 000145

# EXHIBIT G

CONFIDENTIAL

NYCTA 000146

| RESULT | DATE | NAME OF CASE | File number | Index Number |
|---|---|---|---|---|
| Settled after trial $148k | 10/17/2013 | Nedrit Uzunbekiroglu | BU-2010-04-16-08-001 | NY Supreme 111493/10 |
| **Defense Verdict** | 11/8/2013 | Nancy Marshak & Leslie Marshak | BU 2002-07-10-18-001 | NY Supreme 109345/05 |
| **Defense Verdict** | 2/6/2014 | Carmen Camacho | BU 2009-03-21-0010 | Bronx Supreme 308612/2009 |
| **Defense Verdict** | 7/30/2014 | William Tate-Mitros | BU 2008-01-21-14-001 | NY Supreme 112752/2008 |
| Settled before trial $25k | 2/24/2015 | Jane Taylor | TA 2009-10-15-27-001 | NY Supreme 101024/2010 |
| Settled before trial $21k | 4/4/2015 | Ralph Miller | TA 2006-04-26-16-001 | NY Supreme 109764/2006 |
| $100K Verdict | 5/21/15 | Darnell Moore | TA 2006-04-07-0011-001 | NY Supreme 400038/08 |
| Settled during trial $20k | 6/24/2015 | Joy Williams | TA 2009-12-26-05-001 | NY Supreme 109618/10 |
| Verdict after post-trial motions $3,250 | 12/14/2015 | Laura Maymi | BU 2010-04-02-20-001 | NY Supreme 113382/2010 |
| Settled before trial $50k | 10/18/2016 | Dwayne Morgan | TA 2012-02-15-0016-001 | NY Supreme 156452/2013 |
| **Defense Verdict** | 12/16/2016 | Omar Valle | TA 2010-02-28-10-001 | NY Supreme 109486/2010 |
| Settled before trial $7k | 5/2/2017 | Monique Berry | BU 2013-10-21-22-001 | NY Supreme 155217/2014 |
| Settled during trial $50k | 5/11/2017 | Gerald Douglas Novel | TA 2009-10-27-21-001 | NY Supreme 108447/2010 |
| Settled During Trial $30k | 11/3/2017 | Juan Pablo Osorio | BU 2010-10-06-10-001 | NY Supreme 113839/11 |
| $110k Settled after trial during appellate conf. | 12/15/2017 | Maria Garcia | TA 2012-06-29-04-001 | NY Supreme 157482/2012 |
| Settled before trial $35k | 2/22/2018 | Richard Daniel Melendez | BU 2012-04-21-14-001 | NY Supreme 155386/2012 |
| **Defense Verdict** | 3/28/2018 | Jolanta Stec | TA 2013-02-05-14-001 | NY Supreme 157494/2013 |
| **Defense Verdict** | 11/8/2018 | Natalya Rudyak | TA 2015-07-2000-10-001 | NY Supreme 150022/2016 |
| Settled during trial $50k | 12/3/2018 | Samuel Walton | TA 2012-12-28-17-001 | NY Supreme 161930/2013 |
| **Defense Verdict** | 2/25/2019 | Linda Parker | BU 2012-06-10-07-001 | NY Supreme 158173/2013 |
| $20k Settled during trial | 3/14/2019 | Patricia Ewing | BU 2012-05-09-01-001 | NY Supreme 157051/2013 |

CONFIDENTIAL

| Defense Verdict | 6/25/2019 | Jonathan Chinn | TA 2013-12-14-32-001 | NY Supreme 156841/2014 |
|---|---|---|---|---|
| Defense Verdict | 7/26/2019 | Quintin Lowther | BU 2012-11-07-09-001 | NY Supreme 451217/2013 |
| **Mistrial** during plaintiff's opening statements | 8/27/2019 | Constantine Korelis | TA 2013-02-14-0001-001 | NY Supreme 150101/2014 |
| Settled during opening statements $45k | 10/31/2019 | Vivian Jones | TA 2012-03-11-002-001 | NY Supreme 150636/2013 |
| Defense Verdict | 12/24/2019 | Stephanie Adika | BU 2012-04-22-0007-001 | NY Supreme 156526/2012 |
| Defense Verdict | 3/4/2020 | Jeffrey Emmanuel | BU 2016-07-25-0013-001 | Kings Supreme 500383/2017 |

CONFIDENTIAL

# EXHIBIT H

CONFIDENTIAL

NYCTA 000149

**Yehoshua, Amelia**

| | |
|---|---|
| **From:** | Yehoshua, Amelia |
| **Sent:** | Monday, July 8, 2019 12:21 PM |
| **To:** | Yehoshua, Yehezkel |
| **Subject:** | Re: Defense Verdicts-New York/Bronx |

**From:** Goode, Y. Gail
**Sent:** Monday, July 8, 2019 10:52 AM
**To:** Law - Torts <LTORTS@NYCT.com>
**Subject:** FW: Defense Verdicts-New York/Bronx

Good morning all,

I am happy to report that there have been two defense verdicts in the past week.    Both cases were successfully tried to verdict respectively by in-house counsel Amelia Dweck and Tanisha Byron.

**New York**
On December 14, 2013, Plaintiff 42-years-old, entered the Broadway/Lafayette subway station with his wife.  The P claimed that after entering the system, and descending the staircase that led to the platform, he slipped on water.  The  P testified at trial water was streaming down the walls and there was a puddle on the step that he slipped on.  During cross-examination, P testified that although he had a clear view of the staircase, he did not see the water before the incident.  P did not notice the water until after he slipped and landed on the step.  The P conceded that no one else slipped down the stairs on the day of the incident.  The P's expert engineer testified that the water came from the scrubber room and bathroom that were located directly over the staircase.  The Defendant pointed out on cross-examination, that the expert never saw any pictures that depicted the alleged condition.  Moreover, on the day that the expert conducted his inspection, some 8 years later, there was no water in the scrubber room or on the staircase in question.  However, the D argued that on the day of the incident, it had continuously snowed.  P conceded on cross-examination, that when he woke up it was snowing.  It was also snowing when the P entered the system.  The D's maintenance records however showed that there was a leaking  water condition the day before the incident.  Weather reports that were entered into evidence by the D however, showed that it began snowing at 6:00 am and continued snowing until the time of the incident.  This was a reported accident, and P was removed from the scene by ambulance

On the day of the incident, P was treated at NY Presbyterian Hospital.  P complained of right shoulder and left leg pain. X-rays conducted at the hospital revealed no broken bones, but P did sustain a torn patellar tendon in the left knee.   Ten days after the incident, P underwent surgery to the left knee.  After the surgery P wore a knee brace for several months.  P also had extensive physical therapy after the surgery.   At the time of the incident P worked freelance as an audio engineer.  Since the incident. P has been hired full-time by Sony.

In-house counsel Amelia Dweck tried the case against a successful seasoned litigator.
Plaintiff's counsel never lowered his demand from $950k.   Due to plaintiff's counsel's unreasonable demand, Borough Chief Weslii Khahaifa never put any money on the file.  Senior Trial Investigator Adrian Thompson assisted in the trial preparation and Senior Claims Examiner Matt Vetri gathered all the in-house documents during discovery.

1

CONFIDENTIAL

**The Bronx**

Plaintiff 32-years-old on October 30, 2014, was a passenger on a BX42 bus. The P was thrown out of her seat when the bus stopped short due to an unidentified car adjacent to the left side of the bus, making a sudden sharp right turn in front of the bus. The bus video corroborates the B/O's version of the event. P was removed to Jacobi Hospital via ambulance after the incident. The P complained of right wrist and shoulder pain. X-rays revealed distal radius fracture in the wrist and an anterior labral tear on right side. P is right hand dominant. The fracture of the wrist was casted, but P underwent arthroscopic surgery to the shoulder.

Plaintiff's counsel prosecuted the case under the theory that the B/O failed to see what there was to be seen. The B/O testified that he was just pulling out of a bus stop just before the incident. The B/O knew that there were cars to his left. Thus, the B/O should have made sure he had a clear path before pulling out of the bus stop. The D argued that the B/O made a proper stop and pulled out of the bus stop and was going to move left into the travel lane, when suddenly an unidentified vehicle pulled over into the bus's lane. The B/O had no choice but to make an emergency stop.

The D also argued that P's surgery to her shoulder was unnecessary. Prior to the incident, P was employed as a visiting care giver. During the cross-examination of P's surgeon, the D highlighted the MRI films showed degenerative changes to the shoulder. The degeneration was consistent with P's duties as a care giver. P regularly lifted patients as part of her duties.

In-house counsel Tanisha Byron persuaded a Bronx jury to unanimously find that the B/O was not negligent in the operation of the bus.   Genieva Jones was the perfect Bronx P, young, very attractive, and hardworking, The P asked the jury for a total award of 500k. Prior to the trial the P demanded 475k, but at the time of trial, P lowered her demand to 175k. Borough Chief Marie Stanley authorized 100k to settle the matter.

As we know the Bronx is the toughest borough for defendants to win cases. That being said all hands were on deck in assisting Tanisha with her victory.

Thanks
Marie Stanley
Tyrone Lyons
Roselio Recio
Kizzy Gonzalez-Burgos
Jessica Acosta-PettyJohn
Alexandra Vandoros

2

CONFIDENTIAL

NYCTA 000152

Tel #718-694-3885

Fax #718-694-1023

Email: *Amelia.Dweck@nyct.com*

**From:** Goode, Y. Gail
**Sent:** Tuesday, December 15, 2015 5:32 PM
**To:** Bonnick, Sandra; Cheng, Samuel; Correa, Haydee; Glasgow, Wayne; Greenstein, Adam; HANNEY, BRIAN; Henderson, Lynne; Moore, Trina; Parker, Daryl; Redmond-Smith, Celeste; Yehoshua, Amelia
**Subject:** FW: Verdicts

**From:** Goode, Y. Gail
**Sent:** Tuesday, December 15, 2015 5:19 PM
**To:** Silverberg, David; O'shea, Barbara; diGuida, Jamileh-Sofia; Sasso, Paul; Bonett-Waters, Miriam; Frazier, Gerald; Khahaifa, Weslii; Sasso, Paul; Stanley, Marie; Urbont, Lisa; Ehrlich, Sherri; George, Gregory; O'shea, Barbara; Reid-Green, Dawn; Ader, Howard; Daniels, Michael; Herrera, George; London, Marion; Santos, Pilar; Alston, Calvin; Braxton, Anthony; Conti, Dominick; Coppola, James; Davis, Sean A.; Delgado, Robert; Febbraio, Charles; Feliz, Francisco; Julien, Veronica H.; Killings, Stacey; Laws, Franklin; Mendelson, Alan; Mobyed, Robert; Petrus, Gregory; Ramos-Lima, Lilly; Rattigan, Roddie; Reyes-Robinson, Lina; Rizzo, Rosario; Thompson, Adrian; Vetri, Matthew; Williams, Felix
**Cc:** Heisler, Lawrence; Murphy, Theresa
**Subject:** Verdicts

Hello all,

It looks like the Authority has been good this year.   In the last week we had three excellent verdicts.

CONFIDENTIAL

**Samuel Cheung**  convinced a Queens jury that although a slab of concrete located outside a subway station was unsafe, the Authority was not negligent.  Unfortunately, it may be an inconsistent verdict.   The second question on the verdict sheet should have been, "Was the unsafe condition a substantial factor that caused the accident?"  Assuming the jury answered no, there is no inconsistency with the verdict.   The  Court may be set aside the verdict and the case thereafter will be settled for a reasonable amount.  Nevertheless,  although Michael Russo  was a seasoned ,honorable and worthy adversary, he was no match for Sam's outstanding litigation skills and  that's why the jury returned a verdict for the Authority.

Despite going up against a judge that attempted to try the case from the bench and an adversary where the adjective honorable is rarely used, **Amelia Dweck**  successfully defended the Authority.
In a unreported case the P claimed that the doors of a bus closed on her shoulder as she attempted to exit the vehicle.   Between the Judge and P's counsel, the rules of evidence did not exist and the  Court consistently ruled against the Authority.  Amelia however was undeterred and remained steadfast in the ultimate goal of defending the Authority.   Although there were a few crunchy granola types on the  jury,  they found 50 percent comparative fault against the Plaintiff.  Thereafter, the jury awarded P $ 6,500.00 for past pain and suffering, 0 for future pain and suffering, $35,000.00 for lost earnings, and $3,500.00 for medical expenses.  However, since this is No-Fault case and  the P's earnings and medical expenses did not exceed 50k, the P will receive ½ of $ 6,500.00, for  a grand total of $ 3, 250.00.  This was a 4 week trial, well done Amelia.

Finally,  outside counsel **Toni Sciretta** also garnered a defendant's verdict in Richmond County.   The jury found that the Authority was not negligent after a collision with another bus.

Excellent work by all involved including the trial attorneys, E &P attorneys, claims examiners, and trial investigators.

NYCTA 000153

CONFIDENTIAL

**Yehoshua, Amelia**

| | |
|---|---|
| **From:** | Goode, Y. Gail |
| **Sent:** | Thursday, March 29, 2018 12:14 PM |
| **To:** | Cheng, Samuel; Khahaifa, Weslii; Stanley, Marie; Urbont, Lisa; Ehrlich, Sherri; Fisch, Marla; Granata, Jerry; Reid-Green, Dawn; di Guida, Jamileh-Sofia; O'shea, Barbara; Ervolina, Anna; George, Gregory; O'Shaughnessy, Timothy; Wong, Harriet; Acosta-PettyJohn, Jessica; Berkowitz, David; Berkson, James; Cahn, Jennifer; Chang, Peter; Charles, Alice; Chenn, June-Annette; Comerford, Sean; Connolly, Mark; Correa, Haydee; Estess, Alison; Fairley, Matthew; Falcon, Elias; FINKEL, MATTHEW; FRAIL, KIERAN; Goldberg, Tracy; Joseph-St Bernard, Jamila; Maltser, Yury; Okoh, Okwede; Philip, Amanda; Rapisardi, Daniela; Rizzo, Ronald; Rozza, Denise; Seltzer, Michael; Shufer, Jane; Uddoh, Humphrey; Wagner, Steven; Wetstone, Channon; Wu, Melissa; Zentz, Michael; Bonnick, Sandra; Byron, Tanisha; Coyne, Jennifer; Glasgow, Wayne; Greenstein, Adam; Jerman, John; Parker, Daryl; Redmond-Smith, Celeste; Regan, Regina; SINHA, URVASHI; Vandoros, Alexandra; Yehoshua, Amelia; Boutros, Nancy; Gonzalez-Burgos, Kizzy; Greene, Donna; LABOSSIERE, STEPHANIE; LEE, MARCELLA; Ramsay, David; Toibman, Anne; WAITE, NICOLE; Wiggins, Brooke; Daniels, Michael; Herrera, George; London, Marion; Sasso, Paul; Recio, Roselio; Santos, Pilar; Ader, Howard; Braxton, Anthony; Charles, Michelle; Davis, Sean A.; Delgado, Robert; Febbraio, Charles; Feliz, Francisco; Jones, Jamel; Julien, Veronica H.; Killings, Stacey; Lyons, Tyrone; Mobyed, Robert; Monroe, John; Murray, Christina; Petrus, Gregory; Ramos-Lima, Lilly; Rattigan, Roddie; Reyes-Robinson, Lina; Rizzo, Rosario; Thompson, Adrian; Vetri, Matthew; Waithe, Flagan; Williams, Felix; Zager, Brandon |
| **Cc:** | Heisler, Lawrence |
| **Subject:** | NY County Defense Verdict/Amelia Dweck |

Good news,

A NY County jury found that the TA had notice of a defective subway step, but the defect was the not the substantial factor for P's fall.  The 68-year-old P claimed she tripped and fell at the 14th Street subway station on 7th Avenue.  As P walked down the platform staircase, she lost her footing because of missing concrete on the top of the stair.  P a cleaning lady was coming home from work at the time of the incident.  She was familiar with the station and had never observed the defect prior to the incident.  After P was removed from the station by ambulance, a station supervisor inspected the area and noted no defects.  As result of the incident, P fractured her left shoulder which was repaired by ORIF.  Both P's doctor and D's doctor agreed, that since the incident, P has limited range of motion in the left shoulder. In-house attorney **Amelia Dweck tried the case for the Authority.**   During settlement negotiations, senior trial counsel for Switzer's firm would not take less than 7 figures to settle the matter.  Borough Chief Weslii Khahaifa never moved off the 50k offer,

CONFIDENTIAL

NYCTA 000154

Senior attorney Jane Shufer oversaw the pre-trial litigation and senior investigator Felix Williams gathered all pertinent documents for trial. Adrian Thompson who remains calm under all circumstances assisted in the trial preparation.

2

CONFIDENTIAL

**Yehoshua, Amelia**

| | |
|---|---|
| **From:** | Goode, Y. Gail |
| **Sent:** | Thursday, May 17, 2018 4:09 PM |
| **To:** | Bonnick, Sandra; Byron, Tanisha; Cheng, Samuel; Correa, Haydee; Coyne, Jennifer; Glasgow, Wayne; Greenstein, Adam; Henry, Kadion; Jerman, John; Parker, Daryl; Redmond-Smith, Celeste; Rozza, Denise; Seltzer, Michael; SINHA, URVASHI; Vandoros, Alexandra; Yehoshua, Amelia; Khahaifa, Weslii; Stanley, Marie; Urbont, Lisa; di Guida, Jamileh-Sofia; O'shea, Barbara |
| **Subject:** | Esprit de Corps |

Once again I would like to recognize NY County's team spirit.  In the last 2 weeks Barbara O'shea has searched for trial attorneys to cover depositions.  There were no outside counsel attorneys available to handle 2 significant cases in King's County.  Amelia Dweck conducted last week's deposition and Jennifer Coyne handled today's fusion deposition.  I would have conducted today's fusion ebt, but I had a meeting at 2 B'way.   Thanks Amelia and Jennifer.   Just remember we are all in the trenches together.


Esprit de Corps is our mantra.

1

CONFIDENTIAL

NYCTA 000156

FW: Verdicts

From: Yehoshua, Amelia (amelia.yehoshua@nyct.com)

To:    acadia7357@yahoo.com

Date:  Tuesday, June 23, 2020, 10:35 AM EDT

**Amelia Dweck, Esq.**

Executive Agency Counsel

New York City Transit Authority

Law Department, Torts Division

130 Livingston Street, Room 1117-h

Brooklyn, New York 11201

Tel #718-694-3885

Fax #718-694-1023

Email: Amelia.Dweck@nyct.com

**From:** Ervolina, Anna
**Sent:** Thursday, December 17, 2015 11:45 AM
**To:** Yehoshua, Amelia <Amelia.Yehoshua@nyct.com>
**Subject:** RE: Verdicts

What a great result!!!!  Congratulations!

CONFIDENTIAL

NYCTA 000157

CONFIDENTIAL

Thanks for sending me the e-mail!

## Anna J. Ervolina

Executive Agency Counsel

Law Department ~ Appeals

**New York City Transit Authority**

130 Livingston Street

Brooklyn, New York 11201

Tel: (718) 694-3853

Fax: (718) 694-5726

Anna.Ervolina@nyct.com

**From:** Yehoshua, Amelia
**Sent:** Thursday, December 17, 2015 11:44 AM
**To:** Ervolina, Anna
**Subject:** FW: Verdicts

See below.

*Amelia Dweck Yehoshua*

Executive Agency Counsel .

New York City Transit Authority

Law Department, Torts Division

130 Livingston Street, Room 1195

Brooklyn, New York 11201

NYCTA 000158

CONFIDENTIAL

NYCTA 000159

**From:** Goode, Y. Gail
**Sent:** Tuesday, December 15, 2015 5:19 PM
**To:** Silverberg, David; O'shea, Barbara; diGuida, Jamileh-Sofia; Sasso, Paul; Bonett-Waters, Miriam; Frazier, Gerald; Khahaifa, Weslii; Sasso, Paul; Stanley, Marie; Urbont, Lisa; Ehrlich, Sherri; George, Gregory; O'shea, Barbara; Reid-Green, Dawn; Ader, Howard; Daniels, Michael; Herrera, George; London, Marion; Santos, Pilar; Alston, Calvin; Braxton, Anthony; Conti, Dominick; Coppola, James; Davis, Sean A.; Delgado, Robert; Febbraio, Charles; Feliz, Francisco; Julien, Veronica H.; Killings, Stacey; Laws, Franklin; Mendelson, Alan; Mobyed, Robert; Petrus, Gregory; Ramos-Lima, Lilly; Rattigan, Roddie; Reyes-Robinson, Lina; Rizzo, Rosario; Thompson, Adrian; Vetri, Matthew; Williams, Felix
**Cc:** Heisler, Lawrence; Murphy, Theresa
**Subject:** Verdicts

Hello all,

It looks like the Authority has been good this year.  In the last week we had three excellent verdicts.

**Samuel Cheung**  convinced a Queens jury that although a slab of concrete located outside a subway station was unsafe, the Authority was not negligent.  Unfortunately, it may be an inconsistent verdict.   The second question on the verdict sheet should have been, "Was the unsafe condition a substantial factor that caused the accident?"  Assuming the jury answered no, there is no inconsistency with the verdict.   The  Court may be set aside the verdict and the case thereafter will be settled for a reasonable amount.  Nevertheless,  although Michael Russo  was a seasoned ,honorable and worthy adversary, he was no match for Sam's outstanding litigation skills and  that's why the jury returned a verdict for the Authority.

Despite going up against a judge that attempted to try the case from the bench and an adversary where the adjective honorable is rarely used, **Amelia Dweck**  successfully defended the Authority.
In a unreported case the P claimed that the doors of a bus closed on her shoulder as she attempted to exit the

CONFIDENTIAL

vehicle.   Between the Judge and P's counsel, the rules of evidence did not exist and the  Court consistently ruled against the Authority.  Amelia however was undeterred and remained steadfast in the ultimate goal of defending the Authority.   Although there were a few crunchy granola types on the  jury,  they found 50 percent comparative fault against the Plaintiff.  Thereafter, the jury awarded P $ 6,500.00 for past pain and suffering, 0 for future pain and suffering, $35,000.00 for lost earnings, and $3,500.00 for medical expenses.  However, since this is No-Fault case and  the P's earnings and medical expenses did not exceed 50k, the P will receive ½ of $ 6,500.00, for  a grand total of $ 3, 250.00.  This was a 4 week trial, well done Amelia.

Finally,  outside counsel **Toni Sciretta** also garnered a defendant's verdict in Richmond County.   The jury found that the Authority was not negligent after a collision with another bus.

Excellent work by all involved including the trial attorneys, E &P attorneys, claims examiners, and trial investigators.

Confidentiality Note: This e-mail, and any attachment to it, may contain privileged and confidential information and is intended for the use of the individual(s) or entity named on the e-mail. Unauthorized disclosure of this message is prohibited. If you have received this message in error, please notify the sender immediately by return e-mail and destroy this message and all copies thereof, including all attachments.

NYCTA 000160

CONFIDENTIAL

**From:** Heisler, Lawrence
**Sent:** Monday, December 14, 2015 8:15 PM
**To:** Henly, James; Goode, Y. Gail; Murphy, Theresa
**Subject:** Maymi v NYCTA S/NY

Another verdict came in two hours ago. Amelia Dweck defended the Authority in a suit where plaintiff alleged she was struck by the back doors of an Authority bus as she was leaving. Jury apportioned liability 50-50, and awarded plaintiff 6500 in gross damages. Plaintiff leaves the table with 3250. Our medical defense was stymied because one of our IME physicians was incarcerated and couldn't show, another was under Federal investigation and didn't want to show. Still, Amelia's attack on plaintiff's expert obviously persuaded the jury.

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

Confidentiality Note: This e-mail, and any attachment to it, may contain privileged and confidential information and is intended for the use of the individual(s) or entity named on the e-mail. Unauthorized disclosure of this message is prohibited. If you have received this message in error, please notify the sender immediately by return e-mail and destroy this message and all copies thereof, including all attachments.

NYCTA 000161

CONFIDENTIAL

FW: Maymi v NYCTA S/NY

From: Yehoshua, Amelia (amelia.yehoshua@nyct.com)

To:    acadia7357@yahoo.com

Date:   Tuesday, June 23, 2020, 10:34 AM EDT

*Amelia Dweck, Esq.*

Executive Agency Counsel

New York City Transit Authority

Law Department, Torts Division

130 Livingston Street, Room 1117-h

Brooklyn, New York 11201

Tel #718-694-3885

Fax #718-694-1023

Email: Amelia.Dweck@nyct.com

**From:** Murphy, Theresa
**Sent:** Tuesday, December 15, 2015 10:02 AM
**To:** Yehoshua, Amelia <Amelia.Yehoshua@nyct.com>
**Subject:** FW: Maymi v NYCTA S/NY

Wow Amelia great job!

NYCTA 000162

# EXHIBIT I

CONFIDENTIAL

NYCTA 000163

Yehoshua, Amelia

| | |
|---|---|
| **From:** | Khahaifa, Weslii |
| **Sent:** | Thursday, February 4, 2016 9:38 AM |
| **To:** | Heisler, Lawrence; Yehoshua, Amelia |
| **Subject:** | Timesheet issue |

Larry,

      I went home last night very upset and I feel compelled to address our conversation about the timesheet issue that was apparently brought to your attention by Amelia Dweck Yehoshua. The timesheet issue that Amelia and I discussed was solely based upon procedure. The one and only issue was whether the late train report excused the 45 minute deficit in her timesheet on 1/15/16, nothing more and nothing less. To now be accused of interfering with her religious observance of the Sabbath is insulting, disappointing and could not be farther from the truth.

      On Friday, 1/29/16. She handed me her timesheet accompanied by a train incident report. Her timesheet indicated that she swiped in at 9:12am, double swiped for lunch and swiped out at 3:33pm and showed a deficit of 45 minutes which was automatically charged as vacation. Amelia wrote on her timesheet "due to signal problems on Q train was delayed 45 minutes". I simply told her that I don't know if a late train report excuses the 45 minute deficit and that I would check with timekeeping as I had never encountered this issue. Subsequently, I spoke with another borough Chief, a former timekeeper and a current timekeeper to determine whether the late train report excuses the deficit. Each of them had the same response: that it doesn't excuse the deficit, it simply allows for the time to be made up at the end of the day. This was relayed to Amelia, who then advised me that it had been done for her previously by Danielle Rutman and that she spoke with her timekeeper Clara McNair, who told her that was the procedure. I then advised her that I would call her Clara on Monday. I also advised her that I would not be initialing the excusal if Clara told me the same as all of the others. At that point, she indicated that she would simply ask you or Gail Goode to sign if I would not. On Tuesday, 2/2/16, I spoke with Clara who confirmed what the others had told me regarding the procedure. Before I returned Amelia's timesheet to her, I sought further guidance on the issue. You were not in your office, so I spoke to Gail Goode. That same evening, after I returned from court, I returned Amelia's timesheet to her and left her a message stating that her timekeeper told me the same thing and that I was not initialing her excusal, but that she should go ahead and submit the train delay report with her timesheet and/or seek yours or Gail's approval as she had already planned. Those are the facts in a nutshell.

      First, I am in disbelief that this story has morphed into the fabricated allegation that I tried to prevent or took issue with Amelia's observance of the Sabbath. I do not, have not and never will take issue with her observance of the Sabbath or anyone else's religious beliefs and customs. She has always been accommodated and she has never had a problem with her timesheet, or otherwise, in this regard. Instead, her early departures are always approved. In fact, this issue did not come up once in any of the conversations that I had with Amelia with regard to this timesheet. So, I don't understand how it went from a procedural issue to a religious accommodation issue.

      Next, I am disappointed, but more so offended, by the way this situation was handled. Instead of being confronted with such an allegation and instead of being notified by you (or by Amelia for that matter) that such an issue existed, you had obviously already made up your mind about what transpired based solely upon whatever was relayed to you by Amelia and I was all but outright accused by you of taking issue with her observance of the Sabbath. I felt attacked and unfairly accused, instead of being questioned about the issue. I have never in the 13 years that I have been working at Transit ever taken issue or been known to have issues with anybody's beliefs or customs and I certainly wouldn't start now. I have never in my life been accused of such egregious behavior and I pride myself on my professional disposition and my unconditional respect for every employee and anyone who knows me will tell you the same. This situation has simply been distorted and blown out of proportion.

1

CONFIDENTIAL

NYCTA 000164

The fact that this timesheet issue happens to involve a Friday does not justify the conversion of this issue from procedure to religion. Had it been any other day of the week, the result would have been the same. You kept indicating that it would have been impossible for her to make up the time and I never told her that she had to. I simply told her that the only effect that the late train report would have was to give her the ability to make up the time. In fact, no matter what day of the week it occurred on she would never be able to make up the time because the issue didn't surface until she submitted her timesheet for that day some 2 weeks after the fact. It's not as if she came to me on 1/15 and advised me that she was late and would have a deficit in her timesheet. As I explained I am simply doing my job and I would have treated this matter the same way for anyone who brought it to me. There was no singling out, discrimination, or failure to accommodate. The fact that I've been so accused and condemned without having had the opportunity to address the allegation and to present my side of this story is disturbing and I am deeply offended.

*Weslii Khahaifa, Esq.*
*Borough Litigation Chief, New York County*
*130 Livingston Street, 11th Fl.*
*Brooklyn, New York 11201*
*(718)694-3991 Telephone*
*(718)694-1023 Fax*

2

CONFIDENTIAL

NYCTA 000165

# EXHIBIT J

CONFIDENTIAL

NYCTA 000166

**Yehoshua, Amelia**

| | |
|---|---|
| From: | Yehoshua, Amelia |
| Sent: | Wednesday, June 10, 2020 11:08 AM |
| To: | Khahaifa, Weslii |
| Cc: | Urbont, Lisa |
| Subject: | RE: timesheet |

Hi Weslii,
May 29th was Shavuot, a Jewish holiday but I did work from home. Since I did not have to take the train to work, I was able to work from home and observe the holiday. I had numerous cases to read on the Korelis case that Jim Berkson gave me, which is what I spent my time doing. That is why I did not put vacation on my timesheet. If I had to take the train to work or prepare a Passover seder, then I would have put vacation on my timesheet. (I did take 4 vacation days for the Passover holiday) Since the synagogues were closed, I could not have any relatives over and I did not have to drive or take the train, there was no reason not to work from home. So I spent the time reading the cases for the Korelis motion. I will send you a Korelis update in a separate email.
Let me know if you have any further questions.
Amelia

**From:** Khahaifa, Weslii <Weslii.Khahaifa@nyct.com>
**Sent:** Wednesday, June 10, 2020 10:24 AM
**To:** Yehoshua, Amelia <Amelia.Yehoshua@nyct.com>
**Cc:** Urbont, Lisa <Lisa.Hodes-Urbont@nyct.com>
**Subject:** timesheet

Hi Amelia,

I am approving timesheets.  Did you take off work on 5/29?  If so, i'm just letting you know that you forgot to indicate it on your timesheet.  Please let me know ASAP so that I can approve your timesheet.

Thanks,


*Weslii Khahaifa, Esq.*

*Borough Litigation Chief, New York County*

*130 Livingston Street, 11th Fl.*

*Brooklyn, New York 11201*

*(718)694-3991.Telephone*

*(718)694-1023 Fax*

CONFIDENTIAL

NYCTA 000167

# EXHIBIT K

CONFIDENTIAL

NYCTA 000168

----- Forwarded Message -----
**From:** Yehoshua, Amelia <amelia.yehoshua@nyct.com>
**To:** acadia7357@yahoo.com <acadia7357@yahoo.com>
**Sent:** Monday, June 22, 2020, 12:15:06 PM EDT
**Subject:** FW: status of cases

---

**From:** Khahaifa, Weslii
**Sent:** Wednesday, January 29, 2020 11:26 AM
**To:** Yehoshua, Amelia <Amelia.Yehoshua@nyct.com>
**Subject:** status of cases

Amelia,

As per our prior conversation with regard to your transfer to the Kings Unit, kindly provide a detailed status (including what is outstanding and any upcoming EBT, hearing and conference dates) of each of your cases that have not already been reassigned.

Thanks,

**Weslii Khahaifa, Esq**.

*Borough Litigation Chief, New York County*

*130 Livingston Street, 11th Fl.*

*Brooklyn, New York 11201*

*(718)694-3991 Telephone*

*(718)694-1023 Fax*

Confidentiality Note: This e-mail, and any attachment to it, may contain privileged and confidential information and is intended for the use of the individual(s) or entity named on the e-mail. Unauthorized disclosure of this message is prohibited. If you have received this message in error, please notify the sender immediately by return e-mail and destroy this message and all copies thereof, including all attachments.

CONFIDENTIAL

# EXHIBIT L

CONFIDENTIAL

NYCTA 000170

**From:** ████
**Sent:** Thursday, November 08, 2018 8:20 PM
**To:** Complaints
**Subject:** New complaint has been sent.
**Attachments:** ████ Ethics problem.pdf; Expert Witness Disclosure.pdf

# COMPLAINT:

**Summary**
Pursuant to an OIG case that was brought in 2013 (document attached), I had been in contact with ████ in ████ capacity as an ████ I was in no way aware that ████ employed by the MTA at any time. My contact with ████ related to a residential construction project where ████ oversaw construction, produced construction documents, and a TR-1 in 2008 and 2009. The project was for a person named Amelia Dweck, also known as Amelia Yehoshua. She works as an attorney for the MTA at 130 Livingston St, Brooklyn, NY 11201-5106, phone number: (718) 694-3885. Because of alleged extremely unethical behavior, I have been involved ████ The case is to begin ████ There is good reason to believe that similar to ████ Mrs. Dweck and her other cohorts are involved with violations to the MTA's code of ethics. Moreover, ████ opposing attorney in the case ████ representing Mrs. Dweck), though not employed by the MTA, has been involved in litigation involving the MTA. We have been advised that the attorney may not actually be getting paid by Mrs. Dweck for ████ services, but may involved in a quid pro quo either receive MTA legal business at Mrs. Dweck's influence as compensation or may be fed leads on litigants against the MTA for which damages or compensation are likely to be paid out. Lastly, Mrs. Dweck and ████ expert witness, ████ is another ████ in the employ of the MTA. The filed Expert Witness Disclosure (attached) containing ████ supposed resume, outlining substantial work and projects in which ████ claims to have been involved while working for the MTA. ████ seems to be in a more senior leadership position than ████ You will notice that on ████ of the filing pdf, ████ advertises ████ as Principal, Owner Chief Operating Officer and Sole Proprietor of ████ A search in the BIS system of the NYC Department of Buildings (Item 19, Registered Architect: ████ brings up over 1,100 filings, of which 57 are of this year alone, it is amazing that ████ has any time left over to do any work at all for the MTA. We do not feel that the MTA has an interest in being an unwitting participant in ████ litigation, at the behest of employees who may be acting inappropriately.
**When:** ████
**Where:** Kings county
**Agency Involved:** NYC Transit Office
**Subject_Target:** Amelia Dweck.

# COMPLAINANT INFORMATION:

OIG may contact me for more information but should withhold my contact information from the agency
**Name:** ████
**Email:** ████
**Phone:** ████
**Street Address:** ████
**City:** Brooklyn
**State:** New York

1

CONFIDENTIAL

NYCTA 000171